Richard S. Busch (SBN 319881)
E-Mail: *rbusch@kingballow.com*
**KING & BALLOW**
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (424) 253-1255
Facsimile: (888) 688-0482
*Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YELLOW ROSE PRODUCTIONS, INC., *a Corporation on behalf of Bill Engvall* <br><br> Plaintiff, <br><br> vs. <br><br> PANDORA MEDIA, LLC, *a limited liability company* <br><br> Defendant. | Case Number: 22-cv-00809 <br><br> **COMPLAINT FOR COPYRIGHT INFRINGEMENT** <br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff YELLOW ROSE PRODUCTIONS, INC., on behalf of Bill Engvall, by and through its attorneys of record, alleges as follows:

## **JURISDICTION**

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as the action arises under the original and exclusive jurisdiction of the federal court and 28 U.S.C. § 1338(a) as the controversy arises under the Copyright Act of 1976 (17 U.S.C. § 101 *et seq.*).

2. This Court has personal jurisdiction over Defendant as discussed fully below.

3. This Court has general personal jurisdiction over Pandora Media, LLC ("Pandora") because Pandora's principal place of business is in Oakland, California, while also having a substantial office in Santa Monica, California, meaning that Pandora is at home in the State of California. Furthermore:

    a. Upon information and belief, through January 28, 2022, Pandora was qualified to do business in California and was registered as a foreign corporation with the California Secretary of State.

    b. Pandora is also registered as a foreign limited liability company with the California Secretary of State.

    c. Pandora's designated DMCA Copyright Agent identified in its "Intellectual Property Policy" on its website is located in California at 2100 Franklin Street, 7th Floor, Oakland, California 94612.

    d. Pandora has previously admitted in other federal court filings that California has jurisdiction over it. *See*, Wixen Music Publishing, Inc. v. Pandora Media, Inc., Case No. 2:19-cv-5278-SVW (C.D. Cal.), Dkt. 15 (Pandora Media, Inc.'s Answer) at ¶¶ 16-17 ("Pandora admits that [it] has availed itself of California law . . . and venue is proper in the [Central District of California]").

4. This Court has specific personal jurisdiction over Pandora because its suit-related conduct creates a substantial connection with the State of California and this Judicial District. YELLOW ROSE PRODUCTIONS, INC., on behalf of Bill Engvall, (hereinafter "Engvall") is a copyright owner of properly registered spoken word literary works (the "Works" or "Engvall's Works") (*see* Exhibit A). Upon information and belief, Pandora has generated substantial revenue from exploitation of the Works in California, as further discussed below:

    a. Pandora actively and purposely does business in California, as evidenced by its (i) subscribers and users in California, which Pandora

2
COMPLAINT FOR COPYRIGHT INFRINGEMENT

actively reaches out to through, at a minimum, its website ([www.pandora.com](www.pandora.com)) and mobile app; (ii) contracts and other transactions that it has entered into in California; (iii) revenue generated from California residents and businesses in connection with its service; and (iv) advertisements that target California residents.

b. Pandora has purposefully availed itself of California law and could and did reasonably anticipate being brought into this Court because, among other reasons, Pandora (i) has been engaged and is engaged in infringing conduct within the State of California and this District, including by knowingly, intentionally, and repeatedly streaming sound recordings and the Works over the Internet to California residents via its services; (ii) knew or should have known that the harm caused by its repeated unlicensed public performance of the Works over the Internet was aimed at comedy writers and comedy publishers, including Plaintiff, who control the Works and are managed and administered in or near Los Angeles County, California, a global hub of the entertainment industry; and (iii) knew or should have known that Plaintiff, an industry leading comedian, actor and comedy writer for nearly 40 years, would suffer, and in fact did suffer, the brunt of the harm caused by Pandora's unauthorized acts in California and around the world.

## VENUE

5. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b), and § 1400(a), as a substantial part of the events or omissions giving rise to the claim occurred in this district, including for example, by the maintenance of Pandora's corporate office in Santa Monica, California. Plaintiff has its principal

place of business in this District and has been injured in this District as a result of Pandora's infringing conduct.

## PARTIES

6. Plaintiff, YELLOW ROSE PRODUCTIONS, INC., represents the intellectual property rights of Bill Engvall, who is an actor, writer, and comedian who resides in Utah. YELLOW ROSE PRODUCTIONS, INC. is a corporation in the care of JP Williams and Jennifer Riker of Parallel Entertainment located at 9696 Culver Boulevard, Suite 308, Culver City, CA 90232.

7. Defendant, Pandora, is a Delaware limited liability company with a principal place of business at 2100 Franklin Street, Suite 700, Oakland, California 94612. According to its website, Pandora maintains another corporate office in California, located at 3000 Ocean Park Boulevard, Suite 3050, Santa Monica, California 90405.

## PRELIMINARY STATEMENT

8. Just as there is with music, there are two copyrights involved in the recorded performance of a literary copyrighted work: a copyright in the sound recording, and a separate copyright in the underlying spoken word composition (Engvall's compositions, as noted, are referred to herein as "the Works" or "Engvall's Works"). Pursuant to 17 U.S.C. §§ 106 and 204 of the Copyright Act of 1976, copyright owners have the exclusive right to, among other things, reproduce, distribute, license, and publicly perform their works. Anyone wishing to obtain the right to do so, must get a license from the respective copyright owner in both of these copyrights, and pay agreed to royalties. The failure to do so constitutes copyright infringement. As discussed below, Pandora not only did not obtain any copyright in Engvall's Works but admitted that it did not do so in Security and Exchange Commission (SEC) filings, and admitted that it would very likely face copyright infringement liability as a result. But Pandora did what most goliaths do:

it decided it would infringe now to ensure it had this very valuable intellectual property on its platform to remain competitive, and deal with the consequences later. Later is now.

## STATEMENT OF FACTS

9. For generations society has turned to comedy as a place of refuge to escape the troubles of their life and view their struggles through a filter of laughter. There's something about watching comedians on stage talking about everyday problems that just transports a person from a place of sadness or frustration to one of hope and happiness, and Bill Engvall is a master at meeting his audience where they're at in life.

10. For the past thirty-four (34) years, Bill Engvall has helped millions of people laugh at everyday situations that would otherwise not be funny. From his early days on *A Pair of Jokers* with Rosie O'Donnell, to the Blue Collar Comedy Tour, which ran for six (6) years, Mr. Engvall has been a natural in the art of comedy, touching on everyday life topics such as marriage, parenting, and of course self-deprecation, which is everyone's favorite.

11. Mr. Engvall, a proud Texan, was named Best Male Standup comedian at the American Comedy Awards in 1992, and his comedy album *Here's Your Sign*, was certified Platinum and peaked at #5 on the Billboard Country album chart. A man of many talents, Mr. Engvall was a semifinalist on *Dancing with the Stars* in 2013, which is not an easy feat, as well as a disc jockey in Dallas Texas, and the game show host of *Lingo* on the Game Show Network.

12. While Mr. Engvall is best known for his stand-up comedy, he has continued to expand his mark in the entertainment world as an actor, appearing in movies such as *Delta Farce* and *Catching Faith*, as well as television shows like *The Golden Palace, Designing Women, Family Guy,* and *Last Man Standing* with his long-time friend Tim Allen.

13. Mr. Engvall's quick wit and easygoing personality, have drawn millions of fans to his comedy tours, and driven them to purchase his albums and watch his music videos. Yet, Defendant took and exploited the Works solely to make money while knowing it had no license and had not paid, and would not be paying, royalties to Mr. Engvall for the Works.

14. According to www.pandora.com, Pandora is the largest digital broadcast and streaming music provider in the U.S. "providing a highly-personalized listening experience to approximately 70 million listeners and users each month" through "its mobile app, the web, and integrations with more than 2,000 connected products."

15. One would think that entertainment giants like Pandora would honor the legacy of such an amazing talent, and instead it has chosen to illegally profit from the creative mind and literary/comedic works of Mr. Engvall.

16. In fact, Defendant has made fifty-one (51) of the Works available for dissemination to the public via their digital broadcast radio service knowing full well that it did not possess a valid license to publicly perform the Works. (*See* Exhibit A). In addition to no license, it also made no royalty payments for the Works. The Works are contained on the albums, "Dorkfish", "Here's Your Sign", "Now That's Awesome (Live)", and "Cheap Drunk: Autobiography". Plaintiff has duly complied with all required provisions of the copyright laws of the United States applicable to the Works, including but not limited to, registering copyrights in and to said Works with the United States Copyright Office (*see* Exhibit A for applicable copyright registration numbers) on or about March 3, 1997, November 5, 1997, October 19, 1998, July 26, 2002, and October 21, 2002 respectively.

17. Further, it is required by law, and fully understood, that digital service providers, like Pandora, must also get a mechanical digital reproduction license from the owner of the underlying composition in order to make the underlying

composition of a recording available for reproduction and distribution through interactive streaming. This is true even where the digital service provider has a license to interactively stream a sound recording. Pandora made all fifty-one (51) of these Works available via its Pandora Premium interactive streaming service, also knowing full well that it did not possess a valid license to not only publicly perform his works but also no license to distribute and reproduce the Works. Pandora made no royalty payments for the public performance and no royalty payments for the reproduction of the Works. The end result is Pandora took Engvall's Works, gained listeners, subscribers and market share with full knowledge it did not have licenses and made no royalty payments for the Works, to increase its stock price helping them to reorganize the company with Sirius XM (although the two companies remain to this day completely separate corporations) for billions all while depriving Engvall of his royalties and the benefits of his ongoing legacy.

18. As of January 28, 2022, www.pandora.com advertised that Bill Engvall had 227,000 monthly listeners. If each listener listened to only one (1) available work per month, that's 2,724,000 broadcasts or/interactive streams per year at a minimum. In fact, as of 2020, more than six hundred million streams (600,000,000) of the Works had streamed on Pandora alone. Unfortunately, Engvall has not received a fraction of a penny for any of these broadcasts or streams of the Works from Pandora.

19. For years therefore Pandora has illegally made reproductions and digital broadcasts on its servers and provided streaming access to its users without a proper public performance license and, when applicable, a reproduction right license. This infringement continues on a daily basis as the Works are broadcast on Pandora radio and/or remain available for interactive streaming on Pandora Premium.

20. While it is commonplace in the music industry for companies like Pandora to enter into public performance licensing agreements with performance rights organizations like BMI and ASCAP for musical compositions, these entities do not license literary works. Therefore, it was the responsibility of Pandora to seek out the copyright owners and obtain valid licenses.

21. Pandora only needed to contact one entity, Engvall, to obtain the required licenses. Or Pandora could have chosen not to use Engvall's Works, particularly since it knew it did not have a license. Instead, it chose to infringe.

22. Bill Engvall entered into a recording agreement with Warner Bros. Records, Inc. ("WBR") dated May 1, 1996) (the "Engvall Warner Agreement"). Under the terms of the Engvall Warner Agreement, Mr. Engvall was obligated to provide his exclusive performance services to WBR, and WBR acquired exclusive ownership rights in the sound recordings of Mr. Engvall's comedic performances in perpetuity.

23. Mr. Engvall retained all of his exclusive rights in the Works.

24. Pandora's failure to obtain the necessary licenses for the Works, or pay any royalties for the Works, but to infringe by nonetheless exploiting the Works, has been willful. In Pandora's own SEC 10K public filing with the SEC from 2011 to 2017, three quarters of a decade, Pandora admitted in its Risk Factors ever year that it performs spoken-word comedy content "absent a specific license from any [] performing rights organization" and it has never obtained a license for the underlying literary works for the sound recordings of spoken-word comedy content that it streams. Pandora further admitted that it "could be subject to significant liability for copyright infringement and may no longer be able to operate under [their] existing licensing regime." This admission was only removed, not so coincidentally, after Pandora's transaction with Sirius XM Radio.

COMPLAINT FOR COPYRIGHT INFRINGEMENT

25. Pandora nonetheless did not even take the simplest of steps to ask Engvall or his representatives for a license for the Works. To the contrary, beginning in or about August of 2020, Word Collections ("WC"), a Spoken Word/Literary Works Collection Agency contacted Pandora in an effort to negotiate a licensing agreement for various copyright owners. From that initial contact and on an ongoing basis over the course of the following year, WC made numerous efforts on behalf of WC's other spoken word/literary works clients, including on behalf of Engvall beginning in April 2021, to engage Pandora in good faith negotiations, to no avail.

26. While Pandora's counsel wrote on September 14, 2021 to advise that counsel would respond with Pandora's position about unlicensed spoken word content appearing on Pandora's platform, no substantive response from Pandora or its counsel has been sent or received.

27. Further, WBR/Warner Music Group ("WMG") in a letter to WC on September 3, 2021 informed that WMG grants rights only as to its recordings and does not grant rights as to any other types of material embodied in those recordings (whether mechanical rights, performance rights or otherwise). That principle applies to comedic material embodied in comedy recordings.

28. To paraphrase Mr. Engvall's famous "Here's Your Sign" collaboration with Travis Tritt, why can't Pandora get the picture? Why don't they understand? We're not dealing with the planet of apes, we're talking about comedic works. So to all the digital service providers like Pandora . . . "Here's Your Sign."

## CAUSE OF ACTION

### (Copyright Infringement – 17 U.S.C. § 501)

29. Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

30. Plaintiff is the legal and beneficial owner of the United States copyrights in the Works, duly registered with the United States Copyright Office, (See Exhibit A), as discussed above.

31. Defendant has directly, vicariously, and/or contributorily infringed and/or induced infringement of Plaintiff's copyright in violation of 17 U.S.C. § 501.

32. Defendant has publicly performed, broadcasted, and provided its listeners/users of the Works, as discussed hereinabove.

33. Defendant's acts were performed without authorization, license, or consent. Defendant's unauthorized and unlicensed reproduction, distribution, public performance and display of the Works infringes Plaintiff's exclusive rights in violation of the Copyright Act, 17 U.S.C. § 106 *et. seq*.

34. Defendant's infringement has been and continues to be, willful, intentional, purposeful, and with complete disregard to Plaintiff's rights.

35. As a direct and proximate result of Defendant's infringement, Plaintiff has been irreparably harmed.

36. Defendant has infringed Plaintiff's copyright interest in the Works by making reproductions and digital broadcasts on its servers and provided streaming access to its users without a proper public performance and, when applicable, reproduction rights license.

37. Plaintiff has received no royalties or payments for the Works embodied in the sound recording of the underlying literary compositions.

38. Defendant has continued to market, exploit, reproduce, distribute, and publicly perform the Works through this day, which violates Plaintiff's copyrights and are at issue in this lawsuit.

39. Defendants had knowledge and have admitted that it did not and does not possess a valid public performance license for the Works at issue, and with that knowledge of infringement, continued to infringe upon Plaintiff's copyrights.

40. The infringement is continuing as the Works continue to be exploited, performed, broadcast, and streamed across Defendant's applicable platforms, and/or their agents.

41. As a direct and proximate result of Defendant's infringement, pursuant to 17 U.S.C. § 504(a)(1) and (b), Plaintiff is entitled to actual damages in addition to Defendant's profits both domestically and relating to foreign sales of other exploitation of the Works that were distributed, performed, broadcast, or otherwise infringed domestically. Further, Plaintiff is entitled to a running royalty on all future exploitations of the Works following judgement in an amount to be determined.

42. In the alternative to profits and actual damages, pursuant to 17 U.S.C. § 504(c), Plaintiff is entitled to the maximum amount of statutory damages, $150,000 per copyrighted work for each act of copyright infringement, for a total of $7,650,000 ($150,000 times 51 registered Works).

43. As a direct and proximate result of Defendant's infringement, Plaintiff has incurred attorneys' fees and costs which are recoverable pursuant to 17 U.S.C. § 505.

44. Defendant's conduct has caused, is continuing to cause, and will further cause great damage to Plaintiff, which damages cannot be accurately measured in monetary terms, and therefore, unless enjoined by the Court, Plaintiff will suffer irreparable injury, for which Plaintiff is without adequate remedy at all. Accordingly, Plaintiff is entitled to a permanent injunction pursuant to 17 U.S.C. § 502 following judgment, prohibiting further infringement, reproduction, distribution, sale public performance, other use, or exploitation of Plaintiff's copyright without a proper license.

**PRAYER FOR RELIEF**

COMPLAINT FOR COPYRIGHT INFRINGEMENT

WHEREFORE, Plaintiff prays for judgment and relief, as follows:

45. For Judgment in favor of Plaintiff and against Defendant.

46. For a declaration and finding that Defendant has willfully infringed Plaintiff's copyrighted work in violation of the Copyright Act;

47. For declaration and finding that Defendant is directly, vicariously, and/or contributorily liable for copyright infringement pursuant to 17 U.S.C. § 504(a)(1) and (b), including a finding that Defendant is liable for actual damages, as well as for Defendant's profits;

48. For an accounting of all profits, income, receipts, or other benefits derived by Defendant from the production, copying, display, promotion, distribution, broadcast, public performance, or sale of products and services or other media, either now known or hereafter devised, that improperly or unlawfully infringe Plaintiff's copyright pursuant to 17 U.S.C. § 504(a)(1) and (b);

49. For statutory damages, upon election prior to final judgment in the alternative to actual damages and profits, for willful copyright infringement pursuant to 17 U.S.C. § 504(c);

50. For costs of suit herein, including an award of attorneys' fees pursuant to 17 U.S.C. § 505;

51. For pre-judgment and post-judgment interest;

52. For a running royalty and/or ownership share in the Infringing Work following judgment in an amount to be proven at trial, or in the alternative, for the entry of an injunction requiring Defendants, their officers, agents, servants, employees, representatives, successors, licensees, partners, attorneys, and assigns, and all persons acting in concert or participation with each or any one of them to be permanently enjoined from directly or indirectly infringing, reproducing, displaying, promoting, advertising, distributing, or selling any work that infringes,

contributorily infringes, or vicariously infringes Plaintiff's rights in the work protected by the Copyright Act;

53. For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), and otherwise, Plaintiff respectfully demands a jury trial on all issues raised in this complaint.

PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 38(b), AND OTHERWISE, PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES RAISED IN THIS COMPLAINT.

Dated: February 7, 2022                    Respectfully submitted,

                                                         By: /s/ Richard S. Busch
                                                       Richard S. Busch
                                                       Attorney for Plaintiff