Richard S. Busch (SBN 319881)
E-Mail: *rbusch@kingballow.com*
**KING & BALLOW**
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (424) 253-1255
Facsimile: (888) 688-0482
*Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re PANDORA MEDIA, LLC COPYRIGHT LITIGATION | Master File No. 2:22-cv-00809-MCS-MAR <br><br> <u>CONSOLIDATED ACTION</u> |
| This Document Relates to: <br><br> ALL ACTIONS | **CONSOLIDATED COMPLAINT FOR COPYRIGHT INFRINGEMENT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs YELLOW ROSE PRODUCTIONS, INC., on behalf of Bill Engvall; MAIN SEQUENCE, LTD.; RON WHITE, INC., on behalf of Ron White; ROBIN WILLIAMS TRUST; BRAVE LION, INC., on behalf of Andrew Clay Silverstein a/k/a Andrew Dice Clay; and NICK DI PAOLO, individually and on behalf of ACID TONGUE, INC., by and through their attorneys of record, allege as follows:

## **JURISDICTION**

1.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as the action arises under the original and exclusive jurisdiction of the federal

1

court and 28 U.S.C. § 1338(a) as the controversy arises under the Copyright Act of 1976 (17 U.S.C. § 101 *et seq.*).

2.    This Court has personal jurisdiction over Defendant as discussed fully below.

3.    This Court has general personal jurisdiction over Pandora Media, LLC ("Pandora") because Pandora's principal place of business is in Oakland, California, while also having a substantial office in Santa Monica, California, meaning that Pandora is at home in the State of California. Furthermore:

    a. Upon information and belief, through January 28, 2022, Pandora was qualified to do business in California and was registered as a foreign corporation with the California Secretary of State.

    b. Pandora is also registered as a foreign limited liability company with the California Secretary of State.

    c. Pandora's designated DMCA Copyright Agent identified in its "Intellectual Property Policy" on its website is located in California at 2100 Franklin Street, 7th Floor, Oakland, California 94612.

    d. Pandora has previously admitted in other federal court filings that California has jurisdiction over it. *See*, *Wixen Music Publishing, Inc. v. Pandora Media, Inc.*, Case No. 2:19-cv-5278-SVW (C.D. Cal.), Dkt. 15 (Pandora Media, Inc.'s Answer) at ¶¶ 16-17 ("Pandora admits that [it] has availed itself of California law . . . and venue is proper in the [Central District of California]").

4.    This Court has specific personal jurisdiction over Pandora because its suit-related conduct creates a substantial connection with the State of California and this Judicial District. Plaintiffs are the equitable and legal owners of the copyrights in properly registered literary works (appended hereto as Exhibits A through F, and collectively referred to as the "Works"). Upon information and

CONSOLIDATED COMPLAINT FOR COPYRIGHT INFRINGEMENT

belief, Pandora has generated substantial revenue from exploitation of the Works in California, as further discussed below:

    a. Pandora actively and purposely does business in California, as evidenced by its (i) subscribers and users in California, which Pandora actively reaches out to through, at a minimum, its website (www.pandora.com) and mobile app; (ii) contracts and other transactions that it has entered into in California; (iii) revenue generated from California residents and businesses in connection with its services; and (iv) advertisements that target California residents.

    b. Pandora has purposefully availed itself of California law and could and did reasonably anticipate being brought into this Court because, among other reasons, Pandora (i) has been engaged and is engaged in infringing conduct within the State of California and this District, including by knowingly, intentionally, and repeatedly streaming sound recordings and the Works over the Internet to California residents via its services; (ii) knew or should have known that the harm caused by its repeated unlicensed public performance of the Works over the Internet was aimed at comedy writers and comedy publishers, including the majority of Plaintiffs in this matter, who control the Works and are managed and administered in or near Los Angeles County, California, a global hub of the entertainment industry; and (iii) knew or should have known that Plaintiffs, industry leading comedians, would suffer, and in fact did suffer, the brunt of the harm caused by Pandora's unauthorized acts in California and around the world.

CONSOLIDATED COMPLAINT FOR COPYRIGHT INFRINGEMENT

**VENUE**

5.       Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b), and § 1400(a), as a substantial part of the events or omissions giving rise to the claim occurred in this district, including for example, by the maintenance of Pandora's corporate office in Santa Monica, California.

**PARTIES**

6.       Plaintiff, YELLOW ROSE PRODUCTIONS, INC., represents the intellectual property rights of Bill Engvall, who is an actor, writer, and comedian who resides in Utah. YELLOW ROSE PRODUCTIONS, INC. is a corporation in the care of JP Williams and Jennifer Riker of Parallel Entertainment located at 9696 Culver Boulevard, Suite 308, Culver City, CA 90232. YELLOW ROSE PRODUCTIONS, INC. is a copyright owner of the properly registered literary works attached hereto as **Exhibit A** (the "Engvall Works").

7.       Plaintiff, MAIN SEQUENCE, LTD. ("Main Sequence" or "Carlin") owns and represents the intellectual property rights of the late George Carlin, who was an actor and comedian who resided in California. MAIN SEQUENCE, LTD. is a corporation with its principal place of business located at 11911 San Vicente #348, Los Angeles, CA 90049, and is in the care of Jerold Hamza, who is also the executor of the Estate of George Carlin. Carlin is a copyright owner of the properly registered literary works attached hereto as **Exhibit B** (the "Carlin Works").

8.       Plaintiff, RON WHITE, INC. is the owner of intellectual property rights, on behalf of Ron White who is a comedian, actor, and author who resides in California. Ron White Inc., is a Georgia corporation with its principal place of business at 75 Washington Street, Unite 1877, Fairburn, Georgia 30213. Ron White, Inc. is a copyright owner of the properly registered literary works attached hereto as **Exhibit C** (the "White Works").

9.     Plaintiff, ROBIN WILLIAMS TRUST, represents the intellectual property rights of the late Robin Williams, who was an actor and comedian and resided in California. The ROBIN WILLIAMS TRUST is in the care of Trustee, Arnold D. Kassoy, of Manatt, Phelps & Phillips, LLP, located in Los Angeles, California. The Robin Williams Trust is a copyright owner of the properly registered literary works attached hereto as **Exhibit D** (the "Williams Works").

10.     Plaintiff, BRAVE LION, INC., on behalf of Andrew Clay Silverstein a/k/a Andrew Dice Clay (hereinafter collectively "Clay" or "Andrew Dice Clay"), is a stand-up comedian, actor, musician and producer who resides in Los Angeles, California. BRAVE LION, INC., has its principal place of business at 11766 Wilshire Blvd., Suite 500, Los Angeles, California 90025. Clay is a copyright owner of the properly registered literary works attached hereto as **Exhibit E** (the Clay Works").

11.     Plaintiff, NICK DI PAOLO, individually and on behalf of ACID TONGUE, INC., (collectively, "Di Paolo") owns the intellectual property rights of Nick Di Paolo, who is an actor and comedian and resides in Georgia. Di Paolo is a copyright owner of the properly registered literary works attached hereto as **Exhibit F** (the "Di Paolo Works").

12.     Defendant, PANDORA, is a Delaware limited liability company with its principal place of business at 2100 Franklin Street, Suite 700, Oakland, California 94612. According to its website, Pandora maintains another corporate office in California, located at 3000 Ocean Park Boulevard, Suite 3050, Santa Monica, California 90405.

## PRELIMINARY STATEMENT

13.     Just like with music, there are two copyrights involved in the recorded performance of a literary copyrighted work: a copyright in the sound recording, and a separate copyright in the underlying spoken word composition (Plaintiffs'

compositions, as noted, are referred to herein as "the Works"). Pursuant to 17 U.S.C. §§ 106 and 204 of the Copyright Act of 1976, copyright owners have the exclusive right to, among other things, reproduce, distribute, license, and publicly perform their works. Anyone wishing to obtain the right to do so, must get a license from the respective copyright owner in both of these copyrights, and pay agreed to royalties. The failure to do so constitutes copyright infringement. As discussed below, Pandora not only did not obtain any license to Plaintiffs' Works but admitted that it did not obtain the required public performance licenses in Security and Exchange Commission (SEC) filings, and admitted that it would very likely face copyright infringement liability as a result.  But Pandora did what most goliaths do: it decided it would just infringe to ensure it had this very valuable intellectual property on its platform to remain competitive, and deal with the consequences later.  Later is now.

## STATEMENT OF FACTS

14.    For generations, society has turned to comedy as a place of refuge to escape the troubles of their life and view their struggles through a filter of laughter. There's something about watching comedians on stage talking about everyday problems that just transports a person from a place of sadness or frustration to one of hope and happiness. Laughter transcends all languages, backgrounds, and ideologies. Comedians serve a crucial role in our society; they give others relief and allow them to laugh at any circumstance or situation without feeling guilty about it. And it is for this very reason that Pandora sought to include the Works from famous comedians, including Plaintiffs, to profit from this good will.

15.    Plaintiffs are all iconic, world famous comedians, each of whom have captivated audiences for decades and are considered, by many, as legends in the entertainment field, having brought to their audiences works that will be treasured for years to come.

CONSOLIDATED COMPLAINT FOR COPYRIGHT INFRINGEMENT

16.     Plaintiffs have duly complied with all required provisions of the copyright laws of the United States applicable to the Works, including but not limited to, registering the copyrights in and to said Works with the United States Copyright office.

## **Bill Engvall**

17.     For the past thirty-four (34) years, Bill Engvall has helped millions of people laugh at everyday situations that would otherwise not be funny. From his early days on *A Pair of Jokers* with Rosie O'Donnell, to the Blue Collar Comedy Tour, which ran for six (6) years, Mr. Engvall has been a natural in the art of comedy, touching on everyday life topics such as marriage, parenting, and of course self-deprecation.

18.     Mr. Engvall, a proud Texan, was named Best Male Standup comedian at the American Comedy Awards in 1992, and his comedy album *Here's Your Sign*, was certified Platinum and peaked at #5 on the Billboard Country album chart. A man of many talents, Mr. Engvall was a semifinalist on *Dancing with the Stars* in 2013, which is not an easy feat, as well as a disc jockey in Dallas Texas, and the game show host of *Lingo* on the Game Show Network.

19.     While Mr. Engvall is best known for his stand-up comedy, he has continued to expand his mark in the entertainment world as an actor, appearing in movies such as *Delta Farce* and *Catching Faith*, as well as television shows like *The Golden Palace, Designing Women, Family Guy,* and *Last Man Standing* with his long-time friend Tim Allen.

20.     Mr. Engvall's quick wit and easygoing personality have drawn millions of fans to his comedy tours and driven them to purchase his albums and watch his music videos. Yet, Defendant took and exploited the Engvall Works solely to make money while knowing it had no license and had not paid, and would not be paying, royalties to Mr. Engvall for the Engvall Works.

CONSOLIDATED COMPLAINT FOR COPYRIGHT INFRINGEMENT

21.     Defendant has made fifty-one (51) of Engvall's Works available for dissemination to the public via their digital broadcast radio service knowing full well that it did not possess a valid license to publicly perform them. (*See* Exhibit A).  In addition to no license, Pandora also made no royalty payments for the Engvall Works. The Engvall Works are contained on the albums, "Dorkfish", "Here's Your Sign", "Now That's Awesome (Live)", and "Cheap Drunk: Autobiography". Plaintiff has duly complied with all required provisions of the copyright laws of the United States applicable to the Engvall Works, including but not limited to, registering copyrights in and to said Engvall Works with the United States Copyright Office (*see* Exhibit A for applicable copyright registration numbers) on or about March 3, 1997, November 5, 1997, October 19, 1998, July 26, 2002, and October 21, 2002 respectively.

22.     Further, and in addition to a public performance license, it is required by law, and fully understood, that digital service providers, like Pandora, must also get a mechanical digital reproduction license from the owner of the underlying composition in order to make the underlying composition of a recording available for reproduction and distribution through interactive streaming. This is true even where the digital service provider has a license to interactively stream a sound recording. Pandora made all fifty-one (51) of Engvall's Works available via its Pandora Premium interactive streaming service, also knowing full well that it did not possess a valid license to not only publicly perform his works but also no license to distribute and reproduce the Works. Pandora made no royalty payments for the public performance and no royalty payments for the reproduction of the Engvall Works. The end result is Pandora took Engvall's Works, gained listeners, subscribers and market share with full knowledge it did not have licenses and made no royalty payments for the Engvall Works, to increase its stock price helping them to reorganize the company with Sirius XM (although the two companies remain to this

8

day completely separate corporations) for billions all while depriving Engvall of his royalties and the benefits of his ongoing legacy.

23.     As of January 28, 2022, www.pandora.com advertised that Bill Engvall had 227,000 monthly listeners. If each listener listened to only one (1) available work per month, that's 2,724,000 broadcasts or interactive streams per year at a minimum. In fact, as of 2020, more than six hundred million streams (600,000,000) of the Engvall Works had streamed on Pandora alone. Unfortunately, Engvall has not received a fraction of a penny for any of these broadcasts or interactive streams of the Engvall Works from Pandora.

24.     Pandora only needed to contact one entity, Engvall, to obtain the required licenses. Or Pandora could have chosen not to use the Engvall Works, particularly since it knew it did not have a license. Instead, it chose to infringe.

25.     Bill Engvall entered into a recording agreement with Warner Bros. Records, Inc. ("WBR") dated May 1, 1996 (the "Engvall Warner Agreement"). Under the terms of the Engvall Warner Agreement, Mr. Engvall was obligated to provide his exclusive performance services to WBR, and WBR acquired exclusive ownership rights in the sound recordings of Mr. Engvall's comedic performances in perpetuity.

26.     Mr. Engvall retained all of his exclusive rights in the Engvall Works.

27.     Pandora nonetheless did not even take the simplest of steps to ask Engvall or his representatives for a license for the Engvall Works. To the contrary, beginning in or about August of 2020, Word Collections ("WC"), a Spoken Word/Literary Works Collection Agency contacted Pandora in an effort to negotiate a licensing agreement for various copyright owners. From that initial contact and on an ongoing basis over the course of the following year, WC made numerous efforts on behalf of WC's other spoken word/literary works clients,

CONSOLIDATED COMPLAINT FOR COPYRIGHT INFRINGEMENT

including on behalf of Engvall beginning in November 2020, to engage Pandora in good faith negotiations, to no avail.

28.     While Pandora's counsel wrote on September 14, 2021 to advise that counsel would respond with Pandora's position about unlicensed spoken word content appearing on Pandora's platform, no substantive response from Pandora or its counsel has been sent or received.

29.     Further, in a letter to WC on September 3, 2021, WBR/Warner Music Group ("WMG") informed WC that WMG grants rights only as to its recordings and does not grant rights as to any other types of material embodied in those recordings (whether mechanical rights, performance rights or otherwise). That principle applies to comedic material embodied in comedy recordings.

30.     To paraphrase Mr. Engvall's famous "Here's Your Sign" collaboration with Travis Tritt, why can't Pandora get the picture? Why don't they understand? We're not dealing with the planet of apes, we're talking about comedic works. So to all the digital service providers like Pandora . . . "Here's Your Sign."

### George Carlin

31.     Dubbed the Dean of Counterculture Comedians, the late George Carlin was known for his politically charged and dark comedy, as well as taboo subjects. There really wasn't a topic or area of culture that Mr. Carlin wasn't willing to tackle.

32.     For fifty-two (52) years, the late George Carlin was an integral part of the entertainment world, and his works even graced the hallowed halls of the United States Supreme Court. Mr. Carlin's ever famous "seven dirty words" comedy routine was at the center of the 1978 Supreme Court case, *F.C.C. v. Pacifica Foundation*, which set a precedent concerning government power to censor indecent material on public airwaves. George Carlin was able to express unique

meaningful insights, observations and ideas through spoken word comedy, impacting culture, society and millions of fans around the globe.

33.     In many ways George Carlin was a trailblazer in the comedy industry, filming fourteen (14) stand-up comedy specials for HBO. Today, these types of stand-up routines are common on streaming services like Netflix, but had it not been for Carlin, these types of comedy specials may never have been popular.

34.     After George Carlin's death in 2008, he was posthumously awarded the Mark Twain Prize for American Humor in 2008 and ranked by Rolling Stone magazine as the second-best stand-up comedian of all time, and he continues to remain a relevant figure in the entertainment industry and has helped chart the way for countless comedians after him.

35.     Since his passing, Main Sequence, Ltd., has been and continues to be the legal and beneficial owner of the exclusive rights to the literary works of George Carlin, including the Carlin Works Pandora has exploited without a license. Accordingly, Main Sequence, Ltd., has the sole right to protect those copyrights and pursue any and all remedies.[1]

36.     Defendant has made fifty-six (56) of Carlin's works available for dissemination to the public via their digital broadcast radio service knowing full well that it did not possess a valid license to publicly perform the Carlin Works. (*see* Exhibit B).  In addition to no license, it also made no royalty payments for the Carlin Works. The Carlin Works are contained on the albums "An Evening with Wally Londo", "Class Clown", "Classic Gold", "George Carlin on Comedy", "On

---

[1] A non-exclusive license to Carlin's literary works has been granted to Laugh.com, Inc. which digitally distributes sound recordings, embodying them, on an exclusive basis, and which serves as an advisor and the collection agent for any revenues arising from that exploitation.

the Road", "SOFA - Comedy Clips", "The George Carlin Collection", "Toledo Window Box", and "You Are All Diseased". Plaintiff has duly complied with all required provisions of the copyright laws of the United States applicable to the Carlin Works, including but not limited to, registering copyrights in and to said Carlin Works with the United States Copyright Office (*see* Exhibit B for applicable copyright registration numbers) on or about October 4, 1972, January 8, 1973, September 19, 1974, September 11, 1975, and February 28, 1977, respectively.

37.    Further, and in addition to a public performance license, it is required by law, and fully understood, that digital service providers, like Pandora, must also get a mechanical digital reproduction license from the owner of the underlying composition in order to make the underlying composition of a recording available for reproduction and distribution through interactive streaming. This is true even where the digital service provider has a license to interactively stream a sound recording. Pandora made eleven (11) of the Carlin Works available via its Pandora Premium interactive streaming service, also knowing full well that it did not possess a valid license to not only publicly perform Carlin's works but also no license to distribute and reproduce the Carlin Works. Pandora made no royalty payments for the public performance and no royalty payments for the reproduction of the Carlin Works. The end result is Pandora took Carlin's Works, gained listeners, subscribers and market share with full knowledge it did not have licenses and making no royalty payments, to increase their stock price helping them to enter into a merger with Sirius XM (although the two companies remain to this day completely separate corporations) for billions all while depriving the George Carlin Estate and his child the legacy her father left her.

38.    As of January 28, 2022, www.pandora.com advertised that George Carlin had 81,000 monthly listeners. If each listener listened to only one (1) available work per month, that's 972,000 broadcasts or/interactive streams per year

at a minimum. Unfortunately, Carlin has not received a fraction of a penny for any of these broadcasts or interactive streams of the Carlin Works from Pandora.

39.     Pandora only needed to contact one entity, Carlin, to obtain the required licenses. Or Pandora could have chosen not to use Carlin's Works, particularly since it knew it did not have a license. Instead, Pandora chose to infringe.

40.     Carlin, over the course of his career entered into numerous recording and record distribution contracts with Atlantic Recording Corporation ("Atlantic"), and its affiliates from August 21, 1981, to October 15, 2005. Carlin retained the rights to digitally distribute his sound recordings which it exploits on an exclusive basis through an alternative distribution channel.

41.     Carlin retained all of his exclusive rights in the Carlin Works.

42.     Pandora nonetheless did not even take the simplest of steps to ask Carlin or his representatives for a license for the Carlin Works. To the contrary, beginning in or about August of 2020, Word Collections ("WC"), a Spoken Word/Literary Works Collection Agency contacted Pandora in an effort to negotiate a licensing agreement for various copyright owners. From that initial contact and on an ongoing basis over the course of the following year, WC made numerous efforts on behalf of WC's other spoken word/literary works clients, including on behalf of Carlin beginning in August 2020, to engage Pandora in good faith negotiations, to no avail.

43.     While Pandora's counsel, on September 14, 2021, more than a year after Carlin's representatives contacted them, wrote to advise that counsel would respond with Pandora's position, no response from Pandora or its counsel has been sent or received.

CONSOLIDATED COMPLAINT FOR COPYRIGHT INFRINGEMENT

44.     While Carlin would have been thrilled for his works to live on through valid licenses and payments, he would have seven dirty words to say about Pandora's actions and willful copyright infringement no doubt.

### Ron "Tater Salad" White

45.     To hear a good story, one need look no further than to Ron "Tater Salad" White. Mr. White dips into his own personal life for inspiration when entertaining audiences, telling stories about growing up in a small town in Texas, to his everyday life, to becoming one of the most successful comedians in American history. Known for his cigar-smoking and scotch-drinking funnyman stage presence, no one can tell a funny story quite like Ron White.

46.     For the last thirty-six (36) years, Ron White has been captivating audiences with his fantastic tales, landing four (4) of his comedy albums at #1 on the Billboard Comedy Charts, receiving three (3) Grammy nominations, and has become one of the top three grossing stand-up comedians on tour in America.

47.     Mr. White is a veteran of the United States Navy, and served near the end of the Vietnam War, but his dream was to be a comedian. Since becoming a legend in his own right, Mr. White has been a passionate supporter of the U.S. military troops for more than twenty (20) years. In 2008, he started his Comedy Benefit, Ron White's Comedy Salute to the Troops to raise money for the Armed Forces Foundation to assist injured troops and their families. This outlet has allowed him to collaborate with many entertainment giants such as Rascal Flatts, Gabriel Iglesias, Lewis Black, Dave Attell, Kathleen Madigan, Ralphie May and many more.

48.     However, Mr. White is more than just a comedian on a stage, he's a unique personality that transcends all walks of life and all mediums of entertainment. His first one-hour television comedy special *They Call Me Tater Salad* had the highest viewership for a Sunday program in Comedy Central history.

14

He continued to set the bar for comedy specials with his one-hour special *You Can't Fix Stupid* on Comedy Central, reaching 4.5 million viewers making it the #1 show on primetime basic cable. The CD of that special stayed at #1 on the Billboard Comedy Charts for nine (9) consecutive weeks.

49.     After his success on the Blue Collar Comedy Tour alongside his friends Jeff Foxworthy, Bill Engvall, and Larry the Cable Guy, Mr. White upped his game once again becoming a New York Times Best Seller with his first book *Ron "Tater Salad" White: I Had the Right to Remain Silent…But I Didn't Have the Ability.* But he didn't stop there. Mr. White has made a name for himself as an actor and producer, starring in the comedy-drama series *Roadies*, and as a supporting actor in major theatrical films such as *Horrible Bosses* and *Sex in the City 2,* and as a co-Executive Producer of the documentary, *Bridegroom*, winning the Audience Award for Best Documentary at the NYC Tribeca Film Festival in 2013.

50.     To say Mr. White is a man of many talents would be putting it mildly, but one thing is certain, his ability to craft everyday life experiences into hilarious stories that mesmerize his audiences and make them feel good about their own lives is remarkable. Everyone deals with struggles and frustrations from the situations faced throughout their day, but being able to laugh about those frustrations is truly nature's best medicine, and "Tater Salad" is just a little something for the road to keep you going.

51.     Defendant has made eighty-six (86) of White's works available for dissemination to the public via their digital broadcast radio service knowing full well that it did not possess a valid license to publicly perform the White Works. (*See* Exhibit C).  In addition to no license, it also made no royalty payments for the White Works. The White Works are contained on the albums, "Drunk in Public", "Behavioral Problems", "You Can't Fix Stupid", "A Little Unprofessional" and the

"Blue Comedy Tour". Plaintiff has duly complied with all required provisions of the copyright laws of the United States applicable to the White Works, including but not limited to, registering copyrights in and to said White Works with the United States Copyright Office (*see* Exhibit C for applicable copyright registration numbers) on or about April 16, 2004, August 1, 2006, July 7, 2009, July 21, 2006, and June 24, 2002 respectively.

52.     Further, and in addition to a public performance license, it is required by law, and fully understood, that digital service providers, like Pandora, must also get a mechanical digital reproduction license from the owner of the underlying composition in order to make the underlying composition of a recording available for reproduction and distribution through interactive streaming. This is true even where the digital service provider has a license to interactively stream a sound recording. Pandora made all eighty-six (86) of the White Works available via its Pandora Premium interactive streaming service, also knowing full well that it did not possess a valid license to not only publicly perform White's Works but also no license to distribute and reproduce the Works. Pandora made no royalty payments for the public performance of the White Works and no royalty payments for the reproduction of the White Works. The end result is Pandora took White's Works, gained listeners, subscribers and market share with full knowledge it did not have licenses and made no royalty payments for the White Works, to increase its stock price helping it to reorganize its company with Sirius XM (although the two companies remain to this day completely separate corporations) for billions all while depriving White of his royalties and the benefits of his ongoing legacy.

53.     As of February 2, 2022, www.pandora.com advertised that Ron White had 233,000 monthly listeners. If each listener listened to only one (1) available work per month, that's 2,796,000 broadcasts or/interactive streams per year at a minimum. In fact, as of 2020, more than four hundred million streams

(400,000,000) of the White Works had streamed on Pandora alone. Unfortunately, White has not received a fraction of a penny for any of these broadcasts or interactive streams of the Works from Pandora.

54.     Mr. White, over the course of his career entered into numerous agreements for the creation/distribution of sound recordings.

55.     White however retained all of his exclusive rights in the White Works. Digital Service Providers, like Pandora, had to come to White to secure the necessary licenses for exploitation of the White Works, and they knew it. But they did not.

56.     Pandora nonetheless did not even take the simplest of steps to ask White or his representatives for a license for the White Works. To the contrary, beginning in or about August of 2020, Word Collections ("WC"), a Spoken Word/Literary Works Collection Agency contacted Pandora in an effort to negotiate a licensing agreement for various copyright owners. From that initial contact and on an ongoing basis over the course of the following year, WC made numerous efforts on behalf of WC's other spoken word/literary works clients, including on behalf of White beginning in April 2021, to engage Pandora in good faith negotiations, to no avail.

57.     While Pandora's counsel wrote on September 14, 2021 to advise that counsel would respond with Pandora's position about unlicensed spoken word content appearing on Pandora's platform, no substantive response from Pandora or its counsel has been sent or received.

58.     The reality is, Pandora had "the right to remain silent" (in other words, the right to not publicly perform or reproduce the White Works without valid licenses) but it did not have the right to disregard its obligations in the pursuit of personal gain at Mr. White's expense.

**Robin Williams**

59.    Throughout history, comedy and spoken word have been the bedrock of entertainment. From Shakespearian comedies to modern-day standup comedians, comedy has brought happiness to the faces of billions of people, and for nearly the last five decades, Robin Williams has been an integral part of that history.

60.    Spanning nearly forty (40) years with unique insights expressed as an active comedian, philosopher, and entertainer in literally every format imaginable, the comedic works of Robin Williams have enriched global culture, our lives, the entertainment industry and provided insights into the absurdity, joy, pains, and irony of life. He pushed other comedians and entertainers to further hone their craft while continuing to trail blaze as a comedic talent until the end of his career.

61.    From his early beginnings at the Holy City Zoo in San Francisco and the Roxy in West Hollywood, California, to the television show Mork & Mindy and then through a plethora of movie acting roles, such as Genie in Disney's Aladdin, and his iconic roles in Dead Poets Society and Good Will Hunting, Williams put his heart, soul and mind into every composition he wrote or role he played. His heart was never more evident and on display then when he spent years lending his comedic talent to the charitable organization Comic Relief USA, whose mission was to raise funds to those in need, particularly America's homeless. He was joined on those Comic Relief USA television specials by Billy Crystal and Whoopi Goldberg among others.  It is nowhere close to an exaggeration to say that Robin Williams was a national treasure.

62.    Williams' on-stage presence and skill with comedic improvisation set the standard for stand-up comedians. Not only was he skilled at communicating through comedy, but he brought a personal honesty to his comedic routines, touching on subjects such as depression and addiction. In fact, Williams was so

CONSOLIDATED COMPLAINT FOR COPYRIGHT INFRINGEMENT

talented in free-form comedy that other comedians, who are now household names, impersonated him, which is the highest compliment a comedian can receive.

63.     Williams won six (6) Golden Globe Awards, including the Cecil B. DeMille Award, two (2) Primetime Emmy Awards, two (2) Screen Actors Guild Awards, an Academy Award, and most notably five (5) Grammy Awards for his comedy albums, including Best Comedy Album and Best Spoken Word Comedy Album.

64.     Defendant has made twenty-seven (27) of Williams' works available for dissemination to the public via their digital broadcast radio service knowing full well that it did not possess a valid license to publicly perform the Williams Works. (*See* Exhibit D).  In addition to no license, it also made no royalty payments for the Williams Works. The Williams Works are contained on the albums, "Reality … What a Concept", and "A Night at the Met". Plaintiff has duly complied with all required provisions of the copyright laws of the United States applicable to the Williams Works, including but not limited to, registering copyrights in and to said Williams Works with the United States Copyright Office (*see* Exhibit D for applicable copyright registration numbers) on or about January 25, 1980, and October 27, 1986 respectively.

65.     Further, and in addition to a public performance license, it is required by law, and fully understood, that digital service providers, like Pandora, must also get a mechanical digital reproduction license from the owner of the underlying composition in order to make the underlying composition of a recording available for reproduction and distribution through interactive streaming. This is true even where the digital service provider has a license to interactively stream a sound recording. Pandora made sixteen (16) of the Williams' Works available via its Pandora Premium interactive streaming service, also knowing full well that it did not possess a valid license to not only publicly perform his works but also no

license to distribute and reproduce the Williams' Works. Pandora made no royalty payments for the public performance and no royalty payments for the reproduction of the Williams Works. The end result is Pandora took Williams's Works, gained listeners, subscribers and market share with full knowledge it did not have licenses and made no royalty payments for the Williams Works, to increase its stock price helping them to reorganize the company with Sirius XM (although the two companies remain to this day completely separate corporations) for billions all while depriving the Robin Williams Estate and its beneficiaries from the legacy of Robin Williams.

66.    As of January 28, 2022, www.pandora.com advertised that Robin Williams had 223,000 monthly listeners. If each listener listened to only one (1) available work per month, that's 2,676,000 broadcasts or/interactive streams per year at a minimum. Unfortunately, Williams has not received a fraction of a penny for any of these broadcasts or interactive streams of the Williams Works from Pandora.

67.    Pandora only needed to contact one entity, Williams, to obtain the required licenses. Or Pandora could have chosen not to use the Williams Works, particularly since it knew it did not have the required licenses. Instead, it chose to infringe.

68.    Williams, via his company Little Andrew Enterprises, Inc., ("LAE Inc.,") entered into a recording agreement with Casablanca Record and Filmworks, Inc. ("Casablanca"), dated March 13, 1979 (the "Williams Casablanca Agreement"). Under the terms of the Williams Casablanca Agreement, Williams was obligated to provide his exclusive performance services to Casablanca, and Casablanca acquired exclusive ownership rights in the sound recordings of Williams' comedic performances in perpetuity. Williams, however, retained all of his exclusive rights in the underlying literary works.

CONSOLIDATED COMPLAINT FOR COPYRIGHT INFRINGEMENT

69.     Additionally, Robin Williams, via his company LAE, Inc., entered into a recording agreement with CBS Records, a division of CBS, Inc., ("CBS"), dated August 5, 1979 (the Williams CBS Agreement"). Under the terms of the Williams CBS Agreement, Williams was obligated to provide his exclusive comedic performance services to CBS, for a performance at the Metropolitan Opera House at Lincoln Centre in New York, and CBS acquired exclusive ownership rights in the sound recordings of Williams' performances created pursuant to the Williams CBS Agreement in perpetuity. Williams likewise retained all exclusive rights in these underlying literary works.

70.     Pandora nonetheless did not even take the simplest of steps to ask Williams or his representatives for licenses for the Works. To the contrary, beginning in or about August of 2020, Word Collections ("WC"), a Spoken Word/Literary Works Collection Agency contacted Pandora in an effort to negotiate a licensing agreement for various copyright owners. From that initial contact and on an ongoing basis over the course of the following year, WC made numerous efforts on behalf of WC's other spoken word/literary works clients, including on behalf of Williams beginning in March 2021, to engage Pandora in good faith negotiations, to no avail.

71.     While Pandora's counsel wrote on September 14, 2021 to advise that counsel would respond with Pandora's position about unlicensed spoken word content appearing on Pandora's platform, no substantive response from Pandora or its counsel has been sent or received.

72.     Pandora will earn no good will hunting for meritless defenses as their SEC filings admitted they had doubt they could put out these fires. The genie cannot be put back in the bottle, and Pandora is on the hook.

1

**<u>Andrew Dice Clay</u>**

2      73.     Hickory Dickory Dock . . .  The Diceman, (a/k/a Andrew Dice Clay)

3   is one of America's most controversial and outrageous comics. With forty-four (44)

4   years as an active comedian, Mr. Clay's comedic career can be described by the

5   parental advisory on his certified gold debut album *Dice*, "Warning: This album is

6   offensive."

7      74.     Mr. Clay is a stand-up comedian, actor, musician, television and film

8   producer. While some may consider his comedic routines offensive, his brash and

9   blatantly honest persona on stage has won over the hearts of millions of loyal fans

10  who appreciate his character, observational and improvisational comedy as well as

11  his political satire.

12     75.     Mr. Clay has forever left his mark on the entertainment world, and

13  especially in the world of comedy. Mr. Clay was the first comedian to sell out

14  Madison Square Garden two nights in a row, as well as numerous sporting arenas

15  across the country, and in true Diceman-fashion, is the only performer ever

16  "Banned For Life from MTV."

17     76.     Mr. Clay's brutally honest, unapologetic, and uncensored approach to

18  comedy is truly what makes him unique and remarkable amongst other comedians.

19  However, his versatility as an artist far exceeds the comedy stage. As an actor, Mr.

20  Clay has been actively involved in Hollywood, appearing in feature-length films

21  such as *Wacko, Making the Grade, Pretty in Pink, Casual Sex?,* and most recently

22  *A Star Is Born* starring alongside Bradley Cooper, Lady Gaga, Dave Chappelle and

23  Sam Elliot. If that wasn't enough, Mr. Clay found his way to the small screen in

24  television favorites such as *M\*A\*S\*H, Diff'rent Strokes, Crime Story, Entourage,*

25  numerous HBO comedy specials, and *Saturday Night Live*.

26

27

28

CONSOLIDATED COMPLAINT FOR COPYRIGHT INFRINGEMENT

77.   In 1989, Mr. Clay was named Comedy Act of the Year by *Performance* magazine, and his popular comedy album, *The Day the Laughter Died*, peaked at No. 39 on the *Billboard* 200.

78.   No matter the venue or entertainment medium, The Diceman continues to captivate audiences with his superb ability to make people laugh about the realest and most uncomfortable topics, and that's what makes Mr. Clay a comedic legend in his own right

79.   Defendant has made fifty-seven (57) of Clay's works available for dissemination to the public via their digital broadcast radio service knowing full well that it did not possess a valid license to publicly perform the Clay Works. (*See* Exhibit E).  In addition to no license, it also made no royalty payments for the Clay Works. The Clay Works are contained on the albums, "Dice", "Dice Rules", "Politically Incorrect (Various Artists)", and "The Day The Laughter Died". Plaintiff has duly complied with all required provisions of the copyright laws of the United States applicable to the Clay Works, including but not limited to, registering copyrights in and to said Clay Works with the United States Copyright Office (*see* Exhibit E for applicable copyright registration numbers) on or about August 18, 1990.

80.   Further, and in addition to a public performance license, it is required by law, and fully understood, that digital service providers, like Pandora, must also get a mechanical digital reproduction license from the owner of the underlying composition in order to make the underlying composition of a recording available for reproduction and distribution through interactive streaming. This is true even where the digital service provider has a license to interactively stream a sound recording. Pandora made all fifty-seven (57) of the Clay Works available via its Pandora Premium interactive streaming service, also knowing full well that it did not possess a valid license to not only publicly perform his works but also no

license to distribute and reproduce the Clay Works. Pandora made no royalty payments for the public performance of the Clay Works and no royalty payments for the reproduction of the Works. The end result is Pandora took Clay's Works, gained listeners, subscribers and market share with full knowledge it did not have licenses and made no royalty payments for the Clay Works, to increase its stock price helping it to reorganize the company with Sirius XM (although the two companies remain to this day completely separate corporations) for billions all while depriving Clay of his royalties and the benefits of his ongoing legacy.

81.    As of February 1, 2022, www.pandora.com advertised that Andrew Dice Clay had 8,200 monthly listeners. If each listener listened to only one (1) available work per month, that's 98,400 broadcasts or/interactive streams per year at a minimum. Unfortunately, Clay has not received a fraction of a penny for any of these broadcasts or streams of the Clay Works from Pandora.

82.    Pandora only needed to contact one entity, Clay, to obtain the required licenses. Or Pandora could have chosen not to use the Clay Works, particularly since it knew it did not have the required licenses. Instead, Pandora chose to infringe.

83.    Clay, through his company, Fleebin Dabble Productions, Inc., entered into a recording agreement with Def American Recordings, Inc., ("Def American") on May 19, 1988 (the "Clay Def American Agreement"). Under the terms of the Clay Def American Agreement, Mr. Clay was obligated to provide his exclusive performance services to Def American, and Def American acquired exclusive ownership rights in the sound recordings of Mr. Clay's comedic performances in perpetuity. Mr. Clay retained his exclusive rights in the underlying literary works.

84.    Pandora nonetheless did not even take the simplest of steps to ask Clay or his representatives for the any of the proper licenses for the Clay Works. To the contrary, beginning in or about August of 2020, Word Collections ("WC"), a

Spoken Word/Literary Works Collection Agency contacted Pandora in an effort to negotiate a licensing agreement for various copyright owners. From that initial contact and on an ongoing basis over the course of the following year, WC made numerous efforts on behalf of WC's other spoken word/literary works clients, including on behalf of Clay beginning in April 2021, to engage Pandora in good faith negotiations, to no avail.

85.    While Pandora's counsel wrote on September 14, 2021 to advise that counsel would respond with Pandora's position about unlicensed spoken word content appearing on Pandora's platform, no substantive response from Pandora or its counsel has been sent or received.

86.    As the Diceman might say, Pandora and Dice went up the hill, but Pandora came down with all the money

## Nick Di Paolo

87.    Born in Danvers, Massachusetts, it is only fitting that Nick Di Paolo's thirty-five (35) year career as a comedian started at an open mic night at Stitches club in Boston. As a fan of stand-up comedy, he was influenced most by comedians who appeared on various television shows, including Johnny Carson, David Letterman, Jay Leno, and Robert Klein.

88.    Di Paolo's observational comedy, news satire, and political humor have made him a favorite of millions around the world. After the success of his first stand-up album, *Born This Way*, comedian Chris Rock offered Di Paolo a writing position on *The Chris Rock Show*, completing two (2) seasons, as well as writing for the 77th Annual Academy Awards, and was twice nominated for an Emmy Award for Outstanding Writing for Variety, Music, or Comedy Program.

89.    Di Paolo went on to make appearances on various television and radio shows including the *Late Show with David Letterman, The Howard Stern Show, The Tonight Show with Jay Leno,* and *Jimmy Kimmel Live.* However, Di Paolo's

most iconic appearances include his regular appearances on Comedy Central's *Tough Crowd with Colin Quinn* and *The Comedy Central Roasts* including Pamela Anderson, Denis Leary, Jeff Foxworthy and Larry the Cable Guy. Di Paolo's strong political opinions and razor-sharp wit made him the perfect fit across the board.

90.     Di Paolo is not one to shy away from controversy, or water down his comedy. He prides himself on being brutally honest in a funny, socially relevant and a little bit reckless way. And his fans love him for it—so it's no surprise that Di Paolo has had three (3) standup specials on Comedy Central, a Showtime Special called *Raw Nerve*, a self-released special *Another Senseless Killing*, and true to form his most controversial release *A Breath of Fresh Air.*

91.     However, Di Paolo is more than a comedian, radio host and writer, he's also an accomplished actor, appearing on FX's *Louie, Inside Amy Schumer,* HBO's *The Sopranos, Cop Show,* and CK's critically acclaimed *Horace and Pete.* Additionally, Di Paolo has enjoyed major success as a national radio host such as the *Nick Di Paolo Show* on 92.3 FM in Manhattan, New York, and *The Nick and Arti Show* on DirectTV. No matter the medium, Di Paolo's quick wit and infectious personality shines through and keeps his fans wanting more.

92.     Di Paolo has brought comedic relief to millions of people over his career, but most notably, some of his most meaningful performances were during his three (3) United Service Organizations' Tours (USO Tours) in Japan, Guantanamo Bay, Cuba, and in Afghanistan as part of Operation Mirth.

93.     Defendant has made one hundred and forty-two (142) of Di Paolo's works available for dissemination to the public via their digital broadcast radio service knowing full well that it did not possess a valid license to publicly perform the Di Paolo Works. (*See* Exhibit F).  In addition to no license, it also made no royalty payments for the Di Paolo Works. The Di Paolo Works are contained on the albums, "Born This Way", "Road Rage", "Funny How?", "Raw Nerve",

"Another Senseless Killing", and "A Breath of Fresh Air". Plaintiff has duly complied with all required provisions of the copyright laws of the United States applicable to the Di Paolo Works, including but not limited to, registering copyrights in and to said Di Paolo Works with the United States Copyright Office (*see* Exhibit F for applicable copyright registration numbers) on or about June 1, 1998, August 23, 2004, January 15, 2009, February 8, 2013, February 2, 2015, and October 27, 2021.[2]

94.     Further, and in addition to a public performance license, it is required by law, and fully understood, that digital service providers, like Pandora, must also get a mechanical digital reproduction license from the owner of the underlying composition in order to make the underlying composition of a recording available for reproduction and distribution through interactive streaming. This is true even where the digital service provider has a license to interactively stream a sound recording. Pandora made one-hundred and forty-two (142) of the Di Paolo Works available via its Pandora Premium interactive streaming service, also knowing full well that it did not possess a valid license to not only publicly perform his works but also no license to distribute and reproduce the Di Paolo Works. Pandora made no royalty payments for the public performance and no royalty payments for the reproduction of the Di Paolo Works. The end result is Pandora took Di Paolo's Works, gained listeners, subscribers and market share with full knowledge it did not have licenses and made no royalty payments for the Di Paolo Works, to increase its stock price helping them to reorganize the company with Sirius XM (although

---

[2] Including three (3) standalone Works: "Old People", "Doggy Hotel", and "Hair In Food" registered with the Copyright Office on February 21, 1995.

CONSOLIDATED COMPLAINT FOR COPYRIGHT INFRINGEMENT

the two companies remain to this day completely separate corporations) for billions all while depriving Nick Di Paolo from his hard-earned royalties.

95.    As of February 17, 2022, www.pandora.com advertised that Nick Di Paolo had 9,100 monthly listeners. If each listener listened to only one (1) available work per month, that's 109,200 broadcasts or/interactive streams per year at a minimum. Unfortunately, Di Paolo has not received a fraction of a penny for any of these broadcasts or interactive streams of the Di Paolo Works from Pandora.

96.    Pandora only needed to contact one entity, Di Paolo, to obtain the required licenses. Or Pandora could have chosen not to use the Di Paolo Works, particularly since it knew it did not have the required licenses. Instead, it chose to infringe.

97.    Di Paolo, over the course of his career entered into numerous agreements for the creation/distribution of sound recordings and television specials.

98.    Di Paolo, however, retained all of his exclusive rights in the underlying literary works. Digital Service Providers, like Pandora, had to come to Di Paolo to secure the necessary licenses for exploitation of the Di Paolo Works, and they knew it—but they did not.

99.    Pandora nonetheless did not even take the simplest of steps to ask Di Paolo or his representatives for licenses for the Di Paolo Works. To the contrary, beginning in or about August of 2020, Word Collections ("WC"), a Spoken Word/Literary Works Collection Agency contacted Pandora in an effort to negotiate a licensing agreement for various copyright owners. From that initial contact and on an ongoing basis over the course of the following year, WC made numerous efforts on behalf of WC's other spoken word/literary works clients, to engage Pandora in good faith negotiations, to no avail.

100.    While Pandora's counsel wrote on September 14, 2021 to advise that counsel would respond with Pandora's position about unlicensed spoken word

CONSOLIDATED COMPLAINT FOR COPYRIGHT INFRINGEMENT

content appearing on Pandora's platform, no substantive response from Pandora or its counsel has been sent or received.

101.   The bottom line is that Pandora's actions were willful and they knew they had their hand in the cookie jar and would eventually get caught—it was just a matter of when. Di Paolo would likely give the following advice to Pandora from his dad: "[comedy] is like pizza, even when it's bad you still gotta pay for it." – the only difference is, Di Paolo's comedy isn't bad, which means it's worth even more.

### Pandora's Willful Infringement of the Works

102.   According to www.pandora.com, Pandora is the largest digital broadcast and streaming music provider in the U.S. "providing a highly-personalized listening experience to approximately 70 million listeners and users each month" through "its mobile app, the web, and integrations with more than 2,000 connected products."

103.   One would think that entertainment giants like Pandora would honor the legacy of such amazing artists, but instead it chose to illegally profit from the creative minds and literary/comedic works of Plaintiffs.

104.   For years, Pandora has illegally made reproductions and digital broadcasts on its servers and provided streaming access to its users without a proper public performance license and, when applicable, a reproduction right license. This infringement continues on a daily basis as the Works were broadcast on Pandora radio and/or remained available for interactive streaming on Pandora Premium through the filing of the actions.

105.   While it is commonplace in the music industry for companies like Pandora to enter into public performance licensing agreements with performance rights organizations like BMI and ASCAP for musical compositions, these entities do not license literary works. Therefore, it was the responsibility of Pandora to seek out the copyright owners and obtain valid licenses.

CONSOLIDATED COMPLAINT FOR COPYRIGHT INFRINGEMENT

106.    As described above, for each Plaintiff, Pandora only needed to contact one entity to obtain the required licenses. Or Pandora could have chosen not to use Plaintiffs' Works, particularly since it knew it did not have the required licenses. Instead, Pandora chose to infringe.

107.    Pandora's failure to obtain the necessary licenses for the Works, or pay any royalties for the Works, but to nonetheless infringe by exploiting the Works, has been willful.  In Pandora's own SEC 10K public filing with the SEC from 2011 to 2017, three quarters of a decade, Pandora admitted in its Risk Factors ever year that it performs spoken-word comedy content "absent a specific license from any [] performing rights organization" and it has never obtained a license for the underlying literary works for the sound recordings of spoken-word comedy content that it streams. Pandora further admitted that it "could be subject to significant liability for copyright infringement and may no longer be able to operate under [their] existing licensing regime." This admission was only removed, not so coincidentally, after Pandora's transaction with Sirius XM Radio.

108.    Pandora made it clear in other places in its SEC disclosures that having to enter into licenses and pay royalties is a burden to the business: "To secure the rights to stream musical works embodied in sound recordings over the internet, we obtain licenses from or for the benefit of copyright owners and pay royalties to copyright owners or their agents. Those who own copyrights in musical works are vigilant in protecting their rights and seek royalties that are very high in relation to the revenue that can be generated from the public performance of such works. . . If we are unable to secure and maintain rights to stream musical works or if we cannot do so on terms that are acceptable to us, our ability to stream music content to listeners, and consequently our ability to attract and retain advertisers, will be adversely impacted."  Pandora decided with respect to spoken word content to simply not license and not pay to reduce the cost to the business.

CONSOLIDATED COMPLAINT FOR COPYRIGHT INFRINGEMENT

109.   Not only did Pandora admit to the federal government that it willfully broadcast and streamed spoken-word comedy content without a specific license, Pandora also shamelessly advertised its "newfound" comedy stations to the public and generated revenue from advertising sales. In 2011, major news outlets such as *CNN* and *The New York Times* reported that "[Pandora has] taken the same approach to comedy as [they] have to music: carefully and deliberately analyzing comedic 'bits' across a very large number of attributes to capture the style, delivery and content of each performance."[3]—there is just one glaring omission, they failed to obtain the required licenses.

110.   In February 2011, *CNNMoney* reported that Pandora wasn't "yet profitable,"[4] posting "a net loss of $328,000 on revenue of $90.1 million in the first nine months of its most recent fiscal year." Its biggest expense— "royalties it pays for the music it streams. As Pandora's audience grows, so do those costs, which reached $45.4 million in the first nine months of 2010."

111.   The timing is significant, following Pandora's reported net losses, the astronomical amount of costs incurred for music streams, and its intention to raise $100 million in an initial public offering, Pandora announced in May of 2011 that it was adding comedy to its list of offerings and that those stations would include audio advertisements, touting Unilever as their first major advertiser—promoting its Axe body spray and Klondike bars.[5] Pandora thereby generated additional

---

[3] Ben Parr, Pandora adds 10,000 comedy clips to its archives CNN (2011), http://www.cnn.com/2011/TECH/web/05/04/pandora.comedy.mashable/index.html (last visited Feb 25, 2022).
[4] Stacy Cowley, Pandora files for $100 million IPO CNNMoney (2011), https://money.cnn.com/2011/02/11/technology/pandora_ipo/index.htm (last visited Feb 25, 2022).
[5] *Id.*

CONSOLIDATED COMPLAINT FOR COPYRIGHT INFRINGEMENT

advertising revenue for the company while excluding comedians like Plaintiffs and many others from their hard earned royalties and licensing fees. Pandora found a cash cow in a new revenue stream, and in a brazen business decision determined that the risk was worth the gain—that is until now.

112.   Since the filing of the lawsuits against Pandora by Plaintiffs, which are now consolidated in this action, Pandora has proceeded to remove each comedian's catalogue from their platform. While Pandora has refused to comment verbally on these lawsuits, their actions in removing the Works from its platform constitute an outright admission that they knew they were infringing the copyrights of the Works, which they admitted in SEC filings, and now wish to belatedly stop the bleeding having been caught and sued.

## **CAUSE OF ACTION**

### **(Copyright Infringement – 17 U.S.C. § 501)**

113.   Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

114.   Plaintiffs are the legal and beneficial owners of the United States copyrights in the Works, duly registered with the United States Copyright Office, (See Exhibits A through F), as discussed above.

115.   Defendant has directly, vicariously, and/or contributorily infringed and/or induced infringement of Plaintiffs' copyrights in violation of 17 U.S.C. § 501.

116.   Defendant has publicly performed, broadcasted, reproduced, displayed, and distributed the Works, as discussed hereinabove.

117.   Defendant's acts were performed without authorization, license, or consent. Defendant's unauthorized and unlicensed reproduction, distribution, public performance and display of the Works infringes Plaintiffs' exclusive rights in violation of the Copyright Act, 17 U.S.C. § 106 *et. seq.*

118.   Defendant's infringement has been and continues to be, willful, intentional, purposeful, and with complete disregard to Plaintiffs' rights.

119.   As a direct and proximate result of Defendant's infringement, Plaintiffs have been irreparably harmed.

120.   Defendant has infringed Plaintiffs' copyright interest in the Works by making reproductions and digital broadcasts on its servers and provided streaming access to its users without a proper public performance and, when applicable, reproduction rights license.

121.   Plaintiffs have received no royalties or payments for the Works embodied in the sound recording of the underlying literary compositions.

122.   Defendant has admitted that it did not and does not possess a valid public performance license for any of the Works at issue, and with that knowledge of infringement, continued to infringe upon Plaintiffs' copyrights.

123.   The infringement is continuing as the Works continue to be exploited, performed, broadcast, and streamed across Defendant's applicable platforms through the filing of the respective actions.

124.   As a direct and proximate result of Defendant's infringement, pursuant to 17 U.S.C. § 504(a)(1) and (b), Plaintiffs are entitled to actual damages in addition to Defendant's profits attributable to the infringements both domestically and relating to foreign sales of other exploitation of the Works that were distributed, performed, broadcast, or otherwise infringed domestically. Further, Plaintiffs are entitled to a running royalty on all future exploitations of the Works following judgement in an amount to be determined.

125.   In the alternative to profits and actual damages, pursuant to 17 U.S.C. § 504(c), Plaintiffs are entitled to the maximum amount of statutory damages, $150,000 per copyrighted work for each willful act of copyright infringement as follows:

CONSOLIDATED COMPLAINT FOR COPYRIGHT INFRINGEMENT

126.   For Plaintiff YELLOW ROSE PRODUCTIONS, INC., a total of $7,650,000 ($150,000 times 51 registered Works).

127.   For Plaintiff MAIN SEQUENCE, LTD., a total of $8,400,000 ($150,000 times 56 registered Works).

128.   For Plaintiff RON WHITE, INC., a total of $12,900,000 ($150,000 times 86 registered Works).

129.   For Plaintiff ROBIN WILLIAMS TRUST, total of $4,050,000 ($150,000 times 27 registered Works).

130.   For Plaintiff BRAVE LION, INC., a total of $8,550,000 ($150,000 times 57 registered Works).

131.   For Plaintiff NICK DI PAOLO, a total of $21,300,000 ($150,000 times 142 registered Works).

132.   As a direct and proximate result of Defendant's infringement, Plaintiffs have and will incur attorneys' fees and costs which are recoverable pursuant to 17 U.S.C. § 505.

133.   Defendant's conduct has caused, is continuing to cause, and will further cause irreparable damages to Plaintiffs, which cannot be adequately remedied by monetary compensation. Therefore, unless enjoined by the Court, Plaintiffs will continue to suffer irreparable injury, for which Plaintiffs are without adequate remedy. Accordingly, Plaintiffs are entitled to a permanent injunction pursuant to 17 U.S.C. § 502 following judgment, prohibiting further infringement, reproduction, distribution, sale public performance, other use, or exploitation of Plaintiffs' copyright without adhering to the terms of a properly issued license to the Works.

CONSOLIDATED COMPLAINT FOR COPYRIGHT INFRINGEMENT

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment and relief, as follows:

134.   For Judgment in favor of Plaintiffs and against Defendant.

135.   For a declaration and finding that Defendant has willfully infringed Plaintiffs' copyrighted works in violation of the Copyright Act;

136.   For declaration and finding that Defendant is directly, vicariously, and/or contributorily liable for copyright infringement pursuant to 17 U.S.C. § 504(a)(1) and (b), including a finding that Defendant is liable for actual damages, as well as for Defendant's profits;

137.   For an accounting of all profits, income, receipts, or other benefits derived by Defendant from the production, copying, display, promotion, distribution, broadcast, public performance, or sale of products and services or other media, either now known or hereafter devised, that improperly or unlawfully infringe Plaintiffs' copyrights pursuant to 17 U.S.C. § 504(a)(1) and (b);

138.   For statutory damages, upon election prior to final judgment in the alternative to actual damages and profits, for willful copyright infringement pursuant to 17 U.S.C. § 504(c);

139.   For costs of suit herein, including an award of attorneys' fees pursuant to 17 U.S.C. § 505;

140.   For pre-judgment and post-judgment interest;

141.   For a running royalty stemming from use of the Works by Defendant following judgment in an amount to be proven at trial, or in the alternative, for the entry of an injunction requiring Defendant, its officers, agents, servants, employees, representatives, successors, licensees, partners, attorneys, and assigns, and all persons acting in concert or participation with each or any one of them to be permanently enjoined from directly or indirectly infringing, reproducing, displaying, promoting, advertising, distributing, or selling any work that infringes,

CONSOLIDATED COMPLAINT FOR COPYRIGHT INFRINGEMENT

contributorily infringes, or vicariously infringes Plaintiffs' rights in the Works protected by the Copyright Act;

142.   For such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), and otherwise, Plaintiff respectfully demands a jury trial on all issues raised in this complaint.

PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 38(b), AND OTHERWISE, PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES RAISED IN THIS COMPLAINT.

Dated: March 29, 2022                    Respectfully submitted,

By: /s/ Richard S. Busch
Richard S. Busch
Attorney for Plaintiff

CONSOLIDATED COMPLAINT FOR COPYRIGHT INFRINGEMENT