MAYER BROWN LLP
PAUL M. FAKLER (*pro hac vice*)
*pfakler@mayerbrown.com*
JACOB B. EBIN (*pro hac vice forthcoming*)
*jebin@mayerbrown.com*
ALLISON AVIKI (*pro hac vice*)
*aaviki@mayerbrown.com*
1221 Avenue of the Americas
New York, New York  10020-1001
Telephone: (212) 506-2500
Facsimile: (212) 262-1910

MAYER BROWN LLP
JOHN NADOLENCO (SBN 181128)
*jnadolenco@mayerbrown.com*
DANIEL D. QUEEN (SBN 292275)
*dqueen@mayerbrown.com*
MEERIM A. NEHME (SBN 322234)
*mnehme@mayerbrown.com*
350 S. Grand Avenue, 25th Floor
Los Angeles, California  90071-1503
Telephone:   (213) 229-9500
Facsimile:   (213) 625-0248

[*Additional counsel listed on signature page*]

Attorneys for Defendant
Pandora Media, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re PANDORA MEDIA, LLC COPYRIGHT LITIGATION | Master File No.: 2:22-cv-00809-MCS-MAR |
| | <u>CONSOLIDATED ACTION</u> |
| | **ANSWER AND DEFENSES OF DEFENDANT PANDORA MEDIA, LLC TO PLAINTIFFS' AMENDED CONSOLIDATED COMPLAINT** |
| This Document Relates To: | |
| ALL ACTIONS | Honorable Mark C. Scarsi Courtroom: 7C |

Defendant Pandora Media, LLC ("Pandora") submits its Answer and Defenses in response to the Amended Consolidated Complaint (the "Amended Consolidated Complaint") of Plaintiffs Yellow Rose Productions, Inc., on behalf of Bill Engvall; Main Sequence, Ltd.; Ron White, Inc., on behalf of Ron White; Robin Williams Trust; Brave Lion, Inc., on behalf of Andrew Clay Silverstein a/k/a/ Andrew Dice Clay; Nick Di Paolo, individually and on behalf of Acid Tongue, Inc.; and Mary Reese Hicks, individually and on behalf of Arizona Bay Production Co., Inc. (collectively, "Plaintiffs") as follows:

## INTRODUCTORY RESPONSE

Through this action, Plaintiffs, the purported owners of the underlying jokes embodied in comedy recordings that have been publicly performed, distributed, or reproduced by a variety of outlets ask this Court to radically transform decades-long industry custom and practice for the licensing of the use of those comedy recordings. The result Plaintiffs seek would unravel and disrupt nearly a century of understandings between comedians and those entities that perform, reproduce, or distribute their recordings in an effort to transform retroactively the streaming services, radio and television broadcasters, comedy clubs and other venues, and the very record labels that produce and distribute their comedy recordings, into serial copyright infringers.  Worse, Plaintiffs, with the assistance of Word Collections—an entity formed for the sole purpose of coordinating an illegal price-fixing conspiracy—are attempting to secure for themselves monopoly power over these purported literary works rights for the express purpose of imposing supra-competitive licensing fees on all manner of comedy broadcasters and distributors. Unless these efforts are halted in their tracks, consumers, comedians, and all entities that perform, reproduce, or distribute comedy will all be harmed.

Before turning to its responses to Plaintiffs' specific allegations, Pandora first must address the relevant history and the driving force behind the efforts to change decades-long custom and practice to provide the necessary context for understanding

- 1 -

1    this unprecedented lawsuit.

2    **I.    Decades-Long Custom and Practice for the Licensing of Comedy**

3         **Routines**

4         For many decades, comedy routines and other spoken-word works of

5    authorship have been publicly performed on the radio, in comedy clubs and other

6    venues, and on television.  Similarly, audio and audio-visual recordings of comedy

7    and other spoken word performances have been copied and distributed to the public

8    for many decades by record labels and home video companies.  And for at least the

9    last decade, recordings of comedy routines have been streamed by services like

10   Pandora, HBO, YouTube, Spotify, and Netflix.

11        But up until now, no comedian has ever licensed separately or collected a

12   separate and additional royalty for the public performance, reproduction, or

13   distribution of the underlying jokes embodied in any of these comedy recordings.

14   There is no disagreement as to this fundamental point.  Word Collections, the newly

15   formed cartel that purports to license the literary works of Plaintiffs and many others,

16   acknowledges as much on its own website:

17        "Q. Have I ever been paid royalties for my Literary Works being broadcast on

18        digital or AM/FM radio?

19        A. No.  To this point in time, these royalties have not been paid."

20   *Frequently Asked Questions*, Word Collections (May 4, 2022, 3:37 PM),

21   https://www.wordcollections.com/faqs.

22        This is for good reason.  Comedy, like every other copyright-intensive industry

23   except the dysfunctional music licensing market, has always followed a "licensing at

24   the source" model for derivative works—new works that incorporate one or more

25   pre-existing works—whereby the "source" or creator of the final product, in this case

26   the record label that creates the comedy recording, secures and passes along all of the

27   necessary rights, including any rights in any pre-existing works used in the new

28   derivative work to all downstream distributors, licensees, and end users, either

explicitly or implicitly. This legal structure works, and has historically worked, with respect to all literary works. When AMC Theatres, for example, exhibits the replay of the 1972 classic, *The Godfather*, under a license from Paramount Pictures, it comes with, among other things, the screenplay rights from Mario Puzo and Francis Ford Coppola. Similarly, when Amazon or Barnes & Noble sells a copy of Catcher in the Rye under a license from Little, Brown, it comes with the rights to the cover art. As a result of this logical, efficient, and long-standing practice, all downstream parties have all of the rights they need to perform, reproduce, and/or distribute the comedy recording, and are able to secure all such rights in a single transaction. This is precisely the practice that Pandora has followed since it began offering comedy recordings to its listeners—one that it has been completely transparent about—and up until now, is one that no comedian has ever objected to.

To be clear, this long-standing custom and practice was not the result of some decades-long oversight on the part of comedians or some massive conspiracy across the varied and distinct entities that have over the years publicly performed, reproduced, or distributed comedy recordings. This well-established arrangement is and has been equitable for all involved and makes complete economic sense.

Comedians benefit in a variety of ways when their comedy recordings are performed on services like Pandora. First, comedians receive substantial royalties from Pandora. Like other digital streaming services, Pandora pays royalties to perform comedy recordings pursuant to license agreements it has entered into with the record labels that produced and own the comedy recordings or by paying royalties to SoundExchange, a regulated entity and one subject to an antitrust exemption that, among other things, collects royalties on behalf of the recorded music industry from services like Pandora that qualify for certain statutory licenses, including, as relevant here, the Section 112 and 114 statutory licenses. 17 U.S.C. §§ 112, 114. A portion of those royalties—whether paid to the record companies or SoundExchange—is then distributed to the comedians. Indeed, since it began playing comedy and other

spoken-word recordings, Pandora has paid out millions of dollars each year in royalties for the use of those recordings to record labels and SoundExchange, which, in turn, should be paying the comedians.[1]

Comedians also benefit from the exposure they receive from entities that perform their comedy recordings. This benefit is unquestionably significant and further explains why comedians have never before sought additional licenses or payments for these purported literary works rights, not even from those entities that do not pay any royalties for sound recording performance rights. The actions of comedians and their representatives make this abundantly clear. They regularly reach out to Pandora in an effort to secure more plays of their comedy on Pandora's service, all in an effort to secure the many benefits that being streamed on Pandora offers to comedians.

Comedians are not the only ones that benefit from this long-standing custom and practice. Consumers also benefit by having comedy available on services like Pandora. While not all Pandora users listen to comedy on the service, some do, and their listening experience is unquestionably made better by having the comedy content available to them. Moreover, not only do Pandora listeners get access to comedy that they already know they like, but they are also introduced to new comedy routines and new comedians that they might not otherwise become familiar with. This enhanced exposure that Pandora offers further benefits comedians. Pandora, for its part, also incrementally benefits by being able to incorporate comedy into its product offering and provide users with a more compelling overall listening experience.

---

[1] In contrast, many other outlets that publicly perform comedy routines pay nothing at all to comedians. AM/FM radio stations, for example, pay no license fees to perform comedy recordings or any underlying literary works, yet even with these outlets, none of the Plaintiffs (or any other comedians) have ever tried to license and collect royalties for the right to perform the underlying jokes they purport to own.

In addition to being beneficial to all involved, this long-standing custom and practice of obtaining a single license to perform and, if needed, reproduce and distribute, comedy recordings is efficient. Pandora, like other streaming services, only performs Plaintiffs' comedy routines to the extent they are embodied in sound recordings that are licensed from the respective record companies that created those recordings. The recordings at issue are not bootlegs; Plaintiffs, like other comedians, voluntarily entered into recording agreements with these record companies for the purpose of creating these recordings. The very purpose of this business arrangement between the comedians and the record companies was to commercially exploit those recordings, including through distribution and licensing with downstream parties such as Pandora. As part of this process, the record labels undoubtedly obtained any rights in the underlying comedy routines that are necessary to commercially distribute or license those recordings. No comedian has ever objected to the record companies' exploitation of the recordings or demanded additional payments or licenses for such exploitation. By contract with these record labels (either explicitly or implicitly), as well as industry custom and practice, those same rights flowed to Pandora and other sound recording licensees.

This type of licensing from the entity that puts out the final derivative work product—licensing at the source—is clearly efficient in that it eliminates the need for a service like Pandora to go out and get multiple licenses from a variety of different entities before a single recording can be played. Moreover, it also promotes competition by requiring negotiation of all necessary rights at the time the sound recording is created. This allows the record label to choose to forego using a particular comedian's work if that comedian is demanding unreasonable royalties or other conditions. And as explained in greater detail below, the licensing at the source model also prevents the type of hold-up power that the newly formed Word Collections cartel is attempting to create for itself and its co-conspirators through this litigation and otherwise.

It is for all of these reasons that every other copyright-intensive industry—except the broken music licensing marketplace[2]—follows the same "licensing at the source" model described above, in which the creator of the final derivative work is the only entity from which the end user needs to obtain a license, with all necessary rights flowing downstream and all royalties flowing upstream to all copyright owners contributing to the final product. Take, for example, the way motion pictures are distributed and licensed. Movies, like comedy recordings, are typically "derivative works" that are produced based upon a pre-existing screenplay, analogous to the pre-existing comedy routines that are incorporated into the comedy recording. When a movie studio obtains the rights to create a motion picture based upon a screenplay, it obtains all of the rights necessary for it and its downstream licensees to exploit the resulting movie. Thus, when movie theaters, cable and streaming services like HBO and Netflix, and others secure the right to show movies pursuant to licenses and distribution agreements with the movie studios, they do not have to separately license the right to publicly perform, distribute, or reproduce the underlying screenplay. Instead, the movie studios pass along all necessary rights to the distributors, licensees, and end users to perform, reproduce, and/or distribute the underlying screenplay as an integrated component of the movie.

In sharp contrast, the custom and practice in the music industry of requiring

---

[2] And even within the otherwise broken music licensing marketplace, there are some bright spots. Synchronizations rights, for example, are generally obtained by the producer of the television or other audio-visual program at the time of production, and those rights are then passed on to those that broadcast or stream the program. And, the licensing of performance rights for movie theaters covering the music embedded in the motion pictures they show similarly functions in this way. Today, movie producers obtain, at the time of production, performance rights from composers and music publishers and pass those rights on to the movie theaters that show the motion pictures. But this example of a functioning licensing system within the otherwise dysfunctional music industry only came about as a result of antitrust lawsuits. *See Alden-Rochelle Inc. v. ASCAP*, 80 F. Supp. 888 (S.D.N.Y. 1948); *M. Witmark & Sons v. Jensen*, 80 F. Supp. 843 (D. Minn. 1948).

multiple separate license negotiations with multiple points of hold-up—the model that Plaintiffs and their newly formed cartel are now trying to force on comedy licensing—is unquestionably broken and should be avoided at all costs. As an initial matter, this unique feature of the music licensing marketplace is an anomaly. It is the product of historical circumstances from the early 1900s and evolved to address certain problems that are simply not present in comedy licensing. As the Supreme Court explained, "[i]n 1914, Victor Herbert and a handful of other composers organized ASCAP because those who performed copyrighted music for profit were so numerous and widespread, and most performances so fleeting, that, as a practical matter, it was impossible for the many individual copyright owners to negotiate with and license the users and to detect unauthorized uses." *Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 4 (1979). Notably, the problem faced by Mr. Herbert had nothing to do with the broadcast of sound recordings of his own performances of his musical compositions. This was long before the advent of the singer songwriter. The problem was that other musicians were performing his works in bars, nightclubs, and concert halls without any license or payment to him at all for the use of his music. And once licensing musical works public performance rights through ASCAP and other performing rights organizations ("PROs") became entrenched industry practice, that practice continued, expanded into many other types of performances, and continues to this day.

But the problems that led to the rise of PROs in the music industry do not apply to comedy. The above-discussed dilemma that ASCAP was meant to address has never been a problem faced by comedians. And, critically, unlike in the music industry, where the songwriter and performer are frequently not the same person, the comedian is in almost all cases both the performer and at least one of the joke writers. Except in extremely limited circumstances, the idea of a comedian "covering" someone else's jokes is unheard of in the comedy industry. Indeed, it is adamantly discouraged. To see as much, one need look no further than the Amended

Consolidated Complaint. All seven of the Plaintiff comedians claiming that their literary works must be separately licensed and paid for are the same comedians that are featured on the recordings identified in the Amended Consolidated Complaint. The same comedians that are trying to secure for themselves a new revenue stream are the ones already getting paid by the record labels and SoundExchange when their comedy recordings are licensed. As a result, there is no valid reason to split the licensing of comedy recordings in two like is done in the music industry—the "author" and the "recording artist" are the same person.

Absent any compelling need to adopt a licensing framework that resembles that found in the music industry, there is every reason to avoid it. Indeed, the Copyright Office itself in its February 2015 *Copyright and the Music Marketplace* study makes it abundantly clear that the music licensing marketplace does not work well. As explained in that report, "there is a widespread perception that our [music] licensing system is *broken*." *Copyright and the Music Marketplace*, United States Copyright Office, 1 (2015), https://www.copyright.gov/policy/musiclicensingstudy/copyright-and-the-music-marketplace.pdf. (emphasis added). Some of the reasons for this dysfunction include, but are not limited to, that: (i) the music licensing market is plagued with market power problems that are a direct result of collective licensing practices that eliminate competition among individual rightsholders; (ii) the need to secure different licenses from different rightsholders and their licensing agents unquestionably creates inefficiencies and further exacerbates market power problems; and (iii) because of all of these market power problems and inefficiencies, there has been a need for government intervention, extensive antitrust litigation, and complex regulatory oversight.[3] Yet this broken system is the one that the Plaintiffs,

---

[3] *See id.* at Section III (detailing some of the challenges with the music licensing market); *see also* Brief for the United States, *United States v. BMI (In Re Application of AEI Music Network, Inc.)*, Case No. 00-6123, dated June 26, 2000 (2d Cir.), at 25 (DOJ explaining that the relationship between two PROs (ASCAP and BMI), in their dealings with music licensees, "may be more accurately described as co-monopolists

at the behest of their new cartel leader, Word Collections, are now trying to impose on comedy licensing—but without any of the consent decree regulations imposed on ASCAP and BMI to at least lessen the anticompetitive harm caused by their collective licensing practices.

Undeterred by decades of past practice, a group of comedians and their heirs have suddenly come forward demanding to be paid by Pandora and others yet another fee—in addition to the royalties they already receive for the performance of their comedy recordings—for purported rights that, if their allegations are to be believed, they have been sitting on for decades. The driving force behind these lawsuits is not some sudden realization on the part of comedians that they just forgot about these purported rights or some epiphany that they were not being appropriately compensated. Instead, some former music-industry insiders have decided to try and create for themselves hold-up power over streaming services and others by upending a functioning marketplace and imposing the dysfunction of music licensing onto comedy. To do so, these individuals formed Word Collections—an entity that is intent on following the anti-competitive playbook of the PROs to collectively license the works of comedians, eliminate any competition between comedians to have their works performed, and force entities like Pandora to take a blanket license at dramatically inflated rates or forego streaming comedy altogether.

---

in the sale of blanket licenses."); United States Memorandum in Aid of Construction of the Final Judgment, *United States v. BMI*, 64 Civ. 3787 (LLS), dated June 4, 1999 (S.D.N.Y.), at 3-4 ("The PROs' pooling and blanket licensing of copyrights creates antitrust concerns. Because both ASCAP and BMI have so many compositions in their repertories, most music users cannot avoid the need to take a license from each PRO .... As a result, the PROs have market power in setting fees for licenses."); *ASCAP v. MobiTV, Inc.*, 681 F.3d 76, 82 (2d Cir. 2012) ("the rate-setting court must take into account the fact that ASCAP, as a monopolist, exercises market-distorting power in negotiations for the use of its music."); *United States v. BMI (In re Application of Music Choice)*, 426 F.3d 91, 96 (2d Cir. 2005) ("rate-setting courts must take seriously the fact that they exist as a result of monopolists exercising disproportionate power over the market for music rights.").

1    The new approach to licensing that the Plaintiffs, through their licensing cartel,

2    seek to impose is nothing more than an effort to make the current system worse by

3    adding more frictions to the marketplace, giving additional parties hold-up power,

4    and increasing royalty payments above already-inflated levels without providing any

5    additional benefit to streaming services, broadcasters, concert venues, or consumers.

6    If Plaintiffs and their licensing cartel prevail here, Pandora and many others will have

7    to pay more to do exactly what they have been doing for years with no offsetting

8    benefits whatsoever.   Indeed, should Plaintiffs and their licensing cartel prevail,

9    Pandora, and plausibly many other services, may have no choice but to remove

10   comedy from its service entirely, making itself, consumers, and comedians

11   unquestionably worse off.

12   **II.    Pandora and its Use of Comedy**

13          **a. Pandora's Offerings**

14   Pandora has long been and remains best known for its flagship, free-to-the-

15   consumer, non-interactive internet radio service.  That service offers listeners a radio-

16   style or "lean-back" listening experience, where Pandora creates for each listener

17   their own playlist.  While the listener is not able to select each particular song or artist

18   that they want to hear, the listener is able to provide Pandora with feedback regarding

19   their likes and dislikes, and can start a station by selecting (or "seeding") a song,

20   artist, or genre of music that they like.  In addition, Pandora offers two subscription

21   services.   The more popular of the two, Pandora Plus, is an ad-free subscription

22   service that, while largely a "lean-back" offering, does include some semi-interactive

23   features, such as song replays and caching of a limited number of stations to enable

24   offline listening when users do not have internet access.  Like the ad-supported

25   service, Pandora Plus does not provide users with fully interactive features, such as

26   the ability to select particular songs or albums on demand.   Pandora's other

27   subscription service—Pandora Premium—is a fully on-demand service that allows

28   the subscriber to select what recordings they want to listen to and when.

Despite amassing approximately 50 million monthly active users as of March 31, 2022, to its ad-supported service and several million subscribers to its two subscription offerings, Pandora has never been able to earn a sustained profit. In stark contrast, the record companies from which Pandora licenses the comedy recordings at issue have consistently been profitable, with record company profitability soaring in recent years as streaming service usage has increased.

### b. Pandora is Uniquely Beneficial to Comedians

Pandora launched as a music streaming service, and up until 2011, it did not include any comedy on its service. But beginning in 2011, Pandora made the business decision to offer comedy and other spoken-word content in addition to music. While Pandora has continued to offer comedy, and its library of comedy recordings has grown over the years, music still accounts for the vast majority of the streams on each of the Pandora services. In fact, today, all comedy listening combined accounts for less than 1% of all streams on Pandora and only a handful of comedians account for any significant number of streams across Pandora's services.

Despite the relatively modest share of all streams that comedy accounts for, Pandora has nevertheless paid substantial royalties for its use of comedy. In any given year, despite being one of many sources of income for comedians, Pandora regularly pays out millions of dollars in royalties for the comedy that it streams.

In addition to paying out substantial royalties to comedians, Pandora is also instrumental in promoting comedy and comedians. Like other services that stream or broadcast comedy recordings, Pandora is promotional of other revenue streams earned by comedians—most notably, the revenues they earn from live performances at comedy clubs and other venues. Were that not the case, the long-standing industry custom and practice would never have taken hold. But Pandora offers comedians something that no other streaming or broadcast service offers. It has developed, at significant upfront and ongoing expense to itself, what it refers to as the "Comedy Genome Project" (or "CGP"), the primary purpose of which is to introduce listeners

- 11 -

to comedy that they will like, but might not otherwise be aware of. The recommendation methodology behind the CGP is based on comedic similarity, without regard to popularity—a level playing field for all comedians.[4] As a result, through the CGP, Pandora is able to introduce listeners to new comedy routines and new comedians that they might not otherwise be aware of. In this regard, Pandora is uniquely promotional of comedy.

Tacitly acknowledging all of the benefits that Pandora offers to comedians, when Word Collections was explicitly asked by Pandora whether it wanted Pandora to take down the comedy content that it claimed to represent, Word Collections said no, asking instead that the comedy content be kept up on the service. In other words, Word Collections is trying to have it both ways—secure the many benefits for its comedians that Pandora brings to the table, but also sue for copyright infringement when Pandora plays the very recordings that Word Collections asked Pandora to keep up on its service.

### c. Pandora's Licensing of Comedy

Pandora was clear from the beginning of its use of comedy that it was licensing comedy pursuant to long-standing industry custom and practice. It was securing a license for the comedy recordings, but was not securing a separate license for the underlying literary works or paying any additional royalties above what it was already paying to license the sound recordings. Indeed, as the Plaintiffs are quick to point out, but are also quick to grossly mischaracterize, Pandora stated as much in its SEC filings, explicitly noting that pursuant to industry-wide custom and practice, it was not securing a separate license or paying a separate license fee for the use of any literary works embodied in comedy recordings. *See, e.g.*, Pandora Media, Inc., Annual Report (Form10-K) at 18 (Feb. 26, 2018) ("We stream spoken word comedy

---

[4] The CGP utilizes technology and human talent to map out a comedy routine's key comedic characteristics (or "genes"), which are expressed as numerical values, and uses mathematical algorithms to identify other comedy with similar "DNA" that a user already knows and likes.

- 12 -

content, for which the underlying literary works are not currently entitled to eligibility for licensing by any performing rights organization in the United States. Rather, pursuant to industry-wide custom and practice, this content is performed absent a specific license from any such performing rights organization or individual rights owners, although content acquisition costs are paid to SoundExchange for the public performance of the sound recordings in which such literary works are embodied.").

Contrary to the Plaintiffs' claims, this is not some sort of admission of copyright infringement.  Pandora merely included this as a risk factor in its SEC filings, explaining that while it was following long-established custom and practice, there is no guarantee that this custom and practice will continue indefinitely.  That is precisely what SEC risk factors are for—to alert investors and potential investors to potential risks that might be faced by the company in the future.[5]  And, despite Pandora's complete public transparency as to its practices of licensing comedy over the last decade, no one has ever objected to this long-standing practice until now.  No comedian has ever asked Pandora to take their comedy routines down.  And no comedian has ever sought to be paid royalties for the performance of the underlying jokes separate from the license fees they receive for the use of the comedy recordings. It was only when Word Collections emerged that anyone challenged these long-standing and completely transparent practices.

### III.   The Emergence of the Word Collections Cartel

Intent on upending what has been working reasonably well for decades to the

---

[5] *See Bondali v. YumA Brands, Inc.*, 620 Fed. Appx. 483, 491 (6th Cir. 2015) ("Risk disclosures like the ones accompanying 10–Qs and other SEC filings are inherently *prospective* in nature.  They warn an investor of what harms *may* come to their investment.  They are not meant to educate investors on what harms are currently affecting the company."); *see also In re Foundry Networks, Inc.*, 2002 WL 32354617 at *7 (N.D. Cal. 2002) (noting that "Plaintiffs … cannot state a claim based on the disclosure of risk factors" because such disclosures are mere speculation and cannot be known to a certainty).

mutual benefit of consumers, comedians, and outlets that perform, distribute, and/or reproduce comedy, Word Collections has taken on as its mission transplantation of the dysfunctional and anticompetitive aspects of music licensing into the comedy marketplace for the sole purpose of creating a new point of hold-up and extracting excessive license fees, of which it takes a 15% cut.  Indeed, the dysfunction of music licensing is something that Word Collections' founders are intimately familiar with. One of those co-founders, and Word Collections' current CEO, Jeff Price, whom the Los Angeles Times called a "music industry gadfly," has, according to Word Collections, "irrevocably upended the global music industry" in his prior positions at TuneCore and Audiam, both of which terminated him.  Word Collections' other co-founder, Bob Kohn, author of *Kohn on Music Licensing*, has himself referred to the music industry as the "modern-day Hydra."  To achieve its disruptive goals, Word Collections has engaged in mutually reinforcing tactics.

First, as explained in more detail above, it is attempting, including through this lawsuit, to force those that stream, or otherwise use or perform comedy to secure multiple licenses at various stages along the distribution chain to increase the number of points of hold-up and drive up license fees.  Second, in order to create for itself market power over Pandora and other services that perform, distribute, or reproduce comedy, Word Collections has bundled together into a single catalog the literary works rights of many high-profile comedians (as well as many others) through what it calls "exclusive affiliation agreements," and only makes that catalog available to services like Pandora on a blanket "all-or-nothing" basis.  In the words of Word Collections' CEO, Word Collections is "the only entity on the planet where these services can come to get a license" to use the works of the comedians affiliated with Word Collections.  Through such coercive licensing tactics, Word Collections is eliminating any potential competition between comedians to have their works performed on services like Pandora, and forces such services to either take a license from Word Collections at a price it and its member comedians have fixed or forgo

- 14 -

performing comedy altogether. By following the anticompetitive playbook of the PROs, Word Collections is also engaging in the same tactics that led the Department of Justice to sue ASCAP and BMI for antitrust violations decades ago and what led to two different private antitrust lawsuits against SESAC—a smaller U.S. PRO— each of which resulted in settlements in which SESAC agreed to be bound by restrictions similar to those imposed on ASCAP and BMI by their consent decrees.

That these are the intentions of Word Collections is plain—it acknowledges as much on its website. As Word Collections explains in response to an "FAQ" about the risk that a comedian may be dropped by a service like Pandora if it does sign up with Word Collections, it states: "Digital radio and AM/FM radio either ***have to pay for all broadcasts of comedy and other spoken word performances or choose to broadcast none of it***." *Frequently Asked Questions*, Word Collections (May 4, 2022, 5:35 PM), https://www.wordcollections.com/faqs. (emphasis added). In other words, Word Collections' clear intent is to make comedy an all-or-nothing proposition. Either a service like Pandora takes a license from Word Collections at a price and on terms dictated by Word Collections, or it will have to forego streaming comedy altogether. If Word Collections has its way, there will be no middle ground, and no room for competition between comedians to have their recordings played by Pandora.

As set forth in greater detail in Pandora's counter claims, these efforts of Word Collections and its affiliated comedians are textbook violations of the antitrust laws. This misconduct also constitutes copyright misuse, unclean hands, and other equitable defenses to Plaintiffs' claims of copyright infringement. First, by agglomerating the rights of many literary works rightsholders through what it calls "exclusive affiliation agreements," and then setting a single fixed price for that collection of rights, Word Collections and its affiliates are engaging in naked horizontal price fixing, a *per se* violation of the antitrust laws. But even if the rule of reason were applied, these price-fixing actions of Word Collections and its rightsholders would still violate the antitrust laws, as there are no valid offsetting

- 15 -

benefits that arise from these plainly anticompetitive and entirely unnecessary tactics.

Second, by accumulating the rights to the works of many high-profile comedians, and combining those rights with the rights to many other literary works that Pandora and other services do not need into a single all-or-nothing blanket license, Word Collections is engaging in unlawful tying.  By exclusively offering its blanket license on an all-or-nothing basis, Word Collections is leveraging the market power it has amassed for itself by consolidating the rights of a critical mass of desirable content—content that a service like Pandora cannot do without if it wants to continue to offer comedy—to force Pandora and other services to also take a license to its other, less desirable material.  If Word Collections' anticompetitive tactics are not stopped, Pandora and other services will have no choice but to accept this tie (or cease playing comedy altogether) because, without accepting it, Word Collections will not give them a license to the rights that they do need if historic custom and practice is upended, and Word Collections' exclusivity agreements with its members ensure that these rights will not be available separately from any other source (including directly from the individual comedians).

Finally, by combining the rights of many high-profile comedians into a single "must have" blanket license, and then making that license available only on an "all-or-nothing" basis, Word Collections has created for itself very significant market power in the market for licenses to the literary works embodied in comedy recordings.  In doing so, it and its affiliated comedians have harmed competition, among other reasons: by agreeing not to compete with each other; by agreeing jointly to exercise hold-up power where none previously existed; and by forcing services like Pandora to take a license and pay royalties at elevated levels where no license was previously needed and no additional royalties (beyond those paid to the record labels) were sought, or face potentially crippling infringement lawsuits.

Indeed, these anti-competitive tactics of the Word Collections cartel are in many respects even worse than what the music licensing PROs have done.  Some of

the more salient differences include:

- Unlike ASCAP, which was originally formed to address a specific need—namely, the uncompensated performance of songs in bars, restaurants, and concert halls by performers other than the songwriters—Word Collections does not help to address any real problem.  It only serves to frustrate a marketplace that has been operating well for decades.  The industry custom and practice has worked well to the mutual benefit of consumers, comedians, and services.  The Word Collections cartel's scheme is a solution in search of a problem.

- Unlike ASCAP and BMI, which, pursuant to the antitrust consent decrees they have entered into with the U.S. Department of Justice ("DOJ"), have numerous checks placed on their ability to fully exploit their market power to extract exorbitant fees—including the presence of a "rate court" that is tasked with determining fees that are in line with those that would emerge in a competitive marketplace—Word Collections is not so restrained and, as a result, has demanded exorbitant license fees under the threat of crippling infringement suits.

- Unlike ASCAP and BMI, which, pursuant to their antitrust consent decrees, are required to offer more flexible licensing options and ensure that licensees are able to enter into licenses directly with individual composers and publishers without having to pay twice for such rights, Word Collections only offers an "all-or-nothing" blanket license.  This licensing practice forces services to either take the offered license or stop using all of the content from the many comedians that Word Collections represents or risk, as Word Collections puts it, being "sued for willful copyright infringement with statutory damages up to $150,000 per infringement… [and] creating legal and financial liability

… that could run into the billions." *Frequently Asked Questions*, Word Collections (May 4, 2022, 5:37 PM), https://www.wordcollections.com/faqs.

- Unlike ASCAP and BMI, which, pursuant to their antitrust consent decrees, are prohibited from entering into exclusive licensing agreements with their affiliated composers and music publishers, upon information and belief, Word Collections has entered into exclusive affiliation agreements with many, if not all, of its affiliated comedians. The exclusive arrangements foreclose any possibility of a comedian affiliated with Word Collections from breaking free of the cartel and licensing his or her works on more competitive terms.

- Unlike music rights licensing, which, as the Supreme Court has observed, involves "thousands of users, thousands of copyright owners, and millions of compositions" (*Broadcast Music Inc.*, 441 U.S. at 20 (1979)), comedy performance rights licensing involves a far smaller universe of users, copyright owners, and works. There is no need for any collective licensing agent to deal with streaming services on behalf of the perhaps hundreds of comedians whose works interest listeners.

- Unlike with music rights licensing, where the songwriter and recording artist associated with a given recording are frequently not the same, the comedian is in almost all cases both the performer and the joke writer. Indeed, all seven of the comedians whose purported literary works are at issue are the same comedians who appear on the recordings appended to the Amended Consolidated Complaint. While it is questionable whether there should be separate licensing of musical works and the sound recordings embodying those musical works, there is clearly no valid reason to split the licensing of comedy recordings in two when the author of the literary work and the recording artist featured on the

1    comedy recording are the same person.

2    In short, there is no sound reason for upending decades-long industry custom

3    and practice in favor of the licensing practices from the dysfunctional music licensing

4    marketplace. Word Collections' efforts to do exactly this are not motivated by some

5    desire to improve comedy licensing or to perform some legitimate service for

6    comedians. Instead, it is motivated by a desire to fix prices and create for itself

7    monopoly power, all so that it can secure monopoly profits. These efforts must be

8    stopped for the good of consumers, comedians, and those that perform comedy alike.

9    While Word Collections and the Plaintiffs have thus far focused on streaming

10   services such as Pandora, the consequences of establishing their preferred new

11   licensing regime and accompanying new royalty obligation would cause significant

12   harm to many different types of businesses across many industries where comedy

13   routines are performed, distributed, or reproduced. A variety of bars, comedy clubs,

14   concert halls, radio stations, television stations, audio-visual streaming services,

15   cable operators, and record companies also are involved in the performance, copying,

16   or distribution of live or recorded comedy routines. Entities like these would also be

17   harmed, and may also be forced to stop offering comedy altogether, should Word

18   Collections and the Plaintiffs prevail here.

19   With this background in mind, we now turn to the responses to the Plaintiffs'

20   specific allegations.

21   ## RESPONSES TO SPECIFIC ALLEGATIONS

22   ## JURISDICTION

23   1.    Paragraph 1 contains characterizations and legal conclusions to which

24   no response is necessary. To the extent a response is required, Pandora admits that

25   Plaintiff purports to base jurisdiction over the subject matter of this action on the

26   statutory provisions cited.

27   2.    The allegations contained in Paragraph 2 call for legal conclusions to

28   which no response is necessary. To the extent a response is required, Pandora denies

- 19 -

the allegations, except admits that this Court has personal jurisdiction over Pandora for the claims asserted in the Amended Consolidated Complaint.

3.      Paragraph 3 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them, except that it admits that its principal place of business and its designated DMCA Copyright Agent are in Oakland, that it is qualified to do business in California, that it is registered as a foreign limited liability company with the California Secretary of State, and that it has an office in Santa Monica.

4.      Paragraph 4 contains characterizations and legal conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them, except it admits that it does business in California and that this Court has specific personal jurisdiction over Pandora for the claims asserted in the Amended Consolidated Complaint.

### VENUE

5.      Paragraph 5 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent those allegations are deemed factual and concern Pandora, Pandora denies them, except admits that venue in the district is proper.  To the extent those allegations are deemed factual and do not concern Pandora, Pandora denies knowledge or information sufficient to respond to such allegations.

### PARTIES

6.      Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 6.

7.      Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 7.

8.      Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 8.

9.      Pandora denies knowledge or information sufficient to respond to the

- 20 -

1    allegations in Paragraph 9.

2         10.    Pandora denies knowledge or information sufficient to respond to the

3    allegations in Paragraph 10.

4         11.    Pandora denies knowledge or information sufficient to respond to the

5    allegations in Paragraph 11.

6         12.    Pandora denies knowledge or information sufficient to respond to the

7    allegations in Paragraph 12.

8         13.    Pandora admits that it is a limited liability company organized under the

9    laws of Delaware, with its principal place of business at 2100 Franklin Street, Suite

10   700, Oakland, California 94612, and with a corporate office at 3000 Ocean Park

11   Boulevard, Suite 3050, Santa Monica, California 90405.

12                      **PRELIMINARY STATEMENT**

13        14.    Paragraph   14   contains   characterizations,   legal   argument,   and

14   conclusions to which no response is necessary.  To the extent those allegations are

15   deemed factual, Pandora denies them.

16                        **STATEMENT OF FACTS**

17        15.    Pandora denies knowledge or information sufficient to respond to the

18   allegations  in  Paragraph  15.    The  last  sentence  of  Paragraph  15  contains

19   characterizations, legal argument, and conclusions to which no response is necessary.

20   To the extent those allegations are deemed factual, Pandora denies them.

21        16.    Pandora denies knowledge or information sufficient to respond to the

22   allegations in Paragraph 16.

23        17.    Pandora denies knowledge or information sufficient to respond to the

24   allegations in Paragraph 17.

25                              **Bill Engvall**

26        18.    Pandora denies knowledge or information sufficient to respond to the

27   allegations in Paragraph 18.

28        19.    Pandora denies knowledge or information sufficient to respond to the

1   allegations in Paragraph 19.

2       20.     Pandora denies knowledge or information sufficient to respond to the

3   allegations in Paragraph 20.

4       21.     Pandora denies knowledge or information sufficient to respond to the

5   allegations in Paragraph 21 concerning Bill Engvall and denies the remaining

6   allegations in Paragraph 21.

7       22.     Pandora denies the allegations contained in the first three sentences of

8   Paragraph 22, except it admits that Pandora has made recordings featuring comedy

9   routines performed by Bill Engvall available on its service.  The remainder of the

10  allegations in Paragraph 22 do not concern Pandora, and Pandora denies knowledge

11  or information sufficient to respond to such allegations.

12      23.     The first two sentences of Paragraph 23 contain characterizations, legal

13  argument, and conclusions to which no response is necessary; to the extent those

14  allegations are deemed factual, Pandora denies them.  Pandora denies the allegations

15  contained in the remainder of Paragraph 23, except it admits that Pandora has made

16  recordings featuring comedy routines performed by Bill Engvall available on its

17  service and that Pandora is a wholly owned subsidiary of Sirius XM Radio Inc.

18      24.     Paragraph 24 contains characterizations, legal argument, and

19  conclusions to which no response is necessary.  To the extent those allegations are

20  deemed factual, Pandora denies them.

21      25.     Paragraph 25 contains characterizations, legal argument, and

22  conclusions to which no response is necessary.  To the extent the allegations are

23  deemed factual, Pandora denies them.

24      26.     Pandora denies knowledge or information sufficient to respond to the

25  allegations in Paragraph 26.

26      27.     Paragraph 27 contains characterizations, legal argument, and

27  conclusions to which no response is necessary.  To the extent those allegations are

28  deemed factual, Pandora denies them.

28.     Paragraph 28 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them, except Pandora admits that representatives of Word Collections contacted Pandora in August 2020 and various times thereafter.

29.     Paragraph 29 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them, except Pandora admits that it communicated with Word Collections on September 14, 2021.

30.     Pandora denies knowledge or information sufficient to respond to the allegations in the first sentence of Paragraph 30.  The second sentence of Paragraph 30 contains characterizations, legal argument, and conclusions to which no response is necessary; to the extent those allegations are deemed factual, Pandora denies them.

31.     Paragraph 31 contains no factual allegations about Pandora or other allegations to which a response is required.  To the extent those allegations are deemed to require a response, Pandora denies them.

**<u>George Carlin</u>**

32.     Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 32.

33.     Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 33.

34.     Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 34.

35.     Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 35.

36.     Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 36.

37.     Pandora denies the allegations contained in the first three sentences of Paragraph 37, except it admits that Pandora has made recordings featuring comedy

routines performed by George Carlin available on its service.  The remainder of the allegations in Paragraph 37 do not concern Pandora, and Pandora denies knowledge or information sufficient to respond to such allegations.

38.    The first two sentences of Paragraph 38 contain characterizations, legal argument, and conclusions to which no response is necessary; to the extent those allegations are deemed factual, Pandora denies them.  Pandora denies the allegations contained in the remainder of Paragraph 38, except it admits that Pandora has made recordings featuring comedy routines performed by George Carlin available on its service and that Pandora is a wholly owned subsidiary of Sirius XM Radio Inc.

39.    Paragraph 39 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them.

40.    Paragraph 40 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them.

41.    Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 41.

42.    Paragraph 42 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them.

43.    Paragraph 43 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them, except Pandora admits that representatives of Word Collections contacted Pandora in August 2020.

44.    Paragraph 44 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them, except Pandora admits that it communicated with Word Collections on September 14, 2021.

45.     Paragraph 45 contains no factual allegations about Pandora or other allegations to which a response is required.  To the extent those allegations are deemed to require a response, Pandora denies them.

### Ron "Tater Salad" White

46.     Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 46.

47.     Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 47.

48.     Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 48.

49.     Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 49.

50.     Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 50.

51.     Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 51.

52.     Pandora denies the allegations contained in the first three sentences of Paragraph 52, except it admits that Pandora has made recordings featuring comedy routines performed by Ron White available on its service.  The remainder of the allegations in Paragraph 52 do not concern Pandora, and Pandora denies knowledge or information sufficient to respond to such allegations.

53.     The first two sentences of Paragraph 53 contain characterizations, legal argument, and conclusions to which no response is necessary; to the extent those allegations are deemed factual, Pandora denies them.  Pandora denies the allegations contained in the remainder of Paragraph 53, except it admits that Pandora has made recordings featuring comedy routines performed by Mr. White available on its service and that Pandora is a wholly owned subsidiary of Sirius XM Radio Inc.

54.     Paragraph   54   contains   characterizations,   legal   argument,   and

- 25 -

conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them.

55.     Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 55.

56.     Paragraph 56 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent the allegations are deemed factual, Pandora denies them.

57.     Paragraph 57 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them, except Pandora admits that representatives of Word Collections contacted Pandora in August 2020.

58.     Paragraph 58 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them, except Pandora admits that it communicated with Word Collections on September 14, 2021.

59.     Paragraph 59 contains no factual allegations about Pandora or other allegations to which a response is required.  To the extent those allegations are deemed to require a response, Pandora denies them.

**Robin Williams**

60.     Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 60.

61.     Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 61.

62.     Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 62.

63.     Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 63.

64.     Pandora denies knowledge or information sufficient to respond to the

1    allegations in Paragraph 64.

2        65.    Pandora denies the allegations contained in the first three sentences of

3    Paragraph 65, except it admits that Pandora has made recordings featuring comedy

4    routines performed by Robin Williams available on its service.  The remainder of the

5    allegations in Paragraph 65 do not concern Pandora, and Pandora denies knowledge

6    or information sufficient to respond to such allegations.

7        66.    The first two sentences of Paragraph 66 contain characterizations, legal

8    argument, and conclusions to which no response is necessary; to the extent those

9    allegations are deemed factual, Pandora denies them.  Pandora denies the allegations

10   contained in the remainder of Paragraph 66, except it admits that Pandora has made

11   recordings featuring comedy routines performed by Mr. Williams available on its

12   service and that Pandora is a wholly owned subsidiary of Sirius XM Radio Inc.

13       67.    Paragraph 67 contains characterizations, legal argument, and

14   conclusions to which no response is necessary.  To the extent those allegations are

15   deemed factual, Pandora denies them.

16       68.    Paragraph 68 contains characterizations, legal argument, and

17   conclusions to which no response is necessary.  To the extent the allegations are

18   deemed factual, Pandora denies them.

19       69.    Paragraph 69 contains characterizations, legal argument, and

20   conclusions to which no response is necessary.  To the extent the allegations are

21   deemed factual, Pandora denies knowledge or information sufficient to respond to

22   the allegations in Paragraph 69.

23       70.    Paragraph 70 contains characterizations, legal argument, and

24   conclusions to which no response is necessary.  To the extent the allegations are

25   deemed factual, Pandora denies knowledge or information sufficient to respond to

26   the allegations in Paragraph 70.

27       71.    Paragraph 71 contains characterizations, legal argument, and

28   conclusions to which no response is necessary.  To the extent those allegations are

deemed factual, Pandora denies them, except Pandora admits that representatives of Word Collections contacted Pandora in August 2020 and at times thereafter.

72.    Paragraph 72 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them, except Pandora admits that it communicated with Word Collections on September 14, 2021.

73.    Paragraph 73 contains no factual allegations about Pandora or other allegations to which a response is required.  To the extent those allegations are deemed to require a response, Pandora denies them.

**Andrew Dice Clay**

74.    Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 74.

75.    Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 75.

76.    Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 76.

77.    Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 77.

78.    Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 78.

79.    Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 79.

80.    Pandora denies the allegations contained in the first three sentences of Paragraph 80, except it admits that Pandora has made recordings featuring comedy routines performed by Andrew Clay Silverstein available on its service.  The remainder of the allegations in Paragraph 80 do not concern Pandora, and Pandora denies knowledge or information sufficient to respond to such allegations.

81.    The first two sentences of Paragraph 81 contain characterizations, legal

argument, and conclusions to which no response is necessary; to the extent those allegations are deemed factual, Pandora denies them.  Pandora denies the allegations contained in the remainder of Paragraph 81, except it admits that Pandora has made recordings featuring comedy routines performed by Andrew Clay Silverstein available on its service and that Pandora is a wholly owned subsidiary of Sirius XM Radio Inc.

82.    Paragraph 82 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them.

83.    Paragraph 83 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent the allegations are deemed factual, Pandora denies them.

84.    Paragraph 84 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent the allegations are deemed factual, Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 84.

85.    Paragraph 85 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them, except Pandora admits that representatives of Word Collections contacted Pandora in August 2020 and at times thereafter.

86.    Paragraph 86 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them, except Pandora admits that it communicated with Word Collections on September 14, 2021.

87.    Paragraph 87 contains no factual allegations about Pandora or other allegations to which a response is required.  To the extent those allegations are deemed to require a response, Pandora denies them.

**Nick Di Paolo**

88.    Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 88.

89.    Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 89.

90.    Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 90.

91.    Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 91.

92.    Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 92.

93.    Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 93.

94.    Pandora denies the allegations contained in the first three sentences of Paragraph 94, except it admits that Pandora has made recordings featuring comedy routines performed by Nick Di Paolo available on its service.  The remainder of the allegations in Paragraph 94 do not concern Pandora, and Pandora denies knowledge or information sufficient to respond to such allegations.

95.    The first two sentences of Paragraph 95 contain characterizations, legal argument, and conclusions to which no response is necessary; to the extent those allegations are deemed factual, Pandora denies them.  Pandora denies the allegations contained in the remainder of Paragraph 95, except it admits that Pandora has made recordings featuring comedy routines performed by Mr. Di Paolo available on its service and that Pandora is a wholly owned subsidiary of Sirius XM Radio Inc.

96.    Paragraph 96 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them.

97.    Paragraph 97 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent the allegations are

1   deemed factual, Pandora denies them.

2        98.    Pandora denies knowledge or information sufficient to respond to the

3   allegations in Paragraph 98.

4        99.    Paragraph 99 contains characterizations, legal argument, and

5   conclusions to which no response is necessary.  To the extent the allegations are

6   deemed factual, Pandora denies them.

7        100. Paragraph 100 contains characterizations, legal argument, and

8   conclusions to which no response is necessary.  To the extent those allegations are

9   deemed factual, Pandora denies them, except Pandora admits that representatives of

10   Word Collections contacted Pandora in August 2020 and at times thereafter.

11        101. Paragraph 101 contains characterizations, legal argument, and

12   conclusions to which no response is necessary.  To the extent those allegations are

13   deemed factual, Pandora denies them, except Pandora admits that it communicated

14   with Word Collections on September 14, 2021.

15        102. Paragraph 102 contains no factual allegations about Pandora or other

16   allegations to which a response is required.  To the extent those allegations are deemed

17   to require a response, Pandora denies them.

18                      **Bill Hicks**

19        103. Pandora denies knowledge or information sufficient to respond to the

20   allegations in Paragraph 103.

21        104. Pandora denies knowledge or information sufficient to respond to the

22   allegations in Paragraph 104.

23        105. Pandora denies knowledge or information sufficient to respond to the

24   allegations in Paragraph 105.

25        106. Pandora denies knowledge or information sufficient to respond to the

26   allegations in Paragraph 106.

27        107. Pandora denies knowledge or information sufficient to respond to the

28   allegations in Paragraph 107.

108.   Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 108.

109.   Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 109.

110.   Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 110.

111.   Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 111.

112.   Pandora denies the allegations contained in the first three sentences of Paragraph 112, except it admits that Pandora has made recordings featuring comedy routines performed by Bill Hicks available on its service.  The remainder of the allegations in Paragraph 112 do not concern Pandora, and Pandora denies knowledge or information sufficient to respond to such allegations.

113.   The first two sentences of Paragraph 113 contain characterizations, legal argument, and conclusions to which no response is necessary; to the extent those allegations are deemed factual, Pandora denies them.  Pandora denies the allegations contained in the remainder of Paragraph 113, except it admits that Pandora has made recordings featuring comedy routines performed by Bill Hicks available on its service and that Pandora is a wholly owned subsidiary of Sirius XM Radio Inc.

114.   Paragraph 114 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them.

115.   Paragraph 115 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent the allegations are deemed factual, Pandora denies them.

116.   Pandora denies knowledge or information sufficient to respond to the allegations in Paragraph 116.

117.   Paragraph 117 contains characterizations, legal argument, and

- 32 -

conclusions to which no response is necessary.  To the extent the allegations are deemed factual, Pandora denies them.

118. Paragraph 118 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them, except Pandora admits that representatives of Word Collections contacted Pandora in August 2020 and at times thereafter.

119. Paragraph 119 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them, except Pandora admits that it communicated with Word Collections on September 14, 2021.

120. Paragraph 120 contains no factual allegations about Pandora or other allegations to which a response is required.  To the extent those allegations are deemed to require a response, Pandora denies them.

### Pandora's Willful Infringement of the Works

121. Pandora denies that Plaintiffs have accurately and completely characterized Pandora's website, except it admits that Pandora provides a personalized listening experience available to its users through its mobile app and on the web at www.pandora.com.

122. Paragraph 122 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them.

123. Paragraph 123 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them.

124. Paragraph 124 contains characterizations, legal argument, and conclusions to which no response is necessary.  To the extent those allegations are deemed factual and concern Pandora, Pandora admits that it enters into licensing agreements with performance rights organizations BMI and ASCAP but otherwise

- 33 -

1    denies the allegations.

2        125.   Paragraph 125 contains characterizations, legal argument, and

3    conclusions to which no response is necessary.  To the extent those allegations are

4    deemed factual, Pandora denies them.

5        126.   Paragraph 126 contains characterizations, legal argument, and

6    conclusions to which no response is necessary.  To the extent the allegations in

7    Paragraph 126 purport to quote from Pandora's SEC 10K filings from 2011 to 2017,

8    Pandora denies that Plaintiffs have accurately and completely characterized those

9    statements.  To the extent the remaining allegations in Paragraph 126 are deemed

10   factual, Pandora denies them.

11       127.   Paragraph 127 contains characterizations, legal argument, and

12   conclusions to which no response is necessary.  To the extent the allegations in

13   Paragraph 127 purport to quote from Pandora's SEC filing, Pandora denies that

14   Plaintiffs have accurately and completely characterized those statements.  To the

15   extent the remaining allegations in Paragraph 127 are deemed factual, Pandora denies

16   them.

17       128.   Paragraph 128 contains characterizations, legal argument, and

18   conclusions to which no response is necessary.  To the extent those allegations are

19   deemed factual, Pandora denies them.

20       129.   Paragraph 129 contains characterizations, legal argument, and

21   conclusions to which no response is necessary.  To the extent those allegations are

22   deemed factual, Pandora denies them, except admits that Pandora has never been

23   profitable and royalties it pays are its largest expense.

24       130.   Paragraph 130 contains characterizations, legal argument, and

25   conclusions to which no response is necessary.  To the extent those allegations are

26   deemed factual, Pandora denies them.

27       131.   Paragraph 131 contains characterizations, legal argument, and

28   conclusions to which no response is necessary.  To the extent those allegations are

1  deemed factual, Pandora denies them.

2  **WITH RESPECT TO THE CAUSE OF ACTION**

3  132. Pandora repeats and reasserts its responses to each of the preceding

4  paragraphs as if fully set forth herein.

5  133. Paragraph 133 contains characterizations, legal argument, and

6  conclusions to which no response is necessary. To the extent the allegations are

7  deemed factual, Pandora denies knowledge or information sufficient to respond to

8  the allegations in Paragraph 133.

9  134. Paragraph 134 contains legal argument and conclusions to which no

10  response is necessary. To the extent those allegations are deemed factual, Pandora

11  denies them.

12  135. Paragraph 135 contains legal argument and conclusions to which no

13  response is necessary. To the extent those allegations are deemed factual, Pandora

14  denies them, except admits that it made recordings featuring comedy routines

15  performed by Plaintiffs available on its service.

16  136. Paragraph 136 contains legal argument and conclusions to which no

17  response is necessary. To the extent those allegations are deemed factual, Pandora

18  denies them.

19  137. Paragraph 137 contains legal argument and conclusions to which no

20  response is necessary. To the extent those allegations are deemed factual, Pandora

21  denies them.

22  138. Paragraph 138 contains legal argument and conclusions to which no

23  response is necessary. To the extent those allegations are deemed factual, Pandora

24  denies them.

25  139. Paragraph 139 contains legal argument and conclusions to which no

26  response is necessary. To the extent those allegations are deemed factual, Pandora

27  denies them, except admits that it made recordings featuring comedy routines

28  performed by Plaintiffs available on its service.

140.   Paragraph 140 contains legal argument and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them.

141.   Paragraph 141 contains legal argument and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them.

142.   Paragraph 142 contains legal argument and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them.

143.   Paragraph 143 contains legal argument and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them.

144.   Paragraph 144 contains legal argument and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them.

145.   Paragraph 145 contains legal argument and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them.

146.   Paragraph 146 contains legal argument and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them.

147.   Paragraph 147 contains legal argument and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them.

148.   Paragraph 148 contains legal argument and conclusions to which no response is necessary.  To the extent those allegations are deemed factual, Pandora denies them.

149.   Paragraph 149 contains legal argument and conclusions to which no

1  response is necessary.  To the extent those allegations are deemed factual, Pandora

2  denies them.

3       150.   Paragraph 150 contains legal argument and conclusions to which no

4  response is necessary.  To the extent those allegations are deemed factual, Pandora

5  denies them.

6       151.   Paragraph 151 contains legal argument and conclusions to which no

7  response is necessary.  To the extent those allegations are deemed factual, Pandora

8  denies them.

9       152.   Paragraph 152 contains legal argument and conclusions to which no

10  response is necessary.  To the extent those allegations are deemed factual, Pandora

11  denies them.

12       153.   Paragraph 153 contains legal argument and conclusions to which no

13  response is necessary.  To the extent those allegations are deemed factual, Pandora

14  denies them.

15  ## <u>GENERAL DENIAL OF ALLEGATIONS IN THE AMENDED</u>

16  ## <u>CONSOLIDATED COMPLAINT</u>

17       Pandora denies any allegations not specifically responded to above, whether

18  expressed, implied, or contained in headings appearing throughout the Amended

19  Consolidated Complaint.

20  ## <u>DEFENSES</u>

21       Without assuming the burden of proof where such burden properly rests with

22  Plaintiffs, and expressly reserving and not waiving the right to assert any and all

23  defenses at such time and to such extent as discovery and factual developments

24  establish a basis therefor, Pandora hereby asserts the following defenses to the claims

25  asserted in the Amended Consolidated Complaint.

26  ## <u>First Defense</u>

27  ## **(Copyright Misuse)**

28       As a separate and first defense to the Amended Consolidated Complaint and

- 37 -

each purported cause of action contained therein against Defendant, Defendant is informed and believes and thereon alleges that the claims made in the Amended Consolidated Complaint and the relief sought therein are barred, in whole or in part, on the basis that Plaintiffs have engaged in one or more acts that constitute misuse of their copyrights, including without limitation by: wrongfully attempting to extend those rights beyond the scope of the limited monopoly granted by the Copyright Act; prejudicing the rights of their co-authors, including by omitting them from their copyright registrations; misrepresenting the scope of their copyrights; seeking license fees to which they are not entitled; engaging in horizontal price-fixing; engaging in illegal tying, gaining, seeking to gain, or conspiring to gain an improper monopoly; gaining, seeking to gain, or conspiring to gain and abuse market power; and engaging in other anticompetitive conduct.

## Second Defense

### (Failure to State a Claim)

As a separate and second defense to the Amended Consolidated Complaint and each purported cause of action contained therein against Defendant, Defendant avers that the claims made in the Amended Consolidated Complaint and the relief sought therein fail to allege facts sufficient to support a claim upon which relief can be granted.

## Third Defense

### (Abandonment)

As a separate and third defense to the allegations in the Amended Consolidated Complaint and each purported cause of action contained therein against Defendant, Defendant is informed and believes and thereon alleges that the claims made in the Amended Consolidated Complaint and the relief sought therein are barred, in whole or in part, to the extent that Plaintiffs abandoned or forfeited their copyrights, including by publication without notice.

**Fourth Defense**

**(Waiver)**

As a separate and fourth defense to the allegations in the Amended Consolidated Complaint and each purported cause of action contained therein against Defendant, Defendant is informed and believes and thereon alleges that Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver because Plaintiffs agreed to make their Works available for streaming through Defendant's service, accepted royalties for such use, encouraged Pandora's use of the Works, and through their alleged licensing agent, requested that Pandora continue streaming those Works.

**Fifth Defense**

**(Fair Use)**

As a separate and fifth defense to the allegations in the Amended Consolidated Complaint and each purported cause of action contained therein against Defendant, Defendant is informed and believes and thereon alleges that the claims made in the Amended Consolidated Complaint and the relief sought therein are barred, in whole or in part, by the fair use doctrine, including because Defendant's use of the Works was consistent with long-standing industry custom and practice, and to the extent intermediate copies were made for the purpose of licensed or otherwise lawful uses of the Works or derivative works based thereon.

**Sixth Defense**

**(License)**

As a separate and sixth defense to the allegations in the Amended Consolidated Complaint and each purported cause of action contained therein against Defendant, Defendant is informed and believes and thereon alleges that the claims in the Amended Consolidated Complaint are barred, in whole or in part, because Defendant's use of the Works was authorized by express, statutory, and/or implied licenses.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### **Seventh Defense**

### **(Statute of Limitations)**

As a separate and seventh defense to the allegations in the Amended Consolidated Complaint and each purported cause of action contained therein against Defendant, Defendant is informed and believes and thereon alleges that the claims made in the Amended Consolidated Complaint and the relief sought therein are barred, in whole or in part, on the basis that Plaintiffs' claims are brought beyond the expiration of the applicable statute of limitations.

### **Eighth Defense**

### **(Failure to Mitigate Damages)**

As a separate and eighth defense to the allegations in the Amended Consolidated Complaint and each purported cause of action contained therein against Defendant, Defendant is informed and believes and thereon alleges that Plaintiffs have failed to mitigate and/or attempt to mitigate their damages, if any damages have been and/or will be sustained, and any recovery by Plaintiff must be diminished or barred by reason thereof.

### **Ninth Defense**

### **(Lack of Ownership)**

As a separate and ninth defense to the allegations in the Amended Consolidated Complaint and each purported cause of action contained therein against Defendant, Defendant is informed and believes and thereon alleges that the claims made in the Amended Consolidated Complaint and the relief sought therein are barred, in whole or in part, to the extent that Plaintiffs are not the owners of one or more of the copyrights at issue.

### **Tenth Defense**

### **(No Causation)**

As a separate and tenth defense to the allegations in the Amended Consolidated Complaint and each purported cause of action contained therein against Defendant,

- 40 -

1  Defendant is informed and believes and thereon alleges that the claims in the
2  Amended Consolidated Complaint are barred, in whole or in part, to the extent
3  Defendant's actions were not the proximate cause of any infringement or alleged
4  damages suffered by Plaintiffs.

**Eleventh Defense**

**(Adequate Remedy at Law)**

7       As a separate and eleventh defense to the allegations in the Amended
8  Consolidated Complaint and each purported cause of action contained therein against
9  Defendant, Defendant is informed and believes and thereon alleges that injunctive
10  and any other equitable relief sought by Plaintiffs is barred, in whole or in part,
11  because Plaintiffs have available an adequate remedy at law for any alleged harm
12  they have suffered.

**Twelfth Defense**

**(Invalid Copyright Registration)**

15       As a separate and twelfth defense to the allegations in the Amended
16  Consolidated Complaint and each purported cause of action contained therein against
17  Defendant, Defendant is informed and believes and thereon alleges that the claims in
18  the Amended Consolidated Complaint are barred, in whole or in part, because one or
19  more registrations upon which Plaintiffs' right to bring the claims rests was obtained
20  through fraud on the Copyright Office, including by making knowing
21  misrepresentations regarding the facts related to Plaintiffs' copyright claims, where
22  if the true facts were known to the Copyright Office, such knowledge would have
23  resulted in denial of registration, and is otherwise invalid, or does not cover the
24  Works at issue in this action.

**Thirteenth Defense**

**(Innocent Infringement)**

27       As a separate and thirteenth defense to the allegations in the Amended
28  Consolidated Complaint and each purported cause of action contained therein against

1    Defendant, Defendant is informed and believes and thereon alleges that any statutory

2    damages sought in the Amended Consolidated Complaint must be reduced because

3    Defendant reasonably believed its conduct was non-infringing pursuant to long-

4    standing industry custom and practice.

5                                    **Fourteenth Defense**

6                                        **(Standing)**

7            As a separate and fourteenth defense to the allegations in the Amended

8    Consolidated Complaint and each purported cause of action contained therein against

9    Defendant, Defendant is informed and believes and thereon alleges that each of the

10   claims in the Amended Consolidated Complaint is barred, in whole or in part,

11   because Plaintiffs lack standing to bring those claims, including to the extent

12   Plaintiffs are not corporations in good standing, a corporate entity purports to sue on

13   behalf of an individual, or an individual purports to sue on behalf of a corporation.

14                                    **Fifteenth Defense**

15                                        **(Laches)**

16           As a separate and fifteenth defense to the allegations in the Amended

17   Consolidated Complaint and each purported cause of action contained therein against

18   Defendant, Defendant is informed and believes and thereon alleges that because

19   Plaintiffs have unreasonably delayed in bringing the claims set forth in the Amended

20   Consolidated Complaint, despite admitting long-standing awareness of Defendant's

21   alleged wrongdoing in their own pleading, any equitable relief sought by Plaintiffs

22   should be barred or limited by the doctrine of laches.

23                                    **Sixteenth Defense**

24                                        **(Estoppel)**

25           As a separate and sixteenth defense to the allegations in the Amended

26   Consolidated Complaint and each purported cause of action contained therein against

27   Defendant, Defendant is informed and believes and thereon alleges that each of the

28   claims in the Amended Consolidated Complaint is barred, in whole or in part, by the

doctrine of estoppel. Plaintiffs were aware of Defendant's use of the Works for many years, and their representatives encouraged Defendants to use and continue using the Works and otherwise acted consistent with their desire to have Defendant continue playing the licensed recordings featuring the Works. Defendant relied upon Plaintiffs' encouragement and other conduct to its detriment.

### Seventeenth Defense

### (Unclean Hands)

As a separate and seventeenth defense to the allegations in the Amended Consolidated Complaint and each purported cause of action contained therein against Defendant, Defendant is informed and believes and thereon alleges that Plaintiffs' own conduct with respect to the matters alleged in the Amended Consolidated Complaint constitute unclean hands. Plaintiffs have misrepresented the scope of their copyrights, including without limitation, in connection with their copyright registrations, sought license fees to which they are not entitled, and used their copyrights in furtherance of anticompetitive conduct, including by: engaging in horizontal price-fixing, engaging in illegal tying, gaining, seeking to gain, or conspiring to gain an improper monopoly, gaining, seeking to gain, or conspiring to gain and abuse market power, and engaging in other anticompetitive conduct. By reason of not coming into court with clean hands, equity should bar or limit any relief sought by Plaintiffs.

### Eighteenth Defense

### (*De Minimis* Copying)

As a separate and eighteenth defense to the allegations in the Amended Consolidated Complaint and each purported cause of action contained therein against Defendant, Defendant is informed and believes and thereon alleges that each of the claims in the Amended Consolidated Complaint is barred, in whole or in part, to the extent Defendant's use of the Works was incidental and *de minimis*, and therefore not actionable.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### Nineteenth Defense

### (Public Domain)

As a separate and nineteenth defense to the allegations in the Amended Consolidated Complaint and each purported cause of action contained therein against Defendant, Defendant is informed and believes and thereon alleges that the claims are barred, in whole or in part, on the basis that one or more of the Works at issue have entered the public domain, whether by publication without notice, failure to observe other copyright formalities, or otherwise.

### PRAYER FOR RELIEF

Wherefore, Pandora prays that this Court:

(a) Dismiss Plaintiffs' Amended Consolidated Complaint in its entirety with prejudice;

(b) Enter judgment in favor of Pandora and against Plaintiffs on the cause of action set forth in the Amended Consolidated Complaint;

(c) Award attorneys' fees and costs in favor of Pandora against Plaintiffs as permitted by applicable law; and

(d) Award such other and further relief as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Pandora demands a jury trial on all claims herein.

1   Dated:  May 5, 2022                    MAYER BROWN LLP
                                           PAUL M. FAKLER
2                                          JACOB B. EBIN
                                           ALLISON AVIKI
3                                          WILLIAM H. STALLINGS
                                           CHRISTOPHER J. KELLY
4                                          JOHN NADOLENCO
                                           DANIEL D. QUEEN
5                                          MEERIM NEHME

6

7                                          By: */s/ Paul M. Fakler*
                                           Paul M. Fakler
8

9                                          MAYER BROWN LLP
                                           WILLIAM H. STALLINGS (*pro hac*
10                                         *vice pending*)
                                           *wstallings@mayerbrown.com*
11                                         1999 K Street, NW
                                           Washington, D.C.  20006-1101
12                                         Telephone: (202) 263-3000
                                           Facsimile: (202) 262-3300
13
                                           MAYER BROWN LLP
14                                         CHRISTOPHER J. KELLY (SBN
                                           276312)
15                                         *cjkelly@mayerbrown.com*
                                           Two Palo Alto Square
16                                         3000 El Camino Real
                                           Palo Alto, California  94306-2112
17                                         Telephone: (650) 331-2000
                                           Facsimile: (650) 331-2060
18
                                           Attorneys for Defendant
19                                         PANDORA MEDIA, LLC

20

21

22

23

24

25

26

27

28

- 45 -