MAYER BROWN LLP
PAUL M. FAKLER (*pro hac vice*)
*pfakler@mayerbrown.com*
JACOB B. EBIN (*pro hac vice forthcoming*)
*jebin@mayerbrown.com*
ALLISON AVIKI (*pro hac vice*)
*aaviki@mayerbrown.com*
1221 Avenue of the Americas
New York, New York  10020-1001
Telephone: (212) 506-2500
Facsimile: (212) 262-1910

MAYER BROWN LLP
JOHN NADOLENCO (SBN 181128)
*jnadolenco@mayerbrown.com*
DANIEL D. QUEEN (SBN 292275)
*dqueen@mayerbrown.com*
MEERIM A. NEHME (SBN 322234)
*mnehme@mayerbrown.com*
350 S. Grand Avenue, 25th Floor
Los Angeles, California  90071-1503
Telephone:  (213) 229-9500
Facsimile:   (213) 625-0248

[*Additional counsel listed on signature page*]

Attorneys for Defendant
Pandora Media, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re PANDORA MEDIA, LLC COPYRIGHT LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS* | Master File No. 2:22-cv-00809-MCS-MAR<br><br>CONSOLIDATED ACTION<br><br>**DEFENDANT AND COUNTERCLAIMANT PANDORA MEDIA, LLC'S COUNTERCLAIMS TO PLAINTIFFS' AMENDED CONSOLIDATED COMPLAINT AGAINST ALL PLAINTIFFS/COUNTERCLAIM DEFENDANTS AND COUNTERCLAIM DEFENDANT WORDCOLLECTIONS, INC.** |

Pursuant to Rule 13 of the Federal Rules of Civil Procedure, Defendant Pandora Media, LLC ("Pandora"), by way of its attorneys, hereby states for its Counterclaims against Plaintiffs and Counterclaim Defendants Yellow Rose Productions, Inc., on behalf of Bill Engvall ("Yellow Rose"), Main Sequence, Ltd. ("Main Sequence"), Ron White, Inc. ("White, Inc."), Robin Williams Trust ("Williams Trust"), Brave Lion, Inc., on behalf of Andrew Clay Silverstein a/k/a/ Andrew Dice Clay ("Brave Lion"), Nick Di Paolo, individually and on behalf of Acid Tongue, Inc. ("Di Paolo"), Mary Reese Hicks, individually and on behalf of Arizona Bay Production Co., Inc. ("Hicks"), and Counterclaim Defendant WordCollections, Inc. ("Word Collections"; collectively, "Counterdefendants"), the following:

## I.    NATURE OF THE ACTION

1.     These Counterclaims seek injunctive relief, treble damages, and the cost of suit, including reasonable attorney's fees, and other relief under Federal antitrust laws, 15 U.S.C. §§ 1, 2, 15 and 26, to remedy a conspiracy in unreasonable restraint of trade, a conspiracy to monopolize, monopolization and attempted monopolization by Counterdefendants.

2.     For years, Pandora and many other services have enabled their listeners and subscribers to listen to recordings of comedians' performances.  Pandora does not need access to all comedians' recordings in order to offer a viable comedy streaming service.  In a competitive market, then, comedians compete to have Pandora and other services play their recordings and the underlying comedy routines embodied in those recordings.  Pandora has always satisfied its copyright obligations to comedians by paying millions of dollars in license fees every year to the owners of the copyright in the sound recordings of the comedians' performances, which in turn shared those payments with the comedians.  No comedian ever sought to raise the price to Pandora by separately licensing or charging an additional royalty for any

---

\*   This caption is formatted pursuant to the Court's March 22, 2022 Order Consolidating Cases.  ECF Doc. No. 18.

rights in the "literary works"—*i.e.*, jokes—underlying the licensed recordings. Instead, comedians chose unilaterally to benefit from the royalties they were already receiving for the use of the comedy recordings and the added promotional and other benefits that the services gave them, creating additional demand for their live performances and otherwise benefiting the comedians.  Comedians were clearly satisfied with this long-standing custom and practice—one that predates Pandora by many decades—as demonstrated by the fact that they and their representatives regularly reached out to Pandora in order to secure more plays of their recordings. Doing so would make no economic sense if the comedians felt that they were not being appropriately compensated by Pandora.

3.     Then, in late 2020, Counterdefendant Word Collections announced its launch.  As a "first of its kind Performing Rights Collection Agency," Word Collections said that it would license to Pandora and other services the comedians' asserted "literary works" rights and collect additional royalties for those rights.

4.     But Word Collections' true business model is not that of a benign licensing agent or an advocate for comedians' intellectual property rights; it is that of a cartel leader.  Word Collections has consolidated its comedians' naturally competing rights into a monopolistic portfolio and fixed the price of the only license available for those rights, ensuring that services have no alternative to its blanket license for its entire portfolio.  In place of the above-noted historic custom and practice that has worked to the mutual benefit of all involved, or a market in which comedians actively compete with each other on the price of literary works rights to have Pandora and others perform their comedy routines, Word Collections seeks to build a market in which it: (a) fixes supracompetitive literary works rights royalties with its co-conspirator comedian "clients," including the other Counterdefendants; (b) accumulates monopoly power in literary works rights licensing; and (c) uses that monopoly power to foreclose competition through its full-portfolio mandatory blanket license and by tying the literary works rights that give it monopoly power to

rights in other literary works, including comedy and other literary works, that Pandora and other services do not need. On information and belief, Word Collections has coordinated and funded the filing of the Amended Consolidated Complaint to impose this dysfunctional market on all manner of entities that perform, reproduce or distribute comedy through the threat of crippling infringement penalties.

5.     The result of Word Collections' anticompetitive tactics is to create for itself and the comedians that join its scheme hold-up power over services like Pandora, to exploit that hold-up power by dramatically increasing the price that Pandora and others have to pay to make comedy recordings available to their listeners, and to hamper the ability of Pandora and other services to respond to consumer demand for high-quality comedy services.

6.     While, as set forth in Pandora's Answer to the Amended Consolidated Complaint, Pandora disputes Counterdefendants' infringement claims, these antitrust counterclaims assume *arguendo* that there exist public performance, reproduction and/or distribution rights in the jokes embodied in comedy recordings and that comedians, as authors of those jokes, might have retained those rights and, if so, could unilaterally upend historic practice and try to separately license them. These antitrust counterclaims instead challenge how Counterdefendants have agreed to suppress competition that otherwise would exist in the licensing of those rights.

## II.     THE PARTIES

7.     A Delaware limited liability company and a subsidiary of SiriusXM Radio Inc. ("SiriusXM"), Pandora is an ad-supported audio entertainment streaming service in the United States. Pandora provides its users with music, comedy and other spoken-word audio programming through internet-connected devices. Pandora has long been and remains best known for its flagship free-to-the-consumer non-interactive internet radio service, which currently has approximately 50 million monthly active users. That service offers listeners a "radio-style" or "lean-back" listening experience, by which Pandora creates for each listener an individualized

play-list.  After creating an account, a listener need only "seed" a station or select a "genre" and then music or spoken-word content will begin to play.  To create a "seeded" station, the listener simply types the name of an artist, composer (for classical music), or song title to serve as the starting point or "seed" of the station. Pandora then automatically creates a station centered around that "seed," which— through use of its Music and Comedy Genome Projects and a combination of proprietary playlist algorithms—will play tracks whose characteristics are similar to those of the "seed."  As an alternative, a user can select a "genre" station, which begins as a pre-programmed collection of tracks that reflect a certain style or preference.  Each genre station is initially populated by tracks selected by Pandora. While the listener is not able to select any particular song or artist to hear at any given time, the listener is able to provide Pandora with feedback regarding likes and dislikes.  This feedback is used to further refine each listener's personalized station.

8.     In addition to its free ad-supported service, Pandora offers two subscription services.  Its second most popular offering, Pandora Plus (formerly called Pandora One), is an ad-free subscription service that includes some semi-interactive features, such as song replays and caching of a limited number of stations to enable offline listening when users do not have internet access, but does not provide users with the ability to select particular songs or albums on demand. Pandora's other subscription service—Pandora Premium—is a fully on-demand service that allows subscribers to select what recordings they want to listen to and when.

9.     According to the Amended Consolidated Complaint, Counterdefendant Yellow Rose is "a corporation in the care of JP Williams and Jennifer Riker of Parallel Entertainment located at 9696 Culver Boulevard, Suite 308, Culver City, CA 90232."   According to the Amended Consolidated Complaint, Yellow Rose "represents the intellectual property rights of Bill Engvall," a comedian who,

according to Yellow Rose's California corporate filings, is its Chief Executive Officer.  On information and belief, Yellow Rose is a California corporation.

10.    According to the Amended Consolidated Complaint, Plaintiff and Counterdefendant Main Sequence "owns and represents the intellectual property rights of the late George Carlin."  According to the Amended Consolidated Complaint, Main Sequence has its principal place of business in Los Angeles, California.  According to the California Secretary of State's website, Main Sequence is a California corporation and has been suspended from doing business in California by the California Franchise Tax Board.

11.    According to the Amended Consolidated Complaint, Plaintiff and Counterdefendant White, Inc. is a Georgia corporation with its principal place of business in Fairburn, Georgia.  According to the Amended Consolidated Complaint, White, Inc. "is the owner of intellectual property rights, on behalf of Ron White who is a comedian, actor, and author who resides in California."  According to White, Inc.'s Georgia corporate filings, Ron White has been White, Inc.'s Chief Executive Officer and sole officer since at least April 2019.

12.    According to the Amended Consolidated Complaint, Plaintiff and Counterdefendant Brave Lion "has its principal place of business at 11766 Wilshire Blvd., Suite 500, Los Angeles, California 90025," and "on behalf of Andrew Clay Silverstein" "is a copyright owner of properly registered literary works" of Mr. Silverstein, better known as the comedian Andrew Dice Clay, who, according to Brave Lion's California corporate filings, is Brave Lion's Chief Executive Officer. On information and belief, Brave Lion is a California corporation.

13.    According to the Amended Consolidated Complaint, Plaintiff and Counterdefendant Di Paolo is an actor and comedian who, "individually and on behalf of Acid Tongue, Inc., owns the intellectual property rights of Nick Di Paolo." According to the State of New York Department of State Division of Corporations database, Acid Tongue, Inc., on whose behalf Counterdefendant Di Paolo

purportedly brought his complaint, is a New York corporation, and Counterdefendant Di Paolo is its registered agent.  According to the same State of New York database, Acid Tongue, Inc.'s entity status has been "inactive" since April 22, 2020.

14.     According to the Amended Consolidated Complaint, Plaintiff and Counterdefendant the Williams Trust "represents the intellectual property rights of the late Robin Williams," and is in the care of Trustee Arnold D. Kassoy, a partner in the law firm of Manatt, Phelps & Phillips, LLP, in Los Angeles, California.

15.     According to the Amended Consolidated Complaint, Plaintiff and Counterdefendant Hicks "individually and on behalf of Arizona Bay Production Co., Inc., owns the intellectual property rights of Bill Hicks (deceased), who was a comedian and musician."  According to the Arkansas Secretary of State website, Arizona Bay Production Co. on whose behalf Counterdefendant Hicks purportedly brought her complaint, is an Arkansas corporation, and Counterdefendant Hicks is its President and Secretary.

16.     According to its website, Counterdefendant Word Collections "is the ASCAP and BMI for spoken word instead of music.  It works for the world's comedians and other spoken word performers to license and collect royalties earned when digital radio or AM/FM radio broadcast recordings of their 'Literary Works.'" According to the Amended Consolidated Complaint, Word Collections has acted on behalf of "various copyright owners" since "in or about August of 2020," and, beginning in April 2021, on behalf also of Brave Lion, Bill Engvall, Main Sequence, White, Inc., the Williams Trust, and Hicks "in an effort to negotiate a licensing agreement for various copyright owners" with Pandora.  On information and belief, Word Collections is a Delaware corporation, with its headquarters in New York City, New York.

### III.   JURISDICTION AND VENUE

17.     These Counterclaims arise under the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, 15 and 26.

- 6 -

18.    This Court has subject matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. §§ 1331 and 1337(a), Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2.

19.    This Court has personal jurisdiction over Brave Lion based on: (a) Brave Lion's filing its Amended Consolidated Complaint; (b) the fact that Brave Lion is, on information and belief, a California corporation, with its principal place of business in Los Angeles, California and, on information and belief, conducts a substantial portion of its business in California; and (c) Word Collections' alleged efforts on behalf of Brave Lion to force Pandora, located in California, including through communications with Pandora employees located in this District, to enter into a license agreement with respect to Brave Lion's alleged literary works rights.

20.    This Court has personal jurisdiction over Yellow Rose based on: (a) Yellow Rose's filing its Amended Consolidated Complaint; (b) the fact that Yellow Rose is, on information and belief, a California corporation, with its principal place of business in Culver City, California and, on information and belief, conducts a substantial portion of its business in California; and (c) Word Collections' alleged efforts on behalf of Yellow Rose's Chief Executive Officer Bill Engvall to force Pandora, located in California, including through communications with Pandora employees located in this District, to enter into a license agreement with respect to Mr. Engvall's alleged literary works rights.

21.    This Court has personal jurisdiction over Di Paolo based on: (a) Di Paolo's filing its Amended Consolidated Complaint; (b) the fact that Di Paolo, on information and belief, conducts a substantial portion of its business in California; and (c) on information and belief, Word Collections' alleged efforts on behalf of Di Paolo to force Pandora, located in California, including through communications with Pandora employees located in this District, to enter into a license agreement with respect to alleged literary works rights owned by Di Paolo.

22.     This Court has personal jurisdiction over Main Sequence based on: (a) Main Sequence's filing of its Amended Consolidated Complaint; (b) the fact that Main Sequence, although suspended from doing business by California's Franchise Tax Board, is a California corporation with its alleged principal place of business in Los Angeles, California and, on information and belief, conducts a substantial portion of its business in California; and (c) Word Collections' alleged efforts on behalf of Main Sequence to force Pandora, located in California, including through communications with Pandora employees located in this District, to enter into a license agreement with respect to Main Sequence's alleged literary works rights.

23.     This Court has personal jurisdiction over White, Inc. based on: (a) White, Inc.'s filing of its Amended Consolidated Complaint; (b) the fact that White, Inc.'s Chief Executive Officer and sole director is a resident of California and, on information and belief, conducts a substantial portion of White, Inc.'s business in California; and (c) Word Collections' alleged efforts on behalf of White, Inc. to force Pandora, located in California, including through communications with Pandora employees located in this District, to enter into a license agreement with respect to White, Inc.'s alleged literary works rights.

24.     This Court has personal jurisdiction over the Williams Trust based on, among other things: (a) the Williams Trust's filing of its Amended Consolidated Complaint; (b) the Williams Trust's operation under the care of its Trustee in Los Angeles, California and, on information and belief, because it conducts a substantial portion of its business in California; and (c) Word Collections' alleged efforts on behalf of the Williams Trust to force Pandora, located in California, including through communications with Pandora employees located in this District, to enter into a license agreement with respect to the Williams Trust's alleged literary works rights.

25.     This Court has personal jurisdiction over Hicks based on: (a) its filing of the Amended Consolidated Complaint in this Consolidated Action; (b) on

information and belief, Hicks conducts a substantial portion of its business in California; and (c) on information and belief, Word Collections' alleged efforts on behalf of Hicks to force Pandora, located in California, including through communications with Pandora employees located in this District, to enter into a license agreement with respect to alleged literary works rights owned by Hicks.

26.    This Court has personal jurisdiction over Word Collections based on: (a) its alleged "numerous efforts" and contacts "on an ongoing basis" since August 2020 directed to Pandora, located in the State of California, including through communications with Pandora employees located in this District, to force Pandora to enter into a license agreement; (b) on information and belief, its role in sponsoring and coordinating the Amended Consolidated Complaint; and (c) on information and belief, because it conducts substantial and ongoing business in California, including in this District, including, but not limited to, by soliciting new clients, investors, and other co-conspirators.

27.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400, and 15 U.S.C. §§ 15, 22, and 26.

28.    Joinder of all Counterdefendants, including Counterdefendant Word Collections, is proper pursuant to Rules 13(h) and 20(a)(2) of the Federal Rules of Civil Procedure.  Rule 20 allows for permissive joinder of defendants (and counter-defendants, pursuant to Rule 13(h)) where, as here: "(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action."  Fed. R. Civ. P. 20(a)(2).  Joinder of all Counterdefendants is further warranted because, among other reasons, it will promote judicial efficiency, it will expedite the final determination of the disputes, including those raised in the Amended Consolidated Complaint, the defenses in the Answer to the Amended Consolidated Complaint, and in these Counterclaims, and because it prejudices no party.

## IV.   TRADE AND COMMERCE

29.   At all times relevant to these Counterclaims, Counterdefendants have been engaged in interstate commerce, and their activities have substantially affected interstate commerce.  The efforts of Counterdefendants, who are residents of multiple different states, to compel Pandora and other services to license asserted literary works rights occurs in interstate commerce.  Pandora and, on information and belief, other providers of comedy content, provide their programming services in interstate commerce.

30.   Moreover, through their concerted efforts to force Pandora and, on information and belief, other providers of comedy to enter into literary works rights licenses for the copyrighted literary works they claim to own or control, Counterdefendants directly affect the interstate transmission of Pandora's offerings as well as those of other services that provide comedy content to listeners.  Their collusion on the licensing of their asserted literary works rights, their consolidation of their asserted rights under Word Collections' control, and Word Collections' bundling of these rights into a mandatory all-or-nothing blanket license have already imposed substantial costs on Pandora; if their collusion succeeds in imposing these licenses on Pandora and other providers of comedy content at supracompetitive prices, the total cost to Pandora, these other providers of comedy, and their customers, all in the flow of interstate commerce, will be enormous.

## V.   FACTUAL ALLEGATIONS

### A.   Streaming Services and Comedy Performances

31.   Until 2011, Pandora did not include any comedy on its service.  Then, in 2011, Pandora made the business decision to offer comedy and other spoken word content in addition to music.  But music still accounts for the vast majority of streams (transmissions of recordings to listeners) on the Pandora service: Today, all comedy content accounts for less than 1% of all streams on the service, and only a handful of comedians account for any significant number of streams across Pandora's services.

Even so, Pandora pays out millions of dollars in royalties each year for this comedy content.

32.     The development of Pandora's comedy streaming service is representative of how Pandora responds to listener demand for specific types of content.  Other examples of Pandora expanding its output to meet listener demand include its expansion into on-demand music streaming, and its continued improvements of Pandora Plus, offering subscribers enhanced functionality.  Pandora has also expanded into podcasting, to meet growing listener demand in that space.  And Pandora has developed, at great upfront and ongoing expense, its content algorithms that give each Pandora user a more tailored listening experience.  As a result of these substantial investments, Pandora is uniquely positioned to not only provide listeners with content they already know they want to hear, but also to introduce listeners to new content they were not previously familiar with.

33.     For its music service, Pandora's primary competitor is AM/FM radio.  But Pandora also competes with other streaming services.  In comedy, Pandora competes with, among others, AM/FM radio stations, YouTube, Spotify, and other digital streaming services.  To a lesser extent, Pandora also competes with certain providers of audio-visual comedy programming, such as Netflix and HBO.  Pandora competes with these other services for listeners on factors including price (either directly through subscription fees or indirectly through exposing the listeners to advertisements) and the quality and range of the comedy performances it offers.

34.     In order to offer a viable comedy streaming service, Pandora needs access, including any necessary licenses, to quality recorded comedy routines by some minimum range of comedians of various styles.  Pandora does not need to have access to the recordings of all comedians, nor does it need access to all recordings of any given comedian.  Stated differently, Pandora can provide a viable comedy product with a relatively modest number of comedy recordings.

35.     As a result, as inputs to a streaming service, comedians' recordings are competitive alternatives to each other.  And in fact comedians do compete to have Pandora carry their recordings.  They and their representatives regularly reach out to Pandora in an effort to secure more plays of their comedy recordings, all in an effort to secure the many benefits that being streamed on Pandora offers to comedians.  That comedians and their representatives make such efforts provides strong evidence that the benefits comedians have been receiving from Pandora are more than adequate. Were that not the case, they would not try to secure additional plays of their recordings.  These benefits include, of course, the substantial royalties that Pandora pays out pursuant to the licenses that it has entered into with the record labels that own the comedy recordings, or through Pandora's royalty payments to SoundExchange, a regulated entity and one subject to an antitrust exemption that, among other things, collects royalties on behalf of the recorded music industry from services like Pandora that qualify for certain statutory licenses, including, as relevant here, the Section 112 and 114 statutory licenses.  17 U.S.C. §§ 112, 114.  The benefits also include the exposure and other promotional value that comedians receive from Pandora.

36.     Pandora's offering adds value for both comedians and listeners alike: Pandora has developed what it refers to as the "Comedy Genome Project" (the "CGP"), whose primary purpose is to introduce listeners to comedy that they are not already aware of, but will like.  The CGP's methodology is based on comedic *similarity*, without regard to popularity, creating a level playing field for all comedians.  The CGP utilizes technology and human talent to map out a comedy routine's key comedic characteristics (or "genes"), which are expressed as numerical values, and uses mathematical algorithms to identify other comedy with "DNA" similar to that which a user already knows and likes.

37.     Through the CGP, Pandora is able to expand listeners' access to comedy they will enjoy, while expanding comedians' access to listeners who do not yet know

their work.  The CGP helps explain why comedians compete specifically to have their recordings in Pandora's active portfolio without demanding additional royalties to license their asserted literary works rights.  In fact, when Pandora asked Word Collections whether it wanted Pandora to take down the comedy content that it claimed to represent after Word Collections demanded that Pandora take its blanket license, Word Collections said no, asking that the comedy content be kept up on the service.

38.     Because Pandora and other streaming services do not need to be able to transmit all of the recordings of all prominent comedians in order to have a viable product, the services can choose among the comedians and their recordings, based on competitive factors including price, quality, and desirability to listeners.  As long as it is able to assemble a critical mass of such comedy recordings, Pandora can offer viable comedy streaming services.

39.     But if Pandora, or another service, were unable to get access to a critical mass of recordings, or could only do so at grossly elevated rates or on other onerous terms, it could no longer offer a viable comedy streaming product and, as a result, would no longer offer comedians the benefits that its current service provides. Consequently, if a single economic actor gained control over the licensing of the rights to the comedy routines embodied in the recordings of a substantial number of quality comedians, and used that control to set a single elevated price for access to those rights, a streaming service could not substitute away from that *collection* of rights and rely only on other comedians' works and survive.  In other words, that economic actor would have monopoly power over Pandora and other services and could, in effect, decide whether a service's comedy offering survived or failed.

**B.     Historic Practice of Licensing Literary Works Rights**

40.     Pandora has a long history of respecting valid copyrights and entering into legitimate license agreements for the copyrighted content it transmits.  Pandora's royalty payments have been so substantial that, in large part because of those royalty

1  payments, it has never been able to earn a sustained profit.  At all times relevant to
2  these Counterclaims, Pandora has been willing to enter into reasonable licenses
3  negotiated in a competitive market for legitimate copyrights covering the content it
4  transmits.

5      41.    Since launching its comedy service in 2011, and pursuant to
6  longstanding industry custom and practice (predating Pandora by many decades),
7  Pandora has always taken licenses for the comedy recordings that it offers, and
8  through those licenses has obtained (either explicitly or implicitly) all of the rights it
9  needs to stream those recordings.  But Pandora has not separately secured licenses
10  just covering the underlying comedy routines embodied in comedy recordings,
11  because it did not need any such separate licenses.  As stated above, Pandora already
12  pays out millions of dollars in royalties each year for its use of comedy recordings
13  and no comedian, until now, has ever approached Pandora about entering into a
14  separate license, or paying additional royalties, just for any rights that comedian may
15  hold in the underlying comedy routines embodied in comedy recordings.  Instead,
16  comedians unilaterally determined that they were satisfied with this historic custom
17  and practice and that they were *not* going to demand additional royalties in exchange
18  for a literary works license on top of what they are already being paid for the comedy
19  recordings.  In other words, to the extent that separate royalties are allocable to the
20  underlying jokes embodied in the comedy recordings, they are already "baked-in" to
21  those paid for the use of the recordings.

22      42.    Thus, until the emergence of Counterdefendant Word Collections, the
23  competitive equilibrium among the competing owners of the jokes embodied in
24  recorded comedy routines was the long-standing practice in which the comedians
25  have treated the royalties received for their recordings as sufficient—no separate,
26  additional royalties just for the underlying jokes were ever called for.

27      43.    Consequently, Pandora rightfully understood that, in exchange for the
28  many benefits that it provides comedians, each implicated comedian literary works

rightsholder unilaterally had decided to maintain long-standing industry custom and practice and not separately license literary works rights or demand additional royalties above what Pandora was already paying to use the comedy recordings. This understanding was no secret. Pandora's publicly available SEC filings confirm its long-standing licensing practices. Those filings explicitly noted that, pursuant to industry custom and practice, it was not securing a separate license, or paying a separate license fee, for the use of any underlying jokes embodied in comedy recordings. For over a decade, and despite Pandora's complete transparency as to its licensing practices, no comedian ever challenged those practices. Instead, they continued to seek increased airplay on Pandora's service. It was only with the emergence of Word Collections that anyone has tried to upend what has been working reasonably well for all involved for decades.

44.    While Word Collections presents itself as "the ASCAP and BMI for spoken word instead of music," there are several ways in which ASCAP's and BMI's licensing of public performances of musical works is fundamentally different from comedy licensing. Some of the more salient differences include, but are not limited to, the following:

a. Unlike music rights licensing, which, as the Supreme Court has observed, involves "thousands of users, thousands of copyright owners, and millions of compositions" (*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S 1, 20 (1979)), comedy licensing involves a far smaller universe of users, copyright owners and works. Because the total number of performing comedians that Pandora might want to secure a license from is so much smaller than the number of music composers, the alleged comedy literary works rights are far less widely held than are public performance rights in musical compositions. As a result,

the benefits of consolidating them into a performance rights organization ("PRO") are minimal.

b. As explained above, Pandora does not need access to the recordings of all, or even most, comedians in order to offer a viable comedy streaming service. Nor does Pandora need access to all of any one comedian's available recordings. Pandora needs only a critical mass of quality comedy recordings by a range of comedians in order to offer a viable and competitive product.

c. The number of potential licensees of comedy literary works rights is far smaller than the number of users of musical works public performance rights. And, in fact, Counterdefendants have targeted only a handful of services for Word Collections' licensing activities.

d. Unlike with music, the author of the comedic routine and the comedian featured on the comedy recording are, in almost all instances, the same. Indeed, for each work listed in the Amended Consolidated Complaint, the performing comedian is also the alleged author of the literary work. Accordingly, it is not only inefficient to depart from historic practice (in which a single license conveys all of the necessary rights) by imposing a separate licensing obligation, but doing so after the owner of the sound recording has already granted a license can only serve to create additional hold-up power over services like Pandora.

45. Consequently, there is no need for any performing rights organization to jointly deal with services offering comedy content on behalf of the relatively modest number of comedians whose works are of sufficient interest to listeners that Pandora might want to use them on its service. Any comedian could easily deal with the entities that are interested in transmitting performances of his or her works.

46.     Indeed, the Amended Consolidated Complaint alleges that Pandora needed only to "take the *simplest of steps* to ask [the rights-holding Counterdefendants] or [their] representatives for licenses for the works." (emphasis added).  In other words, if Pandora had to separately license the jokes embodied in comedy recordings from comedians, it could do so directly in a simple and reasonably competitive marketplace.  And those comedians could deal individually with Pandora without difficulty.

47.     Further, there is no valid justification for a licensing cartel like Word Collections to offer a blanket license covering the rights to all of the works of its co-conspirator "clients," particularly when it makes that blanket license the only means of obtaining *any* license to *any* of the works.  These blanket licensing practices force Pandora and other services to take, and pay for, a license covering far more material than it would ever need; they could succeed only as a result of the collective having accumulated market power that forces services to take the license covering the collective's entire portfolio if they are to get a license to any of it.  And unlike ASCAP and BMI, which are subject to antitrust consent decrees that require them to offer, among other things, meaningful alternatives to their blanket licenses, Word Collections' blanket license faces not even a hypothetical constraint from other competitive alternatives.  The only alternative to the blanket license for all of the rights that Word Collections controls in a world that deviates from historic custom and practice is no license for any of those rights.

48.     For all of these reasons, there is no valid justification for moving away from what has worked well for decades and towards collective licensing of the rights to the jokes embodied in comedy recordings.  Should comedians decide unilaterally to license their literary works rights separately, there would be plenty of room for competition between them to have their works performed on Pandora.  If the owners of literary works rights for jokes embodied in comedy recordings asserted them against Pandora and others without colluding, Pandora—and in turn, its customers—

would benefit from a free competitive market, in which the rights owners would compete against each other in order to attract Pandora to obtain the rights necessary to use their literary works.  On information and belief, the same would be true for other services that offer comedy.  But Word Collections and the other Counterdefendants have conspired to not only disrupt long-standing custom and practice, but to also ensure that the competitive market that would otherwise emerge will never take hold.

C.     **Word Collections' Scheme to Fix Prices and Monopolize the Market for Literary Works Rights Embodied in Comedy Recordings**

49.     In October 2020, a press release announced Word Collections' launch, asserting that "[t]ech has allowed comedy to be everywhere, but the necessary pipelines and infrastructure to ensure licensing and payment have not been built. Word Collections fixes that problem." But as shown above, Word Collections is a solution in search of a problem: for the first time, someone would "collect[] the royalties and get[] the money into the pockets of the comedian" for licenses for rights that their owners have long agreed would call for no additional royalties on top of what is already being paid for the use of the comedy recordings.  Worse, by design, Word Collections' "solution" breaks the market instead of repairing it.

50.     Warning that its co-founder Jeff Price had "irrevocably upended the global music industry" in his prior positions at TuneCore and Audiam (both of which terminated him), the October 2020 press release announced that Word Collections "currently represents over 1,300 literary works including works by George Carlin, Roy Wood Jr., Jake Johannsen, Milton Berle, Bob Zany, Bill Dana (José Jimenez), Rich Vos, John Valby, Steve Sweeney and many others."  According to the Amended Consolidated Complaint, Word Collections contacted Pandora in August 2020 on behalf of "various copyright owners," whom it does not identify.

51.     Word Collections' website describes a simple collective licensing scheme: instead of maintaining past practice, comedians (or the entities holding the rights to the comedians' literary works) sign a required "exclusive affiliation agreement" with Word Collections.   That "exclusive affiliation agreement" empowers Word Collections to grant licenses for the comedians' rights to services and collect royalties from services.   It thus gives Word Collections power to set a single fixed price for access to all of these comedians' literary works rights—rights that otherwise would be offered in competition with each other.

52.     Moreover, the agreements between Word Collections and its co-conspirator comedians, including the other Counterdefendants, mean that Word Collections' price for these works is the *only* price in the market.   Individual licenses from Word Collections' co-conspirator comedians—even if they were available—would be useless to Pandora and other services: Word Collections licenses its comedians' rights only through a blanket license covering its entire portfolio.   Once it forces a service to take that blanket license, taking an individual license from a Word Collections comedian would mean that the service is paying twice (and actually three times, given that the rights were already paid for pursuant to the sound recording licenses) for that member's literary works rights.   Consequently, once a comedian signs up with Word Collections, Word Collections effectively controls access to that comedian's literary works rights.

53.     Worse, on information and belief, through its "exclusive affiliation agreement," Word Collections ensures that Pandora and other services will have no choice but to license any of the comedians' rights through Word Collections.   The comedians have contracted away their rights to license independently and have ensured that the only option available to services like Pandora is to deal directly with Word Collections.

54.     Counterdefendants have conspired not only to fix the price of the rights to their competing works through Word Collections, but also to not undermine those

fixed prices by licensing independently outside of the cartel.  The result of this price-fixing scheme is that Pandora and other services are unable to get licenses for literary works rights at the competitive prices that would prevail if the comedians competed against each other to offer licenses to their works.

55.    But Word Collections and its co-conspirator comedians have not only engaged in naked horizontal price fixing.  In assembling its portfolio of the rights to the works of conspiring comedians, Word Collections also presents a genuine threat of achieving monopoly power in the market for the rights to perform, distribute, and reproduce the comedy routines embodied in comedy recordings, power that it can and will exert over Pandora and other services that offer comedy.  As explained above, because Pandora and other services need access to a sufficient number of quality comedy recordings in order to offer a viable comedy product, any entity that gained control over a critical mass of such recordings would have monopoly power—the power to set prices undisciplined by competition—over Pandora and other services.  Word Collections has created a dangerous probability that, unless stopped by this Court, it will do exactly this.

56.    While Word Collections' joint action on behalf of the otherwise competing comedians listed in the October 2020 press release necessarily constituted price fixing as to those comedians' literary works rights, that early portfolio may not have been of sufficient size and breadth to give Word Collections monopoly power in the market for the rights to the comedy routines embodied in comedy recordings.  At that time, Pandora and, on information and belief, other services that offer comedy likely would have been able to continue operating a viable comedy service even if it were unable to stream any material of the listed comedians.

57.    But less than a year later, Word Collections had upped the ante.  According to the Amended Consolidated Complaint, Word Collections was contacting Pandora by April 2021 on behalf of the late Mr. Carlin, Andrew Clay Silverstein, Bill Engvall, Ron White, and the Williams Estate.  And in a July 22, 2021

press release, Word Collections announced that it had "add[ed] licensing and collections for Ron White, Bill Engvall, Robin Williams Estate; George Carlin Estate; Margaret Cho, Muhammed Ali Estate, Waddie Mitchell and many more."

58.     Barely a month later, on August 26, 2021, another press release announced that Word Collections had added Billy Crystal and Drew Carey, and that it was "[a]lready representing" Louie Anderson, the Bill Hicks Estate, Jim Breuer, and Andrew Dice Clay.  These new additions to Word Collections' portfolio showed that Word Collections was serious about obtaining monopoly power and forming a cartel that Pandora and other streaming services could not ignore.

59.     As of today, Word Collections' cartel has grown even further: According to its website, Word Collections "currently represents thousands of Musical Compositions and Literary Works, including the works of . . . George Carlin, Robin Williams, Billy Crystal, Drew Carey, David Cross, Bill Engvall, Dick Gregory, Muhammed Ali, Louie Anderson, Steven Wright, Andrew Dice Clay, Buddy Hackett, Waddie Mitchell, Bill Hicks, Robert Schimmel, Margaret Cho, Jim Breuer, Tommy Tiernan, Sinbad, Milton Berle, Bob Zany, Bill Dana (José Jimenez), Rich Vos, John Valby, Steve Sweeney and many others."  The website also lists, among others, Paul Mecurio, Dwayne Kennedy, Corey Rodrigues, Matt Ruby, and Nick Griffin as clients.

60.     By taking control of the rights of not only its fellow Counterdefendants, but also those of Louie Anderson, Margaret Cho, Billy Crystal, Drew Carey, Dick Gregory, Steven Wright, Buddy Hackett, and Milton Berle, and, as its website brags, "many others," and continuing to aggressively recruit additional cartel members, Word Collections has come dangerously close to making its portfolio a true "must-have"; once it achieves that level, no streaming service will be able to avoid taking a license from it for the entire Word Collections portfolio, on Word Collections' terms, if it wishes to continue offering a viable comedy product, should historic custom and practice be upended.  Word Collections and its co-conspirator comedians, though

their "exclusive affiliation agreements," have agreed to give, and have created a dangerous probability of giving, Word Collections monopoly power over services that have comedy offerings.

61. Obtaining and exerting monopoly power is Word Collections' business plan. Not only does its website trumpet its huge portfolio of comedians, but it brags that "Word Collections is *the* ASCAP *and* BMI for spoken word instead of music." (Emphasis added.) Word Collections transparently seeks to position itself as the go-to source for licenses under this newly-asserted right. When co-conspirator comedians sign their "exclusive affiliation agreements," they are buying into that business plan, engaging in horizontal price fixing, and agreeing to help make Word Collections a monopolist.

62. In a recent interview given by Jeff Price, Word Collection's current CEO and one of its co-founders, Mr. Price brags that Word Collections is "the *only entity on the planet* where these services [like Pandora] can come to get a license to use their literary works" of all of the members of the Word Collections cartel. Who Knew, *The Smartest People In The Room - Jeff Price and Rick Krim*, YouTube (Mar. 31, 2022), https://www.youtube.com/watch?v=TwaS5Qo5MtA&t=3868s. (Emphasis added). That Word Collections has engaged in exclusive licensing with its co-conspirator comedians to foreclose any potential competition to its blanket license is plain.

**D. Word Collections Uses a Blanket License to Cement and Exploit Its Intended Monopoly Power**

63. There can be no doubt that the very purpose of joining the Word Collections cartel is to fix prices and create and exploit monopoly power. As the Word Collections website assures comedians, "Digital radio and AM/FM radio either have to pay for *all* broadcasts of comedy and other spoken word performances or choose to broadcast *none* of it." (emphases added). This is not just rhetoric: it is how Word Collections licenses the rights it has consolidated. Instead of offering a license

for each of its comedians' literary works rights at separate prices or some flexible license type, the fee for which is reduced if Pandora is able to license the rights to some works outside of the cartel, Word Collections offers the rights only in a single package: an "all-or-nothing" blanket license.   The only license that is available anywhere to services for the rights of a comedian that joins the Word Collections cartel in a world in which historic custom and practice has been upended is one that includes not just that comedian's works, but the works of all of Word Collections' co-conspirator "clients," whether or not the service has any use for them.   This price-fixed "all-or-nothing" blanket license is the very license type that Word Collections has insisted that Pandora and, on information and belief, other services, must take from it.

64.   This blanket license serves several purposes for Word Collections. First, it disguises its price-fixing agreement with its co-conspirator comedians: instead of a catalogue of licenses for individual comedians' works whose uniform prices would make the price-fixing agreement obvious to the most unsuspecting licensee, Word Collections is able to slap a single price onto the consolidated blanket license and pretend that it is putting together a new product of its own, rather than throttling competition among competing products.   But unlike combinations of complementary resources, which can create new value for users, the Word Collection blanket license does nothing but consolidate competitors and fix their prices.   This blanket license is no more a new product than is the output of any other cartel.

65.   Second, by agglomerating the rights of all of its comedians, the blanket license eliminates any incentive for Word Collections' comedians to break loose of the cartel and offer independent licenses.   If a service such as Pandora is forced to take a blanket license for the rights to the works of all Word Collections' comedians, it will have no incentive to negotiate a separate, more competitive individual license with any of those comedians.   Any such individual license, however priced, would mean that the service was paying twice (and really three times in light of the sound

recording licenses) for a license to the same comedian's works.  And, as noted above, Word Collections has gone even further to assure that no member of its cartel will be able to license any service individually.  Through its "exclusive affiliation agreement," Word Collections has eliminated this ability altogether.

66.     Third, the blanket license enables Word Collections to further harm services through tying.  Having acquired, at the very least, market power through its consolidation of rights to comedy routines embodied in desired comedy recordings, Word Collections ties that critical mass to its other, less desirable material, including not just comedy but other spoken-word material as well, and forces services to take the entire package, even if they have no need for this additional material.  As a result of this tie, services like Pandora will end up paying more for the license than they would for one that just covers the desired material because they must pay for streams of the additional material at the price driven by the desired material, not the price they would pay for the undesirable material offered alone.  Pandora and other services would accept this tie only because, without it, Word Collections will not give them a license to the rights that they do need, and Word Collections' exclusivity agreements with its co-conspirator comedians ensure that the rights the licensees need will not be available separately from the comedians in a world in which historic custom and practice has been upended.  Again, Word Collections and its comedians have agreed to this scheme that unites them all collectively against Pandora and other services, and forces the services to pay substantially more for literary works rights than they would in a competitive market.

67.     There is no valid efficiency justification for Word Collections' insistence on an exclusive blanket license.  As explained above, streaming services like Pandora need access to the recordings of only a relatively modest number of comedians in order to offer a viable comedy product.  They have no need for a blanket license to help them get access to the recordings they need, to protect themselves against inadvertent infringement liability, or to help keep their portfolios current.  The

relatively small number of users of the rights to comedy performances makes monitoring by rights owners relatively easy. And any efficiencies that could come from joint license administration and monitoring could easily be accomplished without also consolidating all licensing power and pricing decisions into Word Collections' hands. Moreover, whatever administrative savings Word Collections enjoys from its blanket licensing exist only because it has consolidated its monopoly portfolio in the first place. And those savings do not offset the monopoly profits Word Collections collects as a result of having built its monopoly and setting a fixed monopoly price for its portfolio.

### E.    Harm to Competition and to Pandora

68.    If Counterdefendants had not agreed to fix the price at which Word Collections would grant licenses to their literary works rights, Pandora and other services would be able to obtain the rights to the comedy routines embodied in comedy recordings that Pandora and other services wished to perform, distribute, or reproduce at competitive, and substantially lower, rates set by competition among the owners of the literary works rights. That competition might very well result in the historic custom and practice that worked well for all involved. As noted above, for many decades before Word Collections was created, comedians chose to license any necessary rights to use comedy recordings through a single license. The owner of the comedy recording typically obtained all necessary rights from the comedian and passed those on to the service, either explicitly or implicitly. And the royalty paid for the use of the recording was all that comedians ever sought. They never before sought to bifurcate the licensing requirement into two (one license just for the recording and a separate license just for the underlying jokes embodied in the recording) and they never sought to tack on an additional royalty on top of what was already being paid for the use of the comedy recording. Comedians instead chose unilaterally not to separately assert their literary works rights in favor of reaping the benefits they gained from the services playing their recordings. Now, however,

through Counterdefendants' price-fixing scheme, Word Collections seeks to raise the price for the rights it has consolidated from their longstanding competitive equilibrium level to a price substantially above that level.  Word Collections' aim is to upend long-standing custom and practice and require Pandora and other services to secure, instead of a single license, two separate licenses—one for the comedy recording and a separate license for the underlying comedy routine embodied in the recording—and to impose a substantial additional royalty for the literary works rights on top of what is already being paid.  Word Collections is not suggesting that the royalty paid for the recording should be reduced to offset any additional royalty for the literary work.  It only wants to add a substantial additional royalty obligation to force Pandora and other services to pay far more than they historically have, just so that Pandora and other services can do exactly the same thing they always have— provide consumers with a compelling comedy offering to the benefit of the comedians.

69.    Moreover, because the literary work author and the recording artist are, in the case of comedy, typically the same person, there is no rational reason for having separate literary-works and sound recording licenses, except to create additional hold-up power by any licensor that has amassed market power over such rights.  Under a regime in which separate licenses are required, each license is useless to a service like Pandora without the other—even with the sound recording license in hand, Word Collections' contention is that Pandora cannot legally play the recording without the literary works license.  This need to secure multiple licenses before a comedy recording can be performed does not exist in the current licensing regime, in which a single license covers all of the necessary rights.  But by forcing a change to historic licensing practice, and by collectively licensing the literary works rights of a critical mass of comedians, Word Collections is creating for itself hold-up power over services like Pandora.  Under such a licensing regime, even though services like Pandora have already secured and paid for the necessary rights to exploit

the comedy recordings, they cannot do so until they secure a separate license for the jokes from Word Collections on terms dictated by Word Collections.

70.    Similarly, if Counterdefendants had not agreed that Word Collections would offer only a blanket license to all of the literary works rights they purport to control, Pandora and other streaming services would license only the literary works rights of the comedians whose works they wished to stream, and even then would license the rights only to the particular works of those comedians they wanted to include in their offerings.  Instead, if Counterdefendants' tying scheme succeeds, Pandora and other services will be forced to pay Word Collections for literary works rights for the works of comedians (and others) they do not need to use, and might not seek to obtain in a competitive market, at a total price substantially greater than they would pay in a competitive market for the rights they actually require.

## VI.    THE RELEVANT PRODUCT AND GEOGRAPHIC MARKETS

71.    The relevant product market in which to assess the anticompetitive effect of Counterdefendants' conduct is the U.S. market for the rights to comedy routines embodied in comedy recordings.

72.    The relevant product market does not include all written comedy routines.  The only written comedic works to which Pandora would ever need a literary works rights license are ones that have been recorded and for which the recording is available to Pandora for streaming.

73.    Because consumer demand for streaming of comedy recordings is specific to recorded comedy, rights for other types of written works, even ones embodied in recorded performances of some kind, are not a substitute for the rights to the comedy routines embodied in comedy recordings.

74.    Pandora's customers, and those of other services, whose demand ultimately determines the content that the services provide in competition with each other, have a pronounced demand for comedy recordings.  If comedy recordings became unavailable, or if a service was somehow able to pass along increased

comedy-rights costs to comedy listeners, those listeners would not readily shift to other types of streamed content.

75.   Because it must respond to listener demand in a competitive market, Pandora would not and could not respond to a sustained price increase for the rights to comedy routines embodied in comedy recordings by shifting its programming towards other recorded spoken word content, such as famous speeches or poetry. Similarly, Pandora would not and could not shift its programming further towards music in response to a sustained price increase for the rights to comedy routines embodied in comedy recordings; comedy programming answers consumer demand that is different from consumer demand for music programming.

76.   As explained above, a person or entity that, like Word Collections, gained control over the rights to a critical mass of comedy routines embodied in comedy recordings would be able to impose a substantial price increase over competitive levels without seeing shifts by Pandora and other services to other products.

77.   Counterdefendants are competitors in the relevant market.  But for their agreements with Word Collections, they would be competing against each other to persuade Pandora and other services to include their comedy in the service offerings. That competition would manifest itself in license royalties at competitive levels, reflecting the ability of services like Pandora to pick and choose among individual comedians and individual comedy recordings, knowing that they need only a critical mass of content to offer listeners, and not access to all comedy recordings.

78.   The relevant geographic market is the United States.   The rights Counterdefendants are asserting against Pandora are based on federal copyright law, and are exercisable and enforceable nationwide.   Counterdefendants have not attempted to license on different terms in different geographic areas within the United States, and Pandora operates throughout the United States.

/ /

- 28 -

## VII.   ANTICOMPETIVE EFFECTS OF COUNTERDEFENDANTS' CONDUCT

### A.   Harm to Competition in the Relevant Market

79.   Word Collections' scheme of consolidating the rights to comedy routines embodied in comedy recordings, fixing prices for them, and exclusively licensing them through its blanket license has already throttled competition among Counterdefendants and the other comedians that have joined Word Collections.

80.   Word Collections' website makes clear that the competition that would and easily could exist in the Relevant Market among its co-conspirator "clients" and other comedians will not happen.   Word Collections' mission, adopted by Counterdefendants and Word Collections' other comedians, is to force Pandora and other services to take and pay for its entire portfolio—at a price that it alone will set—or to get none of it, and have no choice but to drop its comedy offering entirely.

81.   The likely results of this anticompetitive scheme will be not only higher prices but a reduced supply of comedy programming by services than would be available if the market for comedy literary works rights were competitive.  The higher prices will also affect Pandora's and other services' overall efficiency and competitiveness, possibly even leading to decisions to abandon comedy services; in any case, the actions of Word Collections will lead to overall higher consumer prices and/or less output, and to less consumer satisfaction than would exist if Counterdefendants had not eliminated competition in the Relevant Market.

### B.   Harm to Pandora

82.   Pandora has already borne the brunt of Counterdefendants' scheme. Despite the publicity surrounding this new effort spearheaded by Word Collections to force Pandora and other services to take a second license just covering the literary works embodied in the recordings that they already license (and pay substantial royalties for), and the substantial resources available to any number of the comedian Counterdefendants, no individual Counterdefendant, or any other comedian member

of Word Collections, has approached Pandora about the possibility of a license for that comedian's works.  Word Collections, on the other hand, has approached Pandora repeatedly on behalf of its consolidated portfolio of comedians.  Instead of offering Pandora licenses for individual comedians' work at prices set unilaterally by the comedians, or licenses for just the comedy content Pandora actually wants to use, Word Collections has insisted that Pandora must take its price-fixed "all-or-nothing" blanket license.  As a result, it has given Pandora the Hobson's Choice between this price-fixed and economically unviable bundle—its blanket license—and litigation.  Because Pandora could not accept the former, Word Collections, through the other Counterdefendants, has imposed the latter onto it in the form of Counterdefendants' infringement suits.

83.    The costs of defending against these litigations are themselves a substantial burden for Pandora's business, making it less efficient and competitive than it otherwise would be.  But if Counterdefendants prevailed in carrying out their scheme, Pandora would be even more badly harmed.  Pandora would be forced to pay an ongoing stream of supracompetitive royalties for access to a critical mass of recordings that it must have if it is to provide comedy to its listeners at all.  These increased prices will harm Pandora's cost-competitiveness, unreasonably limit the return on its investment in its comedy offering, and sap resources that otherwise might have been used to improve Pandora's products to the benefit of consumers.

# COUNT I

## (Sherman Act § 1 – Price Fixing (against all Counterdefendants))

84.    Pandora re-alleges and incorporates by reference the preceding paragraphs of these Counterclaims as though fully set forth herein.

85.    Counterdefendants agreed among themselves and through a series of "exclusive affiliation agreements" between Word Collections on the one hand and the other Counterdefendants on the other, to fix the price at which the other Counterdefendants' literary works rights would be licensed.

86. Counterdefendants' conspiracy to fix prices has been carried out through Word Collections' efforts to license the literary works rights of its co-conspirator comedians, including the other Counterdefendants, exclusively through a blanket license for all of the literary works rights Word Collections has consolidated, at a fixed price set pursuant to the agreements with and among Counterdefendants.

87. By eliminating the direct price competition that otherwise would have existed among Counterdefendants in the Relevant Market, the alleged conspiracy directly has harmed, and threatens to further harm, competition in the Relevant Market in the course of interstate commerce, and has harmed Pandora, by: (a) increasing Pandora's costs in operating its comedy offering; and (b) impairing Pandora's ability to present high-quality comedy offerings in response to consumer demand.

88. Counterdefendants' conspiracy to fix prices is a *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Alternatively, Counterdefendants' conduct also violates Section 1 of the Sherman Antitrust Act under the rule of reason, in that the blatant harm to competition and Pandora and other services caused directly and proximately by the Counterdefendants' agreement to place pricing decisions for their competing rights into the hands of Word Collections vastly outweighs any conceivable procompetitive benefit created by the agreement.

89. Such injury to Pandora flows directly from that which makes Counterdefendants' acts unlawful.

90. Pandora seeks money damages from Counterdefendants' violation of Section 1 of the Sherman Antitrust Act and injunctive relief against continued and further violations.

//

//

**COUNT II**

**(Sherman Act § 1 – Tying (against all Counterdefendants))**

91.     Pandora re-alleges and incorporates by reference the preceding paragraphs of these Counterclaims as though fully set forth herein.

92.     Counterdefendants agreed among themselves that Word Collections would license the literary works rights in written comedy that they owned to Pandora and other services exclusively through a blanket license, by which Word Collections would use the market power it had accumulated through its "exclusive affiliation agreements" with co-conspirator comedians to force Pandora and other services to agree to take a license for Word Collections' entire portfolio of literary works rights (including comedy and other literary works), and pay Word Collections more for that license than such services would have paid Word Collections or the rights owners directly in total for the licenses that Pandora and other services want in a competitive market.

93.     The conspiracy to tie the rights to the various desirable comedy routines embodied in comedy recordings that created Word Collections' market power to the other, less desirable, literary works rights in Word Collections' portfolio, including both comedy routines and other literary works that Pandora does not need, has harmed, and threatens to further harm, competition in the Relevant Market in interstate commerce by increasing prices, foreclosing competition, and reducing consumer choice for licenses to literary works rights, and has harmed and threatens to further harm Pandora by: (a) increasing Pandora's costs in operating its comedy offerings; (b) impairing Pandora's ability to present high-quality comedy offerings in response to consumer demand; and (c) foreclosing licensing to streaming services by the actual owners of the rights to comedy routines embodied in comedy recordings, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

94.     Such injury to Pandora flows directly from that which makes Counterdefendants' acts unlawful.

95.    Pandora seeks money damages from Counterdefendants' violation of Section 1 of the Sherman Antitrust Act and injunctive relief against continued and further violations.

## COUNT III

### (Sherman Act § 2 – Attempted Monopolization and Monopolization (against all Counterdefendants))

96.    Pandora re-alleges and incorporates by reference the preceding paragraphs of these Counterclaims as though fully set forth herein.

97.    Counterdefendants have, through a series of agreements among themselves and with other co-conspirator "clients" of Word Collections, accumulated and consolidated control within Word Collections over the licensing of a critical mass of rights to comedy routines embodied in comedy recordings such that they have achieved monopoly power, or, in the alternative, pose a dangerous probability of achieving monopoly power, in the Relevant Market.

98.    Counterdefendants' intent in entering into these agreements among themselves and with other co-conspirator "clients" of Word Collections was specifically to achieve monopoly power in the Relevant Market, which none of them could have achieved through competition on the merits, and thereby control the prices at which their respective literary works rights were made available to Pandora and other services—exclusively through the mandatory blanket license for Word Collections' entire portfolio of literary works rights, unconstrained by competition from owners of the rights to comedy routines embodied in comedy recordings.

99.    By obtaining, or creating a dangerous probability of obtaining, monopoly power—specifically, the ability to control prices free from competitive discipline—in the Relevant Market, Counterdefendants have directly and proximately harmed competition in the Relevant Market, and threaten directly and proximately to further harm, competition in the Relevant Market in the course of interstate commerce, and have directly and proximately harmed, and threaten directly

and proximately to further harm, Pandora by: (a) depriving Pandora of the ability to benefit from competition in the Relevant Market between Counterdefendants and other owners of literary works rights embodied in comedy recordings; (b) increasing Pandora's costs in operating its comedy offerings; and (c) impairing Pandora's ability to present high-quality comedy programming in response to consumer demand, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

100. Such injury to Pandora flows directly from that which makes Counterdefendants' acts unlawful.

101. Pandora seeks money damages from Counterdefendants' violation of Section 2 of the Sherman Antitrust Act and injunctive relief against continued and further violations.

### COUNT IV

### (Sherman Act § 2 – Conspiracy to Monopolize (against all Counterdefendants))

102. Pandora re-alleges and incorporates by reference the preceding paragraphs of these Counterclaims as though fully set forth herein.

103. Counterdefendants have conspired to monopolize the Relevant Market by agreeing to accumulate and consolidate control within Word Collections over the licensing of the rights to a sufficiently great number of comedy routines embodied in comedy recordings that they would achieve monopoly power in the Relevant Market.

104. In furtherance of this conspiracy, Counterdefendants have undertaken specific acts, including: (a) entering into "exclusive affiliation agreements" between Word Collections and other Counterdefendants; (b) agreeing not to license their literary works rights other than through Word Collections; (c) refraining from licensing their literary works rights other than through Word Collections; and (d) initiating a series of copyright infringement actions against Pandora in response to Pandora's refusal to submit to Word Collections' blanket-license demand.

105.  Counterdefendants' specific intent in entering into this conspiracy to monopolize was to achieve monopoly power in the Relevant Market, which none of them could have achieved through competition on the merits, and thereby control the prices at which their respective literary works rights were made available to Pandora and other services—exclusively through the mandatory blanket license for Word Collections' entire portfolio of literary works rights, unconstrained by competition from owners of the rights to comedy routines embodied in other recorded comedy routines.

106.  Through their conspiracy to monopolize the Relevant Market, Counterdefendants have directly and proximately harmed competition in the Relevant Market, and threaten directly and proximately to further harm competition in the Relevant Market in the course of interstate commerce, and have directly and proximately harmed, and threaten directly and proximately to further harm, Pandora by: (a) depriving Pandora of the ability to benefit from competition in the Relevant Market between Counterdefendants and other owners of the rights to comedy routines embodied in comedy recordings; (b) increasing Pandora's costs in operating its comedy offerings; and (c) impairing Pandora's ability to present high-quality comedy programming in response to consumer demand, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

107.  Such injury to Pandora flows directly from that which makes Counterdefendants' acts unlawful.

108.  Pandora seeks money damages from Counterdefendants' violation of Section 2 of the Sherman Antitrust Act and injunctive relief against continued and further violations.

## **PRAYER FOR RELIEF**

WHEREFORE, Pandora respectfully prays for judgment in its favor on each of the foregoing claims and for the following relief against Counterdefendants:

a) An injunction prohibiting any one or more Counterdefendants, and those acting in concert with them, from agreeing, directly or indirectly, with each other as to the assertion or non-assertion of any literary works rights any of them controls, or the terms on which any one or more of them will license such literary works rights;

b) An injunction prohibiting Word Collections' use of a blanket license, or any other method by which it bundles literary works rights, and requiring that Word Collections offer separate, economically viable and individually priced licenses to the literary works rights of each of its "clients";

c) An injunction prohibiting Word Collections from obtaining, by license or otherwise, directly or indirectly, the exclusive power to grant licenses to any literary works rights;

d) An injunction prohibiting any one or more Counterdefendants from granting, by license or otherwise, directly or indirectly, the exclusive power to grant licenses to any literary works rights;

e) An injunction prohibiting Counterdefendants and all other members of the Word Collections cartel from instituting, or threatening to institute, copyright infringement actions directed against the use by Pandora of copyrighted works licensed by Word Collections until such time as the effects of the anticompetitive conduct described herein have dissipated;

f) An order declaring unenforceable the copyrights licensed by Word Collections as a result of the misuse of those copyrights for anticompetitive and unlawful purposes, the adverse effects of such misuse are continuing, until such time as adequate relief is entered to remedy the violations alleged herein, and the effects of the violations have dissipated;

DEFENDANT AND COUNTERCLAIMANT PANDORA MEDIA, LLC'S COUNTERCLAIMS,
CASE NO. 2:22-CV-00809-MCS-MAR

g) An award to Pandora of three times any damages suffered as a result of the above-described anticompetitive conduct, as well as reasonable attorneys' fees; and

h) Any other relief the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Pandora hereby demands a trial by jury on all issues so triable.

Dated:  May 5, 2022

MAYER BROWN LLP
PAUL M. FAKLER
JACOB B. EBIN
ALLISON AVIKI
WILLIAM H. STALLINGS
CHRISTOPHER J. KELLY
JOHN NADOLENCO
DANIEL D. QUEEN
MEERIM NEHME


By: */s/ Paul M. Fakler*
     Paul M. Fakler


MAYER BROWN LLP
WILLIAM H. STALLINGS (*pro hac vice pending*)
*wstallings@mayerbrown.com*
1999 K Street, NW
Washington, D.C.  20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 262-3300

MAYER BROWN LLP
CHRISTOPHER J. KELLY (SBN 276312)
*cjkelly@mayerbrown.com*
Two Palo Alto Square
3000 El Camino Real
Palo Alto, California  94306-2112
Telephone: (650) 331-2000
Facsimile: (650) 331-2060

Attorneys for Defendant
PANDORA MEDIA, LLC