1  Oliver Rocos - State Bar No. 319059
2      orocos@birdmarella.com
   BIRD, MARELLA, BOXER,
3  WOLPERT, NESSIM, DROOKS,
   LINCENBERG & RHOW, P.C.
4  1875 Century Park East, 23rd Floor
5  Los Angeles, California 90067-2561
   Telephone: (310) 201-2100
6  Facsimile: (310) 201-2110

7  Christine A. Varney (*pro hac vice*)
8      cvarney@cravath.com
   Lauren A. Moskowitz (*pro hac vice*)
9      lmoskowitz@cravath.com
10 CRAVATH, SWAINE & MOORE LLP
   825 Eighth Avenue
11 New York, NY 10019-7475
   Telephone: (212) 474-1000
12 Facsimile: (212) 474-3700

13 Attorneys for Counterclaim Defendant Word Collections, Inc.

14          **UNITED STATES DISTRICT COURT**

15   **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| 16 | Master File No. 2:22-cv-00809-MCS-MAR |
| 17 In re PANDORA MEDIA, LLC | <u>CONSOLIDATED ACTION</u> |
| COPYRIGHT LITIGATION | **COUNTERCLAIM DEFENDANT** |
| 18 | **WORD COLLECTIONS, INC.'S** |
| 19 | **NOTICE OF MOTION AND MOTION** |
| | **TO DISMISS PANDORA MEDIA, LLC'S** |
| 20 | **COUNTERCLAIMS; MEMORANDUM** |
| | **OF POINTS AND AUTHORITIES IN** |
| 21 | **SUPPORT THEREOF** |
| 22 This Document Relates To: | Filed concurrently with [Proposed] Order, |
| ALL ACTIONS | Request for Judicial Notice, and Declaration |
| 23 | of Lauren A. Moskowitz |
| 24 | Date:    August 29, 2022 |
| 25 | Time:    9:00 a.m. |
| | Crtrm.:  7C - First Street Courthouse |
| 26 | 350 W. 1st Street, 7th Floor, |
| | Los Angeles, California 90012 |
| 27 | Assigned to Hon. Mark C. Scarsi |
| 28 | |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on August 29, 2022, at 9:00 a.m., or as soon thereafter as this matter may be heard in the above-entitled court, before the Honorable Mark C. Scarsi, United States District Judge of the Central District of California in Courtroom 7C, Counterclaim Defendant Word Collections, Inc. will, and hereby does, move for an order dismissing Defendant and Counterclaimant Pandora Media, LLC's Counterclaims to Plaintiffs' Amended Consolidated Complaint or striking the allegations therein pursuant to Federal Rule of Civil Procedure 12(b)(1), for lack of Article III standing, and Federal Rule of Civil Procedure 12(b)(6), for failure to state any claims for relief.

This motion is based on the following grounds:  Pandora Media, LLC lacks standing to pursue its claims because it fails adequately to plead a cognizable injury under Article III and fails adequately to plead antitrust standing; its claims are barred by the *Noerr-Pennington* doctrine; it failed adequately to allege the elements of its antitrust claims, specifically that it lacks a realistic opportunity to obtain separate licenses for literary works of individual copyright owners, that Word Collections, Inc. possesses market power in a well-pleaded market, and the necessary elements of its conspiracy and tying claims; and other deficiencies outlined in the accompanying Memorandum of Points and Authorities.  This motion is based upon this Notice of Motion, the attached Memorandum of Points and Authorities, the concurrently filed Request for Judicial Notice, all papers on file with the Court in this action, and such other evidence and argument as the Court may receive.

This motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on July 7, 2022, between counsel for Word Collections, Inc. and counsel for Pandora Media, LLC.

1  DATED:  July 15, 2022

2                                              Oliver Rocos
                                               BIRD, MARELLA, BOXER, WOLPERT,
3                                              NESSIM, DROOKS, LINCENBERG &
4                                              RHOW, P.C.

5                                                  by
6                                                      */s/  Oliver Rocos*
                                                           Oliver Rocos
7

8                                              Christine A. Varney
9                                              Lauren A. Moskowitz
                                               CRAVATH, SWAINE & MOORE LLP
10
11                                                 by
                                                       */s/ Lauren A. Moskowitz*
12                                                         Lauren A. Moskowitz

13                                             Attorneys for Counterclaim Defendant
14                                                 Word Collections, Inc.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2  TABLE OF AUTHORITIES ....................................................... ii

3  CITATION AND ABBREVIATION CONVENTIONS ........................................ vii

4  MEMORANDUM OF POINTS AND AUTHORITIES............................................1

5  STATEMENT OF FACTS .............................................................2

6  APPLICABLE LEGAL STANDARDS ....................................................5

7  ARGUMENT.......................................................................6

8  I.    PANDORA LACKS STANDING TO PURSUE ITS CLAIMS....................6

9        A.    Pandora Does Not Plausibly Allege Article III Injury-in-Fact or

10             Antitrust Standing from Alleged Supracompetitive Prices. ..................8

11       B.    Pandora Does Not Plausibly Allege Article III Injury-in-Fact or

12             Antitrust Standing Based on Its Litigation Costs................................12

13  II.   *NOERR-PENNINGTON* BARS PANDORA'S COUNTERCLAIMS. ..........13

14  III.  PANDORA FAILS TO PLEAD A PLAUSIBLE ANTITRUST CLAIM......15

15        A.    Pandora's Failure To Seek Individual Licenses Is Fatal. ....................15

16        B.    Pandora Fails To State a Claim Under Sherman Act Section 2. ..........17

17              1.    Pandora Does Not Adequately Allege a Relevant Market. ........17

18              2.    Pandora Does Not Adequately Allege Market Power................19

19        C.    Pandora Fails To State a Claim Under Sherman Act Section 1. ..........21

20              1.    Pandora Fails To Allege an Antitrust Conspiracy.....................21

21              2.    Pandora Fails To State a Section 1 Tying Claim. .....................24

22  CONCLUSION ...................................................................25

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Adobe Sys. Inc. v. Coffee Cup Partners, Inc.*,
   No. 11-cv-2243-CW, 2012 WL 3877783 (N.D. Cal. Sept. 6, 2012) ...................11

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
   190 F.3d 1051 (9th Cir. 1999)........................................................................7, 10

*Am. Med. Ass'n v. United Healthcare Corp.*,
   No. 00-cv-2800-LMM, 2007 WL 683974 (S.D.N.Y. Mar. 5, 2007)...................12

*Am. Needle v. NFL*,
   560 U.S. 183 (2010)..........................................................................................23

*Apple, Inc. v. Motorola Mobility, Inc.*,
   886 F. Supp. 2d 1061 (W.D. Wis. 2012) ...........................................................15

*Apple, Inc. v. Psystar Corp.*,
   586 F. Supp. 2d 1190 (N.D. Cal. 2008) .............................................................18

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................................5

*Atl. Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990)............................................................................................8

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins.*,
   166 F. Supp. 3d 988 (N.D. Cal. 2015)...............................................................22

*BE & K Constr. Co. v. NLRB*,
   536 U.S. 516 (2002)..........................................................................................14

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..................................................................................5, 6, 22

*Blough v. Holland Realty*,
   574 F.3d 1084 (9th Cir. 2009)...........................................................................25

*BMI v. CBS, Inc.*,
   441 U.S. 1 (1979)........................................................................................21, 22

*BMI v. Moor-Law, Inc.*,
   527 F. Supp. 758 (D. Del. 1981) .......................................................................23

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012)................................................................6, 21, 24

*Buffalo Broad. Co. v. Am. Soc'y of Composers, Authors & Publishers*,
    744 F.2d 917 (2d Cir. 1984)......................................................................15, 16

*Cascade Health Sols. v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008)..........................................................................24

*Chip-Mender, Inc. v. Sherwin-Williams Co.*,
    No. 05-cv-3465-PJH, 2006 WL 13058 (N.D. Cal. Jan. 3, 2006) .......................12

*City of Oakland v. Oakland Raiders*,
    20 F.4th 441 (9th Cir. 2021)........................................................................7, 10

*Clapper v. Amnesty Int'l, USA*,
    568 U.S. 398 (2013).........................................................................................13

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 (1984).........................................................................................23

*Davidson v. Kimberly-Clark Corp.*,
    889 F.3d 956 (9th Cir. 2018)............................................................................8

*Digital Sun v. Toro Co.*,
    No. 10-CV-4567-LHK, 2011 WL 1044502 (N.D. Cal. Mar. 22, 2011) .............20

*Eastman v. Quest Diagnostics Inc.*,
    108 F. Supp. 3d 827 (N.D. Cal. 2015)..............................................................8

*Edwards Vacuum, LLC v. Hoffman Instrumentation Supply, Inc.*,
    556 F. Supp. 3d 1156 (D. Or. 2021).................................................................9

*Entrepreneur Media, Inc. v. Dermer*,
    No. 18-cv-01562-JVS-KES, 2019 WL 4187466 (C.D. Cal. July 22, 2019)........14

*Fitbit, Inc. v. Laguna 2, LLC*,
    No. 17-cv-00079-EMC, 2018 WL 306724 (N.D. Cal. Jan. 5, 2018)..................14

*Freeman v. Lasky, Haas & Cohler*,
    410 F.3d 1180 (9th Cir. 2005).........................................................................14

*Freeman v. San Diego Ass'n of Realtors*,
    322 F.3d 1133 (9th Cir. 2003).....................................................................22, 25

*Friends of the Earth, Inc. v. Laidlaw Env't Servs.*,
    528 U.S. 167 (2000)................................................................................7

*FTC v. Apex Cap. Grp.*,
    No. 18-cv-9573-JFW, 2022 WL 1060486 (C.D. Cal. Mar. 10, 2022)................12

*Gen. Bus. Sys. v. N. Am. Philips Corp.*,
    699 F.2d 965 (9th Cir. 1983)........................................................20

*Gerlinger v. Amazon.com Inc.*,
    526 F.3d 1253 (9th Cir. 2008)............................................7, 8, 13

*Glen Holly Ent., Inc. v. Tektronix, Inc.*,
    100 F. Supp. 2d 1073 (C.D. Cal. 1999)............................................13

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018)..............................................17, 18

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
    No. 16-cv-1421-SVW-FFM, 2016 WL 7324091 (C.D. Cal. Oct. 26, 2016).......20

*Honey Bum, LLC v. Fashion Nova, Inc.*,
    No. 20-cv-11233-RGK-AS, 2021 WL 4205618 (C.D. Cal.
    Mar. 26, 2021) ..............................................................17, 18

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015)..............................................22, 23

*Intel Corp. v. Fortress Inv. Grp.*,
    511 F. Supp. 3d 1006 (N.D. Cal. 2021)............................................11

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v.
    Indep. Ink, Inc.*, 547 U.S. 28 (2006)......................................24, 25

*Kendall v. Visa USA, Inc.*,
    518 F.3d 1042 (9th Cir. 2008)..............................................6, 22

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000)..............................................7, 8

*L.A. Land Co. v. Brunswick Corp.*,
    6 F.3d 1422 (9th Cir. 1993)..............................................21

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
   140 F.3d 1228 (9th Cir. 1998)....................................................................7

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)....................................................................................7

*McCray v. Fidelity Nat'l Title Ins.*,
   682 F.3d 229 (3d Cir. 2012)...................................................................8, 9

*McGlinchy v. Shell Chem. Co.*,
   845 F.2d 802 (9th Cir. 1988)...................................................................12

*Nat'l Cable Television Ass'n v. BMI*,
   772 F. Supp. 614 (D.D.C. 1991) .............................................................16

*Nero AG v. MPEG LA, LLC*,
   No. 10-cv-3672-MRP-RZ, 2010 WL 4366448 (C.D. Cal. Sept. 14, 2010).........16

*Newcal Indus., Inc. v. IKON Off. Sol.*,
   513 F.3d 1038 (9th Cir. 2008).............................................................16, 17

*Novation Ventures, LLC v. J.G. Wentworth Co.*,
   156 F. Supp. 3d 1094 (C.D. Cal. 2015) ...................................................7

*Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*,
   No. 11-cv-2652-GPC-RBB, 2013 WL 3873074 (S.D. Cal. July 25, 2013)...10, 11

*Pro. Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*,
   508 U.S. 49 (1993)...............................................................................13, 15

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995)................................................................19, 21

*Reudy v. Clear Channel Outdoors, Inc.*,
   693 F. Supp. 2d 1091 (N.D. Cal. 2010)...................................................18

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
   471 F. Supp. 3d 981 (N.D. Cal. 2020).....................................................10

*Rick-Mik Enters., Inc. v. Equilon Enters., LLC*,
   532 F.3d 963 (9th Cir. 2008)..........................................................19, 20, 25

*San Diego Unified Port Dist. v. Monsanto Co.*,
   309 F. Supp. 3d 854 (S.D. Cal. 2018) ....................................................12

*Sosa v. DirecTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006)............................................................................14

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016).......................................................................................7

*Staley v. Gilead Scis., Inc*,
    No. 19-cv-02573-EMC, 2020 WL 5507555 (N.D. Cal. July 29, 2020) ..............15

*Stockfood Am., Inc. v. Adagio Teas, Inc.*,
    475 F. Supp. 3d 394 (D.N.J. 2020)................................................................23

*Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*,
    No. 05-cv-02133-SBA, 2007 WL 2318903 (N.D. Cal. Aug. 13, 2007)..............16

*Terenkian v. Republic of Iraq*,
    694 F.3d 1122 (9th Cir. 2012)........................................................................6

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
    546 F.3d 991 (9th Cir. 2008)........................................................................17

*Times-Picayune Publ'g Co. v. United States*,
    345 U.S. 594 (1953).....................................................................................24

*Ways & Means, Inc. v. IVAC Corp.*,
    506 F. Supp. 697 (N.D. Cal. 1979)................................................................25

*Zunum Aero, Inc. v. Boeing Co.*,
    No. 21-cv-0896-JLR, 2022 WL 2116678 (W.D. Wash. June 13, 2022) ............19

**Statutes & Rules**

15 U.S.C. § 1 ..............................................................................................passim

15 U.S.C. § 2 ..............................................................................................passim

17 U.S.C. § 505 ................................................................................................13

Fed. R. Civ. P. 12(b)(1)........................................................................................6

Fed. R. Civ. P. 12(b)(6)........................................................................................5

# CITATION AND ABBREVIATION CONVENTIONS

**Entities and Parties**

- "Comedians":  Brave Lion, Inc.; Nick Di Paolo; Mary Reese Hicks; Main Sequence, Ltd.; Robin Williams Trust; Ron White, Inc.; Yellow Rose Productions, Inc.

- "Counterdefendants":  Word Collections and the Comedians, collectively

- "Pandora":  Pandora Media, LLC

- "SiriusXM":  SiriusXM Holdings Inc.

- "Word Collections":  Word Collections, Inc.

**Pleadings and Court Submissions**

- "Answer":  Answer and Defenses of Defendant Pandora to Plaintiffs' Amended Consolidated Complaint, filed on May 5, 2022 (ECF 33)

- "Complaint":  Amended Consolidated Complaint for Copyright Infringement, filed on April 26, 2022 (ECF 24)

- "Counterclaims":  Defendant and Counterclaimant Pandora's Counterclaims to Plaintiffs' Amended Consolidated Complaint Against All Plaintiffs/Counterclaim Defendants and Counterclaim Defendant Word Collections, filed on May 5, 2022 (ECF 34)

- "Ex.":  Exhibit to Declaration of Lauren A. Moskowitz in support of Request for Judicial Notice

- "Request for Judicial Notice": Word Collections' Request for Judicial Notice, filed concurrently herewith

**Other**

- "2011 10-K":  Pandora Media, Inc., Annual Report (Form 10-K) (Mar. 16, 2012)

- "2016 10-K":  Pandora Media, Inc., Annual Report (Form 10-K) (Feb. 16, 2017)

- "Herring Testimony":  *In re Determination of Rates and Terms for Making and Distributing Phonorecords* (*Phonorecords III*), No. 16-CRB-0003-PR (2018-2022) Open Session Transcript, Volume IV, March 14, 2017, Testimony of Michael Herring

- "Proposed License":  Performance License Agreement proposed by Word Collections to Pandora

## **MEMORANDUM OF POINTS AND AUTHORITIES**

This copyright litigation seeks redress for a decade of Pandora's willful copyright infringement of the Comedians' literary works.  In a blatant act of retaliation and bullying, Pandora has ginned up spurious antitrust Counterclaims against the Comedians and their agent, Word Collections.  This intimidation tactic should not be permitted to stand, and the Counterclaims should be dismissed.

Word Collections is an organization that has been engaged by a few dozen owners of copyrights to literary works underlying comedy recordings, including the Comedians, to perform the benign and procompetitive activity of assisting in procuring licenses and royalties for their legally protected property.  In its Counterclaims, Pandora paints an absurd picture of Word Collections as a ringleader of a price-fixing cartel of comedians and as a monopolist that is somehow capable of extracting supracompetitive royalties from the likes of Pandora, which—together with its parent, SiriusXM—dominates digital broadcasting of comedy content.

Pandora publicly has recognized for over a decade that copyrights to the literary works underlying comedy recordings exist (separate from copyrights for the sound recordings of such content), that Pandora has not separately licensed or paid for broadcasting or streaming those literary works, and that it could be sued for infringing those works.  That risk of suit eventually materialized.  But the Comedians did not commence this litigation until nearly a year after Word Collections put Pandora on notice of its infringement and attempted to enter a license.  If Pandora had a *bona fide* antitrust claim based on Word Collections' existence or conduct, it would have brought it long before these copyright actions were filed by the Comedians, not in response to them.

Pandora's Counterclaims are clearly nothing more than a backdoor attempt to dismiss copyright claims to which they have no valid defense.  This is not hyperbole:  Pandora explicitly requests an injunction to shut down the copyright litigation and render the copyrights unenforceable, and seeks treble damages for the

costs of defending that litigation.  (Counterclaims Prayer for Relief §§ (e)-(g).)
Pandora also effectively seeks to dissolve Word Collections and leave comedians to
fend for themselves—*i.e.*, be steamrolled by Pandora.  (*Id.* §§ (c)-(d).)  These
Counterclaims have nothing to do with protecting competition and everything to do
with squashing any and all challenges to Pandora's copyright infringement.  They
should be dismissed with prejudice.

     *First*, Pandora lacks Article III and antitrust standing.  Conclusory references
to hypothetical "supracompetitive" license rates that it *might* be forced to pay in the
future do not confer standing.  (Section I.A.)  Nor does Pandora acquire standing by
having to defend against meritorious copyright infringement claims.  (Section I.B.)

     *Second*, the copyright infringement lawsuits and Counterdefendants' related
activities in pursuit of a license to resolve potential litigation constitute protected
First Amendment petitioning activity that cannot form the basis of an antitrust claim
under the Supreme Court's *Noerr-Pennington* doctrine.  (Section II.)

     *Third*, Pandora fails to plead the requisite elements of its Sherman Act claims.
All of Pandora's claims are fatally flawed because it cannot plead a lack of a
"realistic opportunity" to obtain separate licenses for the literary works of individual
copyright owners.  (Section III.A.)  Pandora does not adequately plead a relevant
antitrust market or that Counterdefendants possess market power under Section 2.
(Section III.B.)  Pandora also fails to plead the elements of its Section 1 price fixing
conspiracy and tying claims.  (Section III.C.)

## STATEMENT OF FACTS[1]

     Word Collections is an agent, advocate and administrator of licensing
agreements and royalties collections for its clients, which include comedians and
other spoken word performers who create and control literary works.

---

[1] These facts are drawn from the Counterclaims (taken as true) or documents for
which judicial notice is proper.  (*See* Request for Judicial Notice.)

(Counterclaims ¶ 16.)  Pandora's Counterclaims "assume" the existence of "public performance, reproduction and/or distribution rights in the jokes embodied in comedy recordings", which "comedians, as authors of those jokes, might have retained" and could license "separately" from the sound recording itself.  (*Id.* ¶ 6.) Pandora also concedes that it did not secure licenses for the literary works embodied in the spoken word comedy routines that it streamed for over a decade.  (*Id.* ¶ 43.) In its own SEC filings, Pandora warned that its practice could expose it to litigation. In 2011, Pandora disclosed that it had "started streaming spoken word comedy content" but that "pursuant to industry-wide custom and practice, this content is performed absent a specific license from any such performing rights organization", which could create "exposure to new regulatory and legal risks".  (Ex. A, 2011 10-K at 29.)  Pandora subsequently warned investors:  "There can be no assurance that this industry custom will not change or that we will not otherwise become subject to additional licensing costs for spoken word comedy content imposed by performing rights organizations or individual copyright owners in the future or be subject to damages for copyright infringement."  (Ex. B, 2016 10-K at 15.)

Word Collections approached Pandora in 2020 on behalf of its clients to offer a license to the Comedians' literary works that Pandora uses.  (Counterclaims ¶ 82; Answer at 23 (admitting that "representatives of Word Collections contacted Pandora in August 2020 and various times thereafter").)  Word Collections sent Pandora the Proposed License in March 2021.[2]  Despite claiming that it is "willing to enter into reasonable licenses negotiated in a competitive market for legitimate copyrights covering the content it transmits" (Counterclaims ¶ 40), Pandora nowhere alleges that it counteroffered Word Collections or otherwise attempted to

---

[2] That same correspondence included a letter and memorandum providing notice of a copyright infringement claim and explaining in detail the legal bases of the claim.  (Ex. C, 3/11/21 Email from J. Price to J. Subramaniam et al.)

negotiate the terms of licensing the literary works of Word Collections' clients, whether individually or as a group, at any time. Pandora does not allege that Word Collections ever said "no" to any overall rate, any individual rate, any royalty structure, or anything at all. After waiting for nearly a year (or a decade, really) with no movement from Pandora, the Comedians sued Pandora for copyright infringement. Pandora now brings these Counterclaims in a brazen attempt to shut those cases down.

Pandora's antitrust "theory" is that by offering Pandora a "blanket license", Counterdefendants have (1) collusively fixed the price of licensing the Comedians' literary works (*id.* ¶¶ 84-90); (2) tied "the rights to the various desirable comedy routines embodied in comedy recordings" to "other, less desirable, literary works rights in Word Collections' portfolio" (*id.* ¶¶ 91-95); (3) monopolized, or attempted to monopolize, the U.S. market for "comedy routines embodied in comedy recordings" (*id.* ¶¶ 96-101); and (4) conspired to monopolize that market (*id.* ¶¶ 102-08). On its face, this market includes the rights to all comedy routines, but Pandora elsewhere alleges the existence of distinct product markets for "desirable" and "less desirable" or "undesirable" literary works rights. (*Id.* ¶¶ 66, 93.) Pandora nowhere explains this inconsistency, nor whether "desirable" refers to an assessment by Pandora, by certain of its customers but not others, by critics, or otherwise.

Pandora alleges the conspiracy involved the Comedians agreeing with Word Collections through "exclusive affiliation agreements" to offer a "blanket license" at a fixed price.[3] (*Id.* ¶¶ 85, 104.) Pandora alleges with no basis it has been harmed

---

[3] Pandora falsely alleges that this "blanket license" would force it to "pay for" material that it does not want. (Counterclaims ¶¶ 47, 70, 80, 82.) The actual Proposed License makes clear that Pandora would be entitled to play any work covered by the license, but would not pay for anything it did not use. (*See* Ex. C, Proposed License ¶ 5 (defining license fee calculations based on *performances* of literary works rather than a single subscription price for access to all works in Word

because it will have to pay "supracompetitive royalties" in the future if the alleged conspiracy succeeds (on top of being forced to incur costs defending the copyright actions). (*Id.* ¶¶ 82-83.) Pandora does not specify what a "competitive" rate would be or how the proposed rate was supracompetitive. Instead, Pandora resorts to vague descriptors, alleging royalties would be "dramatically increas[ed]" (*id.* ¶ 5); "substantially more" (*id.* ¶ 66); and "substantially greater" (*id.* ¶ 70) than the rate that would prevail in a "competitive" market in which each comedian vied against all others to have Pandora license and pay royalties for the literary works it broadcasts and streams. Pandora could have licensed and negotiated a royalty rate with any of the thousands of comedians who are not clients of Word Collections to establish its view of the competitive rate at any point "without difficulty" (*id.* ¶ 46), but it did not. Pandora makes no attempt to quantify the supposed rate increase, and the Counterclaims make clear that its true complaint is that it has to pay anything at all for the literary works embodied in comedy recordings.

## APPLICABLE LEGAL STANDARDS

To withstand a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain plausible factual allegations that support a "reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It is not sufficient to "plead[] facts that are 'merely consistent with' a defendant's liability"; rather, the allegations must cross "the line between possibility and plausibility of 'entitlement to relief'". *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Determining whether a plausible claim is stated is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense". *Id.* at 679. In performing this exercise, the court must ignore "'naked

---

Collections' portfolio).) This mischaracterization was raised as part of the meet and confer process in connection with this motion but was not corrected by Pandora.

1  assertion[s]' devoid of 'further factual enhancement'", and is "not bound to accept

2  as true a legal conclusion couched as a factual allegation". *Id.* (quoting *Twombly*,

3  550 U.S. at 555, 557).  The same standards apply to a facial challenge to Article III

4  standing.  *See Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012).

5       Rigorous enforcement of these pleading requirements plays an especially

6  important role in evaluating antitrust claims.  *See Kendall v. Visa USA, Inc.*,

7  518 F.3d 1042, 1046-47 (9th Cir. 2008).  As the Supreme Court has recognized,

8  antitrust disputes impose considerable fact and expert discovery burdens that tax the

9  time, energy and resources of courts and litigants.  *See id.* (citing *Twombly*, 550 U.S.

10 at 558-59).  Accordingly, antitrust allegations "must 'raise a reasonable expectation

11 that discovery will reveal evidence of' an injury to competition" and "a complaint's

12 allegation of a practice that may or may not injure competition is insufficient to

13 'state a claim that is plausible on its face'".  *Brantley v. NBC Universal, Inc.*, 675

14 F.3d 1192, 1198 (9th Cir. 2012) (quoting *Twombly*, 550 U.S. at 556, 570).

15 Moreover, "to allege an agreement between antitrust co-conspirators, the complaint

16 must allege facts such as a 'specific time, place, or person involved in the alleged

17 conspiracies'".  *Kendall*, 518 F.3d at 1047 (quoting *Twombly*, 550 U.S. at 565 n.10).

18                      **ARGUMENT**

19 **I.     PANDORA LACKS STANDING TO PURSUE ITS CLAIMS.**

20       Pandora alleges two theories of harm—potential exposure to paying (but not

21 actually paying) "supracompetitive" royalty rates for the literary works underlying

22 the sound recordings of comedy performances, and payment of defense costs or

23 damages in the copyright infringement cases brought by the Comedians.  Neither

24 meets the standards for Article III or antitrust standing.  As a result, the

25 Counterclaims must be dismissed with prejudice.

26       The "irreducible constitutional minimum of standing" under Article III is that

27 the plaintiff "have (1) suffered an injury in fact, (2) that is fairly traceable to the

28 challenged conduct of the defendant, and (3) that is likely to be redressed by a

favorable judicial decision". *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016). To meet the injury-in-fact requirement, the alleged injury must be "concrete and particularized" as well as "actual or imminent, not conjectural or hypothetical". *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 180 (2000). Article III is not satisfied where "the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control". *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 n.2 (1992). In an antitrust case, Article III injury-in-fact is "an injury which bears a causal connection to the alleged antitrust violation". *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1255 (9th Cir. 2008) (quotation omitted).

Separate from Article III standing, private antitrust plaintiffs must also meet "the more demanding standard for *antitrust* standing". *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1232 (9th Cir. 1998) (quotation omitted); *see also Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 n.3 (9th Cir. 1999) ("A plaintiff who satisfies the constitutional requirement of injury in fact is not necessarily a proper party to bring a private antitrust action."). In this Circuit, "courts regularly dismiss antitrust claims" for failure to plead antitrust standing. *Novation Ventures, LLC v. J.G. Wentworth Co.*, 156 F. Supp. 3d 1094, 1099-1100 (C.D. Cal. 2015).

Antitrust standing turns on (i) "the nature of the plaintiff's alleged injury", (ii) "the directness of the injury", and (iii) "the speculative measure of the harm". *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000) (quoting *Am. Ad Mgmt.*, 190 F.3d at 1054-55); *see City of Oakland v. Oakland Raiders*, 20 F.4th 441, 455-61 (9th Cir. 2021) (affirming dismissal of complaint on the ground that plaintiff lacked antitrust standing based on these three factors). The first factor requires a showing of "antitrust injury, *i.e.*, injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful". *Knevelbaard Dairies*, 232 F.3d at 987 (quotation omitted). This

threshold showing "ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior", that is, from higher prices, lower output, or lesser quality. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990). An antitrust plaintiff must plead all four of the following to survive dismissal: (i) unlawful conduct, (ii) causing an injury to the plaintiff, (iii) that flows from what makes the conduct unlawful, and (iv) that is of the type the antitrust laws were intended to prevent. *See Knevelbaard Dairies*, 232 F.3d at 987.

## A. Pandora Does Not Plausibly Allege Article III Injury-in-Fact or Antitrust Standing from Alleged Supracompetitive Prices.

Pandora's hypothetical theory of harm—that "*if* Counterdefendants prevail[] in carrying out their scheme", Pandora "*would be* forced to pay an ongoing stream of supracompetitive royalties" (Counterclaims ¶ 83 (emphases added))—fails plausibly to allege any injury-in-fact or causal antitrust injury.

Pandora does not allege that it has actually entered into a license to exploit the Comedians' literary works or has paid *any* royalties whatsoever for them. That alone demonstrates a lack of actual harm—even without the additional problem that Pandora nowhere alleges how or why the royalties that it refused to pay would have been supracompetitive. *See Gerlinger*, 526 F.3d at 1254 ("[T]he plaintiff lacks [Article III] standing because he did not show that he ever purchased an item for a higher price than he would have had there been no . . . agreement and thus has suffered no injury-in-fact."); *Eastman v. Quest Diagnostics Inc.*, 108 F. Supp. 3d 827, 831 (N.D. Cal. 2015) ("merely alleging [defendant] charged above-competitive prices, without alleging facts demonstrating that plaintiffs were injured as a result of [defendant's] anticompetitive conduct, is insufficient" for Article III standing).

Nor can Pandora establish standing based on a theory of threatened harm. Threatened harm "must be *certainly impending* to constitute injury in fact"; "allegations of *possible* future injury are not sufficient". *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (quotation omitted). In *McCray v.*

*Fidelity National Title Insurance*, plaintiffs relied on allegations of a "significant threat of future losses and injuries" resulting from alleged "collective price-setting of rates", but just like Pandora here, plaintiffs "did not indicate when such 'future losses and injuries' will occur" and instead "vaguely alleged that '[a]s a proximate result of defendants' unlawful conduct, plaintiffs . . . will suffer future loss or damages in that they will be required to pay supracompetitive prices'".  682 F.3d 229, 243 (3d Cir. 2012).  The Third Circuit concluded that plaintiffs failed plausibly to allege Article III standing.  *Id.* at 243-44.  The same result should follow here.

Stated another way, Pandora cannot avoid, much less cure, its decade of copyright infringement by claiming that, in 2021, newly formed Word Collections offered Pandora a draft license it apparently did not like, ignored, and did not enter into.  The royalty rate Pandora might hypothetically pay going forward *after* a negotiation that has never occurred cannot constitute the actual or threatened harm suffered *before* suit that is required to satisfy Article III standing.

Pandora's allegations also fail to clear the high bar for antitrust standing. Pandora does not plausibly allege unlawful conduct that causes injury to it of the type the antitrust laws were intended to prevent.  Even taken as true, Pandora's allegations that Word Collections "insisted that Pandora must take its . . . blanket license" at a "supracompetitive" royalty rate are insufficient as a matter of law given that Pandora admits it *never accepted* such alleged demands.  (Counterclaims ¶ 82.) A plaintiff that did not actually accept the terms of a supposedly anticompetitive license agreement does not have antitrust standing to sue on that alleged conduct. *See Edwards Vacuum, LLC v. Hoffman Instrumentation Supply, Inc.*, 556 F. Supp. 3d 1156, 1170 n.8 (D. Or. 2021) ("[I]t is difficult to see how an unaccepted offer could ever satisfy the causal antitrust injury requirement needed in a private antitrust claim seeking money damages because an unaccepted offer would not be the 'cause' of any material result in the marketplace.").

In addition, Pandora does not allege that this hypothetical harm is fairly traceable to or "the direct result of [the Counterdefendants'] allegedly anticompetitive conduct". *Am. Ad Mgmt.*, 190 F.3d at 1058. Pandora not only acknowledges it has not entered into the supposedly anticompetitive license, but also expressly alleges that it *would not* do so, and, if faced with that license, would "have no choice but to drop its comedy offering entirely". (Counterclaims ¶ 80.) "Nonpurchasers who are priced out of the market", which Pandora claims to be, face an especially high bar for antitrust standing given "the speculative nature of the harm". *City of Oakland*, 20 F.4th at 460. As the Ninth Circuit has recognized, "[a]nyone could claim that he or she would have purchased at the competitive price but was priced out of the market as the result of the anticompetitive pricing"; accordingly, "courts are likely to find that claims of those who refused to purchase at the cartel price are *speculative*" and thus insufficient to confer standing. *Id.* at 458 (quotation omitted) (affirming dismissal of antitrust claim for lack of antitrust standing). Such a finding is appropriate here.

Pandora also fails to plead the threshold question of what unlawful conduct supposedly caused it antitrust injury. Although Pandora conclusorily alleges "supracompetitive" prices in several places (*e.g.*, Counterclaims ¶¶ 4, 30, 83), it never identifies *any* price that was proposed, much less what was supracompetitive about it. Without any such supporting details, these allegations of injury are exactly the kind of "naked assertions devoid of further factual enhancement" that "are insufficient to survive a motion to dismiss". *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 997 (N.D. Cal. 2020) (quotation omitted) (dismissing Section 1 and Section 2 claims for failure to allege antitrust injury "in a non-conclusory manner"). Antitrust claims are properly dismissed where the "plaintiff fails to plead supportive facts beyond conclusory statements that, as a result of Defendants['] actions . . . consumers actually faced higher prices". *Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*, No. 11-cv-2652-GPC-RBB,

2013 WL 3873074, at *13 (S.D. Cal. July 25, 2013); *see also, e.g.*, *Adobe Sys. Inc. v. Coffee Cup Partners, Inc.*, No. 11-cv-2243-CW, 2012 WL 3877783, at *10 (N.D. Cal. Sept. 6, 2012) (allegation that a "lawsuit asserting [certain] patents will result in 'reduced competition and increased prices', with no elaboration or additional factual allegations" is nothing more than a "sweeping legal conclusion").

Finally, Pandora implies that because *it* has a "historic custom and practice" of merely paying the statutory entitlement for the sound recording, *any* royalties for comedians' literary works would constitute supracompetitive pricing. (*E.g.*, Counterclaims ¶ 66.) That is an absurd argument on its face. Pandora assumes for purposes of the Counterclaims that such literary works are appropriately licensed separate and apart from the sound recordings. (*Id.* ¶ 6.) That Pandora licenses and pays a royalty for sound recordings to record labels has no relevance to its failure to properly license and pay for use of the underlying literary works. It is required to pay and does pay for both when it comes to music. (Ex. A, 2011 10-K at 8; Ex. B, 2016 10-K at 6.) There is no difference in the law between these works and musical works. Pandora cannot rewrite the law by supposedly creating its own "custom".

If the mere allegation that a copyright holder has demanded more than a potential licensee unilaterally perceived as "historic custom" were sufficient to state an antitrust claim, valid copyright holders would be subject to antitrust liability the moment they asked for anything at all. There is no basis in antitrust law for this theory, which would chill copyright holders' ability to assert their statutory rights. Having to pay for the use of intellectual property that Pandora previously (and improperly) took and used without paying anything for does not establish a supracompetitive price and does not support a finding of antitrust injury. *See, e.g.*, *Intel Corp. v. Fortress Inv. Grp.*, 511 F. Supp. 3d 1006, 1027 (N.D. Cal. 2021) ("[A]lthough Plaintiffs suggest that the royalties were supracompetitive because prior owners did not even assert the patents in the first place, that does not mean that the patents were worthless.").

### B. Pandora Does Not Plausibly Allege Article III Injury-in-Fact or Antitrust Standing Based on Its Litigation Costs.

Pandora's allegation that it has been harmed because it has "already borne the brunt of Counterdefendants' scheme" through "[t]he costs of defending against [Comedians' infringement suits]" (Counterclaims ¶¶ 82-83) also fails to support Article III or antitrust standing.  "[I]njuries stemming from the cost or potential damages of litigation are insufficient to confer standing" for purposes of Article III. *FTC v. Apex Cap. Grp.*, No. 18-cv-9573-JFW, 2022 WL 1060486, at *3 (C.D. Cal. Mar. 10, 2022); *see also San Diego Unified Port Dist. v. Monsanto Co.*, 309 F. Supp. 3d 854, 866-67 (S.D. Cal. 2018) (holding counterclaimant "fail[ed] to allege sufficient facts to establish Article III standing to assert its counterclaims premised on defense costs" because "[l]itigation costs are insufficient to establish standing for purposes of Article III").  That is particularly true here because Pandora's allegations of harm arise from its attempts to avoid liability in the underlying copyright infringement lawsuits, which Pandora expressly assumes are pursuing cognizable rights.  (Counterclaims ¶ 6.)

Pandora's reliance on a litigation costs theory of harm similarly fails to support antitrust standing.  "It is injury to the market or to competition in general, not merely injury to individuals or individual firms that is significant." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 812 (9th Cir. 1988).  "A claim of injury in the form of attorneys' fees in defending against a[n] . . . infringement suit is not an injury to 'competition' or the type of injury that the antitrust laws were designed to protect against, but is rather a purely individual economic injury . . . that has no effect on competition in the relevant market." *Chip-Mender, Inc. v. Sherwin-Williams Co.*, No. 05-cv-3465-PJH, 2006 WL 13058, at *5-6 (N.D. Cal. Jan. 3, 2006); *see also Am. Med. Ass'n v. United Healthcare Corp.*, No. 00-cv-2800-LMM, 2007 WL 683974, at *5 (S.D.N.Y. Mar. 5, 2007) ("Even reading the complaint generously, it cannot be said that the litigation costs incurred by Counterclaim

1    Plaintiffs are injuries that antitrust laws were intended to prevent or that have had an

2    adverse effect on competition as a whole.").  Pandora alleges no harm to anyone but

3    itself, which is not the type of harm that the antitrust laws were intended to prevent.

4         Moreover, Pandora cannot establish a causal connection between this alleged

5    harm and the alleged antitrust violation.  *Gerlinger*, 526 F.3d at 1255.  The

6    underlying lawsuits seek, among other things, damages for Pandora's *past*

7    infringement.  (*See* Complaint ¶¶ 154-58.)  Those claims and the costs of defending

8    against them would exist regardless of any alleged anticompetitive conduct

9    involving Word Collections to "force" a license upon Pandora for the use of literary

10   works on a *future* basis.[4]  As such, Pandora's purported injury based on litigation

11   costs is not "fairly traceable" to the challenged conduct.  *See Clapper v. Amnesty*

12   *Int'l, USA*, 568 U.S. 398, 412-13 (2013) (no standing where the alleged injury could

13   occur regardless of the conduct challenged by plaintiffs, and therefore was

14   not fairly traceable to that conduct); *see also Glen Holly Ent., Inc. v. Tektronix, Inc.*,

15   100 F. Supp. 2d 1073, 1081 (C.D. Cal. 1999) ("[A] harm is not an antitrust harm if it

16   would *necessarily* have occurred without the anti-competitive behavior.").

17   **II.    *NOERR-PENNINGTON* BARS PANDORA'S COUNTERCLAIMS.**

18        Pandora's Counterclaims should be dismissed for another independent reason:

19   the Counterdefendants' copyright enforcement efforts are protected First

20   Amendment petitioning activity under the *Noerr-Pennington* doctrine and thus

21   cannot give rise to antitrust liability.  *See Pro. Real Estate Invs., Inc. v. Columbia*

22   *Pictures Indus., Inc.* ("*PRE*"), 508 U.S. 49, 56 (1993).

23        The *Noerr-Pennington* doctrine recognizes that the First Amendment protects

24   citizens' right to "use . . . courts to advocate their causes and points of view

25

26   _____

27        [4] Moreover, if Pandora were successful in the underlying copyright infringement
     litigation, the Court would have discretion to award it attorneys' fees and costs,
28   17 U.S.C. § 505, which would leave it with no actual harm.

respecting resolution of their business and economic interests". *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002).  The immunity extends beyond litigants to their agents and representatives. *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1186 (9th Cir. 2005).  In addition, the doctrine protects not only the litigation itself, but also conduct incidental to filing a lawsuit, including pre-litigation communications seeking resolution or settlement of legal claims. *Sosa v. DirecTV, Inc.*, 437 F.3d 923, 935 (9th Cir. 2006) ("[W]e have recognized that, in the litigation context, not only petitions sent directly to the court in the course of litigation, but also conduct incidental to the prosecution of the suit is protected by the *Noerr-Pennington* doctrine." (quotation omitted)).  Courts "routinely dismiss[] claims that are barred by the *Noerr-Pennington* doctrine" at the pleading stage. *Entrepreneur Media, Inc. v. Dermer*, No. 18-cv-01562-JVS-KES, 2019 WL 4187466, at *4 (C.D. Cal. July 22, 2019) (collecting cases); *see also, e.g.*, *Fitbit, Inc. v. Laguna 2, LLC*, No. 17-cv-00079-EMC, 2018 WL 306724, at *10 (N.D. Cal. Jan. 5, 2018).

Pandora's Counterclaims are a naked attempt to chill the Comedians' copyright infringement claims.  Pandora's requested relief boldly seeks, among other things, "[a]n injunction prohibiting Counterdefendants . . . from instituting, or threatening to institute, copyright infringement actions directed against the use by Pandora of copyrighted works licensed by Word Collections".  (Counterclaims Prayer for Relief § (e).)  Pandora is clearly trying to misuse legal process to get relief in the copyright actions that it cannot achieve on the merits in those cases. Counterdefendants' copyright enforcement efforts—including pre-litigation notices of infringement and accompanying requests that Pandora enter into a license—are exactly the types of First Amendment protected activity the *Noerr-Pennington* doctrine exists to safeguard.  The Proposed License was clearly incidental to the pre-litigation communications—it was sent to Pandora in March 2021 along with a notice of infringement and legal memoranda explaining the bases for a copyright infringement claim.  (Ex. C, 3/11/21 Email from J. Price to J. Subramaniam et al.)

*Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061 (W.D. Wis. 2012), is instructive. There, Apple asserted an antitrust claim alleging that the defendant "fail[ed] to offer a [fair, reasonable and nondiscriminatory] license" and then enforced its patents against Apple in litigation. *Id.* at 1076. Like Pandora, Apple had not paid royalties to the defendant; instead, "the only injury Apple suffered as a result of [defendant's] alleged antitrust violation was the attorney fees and costs that it has incurred responding to the patent litigation". *Id.* The court held that *Noerr-Pennington* barred Apple's claim because "its antitrust claim [was] necessarily based on [defendant's] patent litigation". *Id.* The same is true here, and the Court should dismiss all of the Counterclaims with prejudice.[5] *See, e.g., Staley v. Gilead Scis., Inc*, No. 19-cv-02573-EMC, 2020 WL 5507555, at *19 (N.D. Cal. July 29, 2020) ("Plaintiffs have not articulated any other means by which they could avoid *Noerr-Pennington* immunity here, and thus amendment would be futile.").

## III. PANDORA FAILS TO PLEAD A PLAUSIBLE ANTITRUST CLAIM.

Pandora's Counterclaims also should be dismissed for failure to plead the requisite elements of antitrust liability.

### A. Pandora's Failure To Seek Individual Licenses Is Fatal.

Pandora does not and cannot allege that it ever sought an individual license for literary works from the Comedians, Word Collections or any other entity. This failure is fatal to all of its antitrust claims.

The Second Circuit established the rule that "the opportunity to acquire a pool of rights does not restrain trade if an alternative opportunity to acquire individual

---

[5] Pandora does not (because it cannot) plead the sham litigation exception to *Noerr-Pennington* immunity, which requires, among other things, a showing that the underlying litigation is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits". *PRE*, 508 U.S. at 60-61. Notably, Pandora never moved to dismiss the copyright actions, and has warned publicly that such claims might be brought for the past decade. (*E.g.*, Ex. A, 2011 10-K at 29.)

1    rights is realistically available". *Buffalo Broad. Co. v. Am. Soc'y of Composers,*
2    *Authors & Publishers*, 744 F.2d 917, 925 (2d Cir. 1984).  Courts in this Circuit
3    agree.  *E.g.*, *Nero AG v. MPEG LA, LLC*, No. 10-cv-3672-MRP-RZ, 2010 WL
4    4366448, at *6 (C.D. Cal. Sept. 14, 2010) ("The opportunity to acquire a pool of
5    rights does not restrain trade if an alternative opportunity to acquire individual rights
6    is fully available."); *Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials,*
7    *Inc.*, No. 05-cv-02133-SBA, 2007 WL 2318903, at *15 (N.D. Cal. Aug. 13, 2007)
8    ("Courts have repeatedly held that if the antitrust plaintiff had the opportunity to
9    license independently from individual owners of copyright or patent rights engaged
10   in a pooled activity, then the pool of rights does not restrain trade . . . .").

11          "The burden of proving lack of realistic opportunity to license directly cannot
12   be met where a plaintiff never makes an inquiry or attempts to negotiate a single
13   individual license."  *Nero*, 2010 WL 4366448, at *6; *see also Nat'l Cable Television*
14   *Ass'n v. BMI*, 772 F. Supp. 614, 634 (D.D.C. 1991) (holding that "realistically
15   available alternatives" to a "blanket license" existed where "plaintiffs failed to show
16   that they made any serious efforts to obtain" an alternative license).  Indeed, the
17   *Nero* court dismissed an antitrust complaint where the plaintiff "failed to plausibly
18   allege it lacks a 'realistic opportunity' as a 'practical matter' to obtain individual
19   licenses from individual patent holders".  *Nero*, 2010 WL 4366448, at *7.  That is
20   precisely the case here.  According to Pandora's own allegations, it could deal
21   individually with comedians to separately license literary works "without
22   difficulty".  (Counterclaims ¶ 46.)  But at no point during the past decade has
23   Pandora ever attempted to negotiate any license for any literary work with the
24   rightsholders or their representatives.[6]  This is fatal to all of Pandora's Section 1 and
25   Section 2 claims.  *Buffalo Broad.*, 744 F.2d at 933; *Nero*, 2010 WL 4366448, at *6.
26
27          [6] Word Collections made clear in the meet and confer process for this motion
28   that it is willing to enter into individual licenses on behalf of its clients.  It is

**B.    Pandora Fails To State a Claim Under Sherman Act Section 2.**

To state a valid claim for monopolization, attempted monopolization or conspiracy to monopolize, an antitrust plaintiff must adequately allege that a "relevant market" exists, the defendant has power in that market, and the defendant has engaged in anticompetitive conduct in that market.  *Newcal Indus., Inc. v. IKON Off. Sol.*, 513 F.3d 1038, 1044 & n.3 (9th Cir. 2008).  Pandora fails to meet this bar.

1.    Pandora Does Not Adequately Allege a Relevant Market.

An antitrust claim is properly dismissed if its "relevant market" definition is "facially unsustainable".  *Newcal*, 513 F.3d at 1045.  To avoid dismissal, a plaintiff must plead a product market that "encompass[es] the product at issue as well as all economic substitutes for the product".  *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (quoting *Newcal*, 513 F.3d at 1045).  Economic substitutes are products that "have a 'reasonable interchangeability of use' or sufficient 'cross-elasticity of demand' with the relevant product".[7]  *Id.* (quoting *Newcal*, 513 F.3d at 1045).  An alleged market is "facially unsustainable" where "a plaintiff fails to define [its] proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand".  *Honey Bum, LLC v. Fashion*

---

Pandora who does not actually want to do so because its position here is manufactured for litigation; Pandora has stated in rate-setting proceedings that it does not want a royalty structure with non-static per-play fees because that would create a perverse incentive for Pandora to limit the amount of hours of streaming its users consume and "blow[] . . . up" the alignment of interests between Pandora's business objectives and "the long-term royalty streams of the copyright holders". (Ex. E, Herring Testimony at 894:12-897:3.)

[7] Cross-elasticity of demand "measures the percentage change in quantity that consumers will demand of one product in response to a percentage change in the price of another", so "[w]hen demand for the commodity of one producer shows no relation to the price for the commodity of another producer, it supports the claim that the two commodities are not in the same relevant market".  *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008).

*Nova, Inc.*, No. 20-cv-11233-RGK-AS, 2021 WL 4205618, at *5 (C.D. Cal. Mar. 26, 2021) (quotation omitted) ("[Plaintiff's] failure to address the rule of reasonable interchangeability . . . renders [its] alleged relevant market legally insufficient.").

Pandora's alleged relevant product market, namely the "U.S. market for the rights to comedy routines embodied in comedy recordings" (Counterclaims ¶¶ 71-72), suffers from the same flaws as in *Honey Bum* and should be dismissed.

Pandora's Counterclaims are devoid of any discussion of reasonable interchangeability or cross-elasticity of demand.  Instead, Pandora conclusorily states without any support that it and its users would not switch to other kinds of programming if comedy recordings became unavailable or more expensive and that "comedy programming answers consumer demand that is different from consumer demand for music programming".  (*Id.* ¶¶ 74-75.)  Likewise, Pandora's conclusory allegation that "consumer demand for streaming of comedy recordings is specific to recorded comedy" (*id.* ¶ 73) is nothing more than a tautology.  These allegations are insufficient to plead a relevant market.  *See Hicks*, 897 F.3d at 1122 (explaining that "merely restat[ing] a test for market definition without any factual elaboration" renders a product market facially unsustainable); *Reudy v. Clear Channel Outdoors, Inc.*, 693 F. Supp. 2d 1091, 1127 (N.D. Cal. 2010) (granting motion to dismiss monopolization claims because of "vague and conclusory" market allegations).

In addition, Pandora's alleged market rises and falls on the assumption that all comedy works in its proposed market are substitutable for one another, regardless of "price, quality and desirability to listeners".  (Counterclaims ¶ 38.)  This directly contradicts Pandora's allegations, discussed below in the context of Pandora's flawed tying claim, that there exist separate product markets for "desired comedy recordings" and "less desirable material".  (*Id.* ¶¶ 66, 93.)  This internal inconsistency (and inconsistency with Pandora's litigation position in other proceedings, *see* n.6) is reason enough for the Court to reject Pandora's proposed product market as inadequately pleaded.  *See, e.g.*, *Apple, Inc. v. Psystar Corp.*,

586 F. Supp. 2d 1190, 1200 (N.D. Cal. 2008) (rejecting product market defined by "internally contradictory" allegations); *Zunum Aero, Inc. v. Boeing Co.*, No. 21-cv-0896-JLR, 2022 WL 2116678, at *9 (W.D. Wash. June 13, 2022) (same).

## 2. Pandora Does Not Adequately Allege Market Power.

Even if Pandora had adequately alleged a relevant product market, it fails plausibly to allege that Counterdefendants possess market power within that market. Pandora's repeated incantation of the naked legal conclusion that Counterdefendants have "market power" and "monopoly power" is insufficient to state a claim. *See Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 972 (9th Cir. 2008).

Market power must be alleged either directly or circumstantially. To allege it directly, the plaintiff must allege "direct evidence of the injurious exercise of market power", *i.e.*, "evidence of restricted output and supracompetitive prices". *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). Here, Pandora fails to allege any facts—as opposed to conclusory assertions—plausibly suggesting restricted output or supracompetitive prices in the alleged market. Indeed, Pandora does not allege that it ever at any point in the past decade even attempted to secure a literary work license from anyone and failed due to Counterdefendants' purported market dominance. (Section I.A.)

To allege market power circumstantially, the plaintiff must show that "the defendant owns a dominant share of that market", "that existing competitors lack the capacity to increase their output in the short run", and that "there are significant barriers to entry" for new competitors. *Rebel Oil*, 51 F.3d at 1434. Pandora does not even try to allege any of these elements of market power.

"Measurement of market share is necessary to determine whether the defendant possesses sufficient leverage to influence marketwide output" and "hence, increase prices". *Id.* at 1437. Pandora nowhere alleges Counterdefendants' share of the market. Pandora does not allege that Word Collections is the only or the

dominant licensor in its alleged market.[8]  These failures are fatal.  *See, e.g.*, *Rick-Mik*, 532 F.3d at 972 (allegation that defendant "rank[s] number one in the industry" did not suffice to allege market power in gasoline franchises market absent allegations as to, *e.g.*, percentage of franchises owned by defendant as compared to other branded franchises, "percentage of gasoline retail sales . . . made through non-franchise outlets", and "relative difficulty of a franchisee to switch franchise brands"); *Hip Hop Beverage Corp. v. Monster Energy Co.*, No. 16-cv-1421-SVW-FFM, 2016 WL 7324091, at *6 (C.D. Cal. Oct. 26, 2016) (dismissing complaint that alleged defendant "has 'significant' control of the market, but [did] not plead any specific facts of its control"); *Digital Sun v. Toro Co.*, No. 10-CV-4567-LHK, 2011 WL 1044502, at *3 (N.D. Cal. Mar. 22, 2011) (dismissing complaint lacking "any allegations regarding [defendant's] share of the relevant market").

Pandora has touted that its "collection" of comedy recordings grew from over 1,000 comedians and 15,000 tracks in 2011 to more than 3,000 comedians and 35,000 tracks in 2016.  (*Compare* Ex. A, 2011 10-K at 6, *with* Ex. B, 2016 10-K at 3.)  Those numbers dwarf the few dozen comedians and their literary works that Word Collections represents.  (Counterclaims ¶¶ 50, 57-60.)  Pandora alleges that "only a handful of comedians account for any significant number of streams across Pandora's services" (*id.* ¶ 31), but it nowhere identifies that handful of comedians or alleges that they are Word Collections clients.[9]  These allegations do not establish market power.

---

[8] Indeed, Pandora conveniently ignores the existence of Spoken Giants, another "global rights administration company for the owners and creators of Spoken Word copyrights", including comedians and their estates.  (Ex. D, https://www.spokengiants.com/ (last accessed July 15, 2022).)

[9] Notably, Pandora has removed each Comedian's catalogue from all of Pandora's services.  (Complaint ¶ 131.)  A firm whose customers respond to a price increase by simply dropping the product is not a monopolist.  *See, e.g.*, *Gen. Bus. Sys. v. N. Am. Philips Corp.*, 699 F.2d 965, 972 (9th Cir. 1983).

Pandora also does not plead any barriers to entry whatsoever. It does not suggest that other performance rights organizations would not or could not enter the market to license on behalf of rightsholders and compete with Word Collections (and Spoken Giants) in offering licenses, or that Word Collections does anything that prevents new entrants from doing so. *See L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1428 (9th Cir. 1993) ("The disadvantage of new entrants as compared to incumbents is the hallmark of an entry barrier."); *Rebel Oil*, 51 F.3d at 1439 ("To justify a finding that a defendant has the power to control prices, entry barriers must be significant—they must be capable of constraining the normal operation of the market to the extent that the problem is unlikely to be self-correcting.").

### C.   Pandora Fails To State a Claim Under Sherman Act Section 1.

Pandora asserts two claims under Section 1 of the Sherman Act: a "conspiracy to fix prices" claim and a tying claim. (Counterclaims ¶¶ 84-95.) Both claims fail for various reasons, in addition to those stated above.

#### 1.   Pandora Fails To Allege an Antitrust Conspiracy.

Under Section 1, two kinds of analysis may be used. A *per se* rule is applied when "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output". *BMI v. CBS, Inc.*, 441 U.S. 1, 19-20 (1979). The rule of reason, on the other hand, "distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest". *Brantley*, 675 F.3d at 1197 ("We generally evaluate whether a practice unreasonably restrains trade in violation under the 'rule of reason.'"). Pandora asserts in passing that "Counterdefendants' conspiracy to fix prices" is a "*per se* violation of Section 1" (Counterclaims ¶ 88), but makes no allegation about what they supposedly did to "fix"—as opposed to simply propose—a royalty rate. The Supreme Court has held that even a "blanket license" that "accompanies the integration of sales, monitoring, and enforcement against unauthorized copyright use" is subject at most to antitrust's

"rule of reason", rather than any *per se* prohibition.  *BMI*, 441 U.S. at 20; *see also Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1150 (9th Cir. 2003).

Either way, a plaintiff must allege "*evidentiary facts*" supporting the existence of "a contract, combination or conspiracy . . . by which the person or entities *intended to harm or restrain trade*".[10]  *Kendall*, 518 F.3d at 1047 (emphases added); *see also Twombly*, 550 U.S. at 557.  That requires specific allegations of "who, did what, to whom (or with whom), where, and when".  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015).  "[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."  *Twombly*, 550 U.S. at 557.

Here, Pandora fails to allege any agreement or meeting of the minds to unreasonably restrain trade.  Pandora's Section 1 claim rests on an alleged "price-fixing scheme", but the Counterclaims do not contain the requisite factual allegations to support the existence of any such agreement between or among any of the Counterdefendants to pursue that course of action.  Pandora never even states what kind of conspiracy it is alleging.

To the extent that Pandora is attempting to allege that each Comedian agreed with Word Collections to set the prices of the other Comedians' literary works, that attempt completely fails because there are no facts alleged to support that theory. Pandora's various allegations of agreements "between" Word Collections and others are conclusory and thus not entitled to be treated as true.  (*See, e.g.*, Counterclaims ¶ 52 (alleging "agreements between Word Collections and its co-conspirator comedians, including the other Counterdefendants")); *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins.*, 166 F. Supp. 3d 988, 995 (N.D. Cal. 2015) (dismissing Section 1 conspiracy claim for failure to plead factual support for "the 'what,'

---

[10] The rule of reason also requires Pandora to plead market power and anticompetitive effects, which Pandora fails to do.  (Sections I, III.A, III.B.)

'who,' 'where,' and 'when'" details).  The more accurate and plausible reading of the Counterclaims is that each Comedian unilaterally decided to license its literary works through Word Collections and allowed Word Collections to negotiate on its behalf without any understanding or agreement whatsoever with any other Comedian.  That is not anticompetitive behavior.  *In re Musical Instruments*, 798 F.3d at 1194 (allegations that "could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a § 1 violation" (quotation omitted)).

If Pandora is attempting to allege that each Comedian agreed only with Word Collections to set the price of its own literary works, Pandora does not allege how such an arrangement is illegal or how it differs from any other talent-and-licensing agent agreement, which are the products of rational, legal business behavior.  *See, e.g.*, *Stockfood Am., Inc. v. Adagio Teas, Inc.*, 475 F. Supp. 3d 394, 403-04 (D.N.J. 2020) ("It stands to reason that many copyright holders, such as photographers and musicians, are not interested in the day-to-day business of drafting licenses, and would rather outsource those functions to another.  Courts presuppose, without much analysis, that such copyright holders may appoint an 'exclusive licensing agent.'"); *BMI v. Moor-Law, Inc.*, 527 F. Supp. 758, 762 (D. Del. 1981) ("Economies of scale exist as sellers band together to spread transaction costs of identical transactions over a larger group.").  Moreover, where, as here, the parties are principal and agent, that relationship cannot be the basis of a conspiracy claim. *See Am. Needle v. NFL*, 560 U.S. 183, 195-96 (2010) (an illegal contract or conspiracy must be "amongst 'separate economic actors pursuing separate economic interests' such that the agreement 'deprives the marketplace of independent centers of decisionmaking' . . . and thus of actual or potential competition" (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768-69 (1984)).

2.     Pandora Fails To State a Section 1 Tying Claim.

Tying involves the linking of two separate products from two separate product markets. *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008). Tying arrangements are evaluated under Section 1 using either *per se* or rule of reason analysis. *See Jefferson Par.*, 466 U.S. at 29. Under the *per se* rule, a plaintiff must plead: "(1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market." *Cascade Health Sols.*, 515 F.3d at 913 (quotation omitted). The rule of reason additionally requires that the alleged tie "actually injures competition". *Brantley*, 675 F.3d at 1200. Pandora does not specify which theory of tying it is pursuing, but its claim fails under either theory.

*First*, the Counterclaims do not adequately allege the existence of two distinct products in different markets. Pandora alleges that the Counterdefendants have tied "desired comedy recordings" to "other, less desirable material, including not just comedy but other spoken word material as well". (Counterclaims ¶¶ 66, 93.) Pandora does not, however, explain how its subjective preferences for what it (or some undefined other person or group) considers "desirable" comedy versus "less desirable" comedy at any given point in time justifies defining two separate product markets. *Hicks*, 897 F.3d at 1121 (rejecting proposed markets that are "artificial" or "contorted to meet [plaintiff's] litigation needs"). These allegations are also inconsistent with Pandora's alleged relevant product market for its Section 2 claims, which comprises all comedy routines, regardless of "desirability". *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 614 (1953) (rejecting tying claim where

the "tying" and "tied" products were part of the same market); *Freeman*, 322 F.3d at 1146 n.14 ("Distinct product markets are crucial to a tying claim.").

*Second*, Pandora does not plead any facts to show that Counterdefendants possess market power over "desirable" comedy recordings that would allow them to force Pandora to buy or pay more for "less desirable" comedy recordings as a condition of accessing the content it wants. Without such supporting facts, "there can be no cognizable tying claim". *Rick-Mik*, 532 F.3d at 972. Nor does Pandora plausibly allege that it is forced to pay for anything it does not want. The plain language of the Proposed License makes clear that Pandora would pay royalties only on content that it actually uses. (Ex. C, Proposed License ¶ 5; *see supra* n.3.) There can be no tie where there is no forced purchase. *See, e.g.*, *Ways & Means, Inc. v. IVAC Corp.*, 506 F. Supp. 697, 701 (N.D. Cal. 1979) (no tie where the tying product "is truly available without the condition that other products be purchased with it").

*Third*, Pandora cannot allege that the supposed tying arrangement affects a "not insubstantial" volume of commerce in the tied product market. "The injury caused by an unlawful tying arrangement is 'reduced competition in the market for the tied product.'" *Blough v. Holland Realty*, 574 F.3d 1084, 1089 (9th Cir. 2009) (quoting *Rick-Mik*, 532 F.3d at 971). "Zero foreclosure exists where the tied product is completely unwanted by the buyer." *Id.* Thus, where one is forced to buy a product it would not have bought from another seller in the tied product market, as Pandora alleges it is forced to buy rights it "does not need" in the "less desirable" literary works market (Counterclaims ¶ 93), "there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed". *Blough*, 574 F.3d at 1089 (quoting *Jefferson Par.*, 466 U.S. at 16).

## CONCLUSION

For the reasons stated above, Pandora's Counterclaims should be dismissed in their entirety and with prejudice.

1  Respectfully submitted,

2                                                    Oliver Rocos
                                                     BIRD, MARELLA, BOXER, WOLPERT,
3                                                    NESSIM, DROOKS, LINCENBERG &
                                                     RHOW, P.C.
4

5                                                          by
                                                               /s/  Oliver Rocos
6                                                                   Oliver Rocos
7

8                                                    Christine A. Varney
                                                     Lauren A. Moskowitz
9                                                    CRAVATH, SWAINE & MOORE LLP

10                                                         by
                                                               /s/ Lauren A. Moskowitz
11                                                                 Lauren A. Moskowitz
12

13                                                   Attorneys for Counterclaim Defendant
                                                         Word Collections, Inc.
14

15  DATED:  July 15, 2022

16

17

18

19

20

21

22

23

24

25

26

27

28