MAYER BROWN LLP
PAUL M. FAKLER (*pro hac vice*)
*pfakler@mayerbrown.com*
JACOB B. EBIN (*pro hac vice forthcoming*)
*jebin@mayerbrown.com*
ALLISON AVIKI (*pro hac vice*)
*aaviki@mayerbrown.com*
1221 Avenue of the Americas
New York, New York  10020-1001
Telephone: (212) 506-2500
Facsimile: (212) 262-1910

MAYER BROWN LLP
JOHN NADOLENCO (SBN 181128)
*jnadolenco@mayerbrown.com*
DANIEL D. QUEEN (SBN 292275)
*dqueen@mayerbrown.com*
MEERIM A. NEHME (SBN 322234)
*mnehme@mayerbrown.com*
350 S. Grand Avenue, 25th Floor
Los Angeles, California  90071-1503
Telephone:  (213) 229-9500
Facsimile:   (213) 625-0248

[*Additional counsel listed on signature page*]

Attorneys for Defendant
Pandora Media, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re PANDORA MEDIA, LLC COPYRIGHT LITIGATION | Master File No. 2:22-cv-00809-MCS-MAR |
| | <u>CONSOLIDATED ACTION</u> |
| | **DEFENDANT AND COUNTERCLAIMANT PANDORA MEDIA, LLC'S OPPOSITION TO PLAINTIFFS/COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS** |
| This Document Relates To: | Filed concurrently with Pandora's Opposition to Plaintiffs' Joinder in Motion to Dismiss and Pandora's Opposition to Request for Judicial Notice |
| ALL ACTIONS | |
| | Date:       August 29, 2022 |
| | Time:      9:00 AM |
| | Crtrm:    7C - First Street Courthouse |
| |                350 W. 1st Street, 7th Floor |
| |                Los Angeles, CA 90021 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................. 1

STATEMENT OF FACTS ................................................................ 2

APPLICABLE LEGAL STANDARDS ............................................ 5

ARGUMENT .................................................................................... 6

I.    Pandora May Challenge WC's Anti-Competitive Conduct. ........................... 6

    A.    Pandora has Article III and antitrust standing. ..................................... 6

    B.    *Noerr-Pennington* has no bearing on Pandora's counterclaims. ........ 10

II.    Pandora Has Pleaded Plausible Antitrust Claims. ......................................... 12

    A.    Pandora was not required to engage in a futile act by trying to break the WC cartel. ................................................................ 12

    B.    Pandora adequately alleges Section 2 claims. .................................... 15

    C.    Pandora adequately alleges Section 1 claims. .................................... 20

CONCLUSION ................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Teva Pharms. USA, Inc.*,
  432 F. Supp. 2d 408 (D. Del. 2006) .................................................. 10

*Am. Ad Mgmt., Inc. v. GTE Corp.*,
  92 F.3d 781 (9th Cir. 1996) ............................................................... 7

*Amphastar Pharm. Inc. v. Momenta Pharms., Inc.*,
  850 F.3d 52 (1st Cir. 2017) ............................................................... 10

*Anderson v. Boyne USA, Inc.*,
  2022 WL 2528242 (D. Mont. July 7, 2022) ....................................... 18

*Apple v. Motorola Mobility, Inc.*,
  886 F. Supp. 2d 1061 (W.D. Wisc. 2021) .......................................... 11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................... 5, 16

*Ass'n of Irritated Residents v. EPA*,
  10 F.4th 937 (9th Cir. 2021) ............................................................... 8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..................................................................... 6, 16

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
  182 F.3d 1096 (9th Cir. 1999) ........................................................... 16

*Blizzard Entm't Inc. v. Ceiling Fan Software LLC*,
  941 F. Supp. 2d 1227 (C.D. Cal. 2013) ........................................ 15, 16

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
  441 U.S. 1 (1979) ......................................................................... 3, 21

*Cascade Health Sols. v. PeaceHealth*,
  515 F.3d 883 (9th Cir. 2008) ............................................................. 24

*City of Oakland v. Oakland Raiders*,
  20 F.4th 441 (9th Cir. 2021) ........................................................... 6, 8

-ii-

*Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*,
    611 F.3d 495 (9th Cir. 2010) ........................................................ 15, 20

*CollegeNET v. The Common Application, Inc.*,
    711 F. App'x 405 (9th Cir. 2017) ................................................... 17

*CollegeNet, Inc. v. The Common Application, Inc.*,
    355 F. Supp. 3d 926 (D. Or. 2018) ................................................. 20

*Columbia Broad. Sys. v Am. Soc'y of Composers, Authors &
    Publishers*, 620 F.2d 930 (2d Cir. 1980) ....................................... 13

*Datel Holdings Ltd. v. Microsoft Corp.*,
    712 F. Supp. 2d 974 (N.D. Cal. 2010) ............................................ 16

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ....................................................................... 17

*Eastman v. Quest Diagnostics Inc.*,
    108 F. Supp. 3d 827 (N.D. Cal. 2015) .............................................. 7

*Edwards Vacuum, LLC v. Hoffman Instrumentation Supply, Inc.*,
    556 F. Supp. 3d 1156 (D. Or. 2021) ................................................. 9

*Eminence Cap., LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) ....................................................... 25

*Freeman v. San Diego Ass'n of Realtors*,
    322 F.3d 1133 (9th Cir. 2003) ....................................................... 25

*Gerlinger v. Amazon.com Inc.*,
    526 F.3d 1253 (9th Cir. 2008) ......................................................... 7

*Grid Sys. Corp. v. Texas Instruments Inc.*,
    771 F. Supp. 1033 (N.D. Cal. 1991) ............................................... 24

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ....................................................... 17

*High Tech. Careers v. San Jose Mercury News*,
    996 F.2d 987 (9th Cir.1993) .......................................................... 19

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ....................................................... 19

-iii-

*Intel Corp. v. Fortress Invests. Grp. LLC*,
    2020 WL 6390499 (N.D. Cal. July 15, 2020) ................................................. 9, 11

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
    99 F. Supp.3d 610 (D. Md. 2015) ........................................................ 7, 9

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ............................................................................ 24, 25

*Las Vegas Sun v. Adelson*,
    2022 WL 876937 (D. Nev. Mar. 23, 2022) ........................................................ 18

*MCA Tele. Ltd. v. Pub. Interest Corp.*,
    171 F.3d 1265 (11th Cir. 1999) ..................................................................... 24

*McCray v. Fidelity National Title Ins.*,
    682 F.3d 229 (3d Cir. 2012) ....................................................................... 8

*Meredith Corp. v. SESAC LLC*,
    1 F. Supp. 3d 180 (S.D.N.Y. 2014) ........................................................ 14, 19, 21

*Meredith Corp. v. SESAC LLC*,
    2011 WL 856266 (S.D.N.Y. Mar. 9, 2011) ................................................ 2, 19, 22

*Momento, Inc. v. Seccion Amarilla USA*,
    2009 WL 10696217 (N.D. Cal. Sept. 17, 2009) ........................................................ 6

*Moore v. Mars Petcare US, Inc.*,
    966 F.3d 1007 (9th Cir. 2020) .................................................................. 2, 5

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) .............................................................. 20, 21

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
    933 F.3d 1136 (9th Cir. 2019) .............................................................. 15, 20

*Nero AG v. MPEG LA, LLC*,
    2010 WL 4366448 (C.D. Cal. Sep. 14, 2010) ........................................... 13, 14

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008) .................................................... 6, 15, 16, 25

*No Spill, LLC v. Scepter Canada, Inc.*,
    2021 WL 3856619 (D. Kan. Aug. 30, 2021) ............................................. 11

-iv-

*PLSCom LLC v. Nat'l Ass'n of Realtors*,
  32 F.4th 824 (9th Cir. 2022) ............................................................. 6

*PrimeTime 24 Joint Venture v. Nat'l Broad. Co.*,
  219 F.3d 92 (2d Cir. 2000) .............................................................. 11

*Radio Music License Comm., Inc. v. Global Music Rights, LLC*,
  No. 2:19-cv-03957 (C.D. Cal. Feb. 13, 2020) ................................ 2, 22

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ....................................................... 17, 18

*Samsung Elecs. Co., Ltd., v. Panasonic Corp.*,
  2015 WL 10890655 (N.D. Cal. Sep. 30, 2015) .................... 12, 13, 14

*Sosa v. DirecTV, Inc.*,
  437 F.3d 923 (9th Cir. 2006) ........................................................... 11

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) .......................................................................... 6

*Staley v. Gilead Scis.*,
  446 F. Supp. 3d 578 (N.D. Cal. 2020) ......................................... 16, 17

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) ......................................................... 22

*Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*
  2007 WL 2318903 (N.D. Cal. Aug. 13, 2007) ............................ 13, 14

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) .......................................................................... 8

*Times-Picayune Publ'g Co. v. United States*,
  345 U.S. 594 (1953) ........................................................................ 24

*TYR Sport Inc. v. Warnaco Swimwear Inc.*,
  679 F. Supp. 2d 1120 (C.D. Cal. 2009) ........................................... 16

*United States v. Apple, Inc.*,
  791 F.3d 290 (2d Cir. 2015) ............................................................ 23

*United States v. Loew's, Inc.*,
  371 U.S. 38 (1962) ........................................................................... 24

-v-

*United States v. Paramount Pictures, Inc.*,
    334 U.S. 131 (1948) .................................................................................... 24, 25

*In re Zappos*, *Inc.*,
    888 F.3d 1020 (9th Cir. 2018) ......................................................................... 6, 8

**Statutes & Rule**

15 U.S.C. § 1 ....................................................................................................*passim*

15 U.S.C. § 2 ....................................................................................................*passim*

Fed. R. Civ. P. 12(b)(6) ......................................................................................... 15

**Other Authorities**

P. Areeda & H. Hovenkamp, Antitrust Law (4th and 5th eds.
    2015-2021) .................................................................................................. 24, 25

U.S. Department of Justice June 26, 1997 Response to Business
    Review Letter to Trustees of Columbia University, et al., *available
    at* https://www.justice.gov/sites/default/files/atr/legacy/2006/10/17/
    215742.pdf ......................................................................................................... 13

-vi-

# INTRODUCTION

Pandora's counterclaims allege a classic antitrust violation: Counterclaim defendant Word Collections (WC) has joined competing comedians into a consortium, eliminated competition between those comedians, and increased prices for their products to a supracompetitive level.

As Pandora's counterclaims allege clearly and in detail, WC has consolidated the competing works of its numerous comedian clients into a single portfolio; taken exclusive control over licensing those works; set the royalty for the works; and is licensing the works on a blanket, all-or-nothing basis. Specifically, the counterclaims allege, among other things:

*First*, WC and its numerous comedian clients seek to achieve monopoly power over Pandora and other services that use comedy by consolidating the competing comedians' alleged "literary-works" rights with WC through "exclusive affiliation agreements"; setting a fixed, uniform royalty for the rights for all the works in the resulting catalog; and having WC make that catalog available to services like Pandora only on a blanket, "all-or-nothing" basis.

*Second*, these concerted and coercive licensing tactics eliminate all possibility of price competition between the counterclaim-defendant comedians (and other WC client comedians) to have their works performed on services like Pandora, forcing such services to either (1) acquire a license from WC at a price that WC and its member comedians have jointly fixed; or (2) forgo streaming comedy altogether.

*Third*, through their conspiracy, WC and its co-conspirator comedians are attempting to *jointly* upend historic custom and practice, subvert existing licenses, and give themselves new, artificial hold-up power. If allowed to proceed, that tactic will force services that stream comedy to secure multiple licenses at various stages along the distribution chain, driving up license fees.

This is hardly "the benign and procompetitive activity" proclaimed by WC at

Mot. 1. To the contrary, as WC has elsewhere (and more candidly) characterized its scheme, it has set out to make itself "the ASCAP and BMI for spoken word instead of music." Counterclaims ¶¶ 16, 44 (ECF No. 34). And *that* model is neither benign nor procompetitive: The music licensing practices of ASCAP and BMI prompted antitrust suits by the U.S. Department of Justice decades ago, resulting in consent decrees—which remain in place to this day—designed to limit the competitive harms posed by those organizations. More recently, there have been multiple private antitrust actions (including in this district) against similar but smaller unregulated performing rights organizations (PROs). Those suits made allegations similar to those raised here, and all survived motions to dismiss. *See, e.g.*, Order, *Radio Music License Comm., Inc. v. Global Music Rights, LLC*, No. 2:19-cv-03957 (C.D. Cal. Feb. 13, 2020), ECF No. 201; *Meredith Corp. v. SESAC LLC*, 2011 WL 856266, at *3-4 (S.D.N.Y. Mar. 9, 2011). And as we explain below, WC's behavior is considerably *more* vulnerable to antitrust challenge than was that of those PROs.

Rather than justify its actual conduct, WC mischaracterizes key allegations in the counterclaims, ignores those allegations that conflict with its false narrative, distorts the law in several critical respects, and—not least—uses wildly hyperbolic language. But screaming loudly is no substitute for having something persuasive to say. WC does not; its motion to dismiss should be denied.

### STATEMENT OF FACTS[1]

1. Pandora is an audio streaming service. Although most of the material available on Pandora is music, since 2011 Pandora also has provided its users with comedy and other spoken-word audio programming. Counterclaims ¶¶ 7, 31. To offer a viable comedy streaming service, Pandora needs access, including any necessary licenses, to quality recorded comedy routines by a sufficient range of comedians of

---

[1] The factual statements here are taken from the counterclaims and are treated as true. *See*, *e.g.*, *Moore v. Mars Petcare US, Inc.,* 966 F.3d 1007, 1016 (9th Cir. 2020).

various styles. *Id.* at ¶¶ 34, 35, 39. For services like Pandora, comedians' recordings are competitive alternatives to each other, and comedians compete to have Pandora stream their comedy, including by reaching out to Pandora to secure more plays of their comedy recordings. *Id.* at ¶¶ 35, 38, 77. In turn, Pandora pays millions of dollars in royalties each year for its use of those recordings. *Id.* at ¶¶ 2, 35.

Since launching its comedy service in 2011, and pursuant to longstanding industry custom and practice (predating Pandora's existence by many decades), Pandora has always obtained licenses for the comedy recordings that it offers. Counterclaims ¶¶ 40, 41. Through those licenses, Pandora has obtained *all* of the rights it needs to stream the recordings, on the understanding that any rights to the underlying jokes are provided along with the rights to the recordings. *Id.* at ¶¶ 41-43. Pandora's publicly available SEC filings confirmed this longstanding licensing practice, explicitly noting that, pursuant to industry custom and practice, Pandora was not securing a separate license, or paying a separate license fee, for the use of any underlying jokes embodied in the recordings. *Id.* at ¶ 43. Nevertheless, despite Pandora's complete transparency, until WC's appearance no comedian ever challenged those licensing practices or approached Pandora about entering into a separate license, or paying additional royalties, for any rights that the comedian may hold in the underlying jokes. *Id.* at ¶¶ 2, 41, 43.[2]

2. WC's motion to dismiss says very little about how WC operates. But WC elsewhere has presented itself as "the ASCAP and BMI for spoken word instead of music." Counterclaims ¶¶ 16, 44, 61. Those entities issue blanket licenses for all of the musical works performance rights in their vast repertories (*see Broad. Music, Inc.*

---

[2] WC's discussion of this background is misleading. Pandora does not "concede that it did not secure licenses for the literary works embodied in the spoken word comedy routines that it streamed for over a decade." Mot. 3. To the contrary, Pandora stated that it "has always taken licenses for the comedy recordings that it offers, *and through those licenses* has obtained (either explicitly or implicitly) *all* of the rights it needs to stream those recordings." Counterclaims ¶ 41 (emphases added).

*v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 5-6 (1979)), although, as is explained below and in the counterclaims, their licensing practices differ in material respects from those of WC. *See* Counterclaims ¶¶ 44, 47; pp. 14 & n.10, 21, *infra*.

WC's website describes a collective licensing scheme under which comedians (or the entities holding the rights to the comedians' comedy routines) sign an "exclusive affiliation agreement" with WC. Counterclaims ¶ 51. That agreement makes WC "the only entity on the planet" authorized to grant licenses for the comedians' "literary works" rights and to collect royalties for those rights. *Id.* ¶ 62. It gives WC power to set a single fixed price for access to *all* of these comedians' "literary-works" rights—rights that the comedians otherwise would offer in competition with each other. *Id.* at ¶¶ 51, 68.[3] Once a comedian signs with WC, WC controls access to those rights—*i.e.*, to the jokes used by the comedian in a recorded performance. *See id.* ¶¶ 53, 62, 68. Under this regime, individual licenses from WC's client comedians—even if they were available—would be useless to Pandora and other services: WC licenses its comedians' rights only through a blanket license covering its entire portfolio. *Id.* at ¶¶ 63, 65, 80, 82. Were it not for that joint arrangement, Pandora and other services would be able to obtain the rights to the comedy routines at competitive, and substantially lower, rates set by competition among the owners of those rights. *Id.*

Because it must respond to listener demand in a competitive market, Pandora would not and could not respond to a sustained price increase for the rights to comedy routines embodied in comedy recordings by shifting its programming toward other recorded spoken-word content, such as poetry. Counterclaim ¶ 75. Similarly, Pandora would not and could not shift its programming further toward music in response to a

_____

[3] Although WC insists that the blanket license would not require Pandora to pay for comedy that it does not want (Mot. 4 n.3), the key point is that there is a fixed price for everything in WC's catalog, that price is set by WC (not individually by comedians), and there is no opportunity to get those rights anywhere but through WC.

sustained price increase for the rights to comedy routines; comedy programming satisfies consumer demand that is different from demand for music programming. *Id.* at ¶ 74. The result of WC's anticompetitive scheme will be both higher prices and a reduced supply of comedy programming, possibly including the abandonment of comedy by streaming services. *Id.* ¶ 81.

3. WC was launched and approached Pandora in 2020, offering to license the counterclaim-defendant comedians' "literary works" (Counterclaims ¶¶ 49, 82); it sent Pandora a proposed licensing agreement in March 2021. Since WC's launch, it has come to represent numerous prominent comedians. *Id.* at ¶¶ 50, 57-60. In March 2022, the counterclaim-defendant comedians filed a complaint against Pandora—which was, on information and belief, coordinated and funded by WC (*id.* at ¶ 4)—alleging copyright infringement for use of the underlying jokes embodied in comedy recordings that Pandora had licensed. Pandora responded by asserting antitrust counterclaims against the counterclaim-defendant comedians and WC, alleging:

- The joint action of the counterclaim defendants constitutes price-fixing, in violation of Section 1 of the Sherman Act (Counterclaims ¶¶ 84-90);

- That joint action, by forcing Pandora to license WC's entire portfolio, constitutes anticompetitive tying, also in violation of Section 1 (Counterclaims ¶¶ 91-95);

- By obtaining control of a critical mass of comedy routines, the counterclaim defendants achieved monopoly power, or a dangerous probability of achieving monopoly power, within the relevant market, in violation of Sherman Act Section 2; and conspired to achieve monopoly power (Counterclaims ¶¶ 96-108).

## APPLICABLE LEGAL STANDARDS

On a motion to dismiss, the complaint's factual allegations are "taken as true[,] and construed in the light most favorable to Plaintiffs." *Moore,* 966 F.3d at 1016. Such motions are denied when the pleading contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v.*

-5-

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). In fact, a complaint "may proceed even if it strikes a savvy judge that actual proof of [the] facts is improbable, and that a recovery is very remote and unlikely." *Twombly,* 550 U.S. at 556 (quotation cleaned). "[N]o special pleading rule require[es] greater factual specificity in antitrust cases." *Momento, Inc. v. Seccion Amarilla USA*, 2009 WL 10696217, at *1 (N.D. Cal. Sept. 17, 2009); *accord Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).

## ARGUMENT

## I.    Pandora May Challenge WC's Anti-Competitive Conduct.

### A.    Pandora has Article III and antitrust standing.

WC's initial challenge is to Pandora's standing. In the broadest sense, the parties agree on the standards that govern Article III and antitrust standing. The Article III requirements are familiar: constitutional standing exists if the plaintiff suffered an injury in fact that is fairly traceable to the challenged action and that likely would be redressed by a favorable decision. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016); *In re Zappos*, *Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018). Insofar as is relevant here, antitrust standing is present when the plaintiff demonstrates "antitrust injury," which turns on a showing of "(1) unlawful conduct, (2) causing an injury to [the plaintiff], (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *PLSCom LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 833 (9th Cir. 2022) (citation and internal quotation marks omitted); *see City of Oakland v. Oakland Raiders*, 20 F.4th 441, 455-56 (9th Cir. 2021); Mot. 7. Both forms of standing exist here.

Article III standing is manifest. Pandora licenses comedy recordings for use in its streaming service. As the counterclaims allege, WC's scheme centers on obtaining control over licenses needed by Pandora, which it will make available only on a price-fixed, blanket basis and on terms that preclude competition between comedians. This elimination of competition makes it substantially certain that Pandora will pay higher

-6-

prices or will be forced to offer a degraded product. *See* p. 5, *supra.* That is concrete harm directly traceable to WC's conduct.

Antitrust standing is equally apparent. The wrongful conduct alleged is the accumulation of monopoly power and fixing of prices. For the reasons just stated, that conduct, and its unlawful elements in particular, is alleged to injure Pandora. Of course, conduct of just that sort is the central focus of the antitrust laws: "[I]t is difficult to imag[in]e a more typical example of anti-competitive effect than higher prices." *Am. Ad Mgmt., Inc. v. GTE Corp.,* 92 F.3d 781, 791 (9th Cir. 1996).

For numerous reasons, WC is wrong to assert that, in this setting, Pandora has failed to allege "any injury-in-fact or causal antitrust injury." Mot. 8.

*First*, WC contends that Article IIII standing is absent because Pandora does not allege—at all—that it has licensed the comedians' works or shown how WC's pricing for those works is supracompetitive. Mot. 8. But this assertion simply ignores the allegations of the counterclaims. Pandora plausibly alleges that it has had a longstanding practice of licensing comedians' recordings, including the underlying comedy routines. *See* p. 3, *supra.* Pandora also alleges that WC's practices will make it necessary for Pandora to obtain additional licenses at increased prices, requiring it either to pay more or to stop offering comedy on its service, with an obvious adverse impact on its business. *Id.* As to the latter harm, WC itself notes that Pandora has already had to remove comedian content from Pandora's services. Mot. 20 n.9. In either case, Pandora suffers injury directly traceable to WC's challenged conduct. *See*, *e.g.*, *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 99 F. Supp.3d 610, 629 (D. Md. 2015) (standing exists to assert antitrust counterclaims when challenged actions "hindered Counterclaimants' business").[4]

---

[4] WC relies on *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253 (9th Cir. 2008). *See* Mot. 8. But that case was decided on summary judgment, and turned on the plaintiff's failure to rebut the defendant's evidence that he did *not* pay supracompetitive prices. 526 F.3d at 1256. Obviously, WC cannot benefit from that holding on a motion to dismiss. WC gets no more from its invocation of *Eastman v. Quest Diagnostics Inc.*,

*Second*, WC asserts that the threatened harm must be, but is not, "certainly impending." Mot. 8-9. But this, too, is incorrect. At least where a plaintiff seeks prospective relief (as does Pandora), "[a]n allegation of future injury may suffice if the threatened injury is certainly impending, *or there is a substantial risk that the harm will occur*." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quotation cleaned) (emphasis added). A plaintiff satisfies this requirement by adducing "evidence of a credible threat" of harm. *Ass'n of Irritated Residents v. EPA,* 10 F.4th 937, 943 (9th Cir. 2021); *accord, e.g., Susan B. Anthony List,* 573 U.S. at 158-161; *Zappos.com*, 888 F.3d at 1025-1027. And such a threat exists where, as here, WC has locked up numerous comedians, in a manner that precludes those comedians from negotiating competitive arrangements.[5]

*Third*, WC is wrong when it asserts that a plaintiff that has been priced out of the market by monopolistic behavior (as Pandora might be by WC) lacks antitrust standing. Mot. 10. WC relies for this proposition on *City of Oakland*—but it disregards the analysis actually offered by the Ninth Circuit in that decision. The court there explained that a claim of failure to purchase may be too speculative to support standing when the plaintiff "has no prior course of dealing with any defendant" and "[t]he [plaintiff] has not alleged—and there is no way of knowing—

---

108 F. Supp. 3d 827, 831 (N.D. Cal. 2015), where the defendant argued that plaintiffs had not alleged conduct having an impact on the amount paid for defendant's services. Here, in contrast, Pandora alleges that WC's conduct *will* increase the amount paid or degrade the product offered by Pandora.

[5] WC gets no support from *McCray v. Fidelity National Title Ins.*, 682 F.3d 229, 243 (3d Cir. 2012) (cited at Mot. 8-9). That decision predated *Susan B. Anthony List* and *Association of Irritated Residents*, which clarify that a credible threat of harm establishes standing. Moreover, in *McCray* the complaint did not reveal "plans to purchase" the insurance that was the subject of the alleged price-fixing, while rates for that insurance had not been changed for years. 682 F.3d at 243-44. Here, in contrast, Pandora is a long-time purchaser of comedians' product; WC is raising prices (*see* pp. 20-21, *infra*); and, as WC itself asserts, Pandora has removed from its service some comedy content in response to WC's actions. *See* Mot. 20 n.9.

what would have occurred in a more competitive marketplace." 220 F.4th at 458-59 (cleaned up). But here, those circumstances are decisively different. Pandora *has* a long course of dealing with comedians and a history of securing the necessary rights to stream recorded comedy; and that history of dealing tells us *exactly* what would happen in a competitive marketplace. There is nothing speculative here.[6]

*Fourth*, Pandora does not allege, as WC would have it, that "the mere allegation that a copyright holder has demanded more than a potential licensee unilaterally perceived as 'historic custom' [is] sufficient to state an antitrust claim." Mot. 11. The violation here is not any comedian's unilateral request for higher payment, but WC's scheme to lock up the works of numerous otherwise competing comedians, whose prices it then jointly fixes. *That* is a paradigmatic antitrust violation.

*Finally*, WC is wrong when it contends that litigation costs categorically may not be used to establish standing. Mot. 12-13. Courts widely agree that, although antitrust "liability cannot be predicated on petitioning activity," "if a defendant engages in anticompetitive conduct which does not constitute petitioning activity, *it cannot immunize itself from liability for litigation-related damages* if it asserts or tries to assert its unwarranted accumulation of market power through litigation." *Intel Corp. v. Fortress Invests. Grp. LLC*, 2020 WL 6390499, at *16 (N.D. Cal. July 15,

---

[6] WC is wrong when it contends that the victim of a price-fixing conspiracy lacks standing to sue as a matter of law unless it first enters into a contract to purchase from the defendant at the fixed price. *See* Mot. 9; *but see*, *e.g.*, *Intellectual Ventures I*, 99 F. Supp.3d at 628 (standing exists where antitrust counterclaimant was put "'to an anticompetitive choice between paying a monopoly price, exiting the . . . industry, and paying millions of dollars in litigation costs'"). WC cites for its argument a single footnote in *Edwards Vacuum, LLC v. Hoffman Instrumentation Supply, Inc.,* 556 F. Supp. 3d 1156, 1170 n.8 (D. Or. 2021). But the court was there addressing claims for money damages, not for injunctive relief. In any event, if the *Edwards* court meant that "an unaccepted offer [c]ould not be the 'cause' of any material result in the marketplace," it was incorrect; a monopolistic increase in prices could well cause the victim to leave the market, as could happen to Pandora.

2020) (emphasis added), *appealed on other grounds*, No. 21-16817 (9th Cir. Oct. 28, 2021). It follows that such litigation-related damages, like any other damages proximately caused by a violation, *may* establish standing. *Id.* at *15-16 (citing cases).

### B. *Noerr-Pennington* has no bearing on Pandora's counterclaims.

WC also errs when it invokes the *Noerr-Pennington* doctrine to retroactively immunize its anticompetitive behavior. Mot. 13-15. That doctrine protects the right to petition the government for redress—but the right to petition is not at issue here.

Pandora's counterclaims are not directed at the comedians' copyright infringement suits; the comedians are free to advance whatever claims they think have merit. What they may not do is *agree on their price demands*—and then obtain immunity for *that* anticompetitive conduct by jointly bringing copyright claims that effectuate their agreement. *See* Counterclaims ¶¶ 3-6, 30, 42, 48, 52, 62-67, 85-86.[7]

Under WC's contrary view of *Noerr-Pennington*, once members of a cartel allege copyright infringement, price-fixing that eventually is effectuated through invocation of copyright rules is fully immunized, even retroactively, from the antitrust laws. But that is not the law. Time and again, courts have made clear that "[t]he mere existence of a lawsuit does not retroactively immunize prior anti-competitive conduct." *Amphastar Pharm. Inc. v. Momenta Pharms., Inc.*, 850 F.3d 52, 57 (1st Cir. 2017); *accord, e.g.*, *Abbott Labs. v. Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408, 429 (D. Del. 2006) ("[A]n unlawful agreement or an unlawful overall scheme do[es] not become lawful because [it] may be enforced by immunized litigation.") (internal citations omitted).

---

[7] Presenting an incomplete and highly misleading excerpt from Pandora's Prayer for Relief, WC asserts that the counterclaims "are a naked attempt to chill the Comedians' copyright infringement claims." Mot. 14. In fact, Pandora seeks to enjoin those claims only "until such time as the effects of the anticompetitive conduct described herein have dissipated." Counterclaims, Prayer for Relief (e).

-10-

Nor may WC recast its anticompetitive activities as "conduct incidental to the prosecution of the suit." Mot. 14 (quoting *Sosa v. DirecTV, Inc.*, 437 F.3d 923, 935 (9th Cir. 2006)). Incidental conduct involves acts that are closely bound up with legitimate litigation itself, such as settlement offers. *Sosa*, 437 F.3d at 934-35. There is nothing "incidental" about WC's actions to seek out, obtain, and aggregate exclusive licensing arrangements with comedians over the course of several years (thus preventing those comedians from dealing with Pandora individually), set a fixed blanket licensing fee, and then demand that Pandora take the blanket license—all of which occurred long before litigation was even in view. *See* Compl. ¶¶ 27, 42, 56, 70, 84, 99 (ECF No. 19); Counterclaims ¶¶ 3-6, 30, 42, 48, 52, 62-67, 85-86.

WC's anticompetitive actions exist independent of, not incidental to, the comedians' lawsuits. And when a party "engages in anticompetitive conduct which does not constitute petitioning activity"—"such as aggregation of patents"—"it cannot immunize itself from liability for litigation-related damages if it asserts or tries to assert its unwarranted accumulation of market power through litigation." *Intel Corp.*, 2020 WL 6390499, at *15-16. Likewise, "copyright holders may not agree to limit their individual freedom of action in licensing future rights to such an infringer before, during, or after the lawsuit." *PrimeTime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 98-103 (2d Cir. 2000) (cited with approval in *Sosa*) (rejecting the argument that *Noerr-Pennington* precluded liability where defendants filed lawsuits after improperly agreeing not to deal with plaintiff).

Finally, WC places far more weight on *Apple v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061 (W.D. Wisc. 2021), than that decision can bear. Mot. 15. There, the court found on summary judgment that Apple had "produced no evidence or argument" that Motorola's anticompetitive activities harmed it (*id.* at 1076); here, Pandora has plausibly alleged a host of non-litigation harms caused by WC's anticompetitive scheme. *See* Counterclaims ¶¶ 83, 87; *see also No Spill, LLC v. Scepter Canada, Inc.*, 2021 WL 3856619, at *4 (D. Kan. Aug. 30, 2021)

-11-

(distinguishing *Apple* where, as here, the counterclaim plaintiff pleaded that it "was financially burdened" by "the presence of [the] anticompetitive scheme"). Those harms, which are independent of the comedians' copyright claims, make *Noerr-Pennington* inapplicable.

## II.    Pandora Has Pleaded Plausible Antitrust Claims.

When it comes to the substance of Pandora's claims, WC misstates the law and improperly disputes the counterclaim allegations.

### A.    Pandora was not required to engage in a futile act by trying to break the WC cartel.

WC is wrong to contend that its pooling of rights could not be an antitrust violation unless Pandora first sought individual licenses from the comedians (beyond the licenses Pandora already has). Mot. 15-16. Pooling arrangements typically will be subject to antitrust scrutiny when there is no "realistic opportunity as a practical matter to obtain individual licenses from individual owners as opposed to a single license from the pool." *Samsung Elecs. Co., Ltd., v. Panasonic Corp.*, 2015 WL 10890655, at *5 (N.D. Cal. Sep. 30, 2015). And here, WC eliminated any realistic opportunity to obtain individual licenses when its comedians signed required "exclusive affiliation agreement[s]" that contracted away their right to license independently. Counterclaims ¶¶ 51-53, 61-65. Indeed, WC itself has trumpeted that it is "the only entity on the planet where these services [like Pandora] can come and get a license to use [its comedians'] literary works." *Id.* at ¶ 62; *accord, e.g.*, *id.* at ¶ 63 (WC's website: "Digital radio and AM/FM radio either have to pay for all broadcasts of comedy and other spoken word performances or choose to broadcast none of it."). Although WC now says that Pandora acknowledged its ability to "deal individually with comedians to separately license literary works" (Mot. 16 (discussing Counterclaims ¶ 46)), that contention is ridiculous; Pandora was addressing licensing in a *competitive* marketplace, not one in which comedians have signed away their rights through "exclusive affiliation agreements" with the WC

-12-

cartel. *Compare* Counterclaims ¶ 46 (competitive marketplace), *with id.* at ¶¶ 51, 53, 60-62 (discussing marketplace with WC's exclusive affiliation agreements).[8]

Moreover, even if individual licenses were available from some WC comedians, those licenses would not be a substitute for the blanket license—which WC would still require. Given that requirement, any such individual license would be superfluous, and result only in Pandora paying multiple times for the same rights. *Id.* at ¶ 52. On a motion to dismiss, Pandora's allegation of the lack of any reasonable alternative to the blanket license must be taken as true.

WC's contention that Pandora was obligated to seek individual licenses is wrong for another reason, too. The availability of individual licenses, even if realistic, does not preclude imposing liability on "competing sellers [who are] fix[ing] the prices of their products." *Columbia Broadcasting*, 620 F.2d at 935. Fixing prices "violate[s] § 1 no matter how much a buyer may prefer accepting the[] [sellers'] fixed price to negotiating with each for a lower price." *Id.* Tellingly, many of the cases on which WC relies involved the aggregation of *complementary* rights, where anticompetitive harms are of less concern than with the pooling of *competitors'* rights. *See, e.g.*, *Nero AG v. MPEG LA, LLC*, 2010 WL 4366448 (C.D. Cal. Sep. 14, 2010); *Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.* 2007 WL 2318903 (N.D. Cal. Aug. 13, 2007).[9] Here, in contrast, "comedians' recordings are

---

[8] As for WC's assertion that it would entertain "individual licenses on behalf of its clients" (Mot. 16 n.6), the whole point of individual licensing is to have a competitive alternative that is independent of the collective: The individual owners of the right—here, the comedians—are the ones that must offer the alternative in the marketplace. *See, e.g.*, *Samsung*, 2015 WL 10890655, at *5 (discussing licenses "from individual owners"); *Columbia Broad. Sys. v Am. Soc'y of Composers, Authors & Publishers*, 620 F.2d 930, 936-37 (2d Cir. 1980) (recognizing that individual licensing opportunity must be "fully available" from "copyright owners [who] retain unimpaired independence to set competitive prices for individual licenses").

[9] *See also, e.g.*, U.S. Department of Justice June 26, 1997 Response to Business Review Letter to Trustees of Columbia University, et al., at 9, *available at* https://www.justice.gov/sites/default/files/atr/legacy/2006/10/17/215742.pdf   ("[A]

competitive alternatives to each other." Counterclaims ¶ 35.

For all of these reasons, the decisions relied upon by WC are inapposite. In *Nero*, for instance, DOJ's Antitrust Division expressly conditioned its decision not to challenge a patent pool on certain "safeguards," among them that the pool must inform licensees about the availability of individual licenses *from the individual owners*. 2010 WL 4366448, at *1-2.[10] Here, on the other hand, the comedians gave up their rights to individually license their works by joining the WC cartel (Counterclaims ¶¶ 51-53, 61-65), and WC has made clear that it will issue only a blanket license, *id.* at ¶¶ 62-67. Moreover, *Nero* concerned a patent pool of *complementary* IP rights, which differ from the *competing* rights that WC is aggregating. *Id.* at ¶¶ 4, 88.[11] Consequently, nothing here shields WC from liability.

---

patent pool that aggregates competitive technologies and sets a single price for them would raise serious competitive concerns. On the other hand, a combination of complementary intellectual property rights . . . can be an efficient and procompetitive method of disseminating those rights to would-be users.").

[10] Although WC relies on decisions involving ASCAP and BMI (Mot. 16), those organizations' consent decrees likewise impose "safeguards," including that: they are prohibited from obtaining exclusive licensing rights from their affiliates; they are required to offer realistic alternatives to their blanket licenses; and a federal court is empowered to set reasonable fees when agreement cannot be reached with a licensee. *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 185 (S.D.N.Y. 2014). No such safeguards limit WC.

[11] Similarly, *Sumitomo*, 2007 WL 2318903, at *16, involved an opportunity to license from individual owners that is not available in this case. *See Samsung*, 2015 WL 10890655, at *6 (distinguishing *Sumitomo* on the ground that "the plaintiffs [there] had failed to avail themselves of opportunities presented to them for independent licensing of the patent rights from the individual owners"). Here, as in *Samsung*, individual comedians have not presented independent licensing offers; their affiliation agreements with WC foreclose them from doing so. *Id.* at *6 (holding that the *Samsung* complaint "plausibly pleads that Defendants denied Samsung a realistic opportunity as a practical matter to negotiate individual licenses," given that the relevant patent pool agreement contained "no provision permitting separate licenses," no member "had indicated a willingness to negotiate a separate license," and all appeared to lack the authority to individually license).

**B.      Pandora adequately alleges Section 2 claims.**

Pandora brings two claims under Section 2 of the Sherman Act—Count III (monopolization or attempted monopolization) and Count IV (conspiracy to monopolize). To state a monopolization claim, Pandora need only allege facts plausibly showing "(i) the possession of monopoly power in the relevant market; (ii) the willful acquisition or maintenance of that power; and (iii) causal antitrust injury." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1159 (9th Cir. 2019). For attempted monopolization, Pandora must show that (i) WC engaged in predatory or anticompetitive conduct; (ii) with a specific intent to monopolize; and (iii) a dangerous probability of achieving monopoly power. *Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 506 (9th Cir. 2010). Finally, to state a conspiracy-to-monopolize claim, Pandora must plead (i) the existence of a combination or conspiracy to monopolize; (ii) an overt act in furtherance of the conspiracy; (iii) specific intent to monopolize; and (iv) causal antitrust injury. *Sunday Ticket*, 933 F.3d at 1159.

Pandora easily meets all of these requirements. *See* Counterclaims ¶¶ 2-7, 30-63, 71-83, 96-101 (monopolization and attempted monopolization); *id.* at ¶¶ 2-7, 30-64, 68-69, 77, 81-83, 102-108 (conspiracy to monopolize). The only Section 2-specific arguments WC makes concern relevant market and market power—both of which turn largely on matters of fact inappropriate for resolution at the pleading stage. *E.g.*, *Newcal*, 513 F.3d at 1045, 1051. And WC's arguments are, in any event, unavailing on their own terms.

***Relevant Market.*** WC insists that Pandora has not sufficiently alleged a relevant market. *See* Mot. 17-19. But that is a low bar at this stage. There is, for instance, "no requirement that [a relevant market] be pled with specificity." *Newcal*, 513 F.3d at 1045; *Blizzard Entm't Inc. v. Ceiling Fan Software LLC*, 941 F. Supp. 2d 1227, 1232 (C.D. Cal. 2013). "An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged

-15-

market suffers a fatal legal defect." *Newcal*, 513 F.3d at 1045. The operative standard requires an identification of "the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business." *Id.* (internal citations omitted). Pandora's allegations easily pass that test.[12]

Although Pandora does not use the particular buzzwords that WC prefers (*see* Mot. 18), Pandora discusses the contours of the market—what is in, what is out, and why. That is all that is required.[13] Pandora identifies the relevant geographic and product market as "the U.S. market for the rights to comedy routines embodied in comedy recordings." Counterclaims ¶ 71. It explains that is so because of the medium in which it offers customers streaming comedy content (*id.* at ¶ 72) and the demands of its comedy-seeking customers, *id.* at ¶ 73-75. Pandora also alleges that there is a low degree of cross-elasticity of demand between comedy recordings and other audio and audio/visual material. *Id.* at ¶¶ 72-75. That is a "plausible" limit on the relevant market. *TYR*, 679 F. Supp. 2d at 1130-31 (discussing *Twombly* and *Iqbal* standard). A Pandora user surely does not view listening to poetry or music as a substitute for listening to comedy, and WC never suggests otherwise.

Such distinctions are far less nuanced than those in other cases that have met the relevant-market threshold. *See, e.g.*, *TYR*, 679 F. Supp. at 1129 (accepting market of "high-end competitive swimwear" and holding that "it seems plausible that competitive swimmers would not switch to casual swimsuits simply because of a

---

[12] Pleading a relevant market is necessary only for rule-of-reason Section 1 claims, not the *per se* anticompetitive behavior here. *E.g.*, *Staley v. Gilead Scis.*, 446 F. Supp. 3d 578, 616 (N.D. Cal. 2020); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir. 1999).

[13] *See, e.g.*, *TYR Sport Inc. v. Warnaco Swimwear Inc.*, 679 F. Supp. 2d 1120, 1129-30 (C.D. Cal. 2009) (rejecting argument that the "market definition is legally insufficient at the pleading stage" because it does not call out in so many words "interchangeability or cross-elasticity of demand"); *accord Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 996 (N.D. Cal. 2010).

price increase in high-end swimwear"); *Blizzard*, 941 F. Supp. 2d at 1230 (accepting relevant market of "the aftermarket for add-on hardware and software specific to [a game] that enables [] players to advance their character levels at a faster-than-normal rate"). For its part, WC relies on cases that concerned narrowly defined markets that were facially *im*plausible. *See* Mot. 17-18 (citing *Honey Bum, LLC v. Fashion Nova, Inc.*, 2021 WL 4205618, at *6 (C.D. Cal. Mar. 26, 2021) (involving an alleged "Los Angeles-sourced fast fashion online clothing retail market"); *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018) (involving proposed submarket of ads airing "between commercial breaks" "during professional golf tournaments")).

Finally, Pandora does not, as WC would have it, treat desirable and undesirable comedy as separate product markets. Mot. 18 (discussing Counterclaims ¶¶ 38, 66, 93). Pandora simply alleges that its business requires it "to assemble a critical mass of [] comedy recordings," and that it chooses the particular comedians and recordings it offers based on factors such as "price, quality, and desirability to listeners." Counterclaims ¶ 38. At no point does Pandora refer to "desired comedy recordings" and "less desirable material" as separate product markets for purposes of its tying claim (or any other claim). *Contra* Mot. 18.

**Market Power.** Pandora alleges in detail the ways in which WC has market power—*i.e.*, the power "to raise price and restrict output." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992) (cleaned up). Market power "is simply a way to assess whether the defendant's conduct has anticompetitive effects," *Staley*, 446 F. Supp. 3d at 616, and can be shown by either "direct" or "indirect" evidence. *Rebel Oil Co. v. Atl. Richfield Co.,* 51 F.3d 1421, 1434 (9th Cir. 1995). "The question of whether, and if so in what market, [the defendant] has monopoly power is complex, nuanced, and fact dependent." *CollegeNET v. The Common Application, Inc.*, 711 F. App'x 405, 407 (9th Cir. 2017). Pandora plausibly alleges market power here.

Pandora explains how WC orchestrated a cartel to make itself the *exclusive*

licensor for rights to comedy routines of a critical mass of iconic comedians (and others), which gives it the power to demand exorbitant prices through an "all or nothing" blanket license. Counterclaims ¶¶ 56-62. WC thus "has given Pandora the Hobson's choice between the price-fixed and economically unviable bundle—its blanket license—and litigation." *Id.* ¶82. That is "the actual exercise of market power." *Rebel Oil*, 51 F.3d at 1434.

In addition, Pandora alleges an increase in price—well above that paid under longstanding practice where comedians received royalties pursuant to licenses for their recorded comedy routines with no additional royalties paid for the underlying jokes. Counterclaims ¶¶ 41-43, 68. As Pandora further alleges, the comedians' own actions demonstrated that they were satisfied with the compensation they were receiving under that practice. *Id.* at ¶¶ 2, 35, 41. WC's actions changed that dynamic by imposing a 25% royalty *increase* on Pandora. *See, e.g.*, *id.* at ¶ 68 ("[Word Collections] only wants to add a substantial additional royalty obligation to force Pandora and other services to pay far more than they historically have."); Dkt. 49-5, Ex. C to Moskowitz Decl. at 11, § 2 (imposing 25% increase). That supracompetitive price, too, is direct evidence of market power. *See Rebel Oil,* 51 F.3d at 1434.[14]

Pandora likewise shows that it might have to abandon comedy altogether if WC succeeds—a classic induced reduction in output. As Pandora alleges, WC's objective is "to force Pandora and other services to take and pay for its entire portfolio—at a price that it alone will set—or to get none of it, and have no choice but to drop its comedy offering entirely." Counterclaims ¶ 80; *see id.* at ¶ 63. This is not a speculative danger: WC says that Pandora already has had to remove "each Comedian's catalogue from all of Pandora's services." Mot. 20 n.9. Such a forced

---

[14] *See Anderson v. Boyne USA, Inc.*, 2022 WL 2528242, at *6 (D. Mont. July 7, 2022) (allegations permitting court to draw the reasonable inference that rates subject to anticompetitive conduct were 25% higher than comparable rates sufficient for antitrust claims to survive motion to dismiss).

reduction in output is a hallmark of market power. *See Las Vegas Sun v. Adelson*, 2022 WL 876937, at *9 (D. Nev. Mar. 23, 2022) ("Given that RJ alleges that LVS's anticompetitive behavior reduced the quality of the paper and reduction of quality is direct evidence of anticompetitive effects, the Court finds that RJ plausibly alleges market power for purposes of its Sherman Act claims.").

WC asserts that failure to demonstrate its "market share" dooms Pandora's counterclaims. Mot. 19-20. Not so. Courts analyzing antitrust claims against PROs recognize that proof of market share may not be necessary. *See Meredith*, 2011 WL 856266, at *3-4 & n.6 (denying motion to dismiss antitrust claims notwithstanding that plaintiffs "never actually identify what percentage of all copyrighted musical compositions are in the SESAC repertory"). "[C]ommercial realities" are critical in antitrust cases. *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993). Here, the commercial realities are that WC is aggregating licensing rights to a critical mass of iconic and other comedians that together constitute a "must have" collection—without which Pandora could not have a viable comedy offering. *See* Counterclaims ¶¶ 57-60. WC labels itself "the ASCAP and BMI for spoken word" (*id.* at ¶ 61) and, just as those two PROs each have market power, so does WC.

WC also asserts that there can be no market power because there are no "barriers to entry." Mot. 21. But if WC means by this that additional comedian PROs might enter the market, that would hardly improve matters for Pandora and other consumers of comedy. As is true of ASCAP and BMI, for Pandora and other users of comedy, those new PROs would be complements, not competitors, to WC. *See, e.g.*, *Meredith*, 1 F. Supp. 3d at 188-89 (explaining that ASCAP and BMI "have repertories of copyrighted music that are exclusive of one another" and that licensees take licenses from both PROs); *see also* Pandora's Opp. to WC's Request for Judicial Notice 5 (Aug. 5, 2022). Once WC has locked up a critical mass of comedians, it has market power, notwithstanding the hypothetical emergence of other PROs. *See* Counterclaims ¶¶ 51, 53, 60-62; *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125

-19-

F.3d 1195, 1208 (9th Cir. 1997) (intellectual property is a "common entry barrier[]").[15]

### C.   Pandora adequately alleges Section 1 claims.

*Antitrust conspiracy.* To state a Section 1 claim, Pandora need only plausibly allege: (i) an agreement among two or more parties; (ii) that is intended to restrain trade; and (iii) that injures competition. *ICANN Transparency*, 611 F.3d at 501-02. Some types of agreements are *per se* Section 1 violations because they "almost always tend to restrict competition and decrease output." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015). Other agreements must be judged under the "rule of reason," in which their harm to competition is weighed against any procompetitive benefits. *Id.* at 1191-92.

The horizontal price-fixing conspiracy Pandora alleges here falls within the *per se* rule. Competitor comedians, through WC, agreed to: (i) fix a supracompetitive price for their collective set of rights; (ii) license their works exclusively on a collective basis; (iii) eliminate even the possibility of competition between themselves, including by foreclosing the possibility of licensing outside of their cartel; and (iv) upend historic custom and practice and license their comedy routines separately from the licensing of the sound recordings in which those routines are embedded. Counterclaims ¶¶ 2, 4, 35, 48, 51-54, 60-69, 77, 79-80, 82, 85-87, 92. This scheme, by design, eliminates competition between comedians to have their works included on Pandora's services, so as to raise prices and reduce output. *Id.*

---

[15] For this reason, WC is wrong when it points to Spoken Giants—another newly minted spoken-word licensing collective—as somehow negating WC's market power. Mot. 20 n.8. Just as the existence of BMI does not provide an alternative to ASCAP, the existence of Spoken Giants does not lessen WC's market power. Any factual debate about this should be saved for trial. *See generally CollegeNet, Inc. v. The Common Application, Inc.*, 355 F. Supp. 3d 926, 959 (D. Or. 2018) ("[T]he mere fact that a competitor entered the market does not defeat Plaintiff's allegations that barriers to entry are high at this stage in the litigation. Whether the entry of the Coalition is sufficient to defeat this claim is a factual question.").

That is textbook horizontal price-fixing, a "classic example[]" of the sort of agreement that "always or almost always tend[s] to restrict competition and decrease output." *Musical Instruments,* 798 F.3d at 1191 (internal citations omitted).[16]

In the face of these allegations, WC asserts that the counterclaims "fail[] to allege any agreement or meeting of the minds to unreasonably restrain trade." Mot. 22. But as the counterclaims detail and as WC itself declares, WC's very purpose is to license collectively on behalf of many otherwise competing comedians. *E.g.*, Counterclaims ¶¶ 4, 49, 51-52, 61-63. WC's argument is all the more perplexing in the face of WC's self-proclaimed parallel to ASCAP and BMI. *Id.* at ¶ 61. It has long been settled that collective licensing like that engaged in by those entities "plainly involve[s] concerted action." *BMI*, 441 U.S. at 10; *see also Meredith*, 1 F. Supp. 3d at 208-09 (relying, in part, on blanket-licensing practices to deny SESAC's motion for summary judgment on its claim that there was no evidence of an agreement between SESAC's affiliates). That observation applies with equal force to WC—an entity that, while modeling its licensing practices on those of ASCAP and BMI, lacks their arguable efficiencies and the restrictions imposed on them by their respective consent decrees. Counterclaims ¶¶ 44-48, 61-63.

WC also is wrong to assert that the counterclaims "do not contain the requisite factual allegations" to support claims of a horizontal price-fixing conspiracy. Mot. 22. The counterclaims are replete with such allegations,[17] which "go well beyond

---

[16] If the Court were nevertheless to evaluate this conspiracy under the rule of reason, the additional elements necessary—market power and anticompetitive effects—are easily satisfied here. *See* pp. 7-10, 17-19, *supra*.

[17] These include allegations that: (i) describe the licensing tactics of WC and its co-conspirator comedians (Counterclaims ¶¶ 4, 30, 49-67); (ii) describe how those licensing tactics are even more harmful to competition than those employed by ASCAP and BMI (*id.* at ¶¶ 44-48, 51-54); (iii) explain that comedians compete to have Pandora and others stream their content (*id.* at ¶¶ 35, 37); (iv) describe how WC's "exclusive affiliation agreements" foreclose even the possibility of price competition by comedians (*id.* at ¶¶ 51-54, 65); (v) describe the impact that

-21-

reciting the elements of a claim" and, thus, are more than sufficient to withstand a motion to dismiss. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011); *see also* Order, *Radio Music*, No. 2:19-cv-03957, ECF No. 201 (denying a motion to dismiss *per se* and rule-of-reason Section 1 and Section 2 claims based on allegations of collective licensing); *Meredith*, 2011 WL 856266, at *3-4 (same).

WC nevertheless contends that the "more accurate and plausible reading of the Counterclaims is that each Comedian unilaterally decided to license its literary works through Word Collections and allowed Word Collections to negotiate on its behalf without any understanding or agreement whatsoever with any other Comedian." Mot. 23. But that assertion is not plausible, particularly in light of WC's very public intention to act as the "ASCAP and BMI of spoken word." Counterclaims ¶¶ 16, 44, 61. In any case, WC's reading is at odds with Pandora's factual allegations (*see* n.18, *infra*). Even where "there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss." *Starr*, 652 F.3d at 1216.

Finally, WC asserts that its relationship with its comedian clients is that of a "principal and agent," and thus "cannot be the basis of a conspiracy claim." Mot. 23. That, too, is wrong.

For one thing, the counterclaims allege that WC is *not* a mere agent of the

---

competition between comedians would have on price were it to take place (*id.* at ¶¶ 35, 41-43, 68); (vi) detail when individual comedians signed on to the WC cartel and how the number of cartel member comedians has grown steadily over time (*id.* at ¶¶ 49, 56-59); (vii) explain how WC has been empowered to set a single fixed price for all of the works of its cartel members (*id.* at ¶¶ 4, 51-53, 61-65); (viii) explain that it is implausible that individual comedians were not aware of WC's scheme, particularly given the public statements made by WC and its founder, and that by affiliating with WC, they are necessarily buying into the price-fixing conspiracy (*id.* at ¶¶ 61-65); and (ix) explain how this conspiracy works as a business matter only if there is a critical mass of comedians agreeing to band together to collectively license their works at a fixed price (*id.* at ¶¶ 38-39, 55-66).

comedians—it is the facilitator of a horizontal price-fixing conspiracy between and among its affiliated comedians. *E.g.*, Counterclaims ¶¶ 4, 44, 51-54, 61-65. The role WC plays in this price-fixing conspiracy is akin to that played by Apple when it organized "a price-fixing conspiracy among" major book publishers—one the Second Circuit concluded was a *per se* Section 1 violation. *United States v. Apple, Inc.*, 791 F.3d 290, 321 (2d Cir. 2015). As the Second Circuit put it, "[b]y agreeing to orchestrate a horizontal price-fixing conspiracy, Apple committed itself to 'achiev[ing] [that] unlawful objective': namely, collusion with and among the Publisher Defendants to set ebook prices. This type of agreement, moreover, is a restraint 'that would always or almost always tend to restrict competition and decrease output'"—in other words, a *per se* Section 1 violation. *Id.* at 322 (internal citations omitted). That holding applies equally here.

For another, the case that WC cites for its "principal and agent" claim—*American Needle, Inc. v. NFL*, 560 U.S. 183 (2010)—is inapposite. The Court there held that NFL teams' arrangement to license intellectual property rights exclusively through a single entity did *not* immunize them from Section 1 liability. *Id.* at 189-95. As the Court explained, because this licensing entity brought together "independent centers of decisionmaking," thereby depriving the marketplace of "actual or potential competition" between those decisionmakers, the arrangement was actionable under Section 1. *Id.* at 190, 195. Similarly, Pandora alleges that but for WC, comedians would compete with each other. *E.g.*, Counterclaims ¶¶ 35, 37. They were "separate economic actors" (*Am. Needle*, 560 U.S. at 195), but now they are not, as a result of the conspiracy that WC has facilitated with and among them.

*Tying claim.* Pandora has alleged that WC accumulated market power in the relevant product market, tied one product (the rights to desirable comedy material) to another product (the rights to "other, less desirable material"), and is "forc[ing] services to take the entire package" (Counterclaims ¶ 66), at a "substantially greater" total price, *id.* at ¶¶ 66, 70. These are precisely the sorts of allegations that subject

-23-

tying to "per se condemnation."[18] WC's attempt to dismiss Pandora's tying claim distorts the case law and ignores Pandora's allegations.

*First*, although Pandora plainly alleged two different *products*, WC complains that Pandora does not allege separate product *markets* for the tying and tied products. Mot. 24. This objection has no legal basis: The Supreme Court has condemned the tying together of other copyright-protected works that unquestionably compete with each other in the same product market. *See, e.g.*, *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 159 (1948) ("block booking" of motion pictures); *United States v. Loew's, Inc.*, 371 U.S. 38, 49-50 (1962) (licensing feature films to television stations only in bundles containing unwanted films), *overruled in part on other grounds by Ill. Tool Works Inc. v. Ind. Ink, Inc.*, 547 U.S. 28 (2006).[19]

If *Jefferson Parish*—which referred to "two separate product markets," 466 U.S. at 21—meant what WC suggests (Mot. 24), it would have had to overrule both *Paramount* and *Loew's*, "which found an illegal tie between copyrighted films that were partial substitutes competing in the same market for film audiences." P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1747c (4th and 5th eds. 2015-2021). But the *Jefferson Parish* Court "did not purport to overrule *Paramount* and *Loew's*." *Id.* To the contrary, it cited both cases without so much as suggesting tension on that point. *See* 466 U.S. at 10 n.14, 13 n.19, 14, & 16. The additional decisions cited by WC offer it no help: *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 613 (1953), found no tying because morning-paper and evening-paper advertising were

---

[18] *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008) (citing *Eastman Kodak*, 504 U.S. at 461-62, & *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003)); *see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 15-16 (1984) (listing same elements for "*per se* condemnation").

[19] *See also, e.g.*, *MCA Tele. Ltd. v. Pub. Interest Corp.*, 171 F.3d 1265, 1277-78 (11th Cir. 1999) (package television-programming license); *Grid Sys. Corp. v. Texas Instruments Inc.*, 771 F. Supp. 1033, 1038 (N.D. Cal. 1991) (denying motion to dismiss tying claim against package patent license).

"the selfsame 'product'"; and *Freeman v. San Diego Association of Realtors*, 322 F.3d 1133 (9th Cir. 2003), is not a tying case at all.

*Second*, WC's argument (Mot. 25) that Pandora has not sufficiently alleged market power ignores Pandora's extensive allegations on the subject, along with the resulting coercion that is "the essential characteristic of an invalid tying arrangement." *Jefferson Parish*, 466 U.S. at 12; *see also* Counterclaims ¶¶ 66 & 76; pp. 17-19, *supra*. These allegations far exceed what "suffice[d] to survive a motion to dismiss" in *Newcal*, 513 F.3d at 1051-52 (upholding allegations that defendant was "'able to force purchasers of the tying product who are locked in at the end of the original term . . . to buy the tied product'").

*Finally*, WC's argument that Pandora fails to allege the necessary substantial volume of commerce affected by the tying simply ignores Pandora's counterclaim. But for the tying, Pandora would license some material that competed with WC's less desirable material, or even license WC's material—at a competitive price, not the one imposed by WC's collusive tie-in. *See* Counterclaims ¶ 70.[20] The tying thus anticompetitively "increases the market for" WC's less desirable material. *Paramount*, 334 U.S. at 158; *see* Counterclaims ¶¶ 66, 70.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion to dismiss.[21]

---

[20] Contrary to WC's suggestion, Pandora does not allege that it would never license the less-desirable material under any circumstances. This therefore is not the "zero-foreclosure" situation WC posits (Mot. at 25), in which the "plaintiff does *not* allege that it would have taken competing recordings or patents from a different seller but that it does not want a certain subset of these IP rights at all." Antitrust Law ¶ 1724b2. WC's cases on this point are thus irrelevant.

[21] If the Court does grant the motion to dismiss the counterclaims, Pandora should be granted leave to amend. *See, e.g.*, *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (noting that leave to amend should be freely granted "with extreme liberality") (quotations omitted).

| | |
|---|---|
| Dated:  August 5, 2022 | MAYER BROWN LLP |
| | PAUL M. FAKLER |
| | JACOB B. EBIN |
| | ALLISON AVIKI |
| | WILLIAM H. STALLINGS |
| | CHRISTOPHER J. KELLY |
| | JOHN NADOLENCO |
| | DANIEL D. QUEEN |
| | MEERIM NEHME |

By: */s/ Paul M. Fakler*
     Paul M. Fakler

MAYER BROWN LLP
WILLIAM H. STALLINGS
(*pro hac vice*)
*wstallings@mayerbrown.com*
1999 K Street, NW
Washington, D.C.  20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 262-3300

MAYER BROWN LLP
CHRISTOPHER J. KELLY
(SBN 276312)
*cjkelly@mayerbrown.com*
Two Palo Alto Square
3000 El Camino Real
Palo Alto, California  94306-2112
Telephone: (650) 331-2000
Facsimile: (650) 331-2060

Attorneys for Defendant
PANDORA MEDIA, LLC