MAYER BROWN LLP
PAUL M. FAKLER (*pro hac vice*)
*pfakler@mayerbrown.com*
JACOB B. EBIN (*pro hac vice*)
*jebin@mayerbrown.com*
ALLISON AVIKI (*pro hac vice*)
*aaviki@mayerbrown.com*
1221 Avenue of the Americas
New York, New York  10020-1001
Telephone: (212) 506-2500
Facsimile: (212) 262-1910

MAYER BROWN LLP
JOHN NADOLENCO (SBN 181128)
*jnadolenco@mayerbrown.com*
DANIEL D. QUEEN (SBN 292275)
*dqueen@mayerbrown.com*
MEERIM A. NEHME (SBN 322234)
*mnehme@mayerbrown.com*
350 S. Grand Avenue, 25th Floor
Los Angeles, California  90071-1503
Telephone:  (213) 229-9500
Facsimile:   (213) 625-0248

[*Additional counsel listed on signature page*]

Attorneys for Defendant
Pandora Media, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re PANDORA MEDIA, LLC COPYRIGHT LITIGATION | Master File No. 2:22-cv-00809-MCS-MAR |
| This Document Relates To: | <u>CONSOLIDATED ACTION</u> |
| 2:22-cv-04634-MCS-MAR (Black) | **DEFENDANT AND COUNTERCLAIMANT PANDORA MEDIA, LLC'S COUNTERCLAIMS TO PLAINTIFFS' SECOND AMENDED CONSOLIDATED COMPLAINT AGAINST PLAINTIFF/COUNTERCLAIM DEFENDANT LEWIS BLACK, INDIVIDUALLY AND ON BEHALF OF STARK RAVING BLACK PRODUCTIONS, INC., AND COUNTERCLAIM DEFENDANT SPOKEN GIANTS, LLC** |

Pursuant to Rule 13 of the Federal Rules of Civil Procedure, Defendant Pandora Media, LLC ("Pandora"), by way of its attorneys, hereby states for its Counterclaims against Plaintiff and Counterclaim Defendant Lewis Black, individually and on behalf of Stark Raving Black Productions, Inc. ("Mr. Black" or "Counterdefendant Black"), and Counterclaim Defendant Spoken Giants, LLC ("Spoken Giants" and collectively, "Counterdefendants"), the following:

## I.      NATURE OF THE ACTION

1.      These Counterclaims seek injunctive relief, treble damages, and the cost of suit, including reasonable attorney's fees, and other relief under Federal antitrust laws, 15 U.S.C. §§ 1, 2, 15, and 26, to remedy a conspiracy in unreasonable restraint of trade, a conspiracy to monopolize, monopolization and attempted monopolization by Counterdefendants.

2.      For years, Pandora and many other services have enabled their listeners and subscribers to listen to recordings of comedians' performances.  Pandora does not need access to all comedians' recordings in order to offer a viable comedy streaming service.  In a competitive market, then, comedians compete to have Pandora and other services play their recordings and the underlying comedy routines embodied in those recordings.  Pandora has always satisfied its copyright obligations to comedians by paying millions of dollars in license fees every year to the owners of the copyright in the sound recordings of the comedians' performances, which in turn shared those payments with the comedians.  No comedian ever sought to raise the price to Pandora by separately licensing or charging an additional royalty for any rights in the "literary works"—*i.e.*, jokes—underlying the licensed recordings. Instead, comedians chose unilaterally to benefit from the royalties they were already receiving for the use of the comedy recordings and the added promotional and other benefits that the services gave them, creating additional demand for their live performances and otherwise benefiting the comedians.  Comedians were clearly satisfied with this long-standing custom and practice—one that predates Pandora by

- 1 -

many decades—as demonstrated by the fact that they and their representatives regularly contacted Pandora to secure more plays of their recordings. Doing so would make no economic sense if the comedians felt that they were not being fully and appropriately compensated by Pandora.

3. Then, in October 2020, Counterdefendant Spoken Giants announced its public launch as the "first royalty administration company for creators of spoken word copyrights." According to its press release, "[f]ounded by former BMI executive Jim King and 800 Pound Gorilla Records cofounders Ryan Bitzer and Damion Greiman, Spoken Giants represents hundreds of members, including Lewis Black, Dan Cummins, Gerry Dee, Pete Holmes, Kyle Kinane, Kathleen Madigan, the Ralphie May Estate, Leanne Morgan, and Theo Von, among others, and are scaling up dramatically." Spoken Giants has explicitly targeted Pandora, as well as other services that stream or broadcast comedy, as entities that it will license comedians' asserted "literary works" rights to and from which it will collect additional royalties for those asserted rights.

4. But Spoken Giants' true business model is not that of a benign licensing agent or an advocate for comedians' intellectual property rights; it is that of a cartel leader. Spoken Giants has consolidated its comedians' naturally competing rights into a monopolistic portfolio and fixed the price of the only license realistically available for those rights, ensuring that services have no alternative to its blanket license for its entire portfolio. In place of the above-noted historic custom and practice that has worked to the mutual benefit of all involved, or a market in which comedians actively compete with each other on price to have Pandora and others perform their jokes that are embodied in comedy recordings, Spoken Giants seeks to build a market in which it: (a) fixes supra-competitive royalties for the rights to the jokes embodied in comedy recordings with its co-conspirator comedian "clients," including Counterdefendant Black; (b) accumulates monopoly power in the licensing of those rights; and (c) uses that monopoly power to foreclose competition through

its full-portfolio mandatory blanket license and by tying the rights that give it monopoly power to rights in other works that Pandora and other services do not need. On information and belief, Spoken Giants has been involved in the coordination and funding of the filing of the complaint brought by Mr. Black as part of its larger efforts, and those of Word Collections, Inc. ("Word Collections")—another licensing cartel that is similarly violating the antitrust laws—to impose this dysfunctional market on all manner of entities that perform, reproduce or distribute comedy through the threat of crippling infringement penalties.[1]

5.      The result of Spoken Giants' anticompetitive tactics is to create for itself and the comedians that join its scheme hold-up power over services like Pandora, to exploit that hold-up power by dramatically increasing the price that Pandora and others have to pay to make comedy recordings available to their listeners, and to hamper the ability of Pandora and other services to respond to consumer demand for high-quality comedy.

6.      While, as set forth in Pandora's Answer to the Second Amended Consolidated Complaint, Pandora disputes Counterdefendants' infringement claims, these antitrust counterclaims assume *arguendo* that there exist public performance, reproduction and/or distribution rights in the jokes embodied in comedy recordings and that comedians, as authors of those jokes, might have retained those rights and, if so, could unilaterally upend historic practice going forward and try to separately license them.    These antitrust counterclaims instead challenge how Counterdefendants have agreed to suppress competition that otherwise would exist in the licensing of those rights.

## II.    THE PARTIES

7.      A Delaware limited liability company and a subsidiary of Sirius XM Radio Inc. ("SiriusXM"), Pandora offers both ad-supported and subscription-based

---

[1] Pandora has brought separate counterclaims against Word Collections and several of its affiliated comedians.  ECF No. 34.

audio entertainment streaming services in the United States. Pandora provides its users with music, comedy, and other spoken-word audio programming through internet-connected devices. Pandora has long been and remains best known for its flagship free-to-the-consumer non-interactive internet radio service, which currently has approximately 50 million monthly active users. That service offers listeners a "radio-style" or "lean-back" listening experience, by which Pandora creates for each listener an individualized play-list. After creating an account, a listener need only "seed" a station or select a "genre" and then music or spoken-word content will begin to play. To create a "seeded" station, the listener simply types the name of an artist, composer (for classical music), or song title to serve as the starting point or "seed" of the station. Pandora then automatically creates a station centered around that "seed," which—through use of its Music and Comedy Genome Projects and a combination of proprietary playlist algorithms—will play tracks whose characteristics are similar to those of the "seed." As an alternative, a user can select a "genre" station, which begins as a pre-programmed collection of tracks that reflect a certain style or preference. Each genre station is initially populated by tracks selected by Pandora. While the listener is not able to select any particular song or artist to hear at any given time, the listener is able to provide Pandora with feedback regarding likes and dislikes. This feedback is used to further refine each listener's personalized station.

8. In addition to its free ad-supported service, Pandora offers two subscription services. The more popular of the two, Pandora Plus (formerly called Pandora One), is an ad-free subscription service that includes some semi-interactive features, such as song replays and caching of a limited number of stations to enable offline listening when users do not have internet access, but does not provide users with the ability to select particular songs or albums on demand. Pandora's other subscription service—Pandora Premium—is a fully on-demand service that allows subscribers to select what recordings they want to listen to and when.

- 4 -

9.     According to the Second Amended Consolidated Complaint, Counterdefendant Black "owns one hundred percent (100%) of Stark Raving Black Productions, Inc., which is a New York Corporation and has a principal place of business at 11812 San Vicente Blvd., Ste. 400, Los Angeles, CA 90049." According to the Second Amended Consolidated Complaint, "Lewis Black, individually and on behalf of Stark Raving Black Productions, Inc., owns the intellectual property rights of Lewis Black, who is an actor and comedian and resides in New York, New York."

10.     On information and belief, Counterdefendant Black has been a co-conspirator "client" of Spoken Giants since at least October 2020.  Mr. Black regularly speaks out in favor of Spoken Giants' goals of upending historic custom and practice and making Spoken Giants a monopolist that can extract supra-competitive fees from Pandora and others.  And, on information and belief, Mr. Black has been instrumental in recruiting additional comedians to join the Spoken Giants cartel.  Mr. Black has even appeared alongside Spoken Giants' CEO on numerous occasions, giving press interviews regarding Spoken Giants and its efforts to become a must-have licensor of rights necessary for services like Pandora to stream comedy.

11.     While the Second Amended Consolidated Complaint asserts that Mr. Black "is not affiliated with Word Collections or Spoken Giants for the licensing of his Works," Mr. Black has been affiliated with Spoken Giants, was affiliated with Spoken Giants at the time that Spoken Giants first presented Pandora with its "term sheet" for its blanket license, and clearly remains aligned with the goals of the Spoken Giants cartel.  The homepage of the Spoken Giants website explicitly endorses and even takes credit for Mr. Black's claims against Pandora in this action, stating that "Spoken Giants stands along side Mr. Black for fighting to win a victory for all in the comedy community."  Whether Mr. Black is technically still a formal member of Spoken Giants or not, he clearly is still involved in furthering the interests of the conspiracy spearheaded by Spoken Giants.  He has never disavowed the conspiracy, nor has he severed all of this ties to the conspiracy.  Nor has he publicly announced

that he is no longer affiliated with Spoken Giants. Indeed, this current lack of affiliation with Spoken Giants has been claimed by his litigation counsel only in this proceeding, and only *after* Pandora informed his counsel that it intended to bring these antitrust counterclaims against Spoken Giants and Mr. Black. In short, his newly-claimed lack of affiliation with Spoken Giants is nothing more than a half-baked and misguided effort to avoid being named as a Counterdefendant in these Counterclaims. If anything, Mr. Black's newly-claimed lack of affiliation with Spoken Giants is a tacit admission that Spoken Giants, along with its co-conspirator "clients," is engaged in a price-fixing conspiracy in violation of the antitrust laws.

12. According to its website, Spoken Giants is the "first global rights collective for spoken word." In its October 28, 2020 press release announcing its public launch, Spoken Giants asserted that it was "founded by BMI executive Jim King and 800 Pound Gorilla Records co-founders Ryan Bitzer and Damion Greiman" and "represents hundreds of members, including Lewis Black, Dan Cummins, Gerry Dee, Pete Holmes, Kyle Kinane, Kathleen Madigan, the Ralphie May Estate, Leanne Morgan, and Theo Von, among others" and was "scaling up dramatically." That same press release goes on to note that Spoken Giants' plan is to "follow music precedents," become "the de facto collective for spoken word's future in the process," and through "collective representation" to "strengthen the marketplace in favor of the [comedian] creator." On information and belief, Spoken Giants is a Delaware limited liability corporation, with its headquarters in Nashville, Tennessee.

## III.   JURISDICTION AND VENUE

13. These Counterclaims arise under the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, 15, and 26.

14. This Court has subject matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. §§ 1331 and 1337(a), Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2.

15.     This Court has personal jurisdiction over Mr. Black based on: (a) Mr. Black's filing of the Second Amended Consolidated Complaint; (b) the fact that Mr. Black, on information and belief, conducts a substantial portion of its business in California; (c) the fact that Stark Raving Black Productions, Inc.—the alter-ego corporation through which Lewis Black conducts his business, which claims to own the intellectual property rights at issue in this litigation, and which is wholly owned by Lewis Black—has its principal place of business in this District; and (d) Spoken Giants' efforts on behalf of Mr. Black to force Pandora, located in California, including through communications with Pandora employees located in this District, to enter into a license agreement with respect to Mr. Black's alleged literary works rights.

16.     This Court has personal jurisdiction over Spoken Giants based on: (a) its numerous efforts and contacts on an ongoing basis since at least August 2020 directed to Pandora, located in the State of California, including through communications with Pandora employees located in this District, to force Pandora to enter into a license agreement; (b) on information and belief, its role in sponsoring and coordinating the Second Amended Consolidated Complaint; and (c) on information and belief, because it conducts substantial and ongoing business in California, including in this District, including, but not limited to, by soliciting new clients, investors, and other co-conspirators, including Lewis Black and Stark Raving Black Productions, Inc.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400, and 15 U.S.C. §§ 15, 22, and 26.

18.     Joinder of Counterdefendants, including Counterdefendant Spoken Giants, is proper pursuant to Rules 13(h) and 20(a)(2) of the Federal Rules of Civil Procedure.   Rule 20 allows for permissive joinder of defendants (and counter-defendants, pursuant to Rule 13(h)) where, as here: "(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of

the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2).  Joinder of all Counterdefendants is further warranted because, among other reasons, it will promote judicial efficiency, it will expedite the final determination of the disputes, including those raised in the Second Amended Consolidated Complaint, the defenses in the Answer to the Second Amended Consolidated Complaint, and in these Counterclaims, and because it prejudices no party.

## IV.   TRADE AND COMMERCE

19.    At all times relevant to these Counterclaims, Counterdefendants have been engaged in interstate commerce, and their activities have substantially affected interstate commerce.  The efforts of Counterdefendants, who are residents of multiple different states, to compel Pandora and other services to license asserted literary works rights occurs in interstate commerce.  Pandora and, on information and belief, other providers of comedy content, provide their programming services in interstate commerce.

20.    Moreover, through their concerted efforts to force Pandora and, on information and belief, other providers of comedy to enter into purported "literary works" rights licenses for the copyrighted works they claim to own or control, Counterdefendants directly affect the interstate transmission of Pandora's offerings as well as those of other services that provide comedy content to listeners.  Their collusion on the licensing of their purported "literary works" rights, their consolidation of their asserted rights under Spoken Giants' control, and Spoken Giants' bundling of these rights into a mandatory all-or-nothing blanket license have already imposed substantial costs on Pandora; if their collusion succeeds in imposing these licenses on Pandora and other providers of comedy content at supra-competitive prices, the total cost to Pandora, these other providers of comedy, and their customers, all in the flow of interstate commerce, will be enormous.

## V.    FACTUAL ALLEGATIONS

### A.    Streaming Services and Comedy Performances

21.    Until 2011, Pandora did not include any comedy on its service.  Then, in 2011, Pandora made the business decision to offer comedy and other spoken word content in addition to music.  But music still accounts for the vast majority of streams (transmissions of recordings to listeners) on the Pandora service: Today, all comedy content accounts for less than 1% of all streams on the service, and only a handful of comedians account for any significant number of streams across Pandora's services. Even so, Pandora pays out millions of dollars in royalties each year for this comedy content.

22.    The development of Pandora's comedy streaming service is representative of how Pandora responds to listener demand for specific types of content.  Other examples of Pandora expanding its output to meet listener demand include its expansion into on-demand music streaming and its improvements to Pandora Plus, offering subscribers enhanced functionality.   Pandora has also expanded into podcasting, to meet growing listener demand in that space.  And Pandora has developed, at great upfront and ongoing expense, its content algorithms that give each Pandora user a more tailored listening experience.  As a result of these substantial investments, Pandora is uniquely positioned to not only provide listeners with content they already know they want to hear, but also to introduce listeners to new content they were not previously familiar with.

23.    For its music service, Pandora's primary competitor is AM/FM radio. But Pandora also competes with other streaming services.  In comedy, Pandora competes with, among others, AM/FM radio stations, YouTube, Spotify, and other digital streaming services.  To a lesser extent, Pandora also competes with certain providers of audio-visual comedy programming, such as Netflix and HBO.  Pandora competes with these other services for listeners on factors including price (either directly through subscription fees or indirectly through exposing the listeners to

- 9 -

advertisements) and the quality and range of the comedy performances it offers.

24.    In order to offer a viable comedy streaming service, Pandora needs access, including any necessary licenses, to quality recorded comedy routines by some minimum range of comedians of various styles.  Pandora does not need to have access to the recordings of all comedians, nor does it need access to all recordings of any given comedian.  Stated differently, Pandora can provide a viable comedy product with a relatively modest number of comedy recordings.

25.    As a result, as inputs to a streaming service, comedians' recordings are competitive alternatives to each other.  Comedians compete to have Pandora carry their recordings.  They and their representatives regularly contact Pandora to secure more plays of their comedy recordings, all in an effort to secure the many benefits that being streamed on Pandora offers to comedians.  That comedians and their representatives make such efforts provides strong evidence that the benefits comedians have been receiving from Pandora are more than adequate.  Were that not the case, they would not try to secure additional plays of their recordings.  These benefits include, of course, the substantial royalties that Pandora pays out pursuant to the licenses that it has entered into with the record labels (and their authorized distributors) that own the comedy recordings, or through Pandora's royalty payments to SoundExchange, a regulated entity and one subject to an antitrust exemption that, among other things, collects royalties on behalf of the recorded music industry from services like Pandora that qualify for certain statutory licenses, including, as relevant here, the Section 112 and 114 statutory licenses.  17 U.S.C. §§ 112, 114.  The benefits also include the exposure and other promotional value that comedians receive from Pandora.  Indeed, Counterdefendant Black has, on multiple occasions, publicly acknowledged the many benefits that streaming platforms provide to comedians, explaining that streaming platforms not only provide essential promotion for comedians, but also provide comedians with an important revenue stream.

26.    Pandora's offering adds value for both comedians and listeners alike:

- 10 -

Pandora has developed what it refers to as the "Comedy Genome Project" (the "CGP"), whose primary purpose is to introduce listeners to comedy that they are not already aware of, but will like.  The CGP's methodology is based on comedic *similarity*, without regard to popularity, creating a level playing field for all comedians.  The CGP utilizes technology and human talent to map out a comedy routine's key comedic characteristics (or "genes"), which are expressed as numerical values, and uses mathematical algorithms to identify other comedy with "DNA" similar to that which a user already knows and likes.

27.     Through the CGP, Pandora is able to expand listeners' access to comedy they will enjoy, while expanding comedians' access to listeners who do not yet know their work.  The CGP helps explain why comedians compete specifically to have their recordings in Pandora's active portfolio without demanding additional royalties to separately license their asserted "literary works" rights.

28.     Because Pandora and other streaming services do not need to be able to transmit all of the recordings of all prominent comedians in order to have a viable product, the services can choose among the comedians and their recordings, based on competitive factors including price, quality, and desirability to listeners.  As long as it is able to assemble a critical mass of such comedy recordings, Pandora can offer viable comedy streaming services.

29.     But if Pandora, or another service, were unable to get access to a critical mass of recordings, or could only do so at grossly elevated rates or on other onerous terms, it could no longer offer a viable comedy streaming product and, as a result, would no longer offer comedians the benefits that its current service provides.  Consequently, if a single economic actor gained control over the licensing of the rights to the comedy routines embodied in the recordings of a substantial number of quality comedians, and used that control to set a single elevated price for access to those rights, a streaming service could not substitute away from that *collection* of rights and rely only on other comedians' works and survive.  In other words, that

economic actor would have monopoly power over Pandora and other services and could, in effect, decide whether a service's comedy offering survived or failed.

### B.    Historic Practice of Licensing Comedy Rights

30.    Pandora has a long history of respecting valid copyrights and entering into legitimate license agreements for the copyrighted content it transmits. Pandora's royalty payments have been so substantial that, in large part because of those royalty payments, it has never been able to earn a sustained profit. At all times relevant to these Counterclaims, Pandora has been willing to enter into reasonable licenses negotiated in a competitive market for legitimate copyrights covering the content it transmits.

31.    Since launching its comedy service in 2011, and pursuant to longstanding industry custom and practice (predating Pandora by many decades), Pandora has always taken licenses for the comedy recordings that it offers, and through those licenses has obtained (either explicitly or implicitly) all of the rights it needs to stream those recordings. But Pandora has not separately secured licenses just covering the underlying comedy routines embodied in comedy recordings, because it did not need any such separate licenses—all necessary rights were provided along with the rights to stream the recordings. As stated above, Pandora already pays out millions of dollars in royalties each year for its use of comedy recordings and no comedian, until now, has ever approached Pandora about entering into a separate license, or paying additional royalties, just for any rights that the comedian may hold in the underlying comedy routines embodied in comedy recordings. Instead, comedians unilaterally determined that they were satisfied with this historic custom and practice and that they were *not* going to demand additional royalties in exchange for a license to the underlying comedy routines on top of what they are already being paid for the comedy recordings. In other words, to the extent that separate royalties are allocable to the underlying jokes embodied in the comedy recordings, they are already "baked-in" to those paid for the use of the recordings.

32.     Thus, until the public launch of Counterdefendant Spoken Giants on October 28, 2020 (and that of Word Collections less than a week earlier on October 22, 2020), the competitive equilibrium among the competing owners of the jokes embodied in recorded comedy routines was the long-standing practice in which the comedians have agreed that all necessary rights were included with the rights to the recording and they treated the royalties received for their recordings as sufficient— no separate, additional royalties just for the underlying jokes were ever called for.

33.     Consequently, Pandora rightfully understood that, in exchange for the many benefits that it provides comedians, each implicated comedian unilaterally had decided to maintain long-standing industry custom and practice and not separately license rights to the underlying jokes or demand additional royalties above what Pandora was already paying to use the comedy recordings.  This understanding was no secret.   Pandora's publicly available SEC filings confirm its long-standing licensing practices.  Those filings explicitly noted that, pursuant to industry custom and practice, it was not securing a separate license, or paying a separate license fee, for the use of any underlying jokes embodied in comedy recordings.  For over a decade, and despite Pandora's complete transparency as to its licensing practices, no comedian ever challenged those practices.  Instead, they continued to seek increased airplay on Pandora's service.  It was only with the emergence of Spoken Giants (and Word Collections) that anyone has tried to upend what has been working well for all involved for decades.

34.     While Spoken Giants has publicly stated that it is modeling itself after musical works performing rights organizations, including ASCAP and BMI (from which Spoken Giants' CEO came), there are several ways in which ASCAP's and BMI's licensing of public performances of musical works is fundamentally different from comedy licensing.  Some of the more salient differences include, but are not limited to, the following:

      a.  Unlike music rights licensing, which, as the Supreme Court has

observed, involves "thousands of users, thousands of copyright owners, and millions of compositions" (*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S 1, 20 (1979)), comedy licensing involves a far smaller universe of users, copyright owners and works.  Because the total number of performing comedians that Pandora might want to secure a license from is so much smaller than the number of music composers, the alleged comedy "literary works" rights are far less widely held than are public performance rights in musical compositions.  As a result, the benefits of consolidating them into a performance rights organization ("PRO") are minimal.

b. As explained above, Pandora does not need access to the recordings of all, or even most, comedians in order to offer a viable comedy streaming service.  Nor does Pandora need access to all of any one comedian's available recordings.  Pandora needs only a critical mass of quality comedy recordings by a range of comedians in order to offer a viable and competitive product.

c. The number of potential licensees of comedy rights is far smaller than the number of users of musical works public performance rights.  And, in fact, Counterdefendants have targeted only a handful of services for Spoken Giants' licensing activities.

d. Unlike with music, the author of the comedic routine and the comedian featured on the comedy recording are, in almost all instances, the same.  Indeed, for each work listed in the Second Amended Consolidated Complaint, the performing comedian is also the alleged sole author and owner of the work.  Accordingly, it is not only inefficient to depart from historic practice (in which a single license conveys all of the necessary rights) by imposing

- 14 -

1                                  a separate licensing obligation, but doing so after the owner of the

2                                  sound recording has already granted a license can only serve to

3                                  create additional hold-up power over services like Pandora.

4         35.     Consequently, there is no need for any performing rights organization

5 to jointly deal with services offering comedy content on behalf of the relatively

6 modest number of comedians whose works are of sufficient interest to listeners that

7 Pandora might want to use them on its service. Any comedian could easily deal with

8 the entities that are interested in transmitting performances of his or her works.

9         36.     Indeed, the Second Amended Consolidated Complaint alleges that

10 Pandora needed only to "take the *simplest of steps* to ask [the rights-holding

11 Counterdefendants] or [their] representatives for licenses for the Works." (emphasis

12 added). In other words, if Pandora had to separately license the jokes embodied in

13 comedy recordings from comedians, it could do so directly in a simple and reasonably

14 competitive marketplace. And those comedians could deal individually with Pandora

15 without difficulty.

16         37.     Further, there is no valid justification for a licensing cartel like Spoken

17 Giants to offer a blanket license covering the rights to all of the works of its co-

18 conspirator "clients," particularly when it makes that blanket license the only means

19 of obtaining *any* license to *any* of the works. These blanket licensing practices force

20 Pandora and other services to take, and pay for, a license covering far more material

21 than it would ever need; they could succeed only as a result of the collective having

22 accumulated market power that forces services to take the license covering the

23 collective's entire portfolio if they are to get a license to any of it. And unlike ASCAP

24 and BMI, which are subject to antitrust consent decrees that require them to offer,

25 among other things, meaningful alternatives to their blanket licenses, Spoken Giants'

26 blanket license faces not even a hypothetical constraint from other competitive

27 alternatives. The only alternative to the blanket license for all of the rights that

28 Spoken Giants controls in a world that deviates from historic custom and practice is

no license for any of those rights.

38.    For all of these reasons, there is no valid justification for moving away from what has worked well for decades and towards collective licensing of the rights to the jokes embodied in comedy recordings.  Should comedians decide unilaterally to license their rights separately, there would be plenty of room for competition between them to have their works performed on Pandora.  If the owners of rights for the jokes embodied in comedy recordings asserted them against Pandora and others without colluding, Pandora—and in turn, its customers—would benefit from a free competitive market, in which the rights owners would compete against each other in order to attract Pandora to obtain the rights necessary to use their material.  On information and belief, the same would be true for other services that offer comedy.  But Spoken Giants and its co-conspirator "clients," including Counterdefendant Black, have conspired to not only disrupt long-standing custom and practice, but to also ensure that the competitive market that would otherwise emerge will never take hold.  There is no doubt that this is Spoken Giants' plan, and that its co-conspirator comedians are well aware of this, as Spoken Giants has stated it publicly on numerous occasions, repeatedly making clear that only with "collective representation" of comedians will it "strengthen the marketplace in favor of the [comedian] creator."

## C.    Spoken Giants' Scheme to Fix Prices and Monopolize the Market for "Literary Works" Rights Embodied in Comedy Recordings

39.    In October 2020, a press release announced Spoken Giants' public launch, asserting that "[w]hile rights organizations have long existed in the music industry, no such entity has existed to protect and pay spoken word creators, until now."  That same press release went on to explain that the "need for collective representation [of comedians] was identified in 2016, when former comedy managers, Ryan Bitzer and Damion Greiman opened Nashville-based comedy label 800 Pound Gorilla Records… Bitzer and Greiman partnered with former BMI

executive Jim King in 2018, and Spoken Giants began its work to strengthen the community and build the marketplace for all spoken word creators."

40.    But as shown above, Spoken Giants' efforts to build a marketplace—one that, as Spoken Giants' CEO has put it, will "favor[] the creator"—is a solution in search of a problem: it is attempting to upend historic custom and practice, collectively license the jokes embodied in comedy recordings, and collect exorbitant royalties for licenses for those rights that—in a more competitive market—their owners have long agreed would call for no additional royalties on top of what is already being paid for the use of the comedy recordings.  Worse, by design, Spoken Giants' "solution" breaks the market—by eliminating competition—instead of "creating" it.

41.    Spoken Giants' website and its marketing materials describes a simple collective licensing scheme: instead of maintaining past practice, comedians (or the entities holding the rights to the comedians' purported "literary works") sign a required affiliation agreement with Spoken Giants.  That affiliation agreement empowers Spoken Giants to grant licenses for the comedian's rights bundled together with the rights of all of the other Spoken Giants-affiliated comedians to services like Pandora and collect royalties from those services on behalf of all of its co-conspirator comedian "clients."  Those agreements give Spoken Giants power to set a single fixed price for access to all of these comedians' rights—rights that otherwise would be offered in competition with each other.

42.    Moreover, the agreements between Spoken Giants and its co-conspirator comedians, including the other Counterdefendant, mean that Spoken Giants' price for these works is the *only* price in the market.  Individual licenses from Spoken Giants' co-conspirator comedians are useless to Pandora and other services: Spoken Giants licenses its comedians' rights only through a blanket license covering its entire portfolio.  Once it forces a service to take that blanket license, taking an individual license from a Spoken Giants-affiliated comedian would mean that the

- 17 -

service is paying twice (and actually three times, given that the rights were already paid for pursuant to the sound recording licenses) for that member's underlying jokes embodied in the recordings—once through the blanket license and then again through the individually negotiated license.  Consequently, once a comedian signs up with Spoken Giants, there is no longer any economic incentive to try and negotiate directly with that rightsholder—doing so would be economically irrational.  As a result of its blanket licensing practices, Spoken Giants effectively controls access to that comedian's rights and those of all of its other co-conspirator "clients."

43.   The comedians affiliated with Spoken Giants similarly have no economic incentive to enter into direct licenses with Pandora and others so long as they remain a part of the cartel.  By sticking with the cartel, the comedian cartel members know they will get the inflated price set by Spoken Giants, instead of the far lower price that would result if they competed with each other on price.  And comedians understand that the only way that Spoken Giants can secure supra-competitive prices is if a sufficient number of comedians band together through Spoken Giants to give Spoken Giants market power.  No individual comedian could bring about such change—it is only through "collective representation" (i.e., price fixing) that Spoken Giants can, as it put it, "strengthen the marketplace in favor of the creator."

44.   There can be little doubt that Spoken Giants' plan is, and always has been, to license its catalog exclusively on a blanket "all-or-nothing" basis and that its affiliated comedians understand as much.  Spoken Giants has repeatedly made this clear, including on its website, in its marketing materials (including those aimed at recruiting new co-conspirator comedian "clients"), and in its public statements.  For example, the Spoken Giants website states that when a comedian signs up with Spoken Giants, the first thing Spoken Giants does is "collect their works into [the Spoken Giants] catalog," which it then licenses "in full" to services like Pandora.  In other words, as the Spoken Giants website confirms, the only license it offers is for

- 18 -

the entire catalog of the works of all of its affiliated co-conspirator comedians. Spoken Giants' marketing materials reinforce this point.  Those materials explain that Spoken Giants is modeling its licensing practices on those of the musical works PROs, which have been licensing their repertories on a collective "all-or-nothing" basis for over a century.  And, in those same materials, Spoken Giants asserts that its "negotiations for blanket licenses" with Pandora and other services are underway. Public statements by Spoken Giants' CEO repeatedly emphasize that Spoken Giants' plan is "to do the same for comedy writers" as ASCAP and BMI have done for songwriters and music publishers—negotiate blanket licenses with Pandora and others "on behalf of a large group of comedians."

45.    These statements are entirely consistent with the license that Spoken Giants has insisted that Pandora take.  On April 19, 2021, Spoken Giants sent Pandora a "term sheet" for a blanket license covering its entire catalog, including the "literary works" rights of Counterdefendant Black, for a fee well above what would emerge in a competitive marketplace.  The licensing terms did not allow for any reduction in fee should Pandora enter into a separate license directly with a Spoken Giants-affiliated comedian or their representative, nor did it allow for Pandora to secure the rights to just some, but not all, of the material in the Spoken Giants catalog (whether at prices set by the individual comedians or by Spoken Giants).  Spoken Giants simply required that Pandora take an "all-or-nothing" license covering everything in its catalog for an exorbitant fee, just as it promised prospective members it would. And this supra-competitive license fee is on top of the very substantial royalties that Pandora already pays for the right to stream comedy recordings.  In other words, Spoken Giants is demanding that Pandora pay substantially more than it previously has, just so that it can continue to do what it always has done before—stream fully licensed comedy recordings.

46.    Spoken Giants' co-conspirator comedian "clients," including Counterdefendant Black, have not only conspired to fix the price for a license to the

rights to their competing works, but also have agreed not to undermine those fixed prices by licensing independently outside of the cartel.  As noted above, by conspiring to offer only an "all-or-nothing" blanket license, Spoken Giants and its co-conspirator comedian "clients" have ensured that Pandora and other services have no incentive to try and secure individual licenses from any Spoken Giants cartel members.  Doing so would only result in Pandora (and others) paying multiple times for the same rights—something that no rational business would ever entertain.  The result of this price-fixing scheme is that Pandora and other services are unable to get licenses for these asserted literary works rights at the competitive prices that would prevail if the comedians competed against each other to offer licenses to their works instead of banding together to charge supra-competitive fees.  Stated differently, by joining the Spoken Giants cartel, comedians are able to shield themselves from the forces of competition.

47.    But Spoken Giants and its co-conspirator comedians have not only engaged in naked horizontal price fixing.  In assembling its portfolio of the rights to the works of conspiring comedians, Spoken Giants also presents a genuine threat of achieving monopoly power, and likely has already achieved monopoly power, in the market for the rights to perform, distribute, and reproduce the comedy routines embodied in comedy recordings, power that it can and will exert over Pandora and other services that offer comedy.  As explained above, because Pandora and other services need access to a sufficient number of quality comedy recordings in order to offer a viable comedy product, any entity that gained control over a critical mass of such recordings would have monopoly power—the power to set prices undisciplined by competition—over Pandora and other services.  Spoken Giants, if it has not done so already, has created a dangerous probability that, unless stopped by this Court, it will do exactly this.

48.    While Spoken Giants' joint action on behalf of the otherwise competing comedians listed in the October 2020 press release necessarily constituted price

fixing as to those comedians' rights, that early portfolio may not have been of sufficient size and breadth to give Spoken Giants monopoly power in the market for the rights to the comedy routines embodied in comedy recordings.  But if it did not already have monopoly power at that time, it was well on its way to obtaining that monopoly power.

49.   As Spoken Giants warned in that October 2020 press release, it was already "scaling up dramatically."  And by April 2021, Spoken Giants was emailing Pandora explaining that it had already assembled a catalog "of more than 30,000 unique works by members who are household names, such as (the estates of) Don Rickles, Bob Hope, Lucille Ball and Desi Arnaz, along with currently performing comedians Kathleen Madigan, Lewis Black, Larry the Cable Guy, and Mike Birbiglia, among others."  And in a press releases issued on May 31, 2021, Spoken Giants announced that it had also added the "iconic comedic talent" Gabriel Iglesias.

50.   Later, in November 2021, Spoken Giants "announced new signings including Tom Segura, Tiffany Haddish, Jeff Foxworthy, Patton Oswalt, Bob Newhart, Jo Koy, Roy Wood, Jr., Christopher Titus, Lisa Lampanelli and Paula Poundstone.  With Robert Dubac, Ian Bagg, John Heffron, Maz Jobrani, Alycia Cooper as well as the estates of Tim Wilson and John Pinette also on board," Spoken Giants asserted that by that time it "represent[ed] a significant percentage of the comedy market."  In that same announcement, Jim King, the CEO and co-founder of Spoken Giants, stated that Spoken Giants is "fortunate to represent comedy's most iconic estates, marquee names, and emerging talent," affording it "collective bargaining power."

51.   These new additions to Spoken Giants' portfolio showed that it was serious about obtaining monopoly power and forming a cartel that Pandora and other streaming services could not ignore.  As the above-noted press releases and other public statements from Spoken Giants demonstrate, Spoken Giants' clear intent, and one that was expressed directly to comedians in an effort to bring them into the fold,

is to consolidate the works of a critical mass of comedians into a single blanket license so that it would have "collective bargaining power" to force a change to how comedy rights had been licensed for decades and secure supra-competitive royalties for its affiliated comedians, of which Spoken Giants takes a substantial cut.  As explained above, this "collective bargaining power" only comes about by eliminating all competition between individual rightsholders.

52.    While Spoken Giants does not make a complete list of its affiliated comedians or the works it purports to represent publicly available, and demands that potential licensees sign a non-disclosure agreement before it will provide them with such a list, the above-noted press releases and other material contained on its website as well as other public statements made by Spoken Giants make clear that the Spoken Giants cartel continues to grow, and currently "has hundreds of members signed to multi-year agreements," including many of the most streamed comedians on Pandora.

53.    By taking control of the rights of all of these comedians, and continuing to aggressively recruit additional cartel members so as to "scal[e] up dramatically," Spoken Giants has already made its portfolio a true "must-have" for a service like Pandora (and, if not yet, has come dangerously close to doing so). With its "must-have" status, no streaming service will be able to avoid taking a license from it for the entire Spoken Giants portfolio, on Spoken Giants' terms, if it wishes to continue offering a viable comedy product, should historic custom and practice be upended. Spoken Giants and its co-conspirator comedians have agreed to give, and in doing so have created at the very least a dangerous probability of giving, Spoken Giants monopoly power over services that have comedy offerings.

54.    Obtaining and exerting monopoly power is Spoken Giants' business plan.  Not only do its public statements trumpet its huge portfolio of comedians, including "comedy's most iconic estates, marquee names, and emerging talent," but it repeatedly compares itself to ASCAP and BMI, explaining that it is embracing the

business model of the musical works PROs and bringing that model to the licensing of jokes embodied in comedy recordings.  Spoken Giants transparently seeks to position itself as the go-to source for licenses under this newly-asserted right.  When co-conspirator comedians sign on with Spoken Giants, they are buying into that business plan, engaging in horizontal price fixing, and agreeing to help make Spoken Giants a monopolist.

55.     To be sure, the fact that Word Collections—another joke-licensing cartel—exists does not in any way undermine the monopoly power that Spoken Giants has amassed, or has come dangerously close to amassing, for itself.  Pandora must have access to at least a portion of the catalogs of both cartels if it is to offer a viable comedy service.  In this sense, Spoken Giants and Word Collections indeed are very much like ASCAP and BMI—the musical works PROs that they model themselves after.  It has long been recognized by the Department of Justice and the courts that oversee the ASCAP and BMI antitrust consent decrees that licenses from both ASCAP and BMI are "must have" to music streaming services, giving both of these PROs monopoly power—power that is tempered only by their consent decrees, not by competition between them.

### D.     Spoken Giants Uses a Blanket License to Cement and Exploit Its Intended Monopoly Power

56.     There can be no doubt that the very purpose of the Spoken Giants cartel is to fix prices and create and exploit monopoly power.  As Spoken Giants' website, marketing materials, and public statements assure comedians, Spoken Giants is a collective intent on following the established collective licensing practices of ASCAP and BMI, and through this collective licensing, it will "strengthen the marketplace in favor of the creator."  To do so, Spoken Giants offers its entire repertoire only in a single package: an "all-or-nothing" blanket license.  In a world in which historic custom and practice has been upended, the only license that is realistically available to services for the rights of a comedian that joins the Spoken

Giants cartel is one that includes not just that comedian's works, but the works of all of Spoken Giants' co-conspirator "clients," whether or not the service has any use for them.  As noted above, this price-fixed "all-or-nothing" blanket license is the very license type that Spoken Giants has insisted that Pandora and, on information and belief, other services must take from it.

57.    This blanket license serves several purposes for Spoken Giants.  First, it disguises its price-fixing agreement with its co-conspirator comedians: instead of a catalogue of licenses for individual comedians' works whose uniform prices would make the price-fixing agreement obvious to the most unsuspecting licensee, Spoken Giants is able to slap a single price onto the consolidated blanket license and pretend that it is putting together a new product of its own, rather than throttling competition among competing products.  But unlike combinations of complementary resources, which can create new value for users, the Spoken Giants blanket license does nothing but consolidate competitors and fix their prices.  This blanket license is no more a new product than is the output of any other cartel.

58.    Second, as noted above, by agglomerating the rights of all of its comedians, the all-or-nothing blanket license eliminates any economic incentive for Spoken Giants' comedians and Pandora to negotiate independent licenses outside of the cartel.  If a service such as Pandora is forced to take a blanket license for the rights to the works of all Spoken Giants' comedians, it will have no economic incentive to negotiate a separate, more competitive individual license with any of those comedians, as doing so will only result in Pandora paying multiple times for the same rights.

59.    Third, the blanket license enables Spoken Giants to further harm services through tying.  Having acquired, at the very least, market power through its consolidation of rights to comedy routines embodied in desired comedy recordings, Spoken Giants ties that critical mass to its other, less desirable material, and forces services to take the entire package, even if they have no need for this additional

material.  As a result of this tie, services like Pandora will end up paying more for the license than they would for one that just covers the desired material because they must pay for streams of the additional material at the price driven by the desired material, not the price they would pay for the less desirable material offered alone. Pandora and other services would accept this tie only because, without it, Spoken Giants will not give them a license to the rights that they do need, and Spoken Giants' licensing tactics ensure that any efforts to secure the rights the licensees need directly from the individual comedians will only result in the licensee paying multiple times for the same rights.  Again, Spoken Giants and its comedians have agreed to this scheme that unites them all collectively against Pandora and other services, and forces the services to pay substantially more for their rights than they would in a competitive market.

60.    There is no valid efficiency justification for Spoken Giants' insistence on an all-or-nothing blanket license.  As explained above, streaming services like Pandora need access to the recordings of only a relatively modest number of comedians in order to offer a viable comedy product.  They have no need for a blanket license to help them get access to the recordings they need, to protect themselves against inadvertent infringement liability, or to help keep their portfolios current.  The relatively small number of users of the rights to comedy performances makes monitoring by rights owners relatively easy.  And any efficiencies that could come from joint license administration and monitoring could easily be accomplished without also consolidating all licensing power and pricing decisions into Spoken Giants' hands.  Indeed, the current and historical practice of bundling these rights within the sound recording licenses already creates substantial transactional efficiencies for all involved—efficiencies that would be lost if Spoken Giants and its co-conspirator "clients" are successful in upending historic practice.  Moreover, whatever administrative savings Spoken Giants enjoys from its blanket licensing exist only because it has consolidated its monopoly portfolio in the first place.  And

1   those savings do not offset the monopoly profits Spoken Giants collects as a result of

2   having built its monopoly and setting a fixed monopoly price for its portfolio.

3         **E.    Harm to Competition and to Pandora**

4         61.    If Counterdefendants and the other co-conspirator "clients" of Spoken

5   Giants had not agreed to fix the price at which Spoken Giants would grant licenses

6   to their purported "literary works" rights, Pandora and other services would be able

7   to obtain the rights to the comedy routines embodied in comedy recordings that

8   Pandora and other services wished to perform, distribute, or reproduce at

9   competitive, and substantially lower, rates set by competition among the owners of

10  the rights.  That competition in fact resulted in the historic custom and practice that

11  worked well for all involved.  As noted above, for many decades before Spoken

12  Giants (and Word Collections) were created, comedians chose to license any

13  necessary rights to use comedy recordings through a single license.  The owner or

14  distributor of the comedy recording typically obtained all necessary rights from the

15  comedian and passed those on to the service, either explicitly or implicitly.  And the

16  royalty paid for the use of the recording was all that comedians ever sought.  They

17  never before sought to bifurcate the licensing requirement into two (one license just

18  for the recording and a separate license just for the underlying jokes embodied in the

19  recording) and they never sought to tack on an additional royalty on top of what was

20  already being paid for the use of the comedy recording.  Comedians instead chose

21  unilaterally not to separately assert any purported "literary works" rights in favor of

22  reaping the benefits they gained from the services playing their recordings.  Now,

23  however, through Counterdefendants' price-fixing scheme, Spoken Giants seeks to

24  raise the price for the rights it has consolidated from their longstanding competitive

25  equilibrium level to a price substantially above that level.  Spoken Giants' aim is to

26  upend long-standing custom and practice and require Pandora and other services to

27  secure, instead of a single license, two separate licenses—one for the comedy

28  recording and a separate license for the underlying jokes embodied in the recording—

and to impose a substantial additional royalty for the rights to the jokes on top of what is already being paid. Spoken Giants is not suggesting that the royalty paid for the recording should be reduced to offset any additional royalty for the underlying jokes. It only wants to add a substantial additional royalty obligation to force Pandora and other services to pay far more than they historically have, just so that Pandora and other services can do exactly the same thing they always have—provide consumers with a compelling comedy offering to the benefit of the comedians.

62.    Moreover, because the author of the underlying jokes and the recording artist are, in the case of comedy, typically the same person, there is no rational reason for having separate licenses for the recordings and the underlying jokes, except to create additional hold-up power by any licensor that has amassed market power over such rights. Under a regime in which separate licenses are required, each license is useless to a service like Pandora without the other—even with the sound recording license in hand, Spoken Giants' contention is that Pandora cannot legally play the recordings without a separate license covering just the underlying jokes. This need to secure multiple licenses before a comedy recording can be performed does not exist in the current licensing regime, in which a single license covers all of the necessary rights. But by forcing a change to historic licensing practice, and by collectively licensing the purported "literary works" rights of a critical mass of comedians, Spoken Giants is creating for itself hold-up power over services like Pandora. Under such a licensing regime, even though services like Pandora have already secured and paid for the necessary rights to exploit the comedy recordings, they cannot do so until they secure a separate license for the jokes from Spoken Giants on terms dictated by Spoken Giants.

63.    Similarly, if Counterdefendants and other co-conspirator "clients" of Spoken Giants had not agreed that Spoken Giants would offer only a blanket license to all of the "literary works" rights they purport to control, Pandora and other streaming services would license only the rights of the comedians whose works they

wished to stream, and even then would license the rights only to the particular works of those comedians they wanted to include in their offerings.   Instead, if Counterdefendants' tying scheme succeeds, Pandora and other services will be forced to pay Spoken Giants for the rights to the works of comedians they do not need to use, and might not seek to obtain in a competitive market, at a total price substantially greater than they would pay in a competitive market for the rights they actually require.

## VI.   THE RELEVANT PRODUCT AND GEOGRAPHIC MARKETS

64.   The relevant product market in which to assess the anticompetitive effect of Counterdefendants' conduct is the U.S. market for the rights to comedy routines embodied in comedy recordings—the market that Spoken Giants acknowledges it has a "significant percentage" of.

65.   The relevant product market does not include all written comedy routines.   The only written comedic works to which Pandora would ever need a license are ones that have been recorded and for which the recording is available to Pandora for streaming.

66.   Because consumer demand for streaming of comedy recordings is specific to recorded comedy, rights for other types of written works, even ones embodied in recorded performances of some kind, are not a substitute for the rights to the comedy routines embodied in comedy recordings.

67.   Pandora's customers, and those of other services, whose demand ultimately determines the content that the services provide in competition with each other, have a pronounced demand for comedy recordings.   If comedy recordings became unavailable, or if a service was somehow able to pass along increased comedy-rights costs to comedy listeners, those listeners would not readily shift to other types of streamed content.

68.   Because it must respond to listener demand in a competitive market, Pandora would not and could not respond to a sustained price increase for the rights

to comedy routines embodied in comedy recordings by shifting its programming towards other recorded spoken word content, such as famous speeches or poetry. Similarly, Pandora would not and could not shift its programming further towards music in response to a sustained price increase for the rights to comedy routines embodied in comedy recordings; comedy programming answers consumer demand that is different from consumer demand for music programming.

69. As explained above, a person or entity that, like Spoken Giants, gained control over the rights to a critical mass of comedy routines embodied in comedy recordings would be able to impose a substantial price increase over competitive levels without seeing shifts by Pandora and other services to other products.

70. Spoken Giants' co-conspirator comedians, including Counterdefendant Black, are competitors in the relevant market. But for their agreements with Spoken Giants, they would be competing against each other to persuade Pandora and other services to include their comedy in the service offerings. That competition would manifest itself in license royalties at competitive levels, reflecting the ability of services like Pandora to pick and choose among individual comedians and individual comedy recordings, knowing that they need only a critical mass of content to offer listeners, and not access to all comedy recordings.

71. The relevant geographic market is the United States. The rights Counterdefendants are asserting against Pandora are based on federal copyright law, and, to the extent they exist, are exercisable and enforceable nationwide. Counterdefendants have not attempted to license on different terms in different geographic areas within the United States, and Pandora operates throughout the United States.

## VII.   ANTICOMPETIVE EFFECTS OF COUNTERDEFENDANTS' CONDUCT

### A.   Harm to Competition in the Relevant Market

72. Spoken Giants' scheme of consolidating the rights to comedy routines

embodied in comedy recordings, fixing prices for them, and exclusively licensing them through its blanket license has already throttled competition among the comedians that have joined Spoken Giants, including Counterdefendant Black.

73.     Spoken Giants' website, publicly available marketing materials, and other public statements all make clear that the competition that would and easily could exist in the Relevant Market among its co-conspirator "clients" and other comedians will not happen.  Spoken Giants' mission, adopted by Counterdefendant Black and Spoken Giants' other co-conspirator comedians, is to force Pandora and other services to take and pay for its entire portfolio—at a price that it alone will set—or to get none of it, and have no choice but to drop its comedy offering entirely.

74.     The likely results of this anticompetitive scheme will be not only higher prices but a reduced supply of comedy programming by services than would be available if the market for comedy rights were competitive.  The higher prices will also affect Pandora's and other services' overall efficiency and competitiveness, possibly even leading to decisions to abandon comedy services; in any case, the actions of Spoken Giants will lead to overall higher consumer prices and/or less output, and to less consumer satisfaction than would exist if Counterdefendants had not eliminated competition in the Relevant Market.

### B.     Harm to Pandora

75.     Pandora has already borne the brunt of Counterdefendants' scheme. Despite the publicity surrounding this new effort spearheaded by Spoken Giants (and Word Collections) to force Pandora and other services to take a second license just covering the comedy routines embodied in the recordings that they already license, and the substantial resources available to any number of the comedians that have joined the Spoken Giants cartel, including Counterdefendant Black, no individual comedian member of Spoken Giants has approached Pandora about the possibility of a license for that comedian's works.  In contrast, dozens of comedians and comedy labels have recently come forward and reaffirmed historic custom and practice; they

have explicitly agreed that Pandora has always had all of the rights it needs to perform, reproduce and distribute their comedy on its services, and confirmed that no additional royalties beyond those already paid for the recordings are called for.

76.   Spoken Giants, on the other hand, has approached Pandora repeatedly on behalf of its consolidated portfolio of comedians insisting that substantial additional royalties must be paid and that Pandora must take its price-fixed "all-or-nothing" blanket license.  As a result, it has given Pandora the Hobson's Choice between this price-fixed and economically unviable bundle—its blanket license—and litigation.  Because Pandora could not accept the former, Spoken Giants, through Counterdefendant Black, has imposed the latter onto it in the form of Counterdefendant Black's infringement suit (and the specter of more infringement suits to come).

77.   The costs of defending against the infringement litigation is itself a substantial burden for Pandora's business, making it less efficient and competitive than it otherwise would be.  And Pandora's business has been further burdened by having to remove the comedy recordings of Counterdefendant Black and other members of the Spoken Giants cartel from its comedy offering, thereby degrading its product.

78.   If Counterdefendants prevailed in carrying out their scheme, Pandora would be even more badly harmed.  Pandora would be forced to pay an ongoing stream of supra-competitive royalties for access to a critical mass of recordings that it must have if it is to provide comedy to its listeners at all or abandon its comedy offering altogether.  If it chooses the former, the increased prices will harm Pandora's cost-competitiveness, unreasonably limit the return on its investment in its comedy offering, and sap resources that otherwise might have been used to improve Pandora's products to the benefit of consumers.  And if it chooses the latter, there will be a substantial reduction in output in the form of the elimination of Pandora's comedy offering altogether, harming Pandora, comedians, and consumers alike.

1

**COUNT I**

2

**(Sherman Act § 1 – Price Fixing (against all Counterdefendants))**

3      79.     Pandora re-alleges and incorporates by reference the preceding

4  paragraphs of these Counterclaims as though fully set forth herein.

5      80.     Counterdefendants and other members of the Spoken Giants cartel

6  agreed among themselves and through a series of affiliation agreements between

7  Spoken Giants, on the one hand, and Counterdefendant Black and other comedians

8  affiliated with Spoken Giants, on the other, to fix the price at which all of the

9  purported "literary works" rights held by Spoken Giants and its affiliates would be

10 licensed.

11     81.     Counterdefendants' conspiracy to fix prices has been carried out

12 through Spoken Giants' efforts to license the purported "literary works" rights of its

13 co-conspirator comedians, including Counterdefendant Black, exclusively through a

14 blanket license for all of the rights Spoken Giants has consolidated, at a fixed price

15 set pursuant to the agreements with and among Counterdefendants and other Spoken

16 Giants cartel members.

17     82.     By eliminating the direct price competition that otherwise would have

18 existed among Counterdefendant Black and other Spoken Giants cartel members in

19 the Relevant Market, the alleged conspiracy directly has harmed, and threatens to

20 further harm, competition in the Relevant Market in the course of interstate

21 commerce, and has harmed Pandora, by: (a) increasing Pandora's costs in operating

22 its comedy offering; and (b) impairing Pandora's ability to present high-quality

23 comedy offerings in response to consumer demand.

24     83.     Counterdefendants' conspiracy to fix prices is a *per se* violation of

25 Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.    Alternatively,

26 Counterdefendants' conduct also violates Section 1 of the Sherman Antitrust Act

27 under the rule of reason, in that the blatant harm to competition and Pandora and

28 other services caused directly and proximately by the Counterdefendants' agreement

- 32 -

1   to place pricing decisions for their previously competing rights into the hands of
2   Spoken Giants vastly outweighs any conceivable procompetitive benefit created by
3   the agreement.

4       84.    Such injury to Pandora flows directly from that which makes
5   Counterdefendants' acts unlawful.

6       85.    Pandora seeks money damages from Counterdefendants' violation of
7   Section 1 of the Sherman Antitrust Act and injunctive relief against continued and
8   further violations.

9                                **COUNT II**

10      **(Sherman Act § 1 – Tying (against all Counterdefendants))**

11      86.    Pandora re-alleges and incorporates by reference the preceding
12  paragraphs of these Counterclaims as though fully set forth herein.

13      87.    Counterdefendants and other members of the Spoken Giants cartel
14  agreed among themselves that Spoken Giants would license the purported "literary
15  works" rights that they owned to Pandora and other services exclusively through a
16  blanket license, by which Spoken Giants would use the market power it had
17  accumulated through its aggregation of the works of a critical mass of co-conspirator
18  comedians to force Pandora and other services to agree to take a license for Spoken
19  Giants' entire portfolio of rights, and pay Spoken Giants more for that license than
20  such services would have paid Spoken Giants or the rights owners directly in total
21  for the licenses that Pandora and other services want in a competitive market.

22      88.    The conspiracy to tie the rights to the various desirable comedy routines
23  embodied in comedy recordings that created Spoken Giants' market power to the
24  other, less desirable, rights in Spoken Giants' portfolio, including those to comedy
25  routines that Pandora does not need, has harmed, and threatens to further harm,
26  competition in the Relevant Market in interstate commerce by increasing prices,
27  foreclosing competition, and reducing consumer choice for licenses to "literary
28  works" rights, and has harmed and threatens to further harm Pandora by: (a)

- 33 -

increasing Pandora's costs in operating its comedy offerings; (b) impairing Pandora's ability to present high-quality comedy offerings in response to consumer demand; and (c) foreclosing licensing to streaming services by the actual owners of the rights to comedy routines embodied in comedy recordings, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

89.   Such injury to Pandora flows directly from that which makes Counterdefendants' acts unlawful.

90.   Pandora seeks money damages from Counterdefendants' violation of Section 1 of the Sherman Antitrust Act and injunctive relief against continued and further violations.

## COUNT III

### (Sherman Act § 2 – Attempted Monopolization and Monopolization (against all Counterdefendants))

91.   Pandora re-alleges and incorporates by reference the preceding paragraphs of these Counterclaims as though fully set forth herein.

92.   Counterdefendants have, through a series of agreements among themselves and with other co-conspirator "clients" of Spoken Giants, accumulated and consolidated control within Spoken Giants over the licensing of a critical mass of rights to comedy routines embodied in comedy recordings such that they have achieved monopoly power, or, in the alternative, pose a dangerous probability of achieving monopoly power, in the Relevant Market.

93.   Counterdefendants' intent in entering into these agreements among themselves and with other co-conspirator "clients" of Spoken Giants was specifically to achieve monopoly power in the Relevant Market, which none of them could have achieved through competition on the merits, and thereby control the prices at which their respective rights were made available to Pandora and other services— exclusively through the mandatory blanket license for Spoken Giants' entire portfolio, unconstrained by competition from owners of the rights to comedy routines

1    embodied in comedy recordings.

2         94.    By obtaining, or creating a dangerous probability of obtaining,

3    monopoly power—specifically, the ability to control prices free from competitive

4    discipline—in the Relevant Market, Counterdefendants have directly and

5    proximately harmed competition in the Relevant Market, and threaten directly and

6    proximately to further harm, competition in the Relevant Market in the course of

7    interstate commerce, and have directly and proximately harmed, and threaten directly

8    and proximately to further harm, Pandora by: (a) depriving Pandora of the ability to

9    benefit from competition in the Relevant Market between Counterdefendants and

10   other owners of the rights to jokes embodied in comedy recordings; (b) increasing

11   Pandora's costs in operating its comedy offerings; and (c) impairing Pandora's ability

12   to present high-quality comedy programming in response to consumer demand, in

13   violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

14        95.    Such injury to Pandora flows directly from that which makes

15   Counterdefendants' acts unlawful.

16        96.    Pandora seeks money damages from Counterdefendants' violation of

17   Section 2 of the Sherman Antitrust Act and injunctive relief against continued and

18   further violations.

19                            **COUNT IV**

20        **(Sherman Act § 2 – Conspiracy to Monopolize (against all**

21                         **Counterdefendants))**

22        97.    Pandora re-alleges and incorporates by reference the preceding

23   paragraphs of these Counterclaims as though fully set forth herein.

24        98.    Counterdefendants and other Spoken Giants cartel members have

25   conspired to monopolize the Relevant Market by agreeing to accumulate and

26   consolidate control within Spoken Giants over the licensing of the rights to a

27   sufficient number of comedy routines embodied in comedy recordings that they

28   would achieve monopoly power in the Relevant Market.

99.    In furtherance of this conspiracy, Counterdefendants have undertaken specific acts, including: (a) entering into affiliation agreements between Spoken Giants and its co-conspirator comedian "clients," including Counterdefendant Black, with the knowledge and intent that all other cartel members would enter into similar agreements allowing all of their respective previously competing rights to be licensed collectively by Spoken Giants in one blanket license; (b) effectively agreeing not to license their rights other than through Spoken Giants; (c) refraining from licensing their rights other than through Spoken Giants; and (d) initiating a copyright infringement action against Pandora in response to Pandora's refusal to submit to Spoken Giants' blanket-license demand.

100.    Counterdefendants' and Spoken Giants' other co-conspirator comedian "clients'" specific intent in entering into this conspiracy to monopolize was to achieve monopoly power in the Relevant Market, which none of them could have achieved through competition on the merits, and thereby control the prices at which their respective rights were made available to Pandora and other services—exclusively through the mandatory blanket license for Spoken Giants' entire portfolio, unconstrained by competition from owners of the rights to comedy routines embodied in other recorded comedy routines.

101.    Through their conspiracy to monopolize the Relevant Market, Counterdefendants have directly and proximately harmed competition in the Relevant Market, and threaten directly and proximately to further harm competition in the Relevant Market in the course of interstate commerce, and have directly and proximately harmed, and threaten directly and proximately to further harm, Pandora by: (a) depriving Pandora of the ability to benefit from competition in the Relevant Market between Counterdefendants and other owners of the rights to comedy routines embodied in comedy recordings; (b) increasing Pandora's costs in operating its comedy offerings; and (c) impairing Pandora's ability to present high-quality comedy programming in response to consumer demand, in violation of Section 2 of

- 36 -

the Sherman Antitrust Act, 15 U.S.C. § 2.

102. Such injury to Pandora flows directly from that which makes Counterdefendants' acts unlawful.

103. Pandora seeks money damages from Counterdefendants' violation of Section 2 of the Sherman Antitrust Act and injunctive relief against continued and further violations.

## PRAYER FOR RELIEF

WHEREFORE, Pandora respectfully prays for judgment in its favor on each of the foregoing claims and for the following relief against Counterdefendants:

a)  An injunction prohibiting any one or more Counterdefendants, and those acting in concert with them, from agreeing, directly or indirectly, with each other as to the assertion or non-assertion of any literary works or other rights any of them controls, or the terms on which any one or more of them will license such rights;

b)  An injunction prohibiting Spoken Giants' use of a blanket license, or any other method by which it bundles literary works or other rights, and requiring that Spoken Giants offer separate, economically viable and individually priced licenses to the rights of each of its "clients";

c)  An injunction prohibiting Counterdefendants and all other members of the Spoken Giants cartel from instituting, or threatening to institute, copyright infringement actions directed against the use by Pandora of copyrighted works in the Spoken Giants catalog until such time as the effects of the anticompetitive conduct described herein have dissipated;

d)  An order declaring unenforceable the copyrights in the Spoken Giants catalog as a result of the misuse of those copyrights for anticompetitive and unlawful purposes, the adverse effects of such misuse are continuing, until such time as adequate relief is entered to remedy the violations alleged herein, and the effects of the violations have

- 37 -

1   dissipated;

2       e)   An award to Pandora of three times any damages suffered as a result of

3           the above-described anticompetitive conduct, as well as reasonable

4           attorneys' fees; and

5       f)   Any other relief the Court deems appropriate.

6                              **DEMAND FOR JURY TRIAL**

7       Pandora hereby demands a trial by jury on all issues so triable.

8

9   Dated: September 26, 2022          MAYER BROWN LLP
                                       PAUL M. FAKLER
10                                     JACOB B. EBIN
                                       ALLISON AVIKI
11                                     WILLIAM H. STALLINGS
                                       CHRISTOPHER J. KELLY
12                                     JOHN NADOLENCO
                                       DANIEL D. QUEEN
13                                     MEERIM NEHME

14

15                                     By: */s/ Paul M. Fakler*
                                           Paul M. Fakler
16

17                                     MAYER BROWN LLP
                                       WILLIAM H. STALLINGS (*pro hac*
18                                     *vice*)
                                       *wstallings@mayerbrown.com*
19                                     1999 K Street, NW
                                       Washington, D.C.  20006-1101
20                                     Telephone: (202) 263-3000
                                       Facsimile: (202) 262-3300
21
                                       MAYER BROWN LLP
22                                     CHRISTOPHER J. KELLY (SBN
                                       276312)
23                                     *cjkelly@mayerbrown.com*
                                       Two Palo Alto Square
24                                     3000 El Camino Real
                                       Palo Alto, California  94306-2112
25                                     Telephone: (650) 331-2000
                                       Facsimile: (650) 331-2060
26
                                       Attorneys for Defendant
27                                     PANDORA MEDIA, LLC

28

                                       - 38 -