UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE PANDORA MEDIA, LLC COPYRIGHT LITIGATION | Case No. 2:22-cv-00809-MCS-MAR |
| | **ORDER RE: MOTION TO DISMISS (ECF NO. 49)** |

Counterclaim Defendant Word Collections, Inc. moved to dismiss Counterclaimant Pandora Media, LLC's counterclaim. (Mot., ECF No. 49.) Counterclaim Defendants Brave Lion, Inc., Nick Di Paolo, Mary Reese Hicks, Main Sequence, LTD, Robin Williams Trust, Ron White, Inc., and Yellow Rose Productions, Inc. (hereinafter "Comedians") joined the motion. (Joinder, ECF No. 50.) Pandora opposed the motion, (Opp'n, ECF No. 54), and Counterclaim Defendants replied, (Reply, ECF No. 60; Reply Joinder, ECF No. 59). The Court heard argument on the motion on August 29, 2022. (Mins., ECF No. 63.)

I.     BACKGROUND

This litigation involves several comedians bringing claims for copyright infringement against Pandora. The Comedians claim that while Pandora has paid

1

royalties for the copyrights on their recorded performances, Pandora has failed to pay royalties for the copyrights on their underlying written works (i.e., their jokes).[1] (*See generally* 2d Am. Consol. Compl., ECF No. 70.) Pandora brought an antitrust counterclaim against the Comedians and Word Collections, the Comedians' licensing agent. (Countercl., ECF No. 34.)

As described in the counterclaim, Pandora and other streaming services "have enabled their listeners and subscribers to listen to recordings of comedians' performances" for years. (*Id.* ¶ 2.) Pandora assumes arguendo that the copyrights the Comedians hold in their performances and underlying written works are valid. (*Id.* ¶ 6.) Comedy only accounts for about one percent of all streams on Pandora's services, "and only a handful of comedians account for any significant number of streams across Pandora's services." (*Id.* ¶ 31.) Pandora's competitors in the area of comedy streaming include YouTube, Spotify, Netflix, and HBO. (*Id.* ¶ 33.) Pandora "can provide a viable comedy product with a relatively modest number of comedy recordings." (*Id.* ¶ 34.) Put differently, Pandora alleges it only needs a "critical mass" of comedy recordings to have a viable comedy streaming service. (*Id.* ¶ 44(b).) If Pandora cannot secure rights to a critical mass of comedy recordings or can no longer license rights to a critical mass of comedy recordings at reasonable rates, Pandora would be unable to offer a viable comedy streaming product. (*Id.* ¶ 39.)

Comparatively, the comedy market is small, with fewer copyright owners than the thousands in the music industry. (*Id.* ¶ 44(a).) In light of this smaller size, Pandora alleges that separate licensing is efficient and that blanket licensing for comedy recordings lacks any procompetitive justification. (*Id.* ¶¶ 46–48.) Word Collections

---

[1] Similar to recorded music, a performance of a comedic routine and the underlying routine itself are two distinct works under the Copyright Act. *See, e.g.*, U.S. Copyright Off., *Circular 56A: Copyright Registration of Musical Compositions and Sound Recordings*, United States Copyright Office (rev. Mar. 2021), https://www.copyright.gov/circs/circ56a.pdf.

allegedly engages in blanket licensing. Word Collections represents over 1,300 literary works. (*Id.* ¶ 50.) Word Collections requires exclusive affiliation agreements from authors so that Word Collections can set a single price for all the assets in its portfolio. (*Id.* ¶ 51.)

Pandora alleges that these exclusive affiliation agreements amount to a conspiracy, whereby Word Collections and the Comedians have agreed not to license "independently outside of the cartel." (*Id.* ¶ 54.) Word Collections represents many different comedians, (*id.* ¶¶ 57–59), making the Word Collections portfolio "dangerously close" to a must-have if a service wants to offer comedy streaming. (*Id.* ¶ 60). Pandora alleges that this demonstrates Word Collections' monopoly power and permits Word Collections to make itself the go-to entity for comedy performances. (*Id.* ¶¶ 60–65.)

Pandora further alleges that Word Collections is requiring the licensing of additional undesirable works[2] as part of its portfolio, resulting in a higher licensing fee. (*Id.* ¶ 66.) Pandora alleges there is no valid purpose to this product grouping. (*Id.* ¶¶ 67–69.)

Pandora defines its relevant product market as "the U.S. market for the rights to comedy routines embodied in comedy recordings." (*Id.* ¶ 71.) Pandora only includes written comedic works "that have been recorded and for which the recording is available to Pandora for streaming." (*Id.* ¶ 72.) "[O]ther types of written works, even ones embodied in recorded performances of some kind, are not a substitute for the rights to comedy routines embodied in comedy recordings" "[b]ecause consumer demand for streaming of comedy recordings is specific to recorded comedy." (*Id.* ¶ 73.) Customers would not readily shift to other kinds of streamed content, like music or non-comedic

---

[2] While Pandora is unclear on this point, the Court surmises that "undesirable" refers to bad comedians or bad jokes. (E.g., What's the difference between a Federal Judge and God? God doesn't think he's a Federal Judge.)

spoken word, if Pandora stopped offering comedy or increased prices on its comedic offerings. (*Id.* ¶¶ 74–75.)

Pandora alleges that Word Collections' licensing scheme has already throttled competition and will lead to either higher prices or a reduction in supply. (*Id.* ¶¶ 79–82.) Pandora claims it has suffered harm by being forced to either pay supracompetitive royalties or stop offering comedic recordings. (*Id.* ¶ 83.) Pandora also claims it has suffered harm from the costs of defending against copyright lawsuits as part of the Comedians' litigation campaign. (*Id.*)

Pandora brings four claims under the Sherman Act: (i) a claim that Counterclaim Defendants conspired to fix prices, (*id.* ¶¶ 84–90); (ii) a claim that Counterclaim Defendants improperly tied the Comedians' works to Word Collections' entire literary portfolio, (*id.* ¶¶ 91–95); (iii) a claim that Counterclaim Defendants obtained or created a dangerous probability of monopoly power, (*id.* ¶¶ 96–101); and (iv) a claim that Counterclaim Defendants conspired to monopolize the relevant market, (*id.* ¶¶ 102–08.) Pandora requests several forms of relief, including injunctive relief, an order declaring the copyrights licensed by Word Collections unenforceable, damages, and attorneys' fees. Relevant here, Pandora requests an injunction "prohibiting Counterdefendants and all other members of the Word Collections cartel from instituting, or threatening to institute, copyright infringement actions directed against the use by Pandora of copyrighted works licensed by Word Collections until such time as the effects of the anticompetitive conduct described herein have dissipated." (*Id.*, Prayer for Relief.)

## II.  LEGAL STANDARDS

### A.  Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) authorizes a party to seek dismissal of an action for lack of subject-matter jurisdiction. "Because standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a Rule 12(b)(1) motion to dismiss." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). In the context of a 12(b)(1) motion, the plaintiff bears the burden of

1 establishing Article III standing to assert the claims. *Id.*

2 Rule 12(b)(1) jurisdictional challenges can be either facial or factual. *Safe Air for*

3 *Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). When a motion to dismiss

4 attacks subject-matter jurisdiction on the face of the complaint, as is the case here, the

5 court assumes the factual allegations in the complaint are true and draws all reasonable

6 inferences in the plaintiff's favor. *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009).

7 Moreover, the standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544

8 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), apply with equal force to Article III

9 standing when it is being challenged on the face of the complaint. *See Terenkian v.*

10 *Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012) (applying *Iqbal*). Thus, in terms

11 of Article III standing, the complaint must allege "sufficient factual matter, accepted as

12 true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678

13 (quoting *Twombly*, 550 U.S. at 570).

14 **B.    Rule 12(b)(6)**

15 Federal Rule of Civil Procedure 12(b)(6) allows an attack on the pleadings for a

16 "failure to state a claim upon which relief can be granted." "To survive a motion to

17 dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a

18 claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*,

19 550 U.S.at 570). "A claim has facial plausibility when the plaintiff pleads factual

20 content that allows the court to draw the reasonable inference that the defendant is liable

21 for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

22 The determination of whether a complaint satisfies the plausibility standard is a

23 "context-specific task that requires the reviewing court to draw on its judicial

24 experience and common sense." *Id.* at 679. Generally, a court must accept the factual

25 allegations in the pleadings as true and view them in the light most favorable to the

26 plaintiff. *Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017); *Lee v. City of Los*

27 *Angeles*, 250 F.3d 668, 679 (9th Cir. 2001). But a court is "not bound to accept as true

28 a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting

*Twombly*, 550 U.S. at 555).

As a general rule, leave to amend a dismissed complaint should be freely granted unless it is clear the complaint could not be saved by any amendment. Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

## III. DISCUSSION

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Section 2 of the Sherman Act states that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations" violates the law. 15 U.S.C. § 2. Private parties may sue for violations of this law under the Clayton Act. 15 U.S.C. § 15(a).

Word Collections moves to dismiss Pandora's Sherman Act counterclaims on a number of grounds and requests judicial notice of several documents submitted with its motion. The Court will first address the request for judicial notice, and then the Court will address the arguments for dismissal.

### A. Requests for Judicial Notice

Word Collections asks the Court to consider five documents outside the four corners of Pandora's pleading: excerpts of Pandora's fiscal year ("FY") 2011 Annual Report (Form 10-K), excerpts of Pandora's FY 2016 Annual Report (Form 10-K), a March 11, 2021 email containing several attachments, Spoken Giants' website homepage, and a transcript of testimony before the Copyright Royalty Board. (RJN, ECF No. 49-1.) Pandora does not object to the Court's consideration of the Form 10-Ks and to one attachment to the March 11, 2021 email, a proposed license between Pandora and Word Collections, but objects to the request to judicially notice all of the other exhibits. (RJN Opp'n, ECF No. 55.) Word Collections replied in support of its

request. (RJN Reply, ECF No. 61.) The Court grants the request to consider the Form 10-Ks and the proposed license due to the lack of opposition.

"[A] court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A court also may consider documents incorporated by reference in a pleading without converting a Rule 12(b)(6) motion into a motion for summary judgment. *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003). "A court may consider evidence on which the [pleading] 'necessarily relies' if: (1) the [pleading] refers to the document; (2) the document is central to the [pleading party's] claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). "The incorporation by reference doctrine applies only when a document is central to a [pleading party's] claim and no party questions its authenticity." *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1024 (C.D. Cal. 2015) (collecting cases). A document "may be incorporated by reference . . . if the [pleading party] refers extensively to the document or the document forms the basis of the [pleading party's] claim." *Ritchie*, 342 F.3d at 908. Applying the incorporation by reference doctrine is inappropriate where a pleading refers to but does not extensively reference a document, and where a document is not integral to a claim. *See id.* ("[M]ere mention of the existence of a document is insufficient to incorporate the contents of a document by reference[.]" (citing 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1327 (2d ed. 1990))).

Word Collections first requests that the Court consider incorporated by reference an email containing as attachments a notice of potential copyright infringement, a short memorandum addressing the basis for a claim of copyright infringement, documented proof of past copyright infringement, and a proposed licensing agreement for Word Collections' literary works. (RJN 4; RJN Ex. C, ECF No. 49-5.) Word Collections

argues that considering these documents at the Rule 12(b)(6) stage is appropriate because Pandora's counterclaim references them. (RJN 4 (citing Countercl. ¶¶ 47, 63, 82); RJN Reply 3 (citing Countercl. ¶ 26).) Paragraphs 47 and 63 reference the license attached to the email, paragraph 26 references "communications with Pandora employees" to establish personal jurisdiction in this district, and paragraph 82 references Word Collections' communication with Pandora regarding the proposed license. As Pandora concedes, the references to the proposed license are sufficient to incorporate the license by reference. The cited paragraphs, however, do not establish the propriety of incorporation by reference of the email and the other attachments. Accordingly, the Court denies the request to deem these materials incorporated by reference.

Word Collections also asks the Court to judicially notice the homepage of Spoken Giants, a "global rights administration company for the owners and creators of Spoken Word copyrights." (RJN Ex. D, ECF No. 49-6; *see* RJN 5.) The Court rejects this request because "private corporate websites, particularly when describing their own businesses, generally are not the sorts of sources whose accuracy cannot reasonably be questioned." *Spy Optic, Inc. v. Alibaba.com, Inc.*, 163 F. Supp. 3d 755, 763 (C.D. Cal. 2015) (quoting *Victaulic Co. Tieman*, 499 F.3d 227, 237 (3d Cir. 2007)).

Finally, Word Collections asks the Court to judicially notice the testimony of Pandora employee Michael Herring before the Copyright Royalty Board. (RJN 5.) "As a general rule, a court may not take judicial notice of proceedings or records in another cause so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it." *M/V Am. Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983). Thus, while the Court may take judicial notice of the existence of Herring's testimony, *see Diaz v. Carlson*, 5 F. Supp. 2d 809, 814 n.4 (C.D. Cal. 1997) (taking judicial notice of the transcript of administrative hearing testimony), the Court does not "accept as true the facts found or alleged" in Herring's statements, *GemCap Lending, LLC v. Quarles & Brady, LLP*, 269 F. Supp.

3d 1007, 1019 (C.D. Cal. 2017) (internal quotation marks omitted), *aff'd*, 787 F. App'x 369 (9th Cir. 2019).

### B.    Article III Standing

Word Collections argues Pandora has no Article III standing to pursue its counterclaim because Pandora's allegations of supracompetitive prices and litigation costs are not cognizable harms. (Mot. 8–13.)

To demonstrate Article III standing, a party must demonstrate it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that it is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To meet the injury-in-fact requirement, the alleged injury must be "concrete and particularized" as well as "actual or imminent, not conjectural or hypothetical." *Friends of Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). In an antitrust case, Article III injury-in-fact is "an injury which bears causal connection to the alleged antitrust violation." *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1255 (9th Cir. 2008) (quoting *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir 1996)).

Word Collections argues that its alleged supracompetitive prices do not confer standing on Pandora because Pandora has not entered into a license and because Pandora cannot make the necessary allegations of future harm. Neither argument has merit. Here, Pandora alleges that before the existence of Word Collections, Pandora paid comedians for an implied license to use all necessary copyrights to stream the comedians' works.[3] When Word Collections came on the scene, it began seeking supracompetitive royalties at a rate of 25 percent of the rates defined by 37 C.F.R.

---

[3] In certain instances, "in order to permit the full enjoyment of a right expressly, granted[,] there is a necessary implication that certain collateral rights have also been granted." 3 *Nimmer on Copyright* § 10.10[C] (2022). The Court does not address at this stage whether the Comedians impliedly granted Pandora all rights necessary to fully perform their works.

§§ 380.10 and 382. (RJN Ex. C, at 11.)[4] This rate suffices to allege a supracompetitive price because it exceeds the status quo rate from when comedians individually licensed their works and because Pandora provides plausible allegations that, but for Word Collections' conduct, this rate would not be demanded on the market. The demand of a large licensing fee confers standing in an antitrust case. *See Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 99 F. Supp. 3d 610, 629 (D. Md. 2015).

Pandora also properly alleges a likelihood of future injury necessary to confer standing. To determine whether a plaintiff properly alleges a future injury such that the injury is "certainly impending," *In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 888 F.3d 1020, 1025 (9th Cir. 2017) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)), a plaintiff must demonstrate that the theory of future injury is supported by a chain of inferences that is not speculative. *Id.* at 1026. Here, accepting the facts in the counterclaim as true, Pandora has alleged past conduct that involves Word Collections' formation and that involves Word Collections amassing works of a group of comedians under its portfolio. The single inferential step is that there is a danger Word Collections will amass a portfolio of comedians that requires Pandora either to accept supracompetitive royalty rates or to stop offering its comedy services. Pandora alleges sufficient information in the counterclaim to render this harm as certainly impending (at least under the standard articulated in *Iqbal*). Pandora thus properly alleges standing for the injury caused by supracompetitive royalties in this case. Word Collections cites *McCray v. Fidelity National Title Insurance* to the contrary. *McCrary*, however, involved plaintiffs who failed to allege future plans to purchase title insurance and alleged that title insurance rates were remarkably stable over several years. 682 F.3d 229, 243–44 (3d Cir. 2012). Here, there is nothing speculative about Word Collections' alleged plan. It has amassed a formidable portfolio of comedians and it has sought supracompetitive licenses. The only remaining question

---

[4] The Court uses the pagination automatically generated by CM/ECF for Exhibit C.

is whether it has the monopoly power necessary to make this request one Pandora cannot ignore. This, however, which is a merits inquiry inappropriate for standing analysis. *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) ("[O]ne must not 'confus[e] weakness on the merits with the absence of Article III standing.'" (second alteration in original) (quoting *Davis v. United States*, 564 U.S. 229, 249 n.10 (2011))).

Word Collections also argues that litigation costs cannot confer standing. Word Collections cites two cases for this proposition. *FTC v. Apex Cap. Grp., LLC*, No. CV 18-9753 (JFX) (JPRx), 2022 WL 1060486, at *3 (C.D. Cal. Mar. 10, 2022), *appeal filed*, No. 22-55342 (filed 9th Cir. Apr. 5, 2022; *San Diego Unified Port Dist. v. Monsanto Co.*, 309 F. Supp. 3d 854, 866 (S.D. Cal. 2018). These cases, however, rely on a line of authority stating that a plaintiff cannot bring a lawsuit and rely on litigation costs it can recover as its *sole* injury supporting standing. *See, e.g.*, *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 107–08 (1998); *La Asociacion De Trabajadores De Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). Pandora alleges a distinct harm—the costs of defending the Comedians' copyright claims. To the extent *Apex Capital* and *San Diego Unified Port District* hold that a plaintiff cannot claim as harm the costs of defending other suits as part of an anticompetitive scheme, the Court respectfully disagrees with that conclusion as an unwarranted extension of the doctrine.

The Court denies Word Collections' motion to dismiss the claims for want of Article III standing.

## C. Antitrust Standing

Word Collections argues Pandora fails to demonstrate antitrust standing through its allegations of supracompetitive prices and through its allegations of incurred litigation costs. (Mot. 9–13.)

To allege antitrust injury, a plaintiff must allege (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent.

1 | *PLS.com, LLC v. Nat'l Assoc. of Realtors*, 32 F.4th 824, 833 (9th Cir. 2022).

2 |      Word Collections first argues that Pandora does not have antitrust standing to sue
3 | because it did not accept the terms of a supposedly anticompetitive license. Word
4 | Collections relies on *Edwards Vacuum, LLC v. Hoffman Instrumentation Supply, Inc.*,
5 | which states that "it is difficult to see how an unaccepted offer could ever satisfy the
6 | causal antitrust injury requirement needed in a private antitrust claim seeking money
7 | damages because an unaccepted offer would not be the 'cause' of any material result in
8 | the marketplace." 556 F. Supp. 3d 1156, 1170 n.8 (D. Or. 2021). But *Edwards Vacuum*
9 | was limited to its facts and cited a Fifth Circuit precedent stating that an unaccepted
10 | offer to fix prices could confer antitrust injury on several grounds. *Id.* at 1171–72
11 | (distinguishing *United States v. Am. Airlines, Inc.*, 743 F.2d 1114, 1118–19 (5th Cir.
12 | 1984)). While the *Edwards Vacuum* court did not identify a fact pattern establishing
13 | injury from an unaccepted offer, Pandora alleges sufficient facts here to demonstrate
14 | such an injury. Pandora alleges that it is faced with the choice of acquiescing to a
15 | supracompetitive license or canceling its comedy offerings. The counterclaim
16 | adequately alleges that the direct cause of this choice is Word Collections' offer.
17 | Whether Word Collections' conduct is unlawful is another question, but Pandora does
18 | not need to accept Word Collections' offer to demonstrate antitrust injury.

19 |      Word Collections also argues that Pandora's alleged antitrust injury is too
20 | speculative. For this proposition, Word Collections argues the Ninth Circuit case *City*
21 | *of Oakland v. Oakland Raiders* forecloses Pandora's claim. While Word Collections is
22 | correct that nonpurchasers priced out of a market face an especially high bar to
23 | demonstrate antitrust standing, *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 460
24 | (9th Cir. 2021), the Ninth Circuit declined to "adopt a bright-line rule precluding
25 | nonpurchasers who have been priced out of the market from establishing antitrust
26 | standing," *id.* at 459 n.11. The Ninth Circuit panel predicated its result in *City of*
27 | *Oakland* on the fact that "[t]he City ha[d] not alleged—and there is no way of
28 | knowing—what would have occurred in a more competitive marketplace." *Id.* at 459.

The panel found there were "too many speculative links in the chain of causation between Defendants' alleged restrictions on output and the City's alleged injuries." *Id.* at 460. The Ninth Circuit required a "reasonable level of certainty before . . . confer[ring] antitrust standing on such consumers." *Id.*

Unlike in *City of Oakland*, Pandora alleges links in the chain of causation that are not speculative. Pandora alleges the status quo before Word Collections' existence—individual comedians licensing with streaming platforms like Pandora on an individual basis. Pandora's counterclaim alleges Word Collections' formation and aggregation of comedians' works is the cause of Pandora either paying supracompetitive royalties or ceasing offering streamed comedy performances. These allegations also describe a scenario different than that in *Intel Corp. v. Fortress Investment Group*, a case upon which Word Collections relies. In *Intel*, the plaintiff's allegations of supracompetitive licensing did not suffice because the plaintiff did not offer any context to explain whether the rates pleaded were supracompetitive. 511 F. Supp. 3d 1006, 1027 (N.D. Cal. 2021), *appeal filed*, No. 21-16817 (filed 9th Cir. Oct. 28, 2021). Here, Pandora provides the necessary context to state the supracompetitive royalties caused by Word Collections (the new 25 percent royalties) and alleges facts demonstrating this royalty is supracompetitive. Pandora thus properly alleges antitrust standing for the injuries resulting from Word Collections' alleged supracompetitive royalties.

Word Collections also argues Pandora's litigation defense costs are not cognizable as harm under antitrust laws. "[A]bsent an actual antitrust violation[,] the litigation costs themselves are not antitrust injury." *Am. Med. Ass'n v. United Healthcare Corp.*, No. 00 Civ. 2800 (LMM), 2007 WL 683974, at *5 (S.D.N.Y. Mar. 5, 2007). Thus, where a claim relies only on alleged attorney's fees without any initial antitrust injury, a plaintiff has no antitrust standing. *Chip-Mender, Inc. v. Sherwin-Williams Co.*, No. C 05-3465 PJH, 2006 WL 13058, at *5–6 (N.D. Cal. Jan. 3, 2006). Litigation costs that flow from anticompetitive conduct, however, are cognizable as an antitrust wrong. *See Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 997 (9th Cir. 1979)

(holding attorneys' fees are cognizable as damage when they result from a scheme of bad-faith patent prosecution). Here, Pandora claims as harm the litigation fees resulting from unlawfully pooled copyrights. These fees are cognizable harm.

The Court denies Word Collections' motion to dismiss the claims for want of antitrust standing.

### D.    *Noerr-Pennington* Immunity

Word Collections argues the *Noerr-Pennington* doctrine immunizes its conduct from antitrust liability. (Mot. 13–15.) A claim may be dismissed on the pleadings if the allegations in the complaint demonstrate *Noerr-Pennington* protections apply to the defendant's conduct. *See Gamble v. Kaiser Found. Health Plan, Inc.*, 348 F. Supp. 3d 1003, 1026 n.14 (N.D. Cal. 2018) (citing *Boone v. Redevelopment Agency of City of San Jose*, 841 F.2d 886, 894 (9th Cir. 1988), and *Empress LLC v. City & County of San Francisco*, 419 F.3d 1052, 1057 (9th Cir. 2005)); *Entrepreneur Media, Inc. v. Dermer*, No. SACV 18-1562 JVS (KESx), 2019 U.S. Dist. LEXIS 164858, at *9 (C.D. Cal. July 22, 2019) (collecting cases). The Court assumes for the purpose of evaluating this argument only that Pandora's antitrust claims are otherwise well-pleaded.

The *Noerr-Pennington* doctrine recognizes that litigants have rights under the First Amendment to use courts to advance their interests. This doctrine, among other things, provides immunity from antitrust suit for "a concerted effort to influence public officials regardless of intent or purpose." *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965). The Supreme Court later extended *Noerr-Pennington* to situations where "groups use courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-à-vis their competitors." *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002) (cleaned up). The Supreme Court carved out an exception from this immunity for sham petitioning. For a lawsuit to be a sham petition, it must meet two criteria: "first, it must be objectively baseless in the sense that no reasonable litigation could realistically expect success on the merits; second, the litigant's subjective motivation must conceal an attempt to

14

interfere directly with the business relationships of a competitor through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon." *Id.* at 526 (cleaned up).

Courts have recognized, however, that *Noerr-Pennington* immunity does not immunize otherwise anticompetitive conduct associated with a lawsuit. The Ninth Circuit has held "that when there is a conspiracy prohibited by the antitrust laws, and the otherwise legal litigation is nothing but an act in furtherance of that conspiracy, general antitrust principles apply, notwithstanding the existence of *Noerr* immunity." *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1263 (9th Cir. 1982). Thus, even when litigation itself is immunized, a litigant cannot avail itself of *Noerr-Pennington* immunity when the litigation is used to enforce an unlawful scheme. *Abbott Lab'ys v. Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408, 429 (D. Del. 2006); *Intel Corp. v. Fortress Inv. Grp. LLC*, No. 19-cv-07651-EMC, 2020 WL 6390499, at *15–16 (N.D. Cal. July 15, 2020), *appeal filed*, No. 21-16817 (filed 9th Cir. Oct. 28, 2021). Even litigation-based damages are not immunized if the damages stem from litigation used to enforce anticompetitive conduct. *Amphastar Pharms. Inc. v. Momenta Pharms., Inc.*, 850 F.3d 52, 57 (1st Cir. 2017) (collecting cases from sister circuits). In the copyright context, the Second Circuit recognized that "[a]lthough coordinated efforts to enforce copyrights against a common infringer may be permissible, copyright holders may not agree to limit their individual freedom of action in licensing future rights to such an infringer before, during, or after the lawsuit." *Primetime 24 Joint Venture v. Nat'l Broad. Co., Inc.*, 219 F.3d 92, 102–03 (2d Cir. 2000). A litigant seeking to enjoin a party from asserting unlawful market power through litigation must, however, show evidence of more than the attorneys' fees and costs incurred defending against intellectual property infringement litigation. *Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 3d 1061, 1076–77 (W.D. Wisc. 2021).

Reluctant to see this exception vitiate the interests the *Noerr-Pennington* doctrine protects, the Ninth Circuit has held that the immunity protects conduct that is incidental

to the prosecution of a lawsuit. *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934 (9th Cir. 2006). Accordingly, a decision to accept or reject an offer of settlement is conduct incidental to the prosecution of a suit and is not a separate and distinct activity which might form the basis for antitrust liability. *Id.* at 935. This immunity extends to private demand letters made before litigation. *Id.* at 936–37. These demands are not "absolutely protected from liability," however. *Id.* at 938. Instead, any such demands must be "sufficiently related to petitioning activity." *Id.* at 935.

Pandora alleges that Word Collections' and the Comedians' litigation conduct is used to assert unlawful market power (assuming those claims are properly pleaded). Pandora alleges that Word Collections and the Comedians instituted the copyright suits as a way to force Pandora to pay a supracompetitive license. If Word Collections and the Comedians violated the antitrust laws, their litigation to enforce the unlawful scheme is not protected by the *Noerr-Pennington* doctrine. *Clipper Exxpress*, 690 F.2d at 1263. Word Collections argues that the fact that the licensing and royalty demand was made during a settlement offer immunizes the conduct under *Sosa*. As a preliminary matter, the email containing the alleged prelitigation settlement demand is not judicially noticeable or incorporated into the counterclaim by reference, so the Court may not consider it at the motion to dismiss stage. *See* Fed. R. Civ. P. 12(d). Even if the Court did consider this email, however, Pandora plausibly demonstrates that the licensing demand is not "sufficiently related to petitioning activity" to warrant immunity from antitrust liability. *Sosa*, 437 F.3d at 935. The counterclaim raises a plausible inference that Word Collections did not make the licensing demand as part of a prelitigation settlement demand but instead as an independent action to effectuate its allegedly unlawful scheme. *Noerr-Pennington* immunity is thus inappropriate to apply at this stage of the case, both to the claims and the request for injunctive relief.

### E.   Failure to Seek Individual Licenses

Word Collections argues that Pandora cannot maintain claims related to copyright pooling when it failed to seek an individual license from the comedians in the

first instance. (Mot. 15–16.)

"[T]he opportunity to acquire a pool of rights does not restrain trade if an alternative opportunity to acquire individual rights is realistically available." *Buffalo Broad. Co., Inc. v. Am. Soc'y of Composers, Authors & Publishers*, 744 F.2d 917, 925 (2d Cir. 1984); *accord Nero AG v. MPEG LA, LLC*, No. 10-cv-3672-MRP-RZ, 2010 WL 4366448, at *6 (C.D. Cal. Sept. 14, 2010) (collecting cases). An antitrust plaintiff has the burden of pleading the nonavailability of options to acquire individual licensing. *Nero AG*, 2010 WL 4366448, at *6. Multiple courts have held this burden cannot be met where a plaintiff never makes an inquiry or attempt to negotiate an individual license. *E.g.*, *id.* at *6–7; *Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*, Nos. C 05-2133 SBA, C 01-4925, 2007 WL 2318903, at *15 (N.D. Cal. Aug. 13, 2007). A plaintiff need not allege any attempt to individually license, however, if the plaintiff demonstrates availability of individual licenses is illusory. *Samsung Elecs. Co., Ltd. v. Panasonic Corp.*, No. C 10-03098 JSW, 2015 WL 10890655, at *6 (N.D. Cal. Sep. 30, 2015).

Pandora adequately alleges that the availability of any individual licenses is illusory. Word Collections has described itself as the only entity where services like Pandora could receive a license to use literary works in its portfolio. (Countercl. ¶ 62.) Pandora plausibly alleges that Word Collections requires a blanket license at the 25 percent rate to broadcast any of Word Collections' literary works. The proposed license Word Collections sent to Pandora contains language consistent with these allegations. (*See* RJN Ex. C.)

The Court, however, declines Pandora's invitation to require that licenses be offered from individual owners that retain unimpaired independence to set competitive prices for individual licenses in order for availability to be nonillusory. (Opp'n 13 n.8.) Pandora relies on the Second Circuit case *Columbia Broadcasting System, Inc. v. American Society of Composers, Authors & Publishers*, 620 F.2d 930, 936–37 (2d Cir. 1980), for this point, but *Columbia Broadcasting* does not go that far. The Second

1  Circuit simply held that "the issue is whether competition among copyright owners is
2  realistically feasible." *Id.* at 937. Antitrust law does not mandate competition in any
3  specific corporate form. *Cf. Am. Needle v. Nat'l Football League*, 560 U.S. 183, 191
4  (2010) ("[W]e have eschewed . . . formalistic distinctions in favor of a functional
5  consideration of how the parties involved in the alleged anticompetitive conduct
6  actually operate."). It is enough that Pandora has plausibly alleged Word Collections
7  requires a blanket license for access to its literary works.

8     The Court denies Word Collections' motion to dismiss Pandora's claims for
9  failure to seek individual licenses.

10    **F.    Monopolization Claims**

11    Word Collections argues Pandora fails to properly allege market power in a
12  relevant market that causes antitrust injury by Word Collections' allegedly unlawful
13  activity. (Mot. 17–21.)

14    To state a claim for monopolization, a party must plead (1) the possession of
15  monopoly power, (2) the willful acquisition or maintenance of such power, and
16  (3) causal antitrust injury. *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
17  933 F.3d 1136, 1159 (9th Cir. 2019). To state a claim for attempted monopolization, a
18  party must plead that (1) the defendant has engaged in predatory or anticompetitive
19  conduct (2) with a specific intent to monopolize and (3) with a dangerous probability
20  of achieving that monopoly power. *Coalition for ICANN Transparency, Inc. v.
21  VeriSign, Inc.*, 611 F.3d 495, 506 (9th Cir. 2010). To state a claim for conspiracy to
22  monopolize, a party must plead (1) the existence of a combination or conspiracy to
23  monopolize, (2) an overt act in furtherance of the conspiracy, (3) the specific intent to
24  monopolize, and (4) causal antitrust injury. *In re Nat'l Football League*, 933 F.3d at
25  1159.

26    A party can demonstrate market power or monopoly power directly or
27  circumstantially. A party demonstrates direct market power by identifying restricted
28  output or supracompetitive prices. *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d

18

1421, 1434 (9th Cir. 1995); *see also FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) ("Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects." (internal quotation marks omitted)); *accord Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) ("Direct evidence of anticompetitive effects [includes] reduced output, increased prices, or decreased quality in the relevant market . . . ."). A party demonstrates market power circumstantially by defining a relevant market, showing that the opponent owns a dominant share of the market, and showing that there are significant barriers to entry and that existing competitors lack the capacity to increase output in the short run. *Rebel Oil Co.*, 51 F.3d at 1434. A properly defined market encompasses a product as well as its economic substitutes. *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018). Economic substitutes are those goods that "have a 'reasonable interchangeability of use' or sufficient 'cross-elasticity of demand' with the relevant product." *Id.* (quoting *Newcal Indus., Inc. v. IKON Off. Sol., Inc.*, 513 F.3d 1038, 1045 (9th Cir. 2008)).

The monopolization claims suffer from defective allegations of monopoly power. Pandora does not adequately allege direct or circumstantial market power. Pandora argues Word Collections possesses market power because Word Collections presented a license with supracompetitive royalties and forced Pandora to either accept the license or stop offering certain comedy performances. (Opp'n 17–20.) Pandora ultimately decided to stop offering the performances. (Answer to 2d Am. Consol. Compl. ¶ 168, ECF No. 71.)[5] The counterclaim, however, does not provide support for direct market

---

[5] The Court accepts Pandora's judicial admission of this fact. . *See Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) ("Factual assertions in pleadings and pretrial documents, unless amended, are considered judicial admissions conclusively binding on the party who made them.").

power. While formal market analysis is not necessary to allege direct market power, a party must allege "actual, sustained adverse effects on competition" in the relevant market, "viewed in light of the reality" of the market. *Ind. Fed'n of Dentists*, 476 U.S. at 461. Pandora does not allege enough about the reality of the market to demonstrate that Word Collections' offer of a supracompetitive license exhibited the requisite market power. For example, while Pandora describes an impressive collection of comedians whose works Word Collections offers, (Countercl. ¶¶ 57–59), Pandora does not plead facts demonstrating that these comedians are a "must have," (*id.* ¶ 60), the source of injury Pandora articulated in its opposition and at the hearing. Pandora alleges that it only needs a "critical mass" of comedy performances (an undefined amount) to offer a viable streaming service. (*Id.* ¶ 44(b).) As Pandora's own Securities and Exchange Commission filings show, Pandora's comedy collection included "more than 1,000 comedians with more than 15,000 tracks" in 2012, (RJN Ex. A, at 6), and included "more than 3,000 comedians with more than 35,000 tracks" in 2016, (RJN Ex. B, at 8). Pandora fails to connect Word Collections' representation of about 30 comedians to its inability to amass the critical mass needed to offer a viable comedy streaming service, especially when Pandora offers recordings by *several thousand* other comedians. The Court understands the implicit argument in the counterclaim that the comedians represented by Word Collections form a significant part of the critical mass necessary to offer a viable streaming service and may garner a significant percentage of Pandora's comedy streams. (*See* Countercl. ¶ 31.) Pandora cannot rest on such an implicit argument to satisfy Rule 8(a)(2), however. Pandora must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. These allegations fail to establish direct market power.

Pandora's allegations of circumstantial market power fare even worse. Pandora pleads a market in the United States "for the rights to comedy routines embodied in comedy recordings" that only includes "written comedic works . . . that have been

recorded and for which the recording is available to Pandora for streaming." (Countercl. ¶¶ 71–72.) Pandora also pleads that other written works are not substitutes for the written works embodied in comedy recordings "[b]ecause consumer demand for streaming comedy recordings is specific to recorded comedy." (*Id.* ¶ 73; *see also id.* ¶ 74 ("If comedy recordings become unavailable, . . . [Pandora] listeners would not readily shift to other types of streamed content.").) Here, Pandora properly alleges a product market that includes economic substitutes. Word Collections argues the market is overbroad because Pandora implicitly defines the market without reference to the "price, quality, and desirability to listeners" of the comedy recordings. (Mot. 18–19.) Word Collections argues that Pandora has included products in its market that are not substitutes with the comedy recordings, but Word Collections misreads this portion of the counterclaim. Pandora merely states that offering a viable comedy streaming service requires amassing a critical mass of comedy recordings that depends on the "price, quality, and desirability to listeners" of the recordings. (Countercl. ¶ 38.) Pandora's allegation of discernment in selecting its comedy offerings plausibly alleges that the low-quality, less desirable material related to the tying claim is not included in the market.

Even though Pandora adequately defines a relevant market, Pandora offers no allegations that Word Collections owns a dominant share of the market or that there are significant barriers to entry in the market. Pandora argues that it has alleged through conduct that Word Collections owns a dominant share of the market. For the same reasons discussed above, Pandora's description of Word Collections' impressive but short list of comedians whose works it licenses does not suffice to demonstrate that Word Collections owns a dominant share of the comedy recording market in the United States. Importantly, nothing in the counterclaim gives any indication of the size of the market (although the size of Pandora's own catalog casts significant doubts on Word Collections' dominance in the market).

Pandora argues that commercial realities like copyrights, contract agreements,

1   and a high share of the comedy market can demonstrate the existence of market barriers.

2   *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir.

3   1997). Pandora does not plead enough facts supporting that any barriers to entry exist,

4   however. "The main sources of entry barriers are: (1) legal license; (2) control over an

5   essential or superior resource; (3) entrenched buyer preferences for established brands

6   or company reputations; (4) capital markets evaluations imposing higher capital costs

7   on new entrants"; and (5) economies of scale in some situations. *L.A. Land Co. v.*

8   *Brunswick Corp.*, 6 F.3d 1422, 1428 n.4 (9th Cir. 1993). Pandora does not allege any

9   control by Word Collections over a critical mass of comedians, any entrenched listener

10   preferences for the comedians represented by Word Collections, or any other restraints

11   that would prevent new comedians or licensors from entering the market to compete

12   with Word Collections.

13       Because Pandora fails to demonstrate market power directly or circumstantially,

14   the Court grants Word Collections' motion to dismiss Pandora's monopolization

15   claims.

16       **G.    Price Fixing Conspiracy Claim**

17       Word Collections argues that Pandora fails to properly allege a conspiracy to fix

18   prices. (Mot. 21–23.)

19       When evaluating a blanket licensing claim, unless there is no purpose but to stifle

20   competition, courts apply rule of reason analysis. *Broad. Music, Inc. v. Columbia*

21   *Broad. Sys., Inc.*, 441 U.S. 1, 20 (1979). Rule of reason analysis requires determining

22   whether anticompetitive effects outweigh procompetitive effects. *Nat'l Soc'y of Prof.*

23   *Eng'rs v. United States*, 435 U.S. 679, 691 (1978). To demonstrate the existence of a

24   conspiracy to fix prices, a plaintiff must allege the conspiracy with significant

25   specificity. "A statement of parallel conduct, even conduct consciously undertaken,

26   needs some setting suggesting the agreement necessary to make out a § 1 claim; without

27   that further circumstance pointing toward a meeting of the minds, an account of a

28   defendant's commercial efforts stays in neutral territory." *Twombly*, 550 U.S. at 557.

To overcome mere allegations of parallel conduct, a plaintiff must allege "who, did what, to whom (or with whom), where, and when." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015) (quoting *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008)).

To make out a case for concerted activity under § 1, a plaintiff must plead concerted action between two distinct entities. However, the Supreme Court has "eschewed . . . formalistic distinctions in favor of a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate." *Am. Needle*, 560 U.S. at 191. While the Supreme Court has recognized that "a parent corporation and its wholly owned subsidiary 'are incapable of conspiring with each other for the purposes of § 1 of the Sherman Act,'" *id.* at 195 (quoting *Copperworld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 777 (1984)), courts must conduct an inquiry separate from the formal labels of the corporate form. "The relevant inquiry . . . is whether there is a contract, combination, or conspiracy amongst separate economic actors pursuing separate economic interests such that the agreement deprives the marketplace of independent centers of decisionmaking, and therefore of diversity of entrepreneurial interests, and thus of actual or potential competition." *Id.* (cleaned up). Thus, while the Supreme Court recognized in *Copperworld* that a parent and subsidiary corporation cannot conspire to violate the Sherman Act, "[a]greements made within a firm can constitute concerted action covered by § 1 when the parties to the agreement act on interests separate from those of the firm itself, and the intrafirm agreements may simply be a formalistic shell for the ongoing concerted action." *Id.* at 200 (footnote omitted).

Pandora does not offer the necessary facts to support a conspiracy. Pandora argues that the allegations throughout the counterclaim describe a conspiracy. Pandora describes the counterclaim as detailing the "licensing tactics of [Word Collections] and its co-conspirator comedians," describing "how those licensing tactics are even more harmful to competition than those employed by ASCAP and BMI," explaining "that comedians compete to have Pandora and others stream their content," describing "how

[Word Collections'] 'exclusive affiliation agreements' foreclose even the possibility of price competition by comedians," describing "the impact that competition between comedians would have on price were it to take place," detailing "when individual comedians signed on to the [Word Collections] cartel and how the number of cartel member comedians has grown steadily over time," explaining "how [Word Collections] has been empowered to set a single fixed price for all of the works of its cartel members," explaining "that it is implausible that individual comedians were not aware of [Word Collections'] scheme, particularly given the public statements made by [Word Collections] and its founder, and that by affiliating with [Word Collections], they are necessarily buying into the price-fixing conspiracy," and explaining "how this conspiracy works as a business matter only if there is a critical mass of comedians agreeing to band together to collectively license their works at a fixed price." (Opp'n 21 n.17.) These allegations, however, are consistent with the parallel conduct that is insufficient under *Twombly* and, therefore, Pandora does not state a claim for antitrust conspiracy. Pandora rests its conspiracy claim on the individual comedians' decisions to associate with Word Collections. Pandora described this as a hub-and-spoke conspiracy at the hearing. Under the standard articulated in *In re Musical Instruments*, this is not enough. Pandora must allege "who, did what, to whom (or with whom), where, and when." *In re Musical Instruments*, 798 F.3d at 1194 n.6. Pandora need not do so with the specificity demanded by Federal Rule of Civil Procedure 9(b), but it must offer some facts plausibly suggesting concerted activity that is distinct from parallel conduct. Pandora has not done so and has not alleged any agreement other than agreements between the comedians and Word Collections for Word Collections to represent the comedians in licensing negotiations. This failure to properly demonstrate the requisite agreement thus demonstrates that Pandora's reliance on *United States v. Apple*, 791 F.3d 290, 325 (2d Cir. 2015), which applied a per se rule analysis to a properly alleged and proven price fixing claim against a copyright pool, is misplaced. Pandora has not properly stated a claim for conspiracy.

1      The Court grants Word Collections' motion to dismiss the price fixing claim.

2      **H.     Tying Claim**

3      Word Collections argues that Pandora fails to properly plead a tying claim. (Mot.

4 24–25.)

5      The Sherman Act prohibits the unlawful tying of the sale of one product to

6 another. "It is clear, however, that not every refusal to sell two products separately

7 cannot be said to restrain competition." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466

8 U.S. 2, 11 (1984), *superseded by statute on other grounds as recognized in Ill. Tool*

9 *Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 31 (2006). "If each of the products may be

10 purchased separately in a competitive market, one seller's decision to sell the two in a

11 single package imposes no unreasonable restraint on either market, particularly if

12 competing suppliers are free to sell either the entire package or its several parts." *Id.* at

13 11–12. "The Supreme Court has developed a unique per se rule for illegal tying

14 arrangements. For a tying claim to suffer per se condemnation, a plaintiff must prove:

15 (1) that the defendant tied together the sale of two distinct products or services; (2) that

16 the defendant possesses enough economic power in the tying product market to coerce

17 its customers into purchasing the tied product; and (3) that the tying arrangement affects

18 a not insubstantial volume of commerce in the tied product market." *Cascade Health*

19 *Sols. v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008) (internal quotation marks

20 omitted). Under rule of reason analysis, a plaintiff must also show an injury to

21 competition. *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1200 (9th Cir. 2012).

22      Pandora has alleged that Word Collections tied together two distinct products—

23 the comedy recordings at issue in the other claims and the "less desirable material,

24 including not just comedy but other spoken-word material as well." (Countercl. ¶ 66.)

25 Pandora provides no allegations supporting Word Collections' market power. Pandora

26 provides no allegations about the realities of the less desirable material market, provides

27 no allegations that Pandora must pay supracompetitive prices for those materials,

28 provides no allegations that offerings of less desirable market products have decreased,

and provides no allegations that there is decreased product quality of products in the less desirable market. Pandora thus does not establish direct market power in the secondary product market. Pandora does not even provide a market definition that could support a circumstantial market power analysis. The counterclaim completely lacks allegations about the volume of commerce in the less-desirable material market affected by Word Collections' tying. Pandora thus fails to state a tying claim.

Pandora argues that it does not need to allege the elements outlined in *Cascade Health* and can instead state a claim under *United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948), and *United States v. Loew's Inc.*, 371 U.S. 38 (1962). One prominent antitrust treatise notes that *Paramount Pictures* and *Loew's* are still good law for the proposition that there can be "an illegal tie between copyrighted films that were partial substitutes competing in the same market for film audiences." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 1747c (5th ed. 2021). *Paramount Pictures* held that it is illegal to refuse "to license one or more copyrights unless another copyright is accepted," 334 U.S. at 159, and thus prohibited block billing in the film industry. *Loew's* held the same for the television industry. 371 U.S. at 47–48. These cases rested on the assumption that intellectual property automatically confers market power. The Supreme Court explicitly overturned this assumption in *Illinois Tool Works.* 547 U.S. at 42–43. The Supreme Court stated that "tying arrangements involving patented products should be evaluated under the standards applied in cases like . . . *Jefferson Parish* rather than under the *per se* rule applied in . . . *Loew's*." *Id.* at 42. The Supreme Court noted that "some such arrangements are still unlawful, such as those that are the product of a true monopoly or a marketwide conspiracy," *id.* at 42–43, and cited *Paramount Pictures* as an example. Such a true monopoly or marketwide conspiracy "must be supported by proof of power in the relevant market rather than by a mere presumption thereof." *Id.* at 43. Because Pandora has not properly alleged the type of marketwide conspiracy or true monopoly necessary to invoke the application of the per se rule, Pandora must allege that Word Collections possesses market power in the relevant market for the less

1  desirable materials. For the reasons discussed above, Pandora fails to do so.

2      The Court grants Word Collections' motion to dismiss the tying claim.

3  **I.      Leave to Amend**

4      Given the Ninth Circuit policy of granting leave to amend with "extreme

5  liberality," *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020)

6  (internal quotation marks omitted), the Court gives Plaintiff leave to amend.

7      While the Court grants leave to amend on the price fixing and tying claims, the

8  Court doubts whether Pandora can allege the necessary facts at this stage. The Court

9  recognizes that discovery may yield information about the nature of the agreements

10 between the comedians and Word Collections, at the very least in the context of

11 Pandora's copyright misuse defense. (Answer, First Defense.) The Court has not set a

12 deadline to amend the pleadings. Thus, the Court will "freely give leave" to amend the

13 pleadings "when justice so requires," including if previously unavailable information

14 made available during discovery gives life to a new claim. Fed. R. Civ. P. 15(a)(2).

15 ///

## IV.    CONCLUSION

The Court grants in part and denies in part the request for judicial notice. The Court grants in part and denies in part the motion. The counterclaim is dismissed in its entirety. Pandora may file an amended counterclaim no later than 14 days from the date of this Order, if it can do so consistent with Federal Rule of Civil Procedure 11(b) and this Order. The parties are encouraged to review the propriety of amendment of the counterclaim filed at ECF No. 72 in light of this Order. The Court will accept a stipulation by the parties to file all amended counterclaims simultaneously. In preparing such a stipulation, the parties should suggest dates that will "secure the just, speedy, and inexpensive determination" of this matter. Fed. R. Civ. P. 1. Failure to file a timely amended counterclaim will waive the right to do so. Leave to add new defendants or claims must be sought by a separate, properly noticed motion.

**IT IS SO ORDERED.**

Dated: October 26, 2022

MARK C. SCARSI
UNITED STATES DISTRICT JUDGE