1  MAYER BROWN LLP
   PAUL M. FAKLER (*pro hac vice*)
2  *pfakler@mayerbrown.com*
   JACOB B. EBIN (*pro hac vice*)
3  *jebin@mayerbrown.com*
   ALLISON AVIKI (*pro hac vice*)
4  *aaviki@mayerbrown.com*
   1221 Avenue of the Americas
5  New York, New York  10020-1001
   Telephone:  (212) 506-2500
6  Facsimile:  (212) 262-1910

7  MAYER BROWN LLP
   JOHN NADOLENCO (SBN 181128)
8  *jnadolenco@mayerbrown.com*
   DANIEL D. QUEEN (SBN 292275)
9  *dqueen@mayerbrown.com*
   MEERIM A. NEHME (SBN 322234)
10 *mnehme@mayerbrown.com*
   350 S. Grand Avenue, 25th Floor
11 Los Angeles, California  90071-1503
   Telephone:  (213) 229-9500
12 Facsimile:  (213) 625-0248

13 [*Additional counsel listed on signature page*]

14 Attorneys for Defendant
   Pandora Media, LLC
15

16          **UNITED STATES DISTRICT COURT**

17          **CENTRAL DISTRICT OF CALIFORNIA**

18
   In re PANDORA MEDIA, LLC          Master File No. 2:22-cv-00809-MCS-
19 COPYRIGHT LITIGATION              MAR

20 ─────────────────────────         CONSOLIDATED ACTION

21 This Document Relates To:         **DEFENDANT AND**
                                     **COUNTERCLAIMANT**
22 2:22-cv-00817-MCS-MAR (Clay)      **PANDORA MEDIA, LLC'S FIRST**
   2:22-cv-01345-MCS-MAR (Di Paolo)  **AMENDED COUNTERCLAIMS**
23 2:22-cv-00810-MCS-MAR (Carlin)    **TO PLAINTIFFS' SECOND**
   2:22-cv-00815-MCS-MAR (Williams)  **AMENDED CONSOLIDATED**
24 2:22-cv-00813-MCS-MAR (White)     **COMPLAINT AGAINST**
   2:22-cv-00809-MCS-MAR (Engvall)   **CERTAIN**
25 2:22-cv-00809-MCS-MAR (Hicks)     **PLAINTIFFS/COUNTERCLAIM**
                                     **DEFENDANTS AND**
26                                   **COUNTERCLAIM DEFENDANT**
                                     **WORDCOLLECTIONS, INC.**
27

28

# TABLE OF CONTENTS

**Page**

I.     NATURE OF THE ACTION ...................................................................... 1

II.    THE PARTIES .......................................................................................... 4

III.   JURISDICTION AND VENUE ................................................................ 7

IV.   TRADE AND COMMERCE .................................................................... 11

V.     FACTUAL BACKGROUND .................................................................... 11

     a.     Pandora's Comedy Offering ........................................................ 11

     b.     Comedians Compete to Have Their Performances Streamed ........... 13

     c.     Historic Practice of Licensing Comedy Rights............................. 14

     d.     The Formation and Growth of the Collective................................ 16

     e.     The Collective Demands that Pandora Take Its Blanket License ...... 19

     f.     Pandora is Forced to Remove Comedy Content from Its Service...... 21

VI.   CONCERTED ACTIVITY ....................................................................... 22

     a.     Agreement Among Comedians.................................................... 23

         i.     The Comedians Committed to a Common Course of Action ................................................................... 23

         ii.    The Comedians' Awareness of, and Participation in, the Collective's Anticompetitive Scheme ...................... 24

         iii.   The Comedians Instruct Word Collections to Implement the Blanket License.................................. 28

         iv.    "Plus" Factors ................................................................ 29

     b.     Agreements Between Word Collections and Individual Comedians................................................................................. 31

VII.   THE COLLECTIVE'S PRICE FIXING SCHEME................................. 33

     a.     The Effects of the Price Fixing Scheme ..................................... 33

     b.     The Collective's Price Fixing Scheme Does Not Create Any Efficiencies................................................................................ 36

VIII.   THE COLLECTIVE'S MARKET POWER ............................................ 40

     a.     Relevant Product and Geographic Market Definition ...................... 40

     b.     Market Power in the Relevant Market .......................................... 42

         i.     Direct Evidence of the Collective's Market Power................... 42

         ii.    The Collective's "Must Have" Portfolio .............................. 45

     c.     Barriers to Entry.......................................................................... 49

IX.   ANTICOMPETITIVE EFFECTS ............................................................ 50

     a.     Harm to Competition in the Relevant Market ................................. 50

     b.     Harm to Pandora ........................................................................ 51

COUNT I .......................................................................................................... 52

- i -

# TABLE OF CONTENTS

**Page**

COUNT II ........................................................................................................ 54
COUNT III ....................................................................................................... 55
COUNT IV ....................................................................................................... 56
PRAYER FOR RELIEF .................................................................................. 58
DEMAND FOR JURY TRIAL ....................................................................... 59

Pursuant to Rules 13 and 15 of the Federal Rules of Civil Procedure, the Court's Order re: Motion to Dismiss (ECF Doc. No. 83), and the Court's Order Granting Stipulation to Set Coordinated Amendment and Response Schedule (ECF Doc. No. 86), Defendant Pandora Media, LLC ("Pandora"), by way of its attorneys, hereby states for its First Amended Counterclaims against Plaintiffs and Counterclaim Defendants Yellow Rose Productions, Inc., on behalf of Bill Engvall ("Yellow Rose"), Main Sequence, Ltd. ("Main Sequence"), Ron White, Inc. ("White, Inc."), Robin Williams Trust ("Williams Trust"), Brave Lion, Inc., on behalf of Andrew Clay Silverstein a/k/a/ Andrew Dice Clay ("Brave Lion"), Nick Di Paolo, individually and on behalf of Acid Tongue, Inc. ("Di Paolo"), Mary Reese Hicks, individually and on behalf of Arizona Bay Production Co., Inc. ("Hicks"), and Counterclaim Defendant WordCollections, Inc. ("Word Collections"; collectively, "Counterdefendants"), the following:

## I.   NATURE OF THE ACTION

1.     These Counterclaims seek injunctive relief, treble damages, and the cost of suit, including reasonable attorney's fees, and other relief under Federal antitrust laws, 15 U.S.C. §§ 1, 2, 15, and 26, to remedy a conspiracy in unreasonable restraint of trade, a conspiracy to monopolize, monopolization, and attempted monopolization by Counterdefendants.

2.     For years, Pandora and many other services have enabled their listeners and subscribers to listen to recordings of comedians' performances.  Pandora does not need access to all comedians' recordings in order to offer a viable comedy streaming service; as long as it is able to assemble a critical mass of comedy recordings, including the recordings of many of the highly sought-after comedians, it can do so.  As a result, in a competitive market, comedians compete to have Pandora and other services play their recordings and the underlying comedy routines

embodied in those recordings.  Pandora has always satisfied its copyright obligations to comedians by obtaining all necessary rights and paying millions of dollars in license fees in exchange for those rights every year to the owners of the sound recordings of the comedians' performances, which in turn shared those payments with the comedians.  No comedian ever sought to raise the price to Pandora by separately licensing or charging an additional royalty for any rights in the purported "literary works"—i.e., jokes and comedy routines—underlying the licensed recordings.  Instead, comedians chose unilaterally to benefit from the royalties they were already receiving for the use of the comedy recordings and the added broad distribution, promotion, and other benefits that the services gave them, creating additional demand for their live performances and otherwise benefiting the comedians.  Comedians, acting in their independent self-interest, were clearly satisfied with this long-standing custom and practice—one that predates Pandora by many decades—as demonstrated by the fact that they and their representatives regularly contacted Pandora to secure more plays of their recordings.  Doing so would make no economic sense if the comedians felt that they were not being fully and appropriately compensated by Pandora.

3.      Then, in late 2020, Word Collections announced its launch.  As a "first of its kind Performing Rights Collection Agency," Word Collections said that it would license to Pandora and other services the comedians' alleged "literary works" rights and collect additional royalties for those rights.

4.      Word Collections is not a benign licensing agent; its true business model is that of a per se illegal cartel.  Word Collections and its affiliated comedians (together, the "Collective") operate jointly and interdependently.   The Word Collections-affiliated comedians have agreed among themselves and individually with Word Collections to consolidate their naturally competing works into a monopolistic portfolio; engage in collective licensing determined by Word Collections through an all-or-nothing blanket license for the Collective's entire

portfolio; and fix the price of the only license available for the comedians' rights, thereby ensuring that services have no alternative other than the Collective's blanket license for its entire portfolio.  The blanket license here does not provide for the efficiencies that the Supreme Court has recognized as potentially justifying collective action.  Far from it.  Whereas an efficient blanket license provides for the "substantial lowering of costs, which is, of course potentially beneficial to both sellers and buyers," *BMI v. CBS*, 441 U.S. 1, 21-22 (1979), the license here only serves to eliminate competition and substantially and supra-competitively increase costs. There simply is no procompetitive marketplace benefit.  In *BMI*, the Supreme Court concluded that a blanket license was not *per se* illegal where "the whole is truly greater than the sum of its parts."  *Id*. at 22.  That is not the case here.  Word Collections' efforts do not solve for any marketplace need, take care of any inefficiency, or make the marketplace run more smoothly.  To the contrary, it adds transaction costs and upends what has worked well for decades.

5.     In place of the established market in which comedians compete with each other to have Pandora and others perform their jokes that are embodied in comedy recordings, the Collective seeks by restraining competition through a conspiracy to build a market in which it: (a) price fixes supra-competitive royalties for the rights to the jokes embodied in comedy recordings controlled by the Collective; (b) accumulates monopoly power in the licensing of those rights; and (c) uses that monopoly power to foreclose competition through its full-portfolio mandatory blanket license.  On information and belief, Word Collections has coordinated and funded the filing of the Second Amended Consolidated Complaint (the "Complaint") as part of its efforts, in parallel to those of Spoken Giants, LLC ("Spoken Giants")—another licensing cartel that is similarly violating the antitrust laws—to impose this dysfunctional market and their anticompetitive constraints on entities that perform, reproduce, or distribute comedy.

6.     The result of the Collective's anticompetitive tactics is to create for itself hold-up power over services like Pandora, to exploit that hold-up power by dramatically increasing the price that Pandora and others have to pay to make comedy recordings available to their listeners, and to hamper the ability of Pandora and other services to respond to consumer demand for high-quality comedy.  Word Collections itself advertises this anticompetitive scheme to comedians as the key purpose and benefit of "joining" the Collective as well as the "over $1 billion in royalties" that it states it will recover.  In fact, Word Collections' founder and CEO has gone so far as to publicly consider adopting as the Collective's official slogan a notorious line from Martin Scorsese's mafia classic, *Goodfellas*, describing the attitude of mobsters towards the legitimate businesses they extort: "f*** you, pay me."  On information and belief, comedians who have joined the Collective—including the Counterdefendant comedians—have done so with the understanding that they would obtain these inflated royalties by virtue of the scheme and that the scheme could produce inflated royalties only if a sufficient number of other high-profile comedians also agree to join the Collective.

7.     Pandora disputes the Counterdefendant comedians' infringement claims, as addressed in Pandora's Answer to the Complaint.  These antitrust counterclaims, however, assume *arguendo* that there exist public performance, reproduction, and/or distribution rights in the jokes embodied in comedy recordings and that comedians, as authors of those jokes, might have retained those rights.  These antitrust counterclaims instead challenge how the members of the Collective have illegally agreed to suppress competition that otherwise would exist in the licensing of those rights.

## II.   THE PARTIES

8.     A Delaware limited liability company and a subsidiary of Sirius XM Radio Inc. ("SiriusXM"), Pandora offers both ad-supported and subscription audio entertainment streaming services in the United States.  Pandora provides its users

- 4 -

with music, comedy, and other spoken word audio programming through internet-connected devices.  Pandora is best known for its flagship free-to-the-consumer non-interactive internet radio service, which as of September 30, 2022, had approximately 48.8 million monthly active users.  That service offers listeners a "radio-style" or "lean-back" listening experience, by which Pandora creates for each listener an individualized playlist.  After creating an account, a listener need only "seed" a station or select a "genre" and then music or spoken word content will begin to play.  To create a "seeded" station, the listener simply types the name of an artist, composer (for classical music), or song title to serve as the starting point or "seed" of the station.  Pandora then automatically creates a station centered around that "seed," which—through use of its Music and Comedy Genome Projects and a combination of proprietary playlist algorithms—will play tracks whose characteristics are similar to those of the "seed."  As an alternative, a user can select a "genre" station, which begins as a pre-programmed collection of tracks that reflect a certain style or preference.  Each genre station is initially populated by tracks selected by Pandora.  While the listener is not able to select any particular song or artist to hear at any given time, the listener is able to provide Pandora with feedback regarding likes and dislikes.  This feedback is used to further refine each listener's personalized station.

9.     In addition to its free ad-supported service, Pandora offers two subscription services.  The more popular of the two, Pandora Plus (formerly called Pandora One), is an ad-free subscription service that includes some semi-interactive features, such as song replays and caching of a limited number of stations to enable offline listening when users do not have internet access, but does not provide users with the ability to select particular songs or albums on demand.  Pandora's other subscription service—Pandora Premium—is a fully on-demand service that allows subscribers to select exactly which recordings they want to listen to and when.

10.     According to the Complaint, Plaintiff and Counterdefendant Yellow Rose is "a corporation in the care of JP Williams and Jennifer Riker of Parallel

Entertainment located at 9696 Culver Boulevard, Suite 308, Culver City, CA 90232." According to the Complaint, Yellow Rose "represents the intellectual property rights of Bill Engvall," a comedian who, according to Yellow Rose's California corporate filings, is its Chief Executive Officer.  On information and belief, Yellow Rose is a California corporation.

11.   According to the Complaint, Plaintiff and Counterdefendant Main Sequence "owns and represents the intellectual property rights of the late George Carlin."  According to the Complaint, Main Sequence has its principal place of business in Los Angeles, California.  According to the California Secretary of State's website, Main Sequence is a California corporation and has been suspended from doing business in California by the California Franchise Tax Board.

12.   According to the Complaint, Plaintiff and Counterdefendant White, Inc. is a Georgia corporation with its principal place of business in Fairburn, Georgia. According to the Complaint, White, Inc. "is the owner of intellectual property rights, on behalf of Ron White who is a comedian, actor, and author who resides in California."  According to White, Inc.'s Georgia corporate filings, Ron White has been White, Inc.'s Chief Executive Officer and sole officer since at least April 2019.

13.   According to the Complaint, Plaintiff and Counterdefendant Brave Lion "has its principal place of business at 11766 Wilshire Blvd., Suite 500, Los Angeles, California 90025," and "on behalf of Andrew Clay Silverstein" "is a copyright owner of properly registered literary works" of Mr. Silverstein, better known as the comedian Andrew Dice Clay, who, according to Brave Lion's California corporate filings, is Brave Lion's Chief Executive Officer.  On information and belief, Brave Lion is a California corporation.

14.   According to the Complaint, Plaintiff and Counterdefendant Di Paolo is an actor and comedian who, "individually and on behalf of Acid Tongue, Inc., owns the intellectual property rights of Nick Di Paolo."  According to the State of New York Department of State Division of Corporations database, Acid Tongue, Inc., on

whose behalf Counterdefendant Di Paolo purportedly brought his complaint, is a New York corporation, and Counterdefendant Di Paolo is its registered agent. According to the same State of New York database, Acid Tongue, Inc.'s entity status has been "inactive" since April 22, 2020.

15.     According to the Complaint, Plaintiff and Counterdefendant the Williams Trust "represents the intellectual property rights of the late Robin Williams," and is in the care of Trustee Arnold D. Kassoy, a partner in the law firm of Manatt, Phelps & Phillips, LLP, in Los Angeles, California.

16.     According to the Complaint, Plaintiff and Counterdefendant Hicks "individually and on behalf of Arizona Bay Production Co., Inc., owns the intellectual property rights of Bill Hicks (deceased), who was a comedian and musician." According to the Arkansas Secretary of State website, Arizona Bay Production Co., Inc. on whose behalf Counterdefendant Hicks purportedly brought her complaint, is an Arkansas corporation, and Counterdefendant Hicks is its President and Secretary.

17.     According to its website, Counterdefendant Word Collections "is the ASCAP and BMI for spoken word instead of music. It works for the world's comedians and other spoken word performers to license and collect royalties earned when digital radio or AM/FM radio broadcast recordings of their 'Literary Works.'" According to the Complaint, Word Collections has acted on behalf of "various copyright owners" since "in or about August of 2020," and, beginning in April 2021, on behalf also of Brave Lion, Bill Engvall, Main Sequence, White, Inc., the Williams Trust, and Hicks "in an effort to negotiate a licensing agreement for various copyright owners" with Pandora. On information and belief, Word Collections is a Delaware corporation, with its headquarters in New York, New York.

## III.   JURISDICTION AND VENUE

18.     These First Amended Counterclaims arise under the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, 15, and 26.

19.     This Court has subject matter jurisdiction over these First Amended Counterclaims pursuant to 28 U.S.C. §§ 1331 and 1337(a), Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2.

20.     This Court has personal jurisdiction over Brave Lion based on: (a) Brave Lion's filing its Complaint; (b) the fact that Brave Lion is, on information and belief, a California corporation, with its principal place of business in Los Angeles, California and, on information and belief, conducts a substantial portion of its business in California; and (c) Word Collections' alleged efforts on behalf of Brave Lion to force Pandora, located in California, including through communications with Pandora employees located in this District, to enter into a license agreement with respect to Brave Lion's alleged literary works rights.

21.     This Court has personal jurisdiction over Yellow Rose based on: (a) Yellow Rose's filing its Complaint; (b) the fact that Yellow Rose is, on information and belief, a California corporation, with its principal place of business in Culver City, California and, on information and belief, conducts a substantial portion of its business in California; and (c) Word Collections' alleged efforts on behalf of Yellow Rose's Chief Executive Officer Bill Engvall to force Pandora, located in California, including through communications with Pandora employees located in this District, to enter into a license agreement with respect to Mr. Engvall's alleged literary works rights.

22.     This Court has personal jurisdiction over Di Paolo based on: (a) Di Paolo's filing its Complaint; (b) the fact that Di Paolo, on information and belief, conducts a substantial portion of its business in California; and (c) on information and belief, Word Collections' alleged efforts on behalf of Di Paolo to force Pandora, located in California, including through communications with Pandora employees located in this District, to enter into a license agreement with respect to alleged literary works rights owned by Di Paolo.

23.     This Court has personal jurisdiction over Main Sequence based on: (a) Main Sequence's filing of its Complaint; (b) the fact that Main Sequence, although suspended from doing business by California's Franchise Tax Board, is a California corporation with its alleged principal place of business in Los Angeles, California and, on information and belief, conducts a substantial portion of its business in California; and (c) Word Collections' alleged efforts on behalf of Main Sequence to force Pandora, located in California, including through communications with Pandora employees located in this District, to enter into a license agreement with respect to Main Sequence's alleged literary works rights.

24.     This Court has personal jurisdiction over White, Inc. based on: (a) White, Inc.'s filing of its Complaint; (b) the fact that White, Inc.'s Chief Executive Officer and sole director is a resident of California and, on information and belief, conducts a substantial portion of White, Inc.'s business in California; and (c) Word Collections' alleged efforts on behalf of White, Inc. to force Pandora, located in California, including through communications with Pandora employees located in this District, to enter into a license agreement with respect to White, Inc.'s alleged literary works rights.

25.     This Court has personal jurisdiction over the Williams Trust based on: (a) the Williams Trust's filing of its Complaint; (b) the Williams Trust's operation under the care of its Trustee in Los Angeles, California and, on information and belief, because it conducts a substantial portion of its business in California; and (c) Word Collections' alleged efforts on behalf of the Williams Trust to force Pandora, located in California, including through communications with Pandora employees located in this District, to enter into a license agreement with respect to the Williams Trust's alleged literary works rights.

26.     This Court has personal jurisdiction over Hicks based on: (a) its filing of the Complaint in this Consolidated Action; (b) on information and belief, Hicks conducts a substantial portion of its business in California; and (c) on information

and belief, Word Collections' alleged efforts on behalf of Hicks to force Pandora, located in California, including through communications with Pandora employees located in this District, to enter into a license agreement with respect to alleged literary works rights owned by Hicks.

27.     This Court has personal jurisdiction over Word Collections based on: (a) its alleged "numerous efforts" and contacts "on an ongoing basis" since August 2020 directed to Pandora, located in the State of California, including through communications with Pandora employees located in this District, to force Pandora to enter into a license agreement; (b) on information and belief, its role in sponsoring and coordinating the Complaint; and (c) on information and belief, because it conducts substantial and ongoing business in California, including in this District, including, but not limited to, by soliciting new "clients," investors, and other co-conspirators.

28.     Venue is proper in this judicial District pursuant to 28 U.S.C. §§ 1391 and 1400, and 15 U.S.C. §§ 15, 22, and 26.

29.     Joinder of all Counterdefendants, including Word Collections, is proper pursuant to Rules 13(h) and 20(a)(2) of the Federal Rules of Civil Procedure.  Rule 20 allows for permissive joinder of defendants (and counter-defendants, pursuant to Rule 13(h)) where, as here: "(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action."  Fed. R. Civ. P. 20(a)(2). Joinder of all Counterdefendants is further warranted because, among other reasons, it will promote judicial efficiency, it will expedite the final determination of the disputes, including those raised in the Complaint, the defenses in the Answer to the Complaint, and in these Counterclaims, and because it prejudices no party.

## IV.   TRADE AND COMMERCE

30.     At all times relevant to these Counterclaims, Counterdefendants have been engaged in interstate commerce, and their activities have substantially affected interstate commerce.  The efforts of Counterdefendants, who are residents of multiple different states, to compel Pandora and other services to license asserted literary works rights occurs in interstate commerce.  Pandora and, on information and belief, other providers of comedy content, provide their programming services in interstate commerce.

31.     Moreover, through their concerted efforts to force Pandora and, on information and belief, other providers of comedy to enter into purported "literary works" rights licenses for the copyrighted works they claim to own or control, Counterdefendants directly affect the interstate transmission of Pandora's offerings as well as those of other services that provide comedy content to listeners.  Their collusion on the licensing of their purported "literary works" rights, their consolidation of their asserted rights under the Collective's control, and the Collective's bundling of these rights into a mandatory all-or-nothing blanket license have already imposed substantial costs on Pandora; if Counterdefendants' collusion succeeds in imposing these licenses on Pandora and other providers of comedy content at supra-competitive prices, the total cost to Pandora, these other providers of comedy, and their customers, all in the flow of interstate commerce, will be enormous.

## V.   FACTUAL BACKGROUND

### a. Pandora's Comedy Offering

32.     Until 2011, Pandora did not include any spoken word comedy on its service.  Then, in 2011, Pandora made the business decision to offer comedy and other spoken word content in addition to music.  But music still accounts for the vast majority of streams (transmissions of recordings to listeners) on the Pandora service: Today, all comedy content accounts for less than 1% of all streams on the service,

yet Pandora still pays out millions of dollars in royalties each year for its use of this comedy content.

33.     While Pandora's comedy library contains the recordings of thousands of comedians, the overwhelming majority of the recordings of those comedians are rarely, if ever, streamed.   Like in many industries today, including music, professional athletics, and film, the comedy industry is dominated by a handful of "superstars," all of whom have become wildly popular and successful, with a long tail of many thousands of comedians that are hoping to reach that level of success, but rarely do.  As would be expected given this landscape, there are only a few dozen comedians that account for any significant number of streams across Pandora's services.

34.     The development of Pandora's comedy streaming service is representative of how Pandora responds to listener demand for specific types of content.  Other examples of Pandora expanding its output to meet listener demand include its expansion into on-demand music streaming, and its improvements to Pandora Plus, offering subscribers enhanced functionality.   Pandora has also expanded into podcasting to meet growing listener demand in that space.   And Pandora has developed, at great upfront and ongoing expense, its content algorithms that give each Pandora user a more tailored listening experience.  As a result of these substantial investments, Pandora is uniquely positioned to not only provide listeners with content they already know they want to hear, but also to introduce listeners to new content they were not previously familiar with.

35.     For its ad-supported music service, Pandora's primary competitor is AM/FM radio.  But Pandora also competes with other streaming services.  In comedy, Pandora competes with, among others, AM/FM radio stations, YouTube, Spotify, and other digital-audio streaming services like those provided by Apple, Google, and Amazon.  To a lesser extent, Pandora also competes with certain providers of audio-visual comedy programming, such as Netflix and HBO.  Pandora competes with

- 12 -

these other services for listeners on factors including price (either directly through subscription fees or indirectly through exposing the listeners to advertisements) and the quality and range of the comedy it offers.

### b. Comedians Compete to Have Their Performances Streamed

36.    In order to offer a viable comedy streaming service, Pandora needs access, including any necessary licenses, to quality recorded comedy routines by some minimum range of comedians of various styles, including many, but not all, of the above-noted "superstar" comedians.  Pandora does not need to have access to the recordings of all comedians, nor does it need access to all recordings of any given comedian.  Stated differently, Pandora can provide a viable comedy product with a relatively modest number of comedy recordings, so long as it has access to the recordings of a sufficient number of "superstar" and other comedians whom its listeners want to hear.

37.    As a result, as inputs to a streaming service, comedians' recordings are competitive alternatives to each other.  And, comedians do compete to have Pandora stream their recordings.  Comedians and their representatives regularly contact Pandora to secure more plays of their comedy recordings, all in an effort to secure the many benefits that being streamed on Pandora offers to comedians.  These benefits include the substantial royalties that Pandora pays out pursuant to the licenses that it has entered into with the record labels (and their authorized distributors) that own the comedy recordings, or through Pandora's royalty payments to SoundExchange, a regulated entity granted a statutory antitrust exemption that, among other things, collects royalties on behalf of the recorded music industry from services like Pandora that qualify for certain statutory licenses, including, as relevant here, the Section 112 and 114 statutory licenses.  17 U.S.C. §§ 112, 114.  The benefits also include the increased distribution, exposure, and other promotional value that comedians receive from Pandora.  That comedians and their representatives make such efforts provides strong evidence that the benefits they receive in return have

fully and appropriately compensated them for the use of their comedy and that each comedian's individual self-interest is served by operating in this way. Were that not the case, instead of trying to secure additional plays of their recordings, individual Comedians long ago would have made the royalty demands unilaterally that the Collective has made for them as a group.

38.   Acknowledging these many benefits, when Pandora asked the Collective whether it wanted Pandora to take down the comedy content that Word Collections claimed to represent after the Collective demanded that Pandora take its blanket license, the Collective said no, asking that the comedy content be kept up on the service.

39.   Because Pandora does not need the recordings of all comedians in order to have a viable product, Pandora can choose among the comedians and their recordings, based on competitive factors including price, quality, and desirability to listeners. As long as it is able to assemble a critical mass of such comedy recordings, including the recordings of many of the highly sought-after comedians, Pandora can offer a viable comedy streaming service.

### c. Historic Practice of Licensing Comedy Rights

40.   Pandora has a long history of respecting valid copyrights and entering into license agreements for the copyrighted content it transmits. Pandora's royalty payments have been so substantial that, in large part because of those royalty payments, it has never been able to earn a sustained profit. At all times relevant to these Counterclaims, Pandora has been willing to enter into reasonable licenses negotiated in a competitive market for legitimate copyrights covering the content it transmits.

41.   Since launching its comedy service in 2011, and pursuant to long-standing industry custom and practice (predating Pandora by many decades), Pandora has always taken licenses for the comedy recordings that it offers, and through those licenses has obtained (either explicitly or implicitly) all of the rights it needs to stream

those recordings.  Comedy, like every other copyright-intensive industry, except the dysfunctional music licensing market, has always followed a "licensing at the source" model for derivative works.  Under this model, the "source" or creator of the final product—in this case, the record label that creates and/or distributes the comedy recording—secures and passes along all necessary rights to use the final product, including any rights in any pre-existing works incorporated into the new derivative work final product, to all downstream distributors, licensees, and end-users, either explicitly or implicitly.  Pandora has not separately secured licenses just covering the underlying comedy routines embodied in comedy recordings, because it did not need any such separate licenses—all necessary rights were provided along with the rights to stream the recordings.  On information and belief, the same is true of all other services that stream or broadcast comedy recordings.

42.     No individual comedian has ever approached Pandora about entering into a separate license, or paying additional royalties, solely for any rights that the comedian may hold in the underlying comedy routines embodied in comedy recordings.  Instead, comedians followed the historic practice of being compensated through the licenses granted and royalties paid for the use of their comedy recordings. In other words, to the extent that separate royalties are allocable to the underlying jokes embodied in the comedy recordings, they are already "baked-in" to those paid for the use of the recordings.

43.     Pandora rightfully understood that each implicated comedian unilaterally had decided to not separately license rights to the underlying jokes or demand additional royalties above what Pandora was already paying to use the comedy recordings.  This understanding was no secret.  Pandora's publicly available SEC filings confirm its long-standing licensing practices.  Those filings explicitly noted that, pursuant to industry custom and practice, it was not securing a separate license, or paying a separate license fee, for the use of any underlying jokes embodied in comedy recordings.  For over a decade, and despite Pandora's complete

transparency as to its licensing practices, no comedian ever challenged those practices. Instead, comedians continued to seek increased airplay on Pandora's service. It was only with the public launch of Word Collections on October 22, 2020 (and Spoken Giants less than a week later on October 28, 2020) that anyone has tried to upend what has been working well for all involved for decades.

44. There is good reason that no comedian has ever approached Pandora about upending historic practice and demanding that Pandora pay an additional substantial royalty on top of what it was already paying for a separate license covering just the jokes embodied in the licensed comedy recordings. It would have been economically irrational to do so because, when acting independently, no individual comedian has the power to price above the competitive level. Had a comedian attempted, on their own, to secure a supra-competitive additional royalty for such rights with the threat of an infringement suit if Pandora did not acquiesce to those demands, Pandora likely would have taken that comedian's recordings off of its service and relied more heavily on (i.e., substituted) the recordings of other similar competitor comedians. Were that to happen, the comedian would lose all of the royalties and exposure he or she otherwise would have received from being streamed on Pandora during the period the recordings at issue were taken off the service. As described more specifically below, many prospective cartel members were concerned and asked Word Collections about this risk, and were told by Word Collections that by joining the Collective, this risk would disappear—broadcasters and streaming services like Pandora would have no choice but to take the Collective's license (with its supra-competitive fee) or abandon their comedy offerings altogether.

### d. The Formation and Growth of the Collective

45. In October 2020, a press release announced the launch of Word Collections, an "unprecedented performing rights collection agency for comedians." Bragging that its co-founder and CEO Jeff Price had "irrevocably upended the global music industry" in his prior positions at TuneCore and Audiam (both of which

terminated him), the press release explained that Word Collections' business purpose is to be "the ASCAP and BMI for spoken word instead of music." (Attached as Ex. A). But unlike Word Collections, these two organizations have been operating under court ordered consent decrees with the United States Department of Justice for *over 80 years* to resolve antitrust violations that arise from their collective licensing practices.

46.    The October 2020 press release emphasizes that Word Collections exists as a collective for its affiliated comedians, specifically listing the high-profile comedians that were part of its inception: George Carlin, Ron White, Bill Engvall, Roy Wood Jr., Jake Johannsen, Milton Berle, Bob Zany, Bill Dana (José Jimenez), Rich Vos, John Valby, Steve Sweeney, "and many others." And it noted that, at the time of launch, it already "represent[ed] over 1,300 literary works." The press release concludes by soliciting other "rights holders interested in working with Word Collections" to join the Collective.

47.    The Collective grew aggressively. For example, on July 22, 2021, Word Collections issued its second press release. In addition to announcing that it had completed a round of fundraising, it also re-listed all the previously-named comedians and added the names of additional comedians who had recently joined the Collective. (Attached as Ex. B). The same pattern continued with press releases on August 2, 2021 (Ex. C), August 10, 2021 (Ex. D), August 26, 2021 (Ex. E), September 14, 2021 (Ex. F), and November 8, 2021 (Ex. G). Each of these press releases followed the same pattern of relisting previously-announced members (many times in bold face), naming new members, and stating that there are "many more."

48.    As Word Collections' website makes clear, since its last press release the Collective has grown even more: According to its website, Word Collections "currently represents thousands of Musical Compositions and Literary Works." The list of comedians Word Collections claimed to represent as of the time this litigation began included at least the following:

| | |
|---|---|
| George Carlin | Robin Williams |
| Billy Crystal | Drew Carey |
| David Cross | Bill Engvall |
| Dick Gregory | Louie Anderson |
| Steven Wright | Andrew Dice Clay |
| Buddy Hackett | Waddie Mitchell |
| Bill Hicks | Robert Schimmel |
| Margaret Cho | Jim Breuer |
| Tommy Tiernan | Sinbad |
| Milton Berle | Bob Zany |
| Bill Dana (José Jimenez) | Rich Vos |
| John Valby | Steve Sweeney |
| Paul Mecurio | Dwayne Kennedy |
| Corey Rodrigues | Matt Ruby |
| Nick Griffin | Jeff Altman |
| Eddie Brill | Dane Cook |
| Will Durst | Jake Johannsen |
| Richard Pryor | Chris Rush |
| Adam Sandler | Flip Schultz |
| Steve Solomon | Jonathan Winters |

49.    In addition to issuing press releases regarding the growth of the Collective, Word Collections regularly reached out to Pandora to make sure that it was aware of the significance of its catalog, updating Pandora when additional comedians joined the Collective.  Some examples include:

- December 5, 2020: Word Collections informed Pandora that it had added the works of Margaret Cho to its catalog.

- April 14, 2021: Word Collections informed Pandora that it had added Dane Cook's works to its catalog.

- May 5, 2021: Word Collections wrote Pandora to make sure it was aware that the works of Richard Pryor, Steve Sweeney, and Eddie Brill were added to the Word Collections catalog.
- June 6, 2021: Word Collections informed Pandora that it had recently added the works of Buddy Hackett and Waddie Mitchell to its catalog.
- July 7, 2021: Word Collections again reached out to Pandora, stating that it had added the works of Adam Sandler to its catalog.

50.     The Collective has continued to grow even after the commencement of the underlying litigation.  For example, on June 25, 2022, Word Collections notified Pandora that it had added the works of Jerry Seinfeld to its catalog.   In this communication, Word Collections explained that it "exclusively controls and administers" the rights to the Seinfeld works and that those rights "cannot be licensed via, nor royalties remitted to, any other entity."  To ensure that it was not just Pandora that was aware that Jerry Seinfeld joined the Collective, on July 1, 2022, Mr. Price— Word Collections' founder and CEO—took to Twitter to publicly "welcome" Jerry Seinfeld as well as Nick Di Paolo to "the Word Collections family."

51.     All told, while the Collective launched with a catalog of some 1,300 literary works and a handful of comedians, it has expanded aggressively and, on information and belief, continues to grow.  It now represents many thousands of works of some of the most iconic and well-known comedians of all time, including such household names as: George Carlin, Robin Williams, Richard Pryor, Adam Sandler, Jerry Seinfeld, Bill Hicks, Dick Gregory, Buddy Hackett, Bill Engvall, Andrew Dice Clay, Dane Cook, Steven Wright, Jonathan Winters, Margret Cho, Jim Breuer, Bill Dana, Louie Anderson and, as the Word Collections repeatedly notes, "many more."

### e. The Collective Demands that Pandora Take Its Blanket License

52.     On March 11, 2021, Mr. Price contacted Pandora demanding that Pandora take a license to the entire catalog controlled by the Collective.  In doing so,

he indicated that the Collective's comedians—and not any individual comedian—"instructed" him to approach Pandora with a blanket license.  Mr. Price went on to note that "the catalog of works Word Collections represents and controls increases" and that Word Collections will "continue to provide [Pandora] notification of the incremental catalogs on a weekly basis."  The license that Mr. Price sent Pandora at the instruction of the Collective was a blanket license covering its entire portfolio for a fee well above what would emerge in a competitive marketplace.  Specifically, it called for a substantial additional royalty to be paid by Pandora on top of what it had been paying historically.  With that additional royalty, the total fee that the Collective demanded Pandora pay to stream comedy recordings increased by 25% over what Pandora had historically paid.  In other words, the Collective's demand was for a 25% increase in overall royalties, just so that Pandora could continue to do what it has always done.  The demand did not allow any means for Pandora to avoid the Collective's supra-competitive royalty or its blanket license:

- The licensing terms did not allow for any reduction in fee should Pandora enter into a separate license directly with a Word Collections-affiliated comedian or their representative.

- The licensing terms did not allow for Pandora to secure the rights to just some, but not all, of the material in the Word Collections catalog (whether at prices set by the individual comedians or by Word Collections).

- At no time did any individual comedian-member of the Collective attempt to enter into a license with Pandora just for the rights to the jokes embodied in their comedy recordings.  On information and belief, the "exclusive affiliation agreements" that these comedians signed with Word Collections prohibited them from doing so.

- And, even though Word Collections purports to act on behalf of its "client" comedians, at no time prior to this litigation did Word

Collections offer Pandora a license for an individual comedian's rights. The Complaint acknowledges as much, explaining that Word Collections "contacted Pandora in an effort to negotiate a licensing agreement for various copyright owners" and made "numerous efforts" to negotiate with Pandora on behalf of its "spoken word/literary works clients." An agent—even one representing multiple clients—is expected to act as a fiduciary for each of its clients. Word Collections did not do so; the Collective is its business model.

53. Instead, Word Collections—acting on behalf of the Collective and in furtherance of its joint interests—demanded that Pandora take the "all-or-nothing" blanket license covering everything in its catalog for an exorbitant fee, just as the Collective comedians had "instructed" it to do.

54. At the same time, the affiliated comedians jointly instructed Mr. Price to alert Pandora that if it did not enter into the blanket license, members of the Collective would bring infringement suits. The Collective made good on this promise as well, with five different comedian members of the Collective filing infringement lawsuits against Pandora all on the same day (February 7, 2022), a sixth member of the Collective bringing an infringement lawsuit against Pandora just three weeks later on February 28, 2022, and a seventh member of the Collective bringing an infringement suit about six weeks after that on April 12, 2022.

**f. Pandora is Forced to Remove Comedy Content from Its Service**

55. Having been sued for copyright infringement by these members of the Collective, Pandora was left with no choice but to remove their comedy recordings from its service. And, more recently, when threatened with the prospect of additional infringement suits from other members of the Collective, Pandora was forced to remove their recordings as well.

56. The forced removal of these recordings has degraded Pandora's comedy offering, and the negative impact on Pandora's offering will grow with the passage

of time.  As discussed in greater detail below, Pandora is no longer able to provide the quality product that it previously offered.  Just in the short time since Pandora began removing the plaintiff comedians' recordings from its services, Pandora's customers have already complained, including with threats that they will cancel their subscriptions if the content is not restored.  If Pandora is not able to use any of the content controlled by the Collective, Pandora will no longer be able to market and provide a competitive comedy offering in the long term.

## VI.   CONCERTED ACTIVITY

57.   To ensure that the Collective will succeed in creating for itself market power and be able to secure supra-competitive license fees from Pandora and others, members of the Collective have entered into two distinct forms of agreement, both of which violate the antitrust laws.  First, the comedian members of the Collective (the "Comedians") have agreed amongst themselves, with Word Collections facilitating their agreement, to no longer compete with each other and instead fix prices for the rights to all of their works through an all-or-nothing blanket license assembled and offered by Word Collections.

58.   Second, with the knowledge that other high-profile comedians were doing the same, each individual Comedian entered into an "exclusive affiliation agreement" with Word Collections.  As Mr. Price explained, these agreements leave Word Collections as the "only entity on the planet" that can license the rights to the comedian's jokes that are embodied in comedy recordings.  Not even the Comedians themselves are able to license their own works once they sign these exclusive affiliation agreements.  By entering into these exclusive affiliation agreements with all of the Comedians, Word Collections is able to license the entire catalog amassed by the Collective for a fixed fee, free from any of the competition that otherwise would have existed, and previously did exist, among the Collective's members.

### a. Agreement Among Comedians

59.    The Comedians, with Word Collections facilitating, have entered into an agreement with each other to restrict competition among themselves and to fix prices, as shown by circumstantial evidence, including "plus" factors, that demonstrate a conscious commitment to their unlawful objective.

### i. The Comedians Committed to a Common Course of Action

60.    Armed with knowledge of the purpose of the Collective and that other high-profile comedians were joining the Collective (as discussed below), each Comedian proceeded to engage in parallel conduct, all within a short time frame. Specifically, each Comedian entered into an "exclusive affiliation agreement" with Word Collections, granting Word Collections the authority to pool their rights together with those of the other members of the Collective, become the exclusive licensor of that collective set of rights, and license that set of rights only on a blanket basis at a uniform fixed price—terms that would be ruinous for any one Comedian to demand unilaterally.

61.    As detailed above, by the time of Word Collections' launch in October 2020, there was already a group of comedians that had signed their "exclusive affiliation agreements."  And over the course of the summer and fall of 2021, more and more comedians signed those same agreements.  This trend continued, including with Jerry Seinfeld also signing an exclusive affiliation agreement earlier this year. This recent coordinated action stands in sharp contrast to the behavior of comedians for decades.  As Word Collections' website confirms, entering into these types of exclusive affiliation agreements for the purpose of licensing purported "literary works" rights is something comedians had never done before.  Nor had they ever demanded a separate license solely for the rights to underlying comedy routines. They always licensed their rights pursuant to the above-discussed historic custom and practice.

### ii. The Comedians' Awareness of, and Knowing Participation in, the Collective's Anticompetitive Scheme

62.     The comedians that joined the Collective were well aware that they were not acting alone and in particular that they were interdependent: while recruiting new cartel members, Word Collections made clear that the Collective's success depended on the participation of many other high-profile comedians.   Word Collections repeatedly and publicly communicated this common course of action, acting as the instrumentality of the conspiracy with the agreement of the Collective and all Comedians who had signed on.   Word Collections made sure in each press release it issued to tout the many high-profile comedians that had already joined the Collective, frequently listing its key "clients" multiple times in the same press release.   These press releases, and additional public statements by Word Collections' founder and chief executive, served the multiple purposes of bringing new comedians into the Collective and assuring the current members that the group continued to be cohesive.

63.     Moreover, individual Comedians solicited other comedians to join the Collective.   For example, Word Collections-affiliate Eddie Brill provided numerous public interviews on social media and in comedy podcasts that expressed the intent of the Collective to coordinate the actions of multiple formerly independent rivals and raise prices.   For example, Mr. Brill acknowledged discussing Word Collections with fellow comedians, and the collective benefits of comedians' participation in the Collective, explaining that "we want to do the same thing for everybody."   Mr. Brill enticed additional comedians to join the Collective and raise prices, stating that he will "continue to be there helping [Word Collections] to have comedians join in and be part of what they do," and by touting that Word Collections already has "all these very famous famous people" and, as a result of its collective might, that "there is going to be a whole financial windfall" for those that join the Collective.   With the refrain that "comedians look out for each other," Mr. Brill has repeatedly highlighted the expansion of the Collective, noting in one podcast targeted toward the comedy

community that "the people who have joined us are not only great comedians who are alive, but the estate of George Carlin, the estate of Richard Pryor… on and on…Bill Hicks… and then comics who are alive—Margaret Cho… []… it's a long list." Additionally, upon information and belief, the identical contracts that each comedian signs with Word Collections grants Word Collections the authority to contract on their behalf, and binds the comedian to accept payment according to the contract terms that Word Collections negotiates between itself and services like Pandora.

64.   The comedians joining the Collective did so knowing full well that the purpose of the Collective was to pool their competing rights into a single catalog that would then be licensed on an all-or-nothing basis and for a fee that well exceeds that which any individual comedian could secure acting independently. Word Collections has repeatedly made this clear, including on its website, in its marketing materials (including those aimed at recruiting new co-conspirator comedian "clients"), and in its public statements. These statements that form an agreement have no less effect when they are communicated through Word Collections as the intermediary.

65.   First, in the press release announcing its launch and elsewhere, Word Collections refers to itself as the "ASCAP and BMI for spoken word instead of music." The collective licensing business model and the market power of ASCAP and BMI (as well as that of SESAC and GMR) are well established and understood. Since their inception (over 100 years ago in the case of ASCAP), those performing rights organizations (commonly referred to as "PROs") have licensed their respective catalogs on an all-or-nothing blanket basis. And it is only as a result of antitrust lawsuits brought by either the U.S. Department of Justice or private parties that any PRO offers a viable alternative to their preferred all-or-nothing blanket license and allows their affiliates to independently license their works outside the collective.

66.   The Comedians, or their representatives, understand the licensing practices of ASCAP and BMI. These practices are no secret within the entertainment

industry and, in the case of ASCAP, have been in existence for over a century.  In fact, some members of the Collective, including at least Adam Sandler, Bill Engvall and, on information and belief, George Carlin, currently are, or previously were, affiliated with ASCAP or BMI.  Moreover, members of the Collective are represented by sophisticated managers and attorneys, well versed in the details of the entertainment industry.  On information and belief, these representatives of the Comedians are well aware of the licensing practices of ASCAP and BMI.  For example, the same law firm that manages Counterdefendant The Williams Trust highlighted coverage of the DOJ review of the ASCAP and BMI consent decrees, observing that "The consent decrees are basically contracts with the government that restrict the organizations from certain activities to help protect from anti-competitive behavior[.]"  It would make no sense for Word Collections to constantly refer to itself as the ASCAP and BMI for spoken word if comedians and their representatives were not aware of what these PROs do and how they operate.

67.    Second, Mr. Price has discussed publicly the ongoing licensing efforts of Word Collections, acknowledging Word Collections' negotiations with streaming services for "blanket performing licenses" and explaining that one of the advantages that Word Collections has over entities like ASCAP and BMI is that it is not regulated by an antitrust consent decree with the United States Department of Justice or otherwise.  In so explaining, Mr. Price noted that "if the rate court [that is charged with setting competitive ASCAP and BMI royalties] wants to decrease the amount of money being paid to songwriters, that's not something I'd be willing to accept on behalf of my clients."  In other words, Word Collections has the ability to demand supra-competitive prices from users like Pandora and it will do so.

68.    Third, on information and belief, as Word Collections met and otherwise communicated with various comedians for the purpose of recruiting them into the Collective, many of those comedians expressed concern that if they allowed Word Collections to upend the historical custom and practice by seeking additional

royalties on their behalf, the various broadcasters and streaming services would stop playing their recordings, to their detriment.  Word Collections responded to these questions by telling the individual comedians that as long as enough of the comedians joined the Collective, bundled their rights together with each other, and gave Word Collections the exclusive right to issue blanket licenses to that collective body of rights, those broadcasters and streaming services could not take down the recordings of the individual cartel members without entirely ceasing to offer comedy programming.  Indeed, so many individual Comedians asked this question that Word Collections published the following "FAQ" on its website: "Q: How do I know the digital radio stations won't black list me and not play my recordings anymore? A: Digital radio and AM/FM radio either have to pay for all broadcasts of comedy and other spoken word performances or choose to broadcast none of it."  The message is clear: by banding together and agreeing only to collectively license their works, comedians can avoid the threat of being dropped by Pandora and others for demanding a supra-competitive price because, as a result of collective action among comedians, Pandora and others will have no choice but to take a license from the Collective on its terms for all of the comedy it represents or abandon their comedy offerings altogether.  As Word Collections also explains in response to the FAQ "Is there any risk to signing a contract with Word Collections?" "there is absolutely no downside."  In other words, by joining the Collective, all of the risks associated with acting unilaterally are eliminated.

69.    These public statements, aimed at furthering the Collective's mission, make it clear that comedians know exactly what they are doing when they affiliate with Word Collections.  These marketing materials and public statements—which promise a scheme that depends on recruiting many high-profile (and other) comedians for the express and essential purpose of bundling their rights together in one blanket license to eliminate competition—are directed at the very comedians Word Collections seeks to recruit into the Collective.  Upon information and belief,

comedians joining the Collective—including the Counterdefendant comedians—read and heard these marketing materials and public statements prior to becoming members.  They are thus not just entering into an individual agreement with Word Collections; they are doing so pursuant to an agreement with their fellow comedians to license their rights collectively with those of all of the other members of the Collective, to allow Word Collections to set a single fixed price for the entire catalog on behalf of the Collective, and to use the market power that the catalog provides the Collective to upend historic licensing practice and extract supra-competitive licensing fees from Pandora and other users of comedy, all to the financial benefit of the members of the Collective.

### iii.   The Comedians Instruct Word Collections to Implement the Blanket License

70.   Word Collections' March 11, 2021 demand that Pandora enter into a blanket license was made at the direction of the Comedians.  In that demand, Word Collections' Jeff Price specifically represented that Word Collections' "clients" (i.e., all of the Comedians through their collective agreement) "have instructed" him to approach Pandora with an all-or-nothing blanket license covering the Collective's entire portfolio of works.  He then acted exactly as instructed—offering only a single license covering the Collective's entire catalog.

71.   This "instruction" to approach Pandora with an all-or-nothing blanket license was on behalf of all the Comedians acting jointly, not in their respective individual interests.  The licensing terms did not allow for any reduction in fee should Pandora enter into a separate license directly with a Word Collections-affiliated comedian, nor did it allow for Pandora to secure the rights to just some, but not all, of the material controlled by the Collective (whether at prices set by the individual comedians or by Word Collections).

72.   The agreement among the Comedians, facilitated by Word Collections, was also on display when Plaintiff Main Sequence sent Pandora a letter by email on

September 9, 2021, via the "administrator" of its "literary works," in which it told Pandora that it was aware of Word Collections' license demand of March 11, 2021; admonished Pandora for not engaging with Word Collections "to reach an expeditious conclusion for the benefit of the comedians upon whose backs Pandora has reaped enormous financial reward without due compensation"; and threatened Pandora with "taking action," including seeking "statutory damages," if Pandora "fail[ed] to engage with Word Collections[.]"  Mr. Price was copied on that message and followed up on it the following day with Pandora, writing "Can we please move things forward? . . . There are additional letters that I suspect will be sent to Pandora and/or SiriusXM shortly by other rights holders on the same issue. . . . We are adding more and more catalogs."  It is noteworthy that the demands for increased money in conjunction with threats of litigation for copyright infringement were taken only once the Comedians were negotiating as a group through Word Collections.   No independent comedian has ever taken this action.

73.     The Comedians' parallel actions in enforcing the goals of the Collective as against Pandora also demonstrate joint conduct.  On February 7, 2022, five of the Comedians simultaneously filed infringement suits against Pandora, a sixth filed suit three weeks later, and a seventh filed suit six weeks after that.  No comedian had ever previously brought such an infringement suit against Pandora or, on information and belief, any other service that uses comedy recordings—such action would not make economic sense unless the Comedians are colluding.

### iv.  "Plus" Factors

74.     Several "plus" factors support the conclusion that the Comedians conspired with one another instead of acting unilaterally.   In particular, Word Collections gives the Comedians the ability to coordinate their actions and the ability to deter cheating.

75.     First, the actions taken by the Comedians are against their own individual self-interest—they do not make sense absent an agreement.  No comedian

acting alone would demand, with the threat of an infringement lawsuit in the background, a supra-competitive extra royalty on top of what they have historically been paid from a service like Pandora. Indeed, no comedian has ever done this in the decade-plus that Pandora has been streaming comedy. And that is for good reason—doing so would likely result in their recordings being removed from Pandora and losing out on the royalties and promotion that would have otherwise occurred. Word Collections' website specifically notes the "[f]requently [a]sked" question as to the risk of an individual being dropped by a service like Pandora for demanding an additional royalty; comedians could avoid that individual risk by being part of the Collective and taking advantage of its joint power. On information and belief, Comedians—including the Counterdefendant Comedians—understood this when they joined the Collective.

76.    Second, the Comedians all had a common motive to conspire with the other members of the Collective, as only in the context of a prior agreement that other competitors behave similarly could they secure additional supra-competitive royalties. It is only through the collective action proposed by Word Collections that Word Collections and the Comedians can amass the market power necessary to bring about a change to historic licensing practice and secure supra-competitive royalties for purported "literary works" rights. An individual comedian would not have the ability to bring about this change on their own—doing so would have only hurt the individual comedian to the benefit of their competitor comedians.

77.    Third, Word Collections and its co-conspirator comedian clients all undertook efforts, within a very short period of time, to force an unprecedented change to the licensing of comedy. They all, for the first time, demanded that services like Pandora take a second license just for the underlying comedy routines embodied in the already-licensed comedy recordings. And, as noted above, each of the Comedians entered into exclusive affiliation agreements with Word Collections that prevent cheating on the cartel all within a short time frame, despite having never

affiliated with a "literary works" licensing agency before, and took the steps set forth above to effectuate the anticompetitive scheme. These dramatic departures from past practice, all within a short period of time, make clear that the decision to affiliate with Word Collections and bring about the change to the marketplace through joint conduct was coordinated activity and not mere coincidental parallel conduct.

78.     Fourth, the Collective took direct steps to provide assurances to each of the Comedians during the period of license demands that the Collective remained intact and that they should all stick together. In the Spring of 2021, the Comedians collectively directed Word Collections to move forward with making demands to Pandora for supra-competitive royalties and, on information and belief, other users of comedy content. On information and belief, the Comedians recognized the potential repercussions in the marketplace from such a strategy, including the potential for services to drop the Comedians, and individual Comedians feared that others might drop from the Collective. In response to this concern, Word Collections, starting in July 2021, issued a series of press releases dated July 22, August 2, August 10, August 26, and September 14. In addition to touting newly-joined comedians, each press release reiterated—in boldface—the names of affiliated comedians, even though those names already had appeared on prior press releases. This assured the Comedians that each would not be acting independently. Rather, the Collective was holding strong and continuing to grow.

### b. Agreements Between Word Collections and Individual Comedians

79.     In addition to the anticompetitive price fixing agreement that the Comedians have entered into with each other, they have also entered into a second form of anticompetitive agreement—"exclusive affiliation agreements" that each Comedian entered into with Word Collections. On information and belief, these agreements make Word Collections the exclusive licensor of the works of the Comedian, and prevent anyone, including the Comedians themselves, from licensing their rights directly to a service like Pandora. For example, when Word Collections

informed Pandora that it had entered into an exclusive affiliation agreement with Jerry Seinfeld, it also emphasized that "Word Collections *exclusively* controls and administers" the rights to the Seinfeld works and that those rights "cannot be licensed via, nor royalties remitted to, *any* other entity." (emphases added). Word Collections has made similar statements with respect to its ability to exclusively license the rights of many of its other comedian affiliates. In addition to granting Word Collections exclusive licensing authority, these agreements also allow Word Collections to bundle the rights of the comedian with those of all of the other members of the Collective.

80.   These agreements serve at least three anticompetitive purposes. First, they enable Word Collections to consolidate each Comedian's rights with those of other members of the Collective and license them jointly. Second, they enable the Collective to amass market power through the aggregation of the individual Comedians' rights. And third, by giving Word Collections exclusive control over the Comedian's rights, these agreements cement the Collective's market power by eliminating even the possibility of the Comedian competing against the Collective. Stated differently, these agreements prevent the Comedians from cheating on the cartel.

81.   In response to the FAQ "Do I have to sign an affiliation agreement with Word Collections?", Word Collections states: "Yes. We require all clients to sign an *exclusive* affiliation agreement that explains the terms of the engagement for Word Collections' services." (emphasis added). In addition, Word Collections has repeatedly sent Pandora purported "Letters of Direction" notifying Pandora that it has been "assigned" by the comedian the "exclusive rights of licensing" the works of the comedian. These purported "Letters of Direction" go on to make clear that "Word Collections represents and warrants that it has entered into a *formal agreement* with the applicable copyright owners relating to the assignment of the foregoing rights,

- 32 -

and that this Letter of Direction is issued in accordance with such *agreement*." (emphases added).

## VII.    THE COLLECTIVE'S PRICE FIXING SCHEME

### a. The Effects of the Price Fixing Scheme

82.    Word Collections (and Spoken Giants) saw an opportunity to do what individual comedians could not, and would not, do on their own.   These newly created cartels decided to follow the anticompetitive playbook of the PROs—those entities that license musical works public performance rights on a collective basis— by bringing together a sufficient number of high-profile comedians (and others) and convincing them to agree with each other to no longer compete and instead license all of their purported "literary works" rights through an all-or-nothing blanket license.   By agreeing to eliminate the competition between comedians that historically has taken place, comedians are able to extract additional supra-competitive royalties for the claimed rights to the jokes embodied in comedy recordings from services like Pandora.  As explained above, Word Collections knows this, as do the Comedians.

83.    Word Collections' website and its marketing materials describe this simple collective licensing scheme: instead of maintaining past practice, comedians (or the entities holding the rights to the comedians' purported "literary works") sign the required "exclusive affiliation agreements" with Word Collections.   Those "exclusive affiliation agreements" empower Word Collections to grant licenses for the comedians' rights bundled together with the rights of all members of the Collective to services like Pandora and collect royalties from those services on behalf of all.  Those agreements give Word Collections power to set a single fixed price for access to all of these comedians' rights—rights that otherwise would be offered in competition with each other.

84.    Moreover, the agreements between Word Collections and its co-conspirator Comedians mean that Word Collections' price for these works is the *only*

price in the market.  Individual licenses from members of the Collective—even if they were available—would be useless to Pandora and other services: the Collective licenses its comedians' rights only through a blanket license covering its entire portfolio.  Once it forces a service to take that blanket license, taking an individual license from a comedian member of the Collective would mean that the service is paying twice (and actually three times, given that the rights were already paid for pursuant to the sound recording licenses) for that Comedian's underlying jokes in the recordings—once through the blanket license and then again through the individually negotiated license.  Consequently, once a comedian joins the Collective, there is no longer any economic incentive to try and negotiate directly with that rightsholder— doing so would be economically irrational.  As a result of its blanket licensing practices, Word Collections effectively controls access to that comedian's rights as well as those of all of its other co-conspirator "clients."

85.    Worse, on information and belief, through its "exclusive affiliation agreements," Word Collections ensures that Pandora and other services will have no choice but to license any of the Comedians' rights through the Collective.  The Comedians have contracted away their rights to license independently and have ensured that the only option available to services like Pandora is to deal directly with the Collective.

86.    The Comedians similarly have no economic incentive to enter into direct licenses with Pandora and others so long as they remain a part of the cartel.  By sticking with the Collective, the Comedians know they will get the inflated price set by Word Collections instead of the far lower price that would result if they continued to compete with each other.  And the Comedians understand that the only way the Collective can secure supra-competitive prices is if a sufficient number of high-profile comedians band together to give the Collective the market power necessary to do so.

87.     The Collective's plan is, and always has been, to license its catalog exclusively on a blanket "all-or-nothing" basis; the Comedians understand as much and have agreed to be part of that plan.  Word Collections has repeatedly made this clear, including on its website, in its marketing materials (including those aimed at recruiting new co-conspirator comedian "clients"), and in its public statements.  Word Collections repeatedly refers to itself as the "ASCAP and BMI for spoken word instead of music"—PROs with blanket licensing practices that are well established and understood.  Mr. Price has discussed publicly the ongoing negotiations between Word Collections and streaming services for "blanket performing licenses."  And, Mr. Price has even gone so far as to explain that one of the advantages that Word Collections has over entities like ASCAP and BMI is that it is not regulated, by an antitrust consent decree with the United States Department of Justice or otherwise.

88.     These statements are also entirely consistent with the license that Word Collections has insisted that Pandora take—one that called for a 25% increase in the fee that Pandora had historically paid to stream comedy, just so that Pandora could continue to do what it has always done.  The licensing terms did not allow for any reduction in fee should Pandora enter into a separate license directly with a Word Collections-affiliated comedian or their representative nor did they allow Pandora to secure the rights to just some, but not all, of the material in the Word Collections catalog.  In short, Word Collections required that Pandora take an "all-or-nothing" license covering everything in its catalog for an exorbitant fee, just as the Comedians "instructed" it to do.

89.     The result of this price fixing scheme is that Pandora and other services are no longer able to get licenses for these asserted "literary works" at the competitive prices that have historically prevailed when comedians competed against each other to have their works played by Pandora instead of banding together to charge supra-competitive fees.  Stated differently, by joining the Collective, comedians are shielding themselves from the forces of competition so that they can reap the benefits

of licensing their rights at supra-competitive fees through an all-or-nothing blanket license.

90.    This approach to licensing is, in many respects, the same as that taken by the two smaller and unregulated U.S. PROs: SESAC and GMR.  Like Word Collections, these two PROs represent a relatively modest number of songwriters.  And also like Word Collections, these two PROs represent some of the most well-known and popular songwriters.  As a result, both of these smaller PROs have been able to make themselves "must have" to a service like Pandora by collectively licensing the rights to the musical works written by a relatively modest number of key songwriters.  These licensing tactics have resulted in antitrust lawsuits brought by television and radio broadcasters against SESAC and radio broadcasters against GMR, the latter of which was brought in this District.  Those suits made allegations similar, and in certain respects identical, to those raised here, and all survived motions to dismiss.

### b. The Collective's Price Fixing Scheme Does Not Create Any Efficiencies

91.    While pooling of intellectual property rights can, under certain circumstances, create efficiencies, the Collective's pooling of the rights of otherwise competing comedians does nothing of the sort.  There is no legitimate reason to collectively license the purported rights to the underlying jokes embodied in comedy recordings—doing so only serves to stifle competition.  Unlike combinations of complementary resources, which can create new value for users, the Collective's blanket license does nothing but consolidate competitors and fix their prices.  It creates no efficiencies.  This blanket license is no more a new product than is the output of any other cartel.

92.    As explained above, the historic practice of licensing the purported "literary works" rights of comedians "at the source"—from the record label that owns the end-product comedy recording—has worked well and efficiently for decades.

Until Word Collections (and Spoken Giants) emerged, no comedian ever sought a separate license and additional royalty from Pandora solely for the rights to the underlying jokes embodied in comedy recordings. To the contrary, comedians regularly contacted Pandora in an effort to secure more plays of their works pursuant to the licenses and royalties that were paid in accordance with historic practice.

93.   While Word Collections regularly presents itself as "the ASCAP and BMI for spoken word instead of music," ASCAP's and BMI's licensing of public performances of musical works fundamentally differs from comedy licensing. Some of the more salient differences include, but are not limited to, the following:

- Unlike music rights licensing, which, as the Supreme Court has observed, involves "thousands of users, thousands of copyright owners, and millions of compositions" (*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S 1, 20 (1979)), comedy licensing involves a far smaller universe of users, copyright owners, and works. Because the total number of performing comedians that Pandora might want to secure a license from is so much smaller than the number of music composers, the alleged comedy "literary works" rights are far less widely held than are public performance rights in musical compositions.

- Word Collections' blanket license does not provide any technological or logistical benefit, further undercutting any justification for its use.

- As explained above, Pandora does not need access to the recordings of all, or even most, comedians in order to offer a viable comedy streaming service. Nor does Pandora need access to all of any one comedian's available recordings. Pandora needs only a critical mass of quality comedy recordings by a range of comedians, including many, but not all, of the most well-known and highly sought after comedians, in order to offer a viable and competitive product.

- The number of potential licensees of comedy rights is far smaller than the number of users of musical works public performance rights. And, in fact, the Collective has targeted only a handful of services.

- Unlike with music, the author of the comedic routine and the comedian featured on the comedy recording are, in almost all instances, the same. Indeed, for each work listed in the Complaint, the performing comedian is also the alleged sole author and owner of the work. Accordingly, it is not only inefficient to depart from historic practice (in which a single license conveys all of the necessary rights) by imposing a separate licensing obligation, but doing so after the owner of the sound recording has already granted a license can only serve to create hold-up power over services like Pandora.

- ASCAP and BMI are both constrained by the antitrust consent decrees they have entered into with the U.S. Department of Justice. Among other things, these decrees: (i) require that ASCAP and BMI offer viable alternatives to their preferred all-or-nothing blanket licenses; (ii) prohibit ASCAP and BMI from entering into exclusive affiliation agreements with their members; and (iii) call for a "rate court" charged with setting "reasonable" (i.e., competitive) fees that music users can turn to in the event of a negotiating impasse with either PRO. None of these constraints applies to Word Collections.

94. The current and historical practice of bundling these purported "literary works" rights within the sound recording licenses creates substantial transactional efficiencies for all involved—efficiencies that would be lost if the Collective is successful in upending historic practice. There is no need for any collective to jointly deal with services offering comedy content on behalf of the relatively modest number of comedians whose works are of sufficient interest to listeners that Pandora might want to use them on its service. Comedians can continue the decades-old practice of

having their record label handle all such licensing for them at the same time it licenses the necessary rights to the comedy recordings. As a result, the Collective brings nothing new to the table. The licensing of all necessary rights is already handled through a single license, and the Collective's preferred approach of splitting the licensing into two only creates more transaction costs, not fewer.

95. Moreover, because the author of the underlying jokes and the recording artist are, in the case of comedy, almost always the same person, there is no rational reason for having separate licenses for the recordings and the underlying jokes, except to create hold-up power by any licensor that has amassed market power over such rights. Under a regime in which separate licenses are required, each license is useless to a service like Pandora without the other—even with the sound recording license in hand, Word Collections' contention is that Pandora cannot legally play the recordings without a separate license covering the underlying jokes.

96. Further, there is no valid justification for the Collective to offer a blanket license covering the rights to all of the works of its Comedians, particularly when it makes that blanket license the only means of obtaining *any* license to *any* of the works. These blanket licensing practices force Pandora and other services to take a license covering far more material than they would ever need; the licensing practices could succeed only as a result of the Collective having accumulated market power that forces services to take the license covering the Collective's entire portfolio if they are to get a license to any of it. And unlike ASCAP and BMI, which are subject to antitrust consent decrees that require them to offer, among other things, meaningful alternatives to their blanket licenses, Word Collections' blanket license faces not even a hypothetical constraint from other competitive alternatives.

97. For all of these reasons, there is no valid justification for facilitating the collective licensing of the rights to the jokes embodied in comedy recordings. If the owners of rights to the jokes embodied in comedy recordings asserted them against Pandora and others without colluding, Pandora—and in turn, its customers—would

benefit from a free competitive market in which the rights owners would compete against each other in order to attract Pandora to obtain the rights necessary to use their material.  On information and belief, the same would be true for other services that offer comedy.  But the Comedians, now consolidated by Word Collections, have conspired to not only disrupt long-standing custom and practice, but to also ensure that the competitive market that would otherwise emerge will never take hold.

## VIII.    THE COLLECTIVE'S MARKET POWER

98.    The Collective has aggregated a portfolio of the rights to the works of some of the most iconic and important comedians of all time, providing it power in the relevant market that it can and does exert over Pandora.  If Pandora, or another service, were unable to get access to a critical mass of recordings, including those of many of the highly sought-after comedians that listeners want to hear, it could no longer offer a viable comedy streaming product in the long-run and, as a result, would no longer offer comedians the benefits that it currently provides.  Consequently, if a single economic actor gained control over the licensing of the rights to the comedy routines embodied in the recordings of a substantial number of "superstar" comedians, and used that control to set a single elevated price for access to all of those rights—just as Word Collections has—a streaming service could not substitute away from that *collection* of rights and rely only on other comedians' works and survive in the long run.  In other words, that economic actor—Word Collections— has monopoly power (or, alternatively, at a minimum has a dangerous probability of achieving monopoly power) over Pandora and, on information and belief, other services, and can, in effect, decide whether a service's comedy offering ultimately survives or fails.

### a.  Relevant Product and Geographic Market Definition

99.    The relevant product market in which to assess the anticompetitive effect of Counterdefendants' conduct is the U.S. market for the rights to comedy routines embodied in comedy recordings.

100.   The relevant product market does not include all written comedy routines.   The only written comedic works to which Pandora would ever need a license are ones that have been recorded and for which the recording is available to Pandora for streaming.

101.   Because consumer demand for streaming of comedy recordings is specific to recorded comedy, rights for other types of written works, even ones embodied in recorded performances of some kind, are not a substitute for the rights to the comedy routines embodied in comedy recordings.

102.   Pandora's customers, and those of other services, whose demand ultimately determines the content that the services provide in competition with each other, have a pronounced demand for comedy recordings.   If comedy recordings became unavailable, those listeners would not readily shift to other types of streamed content.

103.   Because it must respond to listener demand in a competitive market, Pandora would not and could not respond to a sustained price increase for the rights to comedy routines embodied in comedy recordings by shifting its programming towards other recorded spoken word content, such as famous speeches or poetry. Similarly, Pandora would not and could not shift its programming further towards music in response to a sustained price increase for the rights to comedy routines embodied in comedy recordings; comedy programming answers consumer demand that is different from consumer demand for music programming.

104.   As explained above, a person or entity that, like the Collective, gained control over the rights to a critical mass of comedy routines embodied in comedy recordings from a sufficient number of household-name comedians would be able to impose a substantial price increase over competitive levels without seeing shifts by Pandora and other services to other products.

105.   The Comedians are competitors in the Relevant Market.   But for their agreements with Word Collections, they would be competing against each other to

- 41 -

persuade Pandora and other services to include their comedy in the service offerings. That competition would manifest itself in license royalties at competitive levels, reflecting the ability of services like Pandora to pick and choose among individual comedians and individual comedy recordings, knowing that they need only a critical mass of content to offer listeners, and not access to all comedy recordings.

106. The relevant geographic market is the United States. The rights Counterdefendants are asserting against Pandora are based on federal copyright law, and, to the extent they exist, are exercisable and enforceable nationwide. Counterdefendants have not attempted to license on different terms in different geographic areas within the United States, and Pandora operates throughout the United States.

### b. Market Power in the Relevant Market

#### i. Direct Evidence of the Collective's Market Power

107. Word Collections' license fee demands during its negotiations with Pandora provide direct evidence of its market power. Before Word Collections emerged, its affiliated Comedians competed with each other and the result of that competition was the above discussed historic practice. But the Collective, having aggregated substantial market power, is able to demand an exorbitant and supra-competitive price for its license—one that is dramatically higher (25%) than that which prevailed in the previously functioning competitive market. Pandora does not have any competitive alternatives to the Collective's unique portfolio; it cannot simply reject the Collective's price fixed "offer" and deal instead with a competitor. Pandora's only options are to accede to these demands and pay the supra-competitive royalty or degrade its comedy offering by removing the Comedians' recordings from its service (and run the risk of having to abandon its comedy offering in the long term should these conditions continue). Pandora was forced to do the latter. And, as discussed below, these takedowns have already resulted in customer complaints,

including threats to leave Pandora for another service.  The ability to effect such a market result—reduced output and lower quality—is clear evidence of market power.

108.   Moreover, the Collective has eliminated the only potential competition to itself through the exclusive affiliation agreements the Comedians have signed with Word Collections—agreements that contractually prevent the Comedians from licensing outside the Collective and assure the Comedians that no one will cheat on the cartel.  Due to this lack of competition, Pandora and, on information and belief, other services that stream comedy cannot turn to other licensors for any of the works in the Collective's portfolio.

109.   Because Pandora must have access to the works of at least some of the Comedians to remain competitive in the long run, it has no choice but to deal with the Collective on its terms—i.e., take the blanket license and pay the supra-competitive fees or immediately degrade and ultimately shut down its comedy offering.  In a recent interview, Mr. Price made this very point.  He boasted that Word Collections is "the *only entity on the planet* where these services [like Pandora] can come to get a license to use [the] literary works" of any of the members of the Word Collections cartel.  Who Knew, *The Smartest People In The Room - Jeff Price and Rick Krim*, YouTube (Mar. 31, 2022), https://www.youtube.com/watch?v=TwaS5Qo5MtA&t=3868s.  (emphasis added).

110.   Obtaining and exerting monopoly power is Word Collections' business plan.  Not only does its website trumpet its portfolio of iconic comedians, but it brags that "Word Collections is *the* ASCAP *and* BMI for spoken word instead of music." (emphasis added.)  Word Collections transparently seeks to position itself as the go-to source for licenses under this newly-asserted right.   When co-conspirator comedians sign their "exclusive affiliation agreements," they are knowingly and intentionally committing to a common course of action as proposed by Word Collections, engaging in horizontal price fixing, and agreeing to help make Word

Collections a monopolist.  Having already obtained market power, Word Collections is moving steadily towards its goal, if it has not achieved that goal already.

111.   Lest there be any doubt of the Collective's ability and intent to extract supra-competitive license fees as a result of its market power, Mr. Price has confirmed as much publicly.  On June 9, 2022, Mr. Price took to Twitter to proclaim that he is "so thinking that this should be the official T-shirt and slogan of Word Collections: f*** you, pay me."



The T-shirt pictured in Mr. Price's tweet references an iconic line from Martin Scorsese's movie *Goodfellas*, in which mafia soldier Henry Hill describes how an

organized crime family's protection and loansharking operations would force businesses to make unsustainable and unreasonable payments under threat of violence and destruction of the business.  As Mr. Price implies, the Collective works in an analogous manner, using the "must have" nature of the Collective's combined catalog (although not the threat of violence) to extract confiscatory royalty increases from potential licensees, instead of the competitive price.

### ii.  The Collective's "Must Have" Portfolio

112.   Pandora and other services need access to a sufficient number of quality comedy recordings, including many, but not all, of the "superstar" comedians in order to offer a viable comedy product.  An entity that gained control over a critical mass of the recordings of such comedians would have monopoly power—the power to set "f*** you, pay me" prices undisciplined by competition—over Pandora and other services.

113.   The Collective's intent, and one that was expressed directly to comedians in an effort to bring them into the fold, is to consolidate the works of a critical mass of comedians, including some of the most iconic comedians, into a single blanket license so that it will have sufficient market power to force a change to how comedy rights have been licensed for decades, secure supra-competitive royalties for its affiliated Comedians, and ultimately gain full monopoly power.

114.   The Collective has already operationalized that plan.  Its publicly-stated portfolio includes:

- The top two best stand-up comedians of all time—Richard Pryor (#1) and George Carlin (#2)—as ranked by Rolling Stone (*available at* https://www.rollingstone.com/culture/culture-lists/50-best-stand-up-comics-of-all-time-126359/).

- George Carlin, the iconic comedian who defined comedy in the 1960s and 1970s.

- Robin Williams, one of the most iconic and defining comedians of the 1980s and 1990s.
- Nine of the Rolling Stone "50 Best Stand-Up Comedians of All Time": Richard Pryor (#1), George Carlin (#2), Jerry Seinfeld (#7), Robin Williams (#12), Bill Hicks (#13), Steven Wright (#15), Jonathan Williams (#22), Dick Gregory (#29), and Margaret Cho (#48).
- Comedians (Adam Sandler, Dane Cook, and Bill Engvall) responsible for five of the top sixteen comedy albums sold from 1991 to 2014 (*available at* https://www.billboard.com/lists/top-20-best-selling-comedy-albums-nielsen-soundscan-era/various-artists-the-blue-collar-comedy-tour-sales-to-date-731000/).

115.   By taking control of the rights of the many legendary comedians listed above, and, as Word Collections' website brags, "many others," and continuing to aggressively recruit additional cartel members, the Collective has already made its portfolio a true "must have" (and alternatively, if it has not done so already, it has created a dangerous probability of doing so). As a result, no streaming service is able to avoid taking a license from the Collective for its entire portfolio, on the Collective's terms, if it wishes to continue offering a viable comedy product in the long run.   Word Collections and its co-conspirator Comedians, through their "exclusive affiliation agreements," have agreed to give, and have given, the Collective monopoly power (or, alternatively, at a minimum a dangerous probability of achieving monopoly power) over services that have comedy offerings.

116.   Pandora's comedy curation team has found that the raw number of comedians offered on the service alone is not critical to the success of the service. Instead, it is far more important to be able to provide listeners with the recordings of a sufficient number of the prominent comedians that they want to hear.   The Collective's catalog contains the works of many such prominent comedians and a sufficient number to make that catalog a "must have."   As Word Collections has put

- 46 -

it, its "clients" include "some of the world's most iconic" comedians. Indeed, the plaintiff Comedians themselves tout their own position in the market. For example, the Complaint describes the plaintiff Comedians as all being "iconic, world famous comedians, each of whom have captivated audiences for decades and are considered, by many, as legends in the entertainment field, having brought to their audiences works that will be treasured for years to come." The Complaint goes on to list some of the many accomplishments of the plaintiff Comedians, including:

- George Carlin: explaining that he: (i) has been "dubbed the Dean of Counterculture Comedians"; (ii) was an "integral part of the entertainment world" for 52 years; (iii) was a "trailblazer in the comedy industry"; (iv) was "posthumously awarded the Mark Twain Prize for American Humor"; (v) was "ranked by Rolling Stone Magazine as the second-best stand-up comedian of all time"; and (vi) "continues to remain a relevant figure in the entertainment industry and has helped chart the way for countless comedians after him."

- Ron White: explaining that he: (i) has four comedy albums that landed at "#1 on the Billboard Comedy Charts"; (ii) has received three Grammy nominations; (iii) has "become one of the top three grossing stand-up comedians on tour in America"; (iv) had a television special that "had the highest viewership for a Sunday program in Comedy Central history"; (v) "has continued to set the bar for comedy specials" including having one special become the "#1 show on primetime basic cable"; and (vi) has a comedy book that became a New York Times bestseller.

- Robin Williams: explaining that: (i) he has "been an integral part of [comedy] history"; (ii) his "skill with comedic improvisation set the standard for stand-up comedians"; (iii) he won "six (6) Golden Globe Awards, including the Cecil B. DeMille Award, two (2) Primetime

Emmy Awards, two (2) Screen Actors Guild Awards, [and] an Academy Award"; (iv) he won "five (5) Grammy Awards for his comedy albums, including Best Comedy Album and Best Spoken Word Comedy Album"; and (v) he was a "national treasure."

- Andrew Dice Clay: explaining that he: (i) has "won over the hearts of millions of loyal fans"; (ii) was the "first comedian to sell out Madison Square Garden two nights in a row, as well as numerous sporting arenas across the country"; (iii) was "named Comedy Act of the Year by Performance Magazine"; and (iv) "continues to captivate audiences" making him "a comedic legend in his own right."

- Bill Hicks: explaining that he: (i) over the course of his "full and vibrant career" has brought "laughter to millions"; (ii) was "voted thirteenth (13th) on the list put out by comedy insiders of the 'Top 20 Greatest Comedy Acts Ever'"; (iii) "was ranked nineteenth (19th) on Comedy Central Presents: 100 Greatest Stand-Ups of All Time"; (iv) was voted sixth and then later fourth on "Britain's Channel 4 list of the 100 Greatest Stand-Up Comics"; (v) has been cited "as an inspiration" by many other successful comedians; and (vi) "helped shape the comedy world significantly."

117. Pandora's curation team has concluded that if Pandora no longer had access to any of the works in the Collective's catalog, it would, at a minimum, have to significantly degrade its comedy offering in the short run and it would not be able to offer a competitive comedy offering in the long run. Pandora's inability to offer a competitive comedy service in the long-run without access to any of the works in the Collective's catalog is what makes the Collective's catalog "must have" to Pandora and what gives the Collective its market power.

118. The "takedowns" as a result of the Collective's efforts further demonstrate the significance of the Collective's catalog. As noted, Pandora has been

forced to take down the recordings of the plaintiff Comedians.  More recently, it has also taken down the recordings of the other Comedians (and those comedians affiliated with Spoken Giants).  These takedowns, despite having only recently been done, are already having a noticeable impact on Pandora's comedy offering.  Pandora has received customer complaints about its now-degraded comedy offering, including customer threats to leave Pandora for one of its competitors if the recordings of these Comedians are not reinstated.  For example, one customer contacted Pandora asking "why did I lose most a [*sic*] of my comedy."  Another expressed frustration that "everyone's albums are disappearing" and noted that "if this continues [the customer] will be switching to another platform."  As these complaints make clear, it is not just that Pandora is losing one favorite Comedian or another; customers are noticing the loss of the combination of multiple top Comedians who they want to hear.  The takedowns that Pandora has been forced to undertake are already affecting significant portions of the portfolio of comedy that its customers want and expect to hear; should the content remain unavailable, customers will stop listening and subscribing to Pandora, turning instead to a competitor platform's comedy offering.

### c. Barriers to Entry

119.   The barriers to entry into the Relevant Market are insurmountable.  A new licensor of jokes embodied in comedy recordings could not constrain the Collective's market power because only the Collective has the ability to license any of the works in its "must have" catalog.  Whatever a hypothetical entrant might supply, it could not supply a substitute for what the Collective offers.  As noted, because Pandora must have access to the comedy of at least some of the Comedians to offer a viable comedy service in the long run, the only potential competitors to the Collective are its own Comedians.  But because the Collective shares the supra-competitive license fees it is able to extract from comedy services with the Comedians and the Comedians have entered into exclusive affiliation agreements

that prevent them from competing against the Collective, the Comedians have no incentive or ability to cheat on the cartel and license independently.

120.   The fact that Spoken Giants—another joke-licensing cartel—exists does not in any way undermine the market power that the Collective has amassed for itself. Pandora must have access to at least a portion of the catalogs of *both* cartels if it is to offer a viable comedy service in the long run.  In this sense, Word Collections and Spoken Giants are identical to ASCAP and BMI—the musical works PROs that they model themselves after (albeit without any of the restrictions imposed on those PROs by their antitrust consent decrees with the United States Department of Justice).  It has long been recognized by the Department of Justice and the courts that oversee the ASCAP and BMI antitrust consent decrees that licenses from both ASCAP and BMI are "must have" to music streaming services, giving both of these PROs monopoly power—power that is tempered only by their consent decrees, and not by competition between them.

## IX.   ANTICOMPETITIVE EFFECTS

### a. Harm to Competition in the Relevant Market

121.   The Collective's scheme of consolidating the rights to comedy routines embodied in comedy recordings, fixing prices for them, and exclusively licensing them through its blanket license has already throttled competition among the Counterdefendant Comedians and other comedians who have joined the Collective.

122.   Word Collections' website and its public statements make clear that the competition that would and easily could exist in the Relevant Market among its co-conspirator "clients" and other comedians will not happen.  Word Collections' mission, adopted by Counterdefendant Comedians and other members of the Collective, is to force Pandora and other services to take and pay for its entire portfolio—at a price that it alone will set—or to get none of it, and have no choice but to drop its comedy offering.

123.   The result of this anticompetitive scheme—if allowed to proceed— will be not only higher prices but a reduced supply of comedy programming by services than would be available if the market for comedy rights were competitive.  The higher prices will also affect Pandora's and other services' overall efficiency and competitiveness, possibly even leading to decisions to abandon comedy services; in any case, the actions of the Collective will lead to overall higher consumer prices and/or less output, and to less consumer satisfaction than would exist if Counterdefendants had not eliminated competition in the Relevant Market.

### b. Harm to Pandora

124.   Pandora has already borne the brunt of Counterdefendants' collusive and illegal scheme.  Despite the publicity surrounding this new effort spearheaded by Word Collections (and Spoken Giants) to force Pandora and other services to take a second license just covering the comedy routines embodied in the recordings that they already license (and pay substantial royalties for), and the substantial resources available to any number of the plaintiff Comedians, no individual plaintiff Comedian, or any other Comedian, has approached Pandora about the possibility of a license for that Comedian's works.  In contrast, dozens of other comedians and comedy record labels have recently come forward and reaffirmed historic custom and practice; they have explicitly agreed that Pandora has always had all of the rights it needs to perform, reproduce, and distribute their comedy on its services, and confirmed that no additional royalties beyond those already paid for the recordings are called for.

125.   Word Collections, on the other hand, has approached Pandora repeatedly at the instruction of the Comedians, insisting that substantial additional royalties must be paid and that Pandora must take its price fixed "all-or-nothing" blanket license.  As a result, it has given Pandora the Hobson's Choice between taking this price fixed and economically unviable bundle—its blanket license—and abandoning its comedy service altogether in the long run.  In an effort to force Pandora to accept the former, the Collective, through the Comedian

- 51 -

Counterdefendants, has brought infringement suits against Pandora (and has threatened Pandora with the specter of more to come).

126. The costs of defending against these infringement litigations are themselves a substantial burden for Pandora's business, making it less efficient and competitive than it otherwise would be. And Pandora's business has been further burdened by having to remove the comedy recordings of Counterdefendants and other members of the Collective from its comedy offering, thereby degrading its product. The removal of the comedy recordings of the Counterdefendant Comedians and other members of the Collective from Pandora's comedy offering has already had a negative impact on Pandora's business, leading to a degraded comedy offering and customer complaints (including threats of leaving Pandora for another service).

127. If Counterdefendants prevailed in carrying out their scheme, Pandora would be even more badly harmed. Pandora would be forced to pay an ongoing stream of supra-competitive royalties for access to the recordings that it must have if it is to provide comedy to its listeners at all or abandon its comedy offering altogether. If it chooses the former, the increased prices will harm Pandora's cost-competitiveness, unreasonably limit the return on its investment in its comedy offering, and sap resources that otherwise might have been used to improve Pandora's products to the benefit of consumers. And if it chooses the latter, there will be a substantial reduction in output in the form of the outright elimination of Pandora's comedy offering, harming Pandora, comedians, and consumers alike.

## COUNT I

### (Sherman Act § 1 – Price Fixing (against all Counterdefendants))

128. Pandora re-alleges and incorporates by reference the preceding paragraphs of these Counterclaims as though fully set forth herein.

129. Counterdefendants and other members of the Collective agreed among themselves and through a series of "exclusive affiliation agreements" between Word

Collections, on the one hand, and Comedians, on the other, to fix the price at which all of the purported "literary works" rights held by the Collective would be licensed.

130. Counterdefendants' conspiracy to fix prices has been carried out through Word Collections' efforts to license the purported "literary works" rights of its co-conspirator Comedians, including the other Counterdefendants, exclusively through a blanket license for all of the literary works rights the Collective has consolidated, at a fixed price set pursuant to the agreements with and among Counterdefendants and other cartel members.

131. By eliminating the direct price competition that otherwise would have existed among Counterdefendants and other cartel members in the Relevant Market, the conspiracy directly has harmed, and threatens to further harm, competition in the Relevant Market in the course of interstate commerce, and has harmed Pandora, by: (a) increasing Pandora's costs in operating its comedy offering; and (b) impairing Pandora's ability to present high-quality comedy offerings in response to consumer demand.

132. Counterdefendants' conspiracy to fix prices is a *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Alternatively, Counterdefendants' conduct also violates Section 1 of the Sherman Antitrust Act under the rule of reason, in that the blatant harm to competition and Pandora and other services caused directly and proximately by the Counterdefendants' agreement to place pricing decisions for their previously competing rights into the hands of the Collective vastly outweighs any conceivable procompetitive benefit created by the agreement.

133. Such injury to Pandora flows directly from that which makes Counterdefendants' acts unlawful.

134. Pandora seeks money damages from Counterdefendants' violation of Section 1 of the Sherman Antitrust Act and injunctive relief against continued and further violations.

# COUNT II

## (Sherman Act § 1 – Agreements in Unreasonable Restraint of Trade (against all Counterdefendants))

135.  Pandora re-alleges and incorporates by reference the preceding paragraphs of these Counterclaims as though fully set forth herein.

136.  Counterdefendant Word Collections entered into a series of "exclusive affiliation agreements" with the remaining Counterdefendants and the other members of the Collective (the aforementioned "Comedians") pursuant to which each Comedian agreed bilaterally with Word Collections to assign or otherwise convey to Word Collections the exclusive right to license the Comedian's purported "literary works" rights.

137.  By conveying to Word Collections the exclusive right to license each Comedian's purported "literary works" rights, the "exclusive affiliation agreements" vested in Word Collections the power to set the price of the licenses to Pandora and other services for such "literary works" rights.

138.  By consolidating in Word Collections the exclusive power to license the Comedians' purported "literary works" rights and to set the prices of licenses to Pandora and other services for such "literary works" rights, the "exclusive affiliation agreements" enable and incentivize Word Collections to coordinate the prices of such licenses for each Comedian's purported rights and to eliminate the competition that otherwise would exist between each Comedian's purported rights absent the "exclusive affiliation agreements."

139.  Further, by consolidating in Word Collections the exclusive power to license the Comedians' purported "literary works" rights, the "exclusive affiliation agreements" have created market power for Word Collections in the Relevant Market, enabling it to require Pandora and other services to choose between accepting a blanket license under the Comedians' purported "literary works" rights

at a supra-competitive price or being unable to offer a competitively viable comedy streaming service in the long run.

140.   This series of "exclusive affiliation agreements" between Word Collections and the Comedians unreasonably restrains trade in the Relevant Market; it has harmed, and has threatened to further harm, competition in the Relevant Market, and it has injured and threatens to further injure Pandora, other services, and consumers.

141.   Such injury to Pandora flows directly from that which makes Counterdefendants' acts unlawful.

142.   Pandora seeks money damages from Counterdefendants' violation of Section 1 of the Sherman Antitrust Act and injunctive relief against continued and further violations.

## COUNT III

### (Sherman Act § 2 – Attempted Monopolization and Monopolization (against all Counterdefendants))

143.   Pandora re-alleges and incorporates by reference the preceding paragraphs of these Counterclaims as though fully set forth herein.

144.   Counterdefendants have, through a series of agreements among themselves and with other co-conspirator members of the Collective, accumulated and consolidated control within the Collective over the licensing of a critical mass of rights to comedy routines embodied in comedy recordings, including those of many iconic comedians, such that they have achieved monopoly power, or, in the alternative, pose a dangerous probability of achieving monopoly power, in the Relevant Market.

145.   Counterdefendants' intent in entering into these agreements among themselves and with other co-conspirator members of the Collective was specifically to achieve monopoly power in the Relevant Market, which none of them could have achieved through competition on the merits, and thereby control the prices at which

their respective rights were made available to Pandora and other services—exclusively through the mandatory blanket license for the Collective's entire portfolio, unconstrained by competition from owners of the rights to comedy routines embodied in comedy recordings.

146.   By obtaining, or in the alternative creating, a dangerous probability of obtaining, monopoly power—specifically, the ability to control prices free from competitive discipline—in the Relevant Market, Counterdefendants have directly and proximately harmed competition in the Relevant Market, and threaten directly and proximately to further harm competition in the Relevant Market, in the course of interstate commerce, and have directly and proximately harmed, and threaten directly and proximately to further harm, Pandora by: (a) depriving Pandora of the ability to benefit from competition in the Relevant Market between Counterdefendants and other owners of rights to the jokes embodied in comedy recordings; (b) increasing Pandora's costs in operating its comedy offerings; and (c) impairing Pandora's ability to present high-quality comedy programming in response to consumer demand, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

147.   Such injury to Pandora flows directly from that which makes Counterdefendants' acts unlawful.

148.   Pandora seeks money damages from Counterdefendants' violation of Section 2 of the Sherman Antitrust Act and injunctive relief against continued and further violations.

## COUNT IV

### (Sherman Act § 2 – Conspiracy to Monopolize (against all Counterdefendants))

149.   Pandora re-alleges and incorporates by reference the preceding paragraphs of these Counterclaims as though fully set forth herein.

150.   Counterdefendants and other members of the Collective have conspired to monopolize the Relevant Market by agreeing to accumulate and consolidate

control within the Collective over the licensing of the rights to a sufficiently great number of comedy routines embodied in comedy recordings, including those of some of the most iconic comedians of all time, such that they would achieve monopoly power in the Relevant Market.

151.   In furtherance of this conspiracy, Counterdefendants have undertaken specific acts, including: (a) entering into "exclusive affiliation agreements" between Word Collections and other Counterdefendants with the knowledge and intent that all other cartel members would enter into similar agreements allowing all of their respective previously competing rights to be licensed collectively by the Collective in an all-or-nothing blanket license; (b) agreeing not to license their rights other than through the Collective; (c) refraining from licensing their rights other than through the Collective; and (d) initiating a series of copyright infringement actions against Pandora in response to Pandora's refusal to submit to the Collective's blanket license demand.

152.   Counterdefendants' and other members of the Collective's specific intent in entering into this conspiracy to monopolize was to achieve monopoly power in the Relevant Market, which none of them could have achieved through competition on the merits, and thereby control the prices at which their respective rights were made available to Pandora and other services—exclusively through the mandatory blanket license for the Collective's entire portfolio, unconstrained by competition from owners of the rights to comedy routines embodied in comedy recordings.

153.   Through their conspiracy to monopolize the Relevant Market, Counterdefendants have directly and proximately harmed competition in the Relevant Market, and threaten directly and proximately to further harm competition in the Relevant Market in the course of interstate commerce, and have directly and proximately harmed, and threaten directly and proximately to further harm, Pandora by: (a) depriving Pandora of the ability to benefit from competition in the Relevant

1  Market between Counterdefendants and other owners of the rights to comedy
2  routines embodied in comedy recordings; (b) increasing Pandora's costs in operating
3  its comedy offerings; and (c) impairing Pandora's ability to present high-quality
4  comedy programming in response to consumer demand, in violation of Section 2 of
5  the Sherman Antitrust Act, 15 U.S.C. § 2.

6      154.  Such injury to Pandora flows directly from that which makes
7  Counterdefendants' acts unlawful.

8      155.  Pandora seeks money damages from Counterdefendants' violation of
9  Section 2 of the Sherman Antitrust Act and injunctive relief against continued and
10 further violations.

## **PRAYER FOR RELIEF**

12     WHEREFORE, Pandora respectfully prays for judgment in its favor on each
13 of the foregoing claims and for the following relief against Counterdefendants:

14        a)  An injunction prohibiting any one or more Counterdefendants, and those
15            acting in concert with them, from agreeing, directly or indirectly, with
16            each other as to the assertion or non-assertion of any literary works or
17            other rights any of them controls, or the terms on which any one or more
18            of them will license such rights;

19        b)  An injunction prohibiting Word Collections' use of a blanket license, or
20            any other method by which it bundles literary works or other rights, and
21            requiring that Word Collections offer separate, economically viable and
22            individually priced licenses to the rights of each of its "clients";

23        c)  An injunction prohibiting Word Collections from obtaining, by license
24            or otherwise, directly or indirectly, the exclusive power to grant licenses
25            to any literary works or other rights;

26        d)  An injunction prohibiting any one or more Counterdefendants from
27            granting, by license or otherwise, directly or indirectly, the exclusive
28            power to grant licenses to any literary works or other rights;

e) An injunction prohibiting Counterdefendants and all other members of the Collective from instituting, or threatening to institute, copyright infringement actions directed against the use by Pandora of copyrighted works in the Collective's catalog until such time as the effects of the anticompetitive conduct described herein have dissipated;

f) An order declaring unenforceable the copyrights licensed by the Collective as a result of the misuse of those copyrights for anticompetitive and unlawful purposes (the adverse effects of which are continuing) until such time as adequate relief is entered to remedy the violations alleged herein, and the effects of the violations have dissipated;

g) An award to Pandora of three times any damages suffered as a result of the above-described anticompetitive conduct, as well as reasonable attorneys' fees; and

h) Any other relief the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Pandora hereby demands a trial by jury on all issues so triable.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  November 18, 2022

MAYER BROWN LLP
PAUL M. FAKLER
JACOB B. EBIN
ALLISON AVIKI
WILLIAM H. STALLINGS
CHRISTOPHER J. KELLY
JOHN NADOLENCO
DANIEL D. QUEEN
MEERIM NEHME


By: */s/ Paul M. Fakler*
     Paul M. Fakler

MAYER BROWN LLP
WILLIAM H. STALLINGS (*pro hac vice*)
*wstallings@mayerbrown.com*
1999 K Street, NW
Washington, D.C.  20006-1101
Telephone:  (202) 263-3000
Facsimile:  (202) 262-3300

MAYER BROWN LLP
CHRISTOPHER J. KELLY (SBN 276312)
*cjkelly@mayerbrown.com*
Two Palo Alto Square
3000 El Camino Real
Palo Alto, California  94306-2112
Telephone:  (650) 331-2000
Facsimile:  (650) 331-2060

Attorneys for Defendant
PANDORA MEDIA, LLC