MAYER BROWN LLP
PAUL M. FAKLER (*pro hac vice*)
*pfakler@mayerbrown.com*
JACOB B. EBIN (*pro hac vice*)
*jebin@mayerbrown.com*
ALLISON AVIKI (*pro hac vice*)
*aaviki@mayerbrown.com*
1221 Avenue of the Americas
New York, New York  10020-1001
Telephone:  (212) 506-2500
Facsimile:  (212) 262-1910

MAYER BROWN LLP
JOHN NADOLENCO (SBN 181128)
*jnadolenco@mayerbrown.com*
DANIEL D. QUEEN (SBN 292275)
*dqueen@mayerbrown.com*
MEERIM A. NEHME (SBN 322234)
*mnehme@mayerbrown.com*
350 S. Grand Avenue, 25th Floor
Los Angeles, California  90071-1503
Telephone:  (213) 229-9500
Facsimile:  (213) 625-0248

[*Additional counsel listed on signature page*]

Attorneys for Defendant
Pandora Media, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re PANDORA MEDIA, LLC COPYRIGHT LITIGATION | Master File No. 2:22-cv-00809-MCS-MAR |
| This Document Relates To: 2:22-cv-04634-MCS-MAR (Black) | <u>CONSOLIDATED ACTION</u> **DEFENDANT AND COUNTERCLAIMANT PANDORA MEDIA, LLC'S FIRST AMENDED COUNTERCLAIMS TO PLAINTIFFS' SECOND AMENDED CONSOLIDATED COMPLAINT AGAINST PLAINTIFF/COUNTERCLAIM DEFENDANT LEWIS BLACK, INDIVIDUALLY AND ON BEHALF OF STARK RAVING BLACK PRODUCTIONS, INC., AND COUNTERCLAIM DEFENDANT SPOKEN GIANTS, LLC** |

# TABLE OF CONTENTS

**Page**

I.     NATURE OF THE ACTION ........................................................................... 1

II.    THE PARTIES ............................................................................................... 4

III.   JURISDICTION AND VENUE..................................................................... 7

IV.    TRADE AND COMMERCE ......................................................................... 9

V.     FACTUAL BACKGROUND ........................................................................ 9

    a.     Pandora's Comedy Offering .............................................................. 9

    b.     Comedians Compete to Have Their Performances Streamed ........... 11

    c.     Historic Practice of Licensing Comedy Rights................................. 12

    d.     The Formation and Growth of the Collective ................................... 14

    e.     The Collective Demands that Pandora Take Its Blanket License ...... 19

    f.     Pandora is Forced to Remove Comedy Content from Its Service ...... 20

VI.    CONCERTED ACTIVITY ........................................................................... 21

    a.     Agreement Among the Comedians.................................................... 21

        i.     The Comedians Committed to a Common Course of Action............................................................................... 21

        ii.    The Comedians' Awareness of, and Knowing Participation in, the Collective's Anticompetitive Scheme...... 22

        iii.   The Collective Demands a Blanket License............................ 26

        iv.    "Plus" Factors ........................................................................ 27

    b.     Agreements Between Spoken Giants and Individual Comedians ...... 29

VII.   THE COLLECTIVE'S PRICE FIXING SCHEME......................................... 31

    a.     The Effects of the Price Fixing Scheme ........................................... 31

    b.     The Collective's Price Fixing Scheme Does Not Create Any Efficiencies........................................................................................ 34

VIII.  THE COLLECTIVE'S MARKET POWER .................................................... 38

    a.     Relevant Product and Geographic Market Definition ....................... 38

    b.     Market Power in the Relevant Market............................................... 40

        i.     Direct Evidence of the Collective's Market Power................. 40

        ii.    The Collective's "Must Have" Portfolio ............................... 41

    c.     Barriers to Entry............................................................................... 46

IX.    ANTICOMPETITIVE EFFECTS ................................................................. 47

    a.     Harm to Competition in the Relevant Market .................................. 47

    b.     Harm to Pandora .............................................................................. 48

COUNT I ............................................................................................................... 49

# TABLE OF CONTENTS
(continued)

**Page**

COUNT II .................................................................................................... 50

COUNT III ................................................................................................... 52

COUNT IV .................................................................................................. 53

PRAYER FOR RELIEF ............................................................................... 55

DEMAND FOR JURY TRIAL .................................................................... 56

Pursuant to Rules 13 and 15 of the Federal Rules of Civil Procedure, the Court's Order re: Motion to Dismiss (ECF Doc. No. 83), and the Court's Order Granting Stipulation to Set Coordinated Amendment and Response Schedule (ECF Doc. No. 86), Defendant Pandora Media, LLC ("Pandora"), by way of its attorneys, hereby states for its First Amended Counterclaims against Plaintiff and Counterclaim Defendant Lewis Black, individually and on behalf of Stark Raving Black Productions, Inc. ("Mr. Black" or "Counterdefendant Black"), and Counterclaim Defendant Spoken Giants, LLC ("Spoken Giants" and, collectively, "Counterdefendants"), the following:

## I.   NATURE OF THE ACTION

1.      These Counterclaims seek injunctive relief, treble damages, and the cost of suit, including reasonable attorneys' fees, and other relief under federal antitrust laws, 15 U.S.C. §§ 1, 2, 15, and 26, to remedy a conspiracy in unreasonable restraint of trade, a conspiracy to monopolize, monopolization, and attempted monopolization by Counterdefendants.

2.      For years, Pandora and many other services have enabled their listeners and subscribers to listen to recordings of comedians' performances.  Pandora does not need access to all comedians' recordings in order to offer a viable comedy streaming service; as long as it is able to assemble a critical mass of comedy recordings, including the recordings of many of the highly sought-after comedians, it can do so.  As a result, in a competitive market comedians compete to have Pandora and other services play their recordings and the underlying comedy routines embodied in those recordings.  Pandora has always satisfied its copyright obligations to comedians by obtaining all necessary rights and paying millions of dollars in license fees in exchange for those rights every year to the owners of the sound recordings of the comedians' performances, which in turn shared those payments with the comedians.  No comedian ever sought to raise the price to Pandora by separately licensing or charging an additional royalty for any rights in the purported

"literary works"—i.e., jokes and comedy routines—underlying the licensed recordings. Instead, comedians chose unilaterally to benefit from the royalties they were already receiving for the use of the comedy recordings and the added broad distribution, promotion, and other benefits that the services gave them, creating additional demand for their live performances and otherwise benefiting the comedians. Comedians were clearly satisfied with this longstanding custom and practice—one that predates Pandora by many decades—as demonstrated by the fact that they and their representatives regularly contacted Pandora to secure more plays of their recordings. Doing so would make no economic sense if the comedians felt that they were not being fully and appropriately compensated by Pandora.

3.    Then, in October 2020, "the first global rights collective for spoken word" arrived: Spoken Giants announced its public launch. As the "first royalty administration company for creators of spoken word copyrights," Spoken Giants claimed that it already was "becoming the de facto collective for spoken word's future." According to its press release, "[f]ounded by former BMI executive Jim King and 800 Pound Gorilla Records cofounders Ryan Bitzer and Damion Greiman, Spoken Giants represents *hundreds of members*, including Lewis Black, Dan Cummins, Gerry Dee, Pete Holmes, Kyle Kinane, Kathleen Madigan, the Ralphie May Estate, Leanne Morgan, and Theo Von, among others, and are scaling up dramatically." (emphasis added). Spoken Giants has explicitly targeted Pandora, as well as other services that stream or broadcast comedy, as entities that it will license comedians' alleged "literary works" rights to and from which it will collect additional royalties for those asserted rights.

4.    Spoken Giants is not a benign licensing agent; its true business model is that of a per se illegal cartel. Spoken Giants and its affiliated comedians (the "Comedians"; together with Spoken Giants, the "Collective") operate jointly and interdependently. Its October 2020 press release described itself as a "collective organization" and trumpeted its "collective representation" of the Comedians. The

Comedians have agreed among themselves and individually with Spoken Giants to consolidate their naturally competing works into a monopolistic portfolio; engage in collective licensing on terms determined by Spoken Giants; and fix the price of the only license available for the Comedians' rights, thereby ensuring that services have no alternative other than the Collective's blanket license for its entire portfolio. The blanket license here does not provide for the efficiencies that the Supreme Court has recognized as potentially justifying collective action. Far from it. Whereas an efficient blanket license provides for the "substantial lowering of costs, which is, of course potentially beneficial to both sellers and buyers," *BMI v. CBS*, 441 U.S. 1, 21-22 (1979), the license here only serves to eliminate competition and substantially and supra-competitively increase costs. There simply is no pro-competitive marketplace benefit. In *BMI*, the Supreme Court concluded that a blanket license was not *per se* illegal where "the whole is truly greater than the sum of its parts." *Id*. at 22. That is not the case here. Spoken Giants' efforts do not solve for any marketplace need, take care of any inefficiency, or make the marketplace run more smoothly. To the contrary, it adds transaction costs, upends what has worked well for decades, and provides the incentive and means for price fixing among competitors.

5.     In place of the established market in which comedians compete with each other to have Pandora and others perform their jokes that are embodied in comedy recordings, the Collective seeks to build a market by restraining competition through a conspiracy in which it: (a) price fixes supra-competitive royalties for the rights to the jokes embodied in comedy recordings controlled by the Collective; (b) accumulates monopoly power in the licensing of those rights; and (c) uses that monopoly power to foreclose competition through its full-portfolio mandatory blanket license. On information and belief, Spoken Giants has been involved in the coordination and funding of the filing of the Second Amended Complaint (the "Complaint") brought by Mr. Black as part of its efforts, in parallel to those of Word Collections, Inc. ("Word Collections")—another licensing cartel that is similarly

violating the antitrust laws—to impose this dysfunctional market and their anticompetitive constraints on entities that perform, reproduce, or distribute comedy.

6. The result of the Collective's anticompetitive tactics is to create for itself hold-up power over services like Pandora, to exploit that hold-up power by dramatically increasing the price that Pandora and others have to pay to make comedy recordings available to their listeners, and to hamper the ability of Pandora and other services to respond to consumer demand for high-quality comedy.  Spoken Giants itself advertises this anticompetitive scheme to comedians as the key purpose and benefit of joining and becoming "members" of the Collective.  On information and belief, comedians who have become "members" of the Collective—including Counterdefendant Black—have done so with the understanding that they would obtain these inflated royalties by virtue of the scheme and that the scheme could produce inflated royalties only if a sufficient number of high-profile comedians also agree to join the Collective.

7. Pandora disputes the Counterdefendant comedians' infringement claims, as addressed in Pandora's Answer to the Complaint.  These antitrust counterclaims, however, assume *arguendo* that there exist public performance, reproduction, and/or distribution rights in the jokes embodied in comedy recordings and that comedians, as authors of those jokes, might have retained those rights.  These antitrust counterclaims instead challenge how the members of the Collective have illegally agreed to suppress competition that otherwise would exist in the licensing of those rights.

## II.    THE PARTIES

8. A Delaware limited liability company and a subsidiary of Sirius XM Radio Inc. ("SiriusXM"), Pandora offers both ad-supported and subscription audio entertainment streaming services in the United States.  Pandora provides its users with music, comedy, and other spoken word audio programming through internet-connected devices.  Pandora is best known for its flagship free-to-the-consumer non-

interactive internet radio service, which as of September 30, 2022, had approximately 48.8 million monthly active users.  That service offers listeners a "radio-style" or "lean-back" listening experience by which Pandora creates for each listener an individualized playlist.  After creating an account, a listener need only "seed" a station or select a "genre" and then music or spoken word content will begin to play. To create a "seeded" station, the listener simply types the name of an artist, composer (for classical music), or song title to serve as the starting point or "seed" of the station. Pandora then automatically creates a station centered around that "seed," which— through use of its Music and Comedy Genome Projects and a combination of proprietary playlist algorithms—will play tracks whose characteristics are similar to those of the "seed."  As an alternative, a user can select a "genre" station, which begins as a pre-programmed collection of tracks that reflect a certain style or preference.  Each genre station is initially populated by tracks selected by Pandora. While the listener is not able to select any particular song or artist to hear at any given time, the listener is able to provide Pandora with feedback regarding likes and dislikes.  This feedback is used to further refine each listener's personalized station.

9.     In addition to its free ad-supported service, Pandora offers two subscription services.  The more popular of the two, Pandora Plus (formerly called Pandora One), is an ad-free subscription service that includes some semi-interactive features, such as song replays and caching of a limited number of stations to enable offline listening when users do not have internet access, but does not provide users with the ability to select particular songs or albums on demand.  Pandora's other subscription service—Pandora Premium—is a fully on-demand service that allows subscribers to select exactly which recordings they want to listen to and when.

10.    According to the Complaint, Plaintiff and Counterdefendant Black "owns one hundred percent (100%) of Stark Raving Black Productions, Inc., which is a New York Corporation and has a principal place of business at 11812 San Vicente Blvd., Ste. 400, Los Angeles, CA 90049."  According to the Complaint, "Lewis

Black, individually and on behalf of Stark Raving Black Productions, Inc., owns the intellectual property rights of Lewis Black, who is an actor and comedian and resides in New York, New York."

11.   On information and belief, Counterdefendant Black has been a co-conspirator "member" of Spoken Giants since at least October 2020.  Mr. Black regularly speaks out in favor of Spoken Giants' goals of upending historic custom and practice and making Spoken Giants a monopolist that can extract supra-competitive fees from Pandora and others.  And, on information and belief, Mr. Black has been instrumental in recruiting additional comedians to join the Spoken Giants cartel.  Mr. Black has even appeared alongside Spoken Giants' CEO on numerous occasions, giving press interviews regarding Spoken Giants and its efforts to become a must-have licensor of rights necessary for services like Pandora to stream comedy.

12.   While the Complaint asserts that Mr. Black "is not affiliated with Word Collections or Spoken Giants for the licensing of his Works," Mr. Black has been affiliated with Spoken Giants (i.e., he was a member of Spoken Giants), was affiliated with Spoken Giants when Spoken Giants first presented Pandora with its blanket license "term sheet," and clearly remains aligned with the goals of the Spoken Giants cartel.  The homepage of the Spoken Giants website explicitly endorses Mr. Black's claims against Pandora in this action, stating that "Spoken Giants stands alongside Mr. Black for fighting to win a victory for all in the comedy community."  Whether Mr. Black is formally still a member of Spoken Giants or not, he clearly is still involved in furthering the interests of the Collective.  He has never disavowed the conspiracy, or severed all ties to the conspiracy.  Nor has he publicly announced that he is no longer affiliated with Spoken Giants.  Indeed, this asserted current lack of affiliation with Spoken Giants has been claimed by his litigation counsel only in this proceeding, and only *after* Pandora informed his counsel that it intended to bring these antitrust counterclaims against Spoken Giants and Mr. Black.  This timing suggests that his newly-claimed lack of affiliation with Spoken Giants is nothing

more than a belated and futile effort to avoid being named as a Counterdefendant in these Counterclaims.  Mr. Black's newly-claimed lack of affiliation with Spoken Giants is nothing more than a tacit admission that the Collective is engaged in a price fixing conspiracy in violation of the antitrust laws.

13.   According to its website, Spoken Giants is the "first global rights collective for spoken word."  In its October 28, 2020 press release announcing its public launch, Spoken Giants asserted that it was "founded by BMI executive Jim King and 800 Pound Gorilla Records co-founders Ryan Bitzer and Damion Greiman" and "represents hundreds of members, including Lewis Black, Dan Cummins, Gerry Dee, Pete Holmes, Kyle Kinane, Kathleen Madigan, the Ralphie May Estate, Leanne Morgan, and Theo Von, among others" and was "scaling up dramatically."  That same press release goes on to note that Spoken Giants' plan is to "follow music precedents," thereby becoming "the de facto collective for spoken word's future in the process," and to use "collective representation" to "strengthen the marketplace in favor of the [comedian] creator."  On information and belief, Spoken Giants is a Delaware limited liability corporation, with its headquarters in Nashville, Tennessee.

### III.   JURISDICTION AND VENUE

14.   These First Amended Counterclaims arise under the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, 15, and 26.

15.   This Court has subject matter jurisdiction over these First Amended Counterclaims pursuant to 28 U.S.C. §§ 1331 and 1337(a), Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2.

16.   This Court has personal jurisdiction over Mr. Black based on: (a) Mr. Black's filing of the Complaint; (b) the fact that Mr. Black, on information and belief, conducts a substantial portion of his business in California; (c) the fact that Stark Raving Black Productions, Inc.—the alter-ego corporation through which Mr. Black conducts his business, which claims to own the intellectual property rights at issue in

this litigation, and which is wholly owned by Mr. Black—has its principal place of business in this District; and (d) Spoken Giants' efforts on behalf of Mr. Black to force Pandora, located in California, including through communications with Pandora employees located in this District, to enter into a license agreement with respect to Mr. Black's alleged "literary works" rights.

17.    This Court has personal jurisdiction over Spoken Giants based on: (a) its numerous efforts and contacts on an ongoing basis since at least early 2021 directed to Pandora, located in the State of California, including through communications with Pandora employees located in this District, to force Pandora to enter into a license agreement; (b) on information and belief, its role in sponsoring and coordinating the Complaint; and (c) on information and belief, because it conducts substantial and ongoing business in California, including in this District, including, but not limited to, by soliciting new members, investors, and other co-conspirators, including Lewis Black and Stark Raving Black Productions, Inc.

18.    Venue is proper in this judicial District pursuant to 28 U.S.C. §§ 1391 and 1400, and 15 U.S.C. §§ 15, 22, and 26.

19.    Joinder of all Counterdefendants, including Spoken Giants, is proper pursuant to Rules 13(h) and 20(a)(2) of the Federal Rules of Civil Procedure.  Rule 20 allows for permissive joinder of defendants (and counterdefendants, pursuant to Rule 13(h)) where, as here: "(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action."  Fed. R. Civ. P. 20(a)(2). Joinder of all Counterdefendants is further warranted because, among other reasons, it will promote judicial efficiency, it will expedite the final determination of the disputes, including those raised in the Complaint, the defenses in the Answer to the Complaint, and in these Counterclaims, and because it prejudices no party.

# IV.   TRADE AND COMMERCE

20.   At all times relevant to these Counterclaims, Counterdefendants have been engaged in interstate commerce, and their activities have substantially affected interstate commerce.   The efforts of Counterdefendants, who are residents of different states, to compel Pandora and other services to license asserted "literary works" rights occurs in interstate commerce.   Pandora and, on information and belief, other providers of comedy content, provide their programming services in interstate commerce.

21.   Moreover, through their concerted efforts to force Pandora and, on information and belief, other providers of comedy to enter into purported "literary works" rights licenses for the copyrighted works they claim to own or control, Counterdefendants and other members of the Collective directly affect the interstate transmission of Pandora's offerings as well as those of other services that provide comedy content to listeners.   Their collusion on the licensing of their purported "literary works" rights, their consolidation of their asserted rights under the Collective's control, and the Collective's bundling of these rights into a mandatory all-or-nothing blanket license have already imposed substantial costs on Pandora; if Counterdefendants' and other members of the Collectives' collusion succeeds in imposing these licenses on Pandora and other providers of comedy content at supra-competitive prices, the total cost to Pandora, these other providers of comedy, and their customers, all in the flow of interstate commerce, will be enormous.

# V.   FACTUAL BACKGROUND

## a.   Pandora's Comedy Offering

22.   Until 2011, Pandora did not include any spoken word comedy on its service.   Then, in 2011, Pandora made the business decision to offer comedy and other spoken word content in addition to music.   But music still accounts for the vast majority of streams (transmissions of recordings to listeners) on the Pandora service.   Today, all comedy content accounts for less than 1% of all streams on the service,

yet Pandora still pays out millions of dollars in royalties each year for its use of this comedy content.

23.    While Pandora's comedy library contains the recordings of thousands of comedians, the overwhelming majority of the recordings of those comedians are rarely, if ever, streamed.   Like in many industries today, including music, professional athletics, and film, the comedy industry is dominated by a handful of "superstar" comedians, all of whom have become wildly popular and successful, with a long tail of many thousands of comedians who are hoping to reach that level of success, but rarely do.  As would be expected given this landscape, there are only a few dozen comedians who account for any significant number of streams across Pandora's services.

24.    The development of Pandora's comedy streaming service is representative of how Pandora responds to listener demand for specific types of content.  Other examples of Pandora expanding its output to meet listener demand include its expansion into on-demand music streaming, and its improvements to Pandora Plus, offering subscribers enhanced functionality.   Pandora has also expanded into podcasting to meet growing listener demand in that space.   And Pandora has developed, at great upfront and ongoing expense, its content algorithms that give each Pandora user a more tailored listening experience.  As a result of these substantial investments, Pandora is uniquely positioned to not only provide listeners with content they already know they want to hear, but also to introduce listeners to new content they were not previously familiar with.

25.    For its ad-supported music service, Pandora's primary competitor is AM/FM radio.  But Pandora also competes with other streaming services.  In comedy, Pandora competes with, among others, AM/FM radio stations, YouTube, Spotify, and other digital-audio streaming services like those provided by Apple, Google, and Amazon.  To a lesser extent, Pandora also competes with certain providers of audio-visual comedy programming, such as Netflix and HBO.  Pandora competes with

- 10 -

these other services for listeners on factors including price (either directly through subscription fees or indirectly through exposing the listeners to advertisements) and the quality and range of the comedy it offers.

### b.    Comedians Compete to Have Their Performances Streamed

26.    In order to offer a viable comedy streaming service, Pandora needs access, including any necessary licenses, to quality recorded comedy routines by some minimum range of comedians of various styles, including many, but not all, of the above-noted "superstar" comedians.  Pandora does not need to have access to the recordings of all comedians, nor does it need access to all recordings of any given comedian.  Stated differently, Pandora can provide a viable comedy product with a relatively modest number of comedy recordings, so long as it has access to the recordings of a sufficient number of "superstar" and other comedians whom its listeners want to hear.

27.    As a result, as inputs to a streaming service, comedians' recordings are competitive alternatives to each other.  And, comedians compete to have Pandora stream their recordings.  Comedians and their representatives regularly contact Pandora to secure more plays of their comedy recordings, all in an effort to secure the many benefits that being streamed on Pandora offers to comedians.  That comedians and their representatives make such efforts provides strong evidence that the benefits comedians have received fully and appropriately compensated them for the use of their comedy and that it is in each comedian's individual self-interest to operate in this way.  Were that not the case, they would not try to secure additional plays of their recordings.  These benefits include the substantial royalties that Pandora pays out pursuant to the licenses that it has entered into with the record labels (and their authorized distributors) that own the comedy recordings or through Pandora's royalty payments to SoundExchange, a regulated entity granted a statutory antitrust exemption that, among other things, collects royalties on behalf of the recorded music industry from services like Pandora that qualify for certain statutory

licenses, including, as relevant here, the Section 112 and 114 statutory licenses.  17 U.S.C. §§ 112, 114.  The benefits also include the increased distribution, exposure, and other promotional value that comedians receive from Pandora.  Indeed, Counterdefendant Black has, on multiple occasions, publicly acknowledged the many benefits that streaming platforms provide to comedians, explaining that these platforms provide both an important revenue stream and essential promotion for comedians.

28.    Because Pandora does not need the recordings of all comedians in order to have a viable product, Pandora can choose among the comedians and their recordings, based on competitive factors including price, quality, and desirability to listeners.  As long as it is able to assemble a critical mass of such comedy recordings, including the recordings of many of the highly sought-after comedians, Pandora can offer a viable comedy streaming service.

### c.    Historic Practice of Licensing Comedy Rights

29.    Pandora has a long history of respecting valid copyrights and entering into license agreements for the copyrighted content it transmits.  Pandora's royalty payments have been so substantial that, in large part because of those royalty payments, it has never been able to earn a sustained profit.  At all times relevant to these Counterclaims, Pandora has been willing to enter into reasonable licenses negotiated in a competitive market for legitimate copyrights covering the content it transmits.

30.    Since launching its comedy service in 2011, and pursuant to longstanding industry custom and practice (predating Pandora by many decades), Pandora has always taken licenses for the comedy recordings that it offers, and through those licenses has obtained (either explicitly or implicitly) all of the rights it needs to stream those recordings.  Comedy, like every other copyright-intensive industry, except the dysfunctional music licensing market, has always followed a "licensing at the source" model for derivative works—new works that incorporate

one or more pre-existing works—whereby the "source" or creator of the final product—in this case the record label that creates and/or distributes the comedy recording—secures and passes along all necessary rights, including any rights in any pre-existing works used in the new derivative work to all downstream distributors, licensees, and end-users, either explicitly or implicitly.  Conforming with this longstanding practice, Pandora has not separately secured licenses just covering the underlying comedy routines embodied in comedy recordings, because it did not need any such separate licenses—all necessary rights were provided along with the rights to stream the recordings.  On information and belief, the same is true of all other services that stream or broadcast comedy recordings.

31.    No individual comedian has ever approached Pandora about entering into a separate license, or paying additional royalties, solely for any rights that the comedian may hold in the underlying comedy routines embodied in comedy recordings.  On information and belief, the same is true of all other services that stream or broadcast comedy recordings.  Instead, comedians followed the historic practice of being compensated through the licenses granted and royalties paid for the use of their comedy recordings.  In other words, to the extent that separate royalties are allocable to the underlying jokes embodied in the comedy recordings, they are already "baked-in" to those paid for the use of the recordings.

32.    Consequently, Pandora rightfully understood that each implicated comedian unilaterally had decided to not separately license rights to the underlying jokes or demand additional royalties above what Pandora was already paying to use the comedy recordings.  This understanding was no secret.  Pandora's publicly available SEC filings confirm its longstanding licensing practices.  Those filings explicitly noted that, pursuant to industry custom and practice, it was not securing a separate license, or paying a separate license fee, for the use of any underlying jokes embodied in comedy recordings. For over a decade, and despite Pandora's complete transparency as to its licensing practices, no comedian ever challenged those

practices. Instead, comedians continued to seek increased airplay on Pandora's service. It was only with the public launch of Spoken Giants on October 28, 2020 (and Word Collections less than a week earlier on October 22, 2020) that anyone has tried to upend what has been working well for all involved for decades.

33. There is good reason that no comedian has ever approached Pandora about upending historic practice and demanding that Pandora pay an additional substantial royalty on top of what it was already paying for a separate license covering just the jokes embodied in the licensed comedy recordings. It would have been economically irrational to do so because independently no individual comedian has the power to price above the competitive level. Had a comedian attempted, on their own, to secure an inflated additional royalty for such rights with the threat of an infringement suit in the background if Pandora did not acquiesce to those demands, Pandora likely would have taken that comedian's recordings off of its service and relied more heavily on (i.e., substituted) the recordings of other competitor comedians. Were that to happen, the comedian would lose all of the royalties and exposure he or she otherwise would have received from being streamed on Pandora during the period the recordings at issue were taken off the service.

### d. The Formation and Growth of the Collective

34. The Comedians communicate their agreement with each other through the "collective" Spoken Giants intermediary. In October 2020, a press release announced Spoken Giants' public launch, asserting that, "[w]hile rights organizations have long existed in the music industry, no such entity has existed to protect and pay spoken word creators, until now." That same press release went on to explain that the "need for collective representation [of comedians] was identified in 2016, when former comedy managers, Ryan Bitzer and Damion Greiman opened Nashville-based comedy label 800 Pound Gorilla Records…. Bitzer and Greiman partnered with former BMI executive Jim King in 2018, and Spoken Giants began its work to strengthen the community and build the marketplace for all spoken word creators."

Spoken Giants' "collective representation" of its member comedians would "strengthen the marketplace in favor of the creator." (Attached as Ex. A). Already, the release boasted, Spoken Giants was "becoming the de facto collective for spoken word's future" by "follow[ing] music precedents" in rights licensing. But unlike Spoken Giants, ASCAP and BMI have been operating under court-ordered consent decrees with the United States Department of Justice for *over 80 years* to address antitrust violations that arise from their collective licensing practices.

35.    The October 2020 press release states repeatedly that Spoken Giants functions as a collective for the Comedians. The press release specifically notes that Spoken Giants already "represents hundreds of members" and lists some of the many high-profile comedians that were part of its inception, including: Lewis Black, Dan Cummins, Gerry Dee, Pete Holmes, Kyle Kinane, Kathleen Madigan, the Ralphie May Estate, Leanne Morgan, and Theo Von, "among others." The press release goes on to solicit other comedians to join the Collective, explaining that "membership is a must" and "collective representation" is necessary in order to "strengthen the marketplace in favor of the creator" and ensure that members of the Collective all receive an "additive income stream."

36.    The Collective grew aggressively. Over the course of the weeks and months after its public launch, Spoken Giants put out a series of "New Member Announcements," each highlighting the new comedians who had joined the Collective. These include:

- November 19, 2020: "Gary Owens signs with Spoken Giants"
- November 22, 2020: "Spoken Giants welcomes Ted Alexandro"
- January 27, 2021: "Mike Birbiglia joins Spoken Giants"
- January 29, 2021: "Matt Falk on board with Spoken Giants"
- February 7, 2021: "Affiliate Highlight: Paris Sashay"
- February 7, 2021: "Spoken Giants is Proud to Represent Christian Finnegan!"

- February 19, 2021: "Spoken Giants Signs Don Rickles Estate"
- March 15, 2021: "Spoken Giants Affiliated with Jack Hull, Doug Smith, and Dale Jones!"
- March 22, 2021: "Affiliate Highlight: Kyle Kinane"
- April 14, 2021: "Reno Collier signs with Spoken Giants"
- April 27, 2021: "Robert Kelly Joins the Ranks at Spoken Giants"
- April 29, 2021: "Spoken Giants Signs Bob Hope and Lucille Ball Estates!"
- May 31, 2021: "Spoken Giants proud to partner with Gabriel Iglesias"
- July 16, 2021: "Welcome Tom Segura to Spoken Giants!"
- November 7, 2021: "Spoken Giants announces new members!" This press release announces that Spoken Giants "now represents a *significant percentage of the comedy market*," listing "new signings including Tom Segura, Tiffany Haddish, Jeff Foxworthy, Patton Oswalt, Bob Newhart, Jo Koy, Roy Wood, Jr., Christopher Titus, Lisa Lampanelli and Paula Poundstone," as well as Robert Dubac, Ian Bagg, John Heffron, Maz Jobrani, Alycia Cooper, and the Tim Wilson and John Pinette estates. (emphasis added).

37.  While Spoken Giants does not make a complete list of its affiliated comedians or the works it purports to license publicly available, and demands that potential licensees sign a non-disclosure agreement before it will provide them with such a list, the above-noted press releases and other material contained on its website as well as other public statements made by Spoken Giants confirm its claim that, even as of November 2021, it "represents a *significant percentage of the comedy market*." (emphasis added).  These statements make clear, moreover, that the Collective continues to grow, and currently "has hundreds of members signed to multi-year agreements," including "comedy's most iconic estates, marquee names, and emerging talent," affording it "collective bargaining power."  The list of comedians

- 16 -

Spoken Giants publicly claims to represent includes at least the following:

| | |
|---|---|
| John Mulaney | Pete Holmes |
| Leanne Allen | Jon Reep |
| Alonzo Bodden | Luke Thayer |
| Ted Alexandro | Jeff Allen |
| Lewis Black | James Gregory |
| Gary Owen | Chad Daniels |
| Matt Falk | Paris Sasha |
| Don Rickles Estate | Mike Birbiglia |
| Jack Hull | Doug Smith |
| Dale Jones | Kyle Kinane |
| Reno Collier | Robert Kelly |
| Bob Hope Estate | Lucille Ball/Desi Arnaz Estate |
| Gabriel Iglesias | Maz Jobrani |
| Tom Segura | Tiffany Haddish |
| Jeff Foxworthy | Patton Oswalt |
| Bob Newhart | Jo Koy |
| Roy Wood, Jr. | Christopher Titus |
| Lisa Lampanelli | Paula Poundstone |
| Robert Dubac | Ian Bagg |
| John Heffron | Maz Jobrani |
| Alycia Cooper | Tim Wilson Estate |
| John Pinette Estate | Ralphie May Estate |
| Larry the Cable Guy | Elayne Boosler |
| Nephew Tommy | Dan Cummins |
| Kathleen Madigan | Leanne Morgan |
| Theo Von | Jackie Fabulous |
| Eddie Pepitone | Jeff Dye |

| | | |
|---|---|---|
| 1 | Todd Barry | Pete Holmes |
| 2 | Jim Gaffigan | Gerrit Elzinga |
| 3 | Gerry Dee | |

38.   Based on Spoken Giants' claim of hundreds of Comedian members, and on information and belief, this list is far from complete—many more Comedians have expanded the Collective's ranks much further, including other high-profile Comedians whose comedy recordings have been amongst the most streamed on Pandora.

39.   In addition to issuing press releases and other public statements regarding the growth of the Collective, Spoken Giants reached out directly to Pandora to make sure that it was aware of the significance of its catalog, updating Pandora when additional Comedians joined the Collective.  Some examples include:

- April 19, 2021: Spoken Giants informed Pandora that the Collective's catalog "currently consists of more than 30,000 unique works by members who are household names, such as (the estates of) Don Rickles, Bob Hope, Lucille Ball and Desi Arnaz, along with currently performing comedians Kathleen Madigan, Lewis Black, Larry the Cable Guy, and Mike Birbiglia, among others."
- April 28, 2021: Spoken Giants informed Pandora that it "has had several very prominent signings over the past few weeks" and that "[t]wo of the new members are in the Top 5 comedians spinning on Pandora and Sirius."
- May 13, 2021: Spoken Giants informed Pandora that "there are several additional high profile comedians" who will be joining the Collective "soon."
- August 3, 2021: After Pandora signed a non-disclosure agreement that Spoken Giants required, Spoken Giants sent Pandora a link to a spreadsheet listing each of the many thousands of works by hundreds of

comedian members of the Collective.  Spoken Giants also noted that it was adding new comedians each week.

40.     All told, since its launch, the Collective has expanded aggressively and, on information and belief, continues to grow.  It now represents many thousands of works of some of the most iconic and well-known comedians of all time, including such household names as: Tom Segura, Dan Cummins, Patton Oswalt, Tiffany Haddish, John Mulaney, Don Rickles, Mike Birbiglia, Bob Hope, Lucille Ball, Gabriel Iglesias, Jeff Foxworthy, Larry the Cable Guy, Bob Newhart, Pete Holmes, and, as Spoken Giants repeatedly notes, "many more."

**e.      The Collective Demands that Pandora Take Its Blanket License**

41.     On April 19, 2021, Spoken Giants contacted Pandora, asserting that "streaming services have been aware of the need to license and pay royalties for spoken word uses" and demanding that Pandora take a license to the entire "growing catalog of works" controlled by the Collective.  Spoken Giants included with that communication a "term sheet" license.  The license that Spoken Giants sent Pandora on behalf of the Collective was a blanket license covering its entire portfolio, including the works of Counterdefendant Black, for a fee well above what would emerge in a competitive marketplace.  Specifically, it called for a substantial additional royalty to be paid by Pandora on top of what it had been paying historically.  With that additional royalty, the total fee that the Collective demanded Pandora pay to stream comedy recordings increased by at least 25%, and potentially much more, over what Pandora had historically paid.  In other words, the Collective's demand was for at least a 25% increase in overall royalties, just so that Pandora could continue to do what it has always done.  The demand did not allow any means for Pandora to avoid the Collective's supra-competitive royalty or its blanket license:

- The licensing terms did not allow for any reduction in fee should Pandora enter into a separate license directly with a Spoken Giants-affiliated comedian or their representative.

- The licensing terms did not allow for Pandora to secure the rights to just some, but not all, of the material in the Collective's catalog (whether at prices set by the individual comedians or by Spoken Giants).

- At no time did any individual comedian-member of the Collective attempt to enter into a license with Pandora just for the rights to the jokes embodied in their comedy recordings.

- And even though Spoken Giants purports to act on behalf of its member comedians, at no time did Spoken Giants offer Pandora a license for an individual comedian's rights.  An agent—even one representing multiple clients—is expected to act as a fiduciary for each of its clients. Spoken Giants did not do so; the Collective is its business model.

42.    Instead, Spoken Giants—acting on behalf of the Collective and in furtherance of its joint interests—demanded that Pandora take the "all-or-nothing" blanket license covering everything in its catalog for an exorbitant fee, just as it had repeatedly told its member comedians it would do on their collective behalf.

### f.    Pandora is Forced to Remove Comedy Content from Its Service

43.    Having been sued for copyright infringement by Mr. Black—a prominent and outspoken member of the Collective—Pandora was left with no choice but to remove his comedy recordings from its service.  And, more recently, when threatened with the prospect of additional infringement suits from other members of the Collective, Pandora took steps to remove their recordings as well.

44.    The forced removal of these recordings has degraded Pandora's comedy offering, and the negative impact on Pandora's offering will grow with the passage of time.  As discussed in greater detail below, Pandora is no longer able to provide the quality product that it previously offered.  Just in the short time since Pandora began removing these recordings from its services, Pandora's customers have already complained, including with threats that they will cancel their subscriptions if the

1  content is not restored.  If Pandora is not able to use any of the content controlled by

2  the Collective, Pandora will no longer be able to market and provide a competitive

3  comedy offering in the long term.

4                              **VI.   CONCERTED ACTIVITY**

5       45.    To ensure that the Collective will succeed in creating for itself market

6  power and be able to secure supra-competitive license fees from Pandora and others,

7  members of the Collective have entered into two distinct forms of agreement, both

8  of which violate the antitrust laws.  First, the Comedians have agreed amongst

9  themselves, with Spoken Giants facilitating their agreement, to no longer compete

10 with each other and instead fix prices for the rights to all of their works through an

11 all-or-nothing blanket license assembled and offered by Spoken Giants.

12      46.    Second, with the knowledge that other high-profile comedians were

13 doing the same, each individual Comedian entered into an affiliation agreement with

14 Spoken Giants.   By entering into these affiliation agreements with all of the

15 Comedians, Spoken Giants is able to license the entire catalog amassed by the

16 Collective for a fixed fee, replacing the competition that otherwise would have

17 existed, and previously did exist, among the Collective's members.

18           **a.    Agreement Among the Comedians**

19      47.    The Comedians, with Spoken Giants facilitating, have entered into an

20 agreement with each other to restrict competition among themselves and to fix prices,

21 as shown by circumstantial evidence, including "plus" factors, that demonstrate a

22 conscious commitment to their unlawful objective.

23           **i.    The Comedians Committed to a Common Course of Action**

24      48.    Armed with knowledge of the purpose of the Collective and that other

25 high-profile comedians were joining the Collective (as discussed below), each

26 Comedian proceeded to engage in parallel conduct, all within a short time frame.

27 Specifically, each Comedian entered into an affiliation agreement with Spoken

28 Giants, granting Spoken Giants the authority to pool their rights together with those

of the other Comedians, become the de facto exclusive licensor of that collective set of rights, and license that set of rights only on a blanket basis and for a dramatically inflated price—terms that, as shown below, would be ruinous for any one Comedian to demand unilaterally.

49.     As detailed above, by the time of Spoken Giants' launch in October 2020, a significant group of Comedians already had signed affiliation agreements. And over the course of 2021, more and more Comedians signed those same agreements.   This trend continued, including, on information and belief, with additional comedians joining the Collective even after the commencement of the underlying litigation.  This recent trend stands in sharp contrast to the behavior of comedians, including the Comedians, for decades.  As Spoken Giants' website and its CEO have confirmed, entering into these types of affiliation agreements for the purpose of licensing purported "literary works" rights is something "that has never been done before."  Until the emergence of Spoken Giants (and Word Collections), comedians always licensed their rights pursuant to the above-discussed historic custom and practice.

## ii.     The Comedians' Awareness of, and Knowing Participation in, the Collective's Anticompetitive Scheme

50.     The Comedians were well aware that they were not acting alone and in particular that they were interdependent: Spoken Giants' October 2020 press release could not have been clearer that it was their "collective."  Spoken Giants repeatedly and  publicly  communicated  this  common  course  of  action,  acting  as  the instrumentality  of  the  conspiracy  with  the  agreement  of  the  Collective  and  all comedians who had signed on.  And, while recruiting new cartel members, Spoken Giants made clear that the Collective's success was dependent on the participation of many  other  high-profile  comedians.   Spoken  Giants  made  sure  to  regularly  issue press releases announcing the many high-profile Comedians who recently had joined the  Collective,  and  its  founder  and  chief  executive  officer  Jim  King  regularly

participated in press interviews during which he, sometimes alongside Mr. Black, highlighted these same affiliations.  These press releases, and additional public statements by Spoken Giants' founder and chief executive, served the multiple purposes of bringing new comedians into the Collective and assuring the current members that the group continued to be cohesive.

51.    The comedians joining the Collective did so knowing full well that the purpose of the Collective was to pool their competing rights into a single catalog that would then be licensed on an all-or-nothing basis and for a fee that well exceeds that which any individual comedian could secure acting independently.  Members of the Collective have made public statements evidencing exactly that.  For example, comedians Ted Alexandro and Eddie Pepitone released online a conversation between them during which they: (1) identified themselves as Spoken Giants-affiliates; (2) referenced discussions with Mr. King directly about what Spoken Giants was undertaking; (3) mentioned a planned upcoming conversation with "upper-tier, household name comedian[]" Jim Gaffigan, another Spoken Giants affiliate, during a comedy tour stop Alexandro and Gaffigan shared; (4) compared themselves to the 1,000+ striking unionized laborers at Kellogg in 2021, who were "fortifying each other"; (5) took aim at those on the streaming service-side unwilling to "f***ing share the wealth" with "the little guy"; and (6) lamented the "haves and have nots" of the comedy business where "most comedians" are "scrapping together a living," asking "why can't all of us y'know just get paid" without having "the lottery ticket" of being "the Chappelles of the world, the Seinfelds, or for that matter the Jims. . . the people that are at the top."

52.    Spoken Giants has repeatedly and clearly amplified the same message, including on its website, in its marketing materials (including those aimed at recruiting new co-conspirator comedian "members"), and in its public statements.

53.    First, the press release announcing Spoken Giants' public launch explicitly states that its very purpose is to license the works of comedians on a

"collective" basis.  That press release explains that Spoken Giants is going to change the comedy licensing marketplace through "collective representation for all to strengthen the marketplace in favor of the [comedian] creator."  That message could not be any clearer—from its very inception, Spoken Giants' mission has been to collectively license the works of comedians and through those collective licensing practices, it will be able to secure the market power necessary to upend the competitive market and secure royalties well in excess of what comedians have been able to secure for themselves through competition in that market.

54.     Second, the Spoken Giants website clearly lays out its collective licensing plan.  It states that when a comedian signs up with Spoken Giants, the first thing Spoken Giants does is "collect their works into [the Spoken Giants] catalog," which it then licenses "in full" to services like Pandora.  As the website states, Spoken Giants' "overall repertoire containing all [of its] members works is licensed directly to performance outlets."  Spoken Giants' clearly stated plan is to license its entire catalog exclusively through an all-or-nothing blanket license.

55.     Spoken Giants' marketing materials reinforce this point.  Those materials explain that Spoken Giants is modeling its licensing practices on those of the musical works performing rights organizations (commonly known as "PROs"), which have been licensing their repertories on a collective "all-or-nothing" basis for over a century.  Public statements by Spoken Giants' CEO repeatedly emphasize that Spoken Giants' plan is "to do the same for comedy writers" as ASCAP and BMI have done for songwriters and music publishers—negotiate blanket licenses with Pandora and others "on behalf of a large group of comedians."  In fact, Mr. King has gone even further, explaining that one of Spoken Giants' advantages over entities like ASCAP and BMI is that it is not regulated by an antitrust consent decree with the United States Department of Justice or otherwise.

56.     The high-profile members of the Collective, or their representatives, understand the licensing practices of ASCAP and BMI.  These practices are no secret

within the entertainment industry and, in the case of ASCAP, have been in existence for over a century.  In fact, some members of the Collective, including at least John Mulaney, Tiffany Haddish, Larry the Cable Guy, and Jeff Foxworthy currently are, or previously were, affiliated with ASCAP or BMI.  Moreover, members of the Collective are represented by sophisticated managers and attorneys, well versed in the details of the entertainment industry.  On information and belief, these representatives of the Comedians are well aware of the licensing practices of ASCAP and BMI.  It would make no sense for Spoken Giants to constantly refer to itself as the ASCAP and BMI for spoken word if Comedians were not aware of what these PROs do and how they operate.

57.    Third, Spoken Giants has repeatedly made clear that it has started to operationalize its blanket licensing plan.  For example, in its marketing materials, Spoken Giants has stated that "negotiations for blanket licenses" with Pandora and other services are underway.  Mr. King has reinforced this point when publicly discussing Spoken Giants' ongoing licensing efforts.  He has stated, for example, that Spoken Giants has been working "to negotiate a blanket license for [its member comedians'] comedy composition rights" with streaming services.

58.    Fourth, Mr. King has publicly described the need for Comedians to jointly act together to achieve the Collective's goals, making clear that individual action poses significant risks.  Specifically, Mr. King has explained that even those comedians with "marquee" names may not be able to secure for themselves an increase in royalties above what they have historically been paid.  Rather, he said, it is "collective representation" that allows the Collective to "strengthen the marketplace in favor of the creator."  The message is clear: the Collective can do what no individual comedian would dare attempt: by banding together and agreeing to license their works only collectively, comedians can secure for themselves supra-competitive license fees—fees achieved in a market that "favor[s] the creator."  It is this collective action among the Comedians that creates a marketplace in which

Pandora will have no choice but to take a license from the Collective on its terms for all of the comedy it controls or abandon its comedy offering altogether.

59.    These marketing materials and public statements, aimed at furthering the Collective's mission, make it clear that comedians know exactly what they are doing when they affiliate with Spoken Giants.  These marketing materials and public statements—which promise a scheme that depends on recruiting many high-profile comedian members (and others) for the express and essential purpose of bundling their rights together in one blanket license to eliminate competition—are directed at the very comedians Spoken Giants seeks to recruit into the Collective.   Upon information and belief, comedians joining the Collective—including Mr. Black— read and heard these marketing materials and public statements prior to becoming members.  They are thus not just entering into individual agreements with Spoken Giants; they are doing so pursuant to an agreement with their fellow Comedians to license their rights collectively, to allow Spoken Giants to set a single fixed price for the entire catalog on behalf of the Collective, and to use the market power that the catalog provides the Collective to upend historic licensing practice and extract supra-competitive licensing fees from Pandora and other users of comedy, all to the financial benefit of the members of the Collective.

### iii.    The Collective Demands a Blanket License

60.    On April 19, 2021, Spoken Giants followed through on the promises it made on its website, in its marketing materials, and its other public statements, and demanded that Pandora take its license.  The license that Spoken Giants insisted that Pandora enter into was exactly what it promised the Comedians it would demand— an all-or-nothing blanket license covering the Collective's entire "growing catalog of works."

61.    This all-or-nothing blanket license was on behalf of all Spoken Giants-affiliated Comedians acting jointly, not in their respective individual interests.  The licensing terms did not allow for any reduction in fee should Pandora enter into a

1  separate license directly with a Spoken Giants-affiliated comedian, nor did it allow
2  for Pandora to secure the rights to just some, but not all, of the material controlled by
3  the Collective (whether at prices set by the individual comedians or by Spoken
4  Giants).  And, the license called for an exorbitant fee, one well in excess of what
5  previously emerged under more competitive conditions.

6                                iv.      "Plus" Factors

7           62.    Several "plus" factors support the conclusion that the Comedians
8  conspired with one another instead of acting unilaterally.  In particular, Spoken
9  Giants gives the Comedians the ability to coordinate their actions and the ability to
10 deter cheating.

11          63.    First, the actions taken by the Collective would be against the individual
12 self-interest of any Comedian who attempted the same actions alone.  No comedian
13 acting alone would demand, with the threat of an infringement lawsuit in the
14 background, a supra-competitive extra royalty on top of what they have historically
15 been paid from a service like Pandora absent an agreement among the Comedians to
16 do the same.  Indeed, no comedian has ever done this in the decade-plus that Pandora
17 has been streaming comedy.  And that is for good reason—doing so would likely
18 result in their recordings being removed from Pandora and losing out on the royalties
19 and promotion that would have otherwise occurred.   Spoken Giants' public
20 statements—made for the purpose of persuading comedians to join the cartel—
21 specifically explain that even the most popular comedians with "marquee" names are
22 unable to bring about a change to historic practice on their own.  That change can
23 only be made by comedians joining the Collective and taking advantage of its joint
24 power.  On information and belief, comedians—including Mr. Black—understood
25 this when they joined the Collective.

26          64.    Second, the conspirator comedians all had a common motive to conspire
27 with the other members of the Collective, as only in the context of a prior agreement
28 that other competitors behave similarly could they secure additional supra-

competitive royalties.  As Spoken Giants has explained since the date of its launch, it is its collective-action business model that enables Spoken Giants and the Comedians to amass the market power necessary to upend historic, widely-accepted licensing practice and secure supra-competitive royalties.  No individual comedian could bring about this change acting alone—doing so would have only hurt the individual comedian to the benefit of competitor comedians.  As Mr. King has explained, it is only with "collective representation" that comedians "can strengthen the marketplace in favor of the creator."

65.    Third, Spoken Giants and its co-conspirator comedian "members" all undertook efforts, within a very short period of time, to force an unprecedented change to the licensing of comedy.  They all, for the first time, demanded that services like Pandora take a second license just for the underlying comedy routines embodied in the already licensed comedy recordings.  And, as noted above, all of the Comedians entered into affiliation agreements with Spoken Giants within a short time frame, despite having never affiliated with a "literary works" licensing agency before, and took the steps set forth above to effectuate the anticompetitive scheme. These dramatic departures from past practice, all within a short period of time, make clear that the decision to affiliate with Spoken Giants and bring about the change to the marketplace through joint conduct was coordinated activity and not mere coincidental parallel conduct.

66.    Fourth, the Collective took direct steps to provide assurances to each of the Comedians during the period of license demands that the Collective remained intact and that they should all stick together.  In the Spring of 2021, Spoken Giants moved forward with demanding supra-competitive royalties from Pandora and, on information and belief, from other users of comedy content.  On information and belief, the Comedians recognized the potential marketplace repercussions from such a strategy, including the potential for services to drop the Comedians.  In such a case, individual Comedians feared that others would drop from the Collective.  In response

to this concern, Spoken Giants, throughout the spring, summer, and fall, issued a series of "New Member Announcements" as well as "Industry News" pieces. The New Member Announcements touted the many high-profile comedians who had joined the Collective and the Industry News items included articles that noted the many high-profile comedians who remained part of the Collective. Taken together, these series of press releases assured the Comedians that each would not be acting independently. Rather, the Collective was holding strong and even growing.

### b.    Agreements Between Spoken Giants and Individual Comedians

67.    In addition to the anticompetitive price fixing agreement that the Comedians have entered into among themselves and with Spoken Giants, they have also entered into a second form of anticompetitive agreement—the affiliation agreement that each Comedian entered into with Spoken Giants. On information and belief, and as Spoken Giants' website confirms, these agreements allow Spoken Giants to "collect [each Comedian's] rights," which otherwise would be competing against each other, "into [Spoken Giants'] catalog," and then offer that catalog in a bundle—the blanket license—at a centrally determined, supra-competitive price.

68.    Moreover, these individual agreements between the Comedians and Spoken Giants explicitly prevent any Comedian from licensing their rights through any other licensing collective.

69.    These agreements, when combined with Spoken Giants' admitted plan to exclusively license its catalog on an all-or-nothing basis, render individual licenses from members of the Collective useless to Pandora and other services. Once Spoken Giants forces a service to take its blanket license, taking an individual license from a Comedian would mean that the service is paying twice (and actually three times, given that the rights were already paid for pursuant to the sound recording licenses) for that Comedian's underlying jokes embodied in the recordings—once through the blanket license and then again through the individually negotiated license. Consequently, once a comedian joins the Collective, there is no longer any economic

- 29 -

incentive to try and negotiate directly with that rightsholder—doing so would be economically irrational. As a result of its blanket licensing practices, Spoken Giants effectively controls access to that comedian's rights and those of all of its other co-conspirator "members."

70. The Comedians similarly have no economic incentive to enter into direct licenses with Pandora and others so long as they remain a part of the cartel. By sticking with the Collective, the Comedians know they will get the inflated price set by Spoken Giants instead of the far lower price that would result if they competed with each other. And the Comedians understand that the only way that the Collective can secure supra-competitive prices is if a sufficient number of high-profile comedians band together to give the Collective the market power necessary to do so. No individual comedian could bring about such change—it is only through "collective representation" (i.e., price fixing) that Spoken Giants can, as it put it, "strengthen the marketplace in favor of the creator."

71. The combination of these agreements, the Collective's all-or-nothing blanket license practices, and the Collective's ability to secure supra-competitive license fees, make these agreements de facto exclusive affiliation agreements. They effectively prevent anyone other than Spoken Giants, including the Comedians themselves, from licensing the rights controlled by the Collective to a service like Pandora.

72. These agreements serve at least three anticompetitive purposes. First, they enable Spoken Giants to consolidate each Comedian's rights with those of other members of the Collective and license them jointly. Second, through this consolidation, they enable the Collective to amass and exercise market power that no individual comedian possesses. And third, by giving Spoken Giants de facto exclusive control over the Comedian's rights, these agreements cement the Collective's market power by eliminating even the possibility of the Comedian competing against the Collective. Stated differently, these agreements enable

competitors to coordinate to fix prices and prevent the Comedians from cheating on the cartel.

73.     Spoken Giants makes a copy of its affiliation agreement available on its website.  And its website further confirms that signing an affiliation agreement is required to become a "member" of the Collective.  Moreover, in a presentation that Spoken Giants gave about its launch, it explained that "[s]igned affiliation agreements are a key exclusive asset of Spoken Giants."

## VII.   THE COLLECTIVE'S PRICE FIXING SCHEME

### a.     The Effects of the Price Fixing Scheme

74.     Spoken Giants (and Word Collections) saw an opportunity to do what individual comedians could not, and would not, do on their own.  These newly created cartels decided to follow the anticompetitive playbook of the PROs—those entities that license musical-works public performance rights on a collective basis— by bringing together a sufficient number of high-profile comedians (and others) and convincing them to agree with each other to no longer compete and instead license all of their purported "literary works" rights through an all-or-nothing blanket license.  By agreeing to eliminate the competition between comedians that historically has taken place, comedians are able to extract additional supra-competitive royalties for the claimed rights to the jokes embodied in comedy recordings from services like Pandora.  As explained above, Spoken Giants knows this, as do the Comedians.

75.     Spoken Giants' website and its marketing materials describe a simple collective licensing scheme: instead of maintaining past practice, comedians (or the entities holding the rights to the comedians' purported "literary works") sign required affiliation agreements with Spoken Giants.  Those affiliation agreements empower Spoken Giants to grant licenses for the Comedians' rights bundled together with the rights of all of the other Comedians to services like Pandora and collect royalties from those services on behalf of all of the Comedians.  Those agreements give

- 31 -

Spoken Giants the power to set a single fixed price for access to all of the Comedians' rights—rights that otherwise would be offered in competition with each other.

76.   Moreover, as explained above, the agreements between Spoken Giants and its co-conspirator comedians, including the other Counterdefendant, mean that Spoken Giants' price for these works is the *only* price in the market.   As a result of the Collective's licensing scheme, Spoken Giants has become the de facto exclusive licensor of the rights of all of its co-conspirator comedian members.

77.   The Collective's plan is, and always has been, to license its catalog exclusively on a blanket "all-or-nothing" basis, and its affiliated comedians understand as much and have agreed to be part of that plan.   Spoken Giants has repeatedly made this clear, including on its website, in its marketing materials (including those aimed at recruiting new co-conspirator comedian "members"), and in its public statements.   For example, the Spoken Giants website states that when a comedian signs up with Spoken Giants, the first thing Spoken Giants does is "collect their works into [the Spoken Giants] catalog," which it then licenses "in full" to services like Pandora.   In other words, as the Spoken Giants website confirms, the only license it offers is for the entire catalog of the works of all of its affiliated co-conspirator comedians.   Spoken Giants' marketing materials reinforce this point. Those materials explain that Spoken Giants is modeling its licensing practices on those of the musical works PROs, which have been licensing their repertories on a collective "all-or-nothing" basis for over a century.   And, in those same materials, Spoken Giants asserts that its "negotiations for blanket licenses" with Pandora and other services are underway.   Public statements by Spoken Giants' CEO repeatedly emphasize that Spoken Giants' plan is "to do the same for comedy writers" as ASCAP and BMI have done for songwriters and music publishers—negotiate blanket licenses with Pandora and others "on behalf of a large group of comedians."

78.   These statements are entirely consistent with the license that Spoken Giants has insisted that Pandora take—one that called for at least a 25% increase in

the fee that Pandora had historically paid to stream comedy, just so that Pandora could continue to do what it has always done. The licensing terms did not allow for any reduction in fee should Pandora enter into a separate license directly with a Comedian nor did they allow Pandora to secure the rights to just some, but not all, of the material in the Spoken Giants catalog. In short, Spoken Giants required that Pandora take an "all-or-nothing" license covering everything in its catalog for an exorbitant fee, just as it promised the Comedians it would do.

79.     The result of this price fixing scheme is that Pandora and other services are no longer able to get licenses for these asserted "literary works" at the competitive prices that have historically prevailed when comedians competed against each other to have their works played by Pandora instead of banding together to charge supra-competitive fees. Stated differently, by joining the Collective, comedians are shielding themselves from the forces of competition so that they can reap the benefits of licensing their rights at supra-competitive fees through an all-or-nothing blanket license.

80.     This approach to licensing is, in many respects, the same as that taken by the two smaller and unregulated U.S. PROs: SESAC and GMR. Like Spoken Giants, these two PROs represent a relatively modest number of songwriters. Indeed, on information and belief, Spoken Giants represents more comedians than GMR represents songwriters. And also like Spoken Giants, these two PROs represent some of the most well-known and popular songwriters. As a result, both of these smaller PROs have been able to make themselves "must have" to a service like Pandora by collectively licensing the rights to the musical works written by a relatively modest number of key songwriters. These licensing tactics have resulted in antitrust lawsuits brought by television and radio broadcasters against SESAC and radio broadcasters against GMR, the latter of which was brought in this District. Those suits made allegations similar, and in certain respects identical, to those raised here, and all survived motions to dismiss.

**b.** **The Collective's Price Fixing Scheme Does Not Create Any Efficiencies**

81.    While the pooling of intellectual property rights can, under certain circumstances, create efficiencies, the Collective's pooling of the rights of otherwise competing comedians does nothing of the sort.  There is no legitimate reason to collectively license the purported rights to the underlying jokes embodied in comedy recordings—doing so only stifles competition.  Unlike combinations of complementary resources, which can create new value for users, the Collective's blanket license does nothing but consolidate competitors and fix their prices.  It creates no efficiencies.  This blanket license is no more a new product than is the output of any other cartel.

82.    As explained above, the historic practice of licensing the purported "literary works" rights of comedians "at the source"—from the record label that owns the end-product comedy recording—has worked well and efficiently for decades.  Until Spoken Giants (and Word Collections) emerged, no comedian ever sought a separate license and additional royalty from Pandora solely for the rights to the underlying jokes embodied in comedy recordings.  To the contrary, comedians— including through Ryan Bitzer, who in addition to founding Spoken Giants, also represented many of the same members of the Collective in his capacity as founder of a comedy record label—regularly contacted Pandora in an effort to secure more plays of their works pursuant to the licenses and royalties that were paid in accordance with historic practice.

83.    While Spoken Giants has publicly stated that it is modeling itself after the PROs, including ASCAP and BMI (from which Spoken Giants' CEO came), ASCAP's and BMI's licensing of public performances of musical works fundamentally differs from comedy licensing.  Some of the more salient differences include, but are not limited to, the following:

- Unlike music rights licensing, which, as the Supreme Court has observed, involves "thousands of users, thousands of copyright owners, and millions of compositions" (*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S 1, 20 (1979)), comedy licensing involves a far smaller universe of users, copyright owners, and works.  Because the total number of performing comedians that Pandora might want to secure a license from is so much smaller than the number of music composers, the alleged comedy "literary works" rights are far less widely held than are public performance rights in musical compositions.

- Spoken Giants' blanket license does not provide any technological or logistical benefit, further undercutting any justification for its use.

- As explained above, Pandora does not need access to the recordings of all, or even most, comedians in order to offer a viable comedy streaming service.  Nor does Pandora need access to all of any one comedian's available recordings.  Pandora needs only a critical mass of quality comedy recordings by a range of comedians, including many, but not all, of the most well-known and highly sought after comedians, in order to offer a viable and competitive product.

- The number of potential licensees of comedy rights is far smaller than the number of users of musical works public performance rights.  And, in fact, the Collective has targeted only a handful of services.

- Unlike with music, the author of the comedic routine and the comedian featured on the comedy recording are, in almost all instances, the same.  Indeed, for each work listed in the Complaint, the performing comedian is also the alleged sole author and owner of the work.  Accordingly, it is not only inefficient to depart from historic practice (in which a single license conveys all of the necessary rights) by imposing a separate

- 35 -

1             licensing obligation, but doing so after the owner of the sound recording

2             has already granted a license can only serve to create hold-up power

3             over services like Pandora.

4       •   ASCAP and BMI are both constrained by the antitrust consent decrees

5             they have entered into with the U.S. Department of Justice.  Among

6             other things, these decrees: (i) require that ASCAP and BMI offer

7             viable alternatives to their preferred all-or-nothing blanket licenses; (ii)

8             prohibit ASCAP and BMI from entering into exclusive affiliation

9             agreements with their members; and (iii) call for a "rate court" charged

10           with setting "reasonable" (i.e., competitive) fees that music users can

11           turn to in the event of a negotiating impasse with either PRO.  None of

12           these constraints applies to Spoken Giants.

13      84.    The current and historical practice of bundling these purported "literary

14 works" rights within the sound recording licenses creates substantial transactional

15 efficiencies for all involved—efficiencies that would be lost if the Collective is

16 successful in upending historic practice.  There is no need for any collective to jointly

17 deal with services offering comedy content on behalf of the relatively modest number

18 of comedians whose works are of sufficient interest to listeners that Pandora might

19 want to use them on its service.  Comedians can continue the decades-old practice of

20 having their record label handle all such licensing for them at the same time it licenses

21 the necessary rights to the comedy recordings.  As a result, the Collective brings

22 nothing new to the table.  The licensing of all necessary rights is already handled

23 through a single license, and the Collective's preferred approach of splitting the

24 licensing into two only creates more transaction costs, not fewer.

25      85.    Moreover, because the author of the underlying jokes and the recording

26 artist are, in the case of comedy, almost always the same person, there is no rational

27 reason for having separate licenses for the recordings and the underlying jokes,

28 except to create hold-up power by any licensor that has amassed market power over

such rights.  Under a regime in which separate licenses are required, each license is useless to a service like Pandora without the other—even with the sound recording license in hand, Spoken Giants' contention is that Pandora cannot legally play the recordings without a separate license covering just the underlying jokes.

86.     Further, there is no valid justification for the Collective to offer a blanket license covering the rights to all of the works of its comedians, particularly when it makes that blanket license the only means of obtaining *any* license to *any* of the works.  These blanket licensing practices force Pandora and other services to take a license covering far more material than it would ever need; such practices could succeed only as a result of the Collective having accumulated market power such that it can force services to take the license covering the Collective's entire portfolio if a service is to get a license to any of it.  And unlike ASCAP and BMI, which are subject to antitrust consent decrees that require them to offer, among other things, meaningful alternatives to their blanket licenses, Spoken Giants' blanket license faces not even a hypothetical constraint from other competitive alternatives.

87.     For all of these reasons, there is no valid justification for facilitating the collective licensing of the rights to the jokes embodied in comedy recordings.  If the owners of rights for the jokes embodied in comedy recordings asserted them against Pandora and others without colluding, Pandora—and in turn, its customers—would benefit from a free competitive market, in which the rights owners would compete against each other in order to attract Pandora to obtain the rights necessary to use their material.  On information and belief, the same would be true for other services that offer comedy.  But the Comedians, now consolidated by Spoken Giants, have conspired to not only disrupt longstanding custom and practice, but to also ensure that the competitive market that would otherwise emerge will never take hold.  This is Spoken Giants' admitted plan, and Comedians became members knowing this plan and intending to benefit not only from the plan, but also from other Comedians' agreement to the plan.

## VIII.  THE COLLECTIVE'S MARKET POWER

88.    The Collective has aggregated a portfolio of the rights to the works of some of the most iconic and important comedians, including the most popular comedians working today, providing it power in the relevant market that it can and does exert over Pandora.  If Pandora, or another service, were unable to get access to a critical mass of recordings, including those of many of the most popular and highly sought after comedians that listeners want to hear, it could no longer offer a viable comedy streaming product in the long-run and, as a result, would no longer offer comedians the benefits that it currently provides.  Consequently, if a single economic actor gained control over the licensing of the rights to the comedy routines embodied in the recordings of a substantial number of "superstar" comedians and used that control to set a single elevated price for access to all of those rights—just as Spoken Giants has—a streaming service could not substitute away from that *collection* of rights and rely only on other comedians' works and survive in the long run.  In other words, that economic actor—Spoken Giants—has monopoly power (or, alternatively and at a minimum, has a dangerous probability of achieving monopoly power) over Pandora and, on information and belief, other services and can, in effect, decide whether a service's comedy offering ultimately survives or fails.

### a.    Relevant Product and Geographic Market Definition

89.    The relevant product market in which to assess the anticompetitive effect of Counterdefendants' conduct is the U.S. market for the rights to comedy routines embodied in comedy recordings—the market that Spoken Giants acknowledges it has a "significant percentage" of.

90.    The relevant product market does not include all written comedy routines.  The only written comedic works to which Pandora would ever need a license are ones that have been recorded and for which the recording is available to Pandora for streaming.

91.    Because consumer demand for streaming of comedy recordings is specific to recorded comedy, rights for other types of written works, even ones embodied in recorded performances of some kind, are not a substitute for the rights to the comedy routines embodied in comedy recordings.

92.    Pandora's customers, and those of other services, whose demand ultimately determines the content that the services provide in competition with each other, have a pronounced demand for comedy recordings.  If comedy recordings became unavailable, those listeners would not readily shift to other types of streamed content.

93.    Because it must respond to listener demand in a competitive market, Pandora would not and could not respond to a sustained price increase for the rights to comedy routines embodied in comedy recordings by shifting its programming towards other recorded spoken word content, such as famous speeches or poetry. Similarly, Pandora would not and could not shift its programming further towards music in response to a sustained price increase for the rights to comedy routines embodied in comedy recordings; comedy programming answers consumer demand that is different from consumer demand for music programming.

94.    As explained above, a person or entity that, like the Collective, gained control over the rights to a critical mass of comedy routines embodied in comedy recordings from a sufficient number of household-name comedians would be able to impose a substantial price increase over competitive levels without seeing shifts by Pandora and other services to other products.

95.    The Comedians are competitors in the relevant market.  But for their agreements with each other and with Spoken Giants, they would be competing against each other to persuade Pandora and other services to include their comedy in the service offerings.  That competition would manifest itself in license royalties at competitive levels, reflecting the ability of services like Pandora to pick and choose among individual comedians and individual comedy recordings, knowing that they

need only a critical mass of content to offer listeners, and not access to all comedy recordings.

96.     The relevant geographic market is the United States.   The rights Counterdefendants are asserting against Pandora are based on federal copyright law, and, to the extent they exist, are exercisable and enforceable nationwide. Counterdefendants have not attempted to license on different terms in different geographic areas within the United States, and Pandora operates throughout the United States.

### b.     Market Power in the Relevant Market

#### i.     Direct Evidence of the Collective's Market Power

97.     Spoken Giants' license fee demands during its negotiations with Pandora provide direct evidence of its market power.   Before Spoken Giants emerged, the Comedians competed with each other and the result of that competition was the above discussed historic practice.   But the Collective, having aggregated substantial market power, is able to demand an exorbitant and supra-competitive price for its license—one that is dramatically higher (25% or more) than that which prevailed in the previously functioning competitive market.   Pandora does not have any competitive alternatives to the Collective's unique portfolio; it cannot simply reject the Collective's price fixed "offer" and deal instead with a competitor. Pandora's only options were to accede to these demands and pay the supra-competitive royalty or degrade its comedy offering by removing the Comedians' recordings from its service (and face the prospect of having to abandon its comedy offering in the long term should these conditions continue).   Pandora was forced to do the latter.   And, as discussed below, these takedowns have already resulted in customer complaints, including threats to leave Pandora for another service. Moreover, the Comedians have themselves directed their followers to "delete" any streaming service that fails to accede to the Collective's demands.   The ability to effect such a market result—a reduction in quality and output—is clear evidence of

1   market power.

2   98.   Moreover, the Collective has eliminated the only potential competition

3   to itself through its demand for an all-or-nothing blanket license.  As explained

4   above, this type of license eliminates any incentive for Pandora and an individual

5   Comedian to enter into a direct license for just that Comedian's works, as doing so

6   only results in Pandora paying multiple times for the same rights.  As a result, through

7   its blanket license demand, the Collective is able to shield itself from any

8   competition.  Due to this lack of competition, Pandora and, on information and belief,

9   other services that stream comedy cannot turn to other licensors for any of the works

10  in the Collective's portfolio.

11  99.   Because Pandora must have access to the works of at least some of the

12  Comedians to remain competitive in the long run, it has no choice but to deal with

13  the Collective on its terms.  As discussed above, Spoken Giants knows this, as do the

14  Comedians.

15  100.  Obtaining and exerting monopoly power is Spoken Giants' business

16  plan.  Not only does its trumpet its huge portfolio of comedians, but it regularly points

17  out that its "goal is to do the same for comedy writers" that ASCAP and BMI have

18  done for songwriters.  Spoken Giants transparently seeks to position itself as the go-

19  to source for licenses under this newly-asserted right.   When co-conspirator

20  comedians sign their affiliation agreements with Spoken Giants, they are knowingly

21  and intentionally committing to a common course of action as proposed by Spoken

22  Giants, engaging in horizontal price fixing, and agreeing to help make Spoken Giants

23  a monopolist.  Having already obtained market power, Spoken Giants is moving

24  steadily towards its goal, if it has not reached that goal already.

25  ##### ii.   The Collective's "Must Have" Portfolio

26  101.  Pandora needs access to a sufficient number of quality comedy

27  recordings, including many, but not all, of the "superstar" comedians in order to offer

28  a viable comedy product.  An entity that gained control over a critical mass of the

- 41 -

recordings of such comedians would have monopoly power—the power to set prices undisciplined by competition—over Pandora and, on information and belief, other services.

102.   The Collective's intent, and one that was expressed directly to comedians in an effort to bring them into the fold, is to consolidate the works of a critical mass of comedians, including some of the most iconic and popular comedians, into a single blanket license so that it will have sufficient market power to force a change to how comedy rights have been licensed for decades, secure supra-competitive royalties for its affiliated comedians, and ultimately gain full monopoly power, if it has not done so already.

103.   The Collective has already operationalized that plan.  Its publicly-stated portfolio includes:

- All five of the top five most played comedians on Pandora in 2021:  Tom Segura, Chad Daniels, Jim Gaffigan, Dan Cummins, and Gabriel Iglesias.
- Twelve of the top twenty-five, or 48%, of the most played comedians on Pandora in 2021.
- Comedians (Jeff Foxworthy and Larry the Cable Guy) responsible for seven of the top twenty comedy albums sold from 1991 to 2014 (*available at* https://www.billboard.com/lists/top-20-best-selling-comedy-albums-nielsen-soundscan-era/various-artists-the-blue-collar-comedy-tour-sales-to-date-731000/).

104.   Moreover, Spoken Giants has repeatedly trumpeted the significance of the Collective's catalog both publicly and directly to Pandora.  For example, Mr. King publicly stated at the time of its launch that Spoken Giants already had hundreds of members signed to multi-year agreements and that it was "scaling up dramatically."  Mr. King has also publicly stated that Spoken Giants is "fortunate to represent comedy's most iconic estates, marquee names, and emerging talent," which

1   affords it "collective bargaining power."  And, back in November 2021, Spoken

2   Giants publicly asserted that it already "represent[ed] a significant percentage of the

3   comedy market."  On information and belief, Spoken Giants has continued to grow

4   since that time.

5        105.   In its communications with Pandora, Spoken Giants has stated that as of

6   April 2021 its catalog "consist[ed] of more than 30,000 unique works by members

7   who are household names, such as (the estates of) Don Rickles, Bob Hope, Lucille

8   Ball and Desi Arnaz, along with currently performing comedians Kathleen Madigan,

9   Lewis Black, Larry the Cable Guy, and Mike Birbiglia, among others."  And later

10   that same month, Spoken Giants told Pandora that it "has had several very prominent

11   signings over the past few weeks" and that "[t]wo of the new members are in the Top

12   5 comedians spinning on Pandora and Sirius."  The next month, in May 2021, Spoken

13   Giants made sure Pandora was aware that it was about to add "several additional high

14   profile comedians."  These statements only serve to further reinforce that the catalog

15   amassed by the Collective includes many of the most important and high-profile

16   comedians of all time as well as the most important and popular comedians

17   performing today.

18        106.   Moreover, when Spoken Giants approached Pandora about entering into

19   its blanket license, Spoken Giants also demanded that Pandora identify its top 50

20   comedians, including those comedians that were not (yet) "members" of the

21   Collective.  On information and belief, Spoken Giants demanded such a list so that it

22   could explicitly target any high-profile and significant comedians who had not yet

23   joined the Collective and could focus its recruiting efforts on those comedians.  Doing

24   so could only serve to further solidify the very significant market power of the

25   Collective.

26        107.   By taking control of the rights of the many high-profile and wildly

27   popular comedians listed above, and, as Spoken Giants repeatedly brags, "many

28   others," and continuing to aggressively recruit additional cartel members, the

Collective has already made its portfolio a true "must have" (and, alternatively and at a minimum if it has not done so already, it has created a dangerous probability of doing so); as a result, no streaming service is able to avoid taking a license from the Collective for its entire portfolio, on the Collective's terms, if it wishes to continue offering a competitive comedy product in the long run. Spoken Giants and its co-conspirator comedians, through their affiliation agreements, have agreed to give, and have given, the Collective monopoly power over services that have comedy offerings (or, alternatively and at a minimum, have created a dangerous probability of giving the Collective monopoly power).

108. Pandora's comedy curation team has found that the raw number of comedians offered on the service, alone, is not critical to the success of the service. Instead, it is far more important to be able to provide listeners with the recordings of a sufficient number of the prominent comedians that they want to hear. The Collective's catalog contains the works of many such prominent comedians, and a sufficient number to make that catalog a "must have." As Spoken Giants has put it, it is "fortunate to represent comedy's most iconic estates, marquee names, and emerging talent." Indeed, Mr. Black—the plaintiff Comedian—touts his own position in the market. For example, the Complaint describes the plaintiff Comedians as all being "iconic, world famous comedians, each of whom have captivated audiences for decades and are considered, by many, as legends in the entertainment field, having brought to their audiences works that will be treasured for years to come." The Complaint goes on to list some of the many accomplishments of Mr. Black, a member of the Collective, including that he: (i) is the creator of the "world famous 'Back in Black' recurring segment on Comedy Central's The Daily Show," one of the "most popular and longest-running recurring segments on the show"; (ii) has "recorded four stand-up specials for Comedy Central Presents"; (iii) "was named Best Male Stand-Up at the American Comedy Awards in 2001"; (iv) "was involved in the creation of two of his own comedy shows for Comedy Central"; and (v) "has

filed two specials for HBO including 'Black on Broadway' and 'Red, White, and Screwed,' the latter of which was nominated for an Emmy."

109.  Pandora's curation team has concluded that if Pandora no longer had access to any of the works in the Collective's catalog, it would, at a minimum, have to significantly degrade its comedy offering in the short run and it would not be able to offer a competitive comedy offering in the long run.  Pandora's inability to offer a competitive comedy service in the long-run without access to any of the works in the Collective's catalog is what makes the Collective's catalog "must have" to Pandora and what gives the Collective its market power.

110.  The "takedowns" as a result of the Collective's efforts further demonstrate the significance of the Collective's catalog.  As noted, Pandora has been forced to take down the recordings of Mr. Black.  More recently, it has also taken down the recordings of the other Comedians (and those comedians affiliated with Word Collections).  These takedowns, despite having only been done recently, are already having a noticeable impact on Pandora's comedy offering.  Pandora has received customer complaints about its now degraded comedy offering, including customer threats to leave Pandora for one of its competitors if the recordings of these comedians are not reinstated.  For example, one customer contacted Pandora stating that he has "been listening to [Comedian] Tommy Ryman radio for months, and over the last few weeks, he and several other comedians aren't being played at all."  The customer goes on to explain that he'd "be happy to continue paying for [his] subscription if you guys can play the artists' work again."  Another customer expressed similar frustration, noting that, "every year, I buy my spouse a gift subscription.  That will stop since you've pulled our favorite comedians' content ([Collective members] Kathleen Madigan, Jackie Kashian, etc)!"  As these complaints make clear, it is not just that Pandora is losing one favorite Comedian or another; customers are noticing the loss of the combination of multiple top Comedians whom they want to hear.  The takedowns that Pandora has been forced

1  to undertake are already affecting significant portions of the portfolio of comedy that
2  its customers want and expect to hear, and, should the content remain unavailable,
3  customers will stop listening and subscribing to Pandora, turning instead to a
4  competitor platform's comedy offering.

5          **c.**     **Barriers to Entry**

6       111.   The barriers to entry into the relevant market are insurmountable.  A
7  new licensor of jokes embodied in comedy recordings could not constrain the
8  Collective's market power because, as a result of the Collective's blanket licensing
9  scheme, the Collective has effectively made itself the only source for a license to the
10  works in its "must have" catalog.  Whatever a hypothetical entrant might supply, it
11  cannot supply a substitute for what the Collective offers.  As noted, because Pandora
12  must have access to the comedy of at least some of the Comedians to offer a viable
13  comedy service in the long run, the only potential competitors to the Collective are
14  its own Comedians.  And the Comedians have agreed with Spoken Giants, as part of
15  their affiliation agreements, that they will not license their rights through any other
16  licensing collective.  As a result, the only options for a service like Pandora are to get
17  the licenses from the Collective or the individual Comedians.  But because the
18  Collective shares the supra-competitive license fees it is able to extract from comedy
19  services with the Comedians, they have no incentive to license outside of the
20  Collective.  Moreover, because the Comedians have conspired to offer only an "all-
21  or-nothing" blanket license, the Collective has ensured that Pandora and other
22  services have no incentive to try and secure individual licenses from any Spoken
23  Giants cartel member.  Doing so would only result in Pandora (and others) paying
24  multiple times for the same rights—something that no rational business would ever
25  entertain.

26       112.   The fact that Word Collections—another joke-licensing cartel—exists
27  does not in any way undermine the market power that the Collective has amassed for
28  itself.  Pandora must have access to at least a portion of the catalogs of *both* cartels

if it is to offer a viable comedy service in the long run.  In this sense, Spoken Giants and Word Collections are identical to ASCAP and BMI—the musical works PROs that they have announced they are modeling themselves on (albeit without any of the restrictions imposed on those PROs by their antitrust consent decrees with the United States Department of Justice).  It has long been recognized by the Department of Justice and the courts that oversee the ASCAP and BMI antitrust consent decrees that licenses from both ASCAP and BMI are "must have" to music streaming services, giving both of these PROs monopoly power—power that is tempered only by their consent decrees, and not by competition between them.

## IX.   ANTICOMPETITIVE EFFECTS

### a.   Harm to Competition in the Relevant Market

113.   The Collective's scheme of consolidating the rights to comedy routines embodied in comedy recordings, fixing prices for them, and exclusively licensing them through its blanket license has already throttled competition among the Comedians who have joined Spoken Giants, including Counterdefendant Black.

114.   Spoken Giants' website, publicly available marketing materials, and other public statements all make clear that the competition that would and easily could exist in the Relevant Market among its co-conspirator "members" and other comedians will not happen.  Spoken Giants' mission, adopted by Counterdefendant Black and other Comedians, is to force Pandora and other services to take and pay for its entire portfolio—at a price that it alone will set—or to get none of it, and have no choice but to drop its comedy offering entirely.

115.   The results of this anticompetitive scheme—if allowed to proceed—will be not only higher prices but a reduced supply of comedy programming by services than would be available if the market for comedy rights were competitive.  The higher prices will also affect Pandora's and other services' overall efficiency and competitiveness, possibly even leading to decisions to abandon comedy services; in any case, the actions of the Collective will lead to overall higher consumer prices

and/or less output, and to less consumer satisfaction than would exist if Counterdefendants had not eliminated competition in the Relevant Market.

### b.    Harm to Pandora

116.   Pandora has already borne the brunt of Counterdefendants' collusive and illegal scheme.  Despite the publicity surrounding this new effort spearheaded by Spoken Giants (and Word Collections) to force Pandora and other services to take a second license just covering the comedy routines embodied in the recordings that they already license (and pay substantial royalties for), and the substantial resources available to any number of the Comedians, including Counterdefendant Black, no individual Comedian has approached Pandora about the possibility of a license for that Comedian's works.  In contrast, dozens of other comedians and comedy record labels have recently come forward and reaffirmed historic custom and practice; they have explicitly agreed that Pandora has always had all of the rights it needs to perform, reproduce and distribute their comedy on its services, and confirmed that no additional royalties beyond those already paid for the recordings are called for.

117.   Spoken Giants, on the other hand, has approached Pandora repeatedly on behalf of the Collective insisting that substantial additional royalties must be paid and that Pandora must take its price fixed "all-or-nothing" blanket license.  As a result, it has given Pandora the Hobson's Choice between taking this price fixed and economically unviable bundle—its blanket license—and abandoning its comedy service altogether in the long run.  In an effort to force Pandora to accept the former, the Collective, through Counterdefendant Black, has brought an infringement suit against Pandora (and has threatened Pandora with the specter of more to come).

118.   The costs of defending against the infringement litigation is itself a substantial burden for Pandora's business, making it less efficient and competitive than it otherwise would be.  And Pandora's business has been further burdened by having to remove the comedy recordings of Counterdefendant Black and other Comedians from its comedy offering, thereby degrading its product.  The removal of

the comedy recordings of Counterdefendant Black and other members of the Collective from Pandora's comedy offering has already had a negative impact on Pandora's business, leading to a degraded comedy offering and customer complaints (including threats of leaving Pandora for another service).

119.  If Counterdefendants prevailed in carrying out their scheme, Pandora would be even more badly harmed.  Pandora would be forced to pay an ongoing stream of supra-competitive royalties for access to recordings that it must have if it is to provide comedy to its listeners at all or abandon its comedy offering altogether. If it chooses the former, the increased prices will harm Pandora's cost-competitiveness, unreasonably limit the return on its investment in its comedy offering, and sap resources that otherwise might have been used to improve Pandora's products to the benefit of consumers.  And if it chooses the latter, there will be a substantial reduction in output in the form of the elimination of Pandora's comedy offering altogether, harming Pandora, comedians, and consumers alike.

## COUNT I

### (Sherman Act § 1 – Price Fixing (against all Counterdefendants))

120.  Pandora re-alleges and incorporates by reference the preceding paragraphs of these Counterclaims as though fully set forth herein.

121.  Counterdefendants and other members of the Collective agreed among themselves and through a series of affiliation agreements between Spoken Giants on the one hand and Counterdefendant Black and other Comedians on the other, to fix the price at which all of the purported "literary works" rights held by the Collective would be licensed.

122.  Counterdefendants' conspiracy to fix prices has been carried out through Spoken Giants' efforts to license the purported "literary works" rights of its co-conspirator comedians, including Counterdefendant Black, exclusively through a blanket license for all of the rights the Collective has consolidated, at a fixed price

set pursuant to the agreements with and among Counterdefendants and other members of the Collective.

123.   By eliminating the direct price competition that otherwise would have existed among Counterdefendant Black and other members of the Collective in the Relevant Market, the conspiracy directly has harmed, and threatens to further harm, competition in the Relevant Market in the course of interstate commerce, and has harmed Pandora, by: (a) increasing Pandora's costs in operating its comedy offering; and (b) impairing Pandora's ability to present high-quality comedy offerings in response to consumer demand.

124.   Counterdefendants' conspiracy to fix prices is a *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.   Alternatively, Counterdefendants' conduct also violates Section 1 of the Sherman Antitrust Act under the rule of reason, in that the harm to competition and Pandora and other services caused directly and proximately by the Counterdefendants' agreement to place pricing decisions for their previously competing rights into the hands of the Collective vastly outweighs any conceivable pro-competitive benefit created by the agreement.

125.   Such injury to Pandora flows directly from that which makes Counterdefendants' acts unlawful.

126.   Pandora seeks money damages from Counterdefendants' violation of Section 1 of the Sherman Antitrust Act and injunctive relief against continued and further violations.

## COUNT II

### (Sherman Act § 1 – Agreements in Unreasonable Restraint of Trade (against all Counterdefendants))

127.   Pandora re-alleges and incorporates by reference the preceding paragraphs of these Counterclaims as though fully set forth herein.

128.   Counterdefendant Spoken Giants entered into a series of affiliation agreements with Counterdefendant Black and the other members of the Collective (the aforementioned "Comedians") pursuant to which each Comedian agreed bilaterally with Spoken Giants to assign or otherwise convey to Spoken Giants the de facto exclusive right to license the Comedian's purported "literary works" rights.

129.   By conveying to Spoken Giants the de facto exclusive right to license each Comedian's purported "literary works" rights, the affiliation agreements vested in Spoken Giants the power to set the price of the licenses to Pandora and other services for such "literary works" rights.

130.   By consolidating in Spoken Giants the de facto exclusive power to license the Comedians' purported "literary works" rights and to set the prices of licenses to Pandora and other services for such "literary works" rights, the affiliation agreements enable and incentivize Spoken Giants to coordinate the prices of such licenses for each Comedian's purported rights and to eliminate the competition that otherwise would exist between each Comedian's purported rights absent the affiliation agreements.

131.   Further, by consolidating in Spoken Giants the de facto exclusive power to license the Comedians' purported "literary works" rights, the affiliation agreements have created market power for Spoken Giants in the relevant market, enabling it to require Pandora and other services to choose between accepting a blanket license under the Comedians' purported "literary works" rights at a supra-competitive price or being unable to offer a competitively viable comedy streaming service in the long run.

132.   This series of affiliation agreements between Spoken Giants and the Comedians unreasonably restrains trade in the Relevant Market; it has harmed, and has threatened to further harm, competition in the Relevant Market; and it has injured and threatens to further injure Pandora, other services, and consumers.

133. Such injury to Pandora flows directly from that which makes Counterdefendants' acts unlawful.

134. Pandora seeks money damages from Counterdefendants' violation of Section 1 of the Sherman Antitrust Act and injunctive relief against continued and further violations.

## COUNT III

### (Sherman Act § 2 – Attempted Monopolization and Monopolization (against all Counterdefendants))

135. Pandora re-alleges and incorporates by reference the preceding paragraphs of these Counterclaims as though fully set forth herein.

136. Counterdefendants have, through a series of agreements among themselves and with other co-conspirator members of the Collective, accumulated and consolidated control within the Collective over the licensing of a critical mass of rights to comedy routines embodied in comedy recordings, including those of many iconic comedians, such that they have achieved monopoly power, or, in the alternative, pose a dangerous probability of achieving monopoly power, in the Relevant Market.

137. Counterdefendants' intent in entering into these agreements among themselves and with other co-conspirator members of the Collective was specifically to achieve monopoly power in the Relevant Market, which none of them could have achieved through competition on the merits, and thereby control the prices at which their respective rights were made available to Pandora and other services—exclusively through the mandatory blanket license for the Collective's entire portfolio, unconstrained by competition from owners of the rights to comedy routines embodied in comedy recordings.

138. By obtaining, or in the alternative creating a dangerous probability of obtaining, monopoly power—specifically, the ability to control prices free from competitive discipline—in the Relevant Market, Counterdefendants have directly

and proximately harmed competition in the Relevant Market, and threaten directly and proximately to further harm competition in the Relevant Market in the course of interstate commerce; and have directly and proximately harmed, and threaten directly and proximately to further harm, Pandora by: (a) depriving Pandora of the ability to benefit from competition in the Relevant Market between Counterdefendants and other owners of rights to the jokes embodied in comedy recordings; (b) increasing Pandora's costs in operating its comedy offerings; and (c) impairing Pandora's ability to present high-quality comedy programming in response to consumer demand, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

139. Such injury to Pandora flows directly from that which makes Counterdefendants' acts unlawful.

140. Pandora seeks money damages from Counterdefendants' violation of Section 2 of the Sherman Antitrust Act and injunctive relief against continued and further violations.

**COUNT IV**

**(Sherman Act § 2 – Conspiracy to Monopolize (against all Counterdefendants))**

141. Pandora re-alleges and incorporates by reference the preceding paragraphs of these Counterclaims as though fully set forth herein.

142. Counterdefendants and other members of the Collective have conspired to monopolize the Relevant Market by agreeing to accumulate and consolidate control within the Collective over the licensing of the rights to a sufficiently great number of comedy routines embodied in comedy recordings, including those of some of the most popular comedians working today, such that they would achieve monopoly power in the Relevant Market.

143. In furtherance of this conspiracy, Counterdefendants have undertaken specific acts, including: (a) entering into affiliation agreements between Spoken Giants and other members of the Collective, including Counterdefendant Black, with

1  the knowledge and intent that all other cartel members would enter into similar

2  agreements allowing all of their respective previously competing rights to be licensed

3  collectively by the Collective in an all-or-nothing blanket license; (b) effectively

4  agreeing not to license their rights other than through the Collective; (c) refraining

5  from licensing their rights other than through the Collective; and (d) initiating a

6  copyright infringement action against Pandora in response to Pandora's refusal to

7  submit to the Collective's blanket-license demand.

8     144.  Counterdefendants' and other Collective members' specific intent in

9  entering into this conspiracy to monopolize was to achieve monopoly power in the

10  Relevant Market, which none of them could have achieved through competition on

11  the merits, and thereby control the prices at which their respective rights were made

12  available to Pandora and other services—exclusively through the mandatory blanket

13  license for the Collective's entire portfolio, unconstrained by competition from

14  owners of the rights to comedy routines embodied in comedy recordings.

15     145.  Through their conspiracy to monopolize the Relevant Market,

16  Counterdefendants have directly and proximately harmed competition in the

17  Relevant Market, and threaten directly and proximately to further harm competition

18  in the Relevant Market in the course of interstate commerce, and have directly and

19  proximately harmed, and threaten directly and proximately to further harm, Pandora

20  by: (a) depriving Pandora of the ability to benefit from competition in the Relevant

21  Market between Counterdefendants and other owners of the rights to comedy

22  routines embodied in comedy recordings; (b) increasing Pandora's costs in operating

23  its comedy offerings; and (c) impairing Pandora's ability to present high-quality

24  comedy programming in response to consumer demand, in violation of Section 2 of

25  the Sherman Antitrust Act, 15 U.S.C. § 2.

26     146.  Such injury to Pandora flows directly from that which makes

27  Counterdefendants' acts unlawful.

28

147.   Pandora seeks money damages from Counterdefendants' violation of Section 2 of the Sherman Antitrust Act and injunctive relief against continued and further violations.

## **PRAYER FOR RELIEF**

WHEREFORE, Pandora respectfully prays for judgment in its favor on each of the foregoing claims and for the following relief against Counterdefendants:

a)   An injunction prohibiting any one or more Counterdefendants, and those acting in concert with them, from agreeing, directly or indirectly, with each other as to the assertion or non-assertion of any literary works or other rights any of them controls, or the terms on which any one or more of them will license such rights;

b)   An injunction prohibiting Spoken Giants' use of a blanket license, or any other method by which it bundles literary works or other rights, and requiring that Spoken Giants offer separate, economically viable and individually priced licenses to the rights of each of its "members";

c)   An injunction prohibiting Counterdefendants and all other members of the Collective from instituting, or threatening to institute, copyright infringement actions directed against the use by Pandora of copyrighted works in the Collective's catalog until such time as the effects of the anticompetitive conduct described herein have dissipated;

d)   An order declaring unenforceable the copyrights licensed by the Collective as a result of the misuse of those copyrights for anticompetitive and unlawful purposes (the adverse effects of which are continuing) until such time as adequate relief is entered to remedy the violations alleged herein, and the effects of the violations have dissipated;

e)   An award to Pandora of three times any damages suffered as a result of the above-described anticompetitive conduct, as well as reasonable

- 55 -

attorneys' fees; and

f)  Any other relief the Court deems appropriate.

**<u>DEMAND FOR JURY TRIAL</u>**

Pandora hereby demands a trial by jury on all issues so triable.

Dated:  November 18, 2022

MAYER BROWN LLP
PAUL M. FAKLER
JACOB B. EBIN
ALLISON AVIKI
WILLIAM H. STALLINGS
CHRISTOPHER J. KELLY
JOHN NADOLENCO
DANIEL D. QUEEN
MEERIM NEHME


By: */s/ Paul M. Fakler*
      Paul M. Fakler


MAYER BROWN LLP
WILLIAM H. STALLINGS (*pro hac vice*)
*wstallings@mayerbrown.com*
1999 K Street, NW
Washington, D.C.  20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 262-3300

MAYER BROWN LLP
CHRISTOPHER J. KELLY (SBN 276312)
*cjkelly@mayerbrown.com*
Two Palo Alto Square
3000 El Camino Real
Palo Alto, California  94306-2112
Telephone: (650) 331-2000
Facsimile: (650) 331-2060

Attorneys for Defendant
PANDORA MEDIA, LLC