MAYER BROWN LLP
PAUL M. FAKLER (*pro hac vice*)
*pfakler@mayerbrown.com*
JACOB B. EBIN (*pro hac vice*)
*jebin@mayerbrown.com*
ALLISON AVIKI (*pro hac vice*)
*aaviki@mayerbrown.com*
1221 Avenue of the Americas
New York, New York 10020-1001
Telephone: (212) 506-2500
Facsimile: (212) 262-1910

MAYER BROWN LLP
JOHN NADOLENCO (SBN 181128)
*jnadolenco@mayerbrown.com*
DANIEL D. QUEEN (SBN 292275)
*dqueen@mayerbrown.com*
MEERIM A. NEHME (SBN 322234)
*mnehme@mayerbrown.com*
333 S. Grand Avenue, 47th Floor
Los Angeles, California 90071
Telephone: (213) 229-9500
Facsimile: (213) 625-0248

[*Additional counsel listed on signature page*]

Attorneys for Counterclaimant
PANDORA MEDIA, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re PANDORA MEDIA, LLC COPYRIGHT LITIGATION | Master File No.: 2:22-cv-00809-MCS-MAR |
| | <u>CONSOLIDATED ACTION</u> |
| | **DEFENDANT AND COUNTERCLAIMANT PANDORA MEDIA, LLC'S OPPOSITION TO COUNTERCLAIM DEFENDANT SPOKEN GIANTS' MOTION TO DISMISS** |
| This Document Relates To: 2:22-cv-04634-MCS-MAR (Black) | |
| | Date: March 6, 2023 Time: 9:00 AM Crtrm: 7C - First Street Courthouse |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 2

APPLICABLE LEGAL STANDARDS ..................................................................... 3

ARGUMENT .............................................................................................................. 3

A.    Pandora has Article III and antitrust standing ............................................... 3

B.    Pandora adequately alleges that the availability of individual licenses
      was illusory ..................................................................................................... 4

C.    Pandora adequately alleges Section 2 claims ................................................. 6

      1.    SG's catalog is "must-have" for Pandora. ........................................... 7

      2.    Pandora's allegations offer direct evidence of market power. ............ 9

      3.    Pandora's allegations offer circumstantial evidence of
            market power ...................................................................................... 11

D.    Pandora adequately alleges an agreement between Comedians. ................. 12

      1.    Who, did what, to whom, where, and when. ...................................... 13

      2.    The Comedians' knowing participation in a collective scheme. ........ 15

      3.    Pandora alleges circumstantial evidence of horizontal agreement. ...... 17

E.    Pandora adequately alleges agreements in unreasonable restraint of
      trade under the rule of reason. ...................................................................... 19

CONCLUSION ........................................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Needle, Inc. v. Nat'l Football League*,
  560 U.S. 183 (2010) ............................................................................... 13, 21

*Anderson v. Boyne USA, Inc.*,
  2022 WL 2528252 (D. Mont. July 7, 2022) ......................................... 10

*Arista Records v. Doe 3*,
  604 F.3d 110 (2d Cir. 2010) ................................................................. 9

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................... 9, 13, 19

*Brantley v. NBC Universal, Inc.*,
  675 F.3d 1192 (9th Cir. 2012) .............................................................. 20

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
  441 U.S. 1 (1979) ................................................................................... 5

*Calculators Haw., Inc. v. Brandt, Inc.*,
  724 F.2d 1332 (9th Cir. 1983) .............................................................. 20

*CollegeNET v. The Common Application, Inc.*,
  711 F. App'x 405 (9th Cir. 2017)........................................................... 6

*In re Disposable Contact Lenses Antitrust*,
  215 F. Supp. 3d 1272 (M.D. Fla. 2016) ............................................. 18

*Eastman Kodak v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ........................................................................ 7, 11

*In re High-Tech Emp. Antitrust Litig.*,
  856 F. Supp. 2d 1103 (N.D. Cal. 2012)............................................... 16

*Intel Corp. v. Fortress Inv. Grp. LLC*,
  2022 WL 16756365 (9th Cir. Nov. 8, 2022) ........................................ 4

*Interstate Circuit v. United States*,
  306 U.S. 208 (1939) ................................................................. 15, 17, 19

- ii -

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008)...................................................................... 13, 14

*In re Keurig Antitrust Litig.*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019).......................................................... 16, 19

*Las Vegas Sun, Inc. v. Adelson*,
  2022 WL 876937 (D. Nev. Mar. 23, 2022)......................................................... 11

*In re Lithium Ion Batteries Antitrust Litig.*,
  2014 WL 309192 (N.D. Cal. Jan. 21, 2014) ...................................................... 15

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013) ............................................................................. 15

*Meredith Corp. v. SESAC LLC*,
  1 F. Supp. 3d 180 (S.D.N.Y. 2014) ................................................................. 12

*Meyer v. Kalanick*,
  174 F. Supp. 3d 817 (S.D.N.Y. 2016)......................................................... 14, 16

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984) .......................................................................................... 13

*Moore v. Mars Petcare US, Inc.*,
  966 F.3d 1007 (9th Cir. 2020)............................................................................ 9

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015)..................................................................... 17, 18

*NCAA v. Bd. of Regents of the Univ. of Okla.*,
  468 U.S. 85 (1984) ............................................................................................ 7

*Nero AG v. MPEG LA, L.L.C.*,
  2010 WL 43266448 (C.D. Cal. Sept. 14, 2010)................................................. 4

*Newcal Indus., Inc. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008)............................................................................ 6

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
  32 F.4th 824 (9th Cir. 2022)...................................................................... 13, 15

*Retail Prop. Tr. v. United Broth. of Carpenters and Joiners of Am.*,
  768 F.3d 938 (9th Cir. 2014) ............................................................................ 6

*Rick-Mik Enters., Inc. v. Equilon Enters., LLC*,
  532 F.3d 963 (9th Cir. 2008) ....................................................... 9

*Samsung Elecs. Co., Ltd. v. Panasonic Corp.*,
  2015 WL 10890655 (N.D. Cal. Sep. 30, 2015) .............................. 6

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) ..................................................... 3

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  586 F. Supp. 2d 1109 (N.D. Cal. 2008) ...................................... 19

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
  142 F.3d 90 (2d Cir. 1998) ..................................................... 6, 8

*In Re Toys "R" Us, Inc.*,
  126 F.T.C. 415 (1998) .............................................................. 20

*Toys "R" Us, Inc. v. FTC*,
  221 F.3d 928 (7th Cir. 2000) ............................................ 17, 19

*United States v. Visa U.S.A., Inc.*,
  344 F.3d 229 (2d Cir. 2003) .................................................... 12

*United States v. Apple Inc.*,
  952 F. Supp. 2d 638 (S.D.N.Y. 2013) ...................................... 20

*United States v. E. I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956) .................................................................. 6

*In re Xyrem Antitrust Litig.*,
  555 F. Supp. 3d 829 (N.D. Cal. 2021) ..................................... 16

**Statutes**

15 U.S.C. § 1 .............................................................. 13, 20, 21

15 U.S.C. § 2 .................................................................... 6

**Other Authority**

Areeda and Hovenkamp, *Antitrust Law* (4th and 5th eds. 2015-2021) .................... 21

- iv -

**INTRODUCTION**

Spoken Giants ("SG") seeks dismissal of Pandora's antitrust counterclaims. In significant part, SG advances arguments that this Court *already* rejected in its October 26, 2022 Order ("Order") addressing Pandora's initial counterclaims against Word Collections ("WC"). SG's additional arguments, challenging the existence of market power and of a conspiratorial agreement, fare no better.[1]

In particular, Pandora's First Amended Counterclaims against SG ("FACCs") show market power by plausibly alleging both (1) substantial evidence that SG's portfolio is a "must-have" if Pandora is to offer a viable comedy service; and (2) how SG's demand to license its Comedians' works collectively is forcing Pandora either to pay supracompetitive prices or provide a degraded product. These allegations demonstrate that "the reality of the market" is one in which SG's collective treatment of its Comedians eliminates competition. Order 20. The FACCs also show agreement by offering a detailed account of the conspiracy's "who, did what, to whom (or with whom), where, and when," along with "plus factors," describing the facts necessary to show a price-fixing conspiracy, not "parallel conduct." *Id.* at 24.

SG's motion to dismiss ("Mot.") takes no account of what the FACCs *actually* say, ignoring or mischaracterizing the FACCs' controlling allegations and offering SG's own fanciful version of the facts. SG compounds that error when it misunderstands or disregards the governing antitrust standards this Court articulated in the Order. The product at issue here (comedy routines) is unusual, but the misconduct that the FACCs plausibly allege—anticompetitive acquisition of market power and price-fixing—is all too familiar. SG's motion should be denied.[2]

---

[1] Pandora's oppositions to the dismissal motions of SG and WC are substantially similar, but differ where the arguments made by or circumstances of SG and WC diverge.

[2] Pandora does not object to SG's request for the Court to take judicial notice of three documents incorporated by reference in the FACCs. *See* Mot. 5 & Mot. Exs. A-C.

1

**STATEMENT OF FACTS**

2      The Order describes this litigation's background, which in relevant part is

3   substantially identical as to SG and WC. Order 1-4. Addressing WC's motion to

4   dismiss Pandora's initial counterclaims against it, the Court held that Pandora has

5   Article III and antitrust standing, finding sufficient allegations that WC demanded "a

6   supracompetitive price" (*id.* at 10-13) and that "the availability of any individual

7   licenses [from Comedians] is illusory." *Id.* at 17. But the Court dismissed Pandora's

8   monopolization, attempted monopolization, and conspiracy to monopolize claims

9   against WC; the Court found that the counterclaims did not adequately allege

10   monopoly or market power, largely because they failed to show that "the comedians

11   represented by Word Collections form a significant part of the critical mass necessary

12   to offer a viable streaming service." *Id.* at 20 (addressing direct evidence of market

13   power); *see id.* at 21 (same as to circumstantial evidence). The Court also dismissed

14   Pandora's price-fixing claim, finding that Pandora had not alleged the facts necessary

15   to "plausibly suggest[] concerted activity that is distinct from parallel conduct." *Id.*

16   at 24.

17      Following that decision, Pandora filed the FACCs against SG, asserting claims

18   of price-fixing (Count I), agreements in unreasonable restraint of trade (Count II),

19   monopolization and attempted monopolization (Count III), and conspiracy to

20   monopolize (Count IV). Among other things, the FACCs' allegations offer facts

21   showing that the Comedians, with SG facilitating, all entered into a horizontal

22   agreement to fix prices and restrict competition. FACCs ¶¶ 45-66. They also show

23   that SG and the individual Comedians entered into anticompetitive vertical

24   "affiliation agreements." *Id.*, ¶¶ 67-73. And they demonstrate that SG obtained

25   monopoly or market power by assembling a collection of Comedians to which

26   Pandora "must have" access to offer a viable comedy service. *Id.*, ¶¶ 88-112.

27

28

1  Additional allegations of the FACCs are described below, where relevant to SG's

2  particular arguments.

3  **APPLICABLE LEGAL STANDARDS**

4  The Order outlines the standards governing motions to dismiss. Order 5-6. Of

5  special importance here, "[i]f there are two alternative explanations, one advanced

6  by defendant and the other advanced by plaintiff, both of which are plausible,

7  plaintiff's complaint survives." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

8  "[A]t this stage of the litigation, the standard is not that plaintiff's explanation must

9  be true or even probable." *Id.* at 1216-17. Instead, it "simply calls for enough facts to

10 raise a reasonable expectation that discovery will reveal evidence to support the

11 allegations." *Id.* (quotation marks and citation omitted).

12 **ARGUMENT**

13 The FACCs' nonconclusory allegations must be taken as true. Once they are,

14 SG's arguments dissolve. Those allegations show that SG and the Comedians

15 engaged in a classic antitrust violation: SG assembled a syndicate of comedians to

16 which Pandora needs access, eliminated competition between those comedians, and

17 increased prices for their products to a supracompetitive level.

18 **A.    Pandora has Article III and antitrust standing.**

19 SG's initial challenge, to Pandora's standing (Mot. 5-10), is wrong, for the

20 reasons the Court already explained in rejecting WC's substantially identical

21 argument.

22 *First*, SG's assertion that Pandora suffered no injury-in-fact from SG's

23 demand for supracompetitive payment (Mot. 7-8) is inconsistent with the Court's

24 determination that WC's similar "demand of a large licensing fee," and Pandora's

25 allegation of "certainly impending" harm from that demand, confers standing. Order

26 9-10. SG's real contention seems to be that it did not *actually* make an "'all-or-

27 nothing proposal'" (Mot. 7), but we explain below (at pages 5, 10, 14, 19) that this

28

- 3 -

contention disregards the FACCs' factual allegations. Pandora did not, as SG would have it, "face[] a choice between any number of options" (*id.* at 7); the FACCs allege plainly that Pandora's choice was between paying a supracompetitive price and degrading (or abandoning) its comedy service.[3]

**Second**, SG contests Pandora's showing of antitrust standing, relying on the Ninth Circuit's unpublished decision in *Intel Corp. v. Fortress Investment Group LLC*, 2022 WL 16756365 (9th Cir. Nov. 8, 2022), which SG reads to say that antitrust injury does not exist unless the plaintiff has already paid a supracompetitive price. Mot. 9-10. But *Intel* has no bearing here at all. As SG itself recognizes (Mot. 9), the Ninth Circuit addressed the merits in *Intel*, saying not a word about standing.[4] And even as to the merits, the court rejected Intel's claim principally because it "failed plausibly to plead that any price increases were the result of Fortress's patent aggregation" (2022 WL 16756365, at *2); here, in contrast, Pandora pleads that SG's supracompetitive price demands followed *directly and necessarily* from SG's collusive collectivization of its Comedians. Moreover, unlike in *Intel*, the FACCs leave no doubt that the rights SG consolidated "are essential or otherwise functionally or economically necessary" to Pandora's business. *Id.* That establishes standing.

## B. Pandora adequately alleges that the availability of individual licenses was illusory.

SG's argument that Pandora needed to seek individual licenses (Mot. 10-11) assumes rule-of-reason analysis. But as SG's own authority makes clear, individual-license availability is irrelevant to per se illegal "arrangements" like those here whose "only apparent purpose is naked price fixing." *Nero AG v. MPEG LA, L.L.C.*, 2010 WL 43266448, at *6 (C.D. Cal. Sept. 14, 2010). Moreover, by fixing prices of

---

[3] SG's contention that litigation costs cannot establish injury for standing purposes (Mot. 8) is identical to the one previously rejected by the Court. *See* Order 11.

[4] As the Court previously recognized, it is important not to confuse "a merits inquiry" with "standing analysis." Order 11.

competing rights, the collective creates no efficiencies that could make rule-of-reason analysis even arguably applicable. FACCs ¶¶ 4, 81-87, 100. Not all "pooling" warrants rule-of-reason analysis. *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 21 & n.34 (1979) (stressing importance of marketplace realities in assessing need for blanket license).

Even if rule-of-reason analysis applied, the Court already addressed the same case law and arguments that SG now offers, finding that Pandora adequately alleged that the availability of any individual licenses as to WC's portfolio was illusory. Order 17-18. That conclusion applies fully to SG.

Like WC, SG demanded that Pandora take an all-or-nothing license for SG's entire "growing catalog of [comedian] works" (FACCs ¶ 60), with no realistic option to seek individual licenses. *Id.*, ¶¶ 41, 69-71. Moreover, SG repeatedly touted its business model as bundling individual rights into a blanket license. *E.g.*, FACCs ¶ 53 (SG says it provides "collective representation for all to strengthen the marketplace in favor of the [comedian] creator"); ¶ 54 (SG "collects their works into [the SG] catalog," which SG then licenses "in full"); ¶ 58 ("collective representation"). Unsurprisingly, SG described its licensing negotiations with companies like Pandora as "negotiations for blanket licenses." *Id.*, ¶ 57.

Ignoring its own public statements, SG seizes on snippets from its proposed license (describing the proposal as "not a binding contract") and cover email to Pandora (labeling the proposal a "first step" in forging a "trusted partner[ship]"). Mot. 10-11 & Exs. B & C. But these phrases are hardly a "genuine offer to engage in arms-length bargaining" over individual licenses. *Id.* at 11. The proposal was for a blanket license. And the cover email actually referred to the "first step" in meeting the collective's "goals" (Mot. Ex. B)—which, as noted, involves "collective representation" of SG's comedian clients. Likewise, boilerplate about "becom[ing] a trusted partner" suggests nothing about a willingness to meaningfully negotiate

licensing terms.[5]

In any event, the appropriate inquiry is not whether there was a realistic opportunity for *any* negotiation (for instance, over such things as the license term or reporting obligations), but whether Pandora "plausibly pleads" that SG denied Pandora "a realistic opportunity as a practical matter to negotiate *individual licenses*." *Samsung Elecs. Co., Ltd. v. Panasonic Corp.*, 2015 WL 10890655, at *6 (N.D. Cal. Sep. 30, 2015) (emphasis added); *see* Order 17. And on this, Pandora's pleading is sufficient: As in *Samsung*, the term sheet SG sent Pandora contained "no provision permitting separate licenses" and no member of the collective "indicated a willingness to negotiate a separate license." *Id. See* FACCs ¶¶ 4, 41, 42, 47-61, 67-73, 77. That disposes of SG's argument. *See* Order 18.

**C.    Pandora adequately alleges Section 2 claims.**

Pandora brings two claims under Section 2 of the Sherman Act—Count III (monopolization or, alternatively, attempted monopolization) and Count IV (conspiracy to monopolize). The Court previously stated each claim's elements. Order 18. Here, SG argues only that Pandora has not sufficiently alleged that SG has obtained, or is dangerously likely to obtain, market power (Mot. 11-16)—an issue that turns largely on matters of fact that often are inappropriate for resolution at the pleading stage. *E.g.*, *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1051 (9th Cir. 2008); *CollegeNET v. The Common Application, Inc.*, 711 F. App'x 405, 407 (9th Cir. 2017) ("The question of whether, and if so in what market, [a defendant] has monopoly power is complex, nuanced and fact dependent.").[6]

---

[5] SG is not entitled to any inference that the phrases it identifies meant that it was open to offering individual licenses; courts "draw all reasonable inferences in favor of the nonmoving party." *Retail Prop. Tr. v. United Broth. of Carpenters and Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014).

[6] The degree of market power necessary for claims of monopolization and attempted monopolization differ. A monopolization claim requires proof of monopoly power, "the power to control prices or exclude competition." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). Attempted monopolization requires only "*some* degree of market power" (*Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 100 (2d Cir. 1998) (emphasis added)), "the ability to raise prices above those

To determine the existence of market power, it is critical to "examine[] closely the economic reality of the market at issue." *Eastman Kodak v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466-67 (1992); *see also* Order 20. Market power may be shown with direct or circumstantial evidence. Order 18-19. Pandora's allegations make both types of showing.

### 1. SG's catalog is "must-have" for Pandora.

The FACCs allege in detail the economic realities of the market for rights to routines embodied in comedy recordings, demonstrating that SG's catalog is "must-have" for Pandora—allegations that bear on both direct and circumstantial showings of market power.

**a**. As the FACCs allege, comedy is dominated by a handful of "superstars." FACCs ¶ 23. Although Pandora's comedy library contains the recordings of thousands of comedians, the overwhelming majority of these recordings are rarely, if ever, streamed—only a few dozen comedians account for any significant number of streams. *Id.* For this reason, Pandora's curation team has concluded that the availability of a large number of comedians on a service, alone, is not critical to its success. *Id.*, ¶ 108. Instead, the ability to provide listeners with the recordings of a sufficient number of the "superstar" comedians that they actually want to hear is crucial to the long-run viability of Pandora's comedy product. *Id.*, ¶¶ 88, 108.

Given these marketplace realities, if a single economic actor gained control over the comedy routines embodied in the recordings of numerous "superstar" comedians, Pandora could not substitute away from that *collection* of rights to other comedians' works. FACCs ¶ 88. That actor would have monopoly power over Pandora. *Id.*

As the FACCs show, this is precisely what SG has done. SG's publicly stated portfolio contains *all* of the top five comedians played on Pandora in 2021, as well

that would be charged in a competitive market." *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 109 n.38 (1984).

as twelve of the top twenty-five played that year (or 48%). FACCs ¶ 103. Two of SG's Comedians are responsible for seven of the top twenty comedy albums sold from 1991 to 2014. *Id.*[7] Moreover, SG itself publicly boasts that its portfolio includes "hundreds of [comedian] members signed to multi-year agreements," including "*comedy's most iconic estates, marquee names, and emerging talent*," affording it "*collective bargaining power*." FACCs ¶¶ 3, 37, 104, Ex. A (emphases added). And SG pointedly claims to "represent[] a *significant percentage* of the comedy market." *Id.*, ¶ 36 (emphasis added). By design, SG's portfolio is "must-have" for Pandora, giving SG monopoly power.[8]

The point is confirmed by Pandora's curation team, which explained that, without access to any of the works in the SG catalog, Pandora would have to significantly degrade its comedy offering in the short run and would not be able to offer a competitive comedy service in the long run. FACCs ¶ 109. And the essential nature of SG's catalog is reinforced by customer complaints that Pandora received about its now-degraded comedy offering, including customer threats to leave Pandora if the taken-down recordings are not reinstated. *Id.*, ¶ 110. This gives SG "the monopoly power necessary to make [its request for a supracompetitive license fee] one Pandora cannot ignore." Order 10-11.

**b**. SG takes issue with this showing, making two arguments (in addition to those already addressed). *First*, it contends (Mot. 13-14) that "Pandora's own allegations undermine its 'must have' claims" because Pandora alleges "that no single comedian is a 'must have.'" But this argument misses the point: the fact that no one comedian is a "must-have" *bolsters* Pandora's claim. The source of SG's

---

[7] SG is wrong in asserting that these factual allegations are disconnected from the relevant market. Mot. 14. That so many of SG's comedians are top draws on Pandora plausibly suggests, as a matter of "'common sense'" (Order 5), that the SG catalog contains a must-have collection of rights for *any* comedy streaming service.

[8] At a minimum, these allegations show that SG has the "degree of market power" necessary for an attempted monopolization claim. *Tops Markets*, 142 F.3d at 100.

monopoly power is its *aggregation* of the rights to many individual "superstar" (and other) comedians—none of whom could exercise market power if negotiating an individual license in a competitive market—making SG's *portfolio* a must-have. *E.g.*, FACCs ¶¶ 107-10. All of SG's arguments resting on Pandora's allegation that no single comedian is essential ignore that controlling point.

*Second*, SG argues (Mot. 14-15) that the conclusions of Pandora's curation team and the existence of customer complaints should be disregarded as "self-serving" and "unsupported," pointing to *Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963 (9th Cir. 2008). But *Rick-Mik* says nothing at all about such evidence, which directly supports the inference that access to SG's stable of Comedians is essential to Pandora's operation of a viable comedy service. Instead, the plaintiff's problem in *Rik-Mik* was that the complaint did not allege "market power in the relevant market"; the allegations the complaint did make related to the wrong market. *Id.* at 972-973. In contrast, Pandora's factual allegations regarding customer complaints and the findings of its curation team speak directly to the market over which SG has gained power, showing Pandora's inability to switch away from SG.[9]

### 2. *Pandora's allegations offer direct evidence of market power.*

Against this background, the FACCs sufficiently allege direct evidence of SG's market power. As the Court explained, "[a] party demonstrates direct market power by identifying restricted output or supracompetitive prices." Order 18. Both are present here.

---

[9] Pandora's curation team members are qualified to determine what Pandora needs to offer a competitive comedy service; that customers complained and threatened to leave Pandora after the takedowns of SG's Comedians reinforces the team's conclusions. These factual allegations "are taken as true" and "construed in the light most favorable to" Pandora at this stage. *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1016 (9th Cir. 2020); *see also Arista Records v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010) ("[T]he notion that *Twombly* imposed a heightened standard that requires a complaint to include … declarations from the persons who collected the evidence is belied by the *Twombly* opinion itself.").

**a**. SG has publicly stated that its plan is to engage in "collective representation" to "strengthen the marketplace in favor of the [comedian] creator" and ensure that its Comedians receive an "additive income stream." FACCs ¶¶ 35, 53. In other words, SG will secure for its Comedian co-conspirators license fees well in excess of what they could command acting alone. *Id.*, ¶¶ 34-35, 50-59, 63, 74-80.[10]

SG's recognition of its market power is not debatable. SG has demanded that Pandora take a blanket license to its entire "growing catalog" for a fee well above competitive levels. FACCs ¶¶ 41, 97. Prior to the emergence of SG (and WC), comedians uniformly were compensated through the licenses granted and royalties paid for the use of their comedy recordings. *Id.*, ¶ 31. The comedians' own actions demonstrated their recognition that upping their demands likely would have resulted in the removal of their content from Pandora. *Id.*, ¶¶ 27, 63. SG's demand for a supracompetitive royalty therefore is direct evidence of market power. Order 18-19; *see also Anderson v. Boyne USA, Inc.*, 2022 WL 2528252, at *6 (D. Mont. July 7, 2022) (25% increase in rates sufficient for antitrust claims to survive a motion to dismiss).

SG nevertheless complains that Pandora fails to identify a "single 'instance in which it has [actually paid] higher royalties post-aggregation.'" Mot. 13 (citation omitted). But as the FACCs show, SG has left Pandora with the choice of paying a supracompetitive price or dropping its comedy offering altogether. FACCs ¶¶ 97, 116-19. And this Court has already recognized, in finding that Pandora has standing, that Pandora need not have actually paid the demanded supracompetitive fees for it to have suffered harm. Order 9-14; *see* FACCs ¶¶ 43-44, 97, 109-10 (Pandora forced to degrade its comedy offering by removing the content of comedians affiliated with SG).

---

[10] These statements, which SG never attempts to explain away, belie SG's claim (Mot. 13) that "Pandora's 'demand' and 'blanket license' assertions are demonstrably false." This is not merely Pandora's assertion—it is how SG publicly describes itself and its approach to licensing. *See* page 5, *supra*.

**b**. Pandora likewise alleges that if it does not accede to SG's license demands and loses access to the SG-controlled comedy, it will be unable to compete and will have to abandon its comedy offering. FACCs ¶¶ 97-100, 107-10, 116-19. That reduction in output is not speculative. Pandora has already had to remove the comedy of SG-affiliated Comedians, prompting customers to complain and threaten to leave Pandora. *Id.*, ¶¶ 43-44, 97, 109-10.[11] Such a forced reduction in output is a hallmark of market power. *See Las Vegas Sun, Inc. v. Adelson*, 2022 WL 876937, at *9 (D. Nev. Mar. 23, 2022).

And as outlined above, the FACCs offer sufficient specificity to plausibly allege that "the comedians represented by [SG] form a significant part of the critical mass necessary to offer a viable streaming service." Order 20. Consequently, the FACCs "allege enough about the reality of the market to demonstrate that [SG's] offer of a supracompetitive license exhibited the requisite market power." *Id.*

### 3. *Pandora's allegations offer circumstantial evidence of market power.*

In addition, the FACCs plausibly allege circumstantial evidence of market power, sufficiently showing that SG "owns a dominant share of the market or that there are significant barriers to entry in the market." Order 21.

**a.** On the first point, as described above, SG's catalog is "must-have" to Pandora. Indeed, SG has been able to force Pandora "to do something that [it] would not do in a competitive market": either pay supracompetitive prices well in excess of what it has historically paid or ultimately drop its comedy offering. *Eastman Kodak Co.*, 504 U.S. at 464 (internal citations omitted). This gives SG "the monopoly power necessary to make [its request for a supracompetitive license fee] one Pandora cannot

---

[11] SG's assertion (Mot. 13) that Pandora made a "business decision" to "de-platform" SG members as an intimidation tactic against any Comedian who "contemplate[s] protecting their rights" is baseless. Pointing to historical practice, the FACCs allege that Pandora took down the works of SG-affiliated comedians only when SG forced it to choose between doing so and paying supracompetitive fees. FACCs ¶¶ 27, 29-33, 43-44, 97, 116. SG's pejorative characterization of this decision does not obviate the FACCs' factual allegations.

1    ignore." Order 10-11. No matter the absolute number of Comedians in the SG
2    portfolio, the portfolio's must-have nature gives SG market power.

3    **b.** In addition, insurmountable barriers to entry protect SG's monopoly. A new
4    licensor of jokes embodied in comedy recordings could not provide a substitute for
5    what SG offers: access to its must-have portfolio. FACCs ¶ 111. As a consequence
6    of these "entrenched listener preferences for the comedians represented by" SG
7    (Order 22), identified by Pandora's curation team and highlighted by customer
8    complaints, Pandora must take SG's license or ultimately drop its comedy offering.

9    In response, SG claims (Mot. 15-16) that it faces competition from WC and
10   unaffiliated comedians. Not so. Pandora needs the respective catalogs of *both* SG and
11   WC to offer a viable comedy offering; they are not substitutes. FACCs ¶ 112. For
12   similar reasons, no unaffiliated comedian could serve as a substitute for what SG
13   offers: SG's must-have catalog. (Contrary to SG's uncited claim (Mot. 16), Pandora
14   has never alleged "that Word Collections and unaffiliated comedians are providing
15   [] substitutes" to what SG offers.) And if SG means to suggest that it cannot have
16   market power unless it is colluding with WC (*see id.*), it is wrong: the phenomenon
17   of multiple firms with market power is familiar. *See*, *e.g.*, *Meredith Corp. v. SESAC*
18   *LLC*, 1 F. Supp. 3d 180, 188-89, 218-19 (S.D.N.Y. 2014); *United States v. Visa*
19   *U.S.A., Inc.*, 344 F.3d 229, 239-40 (2d Cir. 2003).

20   **D.    Pandora adequately alleges an agreement between Comedians.**

21   SG's argument that Pandora fails to allege a horizontal agreement among the
22   Comedians (Mot. 17-19) is wrong. The FACCs describe in detail (1) the nature of
23   the agreement, giving SG adequate notice of the allegations; (2) the context that tends
24   to establish conspiracy; and (3) the circumstantial evidence plausibly pointing toward
25   agreement. These allegations "suggest[] concerted activity that is distinct from
26   parallel conduct." Order 24.

27

28

An agreement under Section 1 is concerted activity that "joins together separate decisionmakers ... such that the agreement deprives the marketplace of independent centers of decisionmaking," (*Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195-96 (2010) (cleaned up)), and demonstrates "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). The agreement may be shown by "direct or circumstantial evidence," (*id.*), and can be "tacit or express." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007). A plaintiff need not allege that a formal agreement existed. *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 842 (9th Cir. 2022). Under these standards, Pandora's showing of agreement is sufficient.

### 1.    *Who, did what, to whom, where, and when.*

The FACCs provide the evidentiary facts that "answer the basic questions [on agreement]: who, did what, to whom (or with whom), where, and when[.]" *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008):

***Who***: The FACCs allege that SG's Comedian members, with SG facilitating, entered into the anticompetitive agreement. The FACCs specifically identify the Comedians known to have been part of SG's original formation in October 2020 (FACCs ¶¶ 34-35), the additional Comedians whom SG publicly announced as joining shortly thereafter (*see id.*, ¶ 36), and all known Comedians who are currently part of the SG collective. *Id.*, ¶¶ 37-38.

***Did What***: The Comedians, with SG facilitating, entered into a scheme to fix the price at which "literary works" rights would be licensed. The FACCs allege that the scheme was effectuated by each Comedian entering into affiliation agreements with SG, granting SG the authority to pool that Comedian's rights with those of the other Comedians and to become the de facto exclusive licensor of that collective set of rights at a fixed price. *E.g.*, FACCs ¶¶ 45-59.

***To Whom***: The FACCs allege that SG demanded that Pandora (and others) take its blanket license at a fixed, supracompetitive price over the royalties that Pandora had historically paid. FACCs ¶¶ 41 & 60-61, 74-80.

***When***:[12] The FACCs allege that the key events of the conspiracy occurred over a roughly 18-month period, with specific acts including:

- The agreement was effectuated upon SG's inception in October 2020, with the associated press release announcing its formation and initial Comedian members. FACCs ¶¶ 34-35.

- The collective grew quickly, with SG announcing new members on November 19 and November 22, 2020, and January 27, January 29, February 7, February 19, March 15, March 22, April 14, April 27, April 29, May 31, July 16, and November 7, 2021. *See* FACCs ¶ 36; *see also id.*, ¶ 39 (listing communications from SG to Pandora with names of additional Comedians).

- On April 19, 2021, SG demanded Pandora take the blanket license. FACCs ¶¶ 41-42.

- On July 7, 2022, SG affiliate Lewis Black brought an infringement suit against Pandora; on that same day, SG stated that it "stands along[]side Mr. Black for fighting to win a victory for all in the comedy community." FACCs ¶¶ 12, 43.

Accordingly, the FACCs describe the scope of the alleged conspiracy in sufficient detail to provide defendants "an idea of where to begin" preparing their defense. *Kendall*, 518 F.3d at 1047-48. Pandora need not go further and "limn the entirety of the conspiracy before discovery" (*In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192 at *11 (N.D. Cal. Jan. 21, 2014)) or present direct, "smoking

---

[12] As to "where," there is no need to allege the location of the proverbial smoke-filled room. *See Meyer v. Kalanick*, 174 F. Supp. 3d 817, 825 (S.D.N.Y. 2016) ("The advancement of technological means for the orchestration of large-scale price-fixing conspiracies need not leave antitrust law behind.").

gun" evidence, particularly at the pleading stage. *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).

### 2.   *The Comedians' knowing participation in a collective scheme.*

**a**. SG asserts that Pandora has failed to allege facts establishing a horizontal agreement among competitor Comedians. Mot. 18. To the extent SG means that Pandora must allege which specific Comedians directly agreed with each other, it is mistaken. There is no requirement to "plead specific back-room meetings between specific actors at which specific decisions were made in order to survive a motion to dismiss." *Lithium Ion Batteries*, 2014 WL 309192 at *11 (internal quotations omitted). Rather, as the Ninth Circuit recently reiterated, no direct communications between conspirators are required: "Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act." *PLS.com*, 32 F.4th at 843 (*quoting Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939)).

That has long been the law. In *Interstate Circuit*, for example, the government alleged that competing movie distributors unlawfully restrained trade when they each agreed to a theater operator's terms, including price restrictions, as indicated in a letter from the operator addressed to all the distributors. *See* 306 U.S. at 214-17. The Court noted that the distributors had a "strong motive for concerted action" given the nature of the market-wide proposal by the operator, which would have "constituted an important departure from prior" business practices and raised prices. *Id.* at 217-18, 222. And each distributor's agreement to the terms would have been economically self-defeating unless other distributors did the same. *Id.* at 222. The Court found that an express agreement was unnecessary; instead, it "was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it. Each distributor was advised that

- 15 -

the others were asked to participate; each knew that cooperation was essential to successful operation of the plan." *Id.* at 226-27.

Consequently, a conspiracy exists where "each Defendant (1) 'had reason to know' that other Defendants were involved in the same 'broad project'; and (2) 'had reason to believe that their own benefits derived from the operation were probably *dependent upon the success of the entire venture.*'" *In re Xyrem Antitrust Litig.*, 555 F. Supp. 3d 829, 866 (N.D. Cal. 2021) (citation omitted). *See, e.g.*, *In re Keurig Antitrust Litig.*, 383 F. Supp. 3d 187, 244-45 (S.D.N.Y. 2019); *Meyer*, 174 F. Supp. 3d at 824.

**b**. The FACCs' allegations satisfy this standard, demonstrating the Comedians' awareness of, and knowing participation in, the price-fixing scheme. FACCs ¶¶ 45-69. For example, SG issued a public statement of the scheme's purpose to license works on a "collective basis," changing the comedy-licensing marketplace through "collective representation for all." *Id.*, ¶ 53. The Comedians understood what that meant, including the use of blanket licenses. *Id.*, ¶ 54-56. And, although "[a] co-conspirator need not know of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy" (*In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012)), each Comedian also had reason to know which other Comedians joined the scheme: SG, via founder Jim King and others, made clear that collective action "for all" was required as, in this marketplace, "even having a marquee name" would not suffice. *E.g.*, *id.*, ¶¶ 57-59 & Ex. A.

The Comedians' adherence to the common scheme is further demonstrated by the interrelated facts that (i) *no individual Comedian* has ever approached Pandora about individual licensing of his or her spoken-word content, and (ii) even though SG purports to act on behalf of its "client" Comedians, *at no time prior to this litigation* did SG offer Pandora a license for an individual Comedian's rights. FACCs ¶ 41. Instead, the scheme the Comedians adopted is for concerted action (*i.e.*,

1   "collective representation") to change the marketplace "in favor of the [comedian]

2   creator." *Id.*, ¶ 53.

3           **3.      Pandora alleges circumstantial evidence of horizontal agreement.**

4           Other allegations in the FACCs confirm agreement among the Comedians on

5   how to proceed. "As is usual in cases of alleged unlawful agreements to restrain

6   commerce, the [plaintiff] is without the aid of direct testimony that the [defendants]

7   entered into any agreement with each other. ... In order to establish agreement it is

8   compelled to rely on inferences drawn from the course of conduct of the alleged

9   conspirators." *Interstate Circuit*, 306 U.S. at 221. Here, beyond the allegations

10  outlined above, Pandora makes that showing by identifying "plus factors" that

11  distinguish "permissible parallel conduct from impermissible conspiracy." *In re*

12  *Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015).

13          **a.      Acts against self-interest**

14          Agreement can be shown by "extreme action against self-interest, ... for

15  example, where individual action would be so perilous in the absence of advance

16  agreement that no reasonable firm would make the challenged move without such an

17  agreement." *Musical Instruments*, 798 F.3d at 1195. That factor is present here:

18  absent agreement, no individual Comedian "would demand … a supra-competitive

19  extra royalty on top of what they have historically been paid from a service like

20  Pandora." FACCs ¶ 63. *See Interstate Circuit*, 306 U.S. at 222 (each distributor's

21  decision to accede to operator's demands would have been economically self-

22  defeating unless the other distributors did likewise); *Toys "R" Us, Inc. v. FTC*, 221

23  F.3d 928, 936 (7th Cir. 2000) (same).

24          SG is wrong that the claims here are "indistinguishable" from those in *Musical*

25  *Instruments*, where the court found the antitrust allegations insufficient. There, a

26  concentrated, interdependent, "follow-the-leader" market meant that, because prices

27  could "be easily readjusted without persistent negative consequences, one firm can

28

risk being the first to raise prices" and "supracompetitive prices and other anticompetitive practices, once initiated, can spread through the market without any prior agreement." 798 F.3d at 1195. Here, many comedians compete to have their performances streamed; as the FACCs allege, no individual comedian would risk seeking a supracompetitive royalty on her own. *See In re Disposable Contact Lenses Antitrust*, 215 F. Supp. 3d 1272, 1297 (M.D. Fla. 2016) ("No single reasonable manufacturer would drastically increase its prices and restrict its available sales without assurances that others would follow suit.").

### b.   *Common motive to conspire*

The Comedians also had a common motive to conspire: only working collectively could they change historic practice and secure supracompetitive royalties. FACCs ¶ 64. Again, SG's reliance on *Musical Instruments* is inapposite. As noted, *Musical Instruments* concerned a situation where a firm could risk being the first to raise prices "without persistent negative consequences," with others then following independently. But in the competitive market for comedy routines, collective action is *necessary* to achieve the price increase. In this case, and unlike in *Musical Instruments*, no Comedian could risk being the first to raise prices for fear of "persistent negative consequences." 798 F.3d at 1195. Instead, they needed to act collectively to achieve the desired outcome. Accordingly, "the common motive alleged here is not akin to a garden-variety motive to increase profits." *B&R Supermarket, Inc. v. Visa*, 2106 WL 5725010 at *7 (N.D. Cal. Sept. 30, 2016).

### c.   *Complex change close in time*

Each of the Comedians entered into an affiliation agreement within a short period of time, despite having never individually demanded a literary-works license from Pandora and never previously affiliating with a "literary works" licensing agency. FACCs ¶ 65. Dramatic changes in a short time suggest coordinated, not coincidental, conduct. *Twombly*, 550 U.S. at 556 n.4 ("complex and historically

unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason," support a plausible inference of conspiracy); *Interstate Circuit*, 306 U.S. at 222; *Toys "R" Us*, 221 F.3d at 935. SG offers no response to this point.

### d.     Public assurances

SG's public pronouncements also suggest agreement. In April 2021, SG demanded a blanket license from Pandora (and potentially other services). FACCs ¶ 60. SG then issued a series of press releases announcing new members throughout 2021. FACCs ¶ 36. The November 7, 2021 release added that SG "now represents a significant percentage of the comedy market." *Id.* These releases followed the October 2020 release listing SG's Comedian members, in which co-founder Jim King stated that "collective representation" would "strengthen the marketplace in favor of the creator." *Id.*, ¶¶ 34-36. These actions assured the Comedians that they were acting collectively and that the collective was holding strong. *Id.*, ¶ 66. S*ee, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1116 (N.D. Cal. 2008) (public statements can be used to facilitate coordinated conduct); *Keurig*, 383 F. Supp. 3d at 244-45 (significant that defendant's agreements "are well known within the market, and each company would have known that its competitors had entered into these agreements").

For all these reasons, Pandora's allegations of a horizontal agreement are more than sufficient.

### D.     Pandora adequately alleges agreements in unreasonable restraint of trade under the rule of reason.

Finally, Count II, like the other counts, alleges SG's elimination of competition among the Comedians and its accumulation of monopoly (or, at least, market) power in the relevant market through its de facto exclusive affiliation agreements with its Comedians. That conduct harmed Pandora, other streaming services, and their

millions of users. These allegations—of an agreement intended to restrain trade and that causes harm—states a Section 1 claim for unreasonable restraint of trade. *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012).

In challenging Count II, SG argues only that (1) the Affiliation Agreements are not "antitrust agreements" (Mot. 20), apparently contending that Section 1 does not apply to agreements that create "principal-agent" relationships; and (2) Pandora has not alleged harm to competition. Mot. 21.[13] These contentions are flawed.

*First*, it is beyond dispute that a vertical agreement between economically independent parties may be challenged under Section 1. *See, e.g.*, *In Re Toys "R" Us*, *Inc.*, 126 F.T.C. 415 (1998), *aff'd sub nom. Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000). This rule extends to all agreements that, like SG's affiliation agreements, create vertical relationships, whether distributorships, agencies, or otherwise. *See United States v. Apple Inc.*, 952 F. Supp. 2d 638, 694 (S.D.N.Y. 2013) (in "eliminat[ing] retail price competition," Apple's vertical agreements with publishers violated Section 1 under the rule of reason), *aff'd*, 791 F.3d 290 (2d Cir. 2015).

The sole case that SG cites for the proposition that a principal-agent relationship may not be the basis for an antitrust claim, *Calculators Hawaii, Inc. v. Brandt, Inc.*, 724 F.2d 1332 (9th Cir. 1983), stands for no such rule. Mot. 20. *Brandt* held only that a manufacturer's district manager "was incapable of conspiring" with the manufacturer to cut off the plaintiff. *Id.* at 1336. But *Brandt* says nothing about agreements *forming* agency or distribution relationships, let alone about a series of agreements by which a single entity becomes the de facto sole distributor for multiple, previously unaffiliated, competing manufacturers. Indeed, SG's argument is undermined by another case it cites, *American Needle*. There, use of a single marketing agent ("NFL Properties") to market the intellectual property of all the

---

[13] SG's argument that it lacks market power (Mot. 21 n.9) is addressed above (at pages 6-12).

individual NFL teams was subject to challenge under Section 1. The teams—like the Comedians prior to SG—"compete[d] in the market for intellectual property," and thus their joint licensing "'deprive[d] the marketplace of independent centers of decisionmaking,' ... and therefore of actual or potential competition." 560 U.S. at 197 (citations omitted). In fact, *American Needle* noted "a possible § 1 violation if two separately owned companies sold their separate products through a 'single selling agent.'" *Id.* That, essentially, is this case. *See* Areeda and Hovenkamp, *Antitrust Law* ¶ 1653e.

*Second*, SG's contention that Pandora failed to allege "anti-competitive injury" (Mot. 21) simply recycles SG's defective arguments about standing. SG ignores the allegations of concrete harm SG and its Comedians have caused not just to Pandora (FACCs ¶¶ 16-19), but to competition and to consumers. *Id.*, ¶¶ 113-15.

SG also is wrong to contend that there is no "anti-competitive injury" because its affiliation agreements "are easily terminable" and "contemplate a three-year term." Mot. 21. Nothing in the FACCs supports those factual characterizations, which are not established even by SG's form affiliation agreement; that agreement leaves the initial term's start and end dates blank, leaving the length an open question. Mot. Ex. A. Similarly, nothing in Lewis Black's contrived alleged exit from SG shows that SG's co-conspirator Comedians are likely to terminate their participation. *See* FACCs ¶ 12. And even assuming that termination is logistically easy, that does not "negate substantially the[] [agreements'] potential to foreclose competition." Mot. 21 (citation omitted). Here, SG recruited the Comedians with promises of increased returns through collective power; on these facts, were SG's Comedians to terminate their affiliation agreements, they would lose out on their share of the monopoly profits—profits that can be secured only through the elimination of competition. SG has not shown that Pandora has failed to plead harm to competition.

1

**CONCLUSION**

2

For the foregoing reasons, the Motion should be denied.

3

Dated:  January 25, 2023                      MAYER BROWN LLP
PAUL M. FAKLER

4

JACOB B. EBIN
ALLISON AVIKI

5

WILLIAM H. STALLINGS
CHRISTOPHER J. KELLY

6

JOHN NADOLENCO
DANIEL D. QUEEN

7

MEERIM NEHME

8

9

By: */s/ Paul M. Fakler*

10

Paul M. Fakler

11

MAYER BROWN LLP
WILLIAM H. STALLINGS (*pro hac vice*)

12

*wstallings@mayerbrown.com*
1999 K Street, NW

13

Washington, D.C.  20006-1101
Telephone: (202) 263-3000

14

Facsimile: (202) 262-3300

15

MAYER BROWN LLP
CHRISTOPHER J. KELLY (SBN

16

276312)
*cjkelly@mayerbrown.com*

17

Two Palo Alto Square
3000 El Camino Real

18

Palo Alto, California  94306-2112
Telephone: (650) 331-2000

19

Facsimile: (650) 331-2060

20

Attorneys for Defendant
PANDORA MEDIA, LLC

21

22

23

24

25

26

27

28

1

## **FILER'S ATTESTATION**

2

The undersigned, counsel of record for Defendant/Counterclaimant Pandora

3

Media, LLC, certifies that this brief contains 6,820 words, which complies with the

4

word limit of L.R. 11-6.1.

5

6

Dated:  January 25, 2023

7

8

*/s/Paul M. Fakler*
Paul M. Fakler

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28