MAYER BROWN LLP
PAUL M. FAKLER (*pro hac vice*)
*pfakler@mayerbrown.com*
JACOB B. EBIN (*pro hac vice*)
*jebin@mayerbrown.com*
ALLISON AVIKI (*pro hac vice*)
*aaviki@mayerbrown.com*
1221 Avenue of the Americas
New York, New York 10020-1001
Telephone: (212) 506-2500
Facsimile: (212) 262-1910

MAYER BROWN LLP
JOHN NADOLENCO (SBN 181128)
*jnadolenco@mayerbrown.com*
DANIEL D. QUEEN (SBN 292275)
*dqueen@mayerbrown.com*
MEERIM A. NEHME (SBN 322234)
*mnehme@mayerbrown.com*
333 S. Grand Avenue, 47th Floor
Los Angeles, California 90071
Telephone: (213) 229-9500
Facsimile: (213) 625-0248

[*Additional counsel listed on signature page*]

Attorneys for Counterclaimant
PANDORA MEDIA, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re PANDORA MEDIA, LLC COPYRIGHT LITIGATION | Master File No.: 2:22-cv-00809-MCS-MAR <br><br> <u>CONSOLIDATED ACTION</u> <br><br> **DEFENDANT AND COUNTERCLAIMANT PANDORA MEDIA, LLC'S OPPOSITION TO COUNTERCLAIM DEFENDANT WORD COLLECTIONS' MOTION TO DISMISS** |
| This Document Relates To: <br> 2:22-cv-00817-MCS-MAR (Clay) <br> 2:22-cv-01345-MCS-MAR (Di Paolo) <br> 2:22-cv-00810-MCS-MAR (Carlin) <br> 2:22-cv-00815-MCS-MAR (Williams) <br> 2:22-cv-00813-MCS-MAR (White) <br> 2:22-cv-00809-MCS-MAR (Engvall) <br> 2:22-cv-00809-MCS-MAR (Hicks) | Date: March 6, 2023 <br> Time: 9:00 AM <br> Crtrm: 7C - First Street Courthouse |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS .......................................................................................... 2

APPLICABLE LEGAL STANDARDS ...................................................................... 3

ARGUMENT ............................................................................................................... 3

A.     Pandora adequately alleges that the availability of individual
       licenses was illusory. ....................................................................................... 3

B.     Pandora adequately alleges Section 2 claims. .................................................. 6

       1.     WC's catalog is "must-have" for Pandora. ............................................ 6

       2.     Pandora's allegations offer direct evidence of market power. ............... 9

       3.     Pandora's allegations offer circumstantial evidence of
              market power ........................................................................................ 11

C.     Pandora adequately alleges an agreement between Comedians. ..................... 12

       1.     Who, did what, to whom, where, and when. ......................................... 13

       2.     The Comedians' knowing participation in a collective scheme. ......... 15

       3.     Pandora alleges circumstantial evidence of horizontal agreement. ..... 17

D.     Pandora adequately alleges agreements in unreasonable restraint of trade. ... 20

CONCLUSION .......................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Needle, Inc. v. Nat'l Football League*,
  560 U.S. 183 (2010) ...................................................................................... 12, 21

*Anderson v. Boyne USA, Inc.*,
  2022 WL 2528242 (D. Mont. July 7, 2022) ...................................................... 10

*Arista Records v. Doe 3*,
  604 F.3d 110 (2d Cir. 2010) ................................................................................ 8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................... 8, 13, 19

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
  441 U.S. 1 (1979) ................................................................................................. 3

*Calculators Haw., Inc. v. Brandt, Inc.*,
  724 F.2d 1332 (9th Cir. 1983) ........................................................................... 21

*In re Disposable Contact Lenses Antitrust*,
  215 F. Supp.3d 1272 (M.D. Fla. 2016) ............................................................. 18

*In re DRAM Antitrust Litig.*,
  28 F.4th 42 (9th Cir. 2022) ................................................................................ 20

*Eastman Kodak v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ..................................................................................... 6, 11

*In re High-Tech Emp. Antitrust Litig.*,
  856 F. Supp. 2d 1103 (N.D. Cal. 2012) ............................................................ 16

*Intel Corp. v. Fortress Inv. Grp. LLC*,
  2022 WL 16756365 (9th Cir. Nov. 8, 2022) ....................................................... 5

*Interstate Circuit v. United States*,
  306 U.S. 208 (1939) ................................................................... 15, 17, 18, 19

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) ..................................................................... 13, 14

*In re Keurig Antitrust Litig.*,
   383 F. Supp. 3d 187 (S.D.N.Y. 2019) ........................................................ 16, 20

*Las Vegas Sun, Inc. v. Adelson*,
   2022 WL 876937 (D. Nev. Mar. 23, 2022) ...................................................... 10

*In re Lithium Ion Batteries Antitrust Litig.*,
   2014 WL 309192 (N.D. Cal. Jan. 21, 2014) ................................................ 14, 15

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013) .............................................................................. 15

*Meredith Corp. v. SESAC LLC*,
   1 F. Supp. 3d 180 (S.D.N.Y. 2014) .................................................................... 12

*Meredith Corp. v. SESAC LLC*,
   2011 WL 856266 (S.D.N.Y. Mar. 9, 2011) ......................................................... 8

*Meyer v. Kalanick*,
   174 F. Supp.3d 817 (S.D.N.Y. 2016) ............................................................ 14, 16

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) .......................................................................................... 13

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ..................................................................... 17, 18

*NCAA v. Bd. of Regents of the Univ. of Okla.*,
   468 U.S. 85 (1984) .............................................................................................. 6

*Nero AG v. MPEG LA, L.L.C.*,
   2010 WL 43266448 (C.D. Cal. Sept. 14, 2010) .................................................. 3

*Newcal Indus., Inc. v. Ikon Office Sol.*,
   513 F.3d 1038 (9th Cir. 2008) ............................................................................ 6

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
   32 F.4th 824 (9th Cir. 2022) ........................................................................ 13, 15

*Radio Music License Comm., Inc. v. Glob. Music Rights, LLC*,
   No. 2:19-cv-03957 (C.D. Cal. Feb. 13, 2020) .................................................... 8

*Retail Prop. Tr. v. United Broth. of Carpenters and Joiners of Am.*,
   768 F.3d 938 (9th Cir. 2014) .............................................................................. 5

- iii -

*Samsung Elecs. Co., Ltd. v. Panasonic Corp.*,
  2015 WL 10890655 (N.D. Cal. Sep. 30, 2015)....................................................5

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) ............................................................... 3, 9

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  586 F. Supp. 2d 1109 (N.D. Cal. 2008)................................................ 20

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
  142 F.3d 90 (2d Cir. 1998) ................................................................... 6, 7

*In Re Toys "R" Us*, *Inc.*,
  126 F.T.C. 415 (1998) .......................................................................... 21

*Toys "R" Us, Inc. v. FTC*,
  221 F.3d 928 (7th Cir. 2000) ........................................................... 18, 19

*United States v. BMI*,
  426 F.3d 91 (2d Cir. 2005) ................................................................... 12

*United States v. Apple Inc.*,
  952 F. Supp. 2d 638 (S.D.N.Y. 2013) ................................................... 21

*United States v. E. I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956) .............................................................................. 6

*United States v. Visa U.S.A., Inc.*,
  344 F.3d 229 (2d Cir. 2003) ................................................................. 12

*Ward v. Apple Inc.*,
  791 F.3d 1041 (9th Cir. 2015) .............................................................. 14

*In re Xyrem Antitrust Litig.*,
  555 F. Supp.3d 829 (N.D. Cal. 2021)................................................... 16

**Statutes**

15 U.S.C. § 1........................................................................... 12, 20, 21

15 U.S.C. § 2........................................................................................ 6

**Other Authority**

Areeda and Hovenkamp, *Antitrust Law* (4th and 5th eds. 2015-2021).................. 21

- iv -

**INTRODUCTION**

In dismissing Pandora's initial antitrust counterclaims against Word Collections ("WC") and seven of its Comedians, the Court's October 26, 2022 Order ("Order") found that Pandora failed to adequately allege either market power or conspiracy to fix prices. Pandora's First Amended Counterclaims ("FACCs") cure those deficiencies.[1]

To show market power, the FACCs both (1) allege substantial evidence establishing that WC's portfolio is a "must-have" if Pandora is to offer a viable comedy service; and (2) illustrate how WC's demand to license its Comedians' works collectively is forcing Pandora either to pay supracompetitive prices or provide a degraded product. These allegations paint a picture of "the reality of the market"— one in which WC's collective treatment of its Comedians eliminates competition— that the Court found missing from the initial counterclaims. Order 20. The FACCs also show agreement by detailing the conspiracy's "who, did what, to whom (or with whom), where, and when," along with "plus factors," describing the facts necessary to show a price-fixing conspiracy, not "parallel conduct." *Id.* at 24.

WC's renewed motion to dismiss ("Mot.") takes no account of what the FACCs *actually* say, ignoring or mischaracterizing the FACCs' controlling allegations and offering WC's own fanciful version of the facts. WC compounds that error when it misunderstands or disregards the governing antitrust standards this Court articulated in the Order. The product at issue here (comedy routines) is unusual, but the misconduct that the FACCs plausibly allege—anticompetitive acquisition of market power and price-fixing—is all too familiar. WC's motion to dismiss should be denied.

---

[1] Pandora's oppositions to the dismissal motions of WC and Spoken Giants ("SG") are substantially similar, but differ where the arguments made by or circumstances of WC and SG diverge.

- 1 -

## STATEMENT OF FACTS

The Order describes this litigation's background and Pandora's initial counterclaims. Order 1-3. Addressing WC's motion to dismiss those counterclaims, the Court held that Pandora has Article III and antitrust standing, finding sufficient allegations that WC demanded "a supracompetitive price" (*id.* at 10-13) and that "the availability of any individual licenses [from Comedians] is illusory." *Id.* at 17. But the Court dismissed Pandora's monopolization, attempted monopolization, and conspiracy to monopolize claims; the Court found that the counterclaims did not adequately allege monopoly or market power, largely because they failed to show that "the comedians represented by Word Collections form a significant part of the critical mass necessary to offer a viable streaming service." *Id.* at 20 (addressing direct evidence of market power); *see id.* at 21 (same as to circumstantial evidence). The Court also dismissed Pandora's price-fixing claim, finding that Pandora had not alleged the facts necessary to "plausibly suggest[] concerted activity that is distinct from parallel conduct." *Id.* at 24.[2]

Pandora responded by filing the FACCs, asserting claims of price-fixing (Count I), agreements in unreasonable restraint of trade (Count II), monopolization and attempted monopolization (Count III), and conspiracy to monopolize (Count IV). Among other things, the FACCs address what the Court described as gaps in the original counterclaims.

The FACCs' allegations offer facts showing that the Comedians, with WC facilitating, all entered into a horizontal agreement to fix prices and restrict competition. FACCs ¶¶ 59-78. They also show that WC and the individual Comedians entered into anticompetitive vertical "exclusive affiliation agreements." *Id.*, ¶¶ 79-81. And they demonstrate that WC obtained monopoly or market power by

---

[2] The Court also dismissed Pandora's tying claim (Order 25-27), which is not renewed in the FACCs.

assembling a collection of Comedians to which Pandora "must have" access to offer a viable comedy service. *Id.*, ¶¶ 112-20. Additional allegations of the FACCs are described below, where relevant to WC's particular arguments.

## APPLICABLE LEGAL STANDARDS

The Order outlines the standards governing motions to dismiss. Order 5-6. Of special importance here, "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). "The standard at this stage of the litigation … simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence to support the allegations." *Id.* at 1216-17 (quotation marks and citation omitted).

## ARGUMENT

The FACCs' nonconclusory allegations must be taken as true. Once they are, WC's arguments dissolve. Those allegations show that WC and the Comedians engaged in a classic antitrust violation: WC assembled a syndicate of comedians to which Pandora needs access, eliminated competition between those comedians, and increased prices for their products to a supracompetitive level.

**A.    Pandora adequately alleges that the availability of individual licenses was illusory.**

WC's argument that Pandora needed to seek individual licenses (Mot. 12-14) assumes rule-of-reason analysis. But, as WC's own authority makes clear, individual-license availability is irrelevant to per se illegal "arrangements" like those here whose "only apparent purpose is naked price fixing." *Nero AG v. MPEG LA, L.L.C.*, 2010 WL 43266448, at *6 (C.D. Cal. Sept. 14, 2010). Moreover, by fixing prices of competing rights, the collective creates no efficiencies that could make rule-of-reason analysis even arguably applicable. FACCs ¶¶ 4, 91-97, 110, 132. Not all "pooling" warrants rule-of-reason analysis. *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,

441 U.S. 1, 21 & n.34 (1979) (stressing importance of marketplace realities in assessing need for blanket license).

In any event, this Court has already rejected WC's individual-licenses argument. Order 17-18. The Court explained that "[a] plaintiff need not allege any attempt to individually license ... if the plaintiff demonstrates availability of individual licenses is illusory." *Id.* at 17 (citing *Samsung Elecs. Co., Ltd. v. Panasonic Corp.*, 2015 WL 10890655, at *6 (N.D. Cal. Sep. 30, 2015)). And the Court held that "Pandora adequately allege[d] that the availability of any individual licenses [was] illusory." *Id.*

That remains true. As the Court recognized, Pandora plausibly alleged in its counterclaims that WC "described itself as the only entity where services like Pandora could receive a license to use literary works in its portfolio." Order 17. The FACCs make that even clearer. *See* FACCs ¶¶ 6, 46, 47, 57, 58, 60, 62, 69, 82. WC applied the strategy of other collective licensing entities to the comedy world (*id.*, ¶¶ 45, 65); obtained exclusive control over its member comedians' content (*id.*, ¶ 81); proclaimed itself as the "only entity on the planet" with the right to license those works (*id.*, ¶¶ 58, 109); and assured its Comedians that "[d]igital radio and AM/FM radio either have to pay *for all broadcasts* of comedy and other spoken word performances *or choose to broadcast none of it.*" *Id.*, ¶ 68 (emphasis added). WC's proposed terms did not allow Pandora to secure the rights to some, but not all, of WC's material. *Id.*, ¶¶ 52-53. And, neither WC nor any of its Comedian members ever offered an individual license for a Comedian's works. *Id.*, ¶ 52; *see* Order 17.

Against all this, WC now points to a phrase in a cover email that WC sent Pandora along with its proposed blanket license; as WC characterizes it, the email said that it was WC's "goal ... to work with [Pandora] to provide an efficient licensing solution"; referenced "next steps"; and conveyed that WC "look[s] forward to speaking further." Mot. Ex. B; *see* Mot. 13-14. But these phrases, far from suggesting

amenability to individual licenses, are merely rote pleasantries routinely included in cover emails. *See, e.g.*, *id.* ("My hope is to set a time this week or early next week to discuss next steps."). Indeed, WC's "goal" was its "efficient licensing solution"—the proposed *blanket* license attached to the cover email. *Id.* WC also seizes on the cover email's description of the license as a "proposal." Mot. 13. But the Court already recognized that there is nothing significant in that terminology. *See* Order 6-8, 17.[3]

And even if WC's verbiage somehow evinced a genuine willingness to negotiate the proposed blanket license's terms, that says nothing about the availability of individual licenses—which are directly at odds with WC's publicly stated blanket-licensing model. The appropriate inquiry is not whether there was a realistic opportunity for *any* negotiation (for instance, over the term or reporting obligations), but whether Pandora "plausibly pleads" that WC denied Pandora "a realistic opportunity as a practical matter to negotiate *individual licenses*." *Samsung*, 2015 WL 10890655, at *6 (emphasis added). As in *Samsung*, WC's proposed license contained "no provision permitting separate licenses," and no member of the collective "indicated a willingness to negotiate a separate license." *Id. See* FACCs ¶¶ 4, 45, 52-54, 57, 58, 60-69, 75-81. That should end the matter. *See* Order 18 ("It is enough that Pandora has plausibly alleged Word Collections requires a blanket license for access to its literary works.").[4]

---

[3] WC is not entitled to any inference that the email's phrasing suggested an openness to individual licenses. To the contrary, the Court "must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party." *Retail Prop. Tr. v. United Broth. of Carpenters and Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014).

[4] Pointing to *Intel Corp. v. Fortress Investment Group LLC*, 2022 WL 16756365 (9th Cir. Nov. 8, 2022), WC argues that "Pandora cannot assert antitrust standing based solely on any *demand* for alleged supracompetitive license fees, rather than its actual payment of them." Mot. 13 n.4. But Pandora asserts antitrust injury based on more than WC's demand: Among other things, as a result of WC's actions, Pandora had to remove content. FACCs ¶¶ 55, 56, 107, 118, 126. There is no basis for WC's contention that Pandora had to accept WC's exorbitant fee to suffer cognizable injury. *See* Order 12-14.

**B.**     **Pandora adequately alleges Section 2 claims.**

Pandora brings two claims under Section 2 of the Sherman Act—Count III (monopolization or, alternatively, attempted monopolization) and Count IV (conspiracy to monopolize). The Court previously stated each claim's elements. Order 18. Here, WC argues only that Pandora has not sufficiently alleged market power (Mot. 14-22)—an issue that turns largely on matters of fact that often are inappropriate for resolution at the pleading stage.[5] *E.g.*, *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1051 (9th Cir. 2008).

To determine the existence of market power, it is critical to "examine[] closely the economic reality of the market at issue." *Eastman Kodak v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466-67 (1992); *see also* Order 20. Market power may be shown with direct or circumstantial evidence. Order 18-19. Pandora's allegations make both types of showing.

**1.**     **WC's catalog is "must-have" for Pandora.**

The FACCs allege in detail that WC's catalog is "must-have" for Pandora—allegations that bear on both direct and circumstantial showings of market power.

**a.** As the FACCs allege, comedy is dominated by a handful of "superstars." FACCs ¶ 33. Although Pandora's comedy library contains thousands of recordings, the overwhelming majority are rarely, if ever, streamed—only a few dozen comedians account for any significant number of streams on Pandora. *Id.* For this reason, Pandora's curation team concluded that the availability of a large number of comedians on a service, alone, is not determinative of success. *Id.*, ¶ 106. Instead, the

---

[5] The degree of market power necessary for claims of monopolization and attempted monopolization differ. Monopolization requires proof of monopoly power, "the power to control prices or exclude competition." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). Attempted monopolization requires only "*some* degree of market power" (*Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 100 (2d Cir. 1998) (emphasis added))—"the ability to raise prices above those that would be charged in a competitive market." *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 109 n.38 (1984).

ability to provide listeners with the recordings of a sufficient number of the "superstar" comedians that they actually want to hear is competitively essential. *Id.* This ability is crucial to the long-term viability of Pandora's comedy product. *Id.*, ¶¶ 117-18.

Given these marketplace realities, if a single economic actor gained control over the comedy routines embodied in the recordings of numerous "superstar" comedians, Pandora could not substitute away from that *collection* of rights to other comedians' works. FACCs ¶ 98. That actor would have monopoly power over Pandora. *Id.*, ¶ 119.

As the FACCs show, this is precisely what WC has done. WC's portfolio contains: (a) the two best stand-up comedians of all time, as ranked by Rolling Stone; (b) nine of Rolling Stone's "50 Best Stand-Up Comedians of All Time"; (c) comedians responsible for five of the top sixteen comedy albums sold from 1991 to 2014, as reported by Billboard; and (d) iconic comedians that defined comedy for multiple decades. FACCs ¶ 114. WC agrees that its "clients" include "some of the world's most iconic" comedians (*id.*, ¶ 116), while the counterclaim-defendant Comedians describe themselves as all "iconic, world famous comedians, each of whom have captivated audiences for decades and are considered, by many, as legends in the entertainment field, having brought to their audiences works that will be treasured for years to come." *Id.* By design, WC's portfolio is "must-have" for Pandora, giving WC monopoly power.[6]

The point is confirmed by Pandora's curation team, which explained that, without access to any of the works in WC's catalog, Pandora would have to significantly degrade its comedy offering in the short run and would not be able to

---

[6] At a minimum, these allegations demonstrate that WC certainly has the "some degree of market power" necessary for an attempted monopolization claim. *Tops Markets*, 142 F.3d at 100.

offer a competitive comedy offering in the long run. FACCs ¶ 117.[7] And the essential nature of WC's catalog is reinforced by customer complaints that Pandora has received about its now-degraded comedy offering, including customer threats to leave Pandora if the taken-down recordings are not reinstated. *Id.*, ¶ 118.[8] This gives WC "the monopoly power necessary to make [its request for a supracompetitive fee] one Pandora cannot ignore." Order 10-11.

   **b.** WC takes issue with this showing, making two overarching arguments. *First*, it finds an "insuperable flaw in Pandora's claim" based on its collective representation of a relatively small percentage of the total number of comedians and comedic recordings Pandora offers. Mot. 16. But, as just discussed, the raw number of comedy recordings in Pandora's library is beside the point. The FACCs' allegations about the iconic nature of WC's stable of Comedians and the analysis of Pandora's curation team "connect Word Collections' representation of about 30 comedians to [Pandora's] inability to amass the critical mass needed to offer a viable comedy streaming service." Order 20.[9]

---

[7] WC is wrong to dismiss the conclusions of Pandora's curation team. Mot 19-20. The team's members are qualified to determine what Pandora needs to offer a competitive comedy service. These are factual allegations that must be taken as true and construed in the light most favorable to Pandora. *See* note 3, *supra*; *see also Arista Records v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010) ("[T]he notion that *Twombly* imposed a heightened standard that requires a complaint to include ... declarations from the persons who collected the evidence is belied by the *Twombly* opinion itself.").

[8] Because Pandora was forced to take down comedians affiliated with both WC and SG, the customer complaints in the FACCs (which do not identify WC Comedians by name) may not by themselves establish market power. Nevertheless, they are well-pled factual allegations that offer support for Pandora's showing of WC's market power.

[9] In this respect, WC is very much like SESAC and GMR. These two PROs represent a relatively modest number of extremely popular songwriters. FACCs ¶ 90. Nevertheless, the catalogs of both are must-have for Pandora and others. Indeed, recent antitrust lawsuits against both SESAC and GMR made allegations similar to those raised here; all survived motions to dismiss. *See, e.g.*, Order, *Radio Music License Comm., Inc. v. Glob. Music Rights, LLC*, No. 2:19-cv-03957 (C.D. Cal. Feb. 13, 2020), ECF No. 201; *Meredith Corp. v. SESAC LLC*, 2011 WL 856266 (S.D.N.Y. Mar. 9, 2011).

WC likewise is wrong when it complains that comedic significance cannot be determined by reference to "third-party lists," or "years-old lists," or the comedian's "general success." Mot. 19. As a matter of "'common sense'" (Order 5), it surely is plausible that a viable comedy service must have access to enough of the comedians described by knowledgeable experts as among the best of all time. So long as Pandora's allegation to that effect is plausible, WC's contrary speculation must be disregarded. *Starr*, 652 F.3d at 1216.

*Second*, WC asserts (Mot. 18-20) that Pandora fails to demonstrate that any one WC-affiliated Comedian is must-have to Pandora. But Pandora makes precisely the opposite argument: that *no* individual comedian is a must-have. *E.g.*, FACCs ¶¶ 36, 44. Instead, the source of WC's monopoly power, just like that of the PROs it emulates, is its *aggregation* of the rights to many "superstar" (and other) comedians, making its *portfolio* a must-have. *E.g.*, *id.*, ¶¶ 80, 82, 98, 115. All of WC's arguments resting on Pandora's purported failure to show that any one comedian is essential ignore that controlling point.

### 2. *Pandora's allegations offer direct evidence of market power.*

Against this background, the FACCs sufficiently allege direct evidence of WC's market power. As the Court explained, "[a] party demonstrates direct market power by identifying restricted output or supracompetitive prices." Order 18. Both are present here.

**a.** WC repeatedly has called itself the "ASCAP and BMI for spoken word instead of music." FACCs ¶¶ 6, 45. As the FACCs explain, the PROs' collective licensing business model—and resulting market power—is well-established and understood. *Id.*, ¶¶ 65-66. In fact, WC has advantages over ASCAP and BMI: it is not regulated by an antitrust consent decree. Unsurprisingly, WC understands that it can demand fees well above competitive levels from users like Pandora. *Id.*, ¶ 67.[10]

---

[10] WC affiliate Eddie Brill also made this clear, explaining that WC has "all these very famous people" including "not only great comedians who are alive, but the

As WC's CEO has publicly stated, "this should be the official T-Shirt and slogan of Word Collections—F*** you, pay me." *Id.*, ¶ 111.[11]

WC's recognition of its market power is not debatable. WC has demanded that Pandora take a blanket license to its entire growing catalog for a fee well above competitive levels. FACCs ¶¶ 52, 88. Prior to the emergence of WC (and SG), comedians uniformly were compensated through the licenses granted and royalties paid to use their comedy recordings. *Id.*, ¶¶ 40-44. The comedians' own actions demonstrated their recognition that upping their demands likely would have resulted in the removal of their content from Pandora. *Id.*, ¶¶ 2, 40-44, 75. WC's demand for a supracompetitive royalty therefore is direct evidence of market power. Order 18-19; *see also Anderson v. Boyne USA, Inc.*, 2022 WL 2528242, at *6 (D. Mont. July 7, 2022) (25% increase in rates sufficient for antitrust claims to survive motion to dismiss).

**b.** Pandora likewise alleges that if it does not accede to WC's supracompetitive license demands and loses access to the WC-controlled comedy, it will be unable to compete and will have to abandon its comedy offering. FACCs ¶¶ 98, 109-117. That reduction in output is not speculative. Pandora has already had to remove the comedy of WC-affiliated Comedians following WC's actions; in the short period since that content was removed, customers have complained and threatened to leave Pandora. FACCs ¶¶ 55-56, 118. Such a forced reduction in output is a classic hallmark of market power. *See Las Vegas Sun, Inc. v. Adelson*, 2022 WL 876937, at *9 (D. Nev. Mar. 23, 2022).

And as outlined above, the FACCs offer sufficient specificity to plausibly

---

estate of George Carlin, the estate of Richard Pryor … on and on" and that, as a result of its collective might, "there is going to be a whole financial windfall" for those joining WC. FACCs ¶ 63.

[11] In an effort to downplay this admission, WC asserts (Mot. 16 n.9) that this "plainly sarcastic comment … says nothing whatsoever about market power." Not so. Market power is what gives WC the ability to extract supracompetitive "F*** you, pay me" prices.

allege that "the comedians represented by Word Collections form a significant part of the critical mass necessary to offer a viable streaming service." Order 20. Consequently, the FACCs "allege enough about the reality of the market to demonstrate that Word Collections' offer of a supracompetitive license exhibited the requisite market power." *Id.*

### 3. *Pandora's allegations offer circumstantial evidence of market power.*

In addition, the FACCs plausibly allege circumstantial evidence of market power, showing that "Word Collections owns a dominant share of the market or that there are significant barriers to entry in the market." Order 21.

**a.** On the first point, as described above, WC's catalog is "must-have" to Pandora. Indeed, WC has been able to force Pandora "to do something that [it] would not do in a competitive market": either pay supracompetitive prices or ultimately drop its comedy offering. *Eastman Kodak Co.*, 504 U.S. at 464 (internal citations omitted). This gives WC "the monopoly power necessary to make [its request for a supracompetitive license fee] one Pandora cannot ignore." Order 10-11. Pandora therefore has filled the gap identified in the Court's Order, at 21, questioning whether WC has a "dominant share of the market." No matter the absolute number of Comedians in WC's portfolio, the portfolio's must-have nature gives WC market power.

**b.** In addition, insurmountable barriers to entry protect WC's market power. A new licensor of jokes embodied in comedy recordings could not provide a substitute for what WC offers: access to WC's unique must-have portfolio. As a consequence of these "entrenched listener preferences for the comedians represented by Word Collections" (Order 22), identified by Pandora's curation team and highlighted by customer complaints, Pandora must take WC's license or ultimately drop its comedy offering.

1    In response, WC claims (Mot. 16-17) that it faces significant competition from

2   SG, ASCAP, and BMI. Not so. Pandora needs the respective catalogs of both WC

3   and SG to offer a viable comedy offering; they are not substitutes. FACCs ¶ 120. And

4   ASCAP and BMI cannot possibly compete with WC—they do not license anything

5   other than performance rights to musical works. *Id.* at 93.

6    WC also argues (Mot. 16-17) that it is implausible that WC and SG can both

7   have monopoly power over Pandora. That contention is not only inconsistent with

8   the facts alleged, but perplexing given WC's statements comparing itself to ASCAP

9   and BMI—*both* of which have long been acknowledged to have substantial market

10   power over Pandora and others; from the perspective of music users, they are not

11   substitutes for each other. *See, e.g.*, *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d

12   180, 188-89, 218-19 (S.D.N.Y. 2014); *United States v. BMI*, 426 F.3d 91, 96 (2d Cir.

13   2005). In fact, this phenomenon of multiple firms with market power is not unique

14   to the music (and now comedy) industries. *See, e.g.*, *United States v. Visa U.S.A.,*

15   *Inc.*, 344 F.3d 229, 239-240 (2d Cir. 2003) ("Visa U.S.A. and MasterCard, jointly

16   and separately, have power within the market for network services"). There is nothing

17   implausible about both WC and SG having monopoly power over Pandora.

18   **C.    Pandora adequately alleges an agreement between Comedians.**

19    WC's argument that Pandora fails to allege a horizontal agreement among the

20   Comedians (Mot. 22-28) is wrong. The FACCs describe in detail (1) the nature of

21   the agreement, giving WC adequate notice of the allegations; (2) the context that

22   tends to establish conspiracy; and (3) the circumstantial evidence plausibly pointing

23   toward agreement. These allegations "suggest[] concerted activity that is distinct

24   from parallel conduct." Order 24.

25    An agreement under Section 1 is concerted activity that "joins together

26   separate decisionmakers ... such that the agreement deprives the marketplace of

27   independent centers of decisionmaking" (*Am. Needle, Inc. v. Nat'l Football League*,

28

560 U.S. 183, 195-96 (2010) (cleaned up)), and demonstrates "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). The agreement may be shown by "direct or circumstantial evidence" (*id.*), and can be "tacit or express." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007). A plaintiff need not allege that a formal agreement existed. *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 842 (9th Cir. 2022). Under these standards, Pandora's showing of agreement is sufficient.

### 1. Who, did what, to whom, where, and when.

The FACCs provide the evidentiary facts that "answer the basic questions [on agreement]: who, did what, to whom (or with whom), where, and when[.]" *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008).

**Who**: The FACCs allege that WC's Comedians, with WC facilitating, entered into the anticompetitive agreement. The FACCs identify the Comedians known to have been part of WC's original formation in October 2020 (FACCs ¶ 46 & Ex. A), the additional Comedians whom WC publicly announced as joining shortly thereafter (*id.,* ¶ 47 & Exs. B-G,), and all known Comedians who are currently part of the WC collective. *Id.*, ¶¶ 48-51.

**Did What**: The Comedians, with WC facilitating, entered into a scheme to fix the price at which "literary works rights" would be licensed. The FACCs allege that the scheme was effectuated by each Comedian entering into an exclusive affiliation agreement with WC, granting WC the authority to pool that Comedian's rights with those of the other Comedians, and to license the collective set of rights at a fixed price. *E.g.*, FACCs ¶¶ 60-61.

**To Whom**: The FACCs allege that the Comedians instructed WC to demand that Pandora take its blanket license at the fixed, supracompetitive price of 25% over the royalties that Pandora had historically paid. FACCs ¶¶ 52, 70-73, 82-90.[12]

**When**:[13] The FACCs allege that the key events of the conspiracy occurred over a roughly eighteen-month period, with specific acts including:

- The agreement was effectuated upon WC's inception in October 2020, with the associated press release announcing its formation and initial Comedian members. FACCs ¶¶ 45-46 & Ex. A.

- The collective grew quickly, with WC announcing new members on July 22, August 2, August 10, August 26, September 14, and November 8, 2021. *See* FACCs ¶¶ 47-48 & Exs. B-G; *see also id.*, ¶ 49 (listing communications from WC to Pandora with names of additional Comedians).

- On March 11, 2021, WC, acting at its Comedians' instruction, demanded that Pandora take the blanket license. FACCs ¶¶ 70-73.

- On February 7, 2022, five WC-affiliated Comedians simultaneously brought individual infringement suits against Pandora, with others bringing suit soon thereafter. FACCs ¶¶ 52-54.

Accordingly, the FACCs describe the scope of the alleged conspiracy in sufficient detail to provide counterdefendants "an idea of where to begin" preparing their defense. *Kendall*, 518 F.3d at 1047-48. Pandora need not go further and "limn the entirety of the conspiracy before discovery" (*In re Lithium Ion Batteries Antitrust Litig*, 2014 WL 309192 at *11 (N.D. Cal. Jan. 21, 2014)) or present direct, "smoking

---

[12] WC argues that only three counterdefendants were affiliated with WC at the time of the March 2021 demand. Mot. 25. That is irrelevant. WC had many affiliates as of that date. FACCs ¶ 46. Nothing requires Pandora to name all co-conspirators as counterdefendants. *Ward v. Apple Inc.*, 791 F.3d 1041, 1048 (9th Cir. 2015).

[13] As to "where," there is no need to allege the location of the proverbial smoke-filled room. *See Meyer v. Kalanick*, 174 F. Supp. 3d 817, 825 (S.D.N.Y. 2016) ("The advancement of technological means for the orchestration of large-scale price-fixing conspiracies need not leave antitrust law behind.").

gun" evidence, particularly at the pleading stage. *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).

### 2. The Comedians' knowing participation in a collective scheme.

**a.** WC asserts that Pandora must allege which specific Comedians directly agreed with each other. Mot. 23. But there is no requirement to "plead specific back-room meetings between specific actors at which specific decisions were made in order to survive a motion to dismiss." *Lithium Ion Batteries*, 2014 WL 309192 at *11 (internal quotations omitted). Rather, as the Ninth Circuit recently reiterated, *no* direct communications between conspirators are required: "Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act." *PLS.com*, 32 F.4th at 843 (*quoting Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939)).

That has long been the law. In *Interstate Circuit*, for example, the government alleged that competing movie distributors unlawfully restrained trade when they each agreed to a theater operator's terms, including price restrictions, as indicated in a letter from the operator addressed to all the distributors. *See* 306 U.S. at 214-17. The Court noted that the distributors had a "strong motive for concerted action" given the market-wide proposal by the operator, which would have "constituted an important departure from prior" business practices and raised prices. *Id.* at 217-18, 222. And each distributor's agreement to the terms would have been economically self-defeating unless other distributors did the same. *Id.* at 222. The Court found that an express agreement was unnecessary; it "was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it. Each distributor was advised that the others were asked to participate; each knew that cooperation was essential to successful operation of the plan." *Id.* at 226-27.

Consequently, a conspiracy exists where "each Defendant (1) 'had reason to know' that other Defendants were involved in the same 'broad project'; and (2) 'had reason to believe that their own benefits derived from the operation were probably *dependent upon the success of the entire venture.*'" *In re Xyrem Antitrust Litig.*, 555 F. Supp. 3d 829, 866 (N.D. Cal. 2021) (citation omitted). *See*, *e.g.*, *In re Keurig Antitrust Litig.*, 383 F. Supp. 3d 187, 244-45 (S.D.N.Y. 2019); *Meyer,* 174 F. Supp. 3d at 824.

**b.** The FACCs' allegations satisfy this standard, demonstrating the Comedians' awareness of, and knowing participation in, the price-fixing scheme. FACCs ¶¶ 57-69. For example, WC issued public statements of its purpose to "upend" the market by being the "ASCAP and BMI for spoken word instead of music." *Id.*, ¶ 45. The Comedians understood what that meant, including the use of blanket licenses. *Id.*, ¶¶ 66-67.[14] And, although "[a] co-conspirator need not know of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy" (*In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012)), each Comedian also had reason to know which other Comedians joined the scheme: WC reiterated in each press release the names of high-profile Comedians that had previously joined and continued in the enterprise. *E.g.*, FACCs ¶¶ 47, 62.

Each Comedian also knew that all the Comedians were acting together for the scheme's collective success. For example, WC responded to the FAQ whether digital radio stations would "black list [participating Comedians] and not play my recordings anymore" by explaining: "Digital radio and AM/FM radio either have to pay for all

---

[14] The sole decision WC cites to mitigate these statements, (Mot. 24, citing *Flextronics Int'l USA, Inc. v. Murata Mfg. Co., Ltd.*, 2020 WL 5106851, at *3, *15, n.6 (N.D. Cal. Aug. 31, 2020)), is inapposite. There, the plaintiff argued "that it need not allege parallel conduct because it asserts a bid-rigging conspiracy." *Id.* at *15 & n.6. Here, Pandora *has* alleged parallel conduct, including that each Comedian entered into exclusive affiliation agreements.

broadcasts of comedy and other spoken word performances or choose to broadcast none of it." FACCs ¶ 68. And it was not just WC providing assurances—individual Comedians solicited others to join the collective. *Id.*, ¶ 63 (Comedian Eddie Brill discussed the "whole financial windfall" of the scheme and how "comedians look out for each other").

The Comedians' adherence to the common scheme is further demonstrated by the interrelated facts that (i) *no individual Comedian* ever approached Pandora about individual licensing of their spoken-word content, and (ii) although WC purports to act on behalf of its "client" comedians, *at no time prior to this litigation* did WC offer Pandora a license for an individual Comedian's rights. FACCs ¶ 52. Instead, the scheme the Comedians adopted is for *concerted* action to change the marketplace.

### 3.    *Pandora alleges circumstantial evidence of horizontal agreement.*

The FACCs' other allegations confirm agreement among the Comedians. "As is usual in cases of alleged unlawful agreements to restrain commerce, the [plaintiff] is without the aid of direct testimony that the [defendants] entered into any agreement with each other. ... In order to establish agreement it is compelled to rely on inferences drawn from the course of conduct of the alleged conspirators." *Interstate Circuit*, 306 U.S. at 221. Here, beyond the allegations outlined above, Pandora makes that showing by identifying "plus factors" that distinguish "permissible parallel conduct from impermissible conspiracy." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015).

### a.    *Acts against self-interest*

Agreement can be shown by "extreme action against self-interest, ... for example, where individual action would be so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement." *Musical Instruments*, 798 F.3d at 1195. That factor is present here: absent agreement, no individual Comedian "would demand … a supra-competitive

extra royalty on top of what they have historically been paid from a service like Pandora." FACCs ¶ 75. *See Interstate Circuit*, 306 U.S. at 222 (each distributor's decision to accede to operator's demands would have been economically self-defeating unless the other distributors did likewise); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000) (same).

Moreover, contrary to WC's assertion (Mot. 26-27), the marketplace here does not resemble the concentrated, interdependent, "follow-the-leader" one at issue in *Musical Instruments*. There, "so long as prices can be easily readjusted without persistent negative consequences, one firm can risk being the first to raise prices" and "supracompetitive prices and other anticompetitive practices, once initiated, can spread through the market without any prior agreement." 798 F.3d at 1195. Here, many comedians compete to have their performances streamed; as the FACCs allege, no individual Comedian would risk seeking a supracompetitive royalty on her own. *See In re Disposable Contact Lenses Antitrust*, 215 F. Supp. 3d 1272, 1297 (M.D. Fla. 2016) ("No single reasonable manufacturer would drastically increase its prices and restrict its available sales without assurances that others would follow suit").

### b.    Common motive to conspire

The Comedians also had a common motive to conspire: only working collectively could they change historic practice and secure supracompetitive royalties. FACCs ¶ 76. It may be, as WC argues, that "common motive" does not necessarily suggest agreement because all firms have a motive to agree with competitors to raise prices. Mot. 27 (citing *Musical Instruments*, 798 F.3d at 1195). But the key point here is that, in the competitive market for comedy routines, collective action is *necessary* to achieve the price increase. In this case, and unlike in *Musical Instruments*, no Comedian could risk being the first to raise prices for fear of "persistent negative consequences." 798 F.3d at 1195. Instead, they needed to act collectively to achieve the desired outcome. Accordingly, "the common motive

alleged here is not akin to a garden-variety motive to increase profits." *B&R Supermarket, Inc. v. Visa*, 2106 WL 5725010 at *7 (N.D. Cal. Sept. 30, 2016).

### c.    Complex change close in time

Each Comedian entered into an exclusive affiliation agreement within a short period of time, despite having never individually demanded a literary-works license from Pandora and never previously affiliating with a "literary works" licensing agency. FACCs ¶ 77. Dramatic changes in a short time suggest coordinated, not coincidental, conduct. *Twombly*, 550 U.S. at 556 n.4 ("[C]omplex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason," support a plausible inference of conspiracy.); *Interstate Circuit*, 306 U.S. at 222; *Toys "R" Us*, 221 F.3d at 935.

Asserting that it was formed before any conspiracy, WC argues that its formation, and not a conspiracy, was "the catalyst for the comedians' actions." Mot. 27-28. But the FACCs allege that numerous high-profile Comedians were *part* of WC's launch as a "collective," (FACC, ¶¶ 45-46), and show how the collective grew aggressively thereafter. *Id.*, ¶¶ 47-48. That suggests coordinated, not independent, action.[15]

### d.    Public assurances

In March 2021, WC—acting on the Comedians' instruction—demanded a blanket license from Pandora (and potentially other services). FACCs ¶ 78. WC then issued a series of press releases from July to September (Exs. B-G) touting newly joined Comedians while also reiterating—in boldface—the names of affiliated Comedians, even though those names already appeared on prior press releases. This action assured the Comedians that they were not acting independently and that the

---

[15] WC also asserts that there was nothing "complex" about the market changes it sought to trigger. Mot. 28 n.16. But a move to completely alter the historical practice on which a marketplace operates is, by definition, a "complex and historically unprecedented" change.

collective was holding strong. FACCs ¶ 78. S*ee, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1116 (N.D. Cal. 2008) (public statements can be used to facilitate coordinated conduct); *Keurig*, 383 F. Supp. 3d at 244-45 (significant that defendants' agreements "are well known within the market, and each company would have known that its competitors had entered into these agreements").[16]

For all these reasons, Pandora's allegations of a horizontal agreement are more than sufficient.

### D.  Pandora adequately alleges agreements in unreasonable restraint of trade.

Finally, Count II, like the other counts, alleges WC's elimination of competition among the Comedians and its accumulation of monopoly (or, at least, market) power in the relevant market through its exclusive affiliation agreements with its Comedians. That conduct harmed Pandora, other streaming services, and their millions of users. These allegations—of an agreement, intended to restrain trade, that causes harm—state a Section 1 claim for unreasonable restraint of trade. *See* Mot. 29 (citing *Brantley v. NBC Universal, Inc*., 675 F.3d 1192, 1197 (9th Cir. 2012)).

In challenging Count II, WC argues only that (a) the exclusive affiliation agreements are "routine talent-and-licensing agent agreements" (Mot. 29), apparently contending that Section 1 does not apply to agreements that create "principal-agent" relationships; and (b) Pandora has not sufficiently alleged harm to competition. Mot. 30. These attacks are flawed.

---

[16] WC's citation to *In re DRAM Antitrust Litigation*, 28 F.4th 42, 50 (9th Cir. 2022) (Mot. 28) is misplaced. There, plaintiffs alleged a *supply reduction* conspiracy. The alleged plus-factor public statements related to potential *price increases*. The court explained that statements "about raising prices do[] not reasonably signal to competitors to reduce DRAM production." 28 F.4th at 48. Here, there is no such disconnect: the public reassurances of the collective hanging together directly concern the alleged conspiracy.

*First*, it is beyond dispute that a vertical agreement between economically independent parties may be challenged under Section 1. *See, e.g., In Re Toys "R" Us*, *Inc.*, 126 F.T.C. 415 (1998), *aff'd sub nom. Toys "R" Us*, 221 F.3d 928. This rule extends to all agreements that, like WC's exclusive affiliation agreements, create vertical relationships, whether distributorships, agencies, or otherwise. *See United States v. Apple Inc.*, 952 F. Supp. 2d 638, 694 (S.D.N.Y. 2013) (in "eliminat[ing]" retail price competition," Apple's vertical agreements with publishers violated Section 1 under the rule of reason), *aff'd*, 791 F.3d 290 (2d Cir. 2015).

The sole case that WC cites for the proposition that a principal-agent relationship may not be the basis for an antitrust claim, *Calculators Hawaii, Inc. v. Brandt, Inc.*, 724 F.2d 1332 (9th Cir. 1983), stands for no such rule. *Brandt* held only that a manufacturer's district manager "was incapable of conspiring" with the manufacturer to cut off the plaintiff. *Id.* at 1336. But *Brandt* says nothing about agreements *forming* agency or distribution relationships, let alone about a series of agreements by which a single entity becomes the sole distributor for multiple, previously unaffiliated, competing manufacturers. Indeed, WC's argument is undermined by another case it cites, *American Needle*. There, use of a single marketing agent ("NFL Properties") to market the intellectual property of all the individual NFL teams was subject to challenge under Section 1. The teams—like the Comedians prior to WC—"compete[d] in the market for intellectual property," and thus their joint licensing "'deprived the marketplace of independent centers of decisionmaking,' ... and therefore of actual or potential competition." 560 U.S. at 197 (citations omitted). In fact, *American Needle* noted "a possible § 1 violation if two separately owned companies sold their separate products through a 'single selling agent.'" *Id.* That, essentially, is this case. *See* Areeda and Hovenkamp, *Antitrust Law* ¶ 1653e.

1    *Second*, WC's contention that Pandora failed to "plead injury beyond the impact on it" (Mot. 30) simply recycles WC's arguments seeking dismissal for lack of standing, which the Court rejected on finding injury to competition in the relevant market. *See* Order 9-14. Once again, WC ignores the allegations of the concrete harm WC and its Comedians have caused not just to Pandora (FACCs ¶¶ 124-27), but to competition and to consumers. *Id.*, ¶¶ 121-23. WC offers nothing new that calls the Court's prior determination into question.

## CONCLUSION

For the foregoing reasons, the Motion should be denied.

1

Dated:  January 25, 2023

MAYER BROWN LLP
PAUL M. FAKLER
JACOB B. EBIN
ALLISON AVIKI
WILLIAM H. STALLINGS
CHRISTOPHER J. KELLY
JOHN NADOLENCO
DANIEL D. QUEEN
MEERIM NEHME

By: */s/ Paul M. Fakler*
     Paul M. Fakler

MAYER BROWN LLP
WILLIAM H. STALLINGS (*pro hac vice*)
*wstallings@mayerbrown.com*
1999 K Street, NW
Washington, D.C.  20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 262-3300

MAYER BROWN LLP
CHRISTOPHER J. KELLY (SBN 276312)
*cjkelly@mayerbrown.com*
Two Palo Alto Square
3000 El Camino Real
Palo Alto, California  94306-2112
Telephone: (650) 331-2000
Facsimile: (650) 331-2060

Attorneys for Defendant
PANDORA MEDIA, LLC

- 23 -

## **FILER'S ATTESTATION**

The undersigned, counsel of record for Defendant/Counterclaimant Pandora Media, LLC, certifies that this brief contains 6,940 words, which complies with the word limit of L.R. 11-6.1.

Dated:  January 25, 2023

*/s/Paul M. Fakler*
Paul M. Fakler

PANDORA MEDIA, LLC'S OPPOSITION TO WORD COLLECTIONS' MOTION TO DISMISS