MAYER BROWN LLP
PAUL M. FAKLER (*pro hac vice*)
*pfakler@mayerbrown.com*
JACOB B. EBIN (*pro hac vice*)
*jebin@mayerbrown.com*
ALLISON AVIKI (*pro hac vice*)
*aaviki@mayerbrown.com*
1221 Avenue of the Americas
New York, New York  10020-1001
Telephone:   (212) 506-2500
Facsimile:    (212) 262-1910

MAYER BROWN LLP
JOHN NADOLENCO (SBN 181128)
*jnadolenco@mayerbrown.com*
DANIEL D. QUEEN (SBN 292275)
*dqueen@mayerbrown.com*
MEERIM A. NEHME (SBN 322234)
*mnehme@mayerbrown.com*
333 S. Grand Avenue, 47th Floor
Los Angeles, California  90071
Telephone:   (213) 229-9500
Facsimile:    (213) 625-0248

[*Additional counsel listed on signature page*]

Attorneys for Counterclaimant
PANDORA MEDIA, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re PANDORA MEDIA, LLC COPYRIGHT LITIGATION | Master File No.: 2:22-cv-00809-MCS-MAR |
| | <u>CONSOLIDATED ACTION</u> |
| | **DEFENDANT AND COUNTERCLAIMANT PANDORA MEDIA, LLC'S OPPOSITION TO CERTAIN PLAINTIFFS/COUNTERCLAIM DEFENDANTS' JOINDER IN MOTION TO DISMISS** |
| This Document Relates To: 2:22-cv-00817-MCS-MAR (Clay) 2:22-cv-01345-MCS-MAR (Di Paolo) 2:22-cv-00810-MCS-MAR (Carlin) 2:22-cv-00815-MCS-MAR (Williams) 2:22-cv-00813-MCS-MAR (White) 2:22-cv-00809-MCS-MAR (Engvall) 2:22-cv-00809-MCS-MAR (Hicks) | Filed concurrently with Pandora's Opposition to Word Collections' Motion to Dismiss Date: March 6, 2023 Time:   9:00 AM Crtrm:  7C - First Street Courthouse |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

LEGAL STANDARD ............................................................................................2

ARGUMENT..........................................................................................................3

A.   The Counterclaim Defendants' arguments regarding their copyright
infringement claims are irrelevant and wrong..................................................3

B.   The Counterclaim Defendants' arguments rely on mischaracterizations
of the Amended Counterclaims and are meritless...........................................5

    1.   Pandora properly alleges a price-fixing conspiracy among the
Comedians.........................................................................................5

    2.   The Counterclaim Defendants' remaining efforts to undermine the
Amended Counterclaims are similarly baseless. ...............................12

C.   Pandora was not required to engage in a futile act by trying to break the
Word Collections' cartel................................................................................17

CONCLUSION.....................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Needle, Inc., v. Nat'l Football League,*
    560 U.S. 183 (2010) ........................................................................ 6

*Antablin v. Motion Picture Costumers, Local No. 705,*
    2021 WL 4731339 (C.D. Cal. Feb. 16, 2021) ...................................... 4

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ........................................................................ 2

*B&R Supermarket, Inc. v. Visa,*
    2016 WL 5725010 (N.D. Cal. 2016) ................................................ 11

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................... 2, 3, 6, 7, 11

*In re Disposable Contact Lenses,*
    215 F. Supp.3d 1272 (M.D. Fla. 2016) ............................................ 10

*Interstate Circuit v. United States,*
    306 U.S. 208 (1939) ........................................................ 6, 10, 11

*Kendall v. Visa USA, Inc.,*
    518 F.3d 1042 (9th Cir. 2008) ...................................................... 1, 7, 9

*In re Keurig Antitrust Litig.,*
    383 F. Supp.3d 187 (S.D.N.Y. 2019) .............................................. 12

*In re Lithium Ion Batteries Antitrust Litig.,*
    2014 WL 309192 (N.D. Cal. 2014) .................................................. 6, 7

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.,*
    709 F.3d 129 (2d Cir. 2013) ............................................................ 7

*Momento, Inc. v. Seccion Amarilla USA,*
    2009 WL 10696217 (N.D. Cal. Sept. 17, 2009) ................................ 3

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
    465 U.S. 752 (1984) ...................................................................... 6, 9

*Moore v. Mars Petcare US, Inc.*,
  966 F.3d 1007 (9th Cir. 2020) ................................................................. 2

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) ........................................................... 9, 10

*Newcal Indus., Inc. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ................................................................. 3

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
  32 F.4th 824 (9th Cir. 2022) .............................................................. 6, 7

*Sanofi-Aventis U.S., LLC v. Mylan, Inc. & Mylan Specialty, LP*,
  44 F.4th 959 (10th Cir. 2022) ............................................................... 19

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) ................................................................. 3

*Stevens v. Britax Child Safety, Inc.*,
  2021 WL 4706702 (C.D. Cal. July 13, 2021) ...................................... 4

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  586 F. Supp. 2d 1109 (N.D. Cal. 2008) ............................................... 12

*Toys "R" Us Inc.v. FTC*,
  221 F.3d 928 (7th Cir. 2000) ......................................................... 10, 11

**Statute**

15 U.S.C. § 1 ................................................................................................ 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Counterclaimant Pandora Media, LLC ("Pandora") respectfully submits the following opposition to Certain Plaintiffs/Counterclaim Defendants' Joinder in Motion to Dismiss by Counterclaim Co-Defendant Word Collections, Inc. (the "Joinder").

## INTRODUCTION

The Joinder amounts to nothing more than a host of meritless arguments grounded in mischaracterizations of the factual allegations contained in Pandora's First Amended Counterclaims to Plaintiffs' Second Amended Consolidated Complaint Against Certain Plaintiffs/Counterclaim Defendants and Counterclaim Defendant Word Collections, Inc. (the "Amended Counterclaims" or the "FACCs"). It begins with a series of arguments that relate not to the Amended Counterclaims, but instead to the underlying copyright infringement claims. Not only are these arguments based on mischaracterizations of the FACCs (and, remarkably, of Pandora's Answer and Defenses to the underlying infringement claims), but as the Joinder acknowledges, they are "not relevant to this motion." Joinder at 1 n.3. Yet the counterclaim defendants that have brought the Joinder (the "Counterclaim Defendants") nevertheless raise them, wasting the Court's time.

The Counterclaim Defendants' efforts to engage on arguably *relevant* substance do not fare any better. First, the Counterclaim Defendants assert that Pandora makes only "conclusory" allegations in support of its horizontal price-fixing claims. The Counterclaim Defendants are wrong. The Amended Counterclaims contain numerous well-pled factual allegations, including facts that "answer the basic questions: who, did what, to whom (or with whom), where, and when," *Kendall v. Visa USA, Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008), and "plus factors" that demonstrate that Word Collections and its comedian affiliates (the "Comedians" and, collectively with Word Collections, the "Collective") were engaged not in mere parallel conduct, but in a price-fixing conspiracy in violation of the antitrust laws.

Next, the Counterclaim Defendants once again mischaracterize the FACCs, asserting that Pandora "actually admits" that it will not enter into an individual license with any comedian for purported "literary works" rights. What Pandora actually said is that it will not enter into any agreement with an individual comedian that demands a *supracompetitive* fee. When the Counterclaim Defendants' mischaracterizations are corrected, their arguments all fall by the wayside.

Finally, the Counterclaim Defendants disregard the Court's prior decision, and once again claim that individual licensing outside of the Collective is possible. That too is wrong. As the Counterclaim Defendants acknowledge, "an antitrust plaintiff need not allege an attempt to individually license if it demonstrates that the availability of an individual license is illusory." Joinder at 5. Pandora made such a demonstration in the original counterclaims against the Counterclaim Defendants and Word Collections, and Pandora makes an even stronger showing in the Amended Counterclaims. When this Court evaluated those allegations, it concluded that "Pandora adequately alleges that the availability of any individual licenses is illusory." October 26, 2022 Order Re: Motion to Dismiss ("Order"), at 17. The Comedians offer nothing that calls the Court's prior ruling into question.

In short, the Counterclaim Defendants offer no cognizable basis for dismissing Pandora's well-pled Amended Counterclaims. The Joinder should be denied in its entirety.

## LEGAL STANDARD

On a motion to dismiss, the complaint's factual allegations are "taken as true[,] and construed in the light most favorable to Plaintiffs." *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1016 (9th Cir. 2020). Such motions are denied when the pleading contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The applicable plausibility

standard "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence" to support the allegations. *Twombly,* 550 U.S. at 556. In fact, a complaint "may proceed even if it strikes a savvy judge that actual proof of [the] facts is improbable, and that a recovery is very remote and unlikely." *Id.* (cleaned up); *see also, e.g., Starr v. Baca,* 652 F.3d 1202, 1216-17 (9th Cir. 2011) ("The standard at this stage of the litigation is not that plaintiff's explanation must be true or even probable."). There is, moreover, "no special pleading rule requiring greater factual specificity in antitrust cases." *Momento, Inc. v. Seccion Amarilla USA*, 2009 WL 10696217, at *1 (N.D. Cal. Sept. 17, 2009); *accord Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).

## ARGUMENT

### A. The Counterclaim Defendants' arguments regarding their copyright infringement claims are irrelevant and wrong.

The Joinder begins with ad hominem-styled accusations, depicting Pandora's well-pled Amended Counterclaims as "a transparent effort to manufacture leverage for these actions in which Pandora does not have a legitimate defense to its more than ten (10) years of willful copyright infringement." Joinder at 1.

To support this claim—one they acknowledge is "not relevant to this motion" (Joinder at 1 n.3)—the Counterclaim Defendants attempt to pre-litigate their own distinct copyright infringement claims through the improper vehicle of a joinder to a motion to dismiss Pandora's Amended Counterclaims, all while ignoring and distorting Pandora's pleadings. Specifically, the Counterclaim Defendants first assert that "Pandora does not claim to have a license for [their] literary works" and that "Pandora absolutely knew that any license it received to use a recording did not come with an 'implied license' to use the Comedians' literary works." Joinder at 1-2 n.3. Pandora's vigorous dispute of exactly these points appears at, *inter alia*, Answer & Defenses at ¶¶ 21-24, 38-40, 52-54, 66-68, 80-83, 94-96, 112-14, 123-28,

136, 139-41; FACCs ¶¶ 40-43. Indeed, Pandora's Amended Counterclaims could not be any clearer on these points, explaining that "Pandora has always taken licenses for the comedy recordings that it offers, and through those licenses has obtained (either explicitly or implicitly) all of the rights it needs to stream those recordings." FACCs ¶ 41.

The Counterclaim Defendants then go on to assert that "DSP's like Pandora came into prominence in the 2010's, and created the self-serving infringing conduct they now attempt to rely on as custom and practice." Joinder at 2 & n.3. This too is entirely at odds with Pandora's Amended Counterclaims and its Answer and Defenses to the underlying infringement claims. Pandora clearly alleges that the "industry custom and practice" at play "predat[ed] Pandora by many decades." FACCs ¶ 41; *see also* Answer & Defenses at 2 (referring to "many decades" of record labels, home video companies, and others performing, copying, and distributing comedy material and securing the necessary rights pursuant to this same custom and practice). Contrary to the Counterclaim Defendants mischaracterizations, this "industry custom and practice" refers to decades of widespread and consistent custom and practice in the *comedy* industry, and not merely with respect to streaming services.

At bottom, not only are these unsupported arguments irrelevant (as the Comedians acknowledge), they are wrong. But in any event, as this Court has previously held, resolution of disputed factual allegations such as these are appropriately resolved not on a motion to dismiss, but at summary judgment. *Stevens v. Britax Child Safety, Inc.*, 2021 WL 4706702, at *6 (C.D. Cal. July 13, 2021) (J. Scarsi); *see also Antablin v. Motion Picture Costumers, Local No. 705*, 2021 WL 4731339, at *5 (C.D. Cal. Feb. 16, 2021) (J. Scarsi) ("Whether the causes animating Plaintiff's [inspection claim under the Labor Management Reporting and Disclosure Act] meet the legal standard is a question of fact inappropriate for determination on

a motion to dismiss."). Pandora looks forward to disposing of the Counterclaim Defendants' infringement claims at the appropriate time.

**B.    The Counterclaim Defendants' arguments rely on mischaracterizations of the Amended Counterclaims and are meritless.**

Similar to their arguments relating to the distinct copyright infringement claims, the arguments raised by the Counterclaim Defendants that purport to relate to the motion to dismiss all rest on mischaracterizations of the Amended Counterclaims and the law.

### 1.    *Pandora properly alleges a price-fixing conspiracy among the Comedians.*

The Counterclaim Defendants start by asserting that the Amended Counterclaims "continue to fail to allege facts" in support of Pandora's horizontal price-fixing conspiracy claim and that "Pandora merely makes the conclusory allegation that the Comedians' individual affiliation agreements with Word Collections somehow shows that the Comedians reached price fixing agreements with and between each other." Joinder at 2-3. Yet in the very same paragraph, the Counterclaim Defendants contradict themselves by attempting to explain away non-conclusory *factual allegations* made in the Amended Counterclaims—the public statements of fellow comedian and cartel member Eddie Brill, in which he acknowledged discussing Word Collections with other comedians in an effort to get them to join the cartel, including with the promise that "there is going to be this whole financial windfall" to those who join. FACCs ¶ 63. These non-conclusory factual allegations speak directly to Pandora's claims and the manner in which Word Collections' members recruited others into the cartel for the specific purpose of

amassing sufficient market power to extract supracompetitive "windfall" license fees.[1]

But even putting this inconsistency to one side, the Counterclaim Defendants' claim that the Amended Counterclaims fail to allege sufficient facts to support a price-fixing conspiracy is wrong. The Amended Counterclaims set forth in detail: (i) the nature of the price-fixing agreement; (ii) the adoption of that agreement by the Comedians; and (iii) the factual context surrounding the agreement that plausibly suggests a conspiracy instead of mere parallel conduct by the Comedians.

As explained in greater detail in Pandora's Opposition to Word Collections' Motion to Dismiss, a Section 1 agreement is based on concerted activity that "joins together separate decisionmakers … such that the agreement deprives the marketplace of independent centers of decisionmaking," *Am. Needle, Inc., v. Nat'l Football League*, 560 U.S. 183, 195-96 (2010) (cleaned up), and demonstrates "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). The agreement may be shown by "direct or circumstantial evidence," *id.*, and be either "tacit or express." *Twombly*, 550 U.S. at 553. Indeed, a plaintiff need not even allege

---

[1] The Counterclaim Defendants' assertion that Pandora has not specifically alleged that Mr. Brill had any communications with any of the plaintiffs (Joinder at 3) is irrelevant. It is well established that there is no requirement to "plead specific back-room meetings between specific actors at which specific decisions were made in order to survive a motion to dismiss." *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192 at *11 (N.D. Cal. 2014) (internal quotations omitted). Rather, as the Ninth Circuit recently reiterated, no direct communications between conspirators is required: "Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act." *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 843 (9th Cir. 2022). (*quoting Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939)). The FACCs' allegations satisfy this standard by demonstrating the Counterclaim Defendants' (and the other Comedians') awareness of, and knowing participation in, the anticompetitive scheme to eliminate competition with each other in order to collectively fix the price for purported "literary works" rights. FACCs ¶¶ 57-69.

that a formal agreement actually existed. *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 842 (9th Cir. 2022).

In *Kendall*, the Ninth Circuit dismissed Section 1 allegations where plaintiffs had provided "nothing more than a conclusory statement" as to the purported conspiracy and, even after taking depositions, had set forth "no facts" to support their conclusion. 518 F.3d at 1047-48. The Court found the complaint deficient in that a proper complaint "must allege facts such as a 'specific time, place, or person involved in the alleged conspiracies' to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin." *Id.* (quoting *Twombly*, 550 U.S. 565 n.10). While a plaintiff must provide such sufficient notice, it need not detail "the entirety of the conspiracy before discovery," *In re Lithium Ion Batteries*, 2014 WL 309192, at *11, or present direct, "smoking gun" evidence, particularly at the pleading stage. *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).

Contrary to the Counterclaim Defendants' claims, the FACCs provide the evidentiary facts that "answer the basic questions: who, did what, to whom (or with whom), where, and when." *Kendall*, 518 F.3d at 1048.

- **Who**: The FACCs allege that the Comedians, with Word Collections facilitating, entered into an anticompetitive agreement. The FACCs specifically identify the Comedians known to have been part of Word Collections' original formation and inception in October 2020, FACCs ¶ 46 & Ex. A, the additional Comedians whom Word Collections publicly announced as joining shortly thereafter, *see* FACCs ¶ 47 & Exs. B-G, and all known Comedians who are currently part of the Word Collections Collective. *Id.*, ¶¶ 48-51.

- **Did What**: The Comedians, with Word Collections facilitating, entered into a scheme to fix the price at which their purported "literary works"

rights would be licensed. The FACCs allege that the scheme was effectuated by each Comedian entering into an exclusive affiliation agreement with Word Collections, granting Word Collections the authority to pool their rights together with those of the other Comedians and to license the collective set of rights at a fixed price. *E.g.*, FACCs ¶¶ 60-61.

- **To Whom**: The FACCs allege that the Comedians then instructed Word Collections to demand that Pandora take its all-or-nothing blanket license at the fixed, supracompetitive price—one that increased Pandora's total royalty obligation by 25% over the royalties that Pandora had historically paid. FACCs ¶ 52. The FACCs detail how the demand did not allow any means for Pandora to avoid the blanket license or its supracompetitive royalty. *Id.*, ¶¶ 52, 70-73, & 82-90.

- **Where and When**: The FACCs allege that the key events of the conspiracy occurred over an approximately 18-month period with specific acts including: (i) the agreement was effectuated with the public launch of Word Collections in October 2020, with the associated press release announcing its formation and initial Comedian members, FACCs ¶¶ 45-46 & Ex. A; (ii) the Collective grew quickly throughout the following months, with Word Collections announcing new members on July 22, August 2, August 10, August 26, September 14 and November 8, 2021, *see id.*, ¶¶ 47-48 & Exs. B-G; *see also id.*, ¶ 49 (listing specific communications from Word Collections to Pandora with names of additional Comedians joining the Collective); (iii) on March 11, 2021, Word Collections, acting at the instruction of its "client" Comedians, demanded Pandora take its all-or-nothing blanket license, *id.*, ¶¶ 70-73; and (iv) on February 7, 2022, five different

Comedians simultaneously brought individual infringement suits against Pandora, with others bringing suit soon thereafter, *id.*, ¶¶ 52-54. As the above showing makes clear, the FACCs describe the scope of the alleged conspiracy in more than enough detail to provide defendants "an idea of where to begin" and how to respond. *Kendall*, 518 F.3d at 1047-48. That is all Pandora is required to do at this stage of the litigation, and the Amended Counterclaims more than meet this burden.

Were that not enough, the Amended Counterclaims also include multiple allegations to support an inference that there was agreement among the Comedians as to how to proceed, a unity of purpose, and "a conscious commitment to a common scheme." *Monsanto*, 465 U.S. at 764. Specifically, Pandora has pointed to circumstantial evidence in the form of "plus factors," which help distinguish "permissible parallel conduct from impermissible conspiracy." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015). These "plus factors" include allegations: (i) showing that the Comedians were acting against their individual self-interest; (ii) demonstrating that the Comedians had a common motive to conspire; (iii) explaining that the Comedians forced an unprecedented change to historic practice in a very short period of time; and (iv) demonstrating that Word Collections repeatedly assured Comedians that the Collective was holding strong. Taken together, these factors demonstrate not "permissible parallel conduct" but an "impermissible conspiracy." *Id.*

*Acts Against Self-Interest*: The Amended Counterclaims specifically allege that, absent agreement, no individual comedian "would demand a supra-competitive extra royalty on top of what they have historically been paid from a service like Pandora." FACCs ¶ 75. Indeed, no individual comedian has ever made such a demand in the decade-plus that Pandora has been streaming comedy. *Id.* That is for good reason. As the Amended Counterclaims also allege, making such a demand

would likely result in the comedians' recordings being removed from Pandora and the comedians losing out on the royalties and promotion that would have otherwise occurred. *Id.* It is only by joining together that comedians can avoid that individual risk and take advantage of their joint power. *Id.* This sort of showing has repeatedly been recognized to support a finding of conspiracy, and not mere parallel conduct. *See, e.g., Interstate Circuit*, 306 U.S. at 222 (conspiracy finding supported by the fact that each distributor's decision to accede to operator's demands would have been economically self-defeating unless the other distributors did the same); *Toys "R" Us Inc.v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000) (finding that a manufacturer unilaterally entering into agreements at issue would risk losing sales to competitors and therefore be contrary to its economic interest unless the other manufacturers had agreed to accept the same deal); *In re Disposable Contact Lenses*, 215 F. Supp.3d 1272, 1297 (M.D. Fla. 2016) (crediting allegations that, in the marketplace at issue, a single manufacturer implementing the alleged anticompetitive policy "could result in product suicide," as customers could switch to alternatives: "No single reasonable manufacturer would drastically increase its prices and restrict its available sales without assurances that others would follow suit.").

*Common Motive to Conspire*: As the Amended Counterclaims explain, it is only by working collectively that the Comedians can amass the market power necessary to upend historic practice and secure supracompetitive royalties. FACCs ¶ 76. Unlike in *Musical Instruments*, which concerned a situation where a firm could risk being the first to raise prices "without persistent negative consequences" (798 F.3d at 1195) and then others would independently follow, here, no individual comedian would take that risk, as doing so would have had dire consequences—they would lose out on the monetary, promotional, and other benefits that Pandora provides. FACCs ¶ 75. It was only by acting collectively that the Comedians could achieve their desired outcome. Accordingly, "the common motive alleged here is not

akin to a garden-variety motive to increase profits." *B&R Supermarket, Inc. v. Visa*, 2016 WL 5725010 at *7 (N.D. Cal. 2016). Like in *B&R Supermarket*, here, each individual comedian knew that "going first" with a demand for supracompetitive royalties would likely cause Pandora to substitute their recordings for those of other competitor comedians. But, by conspiring, the Comedians are able to eliminate that competition that has historically occurred, providing themselves with a means to accomplish their anticompetitive goal.

*Complex Change Close in Time*: The efforts by Word Collections and its co-conspirator Comedians to force an unprecedented change to the historic practice of licensing comedy all occurred within a very short period of time. FACCs ¶ 77. Each of the Comedians entered into exclusive affiliation agreements all within a short period of time, despite having never individually demanded a separate "literary works" license from Pandora and never having previously affiliated with a "literary works" licensing collective. *Id*. Such dramatic changes in a short time suggest coordinated, not coincidental, conduct, further reinforcing a finding of conspiracy. *Twombly*, 550 U.S. at 556 n.4 ("[C]omplex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason," support a plausible inference of conspiracy.); *Interstate Circuit*, 306 U.S. at 222 ("Compliance with the proposals involved a radical departure from the previous business practices of the industry and a drastic increase in admission prices of most of the subsequent-run theatres."); *Toys "R" Us*, 221 F.3d at 935 (Manufacturers' "decision to stop dealing with the warehouse clubs [was] an abrupt shift from the past," contributing to an inference of a horizontal agreement.).

*Public Assurances that the Collective was holding strong*: In March 2021, Word Collections—acting at the instruction of the Comedians—demanded an all-or-nothing blanket license from Pandora (and potentially other services). Such a

strategy carried the risk that Pandora might drop the Comedians from its service and, as a result, individual Comedians might elect to leave the Word Collections cartel. *See* FACCs ¶ 78. Shortly after making its license demand, Word Collections issued a series of press releases dated July 22, August 2, August 10, August 26, and September 14 (Exs. B-G), in which it not only touted newly joined comedians but also—in boldface—reiterated the names of Comedians, even though those names already had appeared on prior press releases. These actions assured the Comedians that individual Comedians would not be acting independently and that the Collective was holding strong. FACCs ¶ 78. Such public statements have repeatedly been found to support an inference of conspiracy. *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1116 (N.D. Cal. 2008) (recognizing that public statements can be used to facilitate coordinated conduct); *In re Keurig Antitrust Litig.*, 383 F. Supp.3d 187, 244-45 (S.D.N.Y. 2019) (denying a motion to dismiss based on allegations that defendants' "agreements with roasters and brands are well known within the market, and each company would have known that its competitors had entered into these agreements").

All told, these "plus factors" demonstrate conspiracy rather than parallel conduct—a showing that the Counterclaim Defendants do not even attempt to refute. That the Counterclaim Defendants simply ignore this robust showing does not make it go away.

### 2. The Counterclaim Defendants' remaining efforts to undermine the Amended Counterclaims are similarly baseless.

The Counterclaim Defendants next assert that "Pandora actually admits in its Amended Counterclaims that it would not, and will not, enter into any individual license with a comedian to stream their literary works, and will drop and not broadcast the works of *any* individual Comedian who demands payment of a fee for the license of his or her literary works." Joinder at 3-4 (emphasis in original). The

Counterclaim Defendants later reiterate this claim, asserting that "Pandora admits that it just will not license Literary Works, and will instead take them down if any comedian, *no matter how popular*, asks them to license this protected intellectual property." Joinder at 5 (emphasis in original). The Counterclaim Defendants cite to paragraphs 44 and 75 of the Amended Counterclaims to support these assertions. These paragraphs, however, in no way support their contention. What these paragraphs actually say (in relevant part) is:

- "Had a comedian attempted, on their own, to secure a ***supra-competitive*** additional royalty for such rights [in any underlying comedy routines embodied in comedy recordings] with the threat of an infringement suit in the background if Pandora did not acquiesce to those demands, Pandora likely would have taken that comedian's recordings off its service and relied more heavily on (i.e., substituted) the recordings of other similar competitor comedians." FACCs ¶ 44 (emphasis added).

- "No comedian acting alone would demand, with the threat of an infringement lawsuit in the background, a ***supra-competitive*** extra royalty on top of what they have historically been paid from a service like Pandora. Indeed, no comedian has ever done this in the decade-plus that Pandora has been streaming comedy. And that is for good reason—doing so would likely result in their recordings being removed from Pandora and losing out on the royalties and promotion that would have otherwise occurred." FACCs ¶ 75 (emphasis added).

In other words, the Amended Counterclaims make clear that Pandora would only consider dropping a comedian if that comedian demanded a *supracompetitive*

*royalty on top of what they were already receiving*.[2] The Counterclaim Defendants' recasting of these paragraphs is off-base.

Moreover, the Counterclaim Defendants' argument appears to be premised on their repeated claim that Pandora has "admitted" that it has never, and will not, obtain the necessary rights to the underlying jokes in the licensed comedy recordings. Joinder at 3-5. This too is a mischaracterization of the Amended Counterclaims. As the FACCs explain, Pandora "has always taken licenses for the comedy recordings that it offers, and through those licenses has obtained (either explicitly or implicitly) *all of the rights* it needs to stream those recordings." FACCs ¶ 41 (emphasis added).[3] The FACCs further expound on this, explaining that comedy, like every other copyright-intensive industry except the dysfunctional music licensing market, has always followed a licensing-at-the-source model whereby the "source" or creator of the final product—in this case the record label that creates or distributes the comedy recordings—secures and passes along *all necessary rights, including any rights in any pre-existing works used in the new derivative work* to all downstream distributors, licensees, and end-users, either explicitly or implicitly. *Id.*

Conforming with this longstanding practice, Pandora has not separately secured licenses just covering the underlying comedy routines embodied in comedy

---

[2] Pandora has always been "willing to enter into reasonable licenses negotiated in a *competitive market* for legitimate copyrights covering the content it transmits." FACCs ¶ 40 (emphasis added).

[3] The FACCs also make clear that Pandora has entered into individual agreements with comedians and comedy record labels that are not affiliated with the Word Collections or Spoken Giants cartels. Specifically, Pandora states that "dozens of other comedians and comedy record labels have recently come forward and reaffirmed historic custom and practice; they have explicitly agreed that Pandora has always had all of the rights it needs to perform, reproduce and distribute their comedy on its services, and confirmed that no additional royalties beyond those already paid for the recordings are called for." FACCs ¶ 124. The Counterclaim Defendants ignore these factual allegations entirely.

recordings, *because it did not need any separate licenses*—all necessary rights were provided along with the rights to stream the recordings. *Id.* While the Counterclaim Defendants may disagree with these factual allegations, any such disagreement is irrelevant at this stage of the litigation. The issue before the Court is the adequacy of Pandora's allegations in the Amended Counterclaims, not what the Counterclaim Defendants think of them.

Moreover, as the FACCs also explain in detail, comedians and their representatives were clearly satisfied with the royalties and other benefits that Pandora provides in exchange for the right to use their comedy. For over a decade, and despite Pandora's complete transparency as to its comedy-licensing practices, no comedian ever challenged those practices. Instead, comedians continued to seek increased airplay on Pandora. Doing so would make no economic sense if the comedians felt that they were not being fully and appropriately compensated by Pandora. FACCs ¶¶ 2, 37-38, 42-43. It was only with the launch of Word Collections (and Spoken Giants less than a week later) that anyone has tried to upend what has been working well for all involved for decades. *Id.*, ¶ 43. The Counterclaim Defendants similarly ignore these factual allegations.

Were the above-discussed mischaracterizations of the Amended Counterclaims not enough, the Counterclaim Defendants go further. Working off the false premise that Pandora "admits" that it will not enter into any individual license with a comedian, they go on to assert that this fabricated claim is "diametrically different" from allegations Pandora made in the original counterclaims it brought against Word Collections, in which Pandora demonstrated that Word Collections' licensing practices eliminate any possibility of Pandora entering into an individual license with its affiliated comedians. Joinder at 4. According to the Counterclaim Defendants, this "change shows the depths to which Pandora will sink to try to salvage its counterclaims." *Id.* It does nothing of the sort.

As already demonstrated, Pandora has never "admitted" that it would not enter into a license with individual comedians. It has said that it would not enter into a license at *supracompetitive fees* with any individual comedian, and that no comedian would have the incentive, absent their participation in a price-fixing cartel, to make such a demand. FACCs ¶¶ 44, 75. Moreover, there is nothing inconsistent about Pandora, on the one hand, stating that it will not enter into an agreement with any individual comedian for a supracompetitive fee and, on the other, explaining that Word Collections' exclusive affiliation agreements with the Comedians and its licensing practices expressly prevent those Comedians from licensing their rights outside of the Collective—an allegation that Pandora makes in both the original and Amended Counterclaims. *Id.*, ¶¶ 82-86; Original Counterclaims ¶¶ 51-54.

More generally, there is no inconsistency between any of Pandora's allegations, including between those raised in the original counterclaims it filed and those contained in the Amended Counterclaims. Pandora has been entirely consistent in its allegations that the emergence of Word Collections and Spoken Giants dramatically changed the market through blatant violations of the antitrust laws. As all of the counterclaims that Pandora has brought clearly state, it was only with the emergence of Word Collections and Spoken Giants that anyone has tried to upend historic licensing practice, which had been working well for all involved for decades. FACCs ¶ 43. The Collective's anticompetitive scheme is a transparent effort to change historic practice to secure supracompetitive fees that are well above those that any individual comedian could secure under competitive conditions—a conclusion that is fully supported by Word Collections' own public statements in which it makes clear that its plan is to model itself after ASCAP and BMI, and to do so without the regulations imposed on those two collective licensing entities by their respective antitrust consent decrees with the U.S. Department of Justice. FACCs ¶¶ 45, 65-67.

**C.     Pandora was not required to engage in a futile act by trying to break the Word Collections' cartel.**

As the Counterclaim Defendants acknowledge, "an antitrust plaintiff need not allege an attempt to individually license if it demonstrates that the availability of an individual license is illusory." Joinder at 5. Like Pandora's original counterclaims (*see* Order 17-18), the Amended Counterclaims do exactly that. The Amended Counterclaims explain that the exclusive affiliation agreements that the Comedians have entered into with Word Collections leave Word Collections as the "only entity on the planet" that can license the rights to the Comedians' jokes that are embodied in comedy recordings. FACCs ¶ 58; *see also id.*, ¶ 79.

To briefly summarize, because Pandora must have a license from Word Collections to offer a viable comedy offering, taking an individual license for the purported literary works rights controlled by any individual Comedian would just result in Pandora paying twice for the same rights—once to Word Collections and then again to the Comedian directly (and, in reality, three times, given that the rights were already secured and paid for through Pandora's sound recording licenses). FACCs ¶ 84. Consequently, once a comedian joins the Collective, there is no longer any economic incentive to try and negotiate directly with that rightsholder; doing so would be economically irrational. *Id.*

Similarly, individual Comedian members of the cartel have no economic incentive to enter into a direct license with Pandora so long as they remain part of the cartel. By sticking with the cartel, the comedians know they will get the inflated price set by Word Collections instead of the far lower price that would result if the Comedians actually competed with each other. FACCs ¶ 86.

Worse, the exclusive affiliation agreements that comedians joining the Collective are required to sign (FACCs ¶ 81) ensure that Pandora and other services will have no choice but to license any of the Comedians' rights through Word

Collections. By signing the required exclusive affiliation agreements, the Comedians are contracting away their rights to license outside of the cartel, ensuring that the only option available to a service like Pandora is to deal directly with Word Collections. *Id.*, ¶ 85.

This is not mere speculation on Pandora's part. The Amended Counterclaims are replete with statements *from Word Collections itself* confirming as much. For example, when Word Collections informed Pandora that it had entered into an exclusive affiliation agreement with Jerry Seinfeld, it also emphasized that "Word Collections *exclusively* controls and administers" the rights to the Seinfeld works and that those rights "cannot be licensed via, nor royalties remitted to, *any* other entity." FACC ¶ 79. And Mr. Price, Word Collections' CEO, has made clear that "Word Collections is 'the *only entity on the planet* where these services [like Pandora] can come to get a license to use [the] literary works'" of any of the Comedians. *Id.*, ¶ 109. Not even the Comedians themselves are able to license their own works once they sign the required exclusive affiliation agreement. By entering into these exclusive affiliation agreements with all of its affiliated Comedians, Word Collections is able to license the entire catalog amassed by the Collective on a blanket basis, free from any of the competition that otherwise would have existed, and previously did exist, among the Comedians. *Id.*, ¶ 58.

As Word Collections has repeatedly made clear, that is exactly what its plan is, and has always been. For example, Word Collections regularly refers to itself as the "ASCAP and BMI for spoken word instead of music." As Pandora's Amended Counterclaims describe, ASCAP and BMI are PROs with blanket licensing practices that are well established and understood. FACCs ¶¶ 65-67. Further, Mr. Price has discussed publicly the ongoing negotiations between Word Collections and streaming services for "blanket performing licenses." *Id.*, ¶ 67. And Mr. Price has even gone so far as to explain that one of the advantages that Word Collections has

1  over entities like ASCAP and BMI is that Word Collections offers similar blanket
2  licenses but is not regulated by an antitrust consent decree with the United States
3  Department of Justice or otherwise. *Id.*, ¶ 87.

4          These statements are entirely consistent with the blanket license that Word
5  Collections has insisted that Pandora take—one that called for a 25% increase in the
6  fee that Pandora had historically paid to stream comedy, just so that Pandora could
7  continue to do what it has always done. FACCs ¶ 88. The licensing terms did not
8  allow for any reduction in fee should Pandora enter into a separate license directly
9  with a Comedian, nor did they allow Pandora to secure the rights to just some, but
10  not all, of the material in the Word Collections catalog. *Id.* In short, Word
11  Collections required that Pandora take an "all-or-nothing" blanket license covering
12  everything in its catalog for an exorbitant fee, just as the Comedians instructed it to
13  do. *Id.*

14          When previously evaluating these same allegations—even prior to Pandora
15  bolstering them with additional material—the Court concluded that "Pandora
16  adequately allege[d] that the availability of any individual licenses is illusory." Order
17  17. The Counterclaim Defendants make no arguments that were not previously
18  presented to the Court, nor do they cite any new or different caselaw.[4] In short,
19  because the Counterclaim Defendants simply rehash arguments the Court has

20

21

22  _____

23  [4] The Counterclaim Defendants' claim that their affiliation agreements are easily terminable is irrelevant. As explained in the FACC, the only way that the Comedians can secure the supracompetitive fees Word Collections promises is to stick with the
24  Collective—by doing so, they avoid subjecting themselves to the forces of competition. FACCs ¶¶ 86-89. As a result, even if a Comedian could easily leave the cartel, they have no incentive to do so. *Id.* These circumstances, among many others,
25  render the Counterclaim Defendants' analogy to *Sanofi-Aventis U.S., LLC v. Mylan, Inc. & Mylan Specialty, LP*, 44 F.4th 959 (10th Cir. 2022)—an exclusive dealing
26  case in which Mylan was alleged to have used exclusive agreements to keep its competitor out of the market—inapposite. In *Sanofi*, the court concluded that the
27  agreements being challenged actually "stimulate[d] price competition." *Id.* at 989. Those at issue here only serve to eliminate it.
28

1  already evaluated and rejected, they provide no basis for the Court to revisit its prior

2  conclusion about individual licensing.

### CONCLUSION

4       For the reasons set forth above, and for those set forth in Pandora's Opposition

5  to Word Collections' Motion to Dismiss, the Joinder should be denied in its entirety.

6  Dated:  January 25, 2023                    MAYER BROWN LLP
7                                              PAUL M. FAKLER
                                               JACOB B. EBIN
                                               ALLISON AVIKI
8                                              WILLIAM H. STALLINGS
                                               CHRISTOPHER J. KELLY
9                                              JOHN NADOLENCO
                                               DANIEL D. QUEEN
10                                             MEERIM NEHME

11

12                                             By: */s/ Paul M. Fakler*
                                                   Paul M. Fakler
13

14                                             MAYER BROWN LLP
                                               WILLIAM H. STALLINGS (*pro hac vice*)
15                                             *wstallings@mayerbrown.com*
                                               1999 K Street, NW
16                                             Washington, D.C.  20006-1101
                                               Telephone: (202) 263-3000
17                                             Facsimile: (202) 262-3300

18                                             MAYER BROWN LLP
                                               CHRISTOPHER J. KELLY (SBN
19                                             276312)
                                               *cjkelly@mayerbrown.com*
20                                             Two Palo Alto Square
                                               3000 El Camino Real
21                                             Palo Alto, California  94306-2112
                                               Telephone: (650) 331-2000
22                                             Facsimile: (650) 331-2060

23                                             Attorneys for Defendant
                                               PANDORA MEDIA, LLC
24

25

26

27

28

# FILER'S ATTESTATION

The undersigned, counsel of record for Defendant/Counterclaimant Pandora Media, LLC, certifies that this brief contains 6,017 words, which complies with the word limit of L.R. 11-6.1.

Dated:  January 25, 2023

*/s/Paul M. Fakler*
Paul M. Fakler

PANDORA MEDIA, LLC'S OPPOSITION TO CERTAIN PLAINTIFFS' JOINDER IN MOTION TO DISMISS