# EXHIBIT O

# 10-3429-cv

# United States Court of Appeals

## for the

## Second Circuit

BROADCAST MUSIC, INC.,

*Petitioner-Appellant,*

– v. –

DMX INC.,

*Respondent-Appellee.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR RESPONDENT-APPELLEE

CHRISTOPHER S. HARRISON
  (admission pending)
CHRISTOPHER HARRISON, PLLC
3267 Bee Caves Road
Suite 107-67
Austin, Texas 78746
(512) 380-8507

R. BRUCE RICH
BENJAMIN E. MARKS
TODD D. LARSON
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Attorneys for Respondent-Appellee*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Civil Procedure, DMX, Inc.

hereby certifies that it is fully owned by DMX Holdings, Inc.  DMX Holdings, Inc.

has no parent corporation, and no publicly held corporation owns 10% or more of

its stock.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................6

STATEMENT OF FACTS ..........................................................................................6

I.     BMI AND THE MUSIC PERFORMANCE RIGHTS
MARKETPLACE ...................................................................................6

      A.    BMI and Its Historic Licensing Practices ...................................6

      B.    The BMI Consent Decree ...........................................................8

      C.    The *AEI* Decision ......................................................................9

II.    DMX, ITS SERVICES, AND THE COMPETITIVE
ENVIRONMENT....................................................................................9

III.   DMX'S DIRECT LICENSE INITIATIVE.......................................11

      A.    The Rationale for Direct Licensing .........................................11

      B.    The Development of the Direct Licenses .................................13

      C.    Rates and Terms of the Direct Licenses ..................................14

      D.    The Success of the Direct-License Initiative ...........................17

      E.    The Sony Direct License.............................................................19

      F.    DMX's Increasing Use of Directly Licensed Music ...............22

IV.   BMI'S INTERFERENCE WITH DMX'S DIRECT-LICENSE
INITIATIVE.........................................................................................23

V.    BMI'S LICENSES WITH MUZAK AND OTHER CMS
PROVIDERS.........................................................................................26

      A.    Muzak......................................................................................26

      B.    PlayNetwork, Music Choice, and Trusonic .............................28

      C.     Other Services ......................................................................30

STANDARD OF REVIEW ......................................................................31

SUMMARY OF ARGUMENT ................................................................32

ARGUMENT ............................................................................................35

I.      THE GOVERNING LEGAL FRAMEWORK FOR BMI RATE
COURT DETERMINATIONS ...........................................................35

II.     THE UNCONTESTED STRUCTURE OF BMI'S
ADJUSTABLE-FEE BLANKET LICENSE.....................................38

III.    THE COURT PROPERLY REJECTED BMI'S PROPOSED
BENCHMARK AS UNRELIABLE AND ITS RATE
PROPOSAL AS UNREASONABLE ................................................40

      A.     The Muzak Agreement Does Not Reflect Competitive-
Market Rates ......................................................................40

      B.     Use of the Muzak Agreement to Set Fees for Other
Services Generated Random Results ....................................41

            1.     The 2004-2009 Muzak agreement is not a $36.36
per-location arrangement ...............................................42

            2.     The Muzak benchmark was inflated by its failure
to account for Muzak's contemporaneous
settlement of the 1994-2004 period ...............................43

      C.     The District Court Was Not Required to Adjust a
Patently Unreliable Benchmark ...............................................46

IV.    THE DISTRICT COURT'S RATE DETERMINATION WAS
AMPLY SUPPORTED BY THE EVIDENCE ..................................48

      A.     The District Court Did Not Err in Using the Direct-
License Benchmark to Value the Performance Rights
Conveyed by the BMI License ...............................................49

      B.     BMI's Critiques of the Fee Determination Are Meritless .......50

1. BMI's "not the same product" argument.......................50

2. The supposedly increased value of an adjustable-
fee blanket license...........................................................52

3. The representativeness of the direct-license royalty
pool ...............................................................................55

4. The Sony advance...........................................................58

V. THE DISTRICT COURT'S ADOPTION OF THE "OFF-
PREMISE PROXY" WAS REASONABLE AND
SUPPORTED BY THE EVIDENCE.................................................60

CONCLUSION ...........................................................................63

# TABLE OF AUTHORITIES

## CASES                                    Page(s)

*ASCAP v. Showtime/The Movie Channel, Inc.,*
 912 F.2d 563 (2d Cir. 1990) …………………………..………………..…*passim*

*United States v. ASCAP (In re Application of Buffalo Broad. Co., Inc.),*
 1993 WL 60687 (S.D.N.Y. Mar. 1, 1993) ………………………….36, 37, 38, 41

*United States v. ASCAP (In re Application of MobiTV, Inc.),*
 2010 WL 1875706 (S.D.N.Y. May 11, 2010).......................................7, 8, 41, 47

*United States v. ASCAP (In re Applications of RealNetworks, Inc. & Yahoo! Inc.),*
 627 F.3d 64 (2d Cir. 2010)....................................................................31, 35, 41

*United States v. ASCAP (In re Application of THP Capstar Acquisition Corp.),*
 2010 WL 4878878 (S.D.N.Y. Dec. 1, 2010).................................................*passim*

*United States v. ASCAP (In re Application of Turner Broad. Sys., Inc.),*
 782 F. Supp. 778 (S.D.N.Y. 1991).......................................................................8

*United States v. BMI (In re Application of AEI Music Network, Inc.),*
 275 F.3d 168 (2d Cir. 2001)…..........................................................................1, 9

*United States v. BMI (In re Application of Music Choice),*
 426 F.3d 91 (2d Cir. 2005)…........................................................................*passim*

## STATUTES

17 U.S.C. § 106……………….............................................................................6

iv

## INTRODUCTION

BMI appeals from an historic rate-making proceeding: the first-ever determination of reasonable terms for an adjustable-fee blanket license ("AFBL"). Until this proceeding, music performance rights licenses offered by BMI to commercial music services ("CMS") such as DMX consisted solely of all-or-nothing blanket licenses. Those licenses afforded access to BMI's multimillion-work repertory at fees that neither reflected the user's actual need for, or use of, that repertory nor varied to the extent the user was able to secure performance rights for its music uses directly from the copyright owners affiliated with BMI. In 2001, this Court held that BMI, pursuant to its antitrust consent decree (the "BMI Decree"), was required to offer an AFBL that provides a fee credit to reflect such direct licenses. *United States v. BMI (In re Application of AEI Music Network Inc.)*, 275 F.3d 168 (2d Cir. 2001) ("*AEI*"). DMX's success in obtaining hundreds of direct licenses in competitive-market transactions is the promise of *AEI* fulfilled.

DMX's success in this initiative came despite BMI's efforts to thwart it. Among other actions, BMI sought to discourage its largest music publisher affiliates from signing on. Toward that end, as an inducement not to license directly, BMI paid one such publisher, Universal, a yearly guarantee amounting to six times the annual royalties Universal had ever received from BMI on account of DMX performances.

With respect to license terms for an AFBL, while BMI did not formally resist its legal obligation to afford DMX such a license, the unreasonableness of its pre-litigation proposal as to rates and terms necessitated resort to this rate proceeding.  The resulting trial required the district court to "define a rate or range of rates that would be set in a competitive market" for the license requested, *ASCAP v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 576 (2d Cir. 1990) ("*Showtime*"), with BMI bearing the burden of demonstrating the reasonableness of its fee proposal.

BMI sought to discharge that burden by proffering as a benchmark what it professed to be a $36.36 per-customer-location agreement it had previously entered into with DMX competitor Muzak.  It was – and remains on appeal – BMI's essential position that the simple proffer of an asserted "willing-buyer/willing-seller" transaction with a similarly situated licensee satisfies BMI's decretal burden of offering a "reasonable" fee.  This misapprehends the rate court's task.  This Court has repeatedly rejected the notion that the rate court should serve merely as – in Judge Newman's words – a "placebo" whose role entails no more than placing the stamp of "reasonableness" on fees that BMI has secured from one or more of an applicant's competitors.  *Id.* at 570.  The rate court process is in fact far more dynamic and searching given the recognition that BMI has amassed considerable

market power and that, under the prevailing blanket license system, "songs do not compete against each other on the basis of price." *Id.* It was BMI's obligation to demonstrate that the Muzak agreement was reached in a market with "an adequate degree of competition to justify reliance" on it. SPA5 (quoting *United States v. BMI (In re Application of Music Choice)*, 426 F.3d 91, 95 (2d Cir. 2005) ("*Music Choice IV*")). BMI failed to make that showing.

The Muzak benchmark was shown also to suffer from numerous other crippling infirmities. These included that it was only one part of a much broader agreement, and that it was not a per-location deal at all, but a flat-fee arrangement. BMI's application of the Muzak template to other CMS entities revealed completely arbitrary, to the point of irrational, per-location fees that ranged from $24.75 to nearly $600 per location. BMI's further attempt to tack onto the AFBL an "option value" premium – recognized by the Government as an effort to "subvert *AEI* and the BMI Consent Decree" – only reinforced the unreasonableness of BMI's trial position. Memorandum of the United States on Decree Construction Issues, Docket No. 25 at 2 ("DOJ Mem.").

The district court instead followed the analytic framework suggested by DMX, which availed itself of the uniquely rich body of data derived from DMX's

3

direct license experience.  That data demonstrated the workings of a competitive

marketplace for licensing the very same rights as are licensed by BMI.

Recognizing that the value conferred by BMI's blanket license comprises a

composite of the value of the music performance rights it conveys and the value of

BMI's role as an aggregator of those rights, the district court determined the

reasonable fee in two components.  First, based on its factual determination that the

performance rights directly licensed were broadly representative of the

performance rights under BMI's license, the district court derived a reasonable fee

for the performance-rights component from the fees reflected in the direct licenses.

Second, the court assessed a reasonable fee for the value of BMI's aggregation of

performance rights.  Summing these components, the court arrived at the starting

fee payable by DMX prior to direct-license credits.  The court then adopted a fee-

crediting mechanism that flexibly rewards DMX's ongoing investments in

licensing performances directly, while preserving for BMI full compensation for its

services as an aggregator in the form of a minimum "Floor Fee."

The AFBL that emerged from this process fulfills two core purposes of the

BMI Decree: opening up a competitive alternative to a collectively priced blanket

license that embodies BMI's market power; and enabling the pricing of the direct

licenses to, in the Government's words, "produc[e] lower-priced competitive benchmarks for BMI's blanket licenses."  DOJ Mem. at 3.

BMI failed in its trial efforts to disparage the probative value of the direct licenses given the undeniable facts that these 550 licenses as of trial were negotiated individually with sophisticated music publishers competing amongst themselves for exposure on DMX, and that they span the range of musical genres and incorporate the works of many of the world's most prominent songwriters. BMI's renewed effort here to marginalize this compelling evidence fails to demonstrate any error – let alone any clear error – in the district court's assessment of the record on these points.

BMI now complains that the trial court erred by relying on the direct-license evidence while failing somehow to make adjustments to the rejected Muzak benchmark or otherwise account for it in its fee-setting calculus.  But the court was under no obligation to resuscitate a benchmark found to be so unreliable.  BMI's position also contradicts its trial posture, where it urged the court not to "triangulate" between the parties' proposals – that instead, the "vastly different" approaches presented an "an either-or" choice for decision.  A621.  In opting for a benchmark that embodies the BMI Decree's aspirational goals of injecting

5

competition into the performing rights marketplace, the district court correctly did just that.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

DMX agrees with the first and second paragraphs of BMI's Statement of Issues.  DMX disagrees with the third paragraph, which suggests, incorrectly, that the district court's ruling "ignores" the music used in DMX's "on-premise" subscriber locations, and that such locations comprise "two-thirds" of DMX's business.  BMI Br. 4.  Stripped of BMI's inaccurate characterizations, the third issue for review is whether the district court erred in adopting the music use data from DMX's satellite-delivered service as a reasonable proxy for all DMX performances of BMI-affiliated music.

## STATEMENT OF FACTS

## I.   BMI AND THE MUSIC PERFORMANCE RIGHTS MARKETPLACE

### A.   BMI and Its Historic Licensing Practices

The Copyright Act grants to copyright owners certain rights to exploit their works, including to publicly perform them and reproduce them in copies.  17 U.S.C. § 106.  BMI, on behalf of some 400,000 affiliated composers and publishers, issues licenses to a wide range of users authorizing public performances of some 6.5 million musical works amassed in BMI's repertory.  BMI collects more than $900 million annually in license fees.  A280.  Its standard

6

practice is to divide those royalties equally between the writers and publishers of performed works.  BMI will not recognize arrangements that give the publisher more than half of the royalties attributable to performances of a given work. A336-37; A995.

BMI and its principal licensing competitor, ASCAP, between them license the music performance rights to most copyrighted music in the United States.[1] *United States v. ASCAP (In re Application of MobiTV, Inc.)*, 2010 WL 1875706, at \*3 (S.D.N.Y. May 11, 2010) ("*Mobi*").  Both organizations' historic preference and practice has been to offer users blanket licenses that afford licensees access to their respective multimillion-work repertoires at fees that neither reflect the user's actual need for, or use of, that repertory nor vary to the extent the user may be able to secure performance rights in the music it uses directly from copyright owners. *See Music Choice IV,* 426 F.3d at 93; *United States v. ASCAP* (*In re Application of THP Capstar Acquisition Corp.*), 2010 WL 4878878, at \*19 (S.D.N.Y. Dec. 1, 2010) ("*ASCAP/DMX*").

---

[1] SESAC, Inc. is a third, smaller performing rights organization ("PRO").

7

## B.      The BMI Consent Decree

BMI's and ASCAP's market power raises significant competitive concerns.

Both organizations have long been regulated by consent decrees negotiated with

the U.S. Department of Justice ("DOJ") resulting from multiple Sherman Act

challenges by DOJ dating back to the early years of both organizations.  *See

generally Mobi,* 2010 WL 1875706, at *3, *18; *United States v. ASCAP (In re

Application of Turner Broad. Sys., Inc.)*, 782 F. Supp. 778, 782-84 (S.D.N.Y.

1991), *aff'd*, 956 F.2d 21 (2d Cir. 1992).  Despite the constraints of these consent

decrees, there remains no doubt that "the market for licensing music rights is not

freely competitive" insofar as, under traditional blanket licensing practices, "songs

do not compete against each other on the basis of price."  *Showtime,* 912 F.2d at

570.

Among the provisions of the BMI Decree designed to minimize the

anticompetitive potential of BMI's blanket licensing practices, "[t]he Decree

requires BMI to make licenses available" and prohibits BMI from "preventing its

affiliated writers and publishers from directly licensing their works to users such as

DMX" or discriminating between "similarly situated" licensees.  SPA3.  The BMI

Decree also enables users such as DMX to seek a judicial determination of

reasonable fees when faced with fee demands from BMI they perceive as

unreasonably high.

8

C.  **The *AEI* Decision**

Although forbidden by its Decree from obtaining exclusive licensing

authority from its affiliates, BMI has forestalled active exploitation and

development of a direct-license market via the structure of its traditional blanket

license.  While the potential competitive benefits of such alternative licensing are

evident, a user who has obtained direct licenses from a BMI affiliate effectively

has had to double-pay for those rights – once to the directly-licensing copyright

owner and a second time as part of the unvarying fee payable to BMI.  In 2001, in

*AEI*, 275 F.3d at 177, this Court held that BMI was required to offer a blanket

license that provided a fee credit reflecting direct licenses separately obtained by

the user.  DMX is the first music user ever to obtain such a license.

## II.  DMX, ITS SERVICES, AND THE COMPETITIVE ENVIRONMENT

DMX provides a commercial music service ("CMS") to a broad array of

business customers, including retail establishments, restaurants, offices, hotels, and

others.  A463.  DMX was created on June 3, 2005, when DMX Holdings, Inc.

purchased assets sufficient to operate the business pursuant to a bankruptcy sale

order from the estate of a prior owner known as DMX Music.  A402.  DMX's

service involves the selection and arrangement of songs into appropriate

categories/genres (e.g., jazz, rock, country) and various "lifestyle" programs

designed to create a particular mood for DMX customer environments, as well as

9

the delivery of such music programming to nearly 100,000 customer locations.
A530-31. DMX delivers its CMS to customers in one of two ways. The first,
referred to as "off-premise" delivery, involves the transmission of programming
via direct broadcast satellite ("DBS") to proprietary devices installed at customer
locations. The second, known as "on-premise" delivery, involves the delivery of
music via CDs, DVDs, or Internet downloads to be played on-site by customers on
proprietary devices. A462. At the time of trial, DMX's off-premise service
consisted of more than 100 different pre-programmed channels covering a broad
range of music styles; its on-premise service consisted of programs for
approximately 140 music styles as well as custom programs designed specifically
for particular accounts. A531-32.

The CMS industry contains many established competitors to DMX that
provide generally similar services, including Muzak, PlayNetwork, Music Choice,
Trusonic, and other smaller competitors. A402. The industry also has seen a rise
in competition from music consultants who utilize iPods or similar devices to
create programming for businesses without investing in a complex distribution
network and from "self-supply," which has been made easy and inexpensive by the
recent proliferation of digital music players and online music services. A400-401.
The CMS industry is highly competitive and price-driven. A464. The increasingly

10

intense competitive landscape has forced DMX to reduce drastically the rates it charges for its service. A464-65. Even with these rate reductions, DMX lost customers steadily over the several years preceding trial as a result of the competitive environment and the depressed state of the economy.[2] A464. DMX expects this downward pricing trend to continue in the future and for DMX's per-location revenue to continue to decline. A464-65.

## III.  DMX'S DIRECT LICENSE INITIATIVE

### A.  The Rationale for Direct Licensing

DMX requires public performance licenses to operate its CMS. DMX also requires reproduction and distribution rights from many of the same copyright owners, including record labels, in relation to its delivery of on-premise media. Because BMI licenses only the right to publicly perform the compositions in BMI's repertory, DMX must deal directly with many copyright owners to secure these other rights. *See, e.g.,* A476.

---

[2] In 2005, DMX served approximately 84,000 locations. By early 2010, its customer base had dwindled to less than 70,000. Shortly before trial, with an aggressively low-priced bid, DMX entered into an agreement with DirecTV to provide the music channels for approximately 25,000 DirecTV commercial customer locations, bringing the total number of locations to approximately 95,000. SPA3; A464-65.

Upon acquiring the business, DMX instituted cost-savings initiatives to correct the problems that had beset the old DMX Music. *See*, *e.g.*, A465 (describing workforce reduction of nearly 40% and office consolidation). One focus of this effort was to reduce the long-term costs associated with acquiring performance rights through blanket licenses from BMI and ASCAP. A473. At the time, ASCAP was seeking $49 from DMX per location per year and BMI was seeking $36.36 for blanket licenses. *See ASCAP/DMX* 2010 WL 4878878, at *9 n.20. DMX believed those rates were substantially above those that would be negotiated in a competitive market for performance rights, SPA11 (citing A464; A473), and "were not reflective of the pressures the CMS industry was facing due to its increasingly competitive nature and the difficult economy." *Id*.

In late 2006, DMX began to acquire catalog licenses directly from music publishers. DMX hoped thereby to introduce competition into a marketplace long dominated by competition-stifling blanket-license arrangements. SPA11; A474. DMX believed this to be especially viable given the fact that customers neither expect to hear particular songs at any given time nor miss a particular song if it is not played. A473; A533. DMX music designers have the ability to substitute directly licensed works for the works of other publishers as long as the directly-licensed works fit the general genre and feel of the program. A533. DMX

assumed – correctly as it turned out – that the forces of competition would spur

publishers seeking to assure a continued, or even enhanced, presence on DMX's

music service to give serious consideration to such licenses, even if, on a per-

location basis, the royalty pool they would share might be lower than that collected

from DMX by the PROs.  Not incidentally, such licenses also afforded DMX the

opportunity to overcome various restrictions imposed by the PROs on the types of

commercial establishments that could be covered by their CMS licenses.[3]  DMX

believed (again correctly) that similar restrictions would not be imposed by music

publishers in direct-license transactions, thereby opening up new business

opportunities for DMX.  A476.

### B.    The Development of the Direct Licenses

DMX engaged Music Reports, Inc. ("MRI"), an entity with decades of

experience in music licensing and royalty administration and reporting, to assist

DMX in developing a direct-licensing strategy as well as the terms of the actual

direct license that DMX would offer.  A517; A519-20; A522-23.  MRI analyzed

DMX playlist data to rank the publishers whose works DMX played most

---

[3] For example, BMI excludes bowling alleys, health clubs, skating rinks,
nightclubs, and other venues that charge admission from coverage under its form
CMS license.  A476.  Coverage for such locations requires a separate license and
payment of a higher fee.  A306.

frequently and thus to identify publishers to approach for direct licenses. A520. DMX also approached publishers with which MRI had existing commercial relationships to solicit feedback on the nascent direct-license program and license terms under development. A523.

DMX's objective was to offer a license that publishers would find recognizable and reasonable. DMX believed that a license incorporating industry-standard terms would obviate the need for lengthy negotiations or material variation from agreement to agreement, and ultimately would lead to broad acceptance. A520; A523. Proceeding in this fashion also would standardize royalty administration across hundreds of direct-licensors. A520; 523. With the benefit of feedback on its proposed form from a number of experienced, well-respected publishers, DMX achieved its goal. A523.

## C.    Rates and Terms of the Direct Licenses

DMX's direct licenses grant all the rights DMX needs from the participating publishers to operate its service. They convey not only the public performance rights that DMX otherwise would obtain from the PROs, but also the reproduction and distribution rights DMX needs for its on-premise service that BMI cannot grant. A721 (clause 1(a)); A476. As the licenses are catalog-wide, they convey, no differently than the BMI blanket license, immediate access to new works owned or administered by the licensing publisher. A523-24; A721. All of DMX's direct

14

licenses provide the same indemnification protection as BMI's blanket license with respect to the works licensed thereunder. A724-25. The licenses also cover locations such as bowling alleys that are excluded under BMI's CMS form agreement. A476; A651-52; A721-22.

DMX's direct licenses provide for each publisher to receive its pro rata share of a royalty pool of $25 per DMX location per year, calculated and paid quarterly by multiplying a fee of $6.25 by the number of DMX locations during the quarter. SPA11; A475; A722. Like the BMI blanket license fee, this $25 per-location fee covers both the publisher's share and the writer's share of royalties attributable to performances by DMX. A475. Royalties are paid by DMX directly to the publisher based on the ratio of DMX's performances of that publisher's works to the total number of DMX performances of all works in that quarter.[4] SPA11; A475; A722-23. In accord with industry practice and the terms of their publishing agreements, the publishers are then required to account to writers for their share of direct-license royalties. A475-76. DMX's direct licenses include a most-favored-nations clause ("MFN") that ensures that each publisher's royalties are calculated

---

[4] Like BMI's own distributions, the publisher's pro rata share is adjusted (or "share weighted") to account for situations where the publisher owns or controls less than a full 100% share of any of the works performed. A723.

using the same pro rata allocation methodology. A524. Contrary to BMI's attempt to rewrite the clear language of the provision and the uncontroverted trial testimony on its meaning (*see* BMI Br. at 21; 47-48), the MFN does not cover advances or the $25 rate itself.[5] A524.

DMX's direct licenses are not limited to BMI music, but convey performance rights to the publishers' catalogs regardless of PRO affiliation.[6] SPA11; A475-76. Thus, if all of DMX's performances in a given year were directly licensed, DMX would pay a total royalty to all participating publishers equal to $25 per location. *See* SPA11-12; A475. Citing DMX's calculation that 40% of its performances as of trial were of BMI-affiliated music, the district court explained that "if all of DMX's performances of BMI-inventory music were done under direct licenses from its publishers, they would receive $10 annually per DMX location (40% of $25). BMI does not challenge this arithmetic." SPA12; *see also* A621.

---

[5] Two publishers negotiated a different MFN clause that covers the size of the royalty pool, but the royalty pool has been $25 in all licenses signed to date. A524; A707-8.

[6] Publishers often affiliate certain of their catalogs with BMI and other catalogs with other PROs, but each catalog is affiliated with just one PRO. A376.

The $25 royalty pool is generated by all DMX customer locations, including both on- and off-premise subscribers.  Publishers' pro rata shares of that pool, however, are calculated using their plays on DMX's off-premise channels as a proxy for plays across the entire service.  A522.  DMX's off-premise data is the most accurate measure of DMX's use of directly licensed works because it captures the frequency with which works are performed.  By contrast, DMX's on-premise data merely identifies which works were distributed in on-premise programs, but not how frequently each work was performed within the program.  A481-82; SPA26-27.  As MRI's Mr. Gertz testified, direct licensors were not only willing to accept the off-premise data as a proxy for all performances, they preferred it because it more accurately reflects the extent to which their works are actually performed.  *See*, *e.g.*, A521.[7]

### D.    The Success of the Direct-License Initiative

DMX's first direct license was signed in May 2006 with Leiber Stoller Songs, Inc.  A478.  The Leiber Stoller catalog contains prominent works written by Songwriter Hall of Fame-members Mike Leiber and Jerry Stoller, including such notable compositions as "Hound Dog," "Jailhouse Rock," and "Stand by Me."

---

[7] BMI has used far less accurate proxies to distribute royalties including, for many years, royalties for DMX performances.  A388; A996; A1005.

17

A478.  By the time of trial, DMX had signed 550 direct licenses, covering more than 5,500 separate music catalogs and hundreds of thousands of songs.  SPA12; A478.  (The number of licenses had grown to approximately 850 by late 2010. *ASCAP/DMX,* 2010 WL 4878878, at *13.)

BMI does not (nor could it) dispute that the quality of the pool of directly-licensed compositions is the equal of BMI's repertory generally.  A384-85; A622. DMX's library of directly-licensed content includes works performed by some of the best-known artists in the world, including the Beatles, Frank Sinatra, Willie Nelson, Duke Ellington, Hank Williams, Loretta Lynn, Aretha Franklin, Bing Crosby, Billie Holiday, Elvis Presley, and Madonna, as well as works written by legendary songwriters such as  Rodgers and Hammerstein, Irving Berlin, John Lennon, and Paul McCartney.  *See, e.g.,* A384-85; A477-79; A534.  Many of the most popular current artists, including Taylor Swift, Lady Gaga, and Beyonce, have directly licensed works on their albums.  *Id.*  DMX's direct licensors (or the songwriters or performers of the directly licensed works) have won numerous industry honors, including membership in the Songwriters Hall of Fame, BMI's Country Music Publisher and Country Songwriter of the Year, and Oscar and Grammy Awards.  *Id.*

Not surprisingly, artists and songwriters of this stature are represented by savvy and sophisticated publishing executives who make their living maximizing the commercial value of the works they represent. A478; A523. The notion, advanced by BMI at trial, that the stewards of these works (including executives who sit on ASCAP's Board of Directors, and who have written seminal works in the field of music administration, A477; A523) must have been uninformed purchasers who undervalued them by entering into direct licenses is nonsensical and lacks record support.[8]

### E. The Sony Direct License

Despite its early success in signing direct licenses with prominent independent publishers, DMX realized there would be significant impediments to implementing a successful direct-licensing initiative – chief among them that the traditional blanket license system has been lucrative and longstanding. Licensing performance rights through PROs is, as the district court described it, "entrenched." SPA12. As an agent of change – and a small one at that – DMX

---

[8] The Songwriters Guild of America ("SGA") filed an *amicus* brief in this appeal criticizing music publishers for entering into DMX direct licenses that it hyperbolically alleges cause "severe injury to American songwriters." SGA Br. 6. SGA fails to advise the Court that it is one of DMX's direct licensors and has been happily taking DMX royalties for years. *See* A786; A788; A793; A800; A803; A806 (listing SGA direct-license royalty receipts).

had no illusions as to the challenges it faced in uprooting this entrenched practice.
*See* A334 (BMI affiliate explaining "[i]ndustry standard is not to be doing direct
licensing"); A479-80 (DMX's Mr. Knittel testifying that "you're asking an
industry that is not usually quick to adapt to change the way they handled the
licensing of their works").  After all, it took years of litigation with BMI by two
other music services to obtain the legal precedent (*AEI*) that made direct licensing
available even in principle.  And DMX, though only 5% the size of ASCAP and
BMI, *see* A1021, also was simultaneously in costly rate litigation with ASCAP,
which was resisting (and continues to resist on appeal to this Court) affording
DMX *any* form of AFBL.

For these reasons, DMX recognized from the outset the importance of
attracting at least one of the four "majors" – Sony/ATV ("Sony"), Universal, EMI,
and Warner-Chappell – into its direct-license program.  A479.  DMX believed that
signing a major would enhance the credibility of its direct-licensing program,
providing benefits well beyond the actual value of the music catalogs so licensed.
A404; A479-480.  DMX also recognized that the novelty of its effort, the need to
break through ossified practice, and the fact that the majors were by far the largest
recipients of royalties from ASCAP and BMI warranted a certain level of up-front
investment (albeit recoupable over the life of the agreement) beyond that needed to

20

attract smaller publishers.  *See* A479-80.  Accordingly, as Mr. Knittel explained,

DMX determined that as a cost of entry into the direct licensing marketplace – to

"entice someone to change" – it would have to offer a premium above what the

majors were receiving from ASCAP and BMI.  A480; SPA16.

Hoping to sign one or two (but not all) major publishers, *see* A404; A479,

DMX offered 150% of what each publisher represented it had received from

ASCAP and BMI on account of DMX performances for the previous four quarters.

*See*, *e.g.*, A890-92.  DMX believed it could recoup any advances by increasing the

frequency with which it performed the works of the first major or two to accept at

the expense of those publishers who declined to license directly.  SPA16; A481;

A404.  This approach was successful.  On November 14, 2007, DMX entered into

a direct license with Sony.  A704-20.  The agreement called for a $2.4 million

advance (paid in three annual installments) and a one-time "administrative"

payment of $300,000.[9]  A704-720; A851-52.  The Sony agreement contains the

same royalty allocation methodology as all of DMX's other direct licenses, i.e., it

---

[9] The $2.7 million total covered both what was represented to be Sony's PRO earnings as well as the "writer's share" that otherwise would be distributed by BMI and ASCAP to the writers involved in the works performed but, under the direct license, would instead be collected by Sony and then distributed to its writers.

pays Sony based on Sony's pro rata share of the same $25 royalty pool from which

DMX's other direct licensors are paid.  A706.

The Sony agreement originally covered a three-year period commencing

January 1, 2008.  DMX subsequently discovered that the "DMX" line on Sony's

BMI royalty statements – the line used to calculate the advance – had included

royalties not only for DMX performances, but also for hundreds of other BMI

CMS licensees.  A290; A480-81.  Under BMI's misleading distribution

methodology – which was neither revealed nor explained on the royalty

statements, and of which DMX learned only through discovery in this proceeding –

DMX performances accounted for only 27% of the royalties reported on the

"DMX" line in BMI's statements.  A290; A480-81; A1157-60.  Because DMX had

based its payment to Sony on BMI's incorrect and inflated statement of DMX-

related royalties, DMX and Sony agreed to extend the term of the direct license

(and the period during which the nonrefundable payments could be recouped

against royalties earned) from 36 to 57 months, i.e., through September 30, 2012.

A480-81; A861-67.

### F.   DMX's Increasing Use of Directly Licensed Music

DMX has significantly increased its use of directly licensed music as more

publishers have signed direct licenses and as DMX has increased its reliance on

their works in its programming.  Directly licensed works, which accounted for

22

10% of all works transmitted by DMX in the first quarter of 2008, grew to

represent over 33% of such uses by third quarter 2009.  *See, e.g.,* SPA14; A479;

A555.  Approximately 40% of DMX's performances of BMI music specifically

were directly licensed as of the time of trial.  A479.  DMX also increased its plays

of Sony compositions significantly, from 6% in first quarter 2008 to 14% by third

quarter 2009, while steadily decreasing performances of the other majors who did

not sign direct licenses.  *See, e.g.,* A555; *ASCAP/DMX*, 2010 WL 4878878, at *31.

These changes have been seamless from a customer service perspective.  A536.

No customer has complained about DMX's increased reliance on directly licensed

performances.  SPA14-15; A463; A536.

## IV. <u>BMI'S INTERFERENCE WITH DMX'S DIRECT-LICENSE INITIATIVE</u>

The trial evidence revealed another explanation for the challenges DMX

faced in attempting to get certain publishers to grant direct licenses: interference by

BMI.  BMI's circle-the-wagons reaction to DMX's incursion on BMI's traditional

role as the licensing intermediary between publishers and commercial music

services – and the perceived threat DMX's initiative posed in encouraging similar

efforts by users in other industries – is revealing.  It demonstrates the lengths to

which BMI was prepared to go to forestall competitive inroads into the music

licensing marketplace.  A287-89; A292-298; A391-97.  It casts a telling light on

23

BMI's appellate arguments extolling the virtues of the old blanket license system
while castigating the probative value of compelling contrasting evidence reflecting
the workings of a competitive marketplace.  It explains why the practice of blanket
licensing is so "entrenched" and why DMX had to pay a "cost of entry" into the
direct-licensing marketplace.  SPA16.

In response to DMX's offer of a sizeable premium over prior earnings from
the PROs, Sony inquired of BMI whether it would match DMX's offer.  A287-89.
BMI was eager to accommodate and deployed its most senior executives to figure
out how to do so.  When BMI discovered that DMX's offer to Sony was based on
the misleading "DMX" line on Sony's past statements – which it correctly
recognized had led DMX to offer far more than 150% of Sony's prior PRO
royalties –BMI informed Sony that it would not match.  A290-91; A1154-60.

The situation became more dire from BMI's perspective when it learned that
Universal too was seriously considering DMX's direct-license offer.  As a
condition of foregoing DMX's offer, Universal asked BMI for a three-year
guarantee of $1,875,000 for DMX performances, an amount much higher than any
actual DMX royalty collections Universal had earned in the past or could expect to
earn in future years.  A292-95; A1161-62.  Indeed, this sum represented more than

six times the level of BMI's historic distributions to Universal on account of DMX

performances.  A294-95; A379-80; A1161-62.

The guarantee Universal sought was unique in BMI's experience, A295, and

(insofar as the guarantee was payable solely to Universal and not to its writers)

would call for BMI to breach its obligation to pay its affiliated writers an equal

share of royalties attributable to DMX performances of Universal-catalog works.

A297-98.  Nonetheless – determined not to let a second major slip away – BMI's

senior management sought approval for the guarantee from a special committee of

BMI's Board of Directors.  A287, 1161-67.  In an accompanying memo to the

board committee, Alison Smith, BMI's Senior Vice President of Performing

Rights, candidly explained the motivation:

> More and more publishers are being asked by DMX to directly
> license.  We have been notified that at least one major publisher has
> entered into a direct license with DMX….  Assuring that BMI licenses
> in this market is important.  Having the ability to license Universal's
> music will help solidify BMI's position not only for this negotiation
> but for the background music industry as a whole.[10]

---

[10] The memo inaccurately suggested that if BMI were successful in its rate-court
action against DMX, BMI would recoup "75-100%" of the guarantee.  A1162; *see
also* A1161; A296-97; A380-81.  At trial, Ms. Smith admitted under examination
by the court that even the best outcome (which BMI did not come close to
achieving) would likely leave BMI only 75% recouped and that the remainder was
fairly seen as a "premium" to Universal.  A381.

A1162.  The board committee approved.  A292.  Universal accepted BMI's

guarantee and, in exchange, terminated its license discussions with DMX.  A293.

Since signing the BMI agreement, Universal's share of DMX performances has

declined significantly as DMX increased its use of directly-licensed compositions.

*See ASCAP/DMX*, 2010 WL 4878878, at *31.[11]

## V.    BMI'S LICENSES WITH MUZAK AND OTHER CMS PROVIDERS

### A.    Muzak

The centerpiece of BMI's case was a 2004 license deal with DMX

competitor Muzak, supposedly bolstered by BMI's ensuing agreements with other

members of the CMS industry patterned after that deal.  BMI Br. at 14, 33-37.  On

December 31, 2004, BMI and Muzak agreed on final license fees for the period

January 1, 1994 through June 30, 2009.  Final fees for the January 1, 1994 through

June 30, 2004 period were fixed at the rates Muzak had been paying on an interim

basis – approximately $12-$14 per location – with no retroactive monies owed.

SPA8; A263.  BMI and Muzak simultaneously entered into a license for the July 1,

-----

[11] The trial record also exposed BMI's efforts to dissuade individual direct
licensors.  A395-97.  This effort fizzled when its fruits – enlisting two music
publishers to testify at trial that, notwithstanding the plain language of the
agreements, they did not understand that they had agreed to grant direct licenses
for performance rights – resulted in both witnesses conceding that they had not
read the agreements prior to signing them.  A332; A335; A337-38; A339.

26

2004 through June 30, 2009 period with flat annual fees of $6 million dollars per
year and a provision allowing Muzak to grow by up to 8% per year without
additional payment. A263.

BMI derives the $36.36 per-location rate it ascribes to its license with
Muzak by ignoring the ten-year settlement period, and dividing the $6 million
annual total by the estimated number of Muzak locations as of December 31, 2003
(165,000). SPA7. But, as the district court found, the 2004-2009 license was just
one part of a larger deal and was conditioned on BMI's willingness to accept much
lower final fees for most of the open period. SPA7-9. BMI's internal documents
contemporaneous with the final stage of the negotiations indicate that BMI
attributed between 14% and 16.7% of the fees payable for the 2004-2009 period to
the earlier 1994-2004 period. A314; A557-60; A854-58; *see also* A502
(acknowledgment by BMI licensing executive that "part of the give and take was
that Muzak agreed to pay higher fees than it had previously offered and BMI
agreed it would not charge a separate fee for the retroactive period of the interim
license").

In addition, the 2004-2009 Muzak agreement contemplated an effective per-
location rate for the first year of the license of $36.36 per location only if the
number of locations as of December 31, 2003 remained static. The agreement

allowed for 8% "organic" growth per year in the number of subscriber locations
before Muzak would incur any additional fee obligations.  A265; A653-59.  The
district court found, and BMI witnesses acknowledged, that this provision meant
that BMI had agreed to accept per-location payments that could decrease by as
much as 8% per year, down to $24.75 per location by the final year of the
agreement.  SPA7-8 & n.4; A265-66.  Both BMI's Senior Vice President for
Licensing and its expert economist testified that the low-end rates contemplated by
8% growth were, from BMI's perspective, reasonable.  A266; A459.

### B.  PlayNetwork, Music Choice, and Trusonic

Following its agreement with Muzak, BMI entered into licenses with other
members of the CMS industry, including PlayNetwork, Music Choice, and
Trusonic.  The agreements between BMI and these services had the same fee
structure as the Muzak agreement for the period beginning July 1, 2004.  SPA10.
Moreover, like Muzak, each of these services, as part of its agreement on new
terms for 2004-2009, finalized a substantial period of interim fees at the much
lower interim rate they had been paying.  SPA10; A982-84.  The economics of
each of these agreements were even more favorable to the licensee than the rates
paid by Muzak and further undermine the credibility of BMI's proposed $36.36
benchmark.

28

PlayNetwork, for example, did not sign its BMI agreement until nearly a
year after its effective date.  A630-38.  Because PlayNetwork already had
increased its subscriber locations, BMI knew before signing that it would receive
an effective per-location rate of only $33.67 from the start of the contract.  A267;
A514.  Because of PlayNetwork's continued subscriber growth, by 2009 its
effective per-location rate was only $24.75.  A267.

BMI and Music Choice did not execute their agreement until nearly two
years after its effective date.  SA1-35; A272.  By then, Music Choice had lost its
most significant account – DirecTV and its then-13,000 commercial locations –
resulting in a net loss of locations (even though its service otherwise had been
growing).  A253; SA1-35.  Had Music Choice accepted the form license offered by
BMI, it would have paid more than $36.36 per location for 2004-2006.  A508-9.
BMI allowed Music Choice to exclude the DirecTV locations from its agreement
and license those locations separately for the stub period for which they had used
the Music Choice service.  A253.  Music Choice was therefore able to benefit from
the substantial growth in excess of 8% it was experiencing in the rest of its
commercial music service business despite an overall net loss of locations.  A272-
73; A508.  Music Choice, like PlayNetwork, continued to grow throughout the rest

of the license term, lowering its effective per-location rate each year until it
reached $26.47.  A273; A1053.

BMI signed its agreement with Trusonic on June 28, 2007, nearly three
years after its effective date, and after Trusonic already had experienced location
growth in excess of 8% per year.  A276; A639.  The effective rate at signing was
$28.86 per location, and declined to $24.75 by 2009.  A276; A1041-53.
Trusonic's deal with BMI also contained an additional feature conferring
substantial value to Trusonic at no additional cost.  Upon signing the agreement,
BMI and Trusonic immediately executed an amendment that provided a "carve-
out" for subscriber locations where Trusonic played only directly-licensed works.
A513-14; A1081.

## C.  <u>Other Services</u>

The economic randomness of the proposed Muzak benchmark was further
demonstrated by BMI's dealings with the remainder of the CMS industry.  Smaller
CMS providers that had lost locations were forced to choose between deals with
substantially higher effective rates than Muzak – some reaching nearly $600 a
location – or bearing the cost of rate court litigation.  *See, e.g.,* A1181-85.  For
these smaller licensees, BMI refused to alter the fee structure of the Muzak deal
even though, in many instances both BMI and the licensee knew that the number of
locations served by the licensee had declined between the effective date and the

execution date of the license.  *Id.*  As the district court recognized, the substantial

exposure that CMS providers faced for retroactive periods prior to 2004 gave BMI

leverage to get CMS providers to sign the new prospective agreement.  SPA10;

A316.

At trial, BMI admitted that its supposed $36.36 benchmark agreement

actually resulted in a "bell curve" of fee results for the rest of the industry, where at

the low end CMS providers paid $24.75, and at the high end services had to pay

"around $500 or $600 per location."  A299-300; *see also* A1041-55.  BMI's Senior

Vice President of Licensing candidly acknowledged that he could not identify an

economic rationale for this result.  A278.

## STANDARD OF REVIEW

BMI cites appropriate Second Circuit precedent in identifying the

"reasonableness" standard of review for this case.  This Court has made it clear,

however, that "factual findings as to each factor under consideration or those

underlying a proposed benchmark agreement, as well as findings with respect to

fair market value, are reviewed for clear error." *United States v. ASCAP (In re*

*Application of RealNetworks, Inc. & Yahoo! Inc.)*, 627 F.3d 64, 76 (2d Cir. 2010),

("*RealNetworks*") (internal citations omitted).  Similarly, in *Music Choice IV*, this

Court stated that it would "review the the District Court's evaluation of the facts

31

surrounding the formation of the benchmark agreements, including the credibility
of witnesses and other evidence at trial, for clear error." 426 F.3d at 96.

## SUMMARY OF ARGUMENT

1.    BMI fundamentally misstates the rate-setting standard governing this
proceeding by arguing that the court need only determine the rate that a willing
buyer and willing seller would agree to in an arm's-length transaction.  The proper
approach is to account for the market power BMI has obtained by aggregating
millions of copyrights from hundreds of thousands of would-be competitors and to
determine a rate that would be paid in a *competitive* market.  BMI premised its
entire case on the purported suitability of prior CMS industry blanket license
agreements as benchmarks for DMX's license.  Its contention that the court below
should have used those agreements without examination of BMI's market power
and the effect competition would have on license fees is directly at odds with this
Court's long-established precedent.

2.    BMI's proposed Muzak benchmark is not the product of a
competitive-market transaction.  Nor is the Muzak agreement, as BMI alleges, an
agreement to pay $36.36 per location.  Rather, it was a flat-fee deal allowing for up
to 8% "organic" growth in covered locations without additional fee consequence.
When applied to other services, this idiosyncratic structure resulted in an

astounding range of results lacking any economic rationale.  In addition, as the district court recognized, the fees Muzak agreed to pay for the 2004-2009 period were substantially inflated (thus inflating BMI's putative benchmark as well) in exchange for BMI's agreement to forgive its claim for several million dollars of retroactive liability and accept less than $14 per location for periods predating 2004.  Having rejected the reliability of the Muzak benchmark, the district court was under no duty to try to adjust for its obvious flaws or otherwise use it for fee-setting.

3. The district court properly concluded that DMX's 550 direct licenses provided the best evidence of competitive-market rates for the performance rights granted by the BMI blanket license.  BMI's argument that the direct licenses are not comparable to the BMI blanket license misses the mark; the district court arrived at the Blanket Fee by summing two conceptually distinct components, one reflecting the value of the underlying performance rights, the other representing compensation to BMI for its role in aggregating those rights.  BMI's attack on the direct-license benchmark (which the court used for only the first fee component) ignores the fact that the court awarded a "Floor Fee" comprising nearly half the total license fee and nearly the full amount BMI proposed.

4.     The district court correctly concluded that BMI failed to present either

a reasonable economic justification or any credible empirical evidence justifying

its "option value premium" – a conclusion supported by DOJ, which filed a brief

with the district court recognizing that such a premium would amount to a penalty

that would discourage the very direct licensing the AFBL is meant to encourage.

5.     BMI's argument that DMX's advance to Sony somehow invalidates

the direct-license benchmark is undermined by the court's determination, with

ample evidentiary support, that the Sony advance was a "cost of entry" into the

direct-licensing market (rather than a payment for royalties per se) necessitated by

"entrenched" industry practice.  BMI's remaining arguments attempting to

undermine the probative value of the direct-license evidence were proven meritless

at trial.

6.     The district court correctly determined that DMX's off-premise

performance data provides an appropriate proxy for all performances on the DMX

service for calculating fee credits.  That data is the preferred metric of DMX's

direct licensors – many of whom are themselves BMI affiliates.  BMI (which

regularly utilizes far less accurate proxies for its own distributions) failed to

demonstrate that including DMX data from on-premise customers would lead to a

34

more accurate measurement of directly licensed performances or that the off-premise data biases that measurement.

## ARGUMENT

## I.  THE GOVERNING LEGAL FRAMEWORK FOR BMI RATE COURT DETERMINATIONS

BMI's appeal is premised on a flawed conception of the rate court's task.  A court exercising its Article XIV duty to establish a "reasonable" fee, A15-17, must do more than simply assess the price that a "willing buyer" would agree to pay BMI, the "willing seller," in an arm's-length transaction.  Nor is the task to rubber stamp whatever price BMI – as a seller with market power – has secured from the applicant's competitors.  Rather, as this Court repeatedly has stated, the task is "to define a rate or range of rates that approximates the rates that would be set *in a competitive market*."  *Showtime,* 912 F.2d at 576 (emphasis added); *accord RealNetworks,* 637 F.3d at 76 ("[f]undamental to the concept of 'reasonableness' is a determination of what an applicant would pay in a competitive market").

The prices BMI has attained in its dealings with users are not those that would result from a competitive market.  BMI's blanket licensing practices are "inherently anti-competitive," reflecting BMI's exercise, as a monopolist, of "disproportionate power over the market for music rights."  *Music Choice IV,* 426 F.3d 91 at 93, 96; *accord Showtime*, 912 F.2d at 567, 570 (affirming conclusion

35

that "ASCAP's bargaining power in negotiating rates for its blanket license was

unduly enhanced by the absence of a truly competitive market for copyrighted

music").  BMI's contention that the rates obtained from DMX's competitors are

reasonable because they were secured in willing, arm's-length transactions

trivializes the rate-making inquiry.  As this Court has recognized in the analogous

ASCAP setting:

> The opportunity of users of music rights to resort to the rate
> court whenever they apprehend that ASCAP's market power
> may subject them to unreasonably high fees would have little
> meaning if that court were obliged to set a 'reasonable' fee
> solely or even primarily on the basis of the fees ASCAP had
> successfully obtained from other users.

*Showtime*, 912 F.2d at 570; *see also United States v. ASCAP (In re Application of*

*Buffalo Broad. Co.)*, 1993 WL 60687, *28 (S.D.N.Y. Mar. 1, 1993) ("*Buffalo*

*Broad.*") (observation that rate courts are designed to protect against excessive fee

demands does not "translate into the conclusion that the availability of the rate

court ensures that any negotiated settlement is a reflection of competitive market

rates").

When "choosing a benchmark and determining how it should be adjusted,"

the court must assess "the degree to which the assertedly analogous market under

examination reflects an adequate degree of competition to justify reliance on

agreements that it has spawned."  *Music Choice IV*, 426 F.3d at 95.  Where the

36

evidence shows, as it did here, that a proposed benchmark does not reflect rates that would be set in a competitive market, the rate court is free to use other, better evidence. *See generally Showtime*, 912 F.2d at 567 (rejecting ASCAP's proposed cable industry benchmarks in setting fee for a competitor); *Buffalo Broad.*, 1993 WL 60687, at *19, *35 (rejecting prior ASCAP agreement between same parties as basis for setting rates, on grounds, *inter alia*, that prior agreement was "not necessarily… indicative of competitive market terms at that time for a blanket license").

In the instant setting, DMX's expert, Professor Jaffe, explained why reliance upon BMI's CMS agreements was unlikely to yield a benchmark that fulfills the rate court's objective. For music users without the resources or incentive to pursue rate litigation when confronted with unreasonable fee demands, their agreements tell little about reasonable fees. A588. For users with greater resources, their agreements reflect expectations as to the terms the rate court likely would conclude were reasonable. A609. Professor Jaffe explained that the historical absence of competition in performance rights licensing and information about what rates competitive markets would bear has given rate courts little option but to look to prior agreements between PROs and music users as the primary source of benchmarks for fee-setting. A593-94; A609. This "circularity" has fostered users'

agreeing to license fees at levels that reflect, not those of a competitive market but,

instead, the levels that the PROs, with their market power, have been able to attain

from others.  *Id.*

Unlike virtually all prior ASCAP and BMI rate proceedings, the district

court here was not remitted to using PRO agreements as "very imperfect

surrogates" for actual competitive market data.  *Showtime*, 912 F.2d at 577 (district

court opinion); *see also Buffalo Broad.*, 1993 WL 60687, at *18 (resorting to PRO

agreements with "comparably situated parties" only "in the absence of a

competitive market in music rights").  For the first time, the rate court was

presented with actual licensing transactions between individual copyright owners

and the applicant.  There was no need to hypothesize or extrapolate as to the rates a

competitive market would yield; real-world data made the district court's task far

more straightforward.

## II.   **THE UNCONTESTED STRUCTURE OF BMI'S ADJUSTABLE-FEE BLANKET LICENSE**

The parties agreed that, unlike BMI's prior flat-fee CMS agreements, the fee

here should be expressed as an annual per-location rate.  Professor Jaffe testified

that the value of the BMI blanket license can be understood to reflect two separate

components, one being the value of the actual music performance rights conveyed

by BMI affiliates, the other being the value of the services provided by BMI in

aggregating its repertory, providing immediate access to new works, and

minimizing users' risk of inadvertent copyright infringement.  A578.   Professor

Jaffe denominated the first component the "Unbundled Music Fee" and the second,

the "Floor Fee."  As summarized by the district court:

> The Floor Fee represents the value to DMX of the portion of
> the AFBL that is independent of the value of the music
> performing rights. … This value is provided by BMI
> assembling its repertoire and making it available to DMX, and
> includes the convenience of gaining access to the entire BMI
> repertoire in one license, the immediate right to access new
> BMI works, and protection against copyright infringement.

SPA17.  The Floor Fee is the minimum fee that DMX would pay BMI even if it

directly licensed all of its performances of BMI music.  The two components in

combination produce the "Blanket Fee," which DMX would pay BMI if it did not

directly license any of its performances of BMI music.  BMI's conception of the

AFBL structure was virtually identical.  A1097 (BMI's October 2007 rate proposal

to DMX).

The parties agreed that the Blanket Fee would be adjusted by the "Direct

License Ratio," the ratio of directly licensed performances of BMI music to all

DMX performances of BMI music.  SPA2.  The court expressed this agreement

formulaically as "Annual Per-Location Fee = Blanket Fee – [(Blanket Fee – Floor

Fee) x Direct License Ratio]."  SPA2 n.2.

The sole areas of disagreement at trial that remain relevant for purposes of appeal were (1) the level at which the Blanket Fee should be set, and (2) how to measure DMX performances for purposes of calculating the Direct License Ratio. (The Floor Fee of $8.91 was set only modestly below BMI's proposed $9.52 per location, and neither party appealed that determination.) BMI proposed a Blanket Fee of $41.81 per-location, whereas DMX proposed that a rate between $11.32 and $19.57 would be reasonable. Concerning measurement of performances, BMI disputed the sufficiency of utilizing DMX's off-premise data as a proxy for all performances and appeals from the district court's contrary determination.

## III.  THE COURT PROPERLY REJECTED BMI'S PROPOSED BENCHMARK AS UNRELIABLE AND ITS RATE PROPOSAL AS UNREASONABLE

### A.  The Muzak Agreement Does Not Reflect Competitive-Market Rates

BMI contends that because Muzak acceded to BMI's fee demands for the 2004-2009 period rather than continue to litigate a fee dispute dating back to 1994, and because other services subsequently accepted licenses derived from the Muzak agreement, it was legal error for the district court to reject that agreement as the benchmark for setting reasonable fees for DMX. BMI Br. 33-34. BMI is incorrect. As noted above, BMI does not discharge its burden of proving the reasonableness of its fee proposal simply by identifying arm's-length agreements

40

between itself and asserted "willing buyers" that compete with DMX. *See supra* pp. 35-38. The evidentiary record here provided ample basis for the district court to conclude, no differently than in *Showtime*, 912 F.2d at 567, *Buffalo Broad.*, 1993 WL 60687, at \*33-\*34, *RealNetworks*, 627 F.3d at 76, *Music Choice IV*, 426 F.3d at 96, and *Mobi*, 2010 WL 1875706, at \*18, that the market in which BMI operates is not competitive and that the resulting fees it has secured from other CMS providers are above the competitive norm.

BMI's contention that the district court erred by setting fees for DMX at a rate lower than those agreed to by Muzak and other CMS competitors, BMI Br. 33-34, invites the very abdication of rate-making responsibility rejected by this Court in *Showtime*. *See* 912 F.2d at 570. The Court's caution there against transforming rate courts into mere "placebos," *id.*, applies with equal force here, particularly given the "circularity" inherent in relying on BMI's past agreements with CMS industry competitors of DMX. *See supra* pp. 37-38.

## B. Use of the Muzak Agreement to Set Fees for Other Services Generated Random Results

Contrary to BMI's contentions, the district court did not "disregard" or "wholly ignore" the BMI-Muzak license for 2004-2009 that BMI proposed as the relevant benchmark. *See, e.g.*, BMI Br. at 41. Rather, the court analyzed that

proposed benchmark in detail and, based on the overwhelming evidence of its

unsuitability, rejected it.  SPA7-10.

### 1. The 2004-2009 Muzak agreement is not a $36.36 per-location arrangement

BMI asked the district court to determine a per-location rate for the DMX

AFBL based on its assertion that the 2004-2009 Muzak license established a rate of

$36.36 per location.  SPA1.  BMI derived the $36.36 annual per-location rate by

dividing the $6 million annual flat fee by the 165,000 locations that Muzak had in

December 2003.  SPA7.  The district court correctly observed that the Muzak

license was, in actuality, a flat-fee agreement for $30 million over its five-year

term, with an "organic growth" feature that permitted Muzak to increase its

locations by up to 8% per year without incurring additional fee obligations,

meaning that the effective rate could decline each year, to as low as $24.75 by the

final year of the license.  SPA7-8 & n.7; A266; *see also* BMI Br. 15.

Professor Jaffe explained that given this "idiosyncratic" combination of a

flat fee and an "arbitrary" location growth factor, any attempt to derive a

reasonable per-location fee from the agreement was "difficult" and "inherently

quite confusing."  A589.  Those observations were borne out by BMI's application

of the fee structure of the Muzak license to other CMS industry licensees, which

resulted in arbitrary fee outcomes ranging from $24.75 to $594.64.  A1041-55.

42

Instead of producing a $36.36 rate, as BMI suggests, the effective per-location rate
paid by DMX's competitors depended on the happenstance of whether they gained
or lost customer locations during the term.  Some services grew considerably over
the course of the license.[12]  At the other end of the spectrum lay services that lost
customers.  For them, application of the Muzak template meant effective rates that
reached nearly $600 per location.  BMI candidly admitted that there was no
"economic rationale" for such arbitrary results.  A278.  DMX's economic expert,
Professor Jaffe, likewise explained that such a pricing scheme is totally irrational.
A587-88.

### 2. The Muzak benchmark was inflated by its failure to account for Muzak's contemporaneous settlement of the 1994-2004 period

The district court also correctly rejected BMI's proposed benchmark because
it was only one part of a much broader transaction.  SPA8-9.  It is undisputed that
at the same time BMI and Muzak negotiated final license fees for the 2004-2009

---

[12] BMI's witnesses acknowledged at trial that the rate at the low end of this
spectrum of possibilities – $24.75 – was reasonable.  A266; A267; A275; A299.
These admissions, and BMI's awareness that PlayNetwork, Music Choice, and
Trusonic would be paying well less than $36.36 when it signed agreements with
those services, *see supra* pp. 28-30, renders academic the question of whether BMI
did or did not expect Muzak itself to grow during its license period.  That said, the
record makes clear that when negotiating with Muzak, BMI believed that Muzak
was in a phase of considerable growth.  A506; A745-46; A316.

period with a starting effective rate of $36.36, BMI also finalized Muzak's fees for

1994 to 2004 at a rate between $12 and $14, abandoning the multimillion dollar

payment it sought to "recoup" for that period.  SPA8 (citing A854-58).  The

district court saw through to the economic reality of the arrangement:

> It is objectively obvious that BMI and Muzak took account,
> even if only tacitly, of the "retroactive" claim when agreeing on
> the future fee.  A contingent liability of about five million
> dollars would be removed from Muzak's back, as part of its
> agreement to pay $30 million over five years.  The jump from
> $12-14 per location to $36.36 is dramatic.  What was fairly
> priced at $12-14 one day could hardly be fairly priced at $36.36
> the next. … In fact the $36.36 per-location figure in the
> BMI/Muzak 2004-2009 license is no more than an arithmetical
> allocation of the $30 million flat fee, and as an economic matter
> must be understood as including a significant component for the
> $4.5 to $5.5 million "retroactive" claim.

SPA9.

BMI contends that the court's finding "contradicted the evidence," citing a

contractual provision – inserted at BMI's request – referring to the fees for 2004-

2009 as "reasonable," along with self-serving testimony by a BMI witness who had

virtually no role in the negotiations.  *See* BMI Br. 34-35; A261.  Contrary to these

assertions, the court's factual determination was well supported by BMI's internal

documents, its communications with Muzak, and the testimony of other fact and

expert witnesses.  A854-58; A557-58; A502-03; A742-43; A747-49; A1093-94.

*See supra* p. 27.  BMI cannot escape its own admission that "part of the give and

take was that Muzak agreed to pay higher fees than it had previously offered and

BMI agreed it would not charge a separate fee for the retroactive period of the

interim license." A502 (admission of BMI Senior Director of General Licensing).

BMI fares no better with its attempt to resuscitate the Muzak benchmark by

pointing to the minority of services with shorter or no periods of retroactive

liability that nonetheless signed a comparably expensive forward-looking license.[13]

The district court properly concluded from the trial record that these additional

licenses were no more useful as benchmarks than the Muzak license because BMI

used threats of retroactive liability and rate court litigation to impose the Muzak

deal on the rest of the industry no matter how exorbitant the results. SPA10 (citing

A1193; A316).[14]

---

[13] Services accounting for 97% of all locations served by the industry faced
retroactive liability. A558 (DMX economic expert Dr. Candell). BMI's suggestion
that nearly half of CMS providers to sign the agreement had retroactive periods
shorter than the full 1994-2004 period (BMI Br. 36 n.14) fails to weight for the
relatively smaller number of locations served by many of these licensees.

[14] BMI's suggestion that the settlement of retroactive liability should not impact
the benchmark rate for 2004-2009 because DMX had its own liability for pre-2004
periods excused when a prior version of the service filed bankruptcy mixes
corporate apples and oranges. The current DMX is a new, separate company that
bought the assets of the old DMX Music out of bankruptcy in June 2005 free of all
claims. BMI's recourse for claims preceding that date was in the bankruptcy court,
directed to the then debtor in possession.

## C.  The District Court Was Not Required to Adjust a Patently Unreliable Benchmark

The palpable weakness of its case for a $36.36 rate leads BMI to criticize the district court for having failed to do what BMI itself did not at trial: offer adjustments to the Muzak benchmark in an effort to salvage it.  *See* BMI Br. 35-37.  This appellate position not only misapprehends the discretion afforded a trial court in evaluating the weight, if any, to be given a proffered benchmark; it also is remarkable given BMI's trial position that the court should select one or the other of the dramatically different fee levels proposed by the parties and not craft something in between.  BMI's trial counsel thus observed that there was an "apples to apples comparison" between "the approximately $11" fee proposed by DMX and "the $36.36 rate that BMI agreed to with the commercial music services industry," such that "this isn't a situation where your Honor can triangulate between the two rates.  The two rates don't point in the same direction.  They point in vastly different directions. . . . *So it's really an either-or situation we would submit, your Honor.*"  A621 (emphasis added).  While BMI may now regret its trial strategy, that scarcely forms a basis for criticizing the district court for acting on it.

Even had BMI not invited the very outcome of which it now complains, there was no reason for the trial court to attempt to salvage a benchmark as

46

patently inadequate as the 2004 Muzak license.  The court identified several of its more salient deficiencies, among others exposed at trial, and BMI cites no precedent that would require the court to do any more than it did.  The instruction that rates be set on the basis of "all the evidence" has never been interpreted to require rate courts to adjust benchmarks they adopt on the basis of evidence relating to proposed benchmarks they reject.  *See, e.g.*, *Showtime*, 912 F.3d at 571 (affirming fee award set without regard to rates suggested by ASCAP's proposed benchmark); *ASCAP/DMX*, 2010 WL 4878878, at *32-*33 (setting DMX fees without regard to rates suggested by ASCAP's other CMS agreements); *MobiTV,* 2010 WL 1875706, at *33, *42-*43 (setting fees that did not contain adjustment for benchmark evidence provided by ASCAP).[15]  As we next discuss, the district court's rejection of the Muzak benchmark was all the more appropriate in light of

---

[15] Neither DMX nor its expert Dr. Candell proposed as reasonable the rate of $30.30 (a number that does not appear on the trial record) that BMI now latches onto for the first time (BMI Br. 36) – or any other number resulting from adjustments to the Muzak benchmark.  Citing out-of-context a snippet from the pre-trial order concerning anticipated testimony (rather than any actual testimony), BMI derives that rate by artificially isolating only one of *three* adjustments Dr. Candell testified would be necessary were the court to attempt to use BMI's proposed benchmark instead of the direct-license benchmark she endorsed. *Compare* BMI Br. 36 *with* A557.  Dr. Candell testified that the necessary adjustments would translate to a rate of approximately $22 per location.  A560.

the far more compelling benchmark offered by DMX.

## IV.   THE DISTRICT COURT'S RATE DETERMINATION WAS AMPLY SUPPORTED BY THE EVIDENCE

The district court's determination to set a reasonable Blanket Fee based on the sum of two fee components – one valuing the actual rights conveyed to DMX, the other rewarding BMI for the costs of aggregating the blanket license repertory, *see* SPA24 – was analytically sound and amply supported by the record.  Professor Jaffe testified at length how approaching the rate-setting task in this fashion maximally comports with the goal of the BMI Decree to generate royalty rates that would be set in a competitive market while, at the same time, reasonably compensating BMI for the benefits of affording users access to its blanket license.  A578-83.  He also testified as to the unusual opportunity afforded the rate court in having available a rich body of marketplace data reflecting the outcome of 550 transactions with individual BMI publisher affiliates involving music performance rights identical to those licensed by BMI.  A578.  For the first time, the rate court did not have to guess as to what hypothetical marketplace transactions might have yielded, or default to highly imperfect benchmarks reached in the absence of such competitive data.

The probative value of DMX's direct-license experience in relation to the core objectives of the BMI Decree cannot be seriously doubted.  As DOJ explained

48

in its brief to the district court:

> The carve-out opportunity [ ] enables a music user to pit rights holders
> against one another in direct licensing competition. . . . As a group,
> the BMI rights holders would prefer to avoid bidding against each
> other to offer the best direct licensing terms.  Yet, this type of
> competition would put pressure on each rights holder to lower its
> prices for its directly licensed music, in turn putting downward
> pressure on and producing lower-priced competitive benchmarks for
> BMI's blanket licenses.

DOJ Mem. at 3.

### A.  The District Court Did Not Err in Using the Direct-License Benchmark to Value the Performance Rights Conveyed by the BMI License

The district court's finding that "DMX's approximately 550 licenses provide

a large enough sample to be representative" of the performance rights granted by

the BMI blanket license was also supported by trial testimony.  SPA14 (citing

A578-79); *see also ASCAP/DMX*, 2010 WL 4878878, at *30-*32.  The court found

that "DMX's direct licenses cover a broad scope of musical works, enabling DMX

to use directly licensed music in approximately 30% of its performances without a

noticeable change in the quality of its services."  SPA14-15 (citing A479; A534;

A536); *see also* SPA12 (DMX direct licenses "cover approximately 5500 music

publishing catalogs and contain many prominent works in a wide variety of music

genres").  DMX and BMI witnesses alike supported these conclusions.  *See supra*

pp. 17-19 (summarizing directly licensed repertory); A384 (BMI's Ms. Smith

49

discussing Grammy-winning writers and compositions covered by DMX direct licenses); A622-23 (BMI counsel acknowledging that BMI was "not arguing that the music that DMX has directly licensed is any worse [or] less valuable music than the music in the BMI repertoire").

Nor was there any dispute that using the $25 per location rate from the direct licenses as a benchmark to value the performance rights component of the BMI blanket license would yield a rate of $10 per-location, given that, at the time of trial, 40% of DMX performances were of BMI affiliated music.  SPA12; A621.

### B.    BMI's Critiques of the Fee Determination Are Meritless

#### 1.    BMI's "not the same product" argument

BMI attempts to side-step the compelling evidence as to the competitive-market valuation embodied in DMX's direct licenses by setting up a false analogy. BMI contends that the direct licenses *in and of themselves* are not "comparable" benchmarks because they fail to account for the unique benefits of the BMI blanket license: transaction-cost savings, immediate access, and indemnification for performances of BMI music.  BMI Br. at 38-39.  But as BMI is well aware, the court did not use the direct licenses as a benchmark for the entire value of the blanket license, only of the performance rights conveyed.  SPA24; A578.  To the extent the blanket license differs from the direct licenses, it is not because it grants different *performance rights*, but because it *aggregates* them under a single

50

license.  The decision below explicitly accounted for that aggregation value separately, via the Floor Fee.  SPA17-18.

This is precisely how BMI conceived of the Floor Fee.  In an October 2007 rate proposal to DMX, BMI referred to the Floor Fee (which it then called the "base fee") as that portion of the AFBL that "compensates BMI for its overhead costs and increased administrative costs to process and review carve-out license reports and direct licenses, as well as the value of indemnity and access to catalog not directly licensed."  A1097.  The district court's pricing of the Floor Fee is consistent with BMI's view of the analytic distinction between the two Blanket Fee components and was set independently of the DMX direct licenses.  Relying on BMI's proffered evidence, the court looked to the amounts BMI withholds from license fees paid by commercial music services prior to making royalty distributions, and then added certain amounts to reflect the increased administrative costs of providing an AFBL and the cost of capital, resulting in a total Floor Fee of $8.91.  SPA23-24.  That is how BMI itself suggested the court should proceed, and the Floor Fee awarded is 94% of the amount BMI requested.

Ignoring its trial position, BMI now complains that the district court priced the Floor Fee merely to cover BMI's *costs* for aggregating its repertory, instead of whatever additional *value* it claims is created for licensees by virtue of aggregating

51

that repertory.  BMI Br. at 40-41, 53.  As Professor Jaffe explained, however, only a monopolist would be able to keep for itself the surplus "value" of the blanket license; in a competitive market, that surplus would flow to consumers as the price of the license was competed down to the cost of providing it.  A585-86.  Indeed, only a monopolist would complain, as BMI does, that it is undercompensated for the value it provides as an aggregator after a fee award that attributes 47% of the Blanket Fee ($8.91/$18.91) to BMI in its role as a licensing middleman.  Valuing the blanket license by separate analysis of its music rights and aggregation components exposes, not flaws of the type asserted by BMI, but how much BMI has been able to exploit its market power to price the blanket license above the competitive-market level of the underlying performance rights and its costs in aggregating them.

### 2. The supposedly increased value of an adjustable-fee blanket license

At trial, BMI proposed "increasing the Blanket Fee by 15% on account of (1) the 'option value' the AFBL provides the licensee by allowing it to reduce the fees it pays to BMI by licensing works directly . . ., and (2) the incremental costs BMI will incur in administering the AFBL."  SPA22.  The district court did just that by increasing the Blanket Fee to reflect the increased administrative costs to BMI of the AFBL, plus a "reasonable return" of 10% of those costs.  SPA22-23.

52

That increase accounts for $2.73 of the $18.91 Blanket Fee, and no part of it is

subject to the fee credit for direct licensing.  SPA24.  Having received a fee

increase of 14.4% on account of having to offer an AFBL, BMI asserts as error the

district court's failure to have further elevated the Blanket Fee.  BMI Br. 50-54.

BMI's analysis – reflective of its continuing effort to thwart meaningful access to a

license it disdains – is deeply flawed.

     The district court's rejection of BMI's proposed "option value" notion was

well-founded on the testimony of Professor Jaffe, summarized in the court's

opinion:

> [I]n a competitive market, the competition among sellers causes prices
> of improved products to be determined by the sellers' costs, not by
> increased value to the buyer.  A seller can increase the price of an
> improved product to the extent of any increased costs associated with
> the improvement, plus a reasonable return on investment.  He cannot
> increase beyond that (to reflect the value of the improvement) because
> his competition can undercut him by maintaining their own price at
> the cost-plus-reasonable profit level.  Thus, the improvement produces
> more sales, but not a higher price.

SPA22 (citing A585; A607).  Citing a host of real-world examples from computers

to automobiles, Dr. Jaffe explained that markets require only "workable" and not

"perfect" competition to behave in this way.  A585.  BMI's off-point retort that

antitrust laws do not require "pristine" (i.e., perfect) competition, BMI Br. at 52-

53, fails to respond to Professor Jaffe's testimony about what happens in markets

with "workable" competition.  A585.

As noted, the anticompetitive implications of BMI's effort to extract an "option value" premium occasioned a brief from DOJ.  The government pointed out that BMI's position "would subvert *AEI* and the BMI Consent Decree by likely making it uneconomic for many BMI licensees to directly license performance rights."  DOJ Mem. at 2.  Whereas BMI and its economist, even in the aftermath of this Court's *AEI* decision, unabashedly proposed to structure the AFBL so as to discourage direct licensing,[16] DOJ explained that the Decree-related purpose of the AFBL is to *encourage* competitive direct-licensing transactions and thereby "put[] downward pressure on and produc[e] lower-priced competitive benchmarks for BMI's blanket licenses."  DOJ Mem. at 3.  As DOJ recognized, "[T]he collective has the incentive to restrict that competition by pricing the carve-out license as high above the traditional flat-fee license as possible.  The greater the 'option value premium,' the fewer licensees will find the carve-out license mandated by *AEI* to be economically viable."  *Id.*[17]

---

[16] At trial, BMI's economist euphemistically cautioned against "overuse of the AFBL."  A432.

[17] Even if a surcharge for the AFBL were appropriate, BMI failed at trial to present credible evidence of its empirical magnitude or the likelihood that BMI could recoup more than its costs in providing the license in a competitive market.  The 15% premium proposed by BMI was exposed as arbitrary, supported only by

### 3. The representativeness of the direct-license royalty pool

BMI does not challenge the breadth or quality of the pool of directly-licensed compositions, but nonetheless criticizes the district court's finding that "the performance rights DMX secured through its direct licenses are sufficiently representative of the performance rights BMI provides through its blanket licenses."  BMI Br. 42-45; SPA14.  BMI asserts that (1) "[t]he direct licenses do not reflect a willing-buyer/willing-seller price because they do not include those publishers who valued their music at a higher rate and thus chose not to sign"; (2) "[p]ublishers … thought they were agreeing to a bigger royalty pool than the direct license actually offered"; and (3) "because DMX induced some publishers to accept a lower rate by promising to play their music *more* often," the direct-license rate should not apply to publishers whose music will be performed less as a result.  *Id.* at 42-44.  The first two assertions find no support in the record, and the third was refuted by Professor Jaffe.  BMI provides no basis to disturb the district court's factual determination of the representativeness of the direct-license royalty rate.

---

testimony from BMI's expert that was founded on data from the 1980s and discredited at trial.  A446-47; A586-87.

55

The court found no credible evidence that any publisher turned down
DMX's request for a direct license because the royalty rate undervalued the
performance rights.  SPA15.  None counter-offered to license directly at a higher
per-location rate or indicated that it would have granted a direct license if only
DMX had raised the rate.  The court's recognition that "[s]ome publishers may
have believed it was better to remain with BMI based on their likely future
distributions from BMI," SPA15, does not support BMI's speculation that
publishers therefore thought the DMX offer "undervalued" their music.  It merely
reflects that some publishers preferred not to break ranks with a lucrative system –
particularly in an environment in which the PROs were undertaking aggressive
efforts to discourage the very direct-licensing activity in which DMX was
engaging.  *See supra* pp. 23-26; A395 (admitting BMI told publishers they would
do better by licensing through BMI rather than on their own);  SPA15 n.6 (noting
BMI offered a guarantee to Universal to prevent direct licensing); A479-80
(testimony as to entrenched blanket-license system and PRO board membership of
major publishers).

There is likewise no evidence to support BMI's assertion of alleged
misrepresentations as to royalty expectations.  On its face, the "representation" of
100,000 locations to which BMI refers (BMI Br. at 43) was no more than a round-

number approximation to illustrate how the royalty allocation formula in the direct

licenses functioned. *See, e.g.*, A780. No publisher testified as to being misled by

use of this example.

Finally, that DMX had an incentive to increase the plays of direct licensors

at the expense of other publishers is not a sign that the direct licensors undervalued

their rights relative to the rest of the market. Even if a publisher believed the DMX

royalty was lower than its expected BMI distribution on a per-play basis, it may

have rationally accepted the offer in an effort to increase its share of plays or, at a

minimum, to avert a decrease in the number of its works performed by DMX.

A580-81. This is simply evidence of competition at work. *Id.*

The probative value of the hundreds of direct licenses is not undermined by

some publishers electing not to sign on. Beyond the forces of inertia and PRO

dissuasion that were at work, DMX's economist explained that a regular feature of

competitive markets is that certain sellers opt not to sell at the competitive price

established by the market, and that only a seller with market power can hold out

for a price above the competitive level. A579. To apply the direct-license rate to

those publishers who opted to continue licensing through the BMI collective is not

unfair, it merely subjects them to "reasonable" pricing reflecting the forces of

competition.

57

## 4.      The Sony advance

BMI contends that the district court erred in adopting the direct license

benchmark because DMX paid Sony a nonrefundable advance that, if not

recouped, purportedly implies an effective royalty rate under the license of greater

than $25.[18]  BMI Br. 46.  There is no basis to overturn the court's factual

determinations that "[w]hen DMX entered the license with Sony, it believed it

would fully recoup the advances" and, "[e]ven if that does not occur, the portions

not recouped are reasonably viewed as a cost of entry into the market, rather than

allocable to royalties."  SPA16.

Those findings – which BMI derides as "speculative," BMI Br. 48 – are

well-supported.  Mr. Knittel testified that DMX believed it would recoup the Sony

advance.  A481.  He also explained the obstacles to direct licensing and why DMX

thought it needed to pay an advance to Sony as a cost of entry into the market.

A479-80; *see also* A334 (corroborating testimony from BMI affiliate that

"[i]ndustry standard is not to be doing direct licensing"); A539 (testimony that

---

[18] BMI misleadingly contends that the Sony transaction implies a royalty rate of
$76.80 (BMI Br. at 46), a number taken from its proposed findings of fact rather
than admissible testimony.  The faulty assumptions of BMI's expert underlying
this figure – including his failure to adjust and weight it based on Sony's rising
share of DMX's direct-license performances – were exposed at trial.  A459; A554-
56.

publishers prefer to license collectively rather than directly in part because they fear that a rate set individually in a direct license might drive down rates set collectively by PRO).  While admitting of other possible interpretations of the Sony deal, Dr. Candell testified that one could reasonably conclude that the advance should be treated as a cost of entry, rather than as additional royalty compensation for performances of Sony compositions.  A554.  Given this testimony, as well as BMI's explicit interference in DMX's efforts with Sony, Universal, and others, *see supra* pp. 23-26; A287-91; A292-98; A379-81; A391-97, the court did not err in its treatment of the Sony advance.  Indeed, the ASCAP rate court reached the same conclusion on a similar trial record.  *ASCAP/DMX*, 2010 WL 4878878, at *32.

BMI's related contention that the Sony transaction infects the rest of the direct licenses because of their MFN clause, BMI Br. 46-48, is baseless, and rests on a mischaracterization of the scope of that provision.  The uncontested record evidence from, among others, Mr. Gertz (who wrote the provision) was that the clause does not apply to advances or guarantees (or even to the $25 royalty pool) but only to the pro rata allocation methodology of the license.  A524; *see also ASCAP/DMX*, 2010 WL 4878878, at *13.  BMI failed to produce evidence that any publisher understood otherwise.

## V.   THE DISTRICT COURT'S ADOPTION OF THE "OFF-PREMISE PROXY" WAS REASONABLE AND SUPPORTED BY THE EVIDENCE

The district court determined that DMX's off-premise performance data was

an appropriate proxy for all DMX performances for purposes of calculating the

Direct License Ratio.  SPA 25-28.  BMI contends that this was unreasonable,

because (1) the percentage of performances that are directly licensed could be

determined more accurately by adding information about the songs distributed to

DMX on-premise subscribers; and (2) the court made no finding that using both

sets of data would be impractical.  BMI Br. 55-58.  These assertions are incorrect.[19]

First, BMI fails to show that using information about the songs distributed to

on-premise customers would lead to a more accurate measurement of the

percentage of directly licensed performances.  As the district court recognized in

rejecting the disputed study that BMI cites on appeal, the lists of songs DMX has

provided to BMI regarding programs distributed to on-premise locations do not

reflect the frequency with which songs are performed in those programs.  SPA26-

27.  Because DMX has increased the frequency with which it performs directly

---

[19] BMI's related contention that two-thirds of DMX customer locations receive
programming via on-premise delivery is also incorrect.  As of February 2010, over
half of DMX's customer locations receive programming via off-premise delivery.
A465.

licensed music, the district court found that the on-premise data understates the percentage of directly licensed performances relative to the off-premise data, which does reflect frequency of performance.  SPA27.  Moreover, the district court did not "acknowledge that using off-premise performances alone would overstate DMX's direct license credit," as BMI inaccurately asserts.  BMI Br. 58.  The court instead acknowledged that *BMI's position* was that the off-premise proxy would overstate the credit – before making the factual determination that the data presented by BMI did not support that conclusion.  SPA 27; A481-82.

BMI fares no better with its distortions of the trial record concerning purported dissimilarities between the music performed at off-premise and on-premise locations.  The record evidence reflects that, contrary to BMI's assertions, the mode of delivery does not impact the amount of directly licensed music used.[20] As Ms. Hilburn testified, DMX music designers take the same approach when designing on- and off-premise programming.  A532-533.  With but one exception, each off-premise program has a nearly identical on-premise program; there is an

---

[20] While BMI refers to a brief period in 2009 during which DMX programmers attempted to increase the use of directly-licensed music between 2:00 a.m. and 5:00 a.m. (*see* BMI Br. at 57), the district court found that DMX "found this practice to be ineffective and ended it."  SPA 28.

estimated 90-95% overlap in the songs used on analogous programs.  A532.  To
the extent there are differences between on-premise and off-premise programming,
they suggest that the percentage of directly-licensed performances would be even
higher for on-premise locations.  SPA 28 (finding that more on-premise programs
contain 100% directly-licensed music than off-premise programs).

 BMI's contention that the district court made no finding that using on-
premise data would be impractical is semantic gamesmanship.  The court found
that "[i]ncluding the on-premises data would defeat the proxy's practical advantage
of not having to account for the differences in the two sets of data DMX reports to
BMI."  SPA 28; *see also* SPA 26 (noting practical advantage of DMX proposal).
In the end, BMI simply has no answer for the core rationale of the district court's
holding: widespread marketplace acceptance of the off-premise proxy as evidenced
by its use in DMX's direct licenses to calculate fees.  SPA25.  No publisher has
ever complained about this proxy, A524, and BMI has failed to demonstrate why
its needs are greater or more legitimate than those of its own affiliates.  SPA25
(citing A475; A721-23); SPA 28.

## CONCLUSION

For the foregoing reasons, DMX respectfully submits that the district court's

Opinion and Order should be affirmed in its entirety.

Dated: April 6, 2011                    Respectfully submitted,


                                        /s/ R. Bruce Rich
                                        R. Bruce Rich
                                        Benjamin E. Marks
                                        Todd D. Larson
                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, NY 10153
                                        (212) 310-8000

                                        -and-

                                        Christopher S. Harrison
                                        (admission pending)
                                        CHRISTOPHER HARRISON, PLLC
                                        3267 Bee Caves Road
                                        Suite 107-67
                                        Austin, Texas 78746
                                        (512) 380-8507

                                        *Counsel for Respondent-Appellee DMX Inc.*

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief for Respondent-Appellee DMX Inc. complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface in 14-point Times New Roman. I further certify that this brief complies with the type-volume limitations set forth in Rule 32(a)(7)(B)(i) because the brief contains 13,943 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).


/s/ R. Bruce Rich
R. Bruce Rich