# EXHIBIT P

REDACTED

# 11-127-cv

## United States Court of Appeals
### for the
### Second Circuit

————— ◆■◆ —————

IN RE: APPLICATION OF THP CAPSTAR ACQUISITION CORP.
(NOW KNOWN AS DMX, INC.)

————————————————————————————

UNITED STATES OF AMERICA,

*Plaintiff,*

AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS,

*Defendant-Appellant,*

– v. –

THP CAPSTAR ACQUISITION CORP., now known as DMX, INC.,

*Applicant-Appellee.*

————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR APPLICANT-APPELLEE

CHRISTOPHER S. HARRISON
CHRISTOPHER HARRISON, PLLC
3267 Bee Caves Road
Suite 107-67
Austin, Texas 78746
(512) 380-8507

R. BRUCE RICH
BENJAMIN E. MARKS
TODD D. LARSON
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Attorneys for Applicant-Appellee*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Civil Procedure, DMX, Inc.
hereby certifies that it is fully owned by DMX Holdings, Inc.  DMX Holdings, Inc.
has no parent corporation, and no publicly held corporation owns 10% or more of
its stock.

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

COUNTER-STATEMENT OF ISSUES PRESENTED ........................................5

STATEMENT OF FACTS ....................................................................................5

 I.  ASCAP AND THE MUSIC PERFORMANCE RIGHTS
    MARKETPLACE .................................................................................5

   A.  ASCAP and Its Historic Licensing Practices............................5

   B.  The ASCAP Consent Decree ....................................................6

   C.  The *AEI* and *Muzak* Decisions..................................................7

 II.  DMX, ITS SERVICES, AND THE COMPETITIVE
    ENVIRONMENT.................................................................................9

 III.  DMX'S DIRECT LICENSE INITIATIVE.......................................11

   A.  The Rationale for Direct Licensing .........................................11

   B.  The Development of the Direct Licenses .................................12

   C.  Rates and Terms of the Direct Licenses ..................................14

   D.  The Success of the Direct-License Initiative ...........................16

   E.  DMX's Outreach to the Four Major Publishers and the
     Sony Direct License.................................................................18

   F.  ASCAP and BMI Interference with DMX's Direct-
     License Effort...........................................................................21

 IV.  ASCAP'S LICENSES WITH MUZAK AND OTHER BG/FG
    PROVIDERS.....................................................................................22

   A.  Muzak.......................................................................................22

   B.  Music Choice ...........................................................................24

   C.  Trusonic ...................................................................................25

 V.  DMX'S ADJUSTABLE-FEE BLANKET LICENSE FROM
    BMI...................................................................................................26

STANDARD OF REVIEW .................................................................................28

SUMMARY OF ARGUMENT ............................................................29

ARGUMENT ...................................................................................31

I.    THE GOVERNING LEGAL FRAMEWORK ..................................31

    A.    The Rate Court's Task Is to Define a Rate That
Approximates the Rates That Would Be Set in a
Competitive Market ................................................................31

    B.    The District Court Has the Authority to Take Account of
DMX's Direct License Program in Setting Fees for
ASCAP's Blanket License .......................................................34

        1.    ASCAP Waived Its Argument That a Blanket
License With Fee Credits For DMX's Directly
Licensed Performances Is Incompatible With AFJ2 .....34

        2.    ASCAP's Arguments That the Court Erred in
Structuring the Blanket License To Accommodate
Direct Licensing Are in Any Event Meritless ...............35

            a.    The Rationale of *AEI* Supports DMX's
Entitlement to an Adjustable-Fee Blanket
License ...............................................................35

            b.    DMX is Entitled to Choose Between a Per-
Segment License and an Adjustable-Fee
Blanket License ...................................................37

            c.    AFJ2's Genuine Choice Provision Does Not
Limit ASCAP's Obligation to Offer DMX
an Adjustable-Fee Blanket License.......................39

            d.    AFJ2's Definition of "Blanket License" Has
No Bearing on DMX's Entitlement to an
Adjustable-Fee Blanket License ..........................39

II.    THE DISTRICT COURT PROPERLY REJECTED ASCAP'S
"OVERREACHING" AND "EXTRAORDINARILY
AGGRESSIVE" FEE PROPOSALS ............................................41

    A.    The District Court Correctly Rejected the Muzak
Benchmark ............................................................................43

B.      The District Court Correctly Rejected ASCAP's Alternative Proposal Purporting to Take Account of DMX Direct Licenses ...............................................................47

III.    THE DISTRICT COURT'S RATE DETERMINATION EMBODIED THE NORMATIVE GOALS OF THE RATE-MAKING PROCESS AND WAS AMPLY SUPPORTED BY THE EVIDENCE ................................................................48

A.      The District Court Did Not Err in Using Separate Benchmarks to Assess the Reasonable Value of Distinct Benefits of the Blanket License ................................................50

B.      The District Court Did Not Err in Using the Direct-License Benchmark to Value the Performance Rights Conveyed by the ASCAP Blanket License.............................52

1.      DMX's Direct-License Experience Provided "Compelling" Evidence of a Competitive-Market Valuation of the Performance Rights In Issue..............52

2.      ASCAP's Critiques of the Direct-License Benchmark are Meritless ................................................54

a.      The purported unreliability of the direct-license benchmark ................................................54

b.      The Sony advance ................................................56

C.      The District Court Did Not Err in Establishing an Adjustable-Fee Structure to Account for DMX's Growing Direct License Program ............................................58

CONCLUSION ........................................................................61

# TABLE OF AUTHORITIES

## CASES

*ASCAP v. Showtime/The Movie Channel, Inc.,*
  912 F.2d 563 (2d Cir. 1990) …………………………...……..….*passim*

*BMI v. DMX, Inc.*
  726 F. Supp. 2d 355 (S.D.N.Y. 2010) ………..……………………21, 26, 58

*United States v. ASCAP (In re Application of Buffalo Broad. Co., Inc.),*
  1993 WL 60687 (S.D.N.Y. Mar. 1, 1993) …..………………..………*passim*

*United States v. ASCAP (In re Application of MobiTV, Inc.),*
  2010 WL 1875706 (S.D.N.Y. May 11, 2010)...............................................5, 6

*United States v. ASCAP (In re Applications of Muzak, LLC and DMX Music, Inc.),*
  309 F. Supp. 2d 566 (S.D.N.Y. 2004).......................................................*passim*

*United States v. ASCAP (In re Applications of Muzak, LLC and DMX Music, Inc.),*
  323 F. Supp. 2d 588 (S.D.N.Y. 2004).......................................................50, 59

*United States v. ASCAP (In re Applications of RealNetworks, Inc. & Yahoo! Inc.),*
  627 F.3d 64 (2d Cir. 2010)................................................................28, 31, 53

*United States v. ASCAP (In re Application of Turner Broad. Sys., Inc.),*
  782 F. Supp. 778 (S.D.N.Y. 1991)...........................................................6-7, 36

*United States v. BMI (In re Application of AEI Music Network, Inc.),*
  275 F.3d 168 (2d Cir. 2001)…...............................................................1, 8, 35

*United States v. BMI (In re Application of Music Choice),*
  426 F.3d 91 (2d Cir. 2005)…................................................................*passim*

*United States v. Brauning*
  553 F.2d 777 (2d Cir. 1977)…........................................................................35

*WPIX, Inc. v. BMI*, Opinion and Order,
  09 Civ. 10366 (LLS) (S.D.N.Y. Apr. 27, 2011)…..........................................56

# STATUTES

17 U.S.C. § 106…………….....................................................................................5

# INTRODUCTION

ASCAP collectively licenses the public performance rights to a repertory of some 8.5 million copyrighted musical works on behalf of some 400,000 composer and music publisher members.  ASCAP's favored technique for licensing users such as Applicant DMX, Inc. ("DMX") has been to offer blanket licenses affording access to the millions of works in ASCAP's repertory solely on an all-or-nothing basis.  The fees set for such licenses have reflected neither the user's actual need for, or use of, that repertory, nor have they varied to the extent to which the user could secure performance rights for the musical works it uses from ASCAP's members.  The recognized market power amassed by ASCAP, as well as by its sister performing rights organization ("PRO"), BMI, has resulted in their conduct being regulated by antitrust consent decrees entered into with the U.S. Department of Justice ("DOJ") in resolution of prior DOJ Sherman Act challenges.

In 2001, this Court held that BMI's consent decree required it to offer an adjustable-fee blanket license ("AFBL") to users that provides a fee credit to reflect licenses for performance rights secured by a music user directly from BMI's affiliates.  *United States v. BMI (In re Application of AEI Music Network, Inc.)*, 275 F.3d 168 (2d Cir. 2001) ("*AEI*").  This consequential ruling opened the doors of competition into a world in which such competition had been entirely absent.  It created incentives for users such as DMX to engage in direct licensing by

eliminating the double-payment trap that previously had denied any economic

benefit from such transactions.

So empowered, DMX embarked on an ambitious and, over time,

extraordinarily successful direct-license program.  By the time of trial, DMX had

secured 850 licenses from music publishers large and small, covering 7,000 music

catalogs and hundreds of thousands of songs, spanning every conceivable music

genre, and including songs written and performed by the world's most famous

songwriters and recording artists.

The instant appeal centers around ASCAP's effort to frustrate the

competitive inroads achieved by DMX, both by seeking to overturn the district

court's holding that ASCAP is required by its decree, no different than BMI, to

offer an AFBL to DMX, as well as by attempting to castigate the level of blanket

fees determined by the district court to be reasonable based upon the very market

pricing resulting from the direct-license initiative.

ASCAP's attack on DMX's entitlement to an AFBL is too little and too late.

It waived this argument at trial (and before) by conceding (repeatedly) to the

district court that a blanket fee with a carve-out for direct licensing *is* permitted by

its decree.  Should this Court nonetheless entertain ASCAP's arguments, it will

find them entirely devoid of merit.  The arguments ASCAP musters ignore the

plainly controlling language of its decree, as made manifest by *AEI* as well as prior ASCAP rate court precedent directly addressing them.

Concerning the levels of blanket fees themselves, in an effort to preserve the ways of the past, ASCAP postulates an improper economic framework for rate-setting and then complains that the trial court failed to accept it. By ASCAP's lights, this proceeding should have been all about adopting its conception of the fee level extracted from a background/foreground ("BG/FG") music service competitor to DMX and imposing that fee level upon DMX. The district court was not misled by this effort to trivialize the rate-making process and instead properly focused on determining fees that approximate those that would result from a competitive marketplace. It found in DMX's robust direct-licensing experience an ideal benchmark.

While ASCAP packages its criticisms of that benchmark in a variety of ways, at its core, ASCAP's true complaint is that direct licensors "made individual decisions independently. And those individual decisions differed dramatically from those ASCAP must make on behalf of its members." ASCAP Br. 36. But what for ASCAP represents a disqualifying attribute of the district court's rate-making instead is precisely what commends it. While ASCAP views as its organizational mission the maximization of license fees on behalf of its members, and seeks to achieve that goal by perpetuation of all-or-nothing blanket licenses

that rely upon and maximize its market power, the function of rate-making under ASCAP's consent decree is quite the opposite. As this Court repeatedly has observed, the rate court's task is to approximate the fees that a market *absent* ASCAP's market power would generate. There is no better measure of that normative goal than the "independent" licensing decisions made by ASCAP's own members in licensing precisely the same copyright rights as are otherwise collectively licensed by ASCAP.

This case, and DMX's parallel rate litigation with BMI, presented the first opportunities for a rate court to avail itself of a meaningful body of empirical data reflecting independent as opposed to collective licensing decisions. Seeking to preserve its historic licensing prerogatives, ASCAP cites as a demerit that "[u]pholding the district court's 'carve-out' rate structure would potentially permit all future licensees" to obtain such licenses. ASCAP Br. 3-4. But what ASCAP fears most – an injection of competition into the world of music performance licensing – is precisely what AFJ2 seeks to promote and what the meticulous opinion by the district court seeks to foster. That decision should be affirmed in all respects.

4

## COUNTER-STATEMENT OF ISSUES PRESENTED

1. Whether the district court erred in setting the annual fee for DMX's AFBL at $13.74 per DMX customer location, prior to any adjustments to reflect performances of music in ASCAP's repertory that have been licensed directly by ASCAP members.

2. Whether the district court erred in fashioning a blanket license fee structure that accounts for DMX's ongoing direct licensing initiative.

## STATEMENT OF FACTS

## I.  ASCAP AND THE MUSIC PERFORMANCE RIGHTS MARKETPLACE

### A.  ASCAP and Its Historic Licensing Practices

The Copyright Act grants to copyright owners certain rights to exploit their works, including to publicly perform them.  17 U.S.C. § 106.  On behalf of its 400,000 affiliated composers and publishers, ASCAP issues licenses to a wide range of music users, including BG/FG music services, authorizing the public performance of any of the 8.5 million works in the ASCAP repertory.  SA7; *United States v. ASCAP (In re Application of MobiTV, Inc.)*, 712 F. Supp. 2d 206, 211 (S.D.N.Y. 2010) ("*Mobi*").  ASCAP's agreements with its members do not permit them to simultaneously license the same compositions through any other PRO.  A228.

ASCAP collects nearly $1 billion annually in performance rights license

fees.  A3042.  After retaining approximately 11% of fees collected to cover its

costs, ASCAP distributes the remainder as royalties to its members.  A229.

ASCAP and BMI, between them, license the right to publicly perform most

copyrighted music in the United States.[1]  *See Mobi*, 712 F. Supp. 2d at 211-12.

Both organizations' historic preference and practice has been to offer users blanket

licenses that afford licensees access to their respective multimillion-work

repertories at fees that neither reflect the user's actual need for, or use of, that

repertory nor vary to the extent the user may be able to secure performance rights

in the music it uses directly from copyright owners.  *See United States v. BMI (In*

*re Application of Music Choice),* 426 F.3d 91, 93 (2d Cir. 2005) ("*Music Choice*

*IV*").

## B.    The ASCAP Consent Decree

The district court recognized that "ASCAP's ability to collectively license

the performing rights to its members' compositions gives the organization market

power when negotiating with music users."  SA7.  Because this market power, also

enjoyed by BMI, raises significant competitive concerns, both organizations have

long been regulated by consent decrees negotiated with the DOJ.  SA7; *see*

*generally Mobi,* 712 F. Supp. 2d at 212, 228; *United States v. ASCAP (In re*

---

[1] SESAC, Inc. is a third, smaller PRO.

*Application of Turner Broad. Sys., Inc.)*, 782 F. Supp. 778, 782-84 (S.D.N.Y. 1991), *aff'd*, 956 F.2d 21 (2d Cir. 1992) ("*Turner*").  Despite the constraints of these decrees, there remains no doubt that "the market for licensing music rights is not freely competitive" insofar as, under traditional blanket licensing practices, "songs do not compete against each other on the basis of price."  *ASCAP v. Showtime/The Movie Channel, Inc.,* 912 F.2d 563, 570 (2d Cir. 1990) ("*Showtime*").

The ASCAP consent decree has been modified on several occasions.  A227; SA7-8.  The current version of the decree, the Second Amended Final Judgment ("AFJ2"), took effect in 2001.  A227; SA8.  Among other provisions designed to blunt the anticompetitive nature of ASCAP's collective licensing practices, Article IV prohibits ASCAP from signing its writer or publisher affiliates to exclusive licenses and from interfering with its members' issuance of public performance licenses directly to music users.  A149-51; SA52.  Article IX entitles users such as DMX to obtain a judicial determination of "reasonable" fees in proceedings such as this one when faced with fee demands from ASCAP the user perceives as unreasonably high.  A155-56; SA47.

### C.    The *AEI* and *Muzak* Decisions

Although BMI is similarly forbidden by its decree from obtaining exclusive licensing authority from its affiliated rights holders, A168-69, both major PROs

7

have long forestalled active development of a direct license market via the pricing structure of their traditional blanket licenses.  Under the PROs' preferred form of license, a user who has obtained direct licenses from rightsholders effectively has had to double-pay for those rights – once to the directly licensing copyright owner and a second time as part of the unvarying blanket fee payable to the associated PRO.  In *AEI*, this Court expressly redressed this double payment circumstance, holding that BMI was required under its consent decree to offer a blanket license that provided a fee credit reflecting direct licenses of BMI-repertory music separately obtained by the user.  *See* 275 F.3d 168.

Following *AEI*, two of the BG/FG services that had been parties to that proceeding sought similar adjustable-fee licenses from ASCAP.  Upon ASCAP's refusal to offer blanket licenses with any form of fee credit for direct licensing, the services sought judicial relief.  SA13-15.  In *United States v. ASCAP (In re Applications of Muzak, LLC and DMX Music, Inc.)*, 309 F. Supp. 2d 566 (S.D.N.Y. 2004) ("*Muzak I*"), the district court, finding the apposite provisions of AFJ2 to be materially identical to those in the BMI decree determined to be germane to the *AEI* decision, held that ASCAP also must offer on request a blanket license with a fee structure that takes account of direct license activity.

ASCAP did not appeal the *Muzak I* decision.  SA15.  During an August 20, 2009 pretrial conference in this proceeding, it acknowledged that it was obligated

8

to "account for [DMX's] direct licensing program in formulating [its fee]

proposal." A286:15-16; SA44. At trial, ASCAP did not dispute that "a blanket

license with 'carve-outs' for DMX's direct licensing program is permitted by

[AFJ2]." SA3. Now reversing field, ASCAP contends to the contrary, raising the

very same arguments that were considered and, with the aid of briefing from the

DOJ, rejected by the court in *Muzak I*.

## II.   DMX, ITS SERVICES, AND THE COMPETITIVE ENVIRONMENT

DMX provides its BG/FG service to a broad array of business customers,

including retail stores, restaurants, and offices, among others. SA8. The right to

publicly perform musical works is part of the service that DMX and other BG/FG

services provide to their customers. *Id.*

DMX was created on June 3, 2005, when DMX Holdings, Inc. purchased

certain assets out of bankruptcy from the estate of a prior owner, DMX Music. *Id.*;

A230-31; A680. DMX's service involves the selection and arrangement of songs

into appropriate genres (*e.g.*, jazz, rock, country) and various "lifestyle" programs

designed to create a particular mood for DMX customer environments, as well as

the delivery of such music programming to, at the time of trial, nearly 100,000

customer locations. SA9; SA11; A232; A684. For the 2005-2009 period, ASCAP-

affiliated works (including those directly licensed) constituted slightly less than

half of all works transmitted by DMX to its clients. SA9; A235.

9

The BG/FG industry contains many established competitors offering generally similar services, including Muzak, Music Choice, Trusonic, PlayNetwork, and other smaller competitors.  SA25; A230; A685.  The industry also has seen a rise in competition from music consultants who utilize iPods or similar devices to create programming for businesses without investing in a complex distribution network and from "self-supply," which has been made easy and inexpensive by the recent proliferation of digital music players and online music services.  A685-86.

The BG/FG industry is highly competitive and price-driven.  A687-88.  The increasingly intense competitive landscape has forced DMX to reduce drastically the rates it charges for its service.  *Id.*; SA25.  Since 2005, the rates DMX was able to garner from the marketplace declined by 37%.  SA26; *see also* SA25-26 & n.19 (noting even greater decline in BG/FG industry rates since 2001).  Even with these rate reductions, DMX lost customers steadily over the several years preceding trial as a result of the competitive environment and the depressed state of the economy.[2]

---

[2] In 2005, DMX served approximately 84,000 locations.  By early 2010, its customer base had dwindled to less than 70,000.  Shortly before trial, with an aggressively low-priced bid, DMX entered into an agreement with DirecTV, A2929-2969, to provide the music channels for approximately 25,000 DirecTV commercial customer locations, bringing the total number of locations to approximately 95,000.  A687; SA8-9.

10

A687; SA25-26. DMX expects this downward pricing trend to continue in the future and for DMX's per-location revenue to continue to decline. A687-88.

## III. DMX'S DIRECT LICENSE INITIATIVE

### A. The Rationale for Direct Licensing

Upon acquiring the business, DMX instituted cost-savings initiatives to correct the problems that had beset its predecesor. *See*, *e.g.*, A688-89 (describing workforce reduction of nearly 40% and office consolidation). One focus of this effort was to reduce the long-term costs associated with acquiring performance rights through PRO blanket licenses. A689; SA26. As noted by the district court, "[t]he fees that DMX pays to the three PROs – ASCAP, BMI, and SESAC – for blanket through-to-the-listener licenses constitute one of DMX's largest costs of sale and DMX is hoping to reduce those costs as it confronts declining per location revenues in an increasingly competitive market." SA26. At the time DMX commenced operations, ASCAP was seeking $49 from DMX per location per year and BMI was seeking $36.36 for blanket licenses. SA26 n.20.

Believing the rates demanded by ASCAP and BMI were substantially above those that would be negotiated in a competitive market, DMX began to acquire catalog licenses directly from music publishers. A689; *see also* A650-51. DMX used a "simple appeal" to obtain direct licenses, explaining in negotiations that "DMX was trying to maximize its reliance on direct licensing and minimize its

reliance on the ASCAP blanket license. As a result, those publishers who gave

DMX a direct license could expect that DMX would play more of their music [or

not play less], and those who did not could expect that DMX would play less."

SA28-29; *see also* A493; A674-75. Because DMX has the ability to substitute

directly licensed works for the works of other publishers as long as the directly

licensed works fit the general mood of the program, DMX assumed (correctly) that

the forces of competition would spur publishers seeking to assure a continued, or

even enhanced, presence on DMX's music service to give serious consideration to

such licenses, even if, on a per-location basis, the royalty pool they would share

might be lower than that collected from DMX by the PROs. A573-74, A651;

SA27. Not incidentally, such licenses also afforded DMX the opportunity to

overcome various restrictions imposed by the PROs on the types of commercial

establishments that could be covered by their BG/FG licenses, such as venues that

charge admission. SA30; A654-55. DMX believed (again correctly) that similar

restrictions would not be imposed by music publishers in direct-license

transactions, thereby opening new business opportunities for DMX. A654-55;

SA30.

### B. <u>The Development of the Direct Licenses</u>

DMX engaged Music Reports, Inc. ("MRI"), an entity with decades of

experience in high-volume music license administration and royalty reporting, to

12

assist DMX in developing a direct licensing strategy and the terms of the actual direct license that DMX would offer.  A478-79; A652-53; SA27.  MRI compiled a list of priority publishers to approach for direct licenses based on the publishers whose works DMX played most frequently.  A479; SA28.  DMX also approached publishers with which MRI had existing commercial relationships to solicit feedback on the license terms under development.  A479.

DMX's objective – consonant with MRI's – was to offer a license that publishers would find recognizable and reasonable.[3]  A479-80; SA27.  DMX believed that a license incorporating industry-standard terms would obviate the need for lengthy negotiations or material variation from agreement to agreement, and ultimately would lead to broad acceptance.  A479-80; SA28.  Proceeding in this fashion also would standardize royalty administration across hundreds of direct licensors.  A479-80; SA28.  With the benefit of feedback on its proposed form from a number of experienced, well-respected publishers, DMX achieved its goal.  A479-80; SA28.

---

[3] The district court, noting MRI's longstanding commercial ties to the music publishing industry, observed, "Because it is important to MRI that it maintain good relationships with music publishers, MRI developed a DMX proposal that it believed would be credible and well received by the music publishing community."  SA27.

13

### C.    Rates and Terms of the Direct Licenses

DMX's direct licenses grant all the rights DMX needs from the participating

publishers to operate its service, including not only the public performance rights

that DMX would otherwise obtain from the PROs, but also the reproduction,

distribution, and editing rights DMX needs for its on-premise service that ASCAP

cannot grant.  SA29-30; A1478.  As the licenses are catalog-wide, they convey, no

differently than the ASCAP blanket license, immediate access to new works

owned or administered by the licensing publisher.  A1478.  All of DMX's direct

licenses provide the same indemnification protection with respect to the licensed

works as ASCAP's blanket license does.  A1481-82.  Unlike ASCAP's and BMI's

BG/FG form agreements, the licenses also cover venues that charge admission.

SA30.

DMX's direct licenses provide for each publisher to receive its pro rata share

of a royalty pool of $25 per DMX location per year, calculated and paid quarterly

by multiplying a fee of $6.25 by the number of DMX locations during the quarter.

A1479-80; SA30-31.  DMX's direct licenses are not limited to ASCAP music but,

rather, convey performance rights to the publishers' catalogs regardless of PRO

affiliation.  A481-82.  Thus, if all DMX performances in a given year were directly

licensed, DMX would pay a total royalty to all participating publishers equal to

$25 per location.  *See id.*  Like the ASCAP blanket license fee, this $25 per-

location fee covers both the publisher's share and the writer's share of royalties attributable to performances by DMX. A1479. Royalties are paid by DMX directly to the publisher based on the ratio of DMX's performances of that publisher's works to the total number of DMX performances of all works in that quarter. SA31-32; A1479-80. Like ASCAP's own distributions, the publisher's pro rata share is adjusted (or "share weighted") to account for situations where the publisher owns or controls less than a full 100% share of any of the works performed. SA32; A481-82. In accord with the terms of their publishing agreements, the publishers then account to writers for their share of direct-license royalties. SA31; A658.

DMX's direct licenses include a most-favored-nations clause ("MFN") that ensures that each publisher's royalties are calculated using the same pro rata allocation methodology. A484; A1480; SA33-34. Contrary to ASCAP's attempt to rewrite the clause, the MFN does not cover advances or the $25 rate itself.[4] A484. As the district court found, "[t]here is little indication in the record that publishers concluded that the MFN would encompass advances paid to music publishers." SA35. Indeed, "[s]everal publishers testified that they did <u>not</u>

---

[4] Two publishers, Cherry Lane and Sony/ATV ("Sony"), negotiated different MFN clauses, which cover the size of the royalty pool, but the royalty pool has been $25 in all licenses signed to date. SA34-35; A1457-58; A1486; *see also* A778 (Cherry Lane testimony acknowledging that its MFN does not cover advances).

15

interpret the MFN as covering advances." *Id.* (emphasis in original).  None

testified to the contrary.

The direct licenses also include a no-double-payment provision that enables

DMX to withhold payment if a PRO or collection society administering

mechanical rights disputes that the performance was within the scope of a direct

license.  SA32-33; A1480.  Contrary to ASCAP's unsubstantiated spin, this

dispute-resolution provision was not intended to, nor does it, permit DMX to

decline to pay a direct licensor for performances generally and elect instead to pay

the PRO.  A483-84; SA32-33.

### D.     The Success of the Direct-License Initiative

DMX's first direct license was signed in May 2006 with Leiber Stoller

Songs, Inc.  SA35.  The Leiber Stoller catalog contains prominent works written

by Songwriter Hall of Fame-members Mike Leiber and Jerry Stoller, including

such notable compositions as "Hound Dog," "Jailhouse Rock," "Spanish Harlem,"

and "Stand by Me."  A660; SA35.  By the time of trial, DMX had signed 850

direct licenses, covering more than 7,000 separate music catalogs and hundreds of

thousands of songs.  A2981-3025; SA36.  The overwhelming majority of

publishers whose initial license terms expired prior to trial elected to continue their

license relationship with DMX and renewed their agreements.  SA37; A487-88.

16

ASCAP does not (nor could it) dispute that the quality of the pool of directly licensed compositions is equivalent to that of ASCAP's repertory generally. DMX's library of directly licensed content includes works performed by some of the best-known artists in the world, including the Beatles, Frank Sinatra, Willie Nelson, Duke Ellington, Ray Charles, Hank Williams, Loretta Lynn, Aretha Franklin, Bing Crosby, Billie Holiday, Elvis Presley, Whitney Houston, Elton John, and Madonna.  Many of the most popular current artists, including Justin Timberlake, Taylor Swift, Lady Gaga, Britney Spears, and Beyonce, have directly licensed works on their albums.  A485-86; A660-65; SA36 n.26.  DMX has directly licensed works written by legendary songwriters such as Rodgers and Hammerstein, Irving Berlin, John Lennon, Paul McCartney, and Hal David (ASCAP's former president).  *See, e.g.,* A485-86; A660-65; SA36 n.26.  DMX's direct licensors (or the songwriters or performers of the directly licensed works) have won numerous honors, including membership in the Songwriters Hall of Fame, ASCAP's Songwriter of the Year, Pulitzer Prizes, Congressional Gold Medals, and Oscar and Grammy Awards.  *See, e.g.,* A485-86; A660-65; SA36 n.26.

Not surprisingly, artists and songwriters of this stature are represented by "prominent and sophisticated" publishing executives who make their living maximizing the commercial value of the works they represent.  SA79; A486-87;

17

A664-65.  ASCAP's portrayal in trial submissions that the direct licenses merely represented the view of marginal sellers who value their performance rights the least was exposed as nonsense at trial by the testimony of ASCAP's own Director of Licensing who, on cross-examination, completely disavowed this disparaging characterization.  A1110-11.

DMX has significantly increased its use of directly licensed music over time as more and more publishers have signed direct licenses and as DMX has increased its reliance on their works in its programming.  SA35-36 nn.25-26.  Directly licensed works represented roughly 30% of all uses by the time of trial.  SA27.  No customer has complained about DMX's increased reliance on directly licensed performances.  A576-77.

###    E.    DMX's Outreach to the Four Major Publishers and the Sony Direct License

Despite its early success in obtaining direct licenses, DMX recognized the impediments it faced in attracting the largest music publishers.  DMX believed that signing at least one of the four "majors" (Sony, Universal, EMI, and Warner-Chappell), which "control a considerable share of the total market," would enhance the credibility of its direct-licensing program and provide benefits well beyond the actual value of the music catalogs so licensed.  SA38-39; *see also* A665.  But the traditional blanket license system has been lucrative and longstanding.  A666 ("breaking ranks with what has generally been an entrenched licensing system is

an extremely difficult thing for the major music publishers to do"); A487. The CEO of each major publisher is a member of ASCAP's Board of Directors, SA39 n.30, and the majors are by far the largest recipients of royalties from ASCAP and BMI.

The antipathy of ASCAP and BMI towards direct licensing was, moreover, manifest from the years of litigation required to obtain the *AEI* and *Muzak I* precedents, notwithstanding which DMX found itself in two simultaneous, extremely costly litigations against licensing collectives twenty times larger in order to obtain reasonable AFBL terms. Against this backdrop, DMX determined that, as a "business reality," an attractive royalty advance to the majors (albeit recoupable over the life of the agreement) was "the price to be paid if DMX was to break through the powerful status quo and pioneer a new licensing paradigm." A666; *see also* SA39.

Hoping to sign one or two (but not all) major publishers, *see* SA39 n.29, A666-67, DMX offered 150% of what each publisher represented it had received from ASCAP and BMI on account of DMX performances for the previous four quarters. A666-67. DMX believed it could recoup any advances by increasing the frequency with which it performed the works of the first major or two to accept at the expense of those publishers who declined to license directly. *Id.* This approach was successful in attracting a direct license from Sony. A667; SA39.

19

The agreement called for a $2.4 million advance (paid in three annual installments) and a one-time "administrative" payment of $300,000.[5]  A667-68; A1457; A1470-71; SA40.  The Sony agreement contains the same royalty allocation methodology as all of DMX's other direct licenses, *i.e.*, it pays Sony based on Sony's pro rata share of the same $25 royalty pool from which DMX's other direct licensors are paid.  A1456-57; SA39.

Consistent with its business plan, following execution of the Sony license, DMX increased its plays of Sony compositions significantly, nearly doubling its use of Sony music between mid-2008 and mid-2010.  At the same time, it steadily decreased performances of the other majors.  *See, e.g.,* A488; SA42; SA81.

The Sony agreement originally covered a three-year period commencing January 1, 2008.  DMX subsequently discovered that the "DMX" line on Sony's BMI royalty statements – the line used in calculating the advance – had included royalties not only for DMX performances, but also for hundreds of other BMI BG/FG licensees.  A668; SA41.  Under BMI's misleading distribution methodology – which was neither revealed nor explained on the royalty statements, and of which DMX learned only through discovery in its BMI rate

---

[5] The $2.7 million total covered both what was represented to be Sony's PRO earnings as well as the "writer's share" that otherwise would be distributed by BMI and ASCAP to the writers of the works performed but, under the direct license, would be collected by Sony and then distributed to its writers.  A667-68; SA40-41.

proceeding – DMX performances accounted for only 27% of the royalties reported on the "DMX" line in BMI's statements. SA41; A668. Because DMX had based its payment to Sony on BMI's incorrect and inflated statement of DMX-related royalties, DMX and Sony extended the term of the license (and the period during which the nonrefundable payments could be recouped against royalties earned) from 36 to 57 months, *i.e.*, through September 30, 2012. A668; A1474; SA41-42.

### F. ASCAP and BMI Interference with DMX's Direct-License Effort

ASCAP and BMI did not take well to DMX's incursion into their traditional license domain. Despite being enjoined by consent decree from interfering with their publishers' direct dealings with users, "[t]he PROs have tried their best to prevent the major music publishers from entering direct licenses with DMX." SA42-43. The record reflects similar efforts at dissuasion with smaller publishers.

For its part, BMI sought to prevent another major publisher from breaking ranks after Sony granted a direct license to DMX. It offered Universal, and Universal accepted, an unprecedented three-year guarantee of annual royalties attributable to DMX performances some six times higher than Universal had ever received and significantly beyond any sums that BMI expected to be able to recoup in exchange for Universal foregoing DMX's offer. SA43; *see also BMI v. DMX, Inc.*, 726 F. Supp. 2d 355, 360-361 (S.D.N.Y. 2010) ("*BMI/DMX*"). In turn, ASCAP's CEO, John LoFrumento, "actively tried to discourage the CEOs of

21

Universal and Sony from entering into [direct licenses with DMX]," SA43,

warning that licensing directly was not in their "long-term interest" because it

could lead to "lower payments for all publishers and songwriters" in the future.

A1006-07; A1010.  To the extent that a handful of publishers chose not to renew

their license agreements with DMX, the trial record as recounted by the district

court exposed PRO interference as a primary cause.  SA37.[6]

## IV.   ASCAP'S LICENSES WITH MUZAK AND OTHER BG/FG PROVIDERS

### A.   Muzak

ASCAP took the position at trial that its 2005 license deal with Muzak was

"the most appropriate benchmark for constructing a blanket license for DMX."

SA16.  To end years of rate litigation, ASCAP and Muzak agreed in January 2005

to a license covering the 2005-2009 period (the "Muzak License"), settled final

license fees for the 1999-2004 period at the interim rates paid to date, and

compromised an ASCAP audit claim for ███████ of past due royalties.  SA17-

18; A2024-31.  Muzak agreed to forego an AFBL, and, in exchange, ASCAP

agreed to a lower effective per location rate and to forego more than ███████ of

---

[6] The remaining non-renewals were a product of publishers switching from the
original administrators DMX had negotiated with or of catalogs represented by an
administrator that renewed its direct license with DMX, but only for other catalogs.
A487-88; SA38.  DMX anticipated that continued negotiation after trial could
result in renewals of those licenses.  A677.

its audit claim. They agreed to a flat fee of ████████ dollars per year for the January 1, 2005-December 31, 2009 period. Based on the number of Muzak subscribers at that time, the contemplated effective per-location rate for the first year of the license was $41.21 provided that the number of locations as of December 31, 2004 remained static (*i.e.*, dividing ████████ annual fee by the-then ██████ locations). The agreement also allowed for an 8% "organic" growth adjustment per year in the number of subscriber locations covered by the license before Muzak would incur additional fee obligations. As the district court found, had the number of Muzak locations increased by 8% each year, the effective per-location rate would have dropped to $28.05 per location in 2009, and the average fee over the term of the license would have been $32.52. SA16-18; A404-05. The district court found that both parties expected that Muzak would grow during the license term and pay effective rates below $41.21. SA17-18.

The district court also found that ASCAP intended the Muzak License to become the template for its other agreements with other BG/FG providers, including several large services that ASCAP expected also would grow significantly in future years. SA18. "Consequently," observed the court, "as of early 2005, ASCAP agreed to a license that it expected to result in a declining per location rate for the five year period ending in 2009." *Id.* Considering the 2005-2009 license, the finalization of fees for the 1999-2004 period, and the audit

settlement as a "single transaction" – as the district court found "the contracts and circumstances suggest they should" – it is apparent that "ASCAP and Muzak agreed to an effective per location rate of substantially less than $41.21." SA18-19.[7]

### B. Music Choice

In May 2010, more than five years after reaching agreement with Muzak, ASCAP entered into a final fee agreement with Music Choice, another leading BG/FG service, at a substantially lower rate for 2005-2009. A1392-1406; SA21. As with Muzak, the interim fees that Music Choice had paid to ASCAP for 1999-2004 were made final. For the 2005-2009 period, Music Choice and ASCAP agreed to calculate final fees using the structure of the Muzak License as a template, including the 8% allowance for "organic" growth. A1392-1406; SA19-21.

During negotiations over final license fees, both ASCAP and Music Choice knew that Music Choice's business had grown significantly. Indeed, "there was no uncertainty as to the extent to which Music Choice would increase its number of customer locations during the license period." SA20. The parties, however, disagreed on the application of the 8% organic growth provision in the Muzak

---

[7] Muzak ended up in bankruptcy anyway. In 2009, the Muzak License was modified in light of Muzak's then-pending bankruptcy, and the fees for 2009 were reduced from ▮▮▮▮▮▮ to ▮▮▮▮▮. SA19.

License to Music Choice. A1102. Under its interpretation, Music Choice calculated total fees for the period of ▮▮▮▮▮▮ (an average of $28.79 per location); under ASCAP's interpretation, the calculated total fees for the period amounted to ▮▮▮▮▮▮ (an average of $35.71 per location). *Id.*; A409-10. The parties eventually compromised on total fees for 2005-2009 of ▮▮▮▮▮▮ (an average of $29.89 per location) – by any measure "a per location rate significantly below $41.21." SA21.

### C.    **Trusonic**

Trusonic, a smaller but fast-growing BG/FG service, entered into a memorandum of understanding with ASCAP to resolve the period covering February 1, 2003 to December 31, 2007 and to establish a fee framework for 2008-2012 (the "Trusonic MOU"). A1371-73. The Trusonic MOU finalized interim fees paid for the 2003-2007 period and settled an outstanding audit claim for $1.1 million in past due royalties for $500,000. SA24; A1371. Trusonic, however, "differs from its competitors . . . in that certain Trusonic customers only receive music from publishers who have entered into direct licensing agreements with Trusonic," and the final fee structure agreed to for 2008-2012 reflected this difference. SA23. Trusonic pays $45 for each subscriber location that plays any otherwise-unlicensed ASCAP music, but nothing for locations that do not play uncleared ASCAP music (whether that music is licensed directly or through

25

another PRO). SA24; A1105; A1371. Since ASCAP does not track the total number of Trusonic locations, nor maintain records of how many locations are serviced by Trusonic without fee obligation to ASCAP, the effective per-location rate Trusonic pays across all locations is unknown. SA24. The court presumed that "this rate is less than $41.21, since during the negotiations preceding the adoption of the $45 rate, Trusonic rejected ASCAP's proposal that it pay $41.21 for all locations." SA24-25.

## V.    DMX'S ADJUSTABLE-FEE BLANKET LICENSE FROM BMI

In parallel with its request to ASCAP, DMX sought an AFBL from BMI. In the aftermath of *AEI*, BMI did not dispute DMX's entitlement to such a license and the agreed-upon fee structure for its implementation was virtually the same as the one adopted by the court here. SA44. The parties did disagree on the reasonable amounts to be paid for such a license and on certain details of calculating the credit, leading to rate litigation. SA44-45; *see BMI/DMX*, 726 F. Supp. 2d 355.

Following a two-week trial, on July 26, 2010 the BMI court entered an order setting fees at $18.91 per location per year for the 2005-2012 period prior to reductions for DMX's ongoing direct-license activity. *Id.* at 364. The structure of the license and the carve-out mechanism adopted by the court was precisely that proposed by DMX and the same as that proposed by DMX in this proceeding. Similarly, the $25 royalty pool agreed to in DMX's direct licenses and adopted by

26

the BMI court (subject to adjustments) as the most appropriate benchmark for
determining the "value of the public performance of music" is the same benchmark
used (subject to similar adjustments) by the district court in this proceeding.  SA45.

     While ASCAP denigrates the district court's fee determination as reflecting
little more than slavish adoption of the BMI rate court's analysis, ASCAP Br. 24-
25; 44-45, this separate trial proceeding was conducted over six days and resulted
in an 87-page opinion, including more than thirty-five pages of independent fact-
finding drawn, *inter alia*, from the testimony of some 20 witnesses.  During
closing arguments, Judge Cote asked both parties for their views as to the degree to
which the court should rely on the findings of the BMI court.  Counsel for both
sides responded that the court should undertake its task independently, a
perspective that Judge Cote indicated was consistent with her own predisposition.
A1283; A1301; SA86.

     That said, it is hardly surprising that two experienced district court judges,
on significantly overlapping factual records, reached similar conclusions as to
reasonable fees and a reasonable fee structure for an AFBL.  This is especially true
given the undisputed finding that ASCAP's share of DMX performances is roughly
equivalent to BMI's, SA46, and the concession of ASCAP's Director of Licensing
that, "to the extent that ASCAP and BMI have comparable market shares, adopting
the BMI rate is a 'proper way to determine the [ASCAP] fee[].'"  *Id.*  To the extent

that the court set a fee somewhat lower than BMI's, that outcome is entirely attributable to the respective courts' computations of a Floor Fee derived from ASCAP's and BMI's incremental costs in providing and administering the license. Whereas BMI developed a full trial record on that issue, ASCAP chose not to do so. SA78 n.48.

## STANDARD OF REVIEW

ASCAP's recitation of the standard of review is incomplete. ASCAP fails to note that this Court has made it clear that "factual findings as to each factor under consideration or those underlying a proposed benchmark agreement, as well as findings with respect to fair market value, are reviewed for clear error." *United States v. ASCAP (In re Applications of RealNetworks, Inc. & Yahoo! Inc.)*, 627 F.3d 64, 76 (2d Cir. 2010) ("*RealNetworks*") (internal citations omitted). Similarly, in *Music Choice IV*, this Court stated that it would "review the District Court's evaluation of the facts surrounding the formation of the benchmark agreements, including the credibility of witnesses and other evidence at trial, for clear error." 426 F.3d at 96. Finally, "[l]ike many matters of fact, the competitiveness of a market and the market power of a seller may be ascertained with the aid of expert opinions, whose persuasive force is itself a factual matter within the purview of the fact finder." *Showtime*, 912 F.2d at 569.

# SUMMARY OF ARGUMENT

1.      ASCAP fundamentally misportrays the rate-setting standard governing this proceeding by arguing that the court need only determine the rate that a willing buyer and willing seller would agree to in an arm's-length transaction.  The proper approach is to account for the market power ASCAP has amassed by aggregating millions of copyrights from hundreds of thousands of would-be competitors under one licensing roof and determine a rate that would be paid in a competitive market untainted by such market power.  ASCAP premised its entire case on the purported suitability of the Muzak License as a benchmark for DMX's license.  Its argumentation that the court below should have used that agreement simply because it was entered into, without consideration of the larger market context is contrary to this Court's long-established precedents.

2.      The district court, following *AEI* and *Muzak I*, properly concluded that DMX is entitled to an AFBL.  ASCAP's contention that the fee structure ordered by the district court is somehow incompatible with AFJ2 was waived at trial and, in any event, is unsupported by the language of the applicable decree provisions, as was previously recognized in *Muzak I* and by the DOJ.

3.      For the host of reasons identified by the court and discussed herein, the court properly rejected ASCAP's proposed benchmark as unreliable and as not supporting ASCAP's "extraordinarily aggressive" fee proposals.

29

4.     The district court properly rejected ASCAP's alternative fee proposal
as a putative means of accounting for DMX's direct-license initiative, recognizing
it was "inequitable" and designed to turn the competition-enhancing policy
objectives of AFJ2 on their head.

5.     The district court arrived at the Blanket Fee by summing two
conceptually distinct components, one reflecting the value of the underlying
performance rights, the other representing compensation to ASCAP for its role in
aggregating those rights.  ASCAP has failed to provide any valid reason, either at
trial or on appeal, as to why the blanket license could not be reasonably valued in
this way.

6.     The district court properly concluded that the combined body of
DMX's 850 direct licenses provided the best evidence of competitive-market rates
for the performance rights granted by the ASCAP blanket license.  ASCAP's
argument that the direct licenses are not comparable to the ASCAP blanket license
fails to grapple with how the benchmark was used.  The district court increased the
license fee by nearly 30% to account for the differences between the direct licenses
and ASCAP's license.

7.     ASCAP's arguments that the direct-license benchmark was an
inappropriate one because not every publisher agreed to enter into a direct license
and because the district court allegedly failed to take proper account of DMX's

advance to Sony fail on the record evidence.  The direct-license experience mirrors how competitive markets operate.  The Sony advance, in turn, was shown to be a "cost of entry" into the direct-licensing market necessitated by "entrenched" industry practice and interference by both ASCAP and BMI in DMX's licensing efforts.

8.    The district court properly adopted a dynamic crediting mechanism that accounts for DMX's robust and ongoing direct license initiative, recognizing the impracticality and fundamental unfairness of foreclosing further fee credits for DMX's expanding program during the license term.

## ARGUMENT

## I.   THE GOVERNING LEGAL FRAMEWORK

### A.   The Rate Court's Task Is to Define a Rate That Approximates the Rates That Would Be Set in a Competitive Market

ASCAP's appeal is premised on a flawed conception of the rate court's task. In establishing a "reasonable" fee, the rate court must do more than simply assess the price that a "willing buyer" would agree to pay ASCAP, the "willing seller," in an arm's-length transaction.  The court's function is instead "to define a rate or range of rates that approximates the rates that would be set *in a competitive market*."  *Showtime,* 912 F.2d at 576 (emphasis added); *accord RealNetworks,* 637 F.3d at 76 ("[f]undamental to the concept of 'reasonableness' is a determination of what an applicant would pay in a competitive market").

31

The prices ASCAP attained in its dealings with other BG/FG services are not those that would result from a competitive market.  ASCAP's blanket licensing practices are "inherently anti-competitive," reflecting ASCAP's exercise of "disproportionate power over the market for music rights."  *Music Choice IV*, 426 F.3d at 93, 96; *accord Showtime*, 912 F.2d at 567, 570.  ASCAP's contrary contention that the fees obtained from Muzak were reasonable for DMX because they were secured in a willing, arm's-length transaction trivializes the rate-making inquiry.  As this Court has recognized:

> The opportunity of users of music rights to resort to the rate court whenever they apprehend that ASCAP's market power may subject them to unreasonably high fees would have little meaning if that court were obliged to set a 'reasonable' fee solely or even primarily on the basis of the fees ASCAP had successfully obtained from other users.

*Showtime*, 912 F.2d at 570; *see also United States v. ASCAP (In re Application of Buffalo Broad. Co.)*, 1993 WL 60687, *28 (S.D.N.Y. Mar. 1, 1993) ("*Buffalo Broad.*") (observation that rate courts are designed to protect against excessive fee demands does not "translate into the conclusion that the availability of the rate court ensures that any negotiated settlement is a reflection of competitive market rates").

The testimony of DMX's economic expert, Professor Jaffe, explaining why reliance upon ASCAP's prior BG/FG agreements was unlikely to yield a benchmark that fulfills the rate court's objective, reinforced the propriety of the

32

district court's rejection of ASCAP's benchmark.  Professor Jaffe explained that the historical absence of competition in performance rights licensing and information about what rates competitive markets would bear has given rate courts little option but to look to prior agreements between PROs and music users as the primary source of benchmarks for fee-setting.  A587-88.  This "circularity" has fostered users' agreeing to license fees at levels that reflect, not those of a competitive market but, instead, the levels that the PROs, with their market power, have been able to attain from others.  *Id.*

Where the evidence shows, as it did here, that a proposed benchmark does not reflect rates that would be set in a competitive market, the rate court is free to use other, better evidence.  *See Music Choice IV*, 426 F.3d at 95 (court must assess whether the "market under examination reflects an adequate degree of competition to justify reliance on agreements that it has spawned") (citation omitted); *Showtime*, 912 F.2d at 567 (rejecting ASCAP's proposed cable industry benchmarks in setting fee for a competitor).

What is more, unlike other rate proceedings prior to DMX's parallel litigation against BMI, the district court here was not remitted to using PRO agreements as "very imperfect surrogates" for actual competitive market data valuing the copyright rights involved.  *Showtime*, 912 F.2d at 577 (district court opinion); *see also Buffalo Broad.*, 1993 WL 60687, at *18 (resorting to PRO

33

agreements with "comparably situated parties" only "in the absence of a competitive market in music rights").  Here, for the first time in an ASCAP rate proceeding, the district court was presented with a rich body of actual license transactions between individual copyright owners and the applicant involving the very same rights of public performance as are licensed by ASCAP.  There was no need on this record to hypothesize as to the rates a competitive market would yield.  Real-world data made the district court's task far more straightforward.

**B.**   **The District Court Has the Authority to Take Account of DMX's Direct License Program in Setting Fees for ASCAP's Blanket License**

**1.**   **ASCAP Waived Its Argument That a Blanket License With Fee Credits For DMX's Directly Licensed Performances Is Incompatible With AFJ2**

ASCAP contends on appeal that the district court erred as a matter of law in affording DMX a blanket license that takes account of DMX's direct licenses with ASCAP members.  ASCAP Br. 50-58.  ASCAP expressed the opposite view at trial.  When the district court asked ASCAP's trial counsel point blank during opening arguments if it was empowered to adopt a blanket fee with fee "carve-outs" to account for DMX's direct licensing program, the answer was yes.  A1073 ("Q:  If they request a blanket license with a carveout for a direct licensing program, it is your position that you are required to respond.  And if the rate court finds that your response is not reasonable but the applicant's proposal is, then that

34

can be adopted by the rate court. A: Yes. Your Honor is correct.").[8] The trial court noted in its opinion that "[t]he parties agree that . . . a blanket license with 'carve-outs' for DMX's direct licensing program . . . is permitted by the consent judgment under which ASCAP operates." SA3; *see also* SA56 ("ASCAP does not dispute that . . . a blanket license with a carve-out . . . is entirely compatible with AFJ2 and that a court may require ASCAP to issue one."). In light of its concessions, ASCAP has waived the argument that a blanket license that takes account of direct licenses is incompatible with AFJ2. *See, e.g., United States v. Brauning*, 553 F.2d 777, 780 (2d Cir. 1977).

> ## 2. ASCAP's Arguments That the Court Erred in Structuring the Blanket License To Accommodate Direct Licensing Are in Any Event Meritless
>
> ### a. The Rationale of *AEI* Supports DMX's Entitlement to an Adjustable-Fee Blanket License

In *AEI*, this Court construed the reasonable fee and rate court provision (Section XIV) of BMI's consent decree to require BMI to offer users blanket licenses. *AEI*, 275 F.3d at 175. The Court rejected BMI's assertion that it was not

---

[8] ASCAP took the same position at the initial status conference before Judge Cote: "DMX is paying the direct licensors for the right to perform music, and they want us to account for that in our formula, which we are required to do under Judge Conner's [*Muzak I*] decision. We have to account for the fact that DMX has entered into these direct licenses." A279; *see also* A293 (court observing that "everyone agrees in principle that … an adjustment has to be made for these independent licensing arrangements"); SA57-58 & n.38.

required to accommodate the applicants' request for a blanket license with pricing
that would reflect direct licensing from BMI's affiliates.  *AEI* recognized that a
license with such a fee mechanism is not, as BMI contended, "a new type of
license" falling outside the four corners of its decree but, rather, simply "a blanket
license with a different fee basis."  *Id*. at 171; *see also id.* at 176 ("The only
modification Applicants have proposed to the traditional blanket license is in the
way the fee is calculated.").

In *Muzak I*, the ASCAP rate court (per Judge Conner) rejected ASCAP's
post-*AEI* contention that it was not similarly required to offer a blanket license
with fee carve-outs to reflect directly licensed ASCAP music.[9]  The court
concluded that Section XIV of BMI's decree is "identical in all relevant aspects" to
Article IX of AFJ2 – indeed, that the ASCAP and BMI consent decrees "are
sufficiently comparable in their entireties to warrant following the analytic trail
blazed in a published opinion by the [Second Circuit] that has immediate appellate
jurisdiction over this tribunal."  *Muzak I* at 576, 580-81 (footnote omitted).  The

---

[9] ASCAP's efforts there, continued here, reflect its practice of resisting all efforts
by licensees to gain access to competition-promoting, decree-required alternatives
to the "traditional" blanket license.  *See, e.g.*, *Buffalo Broad.*, 1993 WL 60687,
\*\*53-57 (chronicling ASCAP's efforts to deprive television broadcasters of a
meaningful per-program license); *Turner*, 782 F. Supp. 778 (requiring ASCAP to
afford cable television program services through-to-the-viewer and per-program
rights).

36

court also observed that "a rule permitting the blanket licensing fee to reflect prior

direct licensing arrangements is in accord with previously articulated principles for

the determination of reasonable fees," including "the rate court's consideration of

ASCAP's considerable market power." *Id.* at 578. In briefing on this issue, the

DOJ agreed. Memorandum of the United States on Decree Construction Issues,

Glancy Rep. Decl., Ex. D, attached to ASCAP Rep. Mem., Dkt. No. 28, at 7 ("DOJ

Muzak I Mem.").

Although ASCAP did not appeal *Muzak I*, SA15, it now argues that the

district court in this proceeding committed reversible error by following the plain

dictates of *AEI* and *Muzak I*. Each of ASCAP's conclusory assertions in support of

its position was rejected in *Muzak I* and, as discussed below, warrant rejection by

this Court as well.

### b. DMX is Entitled to Choose Between a Per-Segment License and an Adjustable-Fee Blanket License

ASCAP's contentions that AFJ2 does not allow for an AFBL because DMX

is separately entitled to a per-segment license, and that to allow otherwise would

"effectively eviscerate" the per-segment licensing provision, are bereft of legal or

factual support. Nothing on the face of AFJ2 prescribes the either-or choice

ASCAP posits. To the contrary, the decree provision that gives rise to DMX's

entitlement to an AFBL (Article IX) is distinct from the enabling language of

Article VII, relating to the per-segment license. As the district court noted,

37

"ASCAP's preference that DMX apply for a per-segment license," rather than an AFBL, "cannot override an applicant's option to apply for either type of license," and its right to obtain a reasonable fee for the license it prefers.  SA59.  *Accord Muzak I* at 568, 580; *see also* DOJ Muzak I Mem. at 19 (noting AFJ2 "gives the decree court wide latitude to order alternative methods of pricing the full-repertory license…" in addition to the per-segment option).[10]

At bottom, ASCAP has it backwards in arguing that the AFBL will "eviscerate" the per-segment license.  In *Muzak I*, the court held that publisher catalog licenses of the type DMX has entered into were not "segments" for purposes of a per-segment license.  Consistent with the DOJ's recommendations, the *Muzak I* court held that the manner in which direct licenses could be accommodated under AFJ2 was via the very form of AFBL DMX has secured here.  ASCAP knows this and, by proposing to force upon DMX an ill-fitting per-segment license, ASCAP in fact hopes to "eviscerate" DMX's direct licensing program.

―――――――――――――――

[10] ASCAP cannot avoid the import of the distinct decretal provisions giving rise to users' entitlement to both AFBLs and per-segment licenses by the bald allegation that the per-segment provision was "carefully negotiated" to allow ASCAP to refrain from having to offer an AFBL.  ASCAP Br. 52.  This effort to reach outside the four corners of the decree is wholly unsupported, and indeed ASCAP's assertion was repudiated by the DOJ during prior briefing of this issue.  *See* DOJ Muzak I Mem. at 19.

### c. AFJ2's Genuine Choice Provision Does Not Limit ASCAP's Obligation to Offer DMX an Adjustable-Fee Blanket License

ASCAP's contention that the AFBL conflicts with AFJ2's "genuine choice" provision reflects another unfounded effort to turn a decretal provision intended to foster meaningful competitive options for users into a shield against competition. As the court in *Muzak I* recognized, AFJ2's "genuine choice" provision is intended "merely to ensure that all of the different types of licenses" that ASCAP is obligated to afford users "remain economically reasonable options," such that users have a "genuine choice" between them. *Muzak I*, 309 F. Supp. 2d at 580. As the court explained, "nothing in the language of section VIII may fairly be read as precluding any kind of reasonable fee structure with respect to the different licenses discussed therein." *Id.* The DOJ again agreed. DOJ Muzak I Mem. at 13 n.16. Furthermore, the provision has nothing whatsoever to do with DMX's entitlement to an AFBL, a matter governed by the separate language of Article IX.

### d. AFJ2's Definition of "Blanket License" Has No Bearing on DMX's Entitlement to an Adjustable-Fee Blanket License

ASCAP's final textual argument – that the fee structure adopted by the district court conflicts with the definition of "blanket license" found in Article II(E) of AFJ2 – is equally unfounded. As an initial matter, Article IX, which governs DMX's entitlement to an AFBL does not even contain the term "blanket

39

license."  ASCAP has not explained how a defined term not used in Article IX

could bear on its interpretation.  Indeed, the only provision of AFJ2 that does use

the defined term "blanket license" is Article VIII – the genuine choice provision,

which, as discussed above, has no bearing on DMX's entitlement to an AFBL.

     In any event, the definition of "blanket license" is in no way inconsistent

with the nature of the AFBL.  Article II(E) prescribes the blanket license as a

license the fee for which "does not vary depending on the extent to which the

music user in fact performs ASCAP music."  A145.  Consistent with such

definition, the fee DMX pays under the AFBL does not vary according to the

extent to which it performs ASCAP music but, rather, on the extent to which such

performances are directly licensed from ASCAP members.  ASCAP so conceded.

ASCAP Br. 53.  Were DMX instead to reduce its overall use of ASCAP music,

however licensed, that activity – consistent with the Article II(E) definition –

would not entitle it to any savings under the AFBL.

     The court in *Muzak I* had no difficulty rejecting ASCAP's first attempt with

this argument:  "We disagree with this argument, and we agree with the United

States' contention that its proposed fee structure remains consistent with the

AFJ2's definition of blanket license," because the blanket fee "would not be based

on the frequency or degree of ASCAP music performance, but rather on the

existence of applicants' direct licensing relationships with ASCAP members."  309

F. Supp. 2d at 579; s*ee also* DOJ Muzak I Mem. at 18-19.  This sound analysis

should be affirmed here.[11]

## II.     THE DISTRICT COURT PROPERLY REJECTED ASCAP'S "OVERREACHING" AND "EXTRAORDINARILY AGGRESSIVE" FEE PROPOSALS

ASCAP, which bore the burden of proof, proffered alternate fee proposals.

The first comprised a fixed fee of $15.7 million for the period June 3, 2005 to

December 31, 2009, which translated into an effective annual per-location rate of

approximately $46 for that period, and a fee of $49 per DMX customer location for

2010-2012, with upward adjustments for inflation in 2011 and 2012.  SA53; A401.

This "primary" fee proposal contained no adjustment mechanism to reflect DMX's

directly licensed performances of ASCAP music and set "a rate far above any yet

paid by a licensee" for the relevant time period.  SA54.  ASCAP's second proposal

called for payment of the same fees, modified only by a fixed-dollar credit

reflecting ASCAP's estimate of the payments made by DMX through 2009 to

ASCAP-affiliated direct licensors and by a $25,000 administrative surcharge to be

paid to ASCAP annually.  SA59-60.  ASCAP maintains that its primary fee

---

[11] In a final effort to evade the clear import of *AEI* and *Muzak I*, ASCAP contends
that even if AFJ2 theoretically permits an AFBL, no rational "willing seller" would
offer a license with the structure requested by DMX.  ASCAP Br. 58-59.  This
attempted diversion into abstract economics cannot obscure the simple and
dispositive point that AFJ2 *requires* ASCAP to offer an AFBL upon request and
the rate court to set reasonable terms therefor as necessary.

proposal and the identical pre-adjustment fee in its alternative proposal were

"based on the flat fee Muzak had agreed to pay" for the 2005-2009 period.

ASCAP Br. 20.

"For at least four reasons," the court rejected ASCAP's "extraordinarily

aggressive" proposals, finding them "over-reaching in the extreme" and admittedly

"inequitable" to DMX.  SA54; SA64; SA61; SA68; A1145.[12]  The court found

that:  (i) ASCAP failed to show that either a $41.21 rate for the pre-2010 period

(let alone the $46 it actually proposed) or a $49 rate for 2010 was "the appropriate

base from which to construct the blanket rate;" (ii) ASCAP's proposed flat fee for

2006-2009 did not account for DMX's substantial loss of customer locations

during that period; (iii) the "dollar-for-dollar" credit ASCAP proposed as a way to

account for DMX's robust and growing direct license initiative was unreasonable;

and (iv) ASCAP failed to provide sufficient evidence to support its proposed

$25,000 annual surcharge for administering the credits.  SA61.

Abandoning any real effort to defend the dollar amounts it proposed,

ASCAP attacks the district court's rejection of its fee proposals on two grounds.

First, it contends that the district court erred in finding its proposed benchmark

---

[12] The court also noted ASCAP's "cynicism" in proposing a flat fee for the period
during which DMX lost customer locations and then switching to a per-location
fee just as DMX started to gain them back.  SA65; *see* A403.

unreliable and not a useful predictor of the rates that DMX would pay in a

competitive market.  ASCAP Br. 46-50.  Second, it suggests that if it must provide

a credit for DMX's direct license activity, no more was required than a "dollar-for-

dollar" credit to reimburse DMX for payments to ASCAP members.  ASCAP Br.

58; *see* SA59-60.  Neither contention has merit.

### A.    The District Court Correctly Rejected the Muzak Benchmark

ASCAP maintains that its fee proposals were "based on the flat fee Muzak

had agreed to pay" for the 2005-2009 period.  ASCAP Br. 20.  In a multi-pronged

analysis, the district court found that the Muzak agreement was "not a reliable

benchmark" because:  (i) the 2005-2009 license on which ASCAP relied was only

one part of a much larger transaction resolving issues relating to an eleven-year

period; (ii) "it is dangerous to rely on a per location fee" extrapolated from the

starting point of a flat fee deal that allows expected growth in locations and

contemplates a decline in the effective rate from $41.21 to $28.05 over the license

term; (iii) DMX refused to enter a license premised on the same formula; and (iv)

economic conditions in the industry had changed.  SA62-65.  The district court

observed that a "global economic decline of historic proportions is not a reliable

basis from which to construct an increase in a licensing rate."  SA64.[13]

---

[13] Moreover, Muzak was shown to have been considerably more dependent on the
ASCAP repertory than DMX.  According to ASCAP's own data, ASCAP's share

Each aspect of the court's analysis was amply supported by the trial testimony. Professor Jaffe explained why reliance on prior blanket license agreements between ASCAP and its licensees was unlikely to fulfill the objective of approximating the fees that a competitive market would generate. A587-88. Dr. Candell explained why the Muzak benchmark was not properly interpreted as an agreement to pay as much as $41.21 per location, let alone as supporting ASCAP's substantially higher proposals. A404-407. She also testified as to the difficulties ASCAP encountered in trying to apply that benchmark to other music services and the wide range of results those efforts yielded. A408-413. Mr. Seaton, DMX's Chief Financial Officer, testified as to the effects of an increasingly competitive environment for members of the BG/FG industry and economic decline on DMX, and the rates it could earn for its music service. A686-89.

ASCAP does not challenge any of the fact-finding based on this testimony. Rather, it contends that the "fundamental error" of this analysis is the court's "reliance on hindsight" in assessing the unreasonableness of ASCAP's proposals. ASCAP Br. 49. ASCAP asks this Court to presume that DMX would have agreed to pay pursuant to the Muzak license formula in 2005 simply because Muzak did.

of Muzak performances (58%) was materially higher than ASCAP's share of DMX performances (48%). A407; SA17 n.11; SA9.

44

*Id.*  As Dr. Candell testified, however, there is no reason to assume that DMX
would have viewed the structure or terms of the Muzak agreement as acceptable
simply because that deal suited Muzak's purposes (including expected growth,
settlement of an additional open period, resolution of a substantial audit claim, and
desire to avoid further litigation burden).  A401-403.  Indeed, ASCAP ignores that
DMX rejected that very same deal in 2006.

 As the district court found, there is "no justification for imposing on DMX
the consequence of a lost bet it did not make."  SA65.  DMX's right to resort to
rate court would have little meaning if the district court were obliged to set a fee on
the basis of the Muzak agreement, let alone in the circumstance where DMX
rejected it at the time.  ASCAP's contention to the contrary invites the very
abdication of rate-making responsibility rejected by this Court in *Showtime*.  *See*
912 F.2d at 570.

 ASCAP does not cite any rate court precedent for its contention that the
district court should have ignored changes in circumstance when evaluating
ASCAP's proposals.  In fact, its argument is at odds with the entirety of rate court
jurisprudence, in which courts do not try to assess, wearing blinders, what the
parties would have agreed to at the start of the license period; they instead
routinely consider changes in relevant economic factors between the start of the
license period and trial.  *See, e.g., Buffalo Broad.*, 1993 WL 60687, **43-44

(accounting for changes in music use, audience, and inflation during license period); *Showtime*, 912 F.2d at 579 (district court opinion using hindsight to evaluate reasonableness of HBO agreement proposed as benchmark for Showtime). Under ASCAP's theory that the court should have ignored post-2005 evidence, DMX would not even be entitled to the much lower rates secured by Music Choice (with the benefit of hindsight) in 2010 because that deal had not yet been struck.

ASCAP, moreover, does not meaningfully address *any* of the other disabling characteristics of the Muzak transaction as a putative benchmark. It does not dispute the court's factual determination that, when all aspects of the Muzak transaction are properly considered, they demonstrate that "ASCAP and Muzak agreed to an effective per location rate of substantially less than $41.21." SA19. Nor does ASCAP confront the court's recognition of the difficulties ASCAP had in trying to apply the Muzak benchmark to other services. Instead, ASCAP misleadingly contends that Music Choice settled "for an amount reflecting a slightly lower average effective per-location rate" than $41.21. ASCAP Br. 16 (citing A462). But ASCAP fails to acknowledge that the testimony it cites was completely discredited at trial, *see* A1103; A1171-74, resulting in the court's assessment that ASCAP's extrapolation of a per-location rate near $41 for Music Choice was not "based on any sound methodology." SA21. As Dr. Candell

46

explained, the effective per-location fee Music Choice actually agreed to pay for

the most recent five-year period was below $30.  A410; SA21 ( "in 2010, at a point

in time when ASCAP and Music Choice knew precisely how Music Choice's

business had expanded in recent years, the parties agreed to settle their fee dispute

for a per location rate *significantly* below $41.21") (emphasis added); A410.

In sum, the evidentiary record here provided ample basis for the district

court to conclude that the fees ASCAP secured from Muzak were above the

competitive norm, that application of the Muzak agreement to other BG/FG

entities was non-uniform and yielded varying fee levels, and that the fees sought

from DMX beginning at a level of $46 per location for the 2005-2009 period and

escalating from there grossly exceeded any reasonable interpretation of the

economics of the Muzak deal.  These well-supported conclusions left the court free

to seek better evidence of the rates DMX would pay in a competitive market.

### B.     The District Court Correctly Rejected ASCAP's Alternative Proposal Purporting to Take Account of DMX Direct Licenses

ASCAP's alternative proposal was identical to its primary proposal but for a

fixed-dollar credit based on DMX payments to direct licensors in prior years and a

$25,000 annual surcharge purportedly to compensate ASCAP for added

administrative expense.  SA59-61.  At trial, ASCAP's Chief Economist conceded

that its alternatively proposed fee structure:  (i) would always cost DMX more than

a traditional blanket license (no matter how much or how little music DMX

47

licensed directly), A1122; (ii) was "inequitable" to DMX, A1145; (iii) would

create a windfall for members who do not license directly, A1127; and (iv) would

eliminate any incentive for DMX to continue to enter into direct licenses post-trial,

A1124.  Professor Jaffe explained that "this proposal [was] strongly anti-

competitive."  SA67; *see* A625-26.  There was no error in the district court's

rejection of a credit proposal that "taxed [DMX] for having engaged in a direct

license program" and was "designed to convince DMX to discontinue the

program."  SA61-62.  Any other conclusion would turn the competition-enhancing

policy objectives of AFJ2 on their head.

## III.   THE DISTRICT COURT'S RATE DETERMINATION EMBODIED THE NORMATIVE GOALS OF THE RATE-MAKING PROCESS AND WAS AMPLY SUPPORTED BY THE EVIDENCE

After rejecting ASCAP's fee proposals, the district court adopted DMX's

own.  That proposal included both the starting fee for the license and the structure

of the crediting mechanism to reflect DMX's ongoing direct-licensing efforts.  The

court expressed the fee formula as follows:  Per-location fee = Floor Fee +

[Unbundled Music Fee x Share Licensed via ASCAP].  SA74.  As the court

explained, this formulation splits the overall blanket license fee into two parts:  a

floor fee that "is the minimum fee that DMX would pay for the benefits of an

ASCAP license, even if all of the ASCAP music that DMX performs is covered by

direct licensing agreements" and an "unbundled music fee" representing the

48

"'pure' value of the performance rights for ASCAP music performed by DMX."

SA73-74.  Under the formula, "the amount of the unbundled music fee that

ASCAP receives varies depending on the extent to which DMX subscribers play

ASCAP works that are directly licensed."  SA74.  The floor fee that ASCAP

receives for the value of its services does not vary.  *Id.*

The court assessed the reasonable value of the unbundled music fee at

$10.74 per location.[14]  Based on the essentially uncontested testimony of Professor

Jaffe and Dr. Candell about how to value the floor fee, the court added an

additional $3 per location to the rate to compensate ASCAP for the value it

provides by aggregating performance rights and the unique characteristics of the

license, producing a starting blanket license fee of $13.74 per location.  SA76-77.

On this appeal, ASCAP challenges the propriety of so "unbundling" the

blanket license for fee-setting purposes.  It further contends that the district court's

reliance on the body of direct licenses in establishing reasonable fees was

improper.  Last, it complains that the court's adoption of a dynamic fee structure to

account for ongoing growth in DMX's direct license program was inconsistent

---

[14] Adopting the analysis of DMX's experts, the court derived the figure by
deducting 10% of the $25 direct-license royalty pool (which was the percentage
ascribed by ASCAP) to account for the value of the mechanical rights additionally
conveyed by the license, and further adjusting for ASCAP's 48% share of DMX
performances (not disputed by ASCAP).  SA75-76.

with the decision in *United States v. ASCAP (In re Applications of Muzak, LLC
and DMX Music, Inc.)*, 323 F. Supp. 2d 588 (S.D.N.Y. 2004) ("*Muzak II*"), on a
very different evidentiary record. We demonstrate below why each of these
critiques fails when tested against the trial record here.

### A.  The District Court Did Not Err in Using Separate Benchmarks to Assess the Reasonable Value of Distinct Benefits of the Blanket License

ASCAP's contentions that its "blanket license is vastly different from and
qualitatively more valuable than any direct license" and that its "blanket license
cannot be 'unbundled' into component parts to be sold in pieces," ASCAP Br. 32,
59, seek to obfuscate the sound analytic underpinnings that led the trial court to
reach its blanket fee determination in the fashion it did. As Professor Jaffe
explained, ASCAP licensees are "getting two kinds of benefits from the license:"
the right to perform specific musical works, and the transactional and
indemnification benefits to the licensee from ASCAP having aggregated its
repertory into a single license. A592. Evaluating the blanket license fee in a
manner that enables separate measurement of these distinct elements of value
"corresponds to an economic reality" that a blanket licensee is getting both of these
benefits. *Id.* Professor Jaffe also explained why approaching fee-setting in this
manner promotes the normative goal of rate-making to approximate the fees that
would be generated for licensing music performance rights in a competitive

market.  Whereas the traditional blanket license fee charged by ASCAP represents "simultaneous and undifferentiated compensation for both services," *id.*, distinguishing the two components of the blanket license fee allows the performance rights component (denominated at trial as the "unbundled music fee") to be priced based on "the price in a competitive market of the music performance rights themselves, unbundled from the aggregative benefit conveyed by the blanket license."  A593.  The record developed at trial presented a textbook case for application of this approach, since it was replete with direct-license data reflecting just how such a competitive market has operated.

Whatever "unique characteristics" are offered by the ASCAP blanket license, such as transactions costs savings, immediate access to ASCAP's repertory, and indemnification against infringement claims by ASCAP members, were expressly accommodated in the separate valuation of the floor fee – a computation that increased the overall price of the blanket license by nearly 30%.  This computation was "based on numbers taken from ASCAP's own books."  SA78.  *See also* A393-95; A597-98; A1263.[15]

---

[15] ASCAP complains that the district court set a lower floor fee (and therefore a lower total blanket fee) than the one set for BMI.  ASCAP Br. 60-61 n.13.  But this is an outcome of ASCAP's own making, given that BMI made its trial record on this point and ASCAP did not.  SA78 n.48 (ASCAP "challenged neither the methodology nor the calculations associated with the proposed floor fee").  As the district court succinctly stated, "While ASCAP argued in summation that DMX's

The district court soundly concluded from the entire record that "isolating
two components for the licensing fee – a floor fee and an unbundled music fee – is
reasonable.  It adequately compensates ASCAP for its service in providing a
blanket license."  SA77.  At trial, ASCAP offered no persuasive explanation as to
why the blanket license could not be valued this way, and it offers none here.
ASCAP simply does not like the results the analysis yields.

### B.   The District Court Did Not Err in Using the Direct-License Benchmark to Value the Performance Rights Conveyed by the ASCAP Blanket License

#### 1.   DMX's Direct-License Experience Provided "Compelling" Evidence of a Competitive-Market Valuation of the Performance Rights In Issue

To value the "unbundled music fee," the district court adopted as a
benchmark the $25 per location royalty rate paid by DMX to direct licensors.
Professor Jaffe explained that the direct licenses provide the court with
"unprecedented and compelling competitive market benchmarks" for the value of
"'pure' music performance rights in a competitive market."  A595-96.  Because the
rightsholders themselves decided "whether or not the compensation offered by
DMX . . . was reasonable," the direct licenses provide "a foundation for

---

proposal does not adequately compensate it for the value it provides in aggregating
individual compositions, it neither provided an alternative mechanism for such a
valuation nor explained why the floor fee is insufficient to capture that value."
SA78.

determination of a reasonable fee that is more compelling from an economic

perspective than any benchmark that [Professor Jaffe is] aware of having been

offered before."  A596.

The court's selection of the direct-license benchmark, moreover, was amply

supported by its own fact-finding, including that:  (i) "[o]ver 850 music publishers

and administrators have issued [direct] licenses to DMX;" (ii) "[a]mong these

licensors are prominent and sophisticated music publishers whose entire business

is devoted to the licensing of music compositions;" (iii) "[t]hese hundreds of

agreements provide compelling evidence of the valuation of the right to publicly

perform musical compositions within the BG/FG industry;" and (iv) "30% of

DMX's musical performances are covered by direct licenses."  SA79.

The court found the reasonableness of the overall fee generated by its

analysis corroborated by the fact that DMX would pay 3.1% of its music service

revenue to ASCAP – a rate that "ASCAP has not shown … is unreasonable."

SA83.  In fact, this percentage is still substantially higher than the percentage paid

by ASCAP licensees in other industries with intensive uses of music.  *See, e.g.,*

*RealNetworks*, 627 F.3d at 81.  The district court found further corroboration in the

fact that the BMI court, on its own trial record, had "also approved a similar fee

structure and the $25 royalty pool rate," noting that its "independent judgment on

53

nearly identical issues . . . serves only to confirm the reasonableness of DMX's

proposal here."  SA86.

### 2.    ASCAP's Critiques of the Direct-License Benchmark are Meritless

#### a.    The purported unreliability of the direct-license benchmark

ASCAP attacks the district court's use of the direct-license benchmark to

value the unbundled music fee component of the Blanket Fee with assertions that

(i) the $25 per location rate "was not the product of true arm's length negotiation"

and (ii) "the district court overlooked the fact that other publishers…did not

acquiesce to DMX's terms."  ASCAP Br. 38-40.[16]  These criticisms are meritless.

ASCAP's assertion that because the $25 rate was not "negotiated" with each

individual publisher, it must not "reflect the 'price that a willing buyer and a

willing seller would agree to in an arm's length transaction,'" ASCAP Br. 39

(internal citation omitted), misportrays the entire process that underlay its offer and

widespread adoption.  As the district court found, the $25 rate was designed to be

---

[16] ASCAP understandably relegates to a footnote its contention that direct licensors "lacked complete, truthful, and clear information about the direct licenses," ASCAP Br. 39 n.6, given ASCAP's complete failure of proof on this score at trial. As the district court concluded, "[t]here is no evidence of any pattern of misrepresentation or omissions by either DMX or its agent MRI, and certainly none designed to deceive music publishers or administrators into signing direct licenses." SA82.  The court's fact-finding in this regard was amply supported by trial testimony.  *See, e.g.*, A673-77; A492-94; A771.

fair and reasonable, and the license form was vetted "by negotiating it in the first instance with the most careful and scrupulous publishers.  Where terms or language needed to be adjusted, it was."  SA82; *see* A479-80.  The uniformity of the $25 rate simply reflects that the publishers that signed the direct license agreements found the rate acceptable.  That non-participating publishers are now faced with receiving ASCAP royalties recalibrated to competitive levels is a consequence of their voluntary association with an organization whose market power has dictated that it be subject to rate-making constraints designed to promote just such an outcome.

ASCAP's contention that the direct-license benchmark was unreliable because certain publishers did not grant direct licenses and some others did not renew theirs, ASCAP Br. 40-42, depends on a factual premise that ASCAP failed to prove, namely, that publishers acted as they did because of the asserted inadequacy of the $25 royalty pool.  In fact, not a single publisher indicated that it would enter into a direct license if only DMX would offer a higher royalty rate.  A1214.  The same is true as to the handful of non-renewing publishers.  *Id.*  The only motivations revealed by the record for publisher non-participation were the inertia of the current licensing system and concerted efforts at dissuasion by ASCAP and BMI – particularly directed at the more prominent publishers.  *See* SA42-43; A1006-07; A1010; *supra,* pp. 18-22.  As the district court concluded:

55

"The PROs have tried their best to prevent the major music publishers from

entering into direct licenses with DMX."  SA43.

ASCAP's criticisms, moreover, ignore the way competitive markets operate.

The fact that certain publishers may have been unwilling to license DMX at the

price set by competition is no different than what occurs in other competitive

markets in which some sellers choose not to sell at the price the market dictates,

and Professor Jaffe explained that there is nothing meaningful from an economic

perspective to be inferred from some publishers declining to license directly at $25.

A608; A1266.  That certain publishers may prefer the protection from competition

that has historically been afforded by traditional blanket license practices also

forms no basis for discrediting a court process charged with redressing market

power obtained through "inherently anti-competitive" practices.  *Music Choice IV*,

426 F.3d at 93.  The notion that the district court's ruling, if affirmed, may open up

competitive options to other user industries, ASCAP Br. 28, 54, while anathema to

ASCAP, is if anything a rationale for its affirmance.  *Cf. WPIX, Inc. v. BMI*,

Opinion and Order, 09 Civ. 10366 (LLS) (S.D.N.Y. Apr. 27, 2011) (holding that

BMI must offer AFBL to television broadcasters).

### b.    The Sony advance

ASCAP also criticizes the manner in which the district court treated the

nonrefundable advance paid to Sony.  ASCAP Br. 42-46.  It contends that, to the

extent not fully recouped, this advance implies an effective royalty rate under the

license of greater than $25.  *Id.* at 44.[17]  There is no basis to overturn the court's

factual determination that the Sony advance should be treated as a cost of entry

into the market rather than as a royalty payment for performance rights with rate-

setting implications of the sort ASCAP suggests.  SA84-85.

DMX showed at trial why a significant advance was necessary to induce at

least one major publisher to break ranks and grant a direct license.  SA84.  Mr.

Knittel explained the obstacles to direct licensing and why DMX thought it needed

to pay an advance to Sony as a cost of entry into the market.  A665-66; *see also*

A693 (testimony concerning publisher fear that rate set individually in a direct

license might drive down rates set collectively by PROs).  ASCAP's own CEO

characterized the Sony advance as a "first mover advantage."  A1006.  Dr. Candell

testified that one could reasonably conclude that the Sony advance should be

treated as a cost of entry, rather than as additional royalty compensation for

performances of Sony compositions.  A390-91.  Given this testimony, as well as

---

[17] ASCAP erroneously contends that, so analyzed, the Sony transaction implies a royalty rate of approximately $100.  ASCAP Br. 43-44.  As the trial record reflects, this deeply flawed calculation is based on false assumptions and fails to account for either the 21-month extension of that agreement or the increased number of locations served by DMX.  A1225.  The district court found that were one to treat the Sony advance as a royalty payment, the music fee portion of the blanket license would only rise from $10.74 to "as high as $17.92."  SA84.

ASCAP's and BMI's explicit interference in DMX's direct-license efforts, the
court did not err in its treatment of the Sony advance.  Indeed, the BMI rate court
reached the same conclusion on a similar trial record.  *BMI/DMX*, 726 F. Supp. 2d
at 361.

ASCAP's related contention that the Sony transaction infects the rest of the
direct licenses because of the MFN clause rests on a deliberate mischaracterization
of the scope of that provision.  ASCAP Br. 45-46.  The record evidence from Mr.
Gertz (who wrote the provision), among others, was that the clause does not apply
to advances or guarantees (or even to the $25 royalty pool), but only to the pro rata
allocation methodology of the license.  A484; SA35.  ASCAP failed to produce
evidence that *any* publisher understood otherwise.  The only publishers that spoke
to the issue testified that they did not believe that the MFN covered advances.
A777-78; A912.  Indeed, as the district court noted, "there is no evidence that since
the existence of the Sony advance became public at the DMX/BMI trial…any
direct licensor has protested to DMX that the $25 pool rate should be increased to
include that advance."  SA85.

### C.   The District Court Did Not Err in Establishing an Adjustable-Fee Structure to Account for DMX's Growing Direct License Program

ASCAP fleetingly criticizes the district court for adopting a dynamic fee-
credit mechanism, rather than freezing the size of the credit in a manner that would

ignore continuing growth of the direct-license initiative.  ASCAP Br. 57.

ASCAP's position that DMX was remitted to seeking short-term licenses from

ASCAP if it wished to benefit from new direct licenses derives from the district

court's determination in *Muzak II* that, in rate-making in that proceeding, the court

would consider only direct licenses signed before trial.  *See id.* (citing *Muzak II*,

323 F. Supp. 2d at 590-92 & n.4).  *Muzak II* was not, as ASCAP suggests, a ruling

limiting what licenses "may be considered" by any future rate court under *AEI* or

AFJ2, ASCAP Br. 57, but only a determination as to what Judge Conner

considered reasonable on the record before him.

    As Judge Cote observed, the *Muzak II* court "was not presented with

evidence of a robust direct license program like the one that DMX has since

created."  SA72.  When *Muzak II* was decided, Muzak had negotiated two option

agreements but had no operative direct licenses in place.  *See* SA72; *Muzak II*, 323

F. Supp. 2d at 592 n.6.  In contrast, the record here reflected that DMX had secured

and already was making payments pursuant to 850 direct licenses and was

acquiring hundreds more each year.  SA35 n.25.  On this record, the district court

recognized the impracticality and fundamental unfairness of foreclosing further fee

credits for DMX's expanding program during the license term.  SA72-73.

    As for ASCAP's suggestion that DMX could avoid a "double payment trap"

by taking short-term licenses from ASCAP, ASCAP failed at trial to make a case

for why remitting DMX to short-term licenses and repeated new fee applications

would be reasonable.  The trial record is replete with testimony about the problems

of such an approach.  *See, e.g.*, A602-03.  Here again, ASCAP offered no contrary

testimony, leading to the court's observation that "no one in this current litigation

has argued that it is wise or appropriate to order [DMX] to execute a short-term

license."  SA72-73.

ASCAP protests that the AFBL lacks "finality" because ASCAP does not

know the size of future credits, ASCAP Br. 57, but numerous "traditional" ASCAP

blanket licenses lack comparable "finality" as to actual cash flows, including both

those with a per-location fee structure and those based on a percentage of licensee

revenues.  The purported lack of "finality" scarcely provides a basis to overturn the

decision below.

# CONCLUSION

For the foregoing reasons, DMX respectfully submits that the district court's

Opinion and Order should be affirmed in its entirety.


Dated: April 29, 2011                    Respectfully submitted,

                                         R. Bruce Rich
                                         Benjamin E. Marks
                                         Todd D. Larson
                                         WEIL, GOTSHAL & MANGES LLP
                                         767 Fifth Avenue
                                         New York, NY 10153
                                         (212) 310-8000

                                         -and-

                                         Christopher S. Harrison
                                         CHRISTOPHER HARRISON, PLLC
                                         3267 Bee Caves Road
                                         Suite 107-67
                                         Austin, Texas 78746
                                         (512) 380-8507

                                         Counsel for Applicant-Appellee DMX, Inc.

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief for Applicant-Appellee DMX, Inc. complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface in 14-point Times New Roman. I further certify that this brief complies with the type-volume limitations set forth in Rule 32(a)(7)(B)(i) because the brief contains 13,972 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

R. Bruce Rich