Jeffery D. McFarland (SBN 157628)
jmcfarland@mckoolsmith.com
MCKOOL SMITH, P.C.
300 South Grand Avenue, Suite 2900
Los Angeles, CA 90071
Telephone: (213) 694-1200
Facsimile: (213) 694-1234

Travis DeArman (*pro hac vice*)
tdearman@mckoolsmith.com
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile:  (214) 978-4044

Attorneys for Counterclaim Defendant
SPOKEN GIANTS, LLC

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| In re PANDORA MEDIA, LLC COPYRIGHT LITIGATION<br><br><br>_____<br><br>This Document Relates to:<br>ALL ACTIONS | Master File No.: 2:22-cv-00809-MCS-MAR<br>CONSOLIDATED ACTION<br><br>**COUNTERCLAIM DEFENDANT SPOKEN GIANTS, LLC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS**<br><br><br>Date: March 6, 2023<br>Time: 9am<br>Courtroom: 7C<br>Assigned to Hon. Mark C. Scarsi |

McKOOL SMITH, P.C.

SPOKEN GIANTS' REPLY IN SUPPORT OF ITS MOTION TO DISMISS

McKool Smith, P.C.

## I. **Pandora fails to allege standing.**

For the reasons stated in Spoken Giants' ("SG") motion to dismiss (the "Motion"),[1] Pandora fails to allege Article III or antitrust standing. Mot. at 5-10. Pandora's Opposition[2] fails to address the defects in its pleadings for three reasons.

*First*, Pandora argues that it faced a "Hobson's choice" between paying a "supra-competitive" license and eliminating its comedy portfolio because SG made an "all-or-nothing" licensing demand, backed by "de facto exclusive" affiliation agreements between SG and its members. *E.g.*, SG ACC ¶¶ 41-49. Pandora cannot maintain this allegation, however, in view of its own pleadings and the facts incorporated by reference therein—including the sample Affiliation Agreement, April 19 Email, and Proposed Term Sheet, all subject to SG's *unopposed* motion for judicial notice. ECF Nos. 102-2, 102-3, 102-4. These facts, not previously available to the Court, belie Pandora's standing allegations. So while the Court takes Pandora's *non-conclusory* allegations as true and makes *reasonable* inferences in Pandora's favor, the Court need not accept unreasonable inferences or Pandora's misrepresentations of the record.

*Second*, contrary to Pandora's argument, SG does not contend that the Ninth Circuit's recent *Intel* decision always requires a supra-competitive payment. Opp. at 4. Instead, *Intel* confirms that a plaintiff must allege more than a mere invitation to negotiate to state an antitrust injury. *Intel Corp. v. Fortress Inv. Grp. LLC*, No. 21-16817, 2022 WL 16756365 (9th Cir. Nov. 8, 2022). Also contrary to Pandora's claim, SG does not argue that Pandora lacks standing because its claims fail on the merits (although they do). Rather, Pandora failed to plead standing because it failed to plead *non-conclusory* allegations sufficient to show it suffered an injury or will

---

[1] ECF No. 102.
[2] ECF No. 129.

2
SPOKEN GIANTS' REPLY IN SUPPORT OF ITS MOTION TO DISMISS

suffer injury in the future. *See Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018); *Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 970 (9th Cir. 2008).

*Third*, the Court's prior standing decision relied on different facts. ECF No. 84 ("Decision") at 12-13. Here, the facts alleged (and incorporated by reference) in the SG ACC preclude such a finding. *See* Section II.[3]

## II.    Pandora fails to plead that individual licenses were illusory.

Applying the rule of reason, the Court previously confirmed that "the opportunity to acquire a pool of rights does not restrain trade if an alternative opportunity to acquire individual rights is realistically available." Decision at 17. Pandora now argues that the Court should apply a *per se* analysis. Opp. at 4-5, *citing AG Nero v. MPEG LA, LLC*, 2010 WL 4366448, at *6 (C.D. Cal. Sept. 14, 2010).

Pandora misunderstands *Nero*, which confirmed that the rule of reason typically applies to IP pooling, and that the "true issue" is whether the "antitrust plaintiff lacked a 'realistic opportunity' as a 'practical matter' to obtain individual licenses." 2010 WL 4366448, at *6. The Court correctly described those principles, (Decision at 17), and the same analysis applies here.

Moreover, Pandora concedes that it never tried to negotiate individual licenses with SG or its members. Thus the only question is: has Pandora sufficiently alleged that the opportunity to obtain individual licenses was illusory? The answer is no.

Pandora attempts to save its claims by arguing that "[l]ike WC, SG demanded that Pandora take an all-or-nothing license for SG's entire 'growing catalog of

---

[3]SG respectfully submits that the Court's Decision concerning litigation costs as a basis for standing is inapplicable for the same reasons.

SPOKEN GIANTS' REPLY IN SUPPORT OF ITS MOTION TO DISMISS

McKool Smith, P.C.

[comedian] works' ([SG ACC[4]] ¶ 60), <u>with no realistic option to seek individual licenses</u>." Opp. at 5 (emphasis added). But SG's publicly available sample affiliation agreement (ECF. No. 102-2) contains the following provision (emphasis added):

> Notwithstanding the provisions of **Section 3** of this Agreement, You retain the right to issue non-exclusive licenses directly to any third person (other than to another spoken word rights administration organization) for the public performance, in the United States, its territories and possessions, of any Work subject to this Agreement, provided that any such direct license is memorialized in a writing, a copy of which is provided to Spoken Giants within ten (10) days of its issuance, and which identifies the Work(s) so licensed, the licensee, the time and the place of the performance(s), and any fee(s) paid therefor.  You hereby acknowledge and agree that Spoken Giants will not pay royalties to You with respect to any public performance directly licensed by You.

As shown, SG's affiliation agreements are not "de facto" exclusive; they are *non-exclusive* (except for a limitation on licensing through a "spoken word rights administration organization"). Pandora omitted the operative language to falsely claim that the agreements were "de facto" exclusive. SG ACC ¶ 71.

Additionally, Pandora claims that SG "demanded that Pandora take the 'all-or-nothing' blanket license covering everything in its catalog." SG ACC ¶¶ 39-42. Pandora distorted the record by omitting SG's email correspondence and proposed term sheet. ECF Nos. 102-3, 102-4. These documents demonstrate that SG merely invited Pandora to negotiate.

Pandora's misrepresentations of the record do not support plausible inferences in its favor. *See, e.g.*, *Nguyen v. Simpson Strong-Tie Co.*, *Inc.*, 2020 WL 5232564, at *5 (N.D. Cal. Sept. 2, 2020). Nor is the Court under an obligation to accept mere conclusions or unreasonable inferences. *E.g.*, *Sprewell v. Golden State*

---

[4] Pandora refers to its amended counterclaims against SG and Lewis Black as the FACCs. To avoid confusion, SG uses the term "SG ACC."

SPOKEN GIANTS' REPLY IN SUPPORT OF ITS MOTION TO DISMISS

McKool Smith, P.C.

*Warriors*, 266 F.3d 979, 989 (9th Cir.), *opinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001).

Pandora also misstates the law, misquoting *Samsung Elecs. Co., Ltd. v. Panasonic Corp.*, 2015 WL 10890655, at *6 (N.D. Cal. Sep. 30, 2015) at page six of its response:

> As in *Samsung*, the term sheet SG sent Pandora contained "no provision permitting separate licenses" and no member of the collective "indicated a willingness to negotiate a separate license."

Pandora's "quotation" omits critical language showing that *Samsung* supports SG's Motion. There, the court evaluated the plaintiff's allegation that it was denied a "realistic opportunity as a practical matter to obtain individual licenses," stating:

> Two points most strongly support Defendants' argument that SD-3C did not prevent individual licensing. First, it is undisputed that the 2006 and 2007 licensing agreements contain **express language providing that each member of the SD Group retains the right to negotiate and license its own patent rights separately**. . . . Second, the Court agrees that, in the TAC, **Samsung stops short of alleging that the members of the SD Group agreed to deny Samsung (or anyone else) the opportunity to negotiate individual licenses for the SD Card patents**.

2015 WL 10890655, at *4-5.[5] The same facts are present here: the affiliation agreements allow individual licensing; and Pandora fails to plead that SG or any of its members refused to negotiate.

Admittedly, the *Samsung* court denied the motion to dismiss on this issue, but it relied on two distinctions not present in this case. *First*, the plaintiff in that case alleged that an additional agreement did not permit separate licenses. *Id.* at *5.

---

[5] Emphasis added.

SPOKEN GIANTS' REPLY IN SUPPORT OF ITS MOTION TO DISMISS

McKOOL SMITH, P.C.

1    Pandora makes no such allegation. *Second*, the court relied on "the allegation that

2    Samsung has attempted to negotiate with individual SD Group members ***and*** no

3    member of the SD Group has indicated a willingness to negotiate a separate license

4    agreement[.]" *Id.* at *6 (emphasis added). Unlike in *Samsung*, Pandora does not

5    allege that it attempted to negotiate. By cutting attempt-to-negotiate language from

6    its "quote," Pandora implies that *Samsung* supports its position.[6] The law is plainly

7    the opposite, and because Pandora failed to "make[] an inquiry or attempt to

8    negotiate an individual license," its claims fail. Decision at 17.

9    **III.    Pandora fails to plead market power.**

10            **A. Pandora's allegation of two "monopolies" dooms both claims.**

11           Pandora has alleged that SG and WC each "has monopoly power (or . . . a

12   dangerous probability of achieving monopoly power) over Pandora." SG ACC at

13   ¶ 88; WC ACC at ¶ 98. As a matter of law, claims alleging two monopolies in a

14   single market fail. *See Reudy v. Clear Channel Outdoors, Inc.*, 693 F.Supp.2d 1091,

15   1127 (N.D. Cal. 2010); *see also SC Innovations, Inc. v. Uber Tech., Inc.*, 434

16   F.Supp.3d 782, 793-94 (N.D. Cal. 2020); *Lenhoff Enter., Inc. v. United Talent*

17   *Agency*, 2015 WL 7008185, at *3 (C.D. Cal. Sep. 18, 2015).

18           Pandora responds to this contradiction by arguing that "the phenomenon of

19   multiple firms with market power is familiar." Opp. at 12, *citing Meredith Corp. v.*

20   *SESAC LLC*, 1 F. Supp. 3d 180, 188-89, 218-19 (S.D.N.Y. 2014); *United States v.*

21   *Visa U.S.A., Inc.*, 344 F.3d 229, 239-40 (2d Cir. 2003). However, nothing in

22   *Meredith* or *Visa* supports Pandora's claims.[7]

---

23   [6] Courts routinely warn against using ellipses or other selective quotations in such a misleading
24   manner. *E.g. Precision Specialty Metals, Inc. v. United States*, 315 F.3d 1346, 1357 (Fed. Cir.
     2003).
25   [7] *Meredith* answered a different question: whether a jury could find that a performing rights
26   organization had monopoly power over its *own* repertory, because evidence suggested that it
     imposed penalties on affiliates for direct licensing. 1 F. Supp. 3d at 223. The court in *Visa* did not
27   address monopoly power at all. 344 F.3d 229.

28   SPOKEN GIANTS' REPLY IN SUPPORT OF ITS MOTION TO DISMISS

McKool Smith, P.C.

**B. Pandora could have negotiated licenses with SG's members.**

Pandora concludes that it "must have" the rights to an unidentified number of works by "superstar" comedians. Opp. at 7-9. Pandora does not identify who counts as a "superstar," how many "superstars" are required, or, of those, how many are SG members. At most, Pandora alleges that, in 2021, 12 SG members were in the top twenty-five comedians on Pandora, and that other SG members led comedy album sales between *1991* and 2014. *Id.* at 8. These sporadic data points do not establish market power.

However, Pandora admits that it does not need any a license for any *single* SG member, and it does not need a license for *all* of SG's portfolio. Opp. at 7-9. Pandora then leaps to the claim that "without access to *any* of the works in SG's catalog, Pandora would have to significantly degrade its comedy service." *Id.* But Pandora skips the second of three logical steps:

1) Pandora "must have" access to some number of SG's "superstars";

2) Pandora can *only* obtain a license from those "superstars" through a blanket license;

3) therefore, "without access to any of the works in SG's catalog, Pandora would have to significantly degrade its comedy service."

Pandora fails to plead items one and three with any specificity. But more critically, it makes no effort to establish the second step, or to contend with the plain language of SG's affiliation agreements showing that Pandora had, at any time, a "realistic opportunity as a practical matter to obtain individual licenses." *Nero*, 2010 WL 4366448, at *6; *Samsung*, 2015 WL 10890655, at *4-5; ECF No. 102-2 at 3.

SPOKEN GIANTS' REPLY IN SUPPORT OF ITS MOTION TO DISMISS

### C. Pandora fails to plead direct or circumstantial evidence of market power.

Pandora alleges that SG's demand for a "blanket license" for a fee "well above competitive levels" is "direct evidence of market power." Opp. at 10. But as established, SG never made a demand for a "blanket license." *See* above at 4; Mot. at 7-8. Pandora similarly alleges that if it does not "accede" to SG's demands it will "lose[] access to the SG-controlled comedy" and be forced to "abandon its comedy offering." This merely repeats the false "Hobsons-choice" narrative belied by the facts stated above. *Id.*

### IV.  Pandora fails to plead an antitrust conspiracy.

### A. Pandora fails to allege "who, did what, to whom, when."

Pandora claims that SG's members (the "who") signed affiliation agreements (the "what"), harming Pandora ("to whom"), when: (a) a member became affiliated with SG; (b) SG proposed its "blanket license demand"; and (c) Lewis Black filed copyright litigation against Pandora (the "when").

Pandora's "who" and "what" allegations fail because affiliation alone cannot establish a hub-and-spoke conspiracy. Decision at 24; *Kendall v. Visa U.S.A.*, 518 F.3d 1042, 1048 (9th Cir. 2008). This is further confirmed by the affiliation agreements, which *expressly permit direct licensing between any comedian and Pandora*. Absent any reasonable inference to support Pandora's claim that the invitation to negotiate was a "blanket license proposal," its allegations of "to whom" also fail. *See* above at 4. The "where" and "when" fail too: Pandora apparently does not even attempt to allege "where," and its attempt at alleging "when" is fatally defective because the dates simply reflect that routine business decisions made after SG's formation. These allegations cannot overcome the

SPOKEN GIANTS' REPLY IN SUPPORT OF ITS MOTION TO DISMISS

McKool Smith, P.C.

McKool Smith, P.C.

deficiencies identified in the Court's dismissal of Pandora's original conspiracy claim.

### B. Pandora fails to allege horizontal agreements.

Pandora argues that the Comedians had an "understanding" of SG's generic public statements, supporting an inference that this was "reason to know which other Comedians joined the scheme." Opp. at 16. That is insufficient, and Pandora's reliance on *Interstate Circuit* is misplaced. There, a theater operator sent individual letters to eight movie distributors, threatening not to exhibit their films if they did not implement a 25 cent admission price for certain other theaters. 306 U.S. 208, 216-17 (1939). Because the letters described the scheme in detail and were each addressed to all eight distributors, the Court inferred an agreement from the distributors' adoption of the terms. *Id.* at 227.

Unlike in *Interstate Circuit*, Pandora has not alleged that SG communicated a detailed scheme or signaled that participation from each comedian was required. Pandora relies only on SG's public statement (Opp. at 16), without alleging who heard it, or when, or how, or any way in which it described the purported conspiracy's "scope and purpose." *Intel Corp.*, 2020 WL 6390499, at *17. This does not approach the *Interstate Circuit* standard. Moreover, no such "invitation" could have existed, as SG's offer allowed for bargaining over terms. Opp. at 6. Merely implementing a new fee structure is insufficient to support a conspiracy. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008).

Pandora's reliance on *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 555 F. Supp. 3d 829 (N.D. Cal. 2021) is likewise misplaced. There, the court found that plaintiffs adequately pleaded specific, individual agreements between the defendant and the co-conspirators resulting in a uniform, overarching scheme. *In re Xyrem*, 555 F. Supp. 3d at 868. Similarly, plaintiffs in *Keurig* pointed to individual

SPOKEN GIANTS' REPLY IN SUPPORT OF ITS MOTION TO DISMISS

agreements between Keurig and individual roasters. *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 243 (S.D.N.Y. 2019). There is no plausible inference that such a scheme was pursued here.

Finally, no law supports Pandora's argument that the Court may infer a conspiracy from the allegation that no comedian initiated individual negotiations with Pandora—especially when Pandora simultaneously pleaded that it will <u>not</u> negotiate with any comedian, on any terms. SG ACC ¶ 33.

## V.  **Pandora's "plus factors" reflect lawful business conduct.**

Viewed individually or collectively, Pandora's "plus factors" simply describe legitimate business practices and fail to support any plausible inference to the contrary.

First, Pandora claims that, by entering affiliation agreements, Comedians "act[ed] against self-interest." Opp. at 17-18. But Pandora offers nothing in support of the conclusion that no comedian would ever seek to enforce their spoken word copyrights, absent a conspiracy. This defies logic and stands antitrust law on its head. At most, Pandora's allegation "could just as easily suggest rational, legal business behavior." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015).

Next, Pandora cites Comedians' purported "common motive" and *B&R Supermarket, Inc. v. Visa*, 2106 WL 5725010 (N.D. Cal. Sept. 30, 2016). Opp. at 18. But unlike in *B&R Supermarket*, where an "impending" market change "threatened to introduce competition where none had existed," the Comedians have taken rational steps to enforce preexisting rights that Pandora has historically infringed. That is exactly the kind of "garden-variety motive" that does not support antitrust conspiracy. *Cf. B&R Supermarket*, 2106 WL 5725010, at *7; *see In re*

SPOKEN GIANTS' REPLY IN SUPPORT OF ITS MOTION TO DISMISS

McKool Smith, P.C.

*Musical Instruments*, 798 F.3d at 1195 ("[A]llegations of parallel conduct—though recast as common motive—[are] insufficient to plead a § 1 violation.").

Pandora's third "plus factor"—complex change close in time—is equally flawed. Opp. at 18, citing SG ACC ¶ 65. SG was formed a few years ago, and its formation is exactly the kind of "discernible reason" for changed behavior that fully negates any potential inference of conspiracy. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, at 556 n.4 (2007) (conspiracy may be plausibly alleged based on "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason").

Pandora's final attempt to identify an antitrust plus factor—"public assurances"—is no more effective. There is nothing inherent to public statements, including the marketing and press statements that Pandora has identified, that suggests an antitrust conspiracy. *See In re Nat'l Ass'n of Music Merchants*, 2012 WL 3637291 at *5 (S.D. Cal. Aug. 20, 2012).

## VI.   Pandora fails to allege agreements in unreasonable restraint of trade.

Pandora argues that SG obtained market or monopoly power "through its de facto exclusive affiliation agreements . . ." Opp. at 20. But as discussed, the affiliation agreements were not "de facto exclusive." *See* Section II.

Pandora fails to allege anything beyond inactionable principal-agent relationships. Its citations only highlight this deficiency. In *Toys "R" Us* and *Apple*, defendants limited competition where market consolidation resulted in the emergence of a small number of identified suppliers. *In Re Toys "R" Us, Inc.*, 126 F.T.C. 415, 424 (1998), *aff'd sub nom. Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000); *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 694 (S.D.N.Y. 2013), *aff'd*, 791 F.3d 290 (2d Cir. 2015). Pandora does not allege market consolidation among comedians or define the "critical mass" of comedians that it

SPOKEN GIANTS' REPLY IN SUPPORT OF ITS MOTION TO DISMISS

McKool Smith, P.C.

purportedly needs to access to offer a viable comedy service; and it fails to identify "must have" comedians.

Pandora concludes that SG's "potential to foreclose competition" caused harm. Opp. at 21. Pandora fails to explain how SG's easily-terminable affiliation agreements injured competition, however. *See Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp 3d 988, 998 (N.D. Cal. 2015). Nor does Pandora allege any actual injury, *e.g.*, overpayment. *See Intel Corp. v. Fortress Inv. Grp. LLC*, No. 21-16817, 2022 WL 16756365, at *2 (9th Cir. Nov. 8, 2022).

## VII.   Conclusion

For the reasons explained above and in the Motion, SG requests that the Court dismiss all of Pandora's counterclaims against SG.

DATED: February 8, 2023          **MCKOOL SMITH, P.C.**
                                 By: */s/ Travis DeArman*
                                 Travis DeArman

                                 *Attorneys for Counterclaim-
                                 Defendant Spoken Giants, LLC*

SPOKEN GIANTS' REPLY IN SUPPORT OF ITS MOTION TO DISMISS

McKool Smith, P.C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

McKool Smith, P.C.

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Spoken Giants, certifies that this brief contains 2,953 words, which complies with the word limit of L.R. 11-6.1.

DATED: February 8, 2023          **MCKOOL SMITH, P.C.**
                                 By: *<u>/s/ Travis DeArman</u>*
                                     Travis DeArman
                                     *Attorneys for Counterclaim-*
                                     *Defendant Spoken Giants, LLC*

SPOKEN GIANTS' REPLY IN SUPPORT OF ITS MOTION TO DISMISS