# EXHIBIT G

# 10-3429

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

BROADCAST MUSIC, INC.,

Petitioner-Appellant,

v.

DMX INC.

Defendant-Appellee.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

BRIEF FOR THE UNITED STATES
AS AMICUS CURIAE

_____

Daniel McCuaig
Matthew J. Bester
  *Attorneys*
U.S. Department of Justice
450 5th Street, N.W., Suite 4000
Washington, D.C. 20530
 (202) 307-0520

Christine A. Varney
  *Assistant Attorney General*

Robert B. Nicholson
Robert J. Wiggers
  *Attorneys*
 U.S. Department of Justice
 950 Pennsylvania Ave., N.W., Room 3224
 Washington, D.C.  20530
 (202)514-2460

# TABLE OF CONTENTS

INTEREST OF THE UNITED STATES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUE PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      THE DISTRICT COURT PROPERLY REJECTED AN ANTICOMPETITIVE
      "OPTION VALUE" ADDITION TO THE PRICE OF AN ADJUSTABLE FEE
      BLANKET LICENSE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          1.     The Language and Context of the Decree Show That It Was Intended to
                 Promote Competition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          2.     The Record Supports the District Court's Decision  . . . . . . . . . . . . . . . . . . . . . 12

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ADDENDUM A – Memorandum of Defendant Broadcast Music, Inc. In Support of
      Motion to Modify Consent Decree (Filed June 27, 1994)

ADDENDUM B – Memorandum of the United States In Response to Motion of
      Broadcast Music, Inc. To Modify the 1966 Final Judgment in this Matter (Filed
      June 20, 1994)

# TABLE OF AUTHORITIES

## CASES

*ASCAP v. Showtime/The Movie Channel, Inc. ("Showtime")*, 912 F.2d 563 (2d Cir. 1990)  . .   10

*Broadcast Music, Inc. v. DMX, Inc.*, 726 F. Supp. 2d 355 (S.D.N.Y. 2010) . . . . . . . . . . . *passim*

*Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561 (1984) . . . . . . . . . . . . . . . . . . . . . .   9

*United States v. ASCAP ("RealNetworks")*, 627 F.3d 64 (2d Cir. 2010)  . . . . . . . . . . . . . . . .   11

*United States v. Armour & Co.*, 402 U.S. 673 (1971)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

*United States v. Broadcast Music, Inc. ("Muzak/AEI")*, 275 F.3d 168 (2d Cir. 2001)  . . .  2, 10,12

*United States v. Broadcast Music, Inc. ("Music Choice I")*, 316 F.3d 189 (2d Cir. 2003) . .   3, 10

*United States v. Broadcast Music, Inc. ("Music Choice II")*, 426 F.3d 91 (2d Cir. 2005)  . .   4, 10

*United States v. ITT Continental Baking Co.*, 420 U.S. 223 (1975)  . . . . . . . . . . . . . . . . . . . . .   10

## MISCELLANEOUS

Consent Decree, *United States v. Broadcast Music, Inc.*, 1966 Trade Cases (CCH) (S.D.N.Y. 1966)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Order Modifying 1966 Consent Decree, *United States v. Broadcast Music, Inc.*, 1996 Trade Cases (CCH) (S.D.N.Y. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2,12

## INTEREST OF THE UNITED STATES

The decision below implements an antitrust consent decree entered between the United States and Defendant-Appellant Broadcast Music, Inc.  The United States has an interest in the correct construction of the Decree.

## ISSUE PRESENTED

Whether BMI is entitled to include an "option value" premium, an addition to the price of a blanket license, in its price for an adjustable-fee blanket license.

## STATEMENT OF FACTS

BMI and the American Society of Composers, Authors and Publishers ("ASCAP") are two of the dominant music performing rights organizations ("PROs").  They aggregate rights from copyright holders, license them on a non-exclusive basis to music users, and distribute the royalties to their members. These and other functions provide some efficiencies, but also give the PROs significant market power.  To cabin the exercise of their power, the government brought antitrust suits against each of them.  The results were regulatory decrees which, as pertinent here, were amended to allow the district court to prescribe reasonable rates for the licenses.  Under the BMI rate court provision, Article XIV(A), "[s]hould defendant not establish that the fee requested by it is a reasonable one, then the Court shall determine a reasonable fee based upon all the

1

evidence." *United States v. Broadcast Music, Inc.*, 1966 Trade Cases (CCH) ¶ 71,941 (S.D.N.Y. 1966), *as amended*, 1996 Trade Cases (CCH) ¶ 71,378 (S.D.N.Y. 1994) (reproduced at JA A-15-16).

The primary form of license granted by BMI and ASCAP is a "blanket license," which gives the licensees the right to use as much of the music as they want at any time.  In 1998, DMX's predecessor, AEI Music Network, Inc. and another "commercial music service" ("CMS") provider, Muzak, asked for blanket licenses priced with "carve-outs" for works directly licensed from the copyright holders.  BMI claimed that the decree did not require it to grant such licenses, but this Court found otherwise.  It held that a "carve out" or "adjustable-fee blanket license" ("AFBL") is a form of blanket license, albeit with an alternative rate structure, and thus within the district court's rate-setting authority.  *United States v. Broadcast Music, Inc.*, 275 F.3d 168 (2d Cir. 2001) ("*Muzak/AEI*").  After lengthy negotiations, however, Muzak settled with BMI in 2004 for a flat-fee blanket license, and most CMS providers have followed suit.  DMX, which merged with AEI, continued to pursue an AFBL, while securing direct licenses from a number of copyright holders.  BMI and DMX were unable to agree on the terms of an AFBL license, and in January 2008 BMI petitioned the district court to

prescribe a rate.[1]

As found by the district court, BMI and DMX agreed that the fee should be
expressed as an annual per location rate. *Broadcast Music, Inc. v. DMX, Inc.*, 726
F. Supp. 2d 355 (S.D.N.Y. 2010); Slip op. 1. They also agreed that the rate should
be computed from three components: a "blanket fee" that DMX would pay if it
licensed all its music from BMI; a "floor fee" it would pay if it licensed all its
music directly; and a "direct license ratio," the percentage reduction between the
blanket fee and the floor fee to account for music licensed directly. They
disagreed on the value of each of those components.

The court accepted some arguments from both sides, but generally decided
in favor of DMX. The test of reasonableness it applied was one of "fair market
value – the price that a willing buyer and a willing seller would agree to in an
arm's length transaction." Slip op. 4 (quoting *United States v. Broadcast Music,
Inc. ("Music Choice I")*, 316 F.3d 189, 194 (2d Cir. 2003)). Fair market value
cannot be measured directly, but requires finding a suitable benchmark that takes
into account the comparability of the circumstances and "the degree to which the

---

[1] The United States filed a Memorandum on Consent Decree Construction
Issues opposing one element of BMI's proposed rate, an "option value premium,"
which will be described below. *Broadcast Music, Inc. v. DMX, Inc.*, No. 08 Civ.
00216 (LLS) (S.D.N.Y. filed Apr. 13, 2010).

assertedly analogous market under examination reflects an adequate degree of

competition to justify reliance on the agreements it has spawned."  Slip op. 5

(quoting *United States v. Broadcast Music, Inc. ("Music Choice II")*, 426 F.3d 91,

95 (2d Cir. 2005)).

The court applied this test to the two very different proposals of the parties.

BMI proposed an aggregate blanket fee of $36.36 per location, derived from its

agreements with Muzak and other CMS providers, plus a 15% "option value"

premium for the greater flexibility of the AFBL.  This produced a total per

location fee of $41.81 before adjustments for direct licenses.  Slip op. 6.  DMX, on

the other hand, separated the blanket fee into two components: a fee for the

performance rights themselves, and a fee to compensate BMI for the cost and

value of assembling its repertoire and its blanket coverage.  The first component is

the counterpart of its direct licenses, and the latter would be the floor fee.  *Id.*  Its

direct licensing was based on a value of a $25 pool for the music rights at each

location, whether the rights holders belonged to BMI, ASCAP, or another PRO,

and the $25 was apportioned among the individual rights holders by calculating

the amount of their music DMX used as a percentage of all the works it used.  For

purposes of calculating the music rights component of the proposed BMI blanket

fee, $10 was allocated to BMI, because 40% of the performances on DMX's

4

service use the music of BMI members.  The court found that adding a proposed

floor fee of 11.7% of the $10 music fee would produce a blanket fee of $11.32 per

location.  *Id.*

Under the decree, the rate court must find BMI's proposal unreasonable

before it can prescribe a different rate, and it did so.  It found the Muzak-based fee

neither comparable nor competitive.  It was not a per location rate, but instead a

flat $30 million fee for a five-year license; the $36.36 figure was derived by

dividing the flat fee by the number of locations Muzak had when the contract was

negotiated.  The per location amount for Muzak could and did change over time;

indeed, the amount increased substantially as the number of locations it served

declined.  Moreover, the overall settlement with Muzak included BMI's dropping

its claim for about $5 million in retroactive fees, and the amount of that claim was

likely folded into the prospective rates.  Slip op. 7-9.  BMI offered the other CMS

providers flat fees derived from the same average per location rate under Muzak's

settlement, but it also reserved the right to seek retroactive fees from them, making

rate court litigation risky and leaving them without a realistic opportunity to

negotiate their future fees.  Slip op. 9-10.  Thus, under the applicable legal

standards, BMI's form license agreements did not establish reliable benchmarks.

Slip op. 10.

On the other hand, the court found DMX's 550 direct licenses, which it used
to program roughly 30% of its music, "sufficiently representative" to establish a
benchmark for the performance rights component of DMX's proposal.  Slip op.
14-15.  It found "no credible evidence" that publishers refused direct licenses
because DMX undervalued their music, or that DMX engaged in "cream
skimming" as opposed to soliciting licenses from publishers whose works it used
the most.  Slip op. 15-16.  The court thought the other values BMI attributed to its
blanket licenses, such as insurance against inadvertent infringement, would be
compensated by the floor fee.  Slip op. 16.  And it rejected BMI's argument that
any unrecouped portion of a $2.4 million advance that DMX paid Sony/ATV, one
of the four major publishers, should be added to the benchmark, accepting DMX's
evidence that it was the "cost of entry into the market" rather than a royalty fee.
Slip op. 13, 16-17.

The court then addressed the "floor fee," which "represents the value to
DMX of the portion of the AFBL that is independent of the value of the music
performing rights," and so does not vary with DMX's direct licensing but includes
BMI's overhead costs.  Slip op. 17.  It accepted BMI's evidence that its overhead
costs were 17% of revenue.  Slip op. 17-18.  It found that BMI had established its
prospective incremental costs for the variable fee feature, which it allocated

6

between routine costs (to be borne by DMX) and initial costs (to be shared by DMX and any future AFBL licensees). Slip op. 18-21. The court rejected BMI's proposed addition of a 15% "option value" premium to the blanket license in light of DMX's expert testimony that, while the carve-out feature has value, in a competitive market a seller cannot increase the price of an improved product beyond the incremental costs associated with the improvement, which the court had already allowed in connection with the floor fee. Slip op. 22-23. Adding together all the various elements allowed and converting the figures to per location rates, the court prescribed a floor fee of $8.66, and a blanket fee of $18.91. Slip op. 23-24.

The court also resolved various issues regarding the Direct License Ratio, the primary one being whether it should be based on both off-premises (satellite delivered, used by 35% of DMX's locations) and on-premises (delivered by internet or CD, 65%) delivery methods, or whether the proportion of off-premises performances should be used as a proxy for both. Slip op. 24-25. BMI asserted that the off-premises programs contained a higher proportion of directly-licensed music than the on-premise programs, that it would be short-changed if only the off-premises programs were used, and that the on-premises deliveries might provide a more accurate method of identifying music that was actually played.

According to DMX, however, the differences were not large; it based the

payments to its direct licensees on its off-premises performances; and the lists of

works in its on-premises reports did not reflect how often they were programed to

play.  Overall, therefore, the court found the off-premises performance data to be

an "acceptable" proxy, and should be used to maintain consistency between the

measures used for compensating direct licensors and BMI.  Slip op. 28.

## ARGUMENT

### THE DISTRICT COURT PROPERLY REJECTED AN ANTICOMPETITIVE "OPTION VALUE" ADDITION TO THE PRICE OF AN ADJUSTABLE FEE BLANKET LICENSE

BMI contends that the district court erred, *inter alia*, in rejecting an "option

value" addition to the blanket rate.  The court's decision, however, is fully

supported by the Consent Decree and the record in this case.

BMI's central premise, that "the additional value created by the adjustable-

fee form of blanket license should be shared" between BMI and DMX, Pet. Br. 53,

is inconsistent with the reasonableness standard of the decree and the requirement

for "carve-out" pricing that this court endorsed in *Muzak/AEI*.  DMX's direct

licensing program is an effort to secure competitive prices on the licenses it needs

to operate in the CMS market, and it already faces the substantial costs of securing

8

and administering direct licenses, as well as the cost-based AFBL premium
adopted by the district court.  BMI's insistence on an additional "sharing" of the
benefits of direct licensing is a transparent attempt to recapture some of the higher
profits it would lose to the extent the direct licenses displace its standard blanket
licenses — or better yet, from its perspective, stifle direct licensing.  Such an
"option value" is not part of a "reasonable rate" under the decree.

### 1.     The Language and Context of the Decree Show That It Was Intended to Promote Competition

Although the district court decided the issue as one of fact, BMI attempts to
raise the legal question of the interpretation of the underlying decree with its
assertion that "consent decrees are agreements between the parties," and that
"BMI would never agree to forego any share in the value created by the blanket
license for its members."  Pet. Br. 53.  The rules for construction of a consent
decree, however, are well established.  "[T]he 'scope of a consent decree must be
discerned within its four corners, and not by reference to what might satisfy the
purposes of one of the parties to it' or by what 'might have been written had the
plaintiff established his factual claims and legal theories in litigation.'"[2]  To the

---

[2] *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574 (1984)
(quoting *United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971)).  *Accord
Muzak/AEI*, 275 F.3d at 175.

9

extent a decree might contain ambiguities, "reliance upon certain aids to

construction is proper, as with any other contract," and "[s]uch aids include the

circumstances surrounding the formation of the consent order."[3]  The antitrust

context of the rate court provision is one of the circumstances to consider.[4]

Here, there is no ambiguity.  BMI has unequivocally agreed to forgo rates

that reflect its market power, and to accept the district court's prescription of a

"reasonable fee."  Under this Court's decisions, reasonableness is determined by

"fair market value – the price that a willing buyer and a willing seller would agree

to in an arm's length transaction," *Music Choice I*, 316 F.3d at 194, assuming a

transaction in a market with "an adequate degree of competition."  *Music Choice

II*, 426 F.3d at 95.  Thus, the rate court is not simply to rubber stamp whatever rate

BMI secured from other licensees in the past without considering whether it was a

product of market power.  *Showtime*, 912 F.2d at 570.  Instead, "[f]undamental to

the concept of 'reasonableness' is a determination of what an applicant would pay

---

[3] *United States  v. ITT Continental Baking Co.*, 420 U.S. 223, 238 (1975).

[4] *Muzak/AEI*, 275 F.3d at 175 (court may "consider the purpose of the
provision in the overall context of the judgment at the time the judgment was
entered"); *ASCAP v. Showtime/The Movie Channel, Inc.* ("*Showtime*"), 912 F.2d
563, 570 (2d Cir. 1990) (rate court may consider antitrust background of decree
and "need not conduct itself without regard to the context in which it was
created").

in a competitive market, taking into account the fact that ASCAP [or in this case,

BMI], as a monopolist, 'exercise[s] disproportionate power over the market for

music rights.'"  *United States v. ASCAP ("RealNetworks")*, 627 F.3d 64, 76 (2d

Cir. 2010).

Even if the Court wishes to look at the circumstances surrounding adoption

of the rate court provision,  these definitions of reasonableness under the Decree

are entirely consistent with them.  BMI itself proposed the provision as an addition

to the pre-existing Decree, and as justification it described at length the costs of

constant litigation under the status quo and the revenue lost if it did withhold

licenses in the course of negotiations.  Mem. in Supp. 12-22.[5]  To rid itself of these

burdens it was willing to "give up to the Court its power to set its own prices," *id.*

at 26, and urged that this was in the public interest as defined by the antitrust laws

because "the modifications sought are procompetitive" and would serve the "key

purpose of the Consent Decree – limiting any alleged market power BMI may

have . . . ."  *Id.* at 29-30.  The United States, in supporting BMI's Motion, added

that it did not intend that "judicial rate setting should become a substitute for

competitive rate setting," pointing to such "competitive alternatives" as direct

_____

[5] Memorandum of Defendant Broadcast Music, Inc. in Support of Motion to
Modify Consent Decree, *United States v. Broadcast Music, Inc.*, No. 64 Civ. 3787
(S.D.N.Y. filed June 27, 1994) (Attached as Addendum A to this Brief).

licensing.  Mem. in Resp. 10-11.[6]

In light of this procompetitive intent, this Court has made clear that the
standard of reasonableness applies to licenses with "carve-out" fee structures in
light of the "direct licenses (required to be permitted by Section IV(A)),"
*Muzak/AEI*, 295 F.3d at 176-77.  *See* 1996 Trade Cases at 83,325; JA A-11 (text
of Section IV(A)).  That provision establishes the basis for competition in
licensing between its members and BMI, competition that could be frustrated not
only by BMI's point blank refusal to allow a "carve-out" from its blanket license
fees, but by its insistence on pricing an AFBL at rates significantly higher than the
rates for a standard blanket license.  BMI's demand for such rates, therefore,
disregards the plain language, intent, and consistent interpretation of the decree to
which it agreed.

## 2.  The Record Supports the District Court's Decision

BMI, relying on the testimony of its economic expert, Dr. Bruce Owen,
argues that under a willing buyer/willing seller test, the AFBL should be priced
15% higher than a standard blanket license to reflect the value of its greater

_____

[6] Memorandum of the United States in Response to Motion of Broadcast
Music, Inc. to Modify the 1966 Final Judgment Entered in This Matter, *United
States v. Broadcast Music, Inc.*, S.D.N.Y.  Docket No. 64 Civ. 3787 (filed June 20,
1994) (Attached as Addendum B to this Brief).

flexibility.  Appellant Br. 50-55.  The district court, relying on the testimony of DMX's expert witness, Dr. Adam Jaffe, found that in a competitive market BMI would be able to demand no more than its incremental costs of administering the AFBL, and refused to award more.  Slip op. 22-23.  In BMI's view, the court's acceptance of Jaffe's testimony and its rejection of Owen's is clear error and unreasonable.  BMI is wrong.

Dr. Owen dismissed the idea of using a hypothetical "perfectly competitive" market to set reasonable BMI rates as impractical and futile.  JA A-414-15. Instead, he considers fixed-fee blanket licenses the economic ideal because they are efficient and price the marginal use of a song at its marginal cost, *i.e.*, zero.  *Id.* An AFBL, on the other hand, is not efficient, because every time DMX uses a BMI-licensed song, it incurs the cost of losing a credit that it would otherwise receive for direct licensing.  JA A-415.  His conclusion was quite explicit — AFBLs should be priced higher than blanket license to discourage their use, and the "option value" premium was the mechanism for doing so.  JA A-415-16. Thus, he does not see DMX's opportunity for cost savings as an economic benefit, but rather as a reason for BMI to impose a charge in addition to its incremental costs, JA A-417, A-419, A-432, because a "willing buyer" would value the opportunity for savings.  JA A-411.

13

Dr. Jaffe, on the other hand, started by "attempting to identify fees that
correspond to what would occur in a competitive market to the extent that there
might be a competitive market for music performance royalties," JA A-576, not
necessarily a "perfectly competitive" market, but at least a "workably competitive"
one.  JA A-594.  He noted that application of the "fair market value" and "willing
buyer/willing seller" concepts needs to take account of the degree of competition
in the market from which the values are drawn, since markets can span the
spectrum from perfectly competitive to monopolistic.  Competitive market
transactions should be used rather than those influenced by market power.  JA A-
608.  Thus, while the AFBL is more valuable to DMX, in a competitive market
BMI could not recover more than its incremental costs of supplying the improved
product.  JA A-585, A-607.  The district court relied on Dr. Jaffe's testimony in
rejecting BMI's proposed "option value" premium and limiting it to recovery of its
additional costs.  Slip op. 22.

In light of the legal standards established by this Court, the district court's
finding is entirely reasonable.  A buyer may often be willing to pay a price in an
imperfectly competitive market that the seller could not demand if it faced
competition.  Dr. Owen analogized the premium to the price difference between a
*prix fixe* and an *a la carte* dinner, JA A-417, but BMI does not pursue that point

14

here, and it does not work. In a competitive market, discounts for buying a package of goods are used to encourage the customer to buy more from the seller. A restaurant, to use Dr. Owen's example, will use a *prix fixe* menu to increase sales and, so long as the additional revenues more than offset costs, increase profits, while maintaining relatively higher *a la carte* prices. In that respect, BMI's higher price for the AFBL resembles the premium for an *a la carte* meal — but there is an important difference. Most restaurants will offer both *prix fixe* and *a la carte* menus in the ordinary course of business. BMI, on the other hand, has made clear its distaste for the AFBL, and if given the right to charge an "option value" premium, there is a real risk that it would seek to use that right not to increase sales, but as a pretext for charging a sufficiently onerous premium to ensure that AFBL's are not commercially viable. Thus, BMI could achieve through its use of an "option value premium" that which it could not achieve in the *Muzak/AEI* litigation — the elimination of a viable AFBL and, with it, competition from direct licensing as envisioned by this court. That would not be a reasonable price under the Decree.[7]

---

[7] Viewed from a different perspective, BMI complains that if the district court were not convinced by BMI evidence supporting a 15% premium, it should have determined an alternative reasonable amount "in light of 'all the evidence.'" Pet. Br. 55. BMI, however, points to no evidence in the record to show how large a premium, if any, a competitive market would support. Certainly, given the

On appeal, BMI presses the analogy to the price of a call option in a competitive market, Pet. Br. 51-52, but the analogy is inapt and has no record support.  An option to buy confers a right to buy an asset at a specified strike price.  If the option is exercised when the value of the asset exceeds the strike price, the option seller will take a loss, sometimes a substantial one. The price of the option reflects this risk to the seller.  BMI has introduced no evidence that it faces a similar risk here, and that is not the basis for its claim.  The district court has already directed compensation for all the incremental costs BMI has identified for administering the AFBL, and the additional premium it seeks here is based solely on the theory of benefit to DMX.  JA A-418-19.  BMI's argument relies on what it could demand through the exercise of market power, and substantial evidence supports the district court's rejection of it.

---

thousands of dollars at stake, DMX would search hard for an alternative source if it were not a captive customer.  Thus, faced with an all-or-nothing choice, the court could reasonably choose nothing.

## CONCLUSION

The district court's finding that BMI is not entitled to an option value

premium for an AFBL should be affirmed.

Respectfully submitted.


Christine A. Varney
   Assistant Attorney General


Robert B. Nicholson


_____/s/_____
Robert J. Wiggers
   Attorneys
   U.S. Department of Justice
   Antitrust Division
   950 Pennsylvania Ave., N.W.
   Washington, D.C.  20530
   (202) 514-2460

April 11, 2011

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 3840 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Corel WordPerfect 4 in 14 point Times New Roman font.

                                          /s/

Robert J. Wiggers
Attorney for the United States
Dated: April 11, 2011

CERTIFICATE OF SERVICE

I, Robert J. Wiggers, hereby certify that on April 11, 2011, I electronically filed the

foregoing Brief for the United States As Amicus Curiae with the Clerk of the Court for the

United States Court of Appeals for the D.C. Circuit by using the CM/ECF system. Attorneys for

each party in the case who are registered CM/ECF users will be served by the CM/ECF system.

James Fitzpatrick
Hughes Hubbard & Reed LLP
1 Battery Park Plaza
New York, NY 10004

Seth P. Waxman
Catherine Carroll
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006

Robert Bruce Rich
Todd Larson
Benjamin Ely Marks, -
Weil, Gotshal & Manges LLP
767 5th Avenue
New York, NY 10153

Scott E. Hershman
Christopher J. Glancy
I. Fred Koenigsberg
Stefan Mentzer
White & Case LLP
1155 Avenue of the Americas
New York, NY 10036

Ira M. Feinberg
Hogan Lovells US LLP
875 3rd Avenue
New York, NY 10022

Paul Alexis
Bradley Arant Boult Cummings, LLP
Suite 700
1600 Division Street
Nashville, TN 37203

_____/s/_____
Robert J. Wiggers

19

ADDENDUM A

MEMORANDUM OF DEFENDANT BROADCAST MUSIC, INC.
IN SUPPORT OF MOTION TO MODIFY CONSENT DECREE

Filed June 27, 1994

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -  x
                                     :
UNITED STATES OF AMERICA,
                                     :        64 Civ. 3787
                         Plaintiff,
                                     :
        - against -
                                     :
BROADCAST MUSIC, INC., et al.,
                                     :
                         Defendants.
                                     :
- - - - - - - - - - - - - - - - - -  x
```

### MEMORANDUM OF DEFENDANT BROADCAST MUSIC, INC. IN SUPPORT OF MOTION TO MODIFY CONSENT DECREE

Robert J. Sisk (RS-8557)
Hughes Hubbard & Reed
One Battery Park Plaza
New York, New York   10004
(212) 837-6000

Of Counsel:

    Norman C. Kleinberg
    Michael E. Salzman
    Charles Lozow
       - and -
    Marvin L. Berenson

4018S

Robert J. Sisk (RS-8557)
Hughes Hubbard & Reed
One Battery Park Plaza
New York, New York  10004
(212) 837-6000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - x
                                       :
UNITED STATES OF AMERICA,              :    64 Civ. 3787

                          Plaintiff,   :

        - against -                    :

BROADCAST MUSIC, INC., et al.,         :

                          Defendants.  :
                                       :
- - - - - - - - - - - - - - - - - - - x

### MEMORANDUM OF DEFENDANT BROADCAST MUSIC, INC. IN SUPPORT OF MOTION TO MODIFY CONSENT DECREE

Defendant Broadcast Music, Inc. ("BMI") submits this memorandum in support of its motion to modify the consent decree entered in this action in 1966 (the "BMI Consent Decree")[1] to provide a more orderly process for licensing music users through creation of a judicial forum in this Court, available to any user of BMI music, for the determination of fees for the licensing of music performing rights from BMI.  BMI has been advised that plaintiff United States tentatively consents to the proposed

---

1.   Reported at United States v. Broadcast Music, Inc., 1966 Trade Cas. (CCH) ¶ 71,941 (S.D.N.Y. Dec. 29, 1966), attached as Exhibit A to the Affidavit of Marvin L. Berenson, Senior Vice President and General Counsel of BMI, sworn to June 28, 1994 ("Berenson Aff.") and filed herewith.

modification, except that it is neutral as to the requested paragraph providing that BMI's rate court be kept separate from the rate proceedings in this Court of its chief competitor, the American Society of Composers, Authors and Publishers ("ASCAP").

## PRELIMINARY STATEMENT

The need for the proposed decree modification has become increasingly apparent over the past several decades. For lack of an independent fee-setting forum, BMI has been forced into repeated copyright infringement and antitrust litigation with many major music users when the parties fail to reach agreement over BMI's license fees. Time after time, as BMI licenses have expired, users have gone to court pressing antitrust and copyright misuse claims and seeking injunctions granting them compulsory licenses under various contrived legal theories. BMI has been forced to defend its songwriters', composers', and music publishers' rights to license or withhold their works under the copyright law and to assert copyright infringement counterclaims. Or the roles have been reversed, and it is BMI which has sought damages and/or an injunction against copyright infringement and the users which have interposed antitrust and copyright misuse defenses.

The participants in this process now agree that an orderly rate-setting procedure would be a more efficient way to deal with negotiation breakdowns. Major users of BMI music -- television and radio broadcasters and cable programmers -- have asked BMI to seek to modify its Consent Decree to establish a

rate court.  Thus BMI license agreements with broadcast networks,
local television stations, and many cable programmers contain
provisions calling for BMI to take such action.

The proposed modification is also needed to balance
competition between BMI and ASCAP more fairly.  Because its
consent decree provides for automatic licenses and interim fee
payments when licensing terms cannot be agreed upon, ASCAP is
assured a steady stream of revenue while continuing to negotiate
with music users.  BMI, in contrast, has no interim fee mechanism
and often must choose between no license and no revenue on the
one hand and a license with those same music users at rates it
finds unpalatable on the other.

The proposed decree modification is in the best
interests of BMI, its affiliated songwriters, composers, and
music publishers, and the users of the BMI repertoire, and is
clearly in the public interest.

**STATEMENT OF FACTS**

**BMI's Business**

BMI is a music performing rights licensing organization
that operates on a non-profit basis.  (Berenson Aff. ¶ 2.)  BMI
has been granted the non-exclusive right by its affiliated
songwriters, composers, and music publishers to license the non-
dramatic public performing rights (Section 106(4) of the

Copyright Act, 17 U.S.C. § 106(4)) in their compositions.[2]  (*Id.*
¶ 2.)

BMI issues non-exclusive licenses to music users,
collects license fees from them, and distributes royalties to its
affiliated songwriters, composers, and publishers.  (*Id.* ¶ 3.)
BMI licenses its repertoire to the major broadcast television
networks, cable programmers, and many thousands of local
television and radio stations, as well as to concert halls,
universities, restaurants, nightclubs, airlines, and other users
of its repertoire.  (*Id.*)  Typically, BMI licenses its entire
repertoire to music users for a designated period of time under a
blanket license which entitles the licensee to use any or all of
the compositions as often as desired for a flat fee or a
predetermined percentage of revenue.[3]  (*Id.*)  BMI's affiliates
retain the right to license their works individually.  (*Id.*)

BMI was organized in 1939 and 1940 by about 400 members
of the radio industry to compete with ASCAP, which at that time
was the only substantial organization licensing music performing
rights in this country.  (*Id.* ¶ 4.)  From its founding, BMI
helped change the face of American music.  By opening its doors
in the 1940's and '50's to early country, rhythm and blues, jazz,

---

2.  By virtue of reciprocal agreements with 41 foreign performing rights
societies it also licenses works from abroad and BMI's repertoire is
licensed by those foreign societies.

3.  With respect to television and radio, BMI also offers a per program
license, which provides access to the entire BMI repertoire, but payment
(at a different rate) is made only for those programs using BMI music.

and rock & roll songwriters and their publishers, BMI helped give direction to a powerful wave of new talent previously shut out of the mainstream due to ASCAP's restrictions on membership. <u>See</u> Jerry Wexler and David Ritz, <u>Rhythm and the Blues</u> 54-55 (1993). BMI enthusiastically sought out these new voices of American music, while ASCAP focused on writers and publishers in the then-established Tin Pan Alley tradition. (<u>Id</u>.) According to one music industry authority, between 1944 and 1954 "BMI licensed fully 77 percent of all songs making the Top Ten on <u>Billboard</u>'s various country charts." Paul Kingsbury, <u>The Explosion of American Music 1940-1990</u> 20 (1990). It licensed an overwhelming 90 percent of weekly rhythm and blues hits after World War II. (<u>Id</u>. at 23.) BMI's now-legendary affiliates from those early days included Buddy Holly, Hank Williams, Sam Cooke, Thelonius Monk, Ray Charles, Little Richard, the Everly Brothers, Miles Davis, and Chuck Berry, to name a few. (Berenson Aff. ¶ 4.) BMI's importance in the music industry has continued to grow and today its repertoire is approximately 2.5 million compositions in every style, from the catalogs of approximately 150,000 songwriters, composers, and publishers. (<u>Id</u>.)

On the music publishing side, BMI affiliates range from the world's largest to the smallest. BMI's affiliate ranks include composers of music for films and musicals such as <u>Beauty and the Beast</u> and <u>Fiddler on the Roof</u> and songwriters comprising 75% of the inductees into the Rock & Roll Hall of Fame. (<u>Id</u>. ¶ 5.) Reflecting this diverse wealth of talent, in recent years

BMI affiliates have garnered the majority of music industry
awards in the rock, country, and rhythm and blues categories.
(<u>Id</u>.)  BMI affiliated composers have also won a majority of all
the Pulitzer Prizes ever awarded in the field of music.  (<u>Id</u>.)
At the same time, thousands of other, less established and less
well-known songwriters earn a portion of their livelihood from
BMI's distribution of royalties they could not collect for
themselves.  (<u>Id</u>.)

      The function and operations of BMI have been described
at length by this Court, the Second Circuit, and the Supreme
Court.  <u>See</u> <u>Buffalo Broadcasting Co. v. American Society of</u>
<u>Composers, Authors and Publishers</u>, 744 F.2d 917 (2d Cir. 1984),
<u>rev'g</u> 546 F. Supp. 274 (S.D.N.Y. 1982), <u>cert. denied</u>, 469 U.S.
1211 (1985) ("<u>Buffalo Broadcasting</u>"), and <u>Columbia Broadcasting</u>
<u>System, Inc. v. American Society of Composers, Authors and</u>
<u>Publishers</u>, 400 F. Supp. 737 (S.D.N.Y. 1975), <u>rev'd</u>, 562 F.2d 130
(2d Cir. 1977), <u>rev'd and remanded sub nom. Broadcast Music, Inc.</u>
<u>v. Columbia Broadcasting System, Inc.</u>, 441 U.S. 1 (1979),
<u>district court decision aff'd on remand sub nom. Columbia</u>
<u>Broadcasting System, Inc. v. American Society of Composers,</u>
<u>Authors and Publishers</u>, 620 F.2d 930 (2d Cir. 1980), <u>cert.</u>
<u>denied</u>, 450 U.S. 970 (1981) ("<u>CBS</u>").

      Through the use of blanket licenses, BMI facilitates
the licensing of performing rights to millions of compositions
for many thousands of music users without the delay and expense
of individual negotiations.  <u>See</u> <u>CBS</u>, 441 U.S. at 22.  Today, as

in the past, music users typically prefer the convenience of blanket licenses because such licenses provide unfettered, indemnified, and instantaneous access to millions of compositions for one fee. (<u>Id</u>.)

### ASCAP's Consent Decree

Prior to the creation of ASCAP in 1914, individual composers had no effective means for licensing or enforcing the performing rights to their compositions. <u>See</u> <u>CBS</u>, 400 F. Supp. at 741. By 1939, however, ASCAP had become a monopoly with the power to deny virtually all users of popular music -- most importantly radio broadcasters and movie theaters -- access to its repertoire if its license fee demands were not met. When negotiations between ASCAP and the broadcasters broke down in 1940, ASCAP did withhold its repertoire. <u>See</u> Sigmund Timberg, <u>The Antitrust Aspects of Merchandizing Modern Music: The ASCAP Consent Judgment of 1950</u>, 19 Law & Contemp. Probs. 294, 306 (1954) ("<u>Timberg</u>"). The broadcasters then formed BMI, but for many months little or no copyrighted music was heard on the radio anywhere in the United States. <u>Id</u>.

As a result of ASCAP's conduct, the Department of Justice sued ASCAP in 1941 for antitrust violations, alleging that ASCAP had acted to raise artificially music performing rights license fees. <u>Timberg</u> at 307. To settle that complaint, ASCAP entered into a consent decree with the government. <u>United States v. American Society of Composers, Authors and Publishers</u>, 1940-43 Trade Cas. (CCH) ¶ 56,104 (S.D.N.Y. March 4, 1941). In

1950, following a successful private action by a motion picture
theater operator finding ASCAP liable for monopolization,[4] the
Department of Justice moved this Court for extensive modification
of its existing consent decree with ASCAP, and its proposed
modifications were allowed.  ASCAP's consent decree has since
been amended at least once.  <u>See United States v. American
Society of Composers, Authors and Publishers</u>, 1993-1 Trade Cas.
(CCH) ¶ 70,153 (S.D.N.Y. Feb. 26, 1993).[5]

        For purposes of this motion, the most significant
feature of ASCAP's consent decree is Article IX, which provides
that, if ASCAP and a would-be licensee are unable to agree on the
license fee to be paid, the music user may obtain a license from
ASCAP automatically simply by requesting one.  (Berenson Aff. ¶ 6
and Exh. B.)  The licensee then may apply to this Court for
determination of a "reasonable" fee, upon which ASCAP bears the

---

4.    <u>Alden-Rochelle, Inc. v. American Society of Composers, Authors and
      Publishers</u>, 80 F. Supp. 888, <u>relief</u>, 80 F. Supp. 900 (S.D.N.Y. 1948).
      <u>See also</u> <u>M. Witmark & Sons v. Jensen</u>, 80 F. Supp. 843 (D. Minn. 1948),
      <u>appeal dismissed sub nom. M. Witmark & Sons v. Berger Amusement Co.</u>, 177
      F.2d 515 (8th Cir. 1949).

5.    The ASCAP Consent Decree as modified in 1950 is reported at <u>United States
      v. American Society of Composers, Authors and Publishers</u>, 1950-51 Trade
      Cas. (CCH) ¶ 62,595 (S.D.N.Y. March 14, 1950).  The current form of the
      principal ASCAP consent decree is attached to the Berenson Aff. as
      Exhibit B.  That decree requires ASCAP to offer a per program license to
      television and radio broadcasters in addition to the blanket license it
      traditionally offered.  ASCAP's licensing authority was also made non-
      exclusive:  the ASCAP Consent Decree provides that music users may bypass
      ASCAP entirely and negotiate for a desired license directly with the
      composer or a publisher holding the individual copyright.

burden of proof.[6]  Under Article IX(B), ASCAP or the music user
may apply to this Court for the setting of an interim fee pending
final determination of what constitutes a "reasonable" fee.  If
the Court fixes an interim fee, ASCAP then issues a license
providing for such payments, from the date of the application for
an interim fee.  ASCAP then includes these interim fees in its
next distribution to its members.  Final fees are made
retroactive to the date of the original license application.
Interim fees being paid to ASCAP at any given time can represent
a substantial percentage of ASCAP's total revenues.[7]

### BMI's Consent Decree

BMI's licensing practices are also governed by a
consent decree.  In 1941, the Department of Justice commenced a
suit alleging that BMI had conspired to control the business of
licensing performing rights to radio broadcasters.  (Berenson
Aff. ¶ 8.)  BMI and the Department of Justice settled that action

---

6.  The ASCAP Consent Decree was administered for many years by then-Chief
Judge Sylvester J. Ryan and now by Judge William C. Conner.

7.  As of December 1992, for example, it appears that ASCAP was receiving
interim fees from the entire local television industry, the CBS and ABC
television networks, and virtually all major cable programmers.  U.S. v.
American Society of Composers, Authors and Publishers (In the Matter of
the Application of Turner Broadcasting System, Inc.), No. 13-95 (S.D.N.Y.
Oct. 12, 1989) (setting interim fees for various cable programmers); U.S.
v. American Society of Composers, Authors and Publishers (In the Matter
of the Applications of Capital Cities/ABC, Inc. and CBS, Inc.), 831
F. Supp. 137, 143 (S.D.N.Y. 1993) (noting that in 1991-92, CBS paid $9.8
million per year in interim fees and that ABC paid that amount per year
in 1986-92).

by entering into a consent decree that, _inter alia_, required BMI
to offer, on request, certain types of per program licenses with
fee arrangements tied to music use.  See _United States v.
Broadcast Music, Inc._, 1940-43 Trade Cas. (CCH) ¶ 56,096 (E.D.
Wis. Feb. 3, 1941), attached to the Berenson Aff. as Exh. C.

In 1964, following repeated complaints from ASCAP, the
Department of Justice brought a new action in this Court against
BMI and a class of its stockholders asserting that BMI was an
illegal combination used by the broadcasters to control the
business of acquiring performing rights to the detriment of ASCAP
and its members.  (Berenson Aff. ¶ 9 and Exh. D.)  The relief
sought by the Department was divestiture of BMI's stock by its
broadcaster-owners to assure that BMI operated fairly to
represent the interests of songwriters, composers, and
publishers, not broadcasters.[8]

The action was settled in 1966, with the transfer of
the 1941 decree to this Court and entry of a new decree in its
place which ensures, _inter alia_, that composers retain the right
to license their works directly to music users, and that

---

8.  Notwithstanding the Government's allegations in the 1964 action,
    Government lawyers eventually conceded privately that no evidence had
    been adduced in discovery that BMI had actually employed the improper
    tactics alleged, such as aiding broadcasters to disfavor ASCAP music or
    using license fees unfairly to favor certain composers over others.
    (Berenson Aff. ¶ 9 and Exh. D.)  The Government's internal memorandum
    candidly stated: "[u]nfortunately, the complaint was filed without first
    obtaining any hard facts . . . .  After the case was filed we began the
    investigation -- hoping to uncover evidence to support the complaint."
    (_Id_. Exh. D at 4-5.)

broadcasters can receive per program licenses from BMI.
(Berenson Aff. ¶ 10 and Exh. A.)  Jurisdiction was retained by
this Court to consider, inter alia, possible future
modifications.  (Id. Exh. A, Article XIII.)

　　　　The 1964 action and the BMI consent decree were
assigned to the late Judge Edward C. McLean of this Court, and it
appears that no proceedings have taken place since the decree was
entered.  (Berenson Aff. ¶ 11 and Exh. E.)  At no time, to BMI's
knowledge, have BMI and ASCAP consent decree proceedings been
treated as related or consolidated by this Court.

　　　　BMI's consent decree does not provide for the automatic
grant of a license on request or for court adjudication of
"reasonable" licensing rates in the event of a fee dispute
between BMI and a prospective licensee.  It has no mechanism for
obtaining interim fees while a fee dispute is unresolved, and
consequently cannot make distributions to its writers and
publishers from these music users.  (Id. ¶ 12 and Exh. A.)

　　　　BMI has been negotiating for some years now with the
Antitrust Division for its consent to a modification of the BMI
Decree to establish a licensing and rate-setting procedure
similar to that of ASCAP.  (Id. ¶ 13.)  BMI has been advised that
plaintiff United States tentatively consents to the proposed
modification, except that it is neutral as to the requested text
providing expressly that BMI's rate court be kept separate from
the rate proceedings in this Court of its chief competitor,
ASCAP.  (Berenson Aff. ¶ 14.)

## Litigation Against the Major Performing Rights Societies

The impetus for modification to BMI's decree is its
desire to remain competitive with ASCAP, satisfy the frequently
expressed preference of its customers -- the music users -- and
avoid repeated, expensive, and fruitless antitrust litigation
with those users.  (Berenson Aff. ¶ 15.)

The modern history of such litigation began in 1969,
with the CBS television network, during negotiations over the
renewal of CBS's license with BMI.  BMI terminated CBS's blanket
license as of January 1, 1970 upon learning that CBS and ASCAP
had agreed to rates for prior years which "had the effect of
sharply widening the historical ratio between BMI and ASCAP fees
from CBS."  CBS, 400 F. Supp. 737, 753-54 (S.D.N.Y. 1975).  On
December 31, 1969, CBS launched an antitrust lawsuit which
challenged the legality of the television network blanket
licenses offered by both BMI and ASCAP.  Id.  Using a claim that
BMI was guilty of copyright misuse as a pretext, CBS continued to
perform BMI music without paying for it.  BMI was obliged to seek
a mandatory injunction from Judge Lasker requiring CBS to pay
license fees pendente lite.  Columbia Broadcasting System, Inc.
v. American Society of Composers, Authors and Publishers, 320
F. Supp. 389, supp. op., 168 U.S.P.Q. 460 (S.D.N.Y. 1970).  In
the meantime, CBS continued to be licensed by ASCAP using the
fee-setting procedure contained in Article IX of the ASCAP
Consent Decree.

After 10 years of litigation, CBS's case was rejected
by the Supreme Court and the Second Circuit.  CBS, 441 U.S. 1

(1979), <u>district court decision aff'd on remand sub nom. Columbia Broadcasting System, Inc. v. American Society of Composers, Authors and Publishers</u>, 620 F.2d 930 (2d Cir. 1980), <u>cert. denied</u>, 450 U.S. 970 (1981). The Supreme Court held that the BMI and ASCAP blanket licenses were not <u>per se</u> illegal, specifically noting the existence of the BMI and ASCAP Consent Decrees and, especially, the existence of the ASCAP judicial fee-setting mechanism as indicia that the licensing practices of ASCAP and BMI were reasonable. 441 U.S. at 10-13. On remand, the Second Circuit found the offer of the blanket license to be no restraint at all because of the availability of direct licensing, basing its ruling in part on the existence of ASCAP's rate court:[9]

> "Pervading these assessments of each of the CBS contentions of alleged barriers to direct licensing is one indisputable fact that perhaps overshadows all others. If CBS were to forgo the blanket license, seek direct licenses, and then discover, contrary to the facts found by Judge Lasker, that a competitive market among copyright owners was not a feasible alternative to the blanket license, it would be entitled under the consent decree, to assure itself of continued performing rights by immediately obtaining a renewed blanket license [at] . . . whatever fees are subsequently negotiated or determined to be reasonable by the [rate] court if negotiations fail."

---

9.  In <u>CBS</u>, the parties stipulated that licensing from BMI and its affiliates was no more difficult than licensing from ASCAP. 441 U.S. at 12 n.20.

CBS, 620 F.2d 930, 938.

In November 1978, the All-Industry Television Station
Music License Committee attacked the blanket licenses offered by
BMI and ASCAP to local television stations under various
antitrust theories.  Plaintiffs sought to obtain compulsory
licenses from Judge Gagliardi pendente lite by temporary
restraining order and preliminary injunction, once again claiming
copyright misuse.  BMI was effectively required by the Court to
grant the stations licenses at rates frozen for the duration of
the litigation.  (Berenson Aff. ¶ 16.)  However, the legality of
the blanket license was once again upheld by the Second Circuit,
again relying in part on the existence of the ASCAP rate court.
Buffalo Broadcasting, 744 F.2d 917 (2d Cir. 1984).  Judge
Newman's opinion for the court said:

> "[E]ven if there were evidence that
> showed the program license rate to be
> too 'high', that price is always subject
> to downward revision by Judge Conner,
> who currently supervises the
> administration of the Amended Final
> Judgment . . . . The availability of a
> judicially enforceable requirement of a
> 'reasonable' fee precludes any claim
> that the program license rate is too
> high."

744 F.2d at 927.[10]  In his concurring opinion, Judge Winter
expressed the hope that music users would refrain from bringing

---

10. See also K-91, Inc. v. Gershwin Publishing Corp., 372 F.2d 1 (9th Cir.
    1967), cert. denied, 389 U.S. 1045 (1968), an antitrust case brought by a
    radio broadcaster where the court held:

(Footnote continued on next page)

any further antitrust litigation against BMI and ASCAP, since their licensing practices, as regulated by their consent decrees, were clearly lawful.  744 F.2d at 933-34.

## BMI's Negotiations with Broadcasters in the 1980's

In the aftermath of CBS and while Buffalo Broadcasting was pending, the broadcast networks and their owned and operated local television stations entered into negotiations with BMI to renew their licenses.  (Berenson Aff. ¶ 17.)  These negotiations, however, led to additional litigation before new license agreements were reached.  See Columbia Broadcasting System, Inc. v. Broadcast Music, Inc., Index No. 11847/83 (N.Y. Sup. Ct. complaint filed July 1, 1983); Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 1983-2 Trade Cas. (CCH) ¶ 65,551 (S.D.N.Y. July 20, 1983); Broadcast Music, Inc. v. National Broadcasting Co., 83 Civ. 4222 (S.D.N.Y. complaint filed June 3, 1983).

---

(Footnote continued from previous page)

> "ASCAP cannot be accused of fixing prices because every applicant to ASCAP has a right under the consent decree to invoke the authority of the United States District Court for the Southern District of New York to fix a reasonable fee whenever the applicant believes that the price proposed by ASCAP is unreasonable, and ASCAP has the burden of proving the price reasonable.  In other words, so long as ASCAP complies with the decree, it is not the price fixing authority . . . .  In short, we think that as a potential combination in restraint of trade, ASCAP has been 'disinfected' by the decree."

372 F.2d at 4.

BMI's negotiations with the radio industry in the mid-
1980's were no less contentious.  (Berenson Aff. ¶ 18.)  In 1984
BMI's some 8,000 radio broadcast licensees -- represented by the
All-Industry Radio Music License Committee -- engaged in a bitter
and prolonged dispute over BMI's license fees.  (Id.)  On
December 31, 1983, BMI's license agreements with most radio
broadcasters expired.  (Id.)  Two subsequent three-month
extensions of the licenses were made.  (Id.)  In early June 1984,
BMI made a final proposal to the All-Industry Radio Committee
regarding the form of a new license agreement.  (Id.)  When no
agreement was reached, BMI sent new radio license agreements
directly to radio broadcasters as the end of June (and the last
license extension expiration) approached.  (Id.)  The All-
Industry Radio Committee immediately informed all radio
broadcasters that the terms of the new license agreements had not
been approved by the All-Industry Radio Committee and were
therefore being "imposed" by BMI on radio broadcasters.  Many
stations did not sign their new BMI licenses and those that did
said that they did so "under protest."  (Id.)  They continued
broadcasting BMI music.  (Id.)  In mid-July 1984, the All-
Industry Radio Committee again wrote to its member radio
broadcasters and described BMI and the All-Industry Radio
Committee as "at loggerheads" and "on the brink of a major
confrontation regarding BMI's new music licenses."  (Id.)  This
description was, unfortunately, entirely accurate.  After weeks
of frequent and often vitriolic communication, an agreement was

A-18

achieved between BMI and the All-Industry Radio Committee to
commence negotiations over the terms and fees of a new radio
station license agreement.  (Id.)  At the request of the radio
broadcasters this agreement contained a provision that such
disputes should be avoided at the expiration of the agreement
through creation of a judicial forum in this Court for the
determination of BMI license fees, if possible.  (Id.)

     BMI's agreement with the radio stations, however, was
not the end of BMI's tough negotiations with the broadcasting
industry.  After several months of fruitless negotiation with the
All-Industry Television Station Music Licensing Committee in 1985
during which BMI granted temporary license extensions, BMI sent
out proposed licenses to the 700-odd local television stations
around the country not owned by CBS, ABC, or NBC and warned of
the risks of infringement.  (Berenson Aff. ¶ 19.)  The All-
Industry Television Committee responded by urging broadcasters
who were BMI stockholders to start a proxy contest to pass
stockholder resolutions, inter alia, to prevent BMI management
from implementing the new licenses and recommending that
management seek a modification of the BMI Consent Decree to
provide for judicial fee-setting.  (Id.)  BMI's management did
not oppose the concept of judicial fee-setting, but did oppose
what it saw as improper interference with its negotiations.
(Id.)  BMI then sued the All-Industry Television Committee,
alleging a buyers' price-fixing conspiracy against BMI, and
sought a preliminary injunction; the All-Industry Television

Committee's members cross-moved for an order requiring the
immediate holding of a special BMI stockholders meeting.  (Id.)
The Court denied BMI's motion and ordered that a stockholders
meeting be held.  Broadcast Music, Inc. v. All-Industry
Television Station Music License Committee, 611 F. Supp. 868
(S.D.N.Y. 1985).  Once again, after great anguish and substantial
cost, a settlement on new license agreements was reached.  As
part of that settlement, BMI agreed to seek a modification of the
BMI Consent Decree to provide for a judicial rate-setting
procedure substantially similar to Article IX of the ASCAP
consent decree.  (Berenson Aff. ¶ 19.)

**BMI's Negotiations with the Cable Industry**

        The rise of the cable television industry presented BMI
with a new set of licensing issues and led to a new round of
litigation.  At the outset of the cable industry, BMI had
licensed the few programmers in existence, such as Home Box
Office, Inc. ("HBO"), now a subsidiary of Time Warner, at
experimental rates.  (Berenson Aff. ¶ 20.)  By the mid-1980's,
several cable program suppliers had taken BMI licenses which were
"through-to-the viewer", meaning that they covered both (1) the
programmers' own satellite and microwave transmissions to their
distributors, including cable system operators and (2)
retransmissions by the distributors to their retail subscribers.
(Id.)

        In or about 1989, BMI sought to modify its licensing
approach for cable programmers and system operators.  (Berenson

Aff. ¶ 21.)  Instead of licensing both programmers and operators
under a single "through-to-the-viewer" license granted to the
cable programmer, BMI sought to license each user in the chain of
distribution separately ("split" or "dual" licensing).  (Id.)
BMI discussed split licensing with HBO in the summer of 1989, as
HBO's existing through-to-the-viewer license was due to expire at
the end of 1989.  (Id.)  When BMI and HBO's negotiations over the
new license structure broke down, BMI unsuccessfully sought a
preliminary injunction to prevent unauthorized use of its
affiliates' music.  See Broadcast Music, Inc. v. Home Box Office,
Inc., 89 Civ. 8579 (S.D.N.Y. complaint filed Dec. 28, 1989) ("BMI
v. HBO").  At the same time, HBO instructed its program suppliers
to avoid using BMI music.  (Berenson Aff. ¶ 21 and Exh. F.)  On
appeal of the preliminary injunction ruling to the Second
Circuit, BMI reached a settlement with HBO.[11]  (Berenson Aff.
¶ 21.)  In that settlement, BMI expressly agreed to seek an
amendment of its Consent Decree to establish a rate court.  (Id.)

During the BMI v. HBO litigation, two other cable
programmers (the Disney Channel and Black Entertainment
Television) and the National Cable Television Association

---

11. At the request of the United States, BMI hereby formally commits itself,
to the same extent and so long as ASCAP is so bound by consent decree
with the United States, to offer per program (or per programming period)
and through-to-the-viewer licenses to cable television programmers which
deliver a line-up of scheduled programs to multiple independently-owned
cable systems -- as those terms are currently understood -- to the same
extent BMI is bound to offer them to television broadcasters and
television broadcast networks pursuant to Articles VIII(B) and IX(A) (as
modified by the present motion) of the BMI Consent Decree, respectively.

("NCTA") commenced an antitrust suit against BMI in Washington,
D.C., see National Cable Television Ass'n. Inc. v. Broadcast
Music. Inc., 772 F. Supp. 614 (D.D.C. 1991) ("NCTA v. BMI"), and
several cable systems owned by Time Warner started an antitrust
action against BMI in California, American Television and
Communications Corp. v. Broadcast Music. Inc., 90 Civ. 0447 (C.D.
Cal. complaint filed Jan. 29, 1990). The California suit was
settled in conjunction with the HBO license agreement, but NCTA
v. BMI proceeded to trial on the plaintiffs' claims that BMI's
blanket license for cable television constituted an unreasonable
restraint of trade. (Berenson Aff. ¶ 22.)

Plaintiffs in NCTA v. BMI sought a preliminary
injunction precluding BMI from suing them or any cable system for
copyright infringement in any other court, and also requested a
mandatory injunction requiring BMI to grant them a license for
which they would pay BMI a court-set "reasonable" royalty during
the litigation. The court denied the preliminary injunction.
(Berenson Aff. Exh. G.) After a three-week bench trial, the
District Court for the District of Columbia rejected all the
plaintiffs' antitrust claims, dismissed the complaints, and
awarded BMI damages for copyright infringement. NCTA v. BMI, 772
F. Supp. 614 (D.D.C. 1991). In reaching her decision, Judge
Joyce Hens Green noted that the most significant difference
between ASCAP's Consent Decree and BMI's was that ASCAP's "decree
provides for a 'rate court'." 772 F. Supp. at 618. The court
also observed

> "There will be, inevitably, future rate
> disputes between BMI and cable industry
> licensees.  Although not a matter
> presently before the Court, it bears
> mention that <u>all parties would
> apparently benefit from the mechanism of
> a rate court comparable to the one
> utilized for ASCAP</u>."

772 F. Supp. at 650 n.88 (emphasis added).

The <u>HBO</u> and <u>NCTA</u> cases have been the most extensive of
BMI's litigations with the cable industry to date.  (<u>Id</u>. ¶ 24.)
These cases also typified the use of lawsuits in BMI's licensing
process:  either BMI was forced to withhold its repertoire when
negotiations failed as in <u>BMI v. HBO</u>, or music users sought
mandatory injunctions for interim licenses in suits brought under
the antitrust law as in <u>NCTA v. BMI</u>.  (<u>Id</u>.)  Other cable suits,
all of which ultimately settled, followed this pattern:
<u>Broadcast Music, Inc. v. Hearst/ABC Viacom Entertainment
Services</u>, 746 F. Supp. 320 (S.D.N.Y. 1990) (Lifetime Television);
<u>Broadcast Music, Inc. v. The Christian Broadcasting Network</u>, 89
Civ. 6246 (S.D.N.Y. complaint filed Sept. 21, 1989) (The Family
Channel); <u>Arts & Entertainment Cable Network v. Broadcast Music,
Inc.</u>, 89 Civ. 3526 (S.D.N.Y. complaint filed May 19, 1989);
<u>Broadcast Music, Inc. v. Rainbow Programming Services Co.</u>, 88
Civ. 7158 (S.D.N.Y. complaint filed Oct. 7, 1988) (American Movie
Classics, Bravo, and others).

Since this flurry of litigation, BMI has continued to
license other cable programmers and to settle these lawsuits by
entering into short-term license agreements subject to adjustment
if a BMI rate court is established.  (Berenson Aff. ¶ 24.)  Cable

programmers generally refused to pay license fees in excess of
the interim rates set in the ASCAP rate court, citing possible
prejudice in the ASCAP final fee proceedings for these years,
which have not yet been scheduled for trial.[12]  (Id.)

## Proceedings in the ASCAP Rate Court

Since its inception, numerous music users have applied
for licenses under Article IX of the ASCAP consent decree, and
the rate court has frequently been called upon to set interim
fees while ASCAP and its prospective licensee attempt to
negotiate the terms of a license.  Until 1988, ASCAP and its
licensees had always been successful in working out final license
fees without the need for a plenary rate court trial.

In January 1988, the ASCAP rate court conducted its
first trial to determine the "reasonable" fee for an ASCAP
blanket license.  The case concerned the music use of two pay
cable program services, Showtime and The Movie Channel, for

---

12. The electronic media are not the only music users to litigate rather than
license.  When BMI and ASCAP, separately, and the International Show Car
Association were unable to agree on the terms of a license, suit was
commenced against both BMI and ASCAP.  International Show Car Ass'n v.
American Society of Composers. Authors and Publishers, No. 92 Civ.
70786DT (E.D. Mich. complaint filed Feb. 13, 1992).  The case was
subsequently transferred to this Court as 92 Civ. 8000, and the music
user subsequently settled with BMI by agreeing to a short-term license
subject to retroactive adjustment if a BMI rate court is created.

In the early 1980's an infringing tavern owner litigated an antitrust
counterclaim to an unsuccessful conclusion against BMI.  Broadcast Music.
Inc. v. Moor-Law. Inc., 527 F. Supp. 758 (D. Del. 1981), aff'd per
curiam, 691 F.2d 490 (3d Cir. 1982).

several years through 1988. <u>See</u> <u>United States v. American</u>
<u>Society of Composers, Authors and Publishers (In the Matter of</u>
<u>the Application of Showtime/The Movie Channel, Inc.)</u>, 912 F.2d
563 (2d Cir. 1990) ("<u>ASCAP v. Showtime</u>").[13]

Rate court trials have since been held concerning the
license fees to be paid ASCAP by local television stations, <u>see</u>
<u>United States v. American Society of Composers, Authors and</u>
<u>Publishers (In the Matter of the Application of Buffalo</u>
<u>Broadcasting Co.)</u>, 1993-1 Trade Cas. (CCH) ¶ 70,153 (S.D.N.Y.
Feb. 26, 1993), <u>appeal docketed</u>, No. 94-6030 (2d Cir. Jan. 27,
1994); and by two broadcast networks, <u>United States v. American</u>
<u>Society of Composers, Authors and Publishers (In the Matter of</u>
<u>the Applications of Capital Cities/ABC, Inc. and CBS, Inc.)</u>, 831
F. Supp. 137 (S.D.N.Y. 1993).

### Proposed Modification of the BMI Consent Decree

BMI seeks by this motion to modify its Consent Decree
to provide for court determination of reasonable performing
rights licensing fees in the event of disputes between BMI and
music users. (Berenson Aff. ¶ 26 and Exh. H.) The modification
contemplates that a would-be licensee would automatically obtain

---

13. In the district court decision, attached to the Second Circuit's
affirmance as an Appendix, Magistrate Judge Dolinger observed, in
speculating as to why BMI fees in one instance were lower than ASCAP's,
that "it must be noted that BMI operates under a potential disadvantage
compared to ASCAP in that it does not have a rate court to which it can
repair to obtain a fee order." <u>ASCAP v. Showtime</u>, 912 F.2d 563, 595 (2d
Cir. 1990).

a BMI license by requesting one. (<u>Id.</u>) If BMI and the applicant
were unable to agree on a reasonable license fee within sixty
days from the date when application for a license is made, the
licensee could apply to this Court for the determination of a
reasonable fee. (<u>Id.</u>) BMI would have the burden of going
forward in any such proceeding to establish the reasonableness of
the fee requested by it.[14] (<u>Id.</u>) During the pendency of the fee
determination proceeding, the applicant would have the right to
utilize any compositions in the BMI repertoire, subject to
payment of an interim licensing fee fixed by the Court. (<u>Id.</u>)
The full text of the proposed modification, which requires the
insertion of provisions in the BMI Consent Decree which are in
substance parallel to those contained in Article IX of the ASCAP
consent decree, is set forth in the Berenson Aff. as Exhibit H.

     In addition to these requested modifications, BMI seeks
two minor modifications to its Consent Decree which are unrelated
to its request for an independent rate court. BMI seeks to
modify the definition of "programming period" contained in
Article II(B) of the 1966 decree. (Berenson Aff. ¶ 27 and
Exh. H.) The purpose of this modification is to facilitate BMI's
use of its option, provided in Article VIII(B), to offer licenses

---

14. BMI understands that this burden of going forward would have these
consequences: BMI would first present its affirmative case that its
proposal was a reasonable one, the applicant would then present its case,
BMI could present a rebuttal case if appropriate, and, if the Court were
to find that BMI's proposal was not within the range of reasonableness,
the Court would determine a reasonable fee based on all the evidence
presented.

on a per programming period basis instead of a per program basis.
The current definition of programming period is such that it is
never in BMI's economic interest to grant licenses on a per
programming period basis, as BMI may elect to do pursuant to
Article VIII(B), because the 15-minute "periods" are shorter than
virtually all actual television or radio programs.  (**Id.** ¶ 27.)
The second minor modification to the BMI Consent Decree is to
amend Article IX(A) concerning network licensing.  (Berenson Aff.
¶ 27 and Exh. H.)  The purpose of this proposed modification is
to clarify that BMI is permitted to issue licenses to those
stations which are broadcasting a network's programming in the
event that the network itself does not request a license covering
the stations' broadcasts.  (**Id.**)

## ARGUMENT

## I.  BMI'S MOTION TO MODIFY ITS CONSENT DECREE SHOULD BE GRANTED.

It is beyond dispute that this Court has the power to
modify the 1966 BMI Consent Decree where circumstances warrant.
Article XIII of the Consent Decree expressly provides that:

> "[j]urisdiction is retained by this
> Court for the purpose of enabling either
> of the parties to this Final Judgment to
> apply to this Court at any time for such
> further orders and directions as may be
> necessary or appropriate for . . . the
> modification of any of the provisions
> thereof . . . ."

(Berenson Aff. Exh. A.)  See also Local Number 93, International
Association of Firefighters v. City of Cleveland, 478 U.S. 501,

524-28 (1986) (noting trial court's power to modify a consent
decree).

### A. The Standards for Modification of BMI's Decree.

While there are numerous cases discussing the standard
for modifying consent decrees,[15] the present motion differs from
those cases in one important respect. For in this case the
defendant is not seeking to be relieved of obligations it
previously agreed to. Rather, the modification requested will
serve to further constrain BMI's licensing practices. Here, BMI
is offering to give up to the Court its power to set its own
prices for its licenses and the concomitant right to withhold its
repertoire from (and sue for infringement) anyone seeking a
license but unwilling to pay the price requested by BMI.

We have found no case stating the standard for judicial
consideration of a consensual modification of a consent decree
where the defendant's obligations are being increased and not
diminished. Nevertheless, the Second Circuit's reasoning in
United States v. American Cyanamid Co., 719 F.2d 558 (2d Cir.
1983), cert. denied, 465 U.S. 1101 (1984), is particularly

---

15. See, e.g., Rufo v. Inmates of Suffolk County Jail, 112 S. Ct. 748 (1992);
    Board of Education of Oklahoma City Public Schools v. Dowell, 498 U.S.
    237 (1991); United States v. United Shoe Machinery Corp., 391 U.S. 244
    (1968); United States v. Swift & Co., 286 U.S. 106, 114 (1932); Patterson
    v. Newspaper & Mail Deliverers' Union, 13 F.3d 33 (2d Cir. 1993), pet.
    for cert. filed, 62 U.S.L.W. 3775 (U.S. May 24, 1994); Still's Pharmacy,
    Inc. v. Cuomo, 981 F.2d 632 (2d Cir. 1992); New York State Association
    for Retarded Children, Inc. v. Carey, 706 F.2d 956 (2d Cir.), cert.
    denied, 464 U.S. 915 (1983).

helpful.  In that case, the Second Circuit addressed whether the
lower court erred in applying a "public interest" standard to a
consented-to termination of a consent decree provision, where the
decree itself provided a somewhat different standard for relief
from the provision at issue.  719 F.2d at 564.  It held that the
district court should have applied the specific standard set out
in the parties' decree.  _Id_.  Significantly for this case,
however, the Second Circuit observed that:

> "it is appropriate for the court to look
> beyond the words of the decree itself in
> situations such as this, where the
> parties jointly seek a modification of
> the decree.
>
>     "In performing this quasi-judicial
> role, the court must, of course,
> consider protection of the 'public
> interest.'  We note, however, that the
> 'public interest' should be based on
> more than a broad and undefined
> criterion such as promotion of the
> public welfare.  Rather, 'the words
> [should] take meaning from the purposes
> of the regulatory legislation,' here,
> the Sherman Anti-trust and Clayton
> Acts."

719 F.2d at 565 (footnote and citation omitted).[16]

Unlike the decree in _American Cyanamid_, BMI's consent
decree does not have a specific provision establishing the

---

16.  In a footnote, the Court of Appeals noted that its reasoning was
consistent with its interpretation of the Antitrust Procedures and
Penalties Act, 15 U.S.C. §16(b)-(h) (1988) ("Tunney Act").  719 F.2d at
565 n.7.  In that footnote, the court stated that the Tunney Act was not
applicable to a decree termination proceeding.  _Id_.

standard for modifications, consensual or otherwise. Thus, we

believe the tentatively-consented-to modifications requested must

be measured against the public interest, as stated by the Second

Circuit in its American Cyanamid decision. See also United

States v. Western Electric Co., 969 F.2d 1231, 1235 (D.C. Cir.

1992) ("Changes uncontested by any party to the decree are

granted if 'within the reaches of the public interest'") (citing

United States v. Western Electric Co., 900 F.2d 283, 306 (D.C.

Cir.), cert. denied, 498 U.S. 911 (1990)), cert. denied, 113 S.

Ct. 1363 (1993); accord United States v. Loew's, Inc., 783

F. Supp. 211 (S.D.N.Y. 1992) ("Where, as here, the United States

consents to the proposed termination of the judgment in a

Government antitrust case, the issue before the Court is whether

termination of the judgment is 'in the public interest.'").

        Even if BMI's motion did not call for further

constraint to be placed on BMI, the Second Circuit's recent

decision in Patterson v. Newspaper & Mail Deliverers' Union, 13

F.3d 33 (2d Cir. 1993), pet. for cert. filed, 62 U.S.L.W. 3775

(U.S. May 24, 1994), would give this Court a "rather free hand"

in modifying the BMI Decree to deal with current conditions.[17]

---

17. Patterson is not authority for the proposition that the Court could make
   modifications in the BMI Consent Decree over BMI's objection, however,
   since BMI's decree was entered on consent before trial and without any
   finding of wrongdoing. See, e.g., Lorain NAACP v. Lorain Board of Educ.,
   979 F.2d 1141, 1153 (6th Cir. 1992) ("In the absence of an adjudication
   or admission of constitutional violation, the district court's authority
   to impose additional obligations on a defendant is constrained by the
   terms of agreement entered by the parties to the consent decree.").

In <u>Patterson</u>, a defendant union successfully moved this Court to
vacate a 20-year-old consent decree on the ground that its
essential purpose had been fulfilled.  The Second Circuit held
that the "flexible" standard set out in <u>Rufo v. Inmates of
Suffolk County Jail</u>, <u>supra</u>, and <u>New York State Association for
Retarded Children, Inc. v. Carey</u>, <u>supra</u>, was applicable even
where the defendant was not a governmental entity such as the
jail in <u>Rufo</u> or the hospital in <u>Carey</u>.

    The "flexible" standard of <u>Patterson</u> has now been
applied to modifications of antitrust consent decrees, even where
the government opposed the modifications.  <u>See United States v.
Eastman Kodak Co.</u>, 1994 U.S. Dist. LEXIS 7449 (W.D.N.Y. May 20,
1994); <u>United States v. Agri-Mark, Inc.</u>, 1994-1 Trade Cas.
¶ 70,512 (D. Vt. Jan. 21, 1994).  In both <u>Kodak</u> and <u>Agri-Mark</u>,
the Government opposed the defendants' motions to remove
antitrust consent decree provisions in the light of changed
conditions.  The district courts granted the defendants' motions,
over the Government's opposition, and held that the correct
standard for modification or termination of a consent decree was
the flexible standard of <u>Patterson</u>.

### B.  A BMI Rate Court Will Further the Goals of the Consent Decree and is in the Public Interest.

    The requested modifications to BMI's Consent Decree are
in the public interest, when measured against the backdrop of the
"regulatory legislation" under which it was entered.  <u>American
Cyanamid</u>, 719 F.2d at 565.  Here, the regulatory legislation is

the Sherman and Clayton Acts, and because the modifications
sought are procompetitive, under those statutes they are in the
public interest.

        The overriding goal of the BMI Consent Decree was to
permit BMI to continue to offer its efficient, bulk performing
rights licenses to music users while restraining whatever market
power BMI allegedly derived from its accumulation of a massive
number of copyright rights in a single entity.  The decree
modification now sought by BMI simply takes this approach one
step further by eliminating BMI's copyright law-derived right to
withhold access to its repertoire should it be unable to agree on
the terms of its licenses with any music user willing to apply
for a license.[18]  The proposed modification substitutes a rate
court mechanism for BMI's right to withhold access to its
repertoire, thus further limiting any possible market power BMI
might derive as a result of its accumulation of performing rights
to over 2 million compositions.  Therefore, the proposed
modification is clearly consistent with a key purpose of the
Consent Decree -- limiting any alleged market power BMI may have
-- as it now exists.

_____

18.  In Stewart v. Abend, 495 U.S. 207 (1990), the Supreme Court recognized
     that "nothing in the copyright statutes would prevent an author from
     hoarding all of his works during the term of the copyright."  Id. at 228-
     29.  The Court noted that "the limited monopoly granted to the artist is
     intended to provide the bargaining capital to garner a fair price for the
     value of the works passing into public use."  Id. at 229.

The proposed modification is also procompetitive because a rate court for BMI should lead to more efficient transactions in licensing. Parties to licensing negotiations will have the time and incentive to develop realistic bargaining positions, rather than continue the practice of brinkmanship and resort to litigation when negotiations become difficult. Knowledge that truly inflexible negotiators will eventually be subjected to established procedures and an impartial decision-maker can only encourage rational settlement of disputes and reduction of industry upheaval and uncertainty. As a result, the value of music performing rights licenses will be based more closely on economic conditions, as consideration of extraneous noncompetitive factors (such as the probability of success or failure of hard-line litigation tactics grounded on antitrust or other causes of action that are not truly the heart of the dispute) lessens.

Moreover, creation of a BMI rate court is procompetitive because it adds a licensing alternative and does not detract from the parties' existing ability to reach privately negotiated agreements. Nor would the creation of a rate court have any impact upon the right of any music user to obtain music rights directly from BMI's songwriters, composers, and publishers in the free market. As the Second Circuit found in the CBS network and Buffalo Broadcasting cases, BMI and its licensing practices do not prevent music users from contacting individual copyright owners -- directly or through brokers -- and

A-33

negotiating free market prices for music they want to perform.
See Buffalo Broadcasting, 744 F.2d at 928-29; CBS, 620 F.2d at
938-39. Since BMI will continue to hold only non-exclusive
rights to the works in its repertoire, any music user seeking to
license directly will be unaffected by the proposed decree
modification. If direct licensing and private negotiations are
unacceptable, the music user could apply to the BMI rate court
for determination of a reasonable fee for a BMI license. By the
same token, songwriters, composers, and publishers will remain
free to leave BMI for ASCAP or some other method of licensing
their works if they are not satisfied with the royalties they
receive.

      Modification of BMI's consent decree to establish a
rate court is, therefore, manifestly in the public interest. The
objective of BMI's motion is supported by almost every major
music user group requiring BMI licenses. The addition of a rate
court provision to the BMI consent decree has been advocated by
the All-Industry Television Station Music License Committee, the
All-Industry Radio Music License Committee, National Broadcasting
Co., CBS Inc., Capital Cities/ABC, Inc., the National Cable
Television Association's Music Licensing Committee, Home Box
Office, Inc., Showtime/The Movie Channel, Inc., The Disney

Channel, Turner Broadcasting System, Inc., and almost every other significant cable programmer.[19]

Nor will the proposed modification impose any new burden on the courts. As we have described, in the absence of a rate-setting court, BMI and its customers have all too often wound up in court anyway, usually this Court, when their negotiations have reached an impasse and a deadline has arrived. (See Berenson Aff. ¶¶ 15-24.) Instead of presenting baseless antitrust claims, music users will now be able to present their real grievance to the court: their contention that BMI's requested fees are too high. Instead of temporary restraining orders, orders to show cause, motions for emergency stays pending appeal, races to the courthouse, forum shopping in parallel lawsuits, and the like, the parties and the Court will be able to proceed in an orderly manner while the music user is assured that it is not committing copyright infringement and BMI is assured of interim license fees subject to later readjustment.

Unable to rely on the protection of a judicial forum for the resolution of licensing fee disputes, BMI has become entangled in a never-ending cycle of litigation. ASCAP, on the other hand, enjoys the security of knowing that a licensee's unreasonable bargaining posture will eventually be subject to close judicial scrutiny. As noted above, knowledge that use of

---

19. Admittedly, music users have urged that the BMI and ASCAP should be before the same rate court.

this outlet is the mandated remedy for an unreasonable stance on
license rates by an ASCAP licensee promotes rational negotiation
of fee disputes and reduces the likelihood that brinkmanship,
threats, and other extreme bargaining tactics will be used.

ASCAP today also enjoys another competitive advantage
over BMI because of its license fee court:  ASCAP customers and
program producers know that if they use ASCAP music in their pre-
recorded programs, the broadcasters of those programs will always
be able to get an ASCAP license to perform that music at a
reasonable fee.  A user of BMI music can never be equally certain
that BMI will not, because of a fee dispute, refuse to grant the
user a license.  To that extent, music users could perceive ASCAP
as more user-friendly than BMI.

Implementation of the proposed decree modification will
also provide BMI with the same shield against unwarranted
allegations of price-fixing now held by ASCAP.  Courts reviewing
the licensing practices of both BMI and ASCAP have in fact noted
the importance of a rate court mechanism in eliminating the
possible exercise of market power.  See, e.g., supra at 13-14.
BMI here seeks simply to garner the benefits of the judicial
supervision which ASCAP now enjoys.  There is no reason why ASCAP
should have a preferred legal position over BMI.

Finally, ASCAP enjoys another competitive advantage
over BMI because of its license-fee court procedure.  During
ASCAP fee disputes with music users, its members continue to
receive a steady flow of royalties from interim fees.  By

contrast, BMI cannot pay its affiliates if license negotiations
break down.  Even on those occasions when music users have sued
both ASCAP and BMI, ASCAP has always been assured that it would
receive interim payments from the music user during the
litigation.  BMI has never had this assurance.  (Berenson Aff.
¶ 31.)  During the CBS television network litigation, for
instance, BMI had to get an extraordinary mandatory injunction
from the Court to receive payments for use of its music during
the ten years of litigation.

## II. BMI'S CONSENT DECREE MODIFICATION MUST ESTABLISH A RATE
## COURT SEPARATE FROM ASCAP'S RATE COURT.

### A.  An Independent Rate Court is Key to BMI's Motion.

The proposal embodied in this motion includes a
paragraph calling for assignment of the BMI Consent Decree to a
judge other than one having continuing jurisdiction of any decree
involving any other performing rights society.  (Berenson Aff.
¶ 32 and Exh. H, ¶ V.)  The proposed modification also
specifically precludes assignment or reference of any issues in
the BMI rate court to a magistrate or master handling any matter
of any other performing rights society.  (Id.)  The intent of
this provision is to establish a rate court for BMI that is in
every respect independent from the rate proceedings for ASCAP.
(Id.)

This guaranteed separation from ASCAP is critical to
BMI's motion.  BMI steadfastly believes that a joint rate court
for both it and ASCAP is less acceptable than the status quo.

BMI does not want to risk becoming in any way associated with
ASCAP proceedings.  BMI has spent its entire existence as ASCAP's
principal competitor, distinguishing itself from ASCAP in every
practical manner and cannot compromise its status by being thrown
into the same rate court as ASCAP.

### B. A Joint Rate Court Would Be Anticompetitive and Therefore Contrary to the Public Interest.

A rate court (for either BMI or ASCAP) should be used
as a last resort, to set final fees only if the parties are
unable to reach agreement voluntarily.  BMI has been able over
the years to reach agreements with nearly all of its prospective
licensees without the benefit of a rate court, sooner or later,
although this course has frequently been marred by unnecessary
and expensive litigation.  ASCAP too has been able to reach
agreement on its licensing fees through private negotiations and
without ultimate resort to the rate court for determination of a
reasonable fee, having had only three rate court trials in 43
years.

A joint rate court for BMI and ASCAP would change that
pattern forever.  Instead of being a last resort, a joint court
would be asked to decide virtually every license fee.  The
reasons for this are several and the results are plainly
anticompetitive and contrary to the public interest.

First, a joint rate court would turn license
negotiations into purely pre-litigation posturing.  Music users
would be reluctant to enter into license agreements with one

A-38

organization knowing that a related and possibly binding
adjudication with the other is in the offing.  By the same token,
negotiators for ASCAP and BMI would be less likely to enter into
voluntary agreements with music users, knowing that their rivals
could stand to do better by continuing to litigate and that any
adverse result would also apply to their competitors.  If any
voluntary agreements were reached they would occur solely on the
basis of lawyers' perceptions of their tactical evidentiary value
in the rate proceedings of the competing performing rights
society.  As in most multi-party cases, BMI and ASCAP would
inevitably get enmeshed in each other's settlement strategies.

        Second, a fact finder asked to decide rates for both
BMI and ASCAP would likely seek to place both organizations in
lockstep to avoid duplicative proceedings and the perception of
inconsistent findings.  BMI and ASCAP licenses with music users
would be dealt with as a single item.  Instead of engaging in
private negotiations with the organization with which its
licenses are about to expire, as is now the case, a music user
would simply deal with both at once on a joint timetable.  In a
joint rate court, licenses for ASCAP and BMI would likely be set
to start and end at the same dates.  This would further suppress
competition between BMI and ASCAP.  In the present market there
is now a staggered schedule where a music user's license with
ASCAP usually expires at a time different from its license with
BMI, thereby allowing for further maneuvering by licensees and

licensors. The same would be true if an independent BMI rate court were created.

Third, a joint rate court would tend to rigidify the license fees of both BMI and ASCAP artificially. One possible scenario would call for multi-stage proceedings where an overall level of fees for all music usage would first be decided, probably based purely on history, and BMI and ASCAP would then haggle about their shares of licensing revenues as they have done in the now-abolished Copyright Royalty Tribunal. E.g., National Ass'n of Broadcasters v. Copyright Royalty Tribunal, 809 F.2d 172 (2d Cir. 1986); Christian Broadcasting Network, Inc. v. Copyright Royalty Tribunal, 720 F.2d 1295 (D.C. Cir. 1983). Instead of a market-driven dynamic reflecting the importance of BMI music to the overall success of the particular music user, which has allowed songwriters, composers, and publishers to stay almost-caught-up with the explosive growth of the television and radio outlets for music over the decades, performance royalties could become a fixed dollar item that, at most, would be adjusted from time to time for inflation. The focus of joint proceedings, however structured, would be Music in the abstract, not the specific contribution of the BMI repertoire to the licensee.

Fourth, a joint rate court would hinder BMI's ability to compete with ASCAP for new affiliates and members to build the best repertoire. For years, BMI has attracted new songwriters, composers, and publishers by offering lower administrative fees, higher royalty payments, and more liberal affiliation

A-40

requirements, and by searching for the best new talent.  A joint

rate court, by tending to place BMI and ASCAP in lockstep, would

handicap this competition between BMI and ASCAP, which has so

greatly benefited the music community, music users, and the

public.[20]  It would also immeasurably compromise BMI's ability to

serve as a vigorous competitor to ASCAP, which is one of BMI's

most important roles.

        Finally, a joint rate court would result in unnecessary

litigation for BMI.  Every time a licensee believed that either

_____

20.  To the extent that music users argue that judicial efficiencies would be
     accomplished by having the BMI rate court consolidated with the existing
     ASCAP rate court, this argument must be rejected for the following
     reasons:  the ASCAP court has heard and drawn conclusions -- sometimes
     erroneous -- about BMI for years now in proceedings where BMI had no
     standing and no voice.  For example, in ASCAP v. Showtime, 912 F.2d 563,
     596 n.49 (2d Cir. 1990), the ASCAP court came to the erroneous conclusion
     that BMI music must be performed less frequently than ASCAP's because
     there are fewer separate titles claimed in its repertoire.  Moreover, the
     ASCAP rate court has been a forum where ASCAP has repeatedly denigrated
     BMI, its repertoire, its management, and its songwriters.  See, e.g.,
     United States v. American Society of Composers, Authors and Publishers,
     586 F. Supp. 727, 731-32 (S.D.N.Y. 1984) (where ASCAP claimed that BMI's
     ownership by broadcasters would lead to discrimination by the networks
     against ASCAP in music selection and in license choice); ASCAP v.
     Showtime, 912 F.2d at 595 (where ASCAP challenged a BMI license as the
     product of a "sweetheart arrangement" because BMI is "an instrument of
     the broadcast industry").  Music users in the ASCAP rate court have also
     frequently cited to their dealings with BMI -- putting their own self-
     interested gloss on how and why BMI has acted; in ASCAP v. Showtime,
     supra, the cable programmers argued that BMI held "monopoly power" and
     that its licenses "should be viewed as the product of coercive market
     power".  912 F.2d at 563.

     Consolidation of BMI rate proceedings with ASCAP's would also be unfair
     because it would be more difficult for BMI (or ASCAP) to maintain the
     confidentiality of its relations with customers, songwriters, composers,
     and publishers; legitimate trade secrets concerning negotiating strategy,
     novel licensing forms, and initiatives by BMI (or ASCAP) would become the
     very focus of all rate proceedings, and protective orders could not
     adequately shield them.

BMI or ASCAP's requested price for a license was unreasonable, a rate proceeding would most likely ensue involving both entities.

## CONCLUSION

BMI seeks a decree modification whose primary objective is universally supported by its television and radio broadcast licensees, is not in derogation of the purposes of the decree and in fact supports those purposes, is not novel or untested, and would greatly aid the business and competitive health of BMI to the detriment of no one. The Court should grant BMI's motion to modify the 1966 BMI Consent Decree to provide for separate, judicial determination of reasonable license fees, as requested herein.

Dated: New York, New York
      June 27, 1994

Respectfully submitted,

HUGHES HUBBARD & REED

By: _____
    Robert J. Sisk (RS-8557)

Attorneys for Defendant
  Broadcast Music, Inc.
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

Of Counsel:

    Norman C. Kleinberg
    Michael E. Salzman
    Charles Lozow
      - and -
    Marvin L. Berenson

ADDENDUM B

MEMORANDUM OF THE UNITED STATES
IN RESPONSE TO MOTION OF BROADCAST MUSIC, INC.
TO MODIFY THE 1966 FINAL JUDGMENT IN THIS MATTER

Filed June 20, 1994

U.S. Department of Justice

Antitrust Division

Kursh
dan
.echter -3208

Hollander          Hold
Tierney           Official
Chrono

GK:BMH
60-22-5-DP

*Judiciary Center Building*
*555 Fourth Street, N.W.*
*Washington, D.C. 20001*

June 24, 1994

**FEDERAL EXPRESS**

Michael E. Salzman, Esquire
Hughes, Hubbard and Reed
One Battery Park Plaza
New York, New York  10004-1482

    Re:  United States v. Broadcast Music, Inc.,
        64 Civ. 3787 (S.D.N.Y.)

Dear Mr. Salzman:

    Pursuant to our telephone conversations, enclosed for
filing with the Court are (1) the signed Stipulation between
the United States and BMI, and (2) the Memorandum of the United
States in Response to the Motion of Broadcast Music, Inc. to
Modify the 1966 Final Judgment Entered in this Matter.  It is
our understanding that these will be filed promptly with your
motion papers.

    I have also enclosed three extra copies of the Memorandum
for your use.

               Sincerely yours,

               Bernard M. Hollander
               Senior Trial Attorney

Enclosures

Bernard M. Hollander (BMH; 0818)
James J. Tierney     (JJT; 7842)
Attorneys for the United States
Antitrust Division
United States Department of Justice
555 4th Street, N.W.
Room 9917
Washington, D.C.   20001
(202) 307-0875


IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 64 Civ. 3787 |
| ) | |
| BROADCAST MUSIC INC., ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

---

MEMORANDUM OF THE UNITED STATES IN RESPONSE
TO MOTION OF BROADCAST MUSIC, INC. TO MODIFY
THE 1966 FINAL JUDGMENT ENTERED IN THIS MATTER

## TABLE OF CONTENTS

I.   BACKGROUND OF THE COMPLAINT AND FINAL JUDGMENT . . .        3

II.  THE PUBLIC INTEREST STANDARD APPLIES WHERE
     MODIFICATION OF AN ANTITRUST JUDGMENT WITH
     THE CONSENT OF THE GOVERNMENT IS INVOLVED. . . . . .        4

III. THE UNITED STATES BELIEVES THAT ESTABLISHMENT
     OF A RATE COURT WOULD BE IN THE PUBLIC INTEREST
     AND HAS THEREFORE TENTATIVELY CONSENTED TO
     MODIFICATION OF THE JUDGMENT. . . . . . . . . . . .        9

IV.  THE PROPOSED PROCEDURES FOR GIVING PUBLIC
     NOTICE OF THE PENDING MOTION AND INVITING
     COMMENT ARE APPROPRIATE. . . . . . . . . . . . . .         13

     CONCLUSION . . . . . . . . . . . . . . . . . . . . .       16

i.

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
UNITED STATES OF AMERICA,          )
                                   )
              Plaintiff,           )
                                   )
              v.                   )
                                   )  64 Civ. 3787
BROADCAST MUSIC INC.,              )
     et al.,                       )
                                   )
              Defendants.          )
                                   )
```

### MEMORANDUM OF THE UNITED STATES IN RESPONSE
### TO MOTION OF BROADCAST MUSIC, INC. TO MODIFY
### THE 1966 FINAL JUDGMENT ENTERED IN THIS MATTER

Broadcast Music, Inc. ("BMI"), defendant in this action,

has moved this Court to modify the Final Judgment entered

herein against it on December 29, 1966 ("the Judgment"), so as

to establish a judicial mechanism for adjudicating disputed

fees for the licensing of music performing rights to music

users. In a stipulation between BMI and the United States, BMI

has agreed to publish notice of its motion and an invitation

for comments thereon in (a) two consecutive issues of the

national edition of The Wall Street Journal, (b) two

consecutive issues of Broadcasting & Cable and (c) two

consecutive issues of the weekly edition of Variety, and the

United States, with one exception_1/, has tentatively consented to the entry of an Order modifying the Judgment at any time more than seventy (70) days after the last publication of such notice.

This memorandum summarizes the Complaint which led to entry of the Judgment, and the nature of that Judgment. It discusses the legal standards and precedents respecting judgment modification, and explains the reasons why the United States has tentatively consented to judgment modification in this instance. Also addressed are the procedures proposed by the United States and agreed to by BMI for giving notice of the pending motion and obtaining public comment thereon, while assuring the right of the United States to withdraw its consent at any time until an order modifying the Judgment is entered.

---

_1/ The United States takes no position at this time with regard to BMI's proposed addition to Article XIII, which would both deprive any Judge assigned to any ASCAP matter of jurisdiction in this case, and enjoin the Court from referring or assigning "any issue or matter under this Final Judgment... to a Magistrate Judge or Master" who handled any corresponding ASCAP issue or matter. Judicial assignments being a matter solely within the Court's discretion, we believe that it would be inappropriate for the Department of Justice now to support or oppose BMI's request for a separate "rate court."

2

## I. BACKGROUND OF THE COMPLAINT AND FINAL JUDGMENT

The Complaint from which the Judgment evolved was filed by
the Government on December 10, 1964. 2/ In addition to
defendant BMI, the Complaint named as class defendants some 517
broadcasters, represented by RKO General, Inc., all of whom
owned voting stock in BMI. BMI and the defendant broadcasters
allegedly constituted a combination to restrain and monopolize,
and an attempt to monopolize, the business of acquiring and
licensing to broadcasters copyrighted music rights, in
violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C.
§§ 1 and 2. The Complaint sought divestiture by the defendant
broadcasters of their stockholdings in BMI, 3/ and "such other,
further and different relief as to the Court may appear to be
just and proper in the premises." In actuality, the 1966
consent Judgment generally incorporated, clarified, updated and

---

2/ In a previous related action, filed in the Eastern
District of Wisconsin on January 27, 1941, the Government
charged that BMI had conspired with the broadcast networks and
others to restrain trade "in radio broadcasting, sheet music
and electrical transcriptions in violation of Section 1 [of the
Sherman Act]". That action was settled on February 3, 1941,
with entry of a consent decree that was vacated on December 29,
1966 upon entry of this Court's Judgment.

3/ This prayed-for divestiture relief was not granted, but
the three networks had already divested their BMI stock in
response to an antitrust inquiry by Congressman Celler in the
late 1950s. Today, BMI is owned by independent radio and
television stations.

3

replaced the earlier Wisconsin decree which had been entered
prior to the advent of commercial television.  The Government
had encountered no enforcement problems to that time, and
indeed has encountered none since.

In view of the fact that the BMI Judgment has no provision
for court adjudication of licensing fees, if necessary, such as
that contained in the comparable ASCAP decree, 4/ the
Government has tentatively concluded that there is no apparent
reason why the modification proposed by BMI to establish a
"rate court" 5/ would be inconsistent with the public interest.

## II.   THE PUBLIC INTEREST STANDARD APPLIES WHERE MODIFICATION OF AN ANTITRUST JUDGMENT WITH THE CONSENT OF THE GOVERNMENT IS INVOLVED

This Court has jurisdiction to modify the Judgment pursuant
to:  Section XIII of the Judgment, Rules 60(b)(5) and (6) of
the Federal Rules of Civil Procedure, and "principles inherent
in the jurisdiction of the chancery."  United States v. Swift &
Co., 286 U.S. 106, 114 (1932).

---

4/  The decree in U.S. v. ASCAP, Civ. No. 13-95 (WCC)
(S.D.N.Y. 1950), established the ground rules under which that
performing rights organization licenses music users to perform
the works of its members, and distributes the revenue it
collects to those members for the use of their music.

5/  As already explained, the United States takes no position
at this time with regard to BMI's request for a separate "rate
court."  See note 1.

4

Where, as here, the United States tentatively consents to
the proposed judgment modification in a Government antitrust
case, the issue before the Court is whether modification of the
judgment is "in the public interest." <u>United States v. Loew's
Incorporated, et al.</u>, 783 F. Supp. 211 (S.D.N.Y. 1992), and
<u>United States v. Columbia Artists Management, Inc.</u> 662 F. Supp.
865, 869 (S.D.N.Y. 1987), citing <u>United States v. Swift & Co.</u>,
1975-1 Trade Case. ¶ 60,201, at 65,702 (N.D. Ill. 1975); <u>cf.</u>
<u>United States v. American Cyanamid Co.</u>, 556 F. Supp. 361, 367
(S.D.N.Y. 1983), <u>rev'd on other grounds</u>, 719 F.2d 558 (2d Cir.
1983), <u>cert. denied</u>, 104 S. Ct. 1596 (1984). 6/ This

---

6/   The judgment in <u>American Cyanamid</u> specifically provided
that the defendant could be relieved from its obligations

'upon a showing . . . that the effect of such relief will
not be substantially to lessen competition or tend to
create a monopoly in any line of commerce in any section of
the country.' <u>American Cyanamid</u>, 719 F.2d at 561.

In light of this language, which is nearly identical to that
used in Section 7 of the Clayton Act, 15 U.S.C. § 18, the court
of appeals concluded that the district court should have
carried out its "public interest" obligations by applying the
"standard framework for analysis of the legality of a vertical
merger." <u>American Cyanamid</u>, 719 F.2d at 566.   The Second
Circuit did not reject the rule that the "public interest" is
the generally applicable standard.  To the contrary, the court
observed that "the court must, of course, consider protection
of the 'public interest.'"  The court agreed with the
Government "that the 'public interest' should be based on more
than a broad and undefined criterion such as promotion of the
public welfare," and that the words take meaning from the
antitrust laws. <u>Id</u>. at 565. Here, unlike <u>American Cyanamid</u>,
the judgment does not establish any special standard to be
applied to a motion for its modification.

5

is the same standard that a district court applies in deciding whether to enter an initial consent decree submitted by the Government in an antitrust proceeding. See 15 U.S.C. § 16(e); United States v. AT&T, 552 F. Supp. 131, 147 n.67 (D.D.C. 1982), aff'd sub nom. Maryland v. United States, 460 U.S. 1001 (1983).

The Supreme Court has held that where the words "public interest" appear in federal statutes designed to regulate public sector behavior, they "take meaning from the purposes of the regulatory legislation." NAACP v. FPC, 425 U.S. 662, 669 (1976); see also, System Federation No. 91 v. Wright, 364 U.S. 642, 651 (1961). The purpose of the antitrust laws, the "regulatory legislation" involved here, is of course to protect competition. E.g., United States v. Penn-Olin Chemical Co., 378 U.S. 158, 170 (1964) (antitrust laws reflect "a national policy enunciated by the Congress to preserve and promote a free competitive economy."). Thus, the ultimate question before the Court at this time is whether modification of the Judgment would serve the public interest in "free and unfettered competition as the rule of trade." Northern Pacific Railway v. United States, 356 U.S. 1, 4, (1958); see also United States v. Western Electric Co., 900 F. 2d 283, 308 (D.C. Cir. 1990), cert. denied, 111 S.Ct. 283 (1990); American Cyanamid, supra, 719 F. 2d at 565; U.S. v. Loews Inc., supra, 783 F. Supp. at 213.

6

It has long been recognized that the Government has broad
discretion in settling antitrust litigation on terms 'that will
best serve the public interest in competition. <u>See</u> <u>Sam Fox</u>
<u>Publishing Co. v. United States</u>, 366 U.S. 683, 689 (1961).  The
judiciary's role in determining whether the initial entry of a
consent decree is in the public interest, absent a showing of
abuse of discretion or a failure to discharge its duty on the
part of the Government, is to determine the reasonableness of
the Government's explanation and not to substitute its
opinion.  <u>United States v. Mid-America Dairymen, Inc.</u>, 1977-1
Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977); <u>see also</u>
<u>United States v. Bechtel Corp.</u>, 648 F.2d 660, 666 (9th Cir.),
<u>cert. denied</u>, 454 U.S. 1083 (1981).  The Government has at its
disposal a range of settlements that are consistent with the
public interest.  <u>See, e.g., Western Electric</u>, 900 F.2d at
307-309; <u>Bechtel</u>, 648 F.2d at 665-66; <u>United States v. Gillette</u>
<u>Co.</u>, 406 F. Supp. 713, 716 (D. Mass. 1975).  The court's role
is to conduct a limited review to "insure that the government
has not breached its duty to the public in consenting to the
decree," <u>Bechtel</u>, 648 F.2d at 666, through malfeasance or by
acting irrationally. 7/

---

7/  The Supreme Court's decision in <u>Rufo v. Inmates of Suffolk</u>
<u>County Jail</u>, 112 S. Ct. 748 (1992), does not affect either the
applicability of the public interest standard to consensual
modification or termination of decrees in government antitrust
cases or the scope of judicial review under that standard.  In
<u>Rufo</u>, a case involving an "institutional reform" decree
requiring specified changes in prison conditions, the proposed
modification was not consensual.  The governmental defendant
(Footnote continued on next page.)

7

The roles of the Government and the Court are the same when the Government consents to the modification of a judgment. United States v. Swift & Co., 1975-1 Trade Cas. at 65,702-03. Where the Department of Justice has offered a reasoned and reasonable explanation of why the modification of a judgment vindicates the public interest in free and unfettered competition, and there is no showing of corruption affecting the Government's recommendation, the Court should conclude that the modification is "within the reaches of the public interest". Bechtel, 648 F.2d at 666. 8/

_____

(Footnote continued from previous page.)
sought modification of its decree obligations; the plaintiffs opposed the modification.

8/ Over the years, courts have approved literally hundreds of consent orders modifying or terminating Government antitrust decrees. Recent instances include:

United States v. National Broadcasting Company, Inc., United States v. American Broadcasting Companies, Inc., United States v. CBS, Inc., 842 F. Supp. 402 (C.D. Cal. 1993); United States v. Linen Supply Institute of Greater New York, Inc., et al., 1993-1 Trade Cas. (CCH) ¶ 70,271 (S.D.N.Y. 1993); United States v. Saks & Company, et al., 1992-1 Trade Cas. (CCH) ¶ 69,845 (S.D.N.Y. 1992); United States v. Loew's Inc., et al., 783 F. Supp. 211 (S.D.N.Y. 1992).

8

III. THE UNITED STATES BELIEVES THAT ESTABLISHMENT
OF A RATE COURT WOULD BE IN THE PUBLIC INTEREST
AND HAS THEREFORE TENTATIVELY CONSENTED TO
<u>MODIFICATION OF THE JUDGMENT</u>

The Government's tentative consent to BMI's motion to
modify the Judgment to establish a judicial rate-setting
mechanism has been given only after extensive consideration.
We were reluctant initially to join in imposing a significant
administrative and regulatory burden on the Court. For several
reasons, however, we have concluded that empowering the Court
to resolve licensing disputes when 'negotiations between BMI and
music users break down is sound enforcement policy, and is in
the public interest.

First, there is the obvious anomaly that ASCAP licensees
have for over forty years been able to invoke the jurisdiction
of the Court to establish reasonable fees under the ASCAP
consent decree, but the same licensees, when dealing with BMI,
have not had that option.

Second, courts, including the Supreme Court, when
considering the antitrust implications of ASCAP and BMI blanket
licensing of music, have cited with apparent approval the rate
court provision in the ASCAP judgment as an effective restraint
on potential abuse of market power. <u>See</u> <u>Broadcast Music, Inc.</u>
<u>v. Columbia Broadcasting System, Inc.</u>, 441 U.S. 1, 11-12, 24
(1979); <u>Columbia Broadcasting System, Inc. v. American Society</u>
<u>of Composers, Authors and Publishers</u>, 620 F.2d 930, 933, 938

9

B-13

(2d Cir. 1980), cert. denied 450 U.S. 970 (1981); Buffalo Broadcasting Co. v. American Society of Composers, Authors and Publishers, 744 F.2d 917, 923, 927 (2d Cir. 1984, cert. denied 469 U.S. 1211 (1985).

Third, it is clear from BMI's recitation of its recent licensing history with the broadcasting and cable industries that the absence of a rate-setting mechanism in the BMI consent decree has not deterred litigation as a means of resolving licensing disputes. On the contrary, it appears that BMI or its licensees have raised copyright infringement and antitrust issues in cases filed in several forums. One court, in deciding such a lawsuit, commented pointedly on the desirability of making available a BMI rate court mechanism. National Cable Television Ass'n, Inc. v. Broadcast Music, Inc. 772 F. Supp. 614, 650, n.88 (D.D.C. 1991.)

Finally, we have given some weight to the fact that all major users of BMI music -- the radio and television broadcasters and the cable television broadcasters -- have urged the Government to consider favorably BMI's request for modification.

We wish to emphasize, however, that the Government's tentative consent to establishment of a "rate court" mechanism does not reflect our intention that judicial rate setting should become a substitute for competitive rate setting. The Judgment already contains important provisions to assure that

10

music users have competitive alternatives to the blanket

license, including direct and per-program licensing, 'and source

licensing for prerecorded programming.

Under the Judgment, BMI may obtain only nonexclusive

licenses from composers, thereby leaving the composers free to

license any of their works directly to any music user who

chooses to negotiate with them. The Judgment further requires

BMI to offer a form of license to radio and television networks

and cable programming services, which includes music

performance rights to be conveyed to local stations or cable

systems which transmit programs to the listening or viewing

audience ("through-to-the-viewer" licenses).   This requirement

places the licensing obligation closer to the source of the

program.   The ASCAP decree court has found this requirement to

make more feasible insistance by the networks that the program

producer acquire performance rights from the composer, if the

price of the blanket license is considered excessive.   See

United States v. ASCAP (Application of Turner Broadcasting),

782 F. Supp. 778 (S.D.N.Y. 1991), aff'd 956 F.2d 21 (2d Cir.

1992)

Finally, the judgment requires BMI to offer to radio,

television and cable broadcasters, a per-program license as an

alternative to its blanket license.   A music user seeking to

move away from reliance on an overpriced blanket license to

direct or source licensing of music performance rights, may use

a per-program license as a "bridge", to cover programs for

11

which music licenses cannot be immediately acquired from the composer or the producer. 9/

Thus, the Judgment provides important protections against supracompetitive pricing of the BMI blanket license for those music users wishing to explore competitive licensing alternatives. For most bulk music users, however, the convenience and efficiency of blanket licensing may make it the licensing method of choice. For these users, the opportunity to ask the decree court to determine a reasonable licensing fee may provide additional protection against any attempt by BMI to exercise market power in the pricing of its blanket license.

---

9/ In the memorandum in support of its motion, BMI acknowledges its obligation to offer through-to-the viewer and per program licenses to cable programmers. It is the position of the United States that this obligation is already established by controlling precedent. In United States v. ASCAP (Application of Turner Broadcasting), supra, this Court has construed parallel provisions of the ASCAP decree to require that these licenses be offered to cable television. Indeed, one court already has held expressly that BMI must offer through-to-the-viewer licenses to cable television program services under Section IX of this judgment. National Cable Television Ass'n, Inc. v. Broadcast Music, Inc., supra, at 647-650.

12

IV.  THE PROPOSED PROCEDURES FOR GIVING
     PUBLIC NOTICE OF THE PENDING MOTION
     AND INVITING COMMENT ARE APPROPRIATE

     The opinion in United States v. Swift & Co., 1975-1 Trade
Cas. at 65,703, discusses a court's responsibility to implement
procedures that will give nonparties notice of, and an
opportunity to comment upon, antitrust judgment modifications
proposed by consent of the parties:

     Cognizant . . . of the public interest in
     competitive economic activity, established
     chancery powers and duties, and the occasional
     fallibility of the Government, the court is, at
     the very least, obligated to insure that the
     public, and all interested parties, have received
     adequate notice of the proposed
     modification. . . . [Footnote omitted.]

     The Department of Justice believes that giving the public
notice of the filing of a motion to modify the final judgment
in a Government antitrust case, and an opportunity to comment
upon that motion, is generally necessary to insure that both
the Department and the Court properly assess the public
interest.  Accordingly, over the years, the Department has
adopted and refined a policy of consenting to motions to modify
or terminate judgments in antitrust actions only on condition
that an appropriate effort be undertaken to notify potentially
interested persons of the pendency of the motion.  In the case
at bar, the Government has proposed, and the movant has agreed
to, the following:

13

1.  When the motion is filed, the Department will publish in the _Federal Register_ a notice (a) announcing the motion and the Government's tentative consent to it; (b) summarizing the Complaint and the Judgment; (c) explaining that copies of the relevant papers can be inspected at the offices of the Antitrust Division and the Clerk of the Court; (d) stating that copies of the papers can be obtained from the Antitrust Division, upon request and payment of the copying fees prescribed by Justice Department regulations; and (e) inviting all interested persons to submit comments concerning the proposed modification to the Antitrust Division.

2.  BMI will publish notice of the motion in two consecutive issues of the national edition of _The Wall Street Journal_, in two consecutive issues of _Broadcasting & Cable_ and in two consecutive issues of the weekly edition of _Variety_. The latter two periodicals are trade journals likely to be read by persons interested in the markets affected by the Judgment. The published notices will invite public comment during the following sixty days and contain essentially the same information about the contemplated proceeding as appears in the Department's _Federal Register_ notice.

3.  The Department of Justice will file with the Court copies of all comments that it receives.

4.  The parties will stipulate that the Court will not rule upon the motion for at least seventy days after the last publication by movants of the notices described above (and thus

14

for at least ten days after the close of the period for public comments), and the Government will reserve the right to withdraw its consent to the motion at any time until an order is entered modifying the Judgment. 10/

We believe that this procedure is well designed to provide all potentially interested persons with notice that a motion is pending to modify the Judgment and to provide an adequate opportunity for comment. The movant here has agreed to follow this procedure, including publication of appropriate notices in The Wall Street Journal, Broadcasting & Cable and weekly Variety. The parties are therefore submitting to the Court a stipulation and order establishing this procedural approach, and we ask that it be entered forthwith.

---

10/ Withdrawal by the Department of Justice of its consent would be significant because the legal standard applicable to a motion to modify or terminate an antitrust judgment over the Government's objection is stricter than the standard applicable to a modification or termination with its consent. United States v. American Cyanamid Co., supra, 556 F. Supp. at 367; see also, United States v. AT&T, supra, 552 F. Supp. at 147 n.67.

15

## CONCLUSION

For the foregoing reasons, the United States tentatively consents to the modification of the Judgment and asks the Court to enter now the Order submitted herewith directing publication of notice of the motion.

Dated:   June 20, 1994

Respectfully submitted,

Bernard M. Hollander
(BMH; 0818)

James J. Tierney
(JJT; 7842)

Attorneys for the United States
Antitrust Division
United States Department of Justice
555 4th Street, N.W.
Room 9917
Washington, D.C.   20001
(202) 307-0875

16