Jeffery D. McFarland (SBN 157628)
jmcfarland@mckoolsmith.com
MCKOOL SMITH P.C.
300 South Grand Avenue, Suite 2900
Los Angeles, CA 90071
Telephone: (213) 694-1200
Facsimile: (213) 694-1234

Travis DeArman *(pro hac vice)*
tdearman@mckoolsmith.com
MCKOOL SMITH P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Attorneys for Counterclaim Defendant
SPOKEN GIANTS, LLC

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| In re PANDORA MEDIA, LLC COPYRIGHT LITIGATION<br><br>This Document Relates to:<br>ALL ACTIONS | Master File No.: 2:22-cv-00809-MCS-MAR<br>CONSOLIDATED ACTION<br><br>**COUNTERCLAIM DEFENDANT SPOKEN GIANTS, LLC.'S REPLY IN SUPPORT OF ITS MOTION FOR RULE 11 SANCTIONS**<br><br>Date: March 6, 2023<br>Time: 9am<br>Courtroom: 7C<br>Assigned to Hon. Mark C. Scarsi |

# INTRODUCTION

Pandora's opposition makes a compelling case *for* the award of Rule 11 sanctions against Pandora and Mayer Brown.[1]

*First*, Pandora confirms that its claims rely on a single allegation: when it comes to licensing the copyrights owned by SG's members, "the only option was, and ever will be, a blanket license." Opp. at 8. This false allegation is based on Pandora's misrepresentation of the record.

*Second*, Pandora uses its misrepresentations to advance claims without legal or evidentiary bases, and its arguments to the contrary only further misstate the facts and the law. For example, Pandora offers no defense of its egregious misrepresentation of the conversations between individual comedians, but rather tries to avoid its misrepresentations by ignoring the evidence.

*Third*, Pandora's briefing only emphasizes that this is an exceptional case warranting Rule 11 sanctions because Pandora has asserted frivolous claims for the purpose driving up litigation costs and intimidating comedians who are asserting their legitimate copyright claims.

## I. Pandora misrepresented the record.

### A. SG never demanded an "all-or-nothing blanket license."

Pandora first misrepresents the record by claiming that SG demanded an "all or nothing blanket license" to SG's entire portfolio. *E.g.*, SG ACC at ¶¶ 21, 41-42, 45, 54-61, 71, 74, 77-80, 98, 117, 143. Specifically, Pandora misstates the content of two documents: (i) a proposed, non-binding term sheet (ECF No. 128-4), and (ii) the April 19 email transmitting that proposal (ECF No. 128-3).[2]

Pandora repeats this misrepresentation in its response, arguing that the "the license [SG] sent Pandora was in fact an all-or-nothing blanket license," because the

---

[1] Collectively referred to as "Pandora."
[2] Pandora submits a copy of this email dated April 20, 2021, likely due to differences in time zones.

1

grant of rights explicitly states that it covers "any or all Works in [SG's] Catalog during the term (sic)." Opp. at 6.

But the document that Pandora cites (ECF No. 128-4) is not a license. It is a proposed, non-binding term sheet containing (among other things) an as-yet-undefined term for the "service" to be licensed. ECF No. 128-4 at 2. It was attached to an email (ECF. No. 128-3) specifically contemplating future negotiations. In other words, SG transmitted an opening offer, with an incomplete set of terms, and an invitation to negotiate.

Pandora's attempt to twist these documents into a demand for an "all-or-nothing blanket license" does not comport with any reasonable interpretation of the facts. This is especially true because Pandora refused—or at minimum failed—to negotiate for licenses with individual comedians, despite having every right to so. *See Section* IIB, below.

Pandora misrepresented these documents and misstated the facts because it knew that "the opportunity to acquire a pool of rights does not restrain trade if an alternative opportunity to acquire individual rights is realistically available." *Buffalo Broad. Co. v. Am. Soc'y of Composers, Authors & Publishers*, 744 F.2d 917, 925 (2d Cir. 1984); *Nero AG v. MPEG LA, LLC*, 2010 WL 4366448, at *7 (C.D. Cal. Sept. 14, 2010). The Court applied this exact principle in dismissing Pandora's original counterclaims against WC. ECF No. 83 (the "Decision") at 17. But rather than heeding the Court's invitation to wait to amend its pleadings pending the development of fact discovery, it chose to distort the record and re-assert its frivolous claims.

Pandora also misleadingly and selectively quotes from a SG press release, the SG website, and other SG statements. Opp. at 6. But even woven together without context, none of these statements amount to an "all-or-nothing" licensing strategy. SG's statements also cannot override the plain text of its communications, nor do they excuse Pandora's misrepresentations. *See Nguyen v. Simpson Strong-Tie Co.*, No. 19-cv-07901-TSH, 2020 WL 5232564, at *7 (N.D. Cal. Sept. 2, 2020) (sanctioning

SPOKEN GIANTS' REPLY IN SUPPORT OF ITS MOTION FOR RULE 11 SANCTIONS

cherry picking and misrepresenting quotes to the court); *Lipsig v. Nat'l Student Mktg. Corp.*, 663 F.2d 178, 181 (D.C. Cir. 1980) (declining to award attorneys' fees where party "seriously misled the Court by misquoting or omitting material portions of documentary evidence").

**B. Spoken Giants is not a "de facto exclusive licensor."**

Pandora also misrepresents SG as a "de facto exclusive licensor." The Court previously set out the four dispositive principles that foreclose Pandora's allegations:

1) "[T]he opportunity to acquire a pool of rights does not restrain trade if an alternative opportunity to acquire individual rights is realistically available." Decision at 17, quoting *Buffalo Broad. Co., Inc. v. Am. Soc'y of Composers, Authors & Publishers*, 744 F.2d 917, 925 (2d Cir. 1984), and citing *Nero AG v. MPEG LA, LLC*, No. 10-cv-3672-MRP-RZ, 2010 WL 4366448, at *6 (C.D. Cal. Sept. 14, 2010).

2) "An antitrust plaintiff has the burden of pleading the nonavailability of options to acquire individual licensing." *Id.*, citing *Nero AG*, 2010 WL 4366448, at *6.

3) "[T]his burden cannot be met where a plaintiff never makes an inquiry or attempt to negotiate an individual license." *Id.*, citing *Nero AG*, 2010 WL 4366448, at *6–7; *Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*, Nos. C 05-2133 SBA, C 01-4925, 2007 WL 2318903, at *15 (N.D. Cal. Aug. 13, 2007).

4) "A plaintiff need not allege any attempt to individually license, however, if the plaintiff demonstrates availability of individual licenses is illusory." *Id.*, citing *Samsung Elecs. Co., Ltd. v. Panasonic Corp.*, No. C 10-03098 JSW, 2015 WL 10890655, at *6 (N.D. Cal. Sep. 30, 2015).

Pandora knew that the record could not support these four necessary elements because the plain text of SG's affiliation agreements establishes that Pandora could

(and can) negotiate for individual licenses with SG's members. ECF No. 128-5, at 3 (copied in pertinent part below, emphasis added).

> A. The rights granted to Spoken Giants under Section 3 of this Agreement do not include:
>
> (i) The right to record and distribute for sale to the public, or to authorize others to record and distribute recordings of your Works, in any medium.
>
> (ii) Notwithstanding the provisions of Section 3 of this Agreement, You retain the right to issue non-exclusive licenses directly to any third person (other than to another spoken word rights administration organization) for the public performance, in the United States, its territories and possessions, of any Work subject to this Agreement, provided that any such direct license is memorialized in a writing, a copy of which is provided to Spoken Giants within ten (10) days of its issuance, and which identifies the Work(s) so licensed, the licensee, the time and the place of the performance(s), and any fee(s) paid therefor. You hereby acknowledge and agree that Spoken Giants will not pay royalties to You with respect to any public performance directly licensed by You.

Pandora ignores this text, citing *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016). But nothing in *Aerotec* permits Pandora to disregard the affiliation agreements. To the contrary, in *Aerotec*, the court affirmed summary judgment on exclusive dealing claims after emphasizing that:

- the plaintiff must show that "the agreements at issue foreclose completion";
- the plaintiff "cannot sustain its burden by offering broad allegations and complaints that are unhinged from any specific agreement"; *and*
- the court's inquiry "requires that we look at the actual terms of the agreements."

*Id.* at 1180-81 (citations omitted). While the court acknowledged the need to look past the language of the contract in limited circumstances, it declined to do so because the plaintiff had failed to make a showing "that contracts that were induced were exclusive rather than run-of-the-mill contracts." *Id.* at 1182.

The same is true here. Pandora cannot argue that its ability to obtain individual licenses was illusory, while unilaterally refusing to negotiate individual licenses. In *Samsung Elecs. Co., Ltd. v. Panasonic Corp.*, 2015 WL 10890655, at *6 (N.D. Cal. Sep. 30, 2015),[3] the court declined to dismiss antitrust claims involving patent

---

[3] Pandora also misquotes *Samsung* in an attempt to avoid dismissal. *See* ECF. No. 143 at 5-6.

pooling, in part, because the plaintiff alleged it tried to negotiate individual licenses, only to be rebuffed. *Id.* Here, in contrast, Pandora does not allege that it ever tried to do so.

Pandora tries to downplay its misrepresentations by alleging that "[o]nce Spoken Giants forces a service to take its blanket license" it would be irrational for Pandora to take individual licenses from SG members. FACC ¶ 69. Pandora's argument is predicated on Pandora having <u>already taken a license</u> with SG. By Pandora's own logic, prior to entering into a license with SG, Pandora could enter into direct licenses with SG members. Pandora was (and is) free to license with SG members directly, as an alternative to taking <u>any</u> license from SG. Alternatively, Pandora was (and is) free to license through SG, including on an individual basis.

Pandora disputes that it refused to negotiate with individual comedians. Opp. at 12. However, Pandora alleges that "no comedian has ever done this in the decade-plus that Pandora has been streaming comedy. And that is for good reason—doing so would likely result in their recordings being removed from Pandora and losing out on the royalties and promotion that would have otherwise occurred." SG ACC ¶¶ 33, 63. But threatening any comedian who might separately enforce the copyright in their jokes with removal from its service proves *Pandora's* refusal to negotiate. Even accepting the *unreasonable* inference that it did not flatly refuse to negotiate, Pandora does not allege that it **ever** made "an inquiry or attempt[ed] to negotiate an individual license." *See* Decision at 17. Pandora's claims therefore fail.

Pandora's contention that "other comedians and comedy record labels have recently come forward and reaffirmed historic custom and practice" is likewise irrelevant. SG AC ¶ 116; Opp. at 16. Even if true, that would not alter the terms of the SG affiliation agreements to make them "de facto exclusive." Nor would it deprive other comedians of their right to enforce their property rights, or convert the existence of those copyright claims into evidence of an antitrust conspiracy.

The fact remains that Pandora was not able to plead that it could not negotiate individual licenses for SG members' works. Instead of withdrawing its claims (or at least waiting to re-plead until it developed the record), Pandora chose to misrepresent the facts to resuscitate its frivolous claims. These misrepresentations are sanctionable.

## II. Pandora's arguments lack evidentiary and legal support.

### A. Pandora's monopolization claims are unsupported.

Pandora's monopolization claims rest on the false assertion that SG demanded an "all-or-nothing" blanket license, and that Pandora cannot obtain individual licenses because SG is a "de fact exclusive" licensor. These assertions are false and based on Pandora's affirmative misrepresentations of the record, and therefore warrant sanctions under Rule 11(b)(3). *See above*.

Additionally, Pandora alleges that SG *and* WC wield monopoly power in the same market (defined by Pandora as "the U.S. market for the rights to comedy routines embodied in comedy recordings" (FACC ¶ 89), at the same time. This claim is legally frivolous and unsupported by the cases that Pandora cites. First, *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180 (S.D.N.Y. 2014) does not apply. There, the relevant market was defined as the market for performance licenses of music in SESAC's repertory—not for performance licenses of all music. Second, Pandora's citations to *United States v. BMI (In re Application of Music Choice)*, 426 F.3d 91, 96 (2d Cir. 2005), *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 239-240 (2d Cir. 2003), and briefing from *Broadcast Music, Inc. v. DMX Inc.*, No. 10-3429-cv (2d Cir. Apr. 6, 2011) are similarly misplaced because not one of those cases finds multiple monopolists in the same relevant market.

Finally, Pandora downplays its failure to plead SG's market power by reasserting that it needs access to some undefined number of "superstar" comedians, as defined by 1990s album sales (among other things). This argument fails because Pandora was (and is) free to negotiate a license with some, any, or all of these "superstars." Pandora twists itself into knots arguing that the SG ACC (at ¶¶ 33 and

63) reflects anything other than its own plain refusal to negotiate (*see* above). But even accepting its characterization of the facts (*arguendo*), Pandora does not and cannot plead that it attempted to negotiate, dooming its claims.

### B. Pandora's Section 1 claims are unsupported.

Pandora argues that it added "substantial additional information" to support its price fixing claim, pointing to its redline. Opp. at 13-14. But the redline just confirms SG's point: though longer, the SG ACC just reiterates and repackages the same deficient allegations.

Second, Pandora argues its "conspiracy claims are neither factually nor legally baseless," without identifying any meritorious allegations. *Id.* at 14. Pandora fails to rebut SG's explanation, set out in its Rule 11 motion and motion to dismiss, demonstrating that the supposed "plus factors" fail to add any new information that could support Pandora's claims. ECF Nos. 102, 128. Instead, it repeats the legal standard and concludes that it is satisfied.

Third, Pandora's purported evidence of a horizontal conspiracy among comedians consisted of a conversation between Eddie Pepitone and Ted Alexandro. SG ACC, ¶ 51. In its opposition, Pandora tries to downplay both the evidence itself and its mischaracterizations of that evidence. Opposition at 15. However, a comparison of the transcript (ECF No. 128-7, at 6-18) to Pandora's mischaracterizations in the SG ACC (at ¶51) speaks for itself, and demonstrates Pandora's unreasonable distortion of the record.

### C. Pandora's extraneous submissions are improper.

Pandora submits four declarations and thirty-one exhibits. Nothing in those voluminous submissions changes the facts supporting SG's motion, however, and two of Pandora's declarations represent an improper end-run on the briefing limits set by the Court.

First, William Stallings recounts his and his colleagues' credentials, and asserts that they have not previously faced a Rule 11 motion. ECF No. 140-1. Mr. Stallings then presents his *characterizations* of facts that are, at best, contested. *Id.* ¶¶ 10a-10j.

Next, Paul Fakler's declaration (ECF No. 104-2) likewise offers his *characterizations* the parties' various conferences, before detouring into contested discovery issues, most of which do not involve SG, and *none of which* are properly before the Court.

SG and its counsel object to this improper use of "declarations" to circumvent the Court's rules.[4] In any case, the declarations of Messrs. Stallings and Fakler only demonstrate that Pandora and its highly capable lawyers should have known better than to distort the record to re-plead frivolous claims that have no intention of litigating to trial, merely to drive up costs.

### III. Pandora filed the SG ACC for an improper purpose.

Pandora and Mayer Brown re-filed frivolous their frivolous antitrust claims as a cudgel to abuse much smaller adversaries. *See* Mot. at 18-19.[5] Another large company and its counsel were recently sanctioned for employing the same well-known litigation "playbook." *In re Facebook, Inc. Consumer Priv. User Profile Litig.*, No. 18-md-02843-VC, 2023 WL 1871107 (N.D. Cal. Feb. 9, 2023). There, the court observed:

> This case is an example of a wealthy client (Facebook) and its high-powered law firm (Gibson Dunn) using delay, misdirection, and frivolous arguments to make litigation unfairly difficult and expensive for their opponents. Unfortunately, this sort of conduct is not uncommon in our court system.

*Id.* at *1. Substitute Pandora for Facebook, and Mayer Brown for Gibson Dunn, and the court may as well have described this case.

---

[4] *E.g. King Cty. v. Rasmussen*, 299 F.3d 1077, 1082 (9th Cir. 2002).
[5] Pandora fails to take issue with SG's motion on this point.

Moreover, in *Facebook*, the court asked a rhetorical question: "does anyone really think that Facebook was planning on taking this case to trial?" *Id.* at 28. The court continued:

> Or was Facebook, with the assistance of its lawyers, executing a different play from the playbook: resist discovery as long as possible, make things increasingly difficult and expensive and frustrating for the opposition, and hope that would drive down the case's settlement value? This is, by far, the most likely explanation for Facebook and Gibson Dunn's conduct.

*Id.*

Pandora is executing the same play. While the *Facebook* decision involved discovery abuse and sanctions awarded under the Court's inherent power, the same principles apply here. SG faces enormous legal fees and other expenses—not counting the disruption to its business and non-monetary costs—to defend itself against Pandora's frivolous claims. Moreover, Pandora brings these frivolous claims and distortions of the record because of, not despite, its sophistication. Now, Pandora leans on its size and its counsel's credentials to evade consequences. *E.g.*, ECF No. 140-1 at 1.

Rule 11 exists as protection against precisely this type of abuse. As the court said in *Facebook*, although substantial sanctions may be "loose change" for large companies and their counsel, "it's important for courts to help protect litigants from suffering financial harm as a result of their opponents' litigation misconduct." 2023 WL 1871107 at *109-110.

### IV. Pandora counter-motion for sanctions is meritless.

Pandora's counter-motion for sanctions only reinforces and compounds its misconduct. The two-page motion fails to identify a single allegation made by SG that Pandora contends to be legally frivolous, without evidentiary support, or asserted for an improper purpose.

Pandora then cites inapplicable cases. For example, Pandora cites *Stockroom Inc. v. Bronstein*, No. SACV0801049JVSMLGX, 2008 WL 11339650, at *1 (C.D. Cal. Dec. 8, 2008). But there the court cited a litany of admissions by the movant, that he filed a motion for the purpose of harassment. *Id* at *2. Similarly, in *Liu v. Worldwide,* the court issued counter-sanctions where the plaintiff's Rule 11 motion was devoid of factual support and apparently filed in response to defendant's motion to dismiss. No. 5:18-CV-02442-SVW-KK, 2019 WL 8690216, at *3 (C.D. Cal. Jan. 30, 2019).

Pandora offers no argument explaining how either of these cases would apply here, other than conclusory statements like "SG's Rule 11 arguments are utterly groundless." Opp. at 18. The Court should disregard the motion in its entirety.

DATED: February 15, 2023             **MCKOOL SMITH, P.C.**

By: */s/ Travis DeArman*
   Travis DeArman

*Attorneys for Counterclaim-Defendant Spoken Giants, LLC*

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Spoken Giants, certifies that this brief contains 2,798 words, which complies with the word limit of L.R. 11-6.1.

DATED: February 15, 2023          **MCKOOL SMITH, P.C.**

By: */s/ Travis DeArman*
Travis DeArman
*Attorneys for Counterclaim-Defendant Spoken Giants, LLC*