UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| In re PANDORA MEDIA, LLC COPYRIGHT LITIGATION | Master File No.: 2:22-cv-00809-MCS-MAR |
|---|---|
| | CONSOLIDATED ACTION |
| | **ORDER RE: COUNTERCLAIM DEFENDANT SPOKEN GIANTS, LLC'S MOTION TO DISMISS COUNTERCLAIM PLAINITFF PANDORA MEDIA, LLC'S COUNTERCLAIMS; COUNTERCLAIM DEFENDANT WORD COLLECTIONS, INC.'S MOTION TO DISMISS COUNTERCLAIM PLAINITFF PANDORA MEDIA, LLC'S COUNTERCLAIMS; COUNTERCLAIM DEFENDANTS' MOTION FOR SANCTIONS AGAINST COUNTERCLAIM PLAINTIFF PANDORA MEDIA, LLC; COUNTERCLAIM DEFENDANTS' MOTIONS FOR JOINDER (ECF Nos. 102–05, 128, 134, 136–37)** |

In this consolidated action, Counterclaim Defendants Spoken Giants, LLC ("Spoken Giants") and Word Collections, Inc. ("Word Collections") filed separate motions to dismiss Counterclaim Plaintiff Pandora Media, Inc.'s ("Pandora") First Amended Counterclaims. (SG Mot., ECF No. 102; WC Mot., ECF No. 104.) Pandora opposed the motions, (SG Opp'n, ECF No. 129; WC Opp'n, ECF No. 131), and Spoken Giants and Word Collections replied, (SG Reply, ECF No. 143; WC Reply, ECF No. 141.) Counterclaim Defendant Lewis Black filed a motion to join Spoken Giants' motion to dismiss individually and on behalf of Stark Raving Black Production, Inc. (Black MTD Joinder Mot., ECF No. 103.) Pandora filed an opposition to the motion for joinder, (Black MTD Joinder Opp'n, ECF No. 130), and Lewis Black replied, (Black MTD Joinder Reply, ECF No. 144). The following Counterclaim Defendants (collectively, the "Comedians") filed a motion to join Word Collections' motion to dismiss: Yellow Rose Productions, Inc., on behalf of Bill Engvall; Main Sequence, Ltd.; Ron White, Inc., on behalf of Ron White; Robin Williams Trust; Brave Lion, Inc., on behalf of Andrew Clay Silverstein a/k/a Andrew Dice Clay; Nick Di Paolo, individually and on behalf of Acid Tongue, Inc.; and Mary Reese Hicks, individually and on behalf of Arizona Bay Production Co., Inc. (Comedians MTD Joinder Mot., ECF No. 105.) Pandora filed an opposition, (Comedians MTD Joinder Opp'n, ECF No. 132), and the Comedians replied, (Comedians MTD Joinder Reply, ECF No. 142).

Separately from the motions to dismiss Pandora's Amended Counterclaims, Spoken Giants and Word Collections filed motions for sanctions against Pandora and its counsel, Mayer Brown, pursuant to Federal Rule of Civil Procedure 11. (SG Sanctions Mot., ECF No. 128; WC Sanctions Mot., ECF No. 136.) Pandora opposed the motions, (SG Sanctions Opp'n, ECF No. 140; WC Sanctions Opp'n, ECF No. 148), and Spoken Giants and Word Collections replied, (SG Sanctions Reply, ECF No. 150; WC Sanctions Reply, ECF No. 152). Lewis Black moved to join Spoken Giants' motion for sanctions. (Black Sanctions Joinder Mot., ECF No. 134.) Pandora opposed Black's motion, (Black Sanctions Joinder Opp'n, ECF No. 146), and Black replied,

(Black Sanctions Joinder Reply, ECF No. 151).  The Comedians moved to join Word Collections' motion for sanctions.  (Comedians Sanctions Joinder Mot., ECF No. 137.)  Pandora opposed the Comedians' motion (Comedians Sanctions Joinder Opp'n, ECF No. 149), and the Comedians replied, (Comedians Sanctions Joinder Reply, ECF No. 153).

The Court deems these matters appropriate for decision without oral argument.  *See* Fed. R. Civ. P. 78(b); C.D. Cal. R. 7-15.

## I.    BACKGROUND

The facts and procedural history of this case are outlined in greater detail in the Court's order dismissing Pandora's Original Counterclaims.  (Order, ECF No. 83.)  The causes of action in both Amended Counterclaims mirror one another.  Count I alleges a price fixing conspiracy in violation of section 1 of the Sherman Act.  (SG Am. Countercl. ¶¶ 120–26, ECF No. 94; WC Am. Countercl. ¶¶ 128–34, ECF No. 93.)  Count II alleges agreements in unreasonable restraint of trade in violation of section 1 of the Sherman Act.  (SG Am. Countercl. ¶¶ 127–34; WC Am. Countercl. ¶¶ 135–42.)  Count III alleges attempted monopolization and monopolization in violation of section 2 of the Sherman Act.  (SG Am. Countercl. ¶¶ 135–40; WC Am. Countercl. ¶¶ 143–48.)  Count IV alleges conspiracy to monopolize in violation of section 2 of the Sherman Act.  (SG Am. Countercl. ¶¶ 141–47; WC Am. Countercl. ¶¶ 149–55.)

## II.    LEGAL STANDARDS

### A.    Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) authorizes a party to seek dismissal of an action for lack of subject-matter jurisdiction.  "Because standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a Rule 12(b)(1) motion to dismiss."  *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).  In the context of a 12(b)(1) motion, the counterclaim plaintiff bears the burden of establishing Article III standing to assert the claims.  *Id*.

Rule 12(b)(1) jurisdictional challenges can be either facial or factual.  *Safe Air*

*for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  When a motion to dismiss attacks subject-matter jurisdiction on the face of the complaint the court assumes the factual allegations in the complaint are true and draws all reasonable inferences in the plaintiff's favor.  *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009).  Moreover, the standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), apply with equal force to Article III standing when it is being challenged on the face of the complaint.  *See Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012) (applying *Iqbal*).  Thus, in terms of Article III standing, the complaint must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

**B.  Rule 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) allows an attack on the pleadings for a "failure to state a claim upon which relief can be granted."  "To survive a motion to dismiss, a [pleading] must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id*. at 679.  Generally, a court must accept the factual allegations in the pleadings as true and view them in the light most favorable to the plaintiff.  *Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017); *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001).  But a court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

As a general rule, leave to amend a dismissed complaint should be freely granted

4

unless it is clear the complaint could not be saved by any amendment.  Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Where a plaintiff has previously amended its complaint, "the court's discretion to deny such leave is particularly broad." *Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 520 (9th Cir. 2013) (internal quotation marks omitted).

### C.    Sanctions

A court may issue sanctions pursuant to Federal Rule of Civil Procedure 11.  Fed. R. Civ. P. 11(c)(1).  "Rule 11 is intended to deter baseless filings in district court and imposes a duty of 'reasonable inquiry' so that anything filed with the court is 'well grounded in fact, legally tenable, and not interposed for any improper purpose.'" *Islamic Shura Council of S. Cal. v. FBI*, 757 F.3d 870, 872 (9th Cir. 2014) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990)).  The Court "must conduct a two-prong inquiry to determine (1) whether the [pleading] is legally or factually 'baseless' from an objective perspective, and (2) if the attorney has conducted 'a reasonable and competent inquiry' before signing and filing it." *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002) (quoting *Buster v. Greisen*, 104 F.3d 1186, 1190 (9th Cir. 1997)).  "As shorthand for this test," courts "use the word 'frivolous'" to refer to any "filing that is *both* baseless *and* made without a reasonable and competent inquiry." *Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005) (internal quotation marks omitted).  If a filing "is not frivolous, it cannot fall within the 'improper purpose' clause of Rule 11." *United States v. Stringfellow*, 911 F.2d 225, 226 n.1 (9th Cir. 1990); *see also Newton v. Thomason*, 22 F.3d 1455, 1463 (9th Cir. 1994); *Truesdell v. S. Cal. Permanente Med. Grp.*, 209 F.R.D. 169, 174 n.6 (C.D. Cal. 2002).

A Rule 11 inquiry is governed by an objective standard.  *Golden Eagle Distrib. Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1537–38 (9th Cir. 1986); *Truesdell*, 209 F.R.D. at 174 n.6.  "Rule 11 sanctions shall be assessed if the paper filed in district court and signed by an attorney or an unrepresented party is frivolous, legally unreasonable or without factual foundation, even though the paper was not filed in subjective bad

1   faith." *Golden Eagle*, 801 F.2d at 1538 (internal quotation marks omitted); *Christian*,
2   286 F.3d at 1127.

3        A court may also order sanctions pursuant to 28 U.S.C. § 1927.  Under this
4   statute, "[a]ny attorney or other person admitted to conduct cases in any court of the
5   United States or any Territory thereof who so multiplies the proceedings in any case
6   unreasonably and vexatiously may be required by the court to satisfy personally the
7   excess costs, expenses, and attorneys' fees reasonably incurred because of such
8   conduct." *Id.*

9        Finally, a court has inherent authority to impose sanctions "when a party has
10   acted in bad faith, vexatiously, wantonly, or for oppressive reasons, delaying or
11   disrupting litigation, or has taken actions in the litigation for an improper purpose."
12   *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001) (citing *Chambers v. NASCO, Inc.*,
13   501 U.S. 32, 45–46 & n.10 (1991)).  The decision of a district court to impose sanctions
14   is discretionary.  *Air Separation, Inc. v. Underwriters at Lloyd's of London*, 45 F.3d
15   288, 291 (9th Cir. 1995).  Before imposing a monetary sanction, a court must afford an
16   opportunity to demonstrate the sanctionable actions were "not undertaken recklessly or
17   willfully." *Toombs v. Leone*, 777 F.2d 465, 472 (9th Cir. 1985).

18   **III.   MOTIONS TO DISMISS**

19        **A.   Pandora's Article III and Antitrust Standing**

20              1.   *Article III Standing*

21        Spoken Giants claims that Pandora lacks Article III standing to bring its
22   counterclaims. (SG Mot. 5–8.)  Specifically, Spoken Giants asserts that Pandora lacks
23   standing because it was never actually presented with "the Hobson's Choice between
24   taking this price fixed and economically unviable bundle—its blanket license—and
25   abandoning its comedy service altogether." (*Id.* at 6 (quoting SG Am. Countercl.
26   ¶ 117).)  In essence, Spoken Giants claims that it never insisted upon an all-or-nothing
27   licensing arrangement, and that Pandora was free to negotiate for individual licenses
28   but failed to do so. (*Id.* at 7–8.)  Pandora responds by pointing to Spoken Giants'

statements suggesting that Spoken Giants' "business model" was premised upon "bundling individual rights into a blanket license." (SG Opp'n 5 (citing SG Am. Countercl. ¶¶ 53–54, 57, 58).)

The Court addressed the standing issue in its prior order, concluding that Pandora adequately alleged the ability to procure individual licenses was "illusory." (Order 17.) Spoken Giants claims the Amended Counterclaims changes the analysis and requests the Court consider certain documents, specifically a sample affiliation agreement, (ECF No. 102-2); an April 19, 2021 email from Spoken Giants to Pandora attaching a proposed term sheet, (ECF No. 102-3); and the proposed term sheet (ECF No. 102-4), on the grounds they are incorporated into the pleadings by reference. (SG Mot. 5.) When evaluating a motion to dismiss, a court may properly "consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). If these conditions are met, a "court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Id.* (internal quotation marks omitted). Because Pandora does not oppose Spoken Giants' request, (SG Opp'n 1 n.2), the Court considers the affiliation agreement, the April 19 email, and the proposed term sheet as part of the Counterclaim.

These documents notwithstanding, Pandora provides numerous factual allegations giving rise to the plausible inference that a blanket license was required. (*See, e.g.*, SG Am. Countercl. ¶ 53 (citing a Spoken Giants press release stating Spoken Giants' "very purpose is to license the works of comedians on a 'collective' basis" and that "Spoken Giants is going to change the comedy licensing marketplace through 'collective representation for all to strengthen the marketplace in favor of the [comedian] creator.'" (alteration in original)).) Accordingly, the Court again concludes that "Pandora has plausibly alleged Word Collections [and Spoken Giants] require[] a

blanket license for access to [their] literary works." (Order 18.)

Spoken Giants also asserts that the costs of defending against copyright infringement claims, including removing content from its service, is insufficient to give rise to an Article III injury. (SG Mot. 8.) Spoken Giants' arguments are indistinguishable from those considered and rejected in the Court's prior Order. (Order 11.) As such, the Court declines to address them again here.

### 2.   *Antitrust Standing*

In the prior order, the Court considered whether Pandora had adequately demonstrated it had the requisite antitrust standing to sustain its claims. (Order 11–14.) Spoken Giants claims "new case law not yet decided at the time of the Court's Decision" is relevant and should be considered here. (SG Mot. 6). Specifically, Spoken Giants asserts that *Intel Corp. v. Fortress Investment Group LLC*, No. 21-16817, 2022 WL 16756365 (9th Cir. Nov. 8, 2022), an unpublished memorandum decision, stands for the proposition that a plaintiff suffers no antitrust injury when it has not actually paid higher royalty payments. (SG Mot. 9.) In *Intel*, the plaintiff identified "no instance in which it has actually paid higher royalties" but instead "merely cite[d the defendant's] litigation demands as evidence that licensing prices have increased." 2022 WL 16756365, at *2. The court acknowledged "[t]here are substantial questions regarding whether a litigation demand is even a cognizable 'price' for purposes of the antitrust laws," but proceeded to set "these potential problems to the side" and address the plaintiff's failure to allege that any price increases were the result of the defendant's conduct. *Id.*

Spoken Giants acknowledges that the Ninth Circuit did not decide *Intel* on the basis of standing, but instead contends "the *logic* driving the Ninth Circuit's decision . . . forecloses Pandora's theory of harm." (SG Mot. 9 (emphasis added).) The fact that the Ninth Circuit refused to explicitly state that litigation costs cannot confer antitrust standing and instead went on to address the parties' other arguments strongly suggests the court did not intend to create a rule in an unpublished disposition

concerning antitrust standing. The Ninth Circuit had an opportunity to pronounce the rule proposed by Spoken Giants, and pointedly declined to do so. For this reason, the Court is not persuaded that the logic of the *Intel* decision forecloses anything. The Court rejects Spoken Giants' argument with respect to antitrust injury for the reasons stated in the prior order.

*\*\**

For the reasons stated above, the Court concludes that Pandora has standing to bring its Amended Counterclaims.

### B.    Pandora's Section 1 Claims

"Section 1 of the Sherman Act prohibits '[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States.'" *FTC v. Qualcomm Inc.*, 969 F.3d 974, 988 (9th Cir. 2020) (alteration in original) (quoting 15 U.S.C. § 1). "Although the Sherman Act, by its terms, prohibits every agreement 'in restraint of trade,'" the Supreme Court "has long recognized that Congress intended to outlaw only *unreasonable* restraints." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (emphasis added). "Thus, to establish liability under § 1, a plaintiff must prove (1) the existence of an agreement, and (2) that the agreement was in *unreasonable* restraint of trade." *Qualcomm*, 969 F.3d at 988–89 (cleaned up).

"Some types of [restraints on trade] have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*." *State Oil*, 522 U.S. at 10. "Typically only horizontal restraints—restraints imposed by agreement between competitors—qualify as unreasonable *per se*." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283–84 (2018) (internal quotation marks omitted). Horizontal restraints are different from vertical restraints, which involve "agreement between firms at different levels of distribution." *Id.* at 2884 (internal quotation marks omitted). "Restraints that are not unreasonable *per se* are judged under the 'rule of reason,'" which "requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual

9

effect on competition." *Id.* (cleaned up). "The goal is to distinguish between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Id.* (cleaned up).

Pandora alleges two forms of section 1 liability. Count I alleges an agreement among the Spoken Giants' and Word Collections' member comedians, facilitated by Spoken Giants and Word Collections, to fix prices. (SG Am. Countercl. ¶¶ 120–26; WC Am. Countercl. ¶¶ 128–34.) Count II alleges that the multiple bilateral agreements between Spoken Giants and Word Collections and their respective member comedians unreasonably restrain trade. (SG Am. Countercl. 127–34; WC Am. Countercl. ¶¶ 135–42.) With respect to Count II's unreasonable restraint of trade claims, Pandora alleges Spoken Giants and Word Collections entered into "de facto exclusive affiliation agreements" which cannot be upheld under a rule of reason analysis. (SG Opp'n 19.) As described in greater detail below, Pandora has not adequately alleged liability under either theory.

>    1.   *Pandora Has Not Adequately Alleged an Agreement Among the Spoken Giants' or Word Collections' Member Comedians*

To allege an agreement among competitors in an antitrust case, a plaintiff must allege something beyond "parallel conduct, even conduct consciously undertaken." *Twombly*, 550 U.S. at 557. "Conscious parallelism occurs when two or more [entities] in a concentrated, interdependent market base their actions in part on the anticipated reactions of their competitors, and thus 'arrive at identical decisions independently, as they are cognizant of—and reacting to—similar market pressures.'" *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 48 n.2 (9th Cir. 2022) ("*DRAM*") (quoting *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015) ("*Musical Instruments*")). At most, parallel conduct is "circumstantial evidence of anticompetitive behavior," and "mere allegations of parallel conduct—even consciously parallel conduct—are insufficient to state a claim under § 1." *Musical Instruments*, 798 F.3d at 1193. "[P]ermissible parallel conduct" is

distinguished "from impermissible conspiracy by looking for certain 'plus factors.'" *Id.*
at 1194. "[P]lus factors are economic actions and outcomes that are largely inconsistent
with unilateral conduct but largely consistent with explicitly coordinated action." *Id.*
(citing *Twombly*, 550 U.S. at 557 n.4).

Pandora acknowledges that each comedian engaged in "parallel conduct." (SG
Am. Countercl. ¶ 48; WC Am. Countercl. ¶ 60.) However, it claims there are sufficient
allegations of circumstantial evidence showing "a conscious commitment to a common
scheme designed to achieve an unlawful objective." (SG Opp'n 13 (internal quotation
marks omitted); WC Opp'n 13 (internal quotation marks omitted).) Pandora states it
has alleged a sufficient number of "plus factors" to show Spoken Giants' and Word
Collections' member comedians' conduct was not just parallel conduct but was instead
an impermissible conspiracy. (SG Opp'n 17; WC Opp'n 17.)

Pandora first asserts that "no individual Comedian would demand a supra-
competitive extra royalty on top of what they have historically been paid from a service
like Pandora." (SG Opp'n 17 (cleaned up); *see id.* at 17–19; WC Opp'n 17–20.) In
*Musical Instruments*, the Ninth Circuit recognized when "prices can be easily readjusted
without persistent negative consequences, one firm can risk being the first to raise
prices, . . . [and] supra competitive prices and other anticompetitive practices, once
initiated, can spread through a market without any prior agreement." 798 F.3d at 1195.
Pandora claims this case is different because "many comedians compete to have their
performances streamed; as the FACCs allege, no individual Comedian would risk
seeking a supracompetitive royalty on her own." (SG Opp'n 18; WC Opp'n 18.) Aside
from a reliance upon historical practice, this conclusory statement is unsupported by
factual allegations. Mere reliance on historical practice was plainly insufficient for the
Ninth Circuit in *Musical Instruments*, and the Court is not satisfied that the "individual
action" proffered here "would be so perilous in the absence of advance agreement that
no reasonable [comedian] would make the challenged move without such an
agreement." *Musical Instruments*, 798 F.3d at 1195.

Further, notwithstanding the principle that a party may plead claims "regardless of consistency," Fed. R. Civ. P. 8(d)(3), the claim that no comedian would risk requesting higher royalties is both contradictory and implausible considering Pandora's theory of liability underlying their section 2 claims.  As discussed in greater detail below, Pandora's section 2 monopolization claims allege that Spoken Giants' and Word Collections' ability to control the small, but economically necessary, cadre of "superstar" comedians lets them restrict output and demand supracompetitive prices for licensing rights.  (SG Opp'n 7–9; WC Opp'n 6–9.)  In this competitive landscape described by Pandora, it is hard to comprehend why "superstar" comedians would be afraid to "risk seeking a supracompetitive royalty," (SG Opp'n 18; WC Opp'n 18), armed with the knowledge they are among the pantheon of "must-have" comedians to run a viable comedy streaming service.

For similar reasons, Pandora also fails to show that prices could not "be easily readjusted without persistent negative consequences." *Musical Instruments*, 798 F.3d at 1195.  Pandora claims that any attempt to charge supracompetitive royalties by an individual comedian "would likely result in their recordings being removed from Pandora and losing out on the royalties and promotion that would have otherwise occurred."  (SG Am. Countercl. ¶ 63; WC Am. Countercl. ¶ 75.)  It seems clear, however, that if these "superstar" performers are indeed as critical as Pandora claims, "one [comedian] can risk being the first to raise prices, confident that if [his or her] price *is* followed, all [comedians] will benefit." *Musical Instruments*, 798 F.3d at 1195; *see Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) ("[W]hen faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are merely consistent with their favored explanation but are also consistent with the alternative explanation." (internal quotation marks omitted)).

Next, Pandora asserts that Spoken Giants' and Word Collections' member comedians have a common motive to conspire with other comedians.  (SG Opp'n 18;

WC Opp'n 18–19.)  Again, *Musical Instruments* is instructive.  "[C]ommon motive does not suggest an agreement.  Any firm that believes that it could increase profits by raising prices has a motive to reach an advance agreement with its competitors." *Musical Instruments*, 798 F.3d at 1194.  Even assuming Spoken Giants' and Word Collections' member comedians are indeed competitors and had a sufficient motive to enter into an illicit agreement, "alleging 'common motive to conspire' simply restates that a market is interdependent." *Id*. at 1195.  Because an interdependent market is the reason entities engage in permissible parallel conduct in the first place, this allegation is not sufficient to "nudge [Pandora's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Pandora next argues that each member comedian entered into an exclusive "affiliation agreement within a short period of time, despite having never individually demanded a literary-works license from Pandora and never previously affiliating with a 'literary works' licensing agency." (SG Opp'n 18; WC Opp'n 19.)  "[C]omplex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason, would support a plausible inference of conspiracy." *Twombly*, 550 U.S. at 556 n.4 (internal quotation marks omitted).  In its motion, Word Collections persuasively argues that Pandora "itself supplies the 'other discernible reason' for the Comedians' actions within a short period of time: the formation and public launch of Word Collections in 2020, a 'first of its kind' agency whose stated purpose was to seek to recover royalties for the use of comedic literary works." (WC Mot. 27.)  Given there was previously no entity who negotiated a license for the rights at issue in this case, the formation of Word Collections offers a reasonable and non-conspiratorial reason for any sudden change in pricing practices.  As a result, the Amended Counterclaims' allegations show nothing "more than [a] similar reaction to similar pressures within an interdependent market, or conscious parallelism." *Musical Instruments*, 798 F.3d at 1196.

Finally, Pandora alleges that Spoken Giants and Word Collections took steps to

provide assurances to their member comedians that the collective remained intact.  (SG Am. Countercl. ¶ 66; WC Am. Countercl. ¶ 78.)  "Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008).   Similarly, "making announcements about new practices or developments is common and doesn't imply illicit or surreptitious signaling was going on." *In re Nat'l Ass'n of Music Merchants, Musical Instruments & Equip. Antitrust Litig.*, No. 09CV2002 etc., 2012 WL 3637291, at *5 (S.D. Cal. Aug. 20, 2012), *aff'd sub nom*. *Musical Instruments*, 798 F.3d 1186.  It is difficult to read the press releases cited in the Amended Counterclaims as anything beyond the kind of client development or standard business promotion that would have happened in the absence of a conspiracy.   Even "[i]f no conspiracy existed, [Counterclaim] Defendants would likely [have made] the same public statements," and this is not enough to plausibly allege an illicit price fixing agreement. *DRAM*, 28 F.4th at 50.

Pandora's "plus factors" consist of conduct that, when taken individually or collectively, is entirely consistent with permissible conscious parallel conduct. Therefore, Pandora again fails to adequately allege a violation of section 1 of the Sherman Act, and Spoken Giants' and Word Collections' motions to dismiss Count 1 of the Amended Counterclaims is GRANTED.

2.   *Pandora Has Not Alleged the Bilateral Agreements Between Spoken Giants or Word Collections and Their Member Comedians Unreasonably Restrain Trade*

Count II in the Amended Counterclaims alleges that Spoken Giants and Word Collections unreasonably restrained trade by eliminating competition among comedians through a series of bilateral "exclusive affiliation agreements."  (SG Am. Countercl. ¶ 71; WC Am. Countercl. ¶ 79.)   "[A]n exclusive-dealing arrangement does not constitute a per se violation of section 1.  Therefore, any particular exclusive-dealing

arrangement does not violate section 1 unless it is found to be unreasonable." *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1303–04 (9th Cir. 1982) (citations omitted). "In order to state a Section 1 claim under the rule of reason, plaintiffs must plead four separate elements." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012). These elements are: 1) a contract, combination, or conspiracy among two or more persons or distinct business entities; 2) by which the persons or entities intended to harm or restrain trade; 3) which actually injures competition; and 4) that plaintiff was harmed by the defendant's anticompetitive agreement. *Id.*

In *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771–72 (1984), the Supreme Court concluded that a corporation and its wholly-owned subsidiaries were legally incapable of forming the requisite contract, combination, or conspiracy to sustain liability under section 1. "Lower courts have since applied *Copperweld*'s reasoning (sometimes referred to as the 'single-entity' rule) to a broader variety of economic relationships." *Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1034 (9th Cir. 2005). "[T]he single entity rule applies to principal-agent relationships . . . ." *Id.* (citing *Calculators Haw., Inc. v. Brandt, Inc.*, 724 F.2d 1332, 1336 (9th Cir. 1983)). "The crucial question" in determining whether the single-entity rule applies "is whether the entities alleged to have conspired maintain an 'economic unity,' and whether the entities were either actual or potential competitors." *Id.*

Here, the Court is guided by the logic of *Levi Case Co. v. ATS Products, Inc.*, 788 F. Supp. 428 (N.D. Cal. 1992). In that case, the defendant obtained the right to manufacture heating, ventilation, and air conditioning ductwork after being granted an exclusive license by the patent holder. *Id.* at 429. The plaintiff brought a claim alleging that the manufacturer and patent holder conspired to restrain trade in violation of section 1 of the Sherman Act. *Id.* at 430. The court concluded that the patent holder was legally incapable of entering into an antitrust conspiracy with its exclusive patent licensee given

15

1    the entities' licensing relationship. *Id.* at 432.

2            The Court sees no principled distinction between the patent license in *Levi* and

3    the exclusive affiliation agreements at issue here.  Pandora alleges that the affiliation

4    agreements allow Spoken Giants "to become the de facto exclusive licensor" of the

5    rights assigned by the individual comedians, (SG Opp'n 13 (citing SG Am. Countercl.

6    ¶¶ 45–59)), and Word Collections to serve as the "the exclusive licensor of the works"

7    of its member comedians, (WC Am. Countercl. ¶ 79).  Accepting Pandora's allegations

8    as true, the "exclusive license" shows a degree of economic unity such that Spoken

9    Giants and Word Collections and their member comedians "could not compete" in the

10   market for standup comedy licensing rights.  *Levi Case Co.*, 788 F. Supp. at 432.  As

11   alleged, "no agreement between" the comedians and either Spoken Giants or Word

12   Collections "involving the exploitation of the [licensing rights] in which they both held

13   an interest can be considered to deprive the marketplace of independent sources of

14   economic power previously pursuing separate interests." *Id.* (internal quotation marks

15   omitted).  At bottom, Pandora alleges the affiliation agreements established a principal-

16   agent relationship that cannot form the basis of an agreement to restrain trade in

17   violation of section 1.  *See Calculators Haw.*, 724 F.2d at 1336.

18           Pandora also does not adequately allege injury to competition.  The Court will

19   not belabor the analysis here because it is discussed in greater detail in the following

20   section.  In essence, Pandora claims consolidating the right to license comedy routines

21   harms competition because Spoken Giants and Word Collections effectively control the

22   market for the rights to stream "superstar" comedians' performances.  (*See* SG Opp'n

23   7–9; WC Opp'n 6–9.)  Without a "critical mass" of these licenses, Pandora claims it

24   cannot offer a viable streaming comedy service.  (*Id.*)  Pandora does not adequately

25   explain who these "superstar" comedians are, how many are necessary to form a

26   "critical mass," or even the size of the relevant market.  Accordingly, the Court cannot

27   reasonably conclude that the aggregation of licensing rights for a handful of performers

28   into two distinct entities has injured competition in the "the U.S. market for the rights

1  to comedy routines embodied in comedy recordings." (SG Am. Countercl. ¶ 89; WC
2  Am. Countercl. ¶ 99.)

3      For the reasons stated above, Spoken Giants' and Word Collections' motion to
4  dismiss Count 2 of the Amended Counterclaims is GRANTED.

5          **C.    Pandora' Monopolization and Attempted Monopolization Claims**

6      Count III of the Amended Counterclaims alleges monopolization and attempted
7  monopolization by Spoken Giants and Word Collections in violation of section 2 of the
8  Sherman Act.   (SG Am. Countercl. ¶¶ 135–40; WC Am. Countercl. ¶¶ 143–48.)
9  Section 2 of the Sherman Act states that "[e]very person who shall monopolize, or
10 attempt to monopolize, or combine or conspire with any other person or persons, to
11 monopolize any part of the trade or commerce among the several States, or with foreign
12 nations" violates the law.  15 U.S.C. § 2.  To state a claim for monopolization, a plaintiff
13 must adequately allege 1) the possession of monopoly power in the relevant market,
14 2) the willful acquisition or maintenance of such power, and 3) a causal antitrust injury.
15 *In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1159 (9th Cir. 2019).  To
16 state a claim for attempted monopolization, a party must plead "(1) that the defendant
17 has engaged in predatory or anticompetitive conduct with (2) a specific intent to
18 monopolize and (3) a dangerous probability of achieving monopoly power." *Coal. for*
19 *ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 506 (9th Cir. 2010).

20     For the purposes of a section 2 claim, "monopoly power" is defined "as the power
21 to control prices or exclude competition." *United States v. Grinnell Corp.*, 384 U.S.
22 563, 571 (1966) (internal quotation marks omitted).  In most cases, whether a defendant
23 can reasonably control prices or exclude competition is determined by examining their
24 "market power." *See, e.g.*, *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 894
25 (10th Cir. 1991) (defining monopoly power as "substantial market power"); *Deauville*
26 *Corp. v. Federated Dep't Stores, Inc.*, 756 F.2d 1183, 1192 n.6 (5th Cir. 1985) (defining
27 monopoly power as an "extreme degree of market power"); *Safeway Inc. v. Abbott*
28 *Lab'ys*, 761 F. Supp. 2d 874, 886 n.2 (N.D. Cal. 2011) (defining monopoly power as a

"substantial degree of market power").  A defendant's market power may be shown directly or through circumstantial evidence.  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

Pandora's monopolization and attempted monopolization claims fail because it does not sufficiently allege direct or circumstantial evidence of Spoken Giants' or Word Collections' market power.  Additionally, Pandora does not adequately allege that "rivals are barred from entering the market" or that "existing competitors lack the capacity to expand their output to challenge the predator's high price."  *Id.* at 1439.

### 1.   *Pandora Fails to Allege Direct Evidence of Market Power*

A plaintiff may supply direct evidence of a defendant's market power by presenting "evidence of restricted output and supracompetitive prices." *Rebel Oil Co.*, 51 F.3d at 1434.  Pandora argues Spoken Giants and Word Collections have restricted access to streaming rights of their member comedians, forcing Pandora to remove comedy content from its streaming service, thereby restricting output.  (WC Opp'n 10; SG Opp'n 11.)  Pandora contends that "it cannot simply reject" Spoken Giants and Word Collections' "price fixed 'offer' and deal instead with a competitor," forcing it to choose between paying supracompetitive prices or getting nothing at all.  (SG Am. Countercl. ¶ 97; WC Am. Countercl. ¶ 107.)

Pandora defines the relevant market as "the U.S. market for the rights to comedy routines embodied in comedy recordings." (SG Am. Countercl. ¶ 89; WC Am. Countercl. ¶ 99.)  Taken at face value, the fact that Spoken Giants and Word Collections control licensing rights to a small fraction of the overall number of recordings previously available on Pandora would be fatal to its claim.  (*See* Order 20 (acknowledging that in 2016 Pandora offered "more than 3,000 comedians with more than 35,000 tracks" as part of its comedy collection, whereas Word Collections represented "about 30 comedians" (internal quotation marks omitted)).)  Instead, Pandora argues that Spoken Giants and Word Collections control the licensing rights for comedians who "form a significant part of the critical mass necessary to offer a

viable streaming service and may garner a significant percentage of Pandora's comedy streams."  (Order 20; *see also* SG Am. Countercl. ¶ 88; WC Am. Countercl. ¶ 98.) Without this "critical mass," according to Pandora, "the raw number of comedy recordings in Pandora's library is beside the point," (WC Opp'n 8), because "the ability to provide listeners with the recordings of a sufficient number of the 'superstar' comedians that they actually want to hear" is competitively essential.  (*Id.* at 6–7; SG Opp'n 7.)  Pandora goes on to claim that "if a single economic actor gained control over the comedy routines embodied in the recordings of numerous 'superstar' comedians, Pandora could not substitute away from that collection of rights to other comedians' works."  (SG Opp'n 7; WC Opp'n 7.)

In its Original Counterclaims, Pandora made the same "implicit argument," namely that Spoken Giants' and Word Collections' ability to control the small, but economically necessary, cadre of "superstar" comedians is what allows them to restrict output and demand supracompetitive prices.  (Order 20.)  Even assuming the relevant market could be redefined as Pandora suggests, Pandora offers no reliable basis to determine who these "superstar" comedians are.  Pandora has therefore failed to plead enough "factual content that allows the court" to conclude Spoken Giants or Word Collections is liable for a section 2 violation because either can restrict output or charge supracompetitive prices in the relevant market.  *Iqbal*, 556 U.S. at 678.

In attempting to identify the "superstar" or "must-have" comedians affiliated with Word Collections, Pandora cites a 2017 list from *Rolling Stone* magazine of the 50 Best Stand-Up Comics of All Time, (WC Am. Countercl. ¶ 114), Billboard's list of the 20 bestselling comedy albums from 1991 to 2014, (*id.*), and the conclusions of its "comedy curation team," (*id.* ¶ 116).  Of the 59 comedians who appear on the *Rolling Stone* and *Billboard* lists (there is understandably some degree of overlap), Pandora alleges that Word Collections controls the licensing rights for just 12 "must-have" comedians: Richard Pryor, George Carlin, Jerry Seinfeld, Robin Williams, Bill Hicks, Steven Wright, Jonathan Williams, Dick Gregory, Margaret Cho, Adam Sandler, Dane Cook,

and Bill Engvall. (*Id.* ¶ 114.) Elsewhere in the Amended Counterclaim, Pandora asserts that Ron White and Andrew Dice Clay, who do not appear on either list, are also "must-have" comedians. (*Id.* ¶ 116.) With respect to Spoken Giants, Pandora alleges that its member comedians includes "[a]ll of the top five comedians played on Pandora in 2021: Tom Segura, Chad Daniels, Jim Gaffigan, Dan Cummins, and Gabriel Iglesias." (SG Am. Countercl. ¶ 103.) Pandora also represents that Spoken Giants' members include "twelve of the top twenty-five [comedians] played that year." (SG Opp'n 8 (citing SG Am. Countercl. ¶ 103.) Pandora also alleges that Jeff Foxworthy and Larry the Cable Guy, who appear on the Billboard list, are "must-have" comedians, although it is not clear if they are also among the top-played comedians on Pandora. (SG Am. Countercl. ¶ 103.)

Pandora's allegations are entirely conclusory. Pandora's claims that Spoken Giants portfolio is a "must-have" because "of the many high-profile and wildly popular comedians" that are members. (*Id.* ¶ 107.) Similarly, Pandora alleges Word Collections portfolio is a "must-have" because it controls "the rights of the many legendary comedians." (WC Am. Countercl. ¶ 115.) Pandora fails to articulate a consistent basis by which a comedian (or group of comedians) could be considered a "must-have." At most, the Amended Counterclaims indicate Spoken Giants and Word Collections are affiliated with popular comedians. However, saying a defendant has market power because they control licensing rights for a group of *popular* comedians, without more, is only slightly better than saying the defendant has market power because they control licensing rights for a group of *funny* comedians. Both statements may very well be true, but neither is sufficient to state a monopolization claim consistent with the standards articulated in *Twombly* and *Iqbal*.

Stated simply, the Amended Counterclaims fail to provide a method of answering a number of simple, but critically important, questions. As one example, given he does not appear on either the *Rolling Stone* or *Billboard* list, why is Lewis Black a "superstar" such that his routines might form part of a "must-have" portfolio? For another, if Larry

the Cable Guy is a "superstar" comedian, is Jerry Clower?[1]  What about comedians who have risen to prominence more recently?  Is it fair to call Hannibal Buress a "must-have" talent?  What about Hannah Gadsby?  Ali Wong?  Ultimately, the Court can only speculate.

It is clear that Pandora has not alleged that Spoken Giants or Word Collections has restricted access to, or charged supracompetitive rates for, the rights "embodied in comedy recordings" in the "U.S. market" as a whole.  Pandora has also failed to allege direct evidence of Spoken Giants' or Word Collections' ability to do the same for the much smaller universe of "superstar" comedians because Pandora does not provide a reasonable basis for identifying any of the "superstar" comedians it claims it needs.  As a result, its contentions that "it cannot simply reject" Spoken Giants and Word Collections' "price fixed 'offer' and deal instead with a competitor" are conclusory and therefore insufficient to state a claim for monopolization or attempted monopolization under section 2.  (SG Am. Countercl. ¶ 97; WC Am. Countercl. ¶ 107.)

### 2.   *Pandora's Circumstantial Evidence of Market Power*

As with the Original Counterclaims, "Pandora's allegations of circumstantial market power fare even worse."  (Order 20.)  "To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run."  *Rebel Oil*, 51 F.3d at 1434.  In addition to the issues with

---

[1] Although unnecessary to the resolution of this motion, the Court notes that Mr. Clower was also included on the *Billboard* list of best-selling comedy albums.  Keith Caulfield, *Top 20 Best Selling Comedy Albums (Nielsen SoundScan Era)*, Billboard (May 16, 2014), https://www.billboard.com/lists/top-20-best-selling-comedy-albums-nielsen-soundscan-era.  With all due respect to The Mouth of Mississippi, this gives reason for the Court to wonder whether the list, which itself is almost a decade old, accurately reflects consumer preferences in the streaming era (or at least following the cancellation of *Hee Haw*).

identifying who the "superstar" comedians might be, Pandora also fails to allege facts from which the Court could conclude that Spoken Giants or Word Collections controls a dominant share of the market or that there are significant barriers to entry.

Pandora has been clear "that *no* individual comedian is a must-have," (WC Opp'n 9), and that Spoken Giants and Word Collections' monopoly power comes from their "*aggregation* of the rights to many 'superstar' (and other) comedians, making" their respective "*portfolio*[*s*] a must-have," (SG Opp'n 9; WC Opp'n 9).  Even if it were possible to determine who the "superstar" comedians are, the total number of these "superstars" remains unpleaded.  The size of the market is therefore unascertainable, and it is impossible to determine that Spoken Giants or Word Collections controls a dominant (or even moderately large) share of the relevant market.

The closet Pandora comes to defining the market is when it states that "there are only a few dozen comedians who account for any significant number of streams across Pandora's services."  (SG Am. Countercl. ¶ 23; WC Am. Countercl. ¶ 33.)  This is insufficient to sustain a claim for a number of reasons.  First, what constitutes a "significant number of streams" is not identified with any degree of certainty.  Second, Pandora does not get any more specific than alleging the number of "superstar" comedians amounts to "a few dozen."  Third and finally, Pandora offers no reason to conclude that the universe of "superstar" comedians necessary to run a viable streaming comedy service and the universe of comedians with "any significant number of streams across Pandora's services" are identical or substantially overlap.

Even if Pandora's vague reference to the size of the market were sufficient, the Amended Counterclaims do not show that either Spoken Giants or Word Collections owns a sufficient share of that market to demonstrate monopoly power.  "The threshold of market share for finding a *prima facie* case of monopoly power is generally no less than 65% market share." *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1029 (N.D. Cal. 2021); *accord Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) ("Courts generally require a 65% market share to establish

a prima facie case of market power."). "When the claim involves attempted monopolization, most cases hold that a market share of 30 percent is presumptively insufficient to establish the power to control price." *Rebel Oil*, 51 F.3d at 1438. Adopting arguendo the number from the *Rolling Stone* article cited by Pandora, Matthew Love, *50 Best Stand-Up Comics of All Time*, Rolling Stone (Feb. 14, 2017), https://www.rollingstone.com/culture/culture-lists/50-best-stand-up-comics-of-all-time-126359, and assuming "a few dozen" equates to fifty comedians, (SG Am. Countercl. ¶ 23; WC Am. Countercl. ¶ 33), Pandora has not made a prima facie case of monopoly power. Pandora claims Spoken Giants and Word Collections each controls the licensing rights for up to 14 "superstars," or 28% of the hypothetical total.[2] (WC Am. Countercl. ¶ 114; SG Am. Countercl. ¶ 103.)

Finally, Pandora undermines its monopolization claims by acknowledging that it "must have access to at least a portion of the catalogs of *both*" Spoken Giants and Word Collections "if it is to offer a viable comedy service in the long run." (SG Am. Countercl. ¶ 112; WC Am. Countercl. ¶ 120.) "To pose a threat of monopolization, one firm *alone* must have the power to control market output and exclude competition." *Rebel Oil*, 51 F.3d at 1443. "Section 2 of the Sherman Act does not punish behavior aimed at creating or maintaining oligopolies." *Reudy v. Clear Channel Outdoors, Inc.*, 693 F. Supp. 2d 1091, 1127 (N.D. Cal. 2010). Even an allegation that Spoken Giants could raise prices above competitive levels knowing Word Collections would do likewise (or vice versa) would not be sufficient to sustain a section 2 violation. As the Ninth Circuit recognized in *Rebel Oil*, the fact that both Spoken Giants and Word

---

[2] Underscoring the lack of specificity in the pleading, Pandora alleges that twelve of the top twenty-five most played comedians on Pandora in 2021 are affiliated with Spoken Giants. (SG Am. Countercl. ¶ 103.) Pandora also claims Jeff Foxworthy and Larry the Cable Guy are responsible for seven of the top twenty comedy albums sold from 1991 to 2014. It is not clear whether Messrs. Foxworthy and Cable Guy are among the most streamed comedians, whether they are "superstars" by virtue of their inclusion on the *Billboard* list, or both.

Collections "may see proper, in the exercise of their own judgment, to follow the prices of" the other "does not establish any suppression of competition or any sinister domination, and does not violate the Sherman Act." 51 F.3d at 1442 (internal quotation marks omitted); *see also Lenhoff Enters., Inc. v. United Talent Agency, Inc.*, No. CV 15-01086-BRO (FFMx), 2015 WL 7008185, at *3 (C.D. Cal. Sep. 18, 2015) ("[T]he Ninth Circuit has specifically emphasized that a claim under § 2 requires the power to be in one entity rather than shared among multiple entities."). Absent a showing that Spoken Giants or Word Collections could unilaterally control "market output and exclude competition," Pandora's section 2 claims are inadequately pleaded. *Rebel Oil*, 51 F.3d at 1443.

        3.    *Pandora Does Not Adequately Allege Rivals Cannot Enter the Market or that Exiting Competitors Lack the Capacity to Expand Their Output*

Pandora has pleaded no facts to "show that there are significant barriers to entry" into the licensing market or "that existing competitors lack the capacity to increase their output in the short run." *Rebel Oil*, 51 F.3d at 1434. The fact that there are two performing rights organizations involved in this suit strongly undermines the plausibility of any claim that a single monopoly presents an insurmountable barrier to entry. Pandora also alleges that "no unaffiliated comedian could serve as a substitute" for access to both Spoken Giants and Word Collections "must-have" catalogues. (SG Opp'n 12.) However, applying the Court's hypothetical above, roughly 44% of the top fifty "superstar" comedians are unaffiliated with either Spoken Giants or Word Collections. It is unclear, then, why Pandora could not form its own "critical mass" from individual (or collective) licenses from the unaffiliated "superstar" comedians. For these reasons, the Court concludes Pandora has failed to plausibly allege "insurmountable barriers to entry protect" Spoken Giants' or Word Collections' monopoly power. (SG Opp'n 12; WC Opp'n 11.)

***

Pandora has failed to establish that Spoken Giants or Word Collections possesses monopoly power or has a dangerous probability of achieving monopoly power.  As a result, Pandora's allegations are insufficient to state a claim of monopolization or attempted monopolization, and Spoken Giants' and Word Collections' motion to dismiss Count III is GRANTED.

### D.    Conspiracy to Monopolize

Pandora alleges Counterclaim Defendants "conspired to monopolize the Relevant Market by agreeing to accumulate and consolidate control . . . over the licensing of the rights to a sufficiently great number of comedy routines embodied in comedy recordings."  (SG Am. Countercl. ¶ 142; WC Am. Countercl. ¶ 150.)  "To prove a conspiracy to monopolize in violation of § 2, [Pandora] must show four elements: (1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury."  *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).  "A conspiracy to monopolize action is similar in its essence to an attempt to monopolize action.  Both focus on specific intent to monopolize and anticompetitive acts designed to effect that intent, although in the conspiracy claim the act may be no more than the agreement itself."  *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir. 1980).  "[N]o particular level of market power or dangerous probability of success has to be alleged or proved in a conspiracy claim where the specific intent to monopolize is otherwise apparent from the character of the actions taken."  *Id.* (internal quotation marks omitted).  "But where actions are ambiguous, the existence and extent of market power may make the inference of specific intent from conduct more or less plausible."  *Id.* at 927.

Pandora's section 2 conspiracy to monopolize claims fail for reasons largely identical to Pandora's section 1 conspiracy claims.  Pandora failed to adequately allege facts giving rise to a reasonable inference of anything but parallel conduct.  This is insufficient to establish an agreement among the parties, let alone one in which the

parties had the specific intent to monopolize. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) (concluding allegations of parallel conduct, without more, are insufficient to sustain a section 2 conspiracy claim). Additionally, the lack of Spoken Giants' and Word Collections' market power (discussed above) makes any inference of an agreement to monopolize implausible. *Ragu Foods*, 627 F.2d at 926.

Because the Amended Counterclaims lack sufficient factual allegations to make these section 2 conspiracy claims plausible, Spoken Giants' and Word Collections' motions to dismiss Count IV is GRANTED.

### E.    Conclusion

The Ninth Circuit has "repeatedly held that a district court should grant leave to amend . . . unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (internal quotation marks omitted). Where a claimant has previously amended its pleading, "the court's discretion to deny such leave is particularly broad." *Ecological Rts. Found*, 713 F.3d at 520 (internal quotation marks omitted). In its prior order, the Court expressed doubt that Pandora's pleadings could be amended to adequately state a claim. (Order 27.) The analysis of the Amended Counterclaims confirmed this initial impression was correct.

The motions to dismiss Pandora's Amended Counterclaims are GRANTED, and the Amended Counterclaims against Word Collections and Spoken Giants are dismissed in their entirety without leave to amend. On its own motion, the Court dismisses without leave to amend the Amended Counterclaims against the other Counterclaim Defendants on the same basis it has dismissed the claims against Spoken Giants and Word Collections. *See Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 742–43 (9th Cir. 2008). The motions to join the motions to dismiss are denied as moot.

## IV.    MOTIONS FOR SANCTIONS

Spoken Giants and Word Collections moved for sanctions, claiming that Pandora misrepresented the record, offered legally frivolous arguments, and filed the Amended

Counterclaims for an improper purpose. (SG Sanctions Mot.; WC Sanctions Mot.) "Rule 11 is an extraordinary remedy, one to be exercised with extreme caution." *Operating Eng'rs Pension Tr. v. A-C Co.*, 859 F.2d 1336, 1345 (9th Cir. 1988). This is particularly true when a "court grants leave to amend a complaint and later finds, as it often does, that an amended complaint continues to fail to state a claim." *Harvey v. CNN, Inc.*, 48 F.4th 257, 280 (4th Cir. 2022). In such situations, "the typical outcome is dismissal of the amended complaint, not an award of sanctions against the litigant and his counsel for making an attempt." *Id.*

Spoken Giants and Word Collections do not make a persuasive case that sanctions are warranted. Although they claim Pandora misrepresented the record, this "misrepresentation" appears to be nothing more than the kind of factual disagreement that is commonplace in any litigation. In essence, the parties adamantly disagree whether Spoken Giants or Word Collections demanded an "all-or-nothing blanket license," (SG Sanctions Mot. 5; WC Sanctions Mot. 9), or properly characterized the affiliation agreements as "'de facto' exclusive licensing agreements," (SG Sanctions Mot. 11). Pandora's oppositions make clear, however, that whatever the merits of their characterizations, they were not fabrications manufactured from whole cloth. (SG Sanctions Opp'n 6–10; WC Sanctions Opp'n 13–16.) As a result, these arguments are not "baseless" and therefore do not warrant sanctions under Rule 11. *Mattel*, 286 F.3d 1127.

Pandora's remaining arguments are also not frivolous or so lacking in evidentiary support that sanctions might be justified. Although Pandora's Amended Counterclaims fell short of the mark, "an unsuccessful argument alone does not warrant sanctions." *Jackson v. Jacob*, No. 2:20-cv-09399-RGK-AGR, 2021 WL 3578671, at *2 (C.D. Cal. Apr. 9, 2021). The changes reflected in Pandora's Amended Counterclaims are not mere window dressing. The Amended Counterclaims include substantive additions and reflect a good faith attempt to correct the deficiencies identified in the Court's order dismissing the Original Counterclaims. (*See* SG Amended Counterclaim Redline, ECF

No. 93-8; WC Amended Counterclaim Redline, ECF No. 94-2.)  These changes were insufficient to state a claim, but they were not "legally or factually 'baseless' from an objective perspective"; nor does it appear that Pandora's counsel failed to conduct "a reasonable and competent inquiry before signing and filing" the Amended Counterclaims.  *Mattel*, 286 F.3d at 1127 (internal quotation marks omitted).  The Court concludes that Pandora had a good faith, if ultimately meritless, basis for filing the Amended Counterclaims.  Because the Amended Counterclaims were "not frivolous, [they] cannot fall within the 'improper purpose' clause of Rule 11." *Stringfellow*, 911 at 226 n.1.  Accordingly, the Amended Counterclaims do not justify the imposition of sanctions under Rule 11.

Because the Court does not find the Amended Counterclaims were filed in bad faith or based on any intentional misconduct my Pandora or its counsel, sanctions are also not appropriate under 28 U.S.C. § 1927 or the Court's inherent authority.  *See MGIC Indem. Corp. v. Moore*, 952 F.2d 1120, 1122 (9th Cir. 1991); *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997).

Spoken Giants' and Word Collections' motions for sanctions are DENIED.[3]

## V.    CONCLUSION

Spoken Giants' and Word Collections' motions to dismiss Pandora's Amended Counterclaims are GRANTED, and the Amended Counterclaims are dismissed in their entirety without leave to amend.

---

[3] The timing of the Amended Counterclaims notwithstanding, the Court declines to find that Pandora's claims against Lewis Black or the other individual comedians merit sanctions.  *See Stringfellow*, 911 F.2d at 226 n.1.  Pandora did not possess an Article III injury giving it standing to sue until it had incurred litigation expenses.  As a result, the fact that these claims were not brought until after the underlying litigation had commenced does not give rise to a finding of bad faith.  Additionally, because there appears to be a disputed issue of fact as to whether Lewis Black remained affiliated with Spoken Giants, it was reasonable for Pandora to proceed as if the relationship remained intact.  (Black Sanctions Joinder Opp'n 5–6.)

1    Spoken Giants' and Word Collections' motions for sanctions are DENIED. The

2  joinder motions are DENIED.

3

4  **IT IS SO ORDERED.**

5

6   Dated: April 5, 2023

7                                    MARK C. SCARSI
                                     UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28