MAYER BROWN LLP
PAUL M. FAKLER (*pro hac vice*)
*pfakler@mayerbrown.com*
JACOB B. EBIN (*pro hac vice*)
*jebin@mayerbrown.com*
ALLISON AVIKI (*pro hac vice*)
*aaviki@mayerbrown.com*
1221 Avenue of the Americas
New York, New York  10020-1001
Telephone:  (212) 506-2500
Facsimile:  (212) 262-1910

MAYER BROWN LLP
JOHN NADOLENCO (SBN 181128)
*jnadolenco@mayerbrown.com*
DOUGLAS A. SMITH (SBN 290598)
*dougsmith@mayerbrown.com*
MICHAEL A. CALVANICO (SBN 344792)
*mcalvanico@mayerbrown.com*
333 S. Grand Avenue, 47th Floor
Los Angeles, California  90071-1503
Telephone:  (213) 229-9500
Facsimile:  (213) 625-0248

*Attorneys for Defendant*
*Pandora Media, LLC*

[*Additional counsel listed on signature page*]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re PANDORA MEDIA, LLC COPYRIGHT LITIGATION | Master File No. 2:22-cv-00809-MCS-MAR |
| | <u>CONSOLIDATED ACTION</u> |
| This Document Relates To: | **PANDORA MEDIA, LLC'S MOTION FOR SUMMARY JUDGMENT** |
| ALL ACTIONS | *Filed concurrently with Statement of Uncontroverted Facts; Declarations of George White, Jack Vaughn, Michael Singletary, Iain Morris, Jaesan Subramaniam and Allison Aviki.* |
| | Hon. Mark C. Scarsi |
| | Date:             October 28, 2024 |
| | Time:             9:00 AM |
| | Pretrial Conference: January 27, 2025 |
| | Trial Date:        February 11, 2025 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, on October 28, 2024, at 9:00 AM, or as soon thereafter as the matter may be heard, before the Honorable Mark C. Scarsi in Courtroom 7C of the above-entitled Court, located at First Street Courthouse, 350 W. 1st Street, 7th Floor, Los Angeles, California 90012, Defendant Pandora Media, LLC ("Pandora") will move the Court for summary judgment under Federal Rule of Civil Procedure 56 on the copyright infringement claims brought by Plaintiffs Yellow Rose Productions, Inc., on behalf of Bill Engvall; Main Sequence, Ltd.; Ron White, Inc., on behalf of Ron White; Robin Williams Trust; Brave Lion, Inc., on behalf of Andrew Clay Silverstein a/k/a/ Andrew Dice Clay; Nick Di Paolo, individually and on behalf of Acid Tongue, Inc.; Mary Reese Hicks, individually and on behalf of Arizona Bay Production Co., Inc.; Lewis Black, individually and on behalf of Stark Raving Black Productions, Inc.; and George Lopez (collectively, "Plaintiffs") in their Second Amended Consolidated Complaint.

This motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on August 9, 2024.

Dated: August 21, 2024

MAYER BROWN LLP
PAUL M. FAKLER (*pro hac vice*)
JACOB B. EBIN (*pro hac vice*)
ALLISON AVIKI (*pro hac vice*)
DAVID YOLKUT (*pro hac vice*)
pfakler@mayerbrown.com
jebin@mayerbrown.com
aaviki@mayerbrown.com
dyolkut@mayerbrown.com
1221 Avenue of the Americas
New York, NY 10020-1001
Telephone: (212) 506-2500
Facsimile: (212) 262-1910

By: */s/ Paul M. Fakler*
       Paul M. Fakler

MAYER BROWN LLP
JOHN NADOLENCO (SBN 181128)
DOUGLAS A. SMITH (SBN 290598)
MAX W. HIRSCH (SBN 301872)
MICHAEL A. CALVANICO (SBN 344792)
jnadolenco@mayerbrown.com
dougsmith@mayerbrown.com
mhirsch@mayerbrown.com
mcalvanico@mayerbrown.com
333 S. Grand Avenue, 47th Floor
Los Angeles, California 90071-1503
Telephone: (213) 229-9500
Facsimile: (213) 625-0248

Attorneys for Defendant
PANDORA MEDIA, LLC

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 3

    I.      Pandora's Beneficial Comedy Use ................................................ 3

    II.     Plaintiffs' Routines ...................................................................... 4

    III.    The Comedy Industry Has Longstanding And Stable Licensing Practices ...................................................................................... 5

        A.     Comedy Has Always Been Licensed "At The Source" ............. 5

        B.     Comedy Licensing Practices Differ From The Music Industry ......................................................................... 6

        C.     Plaintiffs' Agreements With Their Record Labels Convey All Necessary Rights To The Routines ...................................... 6

        D.     Pandora's Licenses With Record Companies And Distributors Likewise Convey All Necessary Rights To Stream Plaintiffs' Routines .......................................................... 7

        E.     Pandora Has Been Forthright About Its Comedy Licensing Practices .................................................... 7

        F.     Word Collections And Spoken Giants Seek To Upend These Stable Licensing Practices ................................ 8

LEGAL STANDARD ............................................................................................ 10

ARGUMENT ........................................................................................................ 11

    I.      PANDORA HAS AN IMPLIED LICENSE TO USE THE ROUTINES ......................................................................... 11

    II.     PLAINTIFFS ARE EQUITABLY ESTOPPED FROM CHALLENGING PANDORA'S USE OF THE ROUTINES .......... 14

    III.    PANDORA HAS EXPRESS LICENSES TO USE PLAINTIFFS' ROUTINES ................................................ 16

    IV.    PLAINTIFFS HAVE ENGAGED IN COPYRIGHT MISUSE AND HAVE UNCLEAN HANDS ...................................... 18

        A.     Misuse Through Collective Licensing ................................... 19

        B.     Misuse Through Fraudulent Registrations ............................. 21

    V.     PLAINTIFFS' COPYRIGHT CLAIMS SUFFER FROM OTHER FATAL DEFICIENCIES ........................................ 22

i

A.    Certain Plaintiffs Have Failed To Prove Copyright Ownership .................................................................. 22

B.    Plaintiffs Have Failed To Demonstrate They Have Valid Registrations For The Routines ............................... 25

C.    Two Plaintiffs Do Not Have Registered Copyrights Covering Certain Routines ....................................... 26

VI.    PLAINTIFFS' REQUESTED STATUTORY DAMAGES ARE EITHER UNAVAILABLE OR DRAMATICALLY OVERSTATED .............................................................. 27

A.    Many Albums Are Ineligible For Statutory Damages .............. 28

B.    Any Purported Infringement Was Not Willful And Was At Most Innocent ...................................................... 29

CONCLUSION ................................................................................ 32

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Agrusa*,
   2016 WL 7665410 (C.D. Cal. July 19, 2016), *aff'd*, 693 F. App'x
   563 (9th Cir. 2017) ........................................................................................ 31

*Altera Corp. v. Clear Logic, Inc.*,
   424 F.3d 1079 (9th Cir. 2005) ................................................................ 19, 22

*Apple Inc. v. Psystar Corp.*,
   658 F.3d 1150 (9th Cir. 2011) ....................................................................... 18

*Bondali v. Yum! Brands, Inc.*,
   620 F. App'x 483 (6th Cir. 2015) .................................................................. 31

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994) ....................................................................................... 31

*Carmichael Lodge No. 2103 v. Leonard*,
   2009 WL 2985476 (E.D. Cal. Sep. 16, 2009) ................................................ 14

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ....................................................................................... 11

*Compass Homes, Inc. v. Heritage Custom Homes, LLC*,
   2015 WL 4639654 (S.D. Ohio Aug. 3, 2015) ................................................ 25

*Dep't of Parks & Recreation v. Bazaar Del Mundo, Inc.*,
   448 F.3d 1118 (9th Cir. 2006) ....................................................................... 16

*Derek Andrew, Inc. v. Poof Apparel Corp.*,
   528 F.3d 696 (9th Cir. 2008) ......................................................................... 28

*DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC*,
   870 F.3d 978 (9th Cir. 2017) ......................................................................... 23

*Effects Assocs., Inc. v. Cohen*,
   908 F.2d 555 (9th Cir. 1990) ......................................................................... 11

*Evergreen Safety Council v. RSA Network Inc.*,
   697 F.3d 1221 (9th Cir. 2012) ....................................................................... 29

iii

*Evox Prods., LLC v. Chrome Data Sols., LP*,
   2023 WL 1879479 (9th Cir. Feb. 10, 2023)................................................12, 13

*ExperExchange, Inc. v. Doculex, Inc.*,
   2009 WL 3837275 (N.D. Cal., Nov. 16, 2009)....................................................13

*Field v. Google, Inc.*,
   412 F. Supp. 2d 1106 (D. Nev. 2006) ..........................................................*passim*

*Fleisher Studios, Inc. v. A.V.E.L.A., Inc.*,
   654 F.3d 958 (9th Cir. 2011) ...........................................................................23

*Foad Consulting Grp., Inc. v. Azzalino*,
   270 F.3d 821 (9th Cir. 2001) ...........................................................................11

*In re Foundry Networks, Inc.*,
   2002 WL 32354617 (N.D. Cal. 2002)..............................................................31

*Friedman v. Live Nation Merch., Inc.*,
   833 F.3d 1180 (9th Cir. 2016)..........................................................................29

*Hadady Corp. v. Dean Witter Reynolds, Inc.*,
   739 F. Supp. 1392 (C.D. Cal. 1990).................................................................15

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
   896 F.2d 1542 (9th Cir. 1989)..........................................................................26

*Hargis v. Pacifica Senior Living Mgmt. LLC*,
   2023 WL 6373869 (C.D. Cal. Aug. 2, 2023) ..............................................29, 31

*Hollywood Foreign Press Ass'n v. Red Zone Cap. Partners II*,
   870 F. Supp. 2d 881 (C.D. Cal. 2012).........................................................16, 18

*I.A.E., Inc. v. Shaver*,
   74 F.3d 768 (7th Cir. 1996) .............................................................................12

*Keane Dealer Servs., Inc. v. Harts*,
   968 F. Supp. 944 (S.D.N.Y. 1997)...................................................................12

*Kennedy v. Gish, Sherwood & Friends, Inc.*,
   143 F. Supp. 3d 898 (E.D. Mo. 2015)..............................................................14

*Kevin Chelko Photography, Inc. v. JF Rests., LLC*,
   2017 WL 240087 (W.D.N.C. Jan. 19, 2017).....................................................24

iv

*Kramer v. From The Heart Prods., Inc.*,
    300 F. App'x 555 (9th Cir. 2008)................................................................. 14, 15

*Lasercomb Am., Inc. v. Reynolds*,
    911 F.2d 970 (4th Cir. 1990) ....................................................................... 20

*Latin Am. Music Co. v. Media Power Grp.*,
    2010 WL 6420575 (D.P.R. Sep. 10, 2010), *aff'd*, 705 F.3d 34 (1st
    Cir. 2013)........................................................................................................ 26

*Lumiere (Rts.) Ltd. v. Baker & Taylor, Inc.*,
    1997 WL 303244 (9th Cir. 1997) ................................................................. 23

*M. Witmark & Sons v. Jensen*,
    80 F. Supp. 843 (D. Minn. 1948) ............................................................. 19, 21

*Marvez v. Uproar Entertainment*,
    2022 WL 18284896 (C.D. Cal. Dec. 12, 2022) ..................................... 2, 16, 17

*Marya v. Warner/Chappell Music, Inc.*,
    131 F. Supp. 3d 975 (C.D. Cal. 2015).......................................................... 24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ...................................................................................... 11

*Meredith Corp. v. SESAC*,
    1 F.Supp.3d 180 (S.D.N.Y. 2014) ................................................................. 6

*Murphy v. Warner Bros. Pictures*,
    112 F.2d 746 (9th Cir. 1940) ........................................................................ 17

*In re Napster, Inc. Copyright Litig.*,
    191 F. Supp. 2d 1087 (N.D. Cal. 2002)......................................................... 20

*Prac. Mgmt. Info. Corp. v. Am. Med. Ass'n*,
    121 F.3d 516 (9th Cir. 1997), *amended*, 133 F.3d 1140 (9th Cir.
    1998)..................................................................................................... 19, 20, 21

*Richardson v. Kharbouch*,
    2024 WL 50374 (N.D. Ill. Jan. 4, 2024) ....................................................... 27

*Stevens v. Corelogic, Inc.*,
    194 F. Supp. 3d 1046 (S.D. Cal. 2016) .................................................. 12, 13, 14

v

*Studio S Imps., LLC v. Deutsch Imps., LLC*,
   2021 WL 3598571 (C.D. Cal. June 21, 2021)...........................................24, 25

*Taylor Holland LLC v. MVMT Watches, Inc.*,
   2016 WL 6892097 (C.D. Cal. Aug. 11, 2016) ......................................................29

*UMG Recordings, Inc. v. Disco Azteca Distribs., Inc.*,
   446 F. Supp. 2d 1164 (E.D. Cal. 2006) ..............................................................13

*United Fabrics Int'l, Inc. v. G-III Apparel Grp., Ltd.*,
   2013 WL 7853485 (C.D. Cal. Dec. 27, 2013) ....................................................31

*Wallert v. Atlan*,
   141 F. Supp. 3d 258 (S.D.N.Y. 2015) ................................................................24

*Wash. Shoe Co. v. A—Z Sporting Goods Inc.*,
   704 F.3d 668 (9th Cir. 2012) .............................................................................29

*Wixen Music Publ'g, Inc. v. Triller, Inc.*,
   2022 WL 3636000 (C.D. Cal. Aug. 1, 2022) .................................................20, 21

*Yi v. Circle K Stores, Inc.*,
   258 F. Supp. 3d 1075 (C.D. Cal. 2017) ...............................................................16

*Zahedi v. Miramax, LLC*,
   2022 WL 4596551 (C.D. Cal. Aug. 19, 2022) ....................................................23

**Statutes**

17 U.S.C. § 101.............................................................................................................23

17 U.S.C. § 204(a).......................................................................................................23

17 U.S.C. § 412(1).......................................................................................................28

17 U.S.C. § 412(2).......................................................................................................28

17 U.S.C. §501(b).................................................................................................23, 25

**Other Authorities**

Fed. R. Civ. P. 56(a) ............................................................................................10, 11

Fed. R. Civ. P. 56(e) ....................................................................................................26

Fed. R. Ev. 803(6) ................................................................................ 26

Fed. R. Ev. 901 .................................................................................... 26

Fed. R. Ev. 1002 .................................................................................. 26

U.S. Copyright Office, *Circular 56 Copyright Registration for Sound
Recordings*, https://www.copyright.gov/circs/circ56.pdf ................................... 26

U.S. Copyright Office, *Compendium: Chapter 803.8(B)*, *Joint
Authorship*, https://www.copyright.gov/comp3/chap800/ch800-
performing-arts.pdf ............................................................................... 27

## INTRODUCTION

This litigation was conceived and orchestrated by Word Collections—a purported collective licensor of comedy routines—to upend longstanding custom and practice in the spoken-word comedy industry for the purpose of creating a new market for its unnecessary license. This consolidated action—funded by Word Collections—asks the Court to hold Pandora liable for willful infringement merely for following that longstanding practice in the comedy industry.

Plaintiffs are the purported owners of comedy routines embodied in licensed comedy recordings. For decades, comedians like Plaintiffs have had mutually beneficial understandings with those businesses, like Defendant Pandora, that perform, distribute, and reproduce their recordings. Until this case, no individual comedian ever sought or obtained a separate license from a streaming service or broadcaster just for the jokes in those recordings. Instead, Pandora and every other streamer and broadcaster of comedy recordings licensed those purported "literary works" at "the source"—from the record label that distributes the recording. In doing so, Pandora provides Plaintiffs and other comedians with both substantial royalty payments and critical promotional benefits. The record now establishes what Pandora has said all along: that record labels secure and pass along all necessary rights to services like Pandora—*including the rights to any pre-existing works like the jokes at issue*—both explicitly and implicitly. Pandora is entitled to summary judgment.

We first demonstrate that Pandora has an implied license covering all of the comedy routines that are the subject of this lawsuit ("Routines") through the parties' conduct, as informed by decades of unbroken industry practice. Plaintiffs knew for years—through royalty statements and otherwise—that Pandora was using their Routines, yet never once objected or asked Pandora to obtain an additional license or pay an additional royalty. On the contrary, Plaintiffs openly celebrated Pandora's promotion of their comedy and repeatedly asked for more airtime on its platform.

1

For similar reasons, Plaintiffs are equitably estopped from pursuing their infringement claims. Plaintiffs clearly knew of and acquiesced to Pandora's use of their Routines. And, after nearly a decade promoting Plaintiffs, Pandora could have hardly known that Plaintiffs would later take collective action and assert these claims after long sitting on their purported rights.

Pandora alternatively has express licenses for the Routines. Plaintiffs' agreements with their record labels expressly convey all necessary rights to the Routines and contemplate that the recordings (and the embodied Routines) will be fully licensed through to downstream users like Pandora—that is the very purpose of these agreements. And, when the labels (or their distributors) license recordings to Pandora, they pass along all rights necessary to use the recordings, thereby fulfilling the purpose of the agreements between labels and comedians. Indeed, the only other case that evaluates the purported infringement of a comedy routine when the recording embodying that routine was streamed reached precisely this conclusion. In *Marvez v. Uproar Entertainment*, 2022 WL 18284896, at *2 (C.D. Cal. Dec. 12, 2022), the court concluded that any rights to the comedy routine must have been provided along with the recording. Were that not the case, the agreement's very purpose would be rendered "impossible." *Id.*

Plaintiffs have also engaged in two forms of copyright misuse and have unclean hands. First, through collective licensing facilitated by Word Collections and Spoken Giants (the "Collectives"), all Plaintiffs save one have secured for themselves pricing power well in excess of what their individual copyrights convey. Second, certain Plaintiffs have fraudulently passed off their Routines as ***musical*** works with music licensing entities to obtain illicit music royalty payments.

Plaintiffs' claims also suffer from several gating evidentiary issues:

- Plaintiffs have not provided the necessary chain-of-title for 238 Routines;

2

- For 362 Routines, Plaintiffs have not provided certificates of registration or other admissible evidence demonstrating they have valid copyright registrations; and

- Two Plaintiffs failed to register copyrights in 182 of the Routines.

Finally, to the extent that these defenses do not dispose of Plaintiffs' claims in their entirety, Pandora is entitled to rulings that statutory damages are unavailable for nearly half of the Routines because of a failure to timely register them and that, in all events, any alleged infringement was not willful. Plaintiffs cannot show that Pandora acted willfully where Pandora had a reasonable belief that it appropriately licensed the Routines. If anything, Plaintiffs' purported evidence of willfulness—that Pandora responsibly described its licensing practices and looked into the Collectives' claims and threats before offering to take the Routines down (an offer that the Collectives *declined*)—shows that any purported infringement was innocent.

## **BACKGROUND**

### I.    **Pandora's Beneficial Comedy Use**

Pandora offers listeners a free-to-the-consumer, non-interactive internet radio service and two subscription services, one of which offers fully interactive functionality. Statement of Uncontroverted Material Facts ("SUMF") ¶ 1.[1] In 2011, Pandora added comedy and other spoken-word content to its music offerings. ¶ 2. While Pandora's comedy library has grown, music still accounts for the vast majority of user streams. ¶¶ 340-354. Spoken-word comedy makes up less than 1% of all streams on Pandora. ¶ 3; Ex. 34 (Jaffe Report, ¶ 19). Still, Pandora pays millions annually for the comedy it streams. ¶ 4; Ex. 34 (Jaffe Report, ¶ 20).

Beyond these substantial royalties, comedians also receive critical promotion from Pandora, thereby increasing their other revenue streams, including from live performances. ¶¶ 5-13, 383-404. Pandora offers promotional value beyond that of

---

[1] All "¶" citations are to the SUMF, and all "Ex." references are to the Declaration of Allison Aviki.

other streaming services through its unique Comedy Genome Project, which introduces listeners to comedy they might like, but might not otherwise be exposed to. ¶¶ 6, 340-350. Similarly, Pandora provides marketing tools to artists to help better connect them with fans—further helping to increase ticket-sales to live shows, sales of albums, and merchandise on their websites. ¶¶ 7-10, 388-390, 400-402. As one comedian explained, "I used only royalties from both [Pandora and Sirius XM] for the downpayment of my current home." ¶ 11. After reaching 400,000,000 streams on Pandora, another comedian told Pandora: "Thanks a ton!!! . . You've changed the lives of an entire family in a great way." ¶ 387.

## II.    Plaintiffs' Routines

Plaintiffs are nine comedians (including entities and heirs suing on their behalf) whose recordings have streamed on Pandora and other platforms for years— all with their approval and encouragement. ¶¶ 14-22, 355-382, 389-401. Every Plaintiff was on notice for years, including from royalty statements, that Pandora was streaming their Routines. *Id.* Yet between 2011 (when Pandora launched its comedy offerings) and the emergence of the Collectives nearly a decade later, no Plaintiff ever complained about being underpaid or not fully licensed by Pandora. ¶¶ 22-41, 355-382. And, to this day, no Plaintiff has ever asked Pandora to stop streaming their Routines. *Id.*

On the contrary, several Plaintiffs actively promoted Pandora's use of their Routines and celebrated the many benefits Pandora provides. ¶¶ 377, 389-401. Plaintiff Black's production company, for example, ███████████████████ ███████████████████████████████. ¶¶ 377, 398. And Black publicly acknowledged the many monetary and promotional benefits that streaming services like Pandora provide. ¶ 399. Same for ███████████. ¶¶ 395-396. As Bill Engvall of Plaintiff Yellow Rose explained, Pandora ██████████████████████ ███████████ and he was "forever grateful" for reaching 600,000,000 streams on Pandora. ¶¶ 392-393.

4

### III.    The Comedy Industry Has Longstanding And Stable Licensing Practices

#### A.    Comedy Has Always Been Licensed "At The Source"

For decades, comedy routines have been publicly performed on the radio, on television, and in clubs and other venues. ¶¶ 423-427. And, for well over a decade, Pandora and other audio and audiovisual services have streamed recordings of comedy routines. ¶ 425. In a practice that predates Pandora by many decades, all of these public performances of comedy routines have taken place without separate licenses or license fees just for the underlying jokes. ¶¶ 355-382, 405-451; Ex. 33 (Del Bene Report, § II).[2] In some instances (broadcast radio), no royalties are paid at all. ¶ 427. In others (*e.g.*, venues, cable and television broadcasters, and audio and audiovisual streaming services), no separate license fees have been paid for the underlying written material on top of any fee paid for the comedian's appearance or recording. ¶¶ 423-451. And, across all these decades, up until this unprecedented case, no individual comedian ever requested a separate license or fee from any of these entities just for the comedy routines performed.

The reason is simple: spoken-word comedy, like every other copyright-intensive industry except music (which is inapposite for reasons described below), has always been licensed "at the source," whereby the "source" of the final product (here, the record label that creates and distributes the recording) secures and passes along to downstream users all necessary rights to use the derivative work, ***including the rights to all pre-existing works used in the new derivative work***, with the comedians being compensated for those uses via their recording agreement royalties. ¶¶ 405-406, 423-451; Ex. 33 (Del Bene Report, § II). This same "at the source" model

---

[2] Under the shadow of litigation and facing threats from Word Collections, ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄. Ex. 33 (Del Bene Report, ¶¶ 119-124).

is used, among many others, for literary works like novels and screenplays embodied in motion pictures. ¶ 406. And for good reason: it allows downstream parties to have all the rights needed to use the comedy recordings, in one transaction, eliminating the need to secure multiple licenses from various sources for the same, single use. As Pandora's experts have explained, it also prevents the type of "hold-up" power that is at the heart of this litigation. *See infra* Argument § IV.A.

### B.   Comedy Licensing Practices Differ From The Music Industry

The dysfunctional music industry works differently. Licensing there requires multiple separate negotiations with multiple points of "hold-up." In the music industry, performing rights organizations ("PROs") like ASCAP and BMI emerged decades ago due to an anomalous issue that uniquely impacts music: the uncompensated performances of songs played by someone other than the songwriter. ¶¶ 412-422; Ex. 34 (Jaffe Report, § VI).[3] Comedy is different. Plaintiffs, like nearly all comedians, are both the performers and writers of their material—they do not "cover" others' material leaving no separation between performer and author. *Id*.

### C.   Plaintiffs' Agreements With Their Record Labels Convey All Necessary Rights To The Routines

For as long as comedy has been recorded, agreements between comedians and their record labels invariably convey all rights to the underlying comedy routines needed such that the label can commercially exploit the resulting recordings. ¶¶ 362, 371, 374, 447-448, 452-914. Indeed, the whole point of the record deal is to distribute the comedian's recordings to entities like Pandora and share the resulting revenue with the comedian—the writer *and* performer. Ex 33 (Del Bene Report, § II).

Plaintiffs' agreements with their record labels are no different. They conveyed the (non-exclusive) rights to use and perform, *inter alia*, Plaintiffs' Routines. ¶¶ 452-

---

[3] ASCAP and BMI operate under longstanding antitrust consent decrees with DOJ to curb their ability to fully exploit their hold-up power. *Meredith Corp. v. SESAC*, 1 F.Supp.3d 180, 185 (S.D.N.Y. 2014).

914. ████████████████████████████████████

████████████████████████████████████████

¶¶ 362, 371, 374, 447-448.

> **D.     Pandora's Licenses With Record Companies And Distributors Likewise Convey All Necessary Rights To Stream Plaintiffs' Routines**

Moving downstream, through their grants-of-rights and related provisions, Pandora's licenses with record companies and distributors provide Pandora with the rights to everything embodied in the sound recordings except any ***musical*** compositions (which are subject to a separate licensing framework). ¶¶ 915-1165. These agreements complete the licensing chain needed to fulfill comedians' and labels' objectives of earning revenues by providing Pandora with everything needed, including any rights in the underlying jokes, to make those recordings available to the public. *Id*.[4]

> **E.     Pandora Has Been Forthright About Its Comedy Licensing Practices**

Since comedy debuted on Pandora, Pandora has been clear that it has licensed comedy under this longstanding framework. ¶¶ 340-354. As Pandora's SEC filings explained, "[w]e stream spoken word comedy, for which the underlying literary works are not currently entitled to eligibility for licensing by any [PRO] in the United States," "pursuant to industry-wide custom and practice." ¶ 352. Pandora made clear that such practice involved securing and paying for the necessary rights through its licensing of sound recordings. *Id*. ("[C]ontent acquisition costs are paid to

---

[4] The Orchard (whose agreement with Pandora is the same as that between Sony and Pandora), for example, has confirmed in writing that it always obtained such rights from comedy labels and passed them through to Pandora and others. ¶¶ 988-991. And TuneCore—an independent distributor—████████████████████████ ¶¶ 1099-1102.

SoundExchange for the public performance of the sound recordings in which such literary works are embodied.").

Despite Pandora's transparency, ***for nearly a decade***, no one ever challenged this practice; no one, including Plaintiffs, ever asked Pandora to take their routines down; and no one ever asked Pandora to take another license or pay a separate, additional royalty. ¶¶ 23-41, 355-380, 428-451. And, as Plaintiffs now admit,

. ¶ 380.

¶ 438.

¶ 444.

¶ 376. And so on. ¶¶ 355-380, 428-451 (additional Plaintiff admissions).

Yet, despite long knowing about Pandora's licensing framework and failing to ever object to it, Plaintiffs now claim that Pandora never had a license to their Routines.

**F.  Word Collections And Spoken Giants Seek To Upend These Stable Licensing Practices**

Plaintiffs' about-face stemmed directly from the rise of Word Collections and Spoken Giants. With leadership hailing from the music industry, these Collectives have sought to upend decades-long practices and demand that all comedy users, including Pandora, take a second, superfluous, "all-or-nothing" blanket license just for the underlying jokes embodied in their affiliated comedians' recordings. ¶¶ 1179-1287. As Pandora's economic expert explained, Pandora and comedians long "behaved as if they all believed that [Pandora was] getting the necessary rights" to the Routines, and that only changed when the Collectives "entered the picture." ¶ 1284.

In late 2020 and 2021, after recruiting dozens of popular comedians, Word Collections demanded Pandora pay for its blanket license, threatening litigation if Pandora did not. ¶¶ 1187-1217. Even as it threatened litigation, Word Collections specifically asked Pandora to continue streaming its members' recordings. ¶¶ 1260-1263, 1593-1594. But, when Pandora took longer to evaluate these demands than Word Collections wished, the first infringement suits followed, managed and funded by Word Collections. ¶¶ 1221-1230. Shortly thereafter, Pandora removed the recordings at issue from its service. Subramaniam Decl. ¶ 32.

Seven of the nine Plaintiffs are members of Word Collections, which bills itself as their "exclusive licensor." ¶¶ 1180-1186. Word Collections lured these Plaintiffs to sue ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ¶¶ 1218-1230. By bundling their rights together, Word Collections explained, Plaintiffs would carry a "collective weight and 'stick' [that] is much larger" than that of any individual comedian. ¶ 1220. The gambit was, through collective licensing, to secure royalties well beyond what any individual Plaintiff could ever secure acting alone. To force that end, Word Collections: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ¶¶ 1224-1227.

Spoken Giants, led by a former BMI executive, followed a similar playbook. ¶¶ 1231-1259. At the time he sued, Plaintiff Black was an outspoken member of Spoken Giants and often appeared with its CEO in press interviews. ¶ 1250. Black assigned to Spoken Giants the "exclusive right" to license his Routines—which meant they could only be licensed together with *all of the other works* in Spoken Giants' catalog of ▮▮▮▮▮▮▮ comedy routines. ¶¶ 1241, 1249. Spoken Giants, like Word Collections, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ¶ 1247. Spoken Giants repeatedly touted, both publicly and directly to Pandora, the scale of its

9

catalog, telling its members ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ ¶ 1248. ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ ¶¶ 1258-1259. ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id*.

The final Plaintiff (Lopez) ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮. ¶¶ 1228-1230.

Once Plaintiffs filed suit (and threatened that additional lawsuits were coming), Pandora was compelled to take down the recordings of comedians affiliated with the Collectives, materially degrading Pandora's comedy offerings and spurring customer complaints. ¶¶ 1265-1271.

Facing a marked decrease in their royalties and promotion, nearly 100 of the comedians affiliated with the Collectives terminated their affiliations and sought reinstatement on Pandora. ¶¶ 1166-1178, 1272-1277. Each returning comedian signed a "reinstatement agreement" confirming that Pandora has (and has always had) all rights necessary to use their recordings and that no additional compensation beyond the royalties Pandora has always paid was due. ¶¶ 1167-1172. Pandora executed similar agreements with a slew of comedy labels, likewise confirming the industry-wide licensing practices described above. ¶¶ 1173-1178. This counter-reaction was unsurprising: as Spoken Giants' CEO acknowledged, ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ¶ 1278.

## LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

10

56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). There is no genuine issue for trial where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. *Id.* at 587.

## **ARGUMENT**

## I.    **PANDORA HAS AN IMPLIED LICENSE TO USE THE ROUTINES**

Plaintiffs' infringement claims are foreclosed because Plaintiffs impliedly licensed the Routines to Pandora. *See Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990). A copyright owner may grant a nonexclusive license either expressly in writing or impliedly through conduct. *Id*. Both types of licenses are present here and independently preclude Plaintiffs' infringement claims. We begin with implied license, which defeats Plaintiffs' claims without requiring an analysis of the dozens of contracts involved in Pandora's express license defense.

"[G]rants of nonexclusive copyright licenses need not be in writing," but can instead be implied "through conduct." *Foad Consulting Grp., Inc. v. Azzalino*, 270 F.3d 821, 825 (9th Cir. 2001); *Field v. Google, Inc.*, 412 F. Supp. 2d 1106, 1115 (D. Nev. 2006). The inquiry turns on whether the owner has engaged in conduct "from which [the] other [party] may properly infer that the owner consents to [the] use." *Field*, 412 F. Supp. 2d at 1116 (citation omitted). And, "[b]ecause the implied license is derived from the relationship of the parties … it is entirely appropriate to look at any words or conduct that bear on whether a copyright license should be implied." *Foad Consulting Grp.*, 270 F.3d at 834 (Kozinski, J., concurring).

As a preliminary matter, several of the Plaintiffs admitted that, when they entered into their recording agreements, ███████████████████████████ ████████████████████████████████████████████.

11

¶¶ 362, 371, 374, 447-448. The undisputed facts further establish that Plaintiffs intended for Pandora to use their Routines on its platform in exchange for the royalties and other benefits Pandora provides. *First*, despite knowing that Pandora was streaming their Routines for years, Plaintiffs never objected to such use or contended that Pandora needed some additional, separate license. *Second*, certain Plaintiffs actively sought, promoted, and celebrated Pandora's use of their Routines. *Third*, Plaintiffs accepted the royalties and other benefits Pandora provided. *Finally*, Pandora's implied license is bolstered by decades of unbroken "common industry practice," which is also "indicative of consent." *Stevens v. Corelogic, Inc.*, 194 F. Supp. 3d 1046, 1054 (S.D. Cal. 2016) (citation omitted). Several Plaintiffs ██████████████████████████████. ¶¶ 364, 366, 380, 428-429, 444-450.

**<u>Failure to object.</u>** Courts in the Ninth Circuit have granted summary judgment to copyright defendants based on an implied license where the owner knew of the allegedly infringing use but did not object to it. *See*, *e.g.*, *Evox Prods., LLC v. Chrome Data Sols., LP*, 2023 WL 1879479, at *3 (9th Cir. Feb. 10, 2023) (affirming summary judgment where the copyright owner did not object to reports of use); *Field*, 412 F. Supp. 2d at 1116 (granting summary judgment based on an implied license defense where the copyright holder's "silence" in the face of the defendant's copyright use was a "conscious decision to permit it"). Other courts are in accord that "consent given in the form of mere permission or lack of objection is also equivalent to a nonexclusive license[.]" *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997) (quoting *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996)).

Here, Plaintiffs knew, or were on notice from royalty statements, that Pandora was streaming their Routines years before filing suit. Plaintiffs admit that Pandora has been advertising its comedy offerings to the public since 2011 and aver that Pandora has "provided streaming access" to their Routines "for years." SACC, ¶¶ 160, 165. Pandora publicly said so in its annual SEC filings, which also explained the nature of its licensing practices. *See* Factual Background § III.E. Yet no Plaintiff

12

ever objected to Pandora's use of the Routines at any time between 2011 and the emergence of the Collectives in late 2020. *See* Factual Background § II. Nor, throughout that period, did any Plaintiff ask Pandora—***even once***—to take a second license or pay a separate royalty just for the Routines. *Id.* The result is an implied license.

> ***Encouragement of use.*** Plaintiffs did far more than stand silent for years in the face of Pandora's use of the Routines: several expressly encouraged Pandora to stream their Routines more, mindful of the many "immeasurable" benefits—monetary and promotional—they derive from streams on Pandora. *See* Factual Background § II. Even beyond Plaintiffs' years-long "[s]ilence [and] lack of objection," this is an "especially" good case for an implied license because Plaintiffs not only knew of Pandora's use, but several actively "encourage[d] it." *Stevens*, 194 F. Supp. 3d at 1053-54 (citations omitted); *Field*, 412 F. Supp. 2d at 1115 (same).

> ***Acceptance of royalties.*** Plaintiffs also accepted royalties (and other benefits) from Pandora during that same lengthy span without ever demanding or even suggesting that they were owed additional royalties for the Routines. *See* Factual Background § II. This undisputed fact cuts across all Plaintiffs and makes Pandora's implied license even clearer—the "acceptance of [royalty] payments gives rise to an implied license as a matter of law." *UMG Recordings, Inc. v. Disco Azteca Distribs., Inc*., 446 F. Supp. 2d 1164, at 1177-78 (E.D. Cal. 2006) (granting summary judgment on implied license grounds); *ExperExchange, Inc. v. Doculex, Inc.*, 2009 WL 3837275, at *23-24 (N.D. Cal., Nov. 16, 2009) (granting summary judgment to defendant based on implied license because the plaintiff "continued to accept … royalty payments for [the allegedly infringing] products" for years before bringing suit). In *Evox Productions*, for example, the Ninth Circuit agreed that the plaintiff granted "an implied license by not objecting to [defendant's] reports of its active sublicensees and accepting royalty payments for those sublicenses" and affirmed a

13

grant of summary judgment to the defendant accordingly. 2023 WL 1879479, at *3 (citation omitted). So too here.

**_Common industry practice_.** Plaintiffs' knowledge of Pandora's use of the Routines and failure to object should also be viewed in the context of years of unbroken "common industry practice," which is "indicative of consent." *Stevens*, 194 F. Supp. 3d at 1054 (citation omitted); *Kennedy v. Gish, Sherwood & Friends, Inc.*, 143 F. Supp. 3d 898, 909 (E.D. Mo. 2015) (finding grant of implied license through plaintiffs' "past conduct," "encouragement and lack of objection," and "accepted practice … in the advertising industry"). Comedy routines have always been licensed "at the source," whereby the record label that creates the comedy recording secures from the comedian, and passes along to all downstream users, all rights needed to use the derivative work. *See* Factual Background § III.A-D. Prior to the filing of these lawsuits, for decades, no streaming service or broadcaster ever separately licensed the underlying written material embodied in spoken-word comedy recordings. *Id.*; Ex 33 (Del Bene Report, § II); Ex. 34 (Jaffe Report, ¶¶ 28-32). And all participants in the chain understood that no separate license was needed just for the jokes embodied in those recordings. *Id.*

## II.  PLAINTIFFS ARE EQUITABLY ESTOPPED FROM CHALLENGING PANDORA'S USE OF THE ROUTINES

The doctrine of equitable estoppel separately bars Plaintiffs' infringement claims. *See Kramer v. From The Heart Prods., Inc.*, 300 F. App'x 555, 556 (9th Cir. 2008); *Field*, 412 F. Supp. 2d at 1116-17 (granting summary judgment on equitable estoppel grounds). Moreover, "a copyright owner's conduct during a period of permissive use may estop[] the owner from later revoking permission and bringing an infringement claim." *Carmichael Lodge No. 2103 v. Leonard*, 2009 WL 2985476, at *15 (E.D. Cal. Sep. 16, 2009) (collecting cases).

Plaintiffs cannot assert their infringement claims because the undisputed facts satisfy each of the necessary elements of the estoppel defense: (i) Plaintiffs knew

14

about Pandora's use of the Routines; (ii) Plaintiffs encouraged or supported it through their conduct; (iii) Pandora was "ignorant of the true facts"; and (iv) Pandora detrimentally relied on Plaintiffs' conduct. *Hadady Corp. v. Dean Witter Reynolds, Inc.*, 739 F. Supp. 1392, 1399 (C.D. Cal. 1990).

*First*, Plaintiffs have known for years that Pandora was using their Routines. They have admitted as much. *Compare* Factual Background § II *with Kramer*, 300 F. App'x at 556 (plaintiffs "knew" defendants "were going to do the acts [plaintiffs] later claimed were infringing").

*Second*, certain Plaintiffs ***actively supported and encouraged*** Pandora's use, seeking out additional airplay and promoting the availability of their Routines on Pandora. And Plaintiffs' acquiescence made perfect sense: they benefited from Pandora's use through royalty payments and promotion. Indeed, even after the Collectives demanded changes to existing licensing practices, they asked that Pandora continue streaming their members' recordings. *Compare* Factual Background § I-II *with Kramer*, 300 F. App'x at 557 (plaintiffs "encouraged" defendants to make the allegedly infringing film).

*Third*, Pandora "was ignorant of the true facts"—namely, that after sitting on their purported rights for nearly a decade (as they continued to collect royalties all-the-while), Plaintiffs would later, at the Collectives' behest, seek to upend the parties' longtime licensing practices and claim infringement after-the-fact. *Compare* Factual Background § III.F *with Field*, 412 F. Supp. 2d at 1117 (due to plaintiff's "silence," defendant "was not aware that [plaintiff] did not wish to have [defendant] provide 'Cached' links to his works").

*Finally*, Pandora detrimentally relied on Plaintiffs' conduct. It had every reason to think Plaintiffs consented to Pandora's use of the Routines, only to be sued many years later. *Compare* Factual Background § II *with Hadady*, 739 F. Supp. at 1400 (ensuing litigation establishes prejudice to defendant).

## III.   PANDORA HAS EXPRESS LICENSES TO USE PLAINTIFFS' ROUTINES

Plaintiffs' infringement claims are alternatively defeated by Pandora's express contractual rights to use the Routines as detailed in the agreements between the Plaintiffs and their record labels and the agreements between those record labels or their distributors and Pandora.

Interpretation of these "licenses [is] governed by ordinary principles of state contract law." *Dep't of Parks & Recreation v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1130 (9th Cir. 2006) (citation omitted). Contract interpretation turns on the "parties' objective intent, demonstrated by the contract words and the contract as a whole, rather than the parties' subjective intent[.]" *Yi v. Circle K Stores, Inc.*, 258 F. Supp. 3d 1075, 1083 (C.D. Cal. 2017). And "contracts 'are to be read on the assumption that … the usages of trade were taken for granted when the document was phrased.'" *Hollywood Foreign Press Ass'n v. Red Zone Cap. Partners II*, 870 F. Supp. 2d 881, 923 (C.D. Cal. 2012) (citation omitted).

It is clear that the rights to the Routines were secured from the Plaintiffs by their record labels, and those rights were then passed along to Pandora—any other result would frustrate the very purpose of these agreements. A court in this district reached ***exactly this conclusion*** in the only other case to evaluate the alleged infringement of a comedy routine when the recording embodying that routine was streamed. In *Marvez*, the court found that the agreement's "plain language," even though it did not specifically mention rights to the underlying routine, must have also provided the rights to those routines because, without such rights, the agreement's purpose would be rendered "impossible." 2022 WL 18284896, at *2. The same holds true here.

*First*, Plaintiffs' agreements with their record labels granted those companies all rights necessary to commercially exploit the resulting recordings, including the right to license the recordings and any Routines embodied therein to downstream

16

users like Pandora. ¶¶ 452-914. Some of the comedian/label agreements at issue

███████████████████████████. *E.g.,*

¶¶ 477, 497-499. The others have ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████. *E.g.*, ¶¶ 529-532, 557-559, 680;

*Marvez*, 2022 WL 18284896, at *2; *see also Murphy v. Warner Bros. Pictures*, 112

F.2d 746, 748-49 (9th Cir. 1940) ("The plaintiffs cannot escape the obvious

conclusion that a talking motion picture is a motion picture and that each of the three

subdivisions of these rights, alleged in the complaint, (pictures, sounds and dialogue)

are included in the general right to produce a 'motion picture,'" because "[t]he sum

of these rights constitutes the 'entire' motion picture right.").[5] Plaintiff Black

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ ¶ 358.

*Second*, the same rights Plaintiffs conveyed to their labels were passed along

to Pandora—either through Pandora's agreements with the major record labels or

though Pandora's agreements with distributors that license on behalf of many

independent labels. *See* ¶¶ 915-1165. In all cases, ███████████████████████

████████████████████████████████████████████████████████

█████████████████ ¶¶ 924, 966, 1003, 1019, 1036, 1068-1069, 1097, 1120, 1131,

1144, 1152, 1161; White Decl. ¶¶ 10-54.[6] Indeed, if the rights to the comedy routines

were withheld, the entire purpose of the agreements between the labels and the

---

[5] A handful of agreements ███████████████████████████████████████████
████████████████████████████. But even those outliers allow the label to provide
downstream licensees like Pandora all needed rights without a separate payment just
for the Routines. *See, e.g.*, ¶¶ 882-886, 903.
[6] Moreover, even those agreements that ████████████████████████████████
████████████████████████████████████████████████████████
██████.

comedians—to provide the comedian's recordings to entities like Pandora and share the resulting revenues with the comedian—would be frustrated. It simply makes no sense that the label would secure the necessary rights from the comedian, only to, *sub silentio*, withhold those rights from Pandora. The label gains nothing by doing so and only stands to be harmed if, as a result, Pandora or other services stop streaming the recordings.

Moreover, "when there is a custom in a certain industry, those engaged in that industry are deemed to have contracted in reference to that practice unless the contrary appears." *Hollywood Foreign Press*, 870 F. Supp. 2d at 923 (citation omitted). Put simply, unless the contracting parties go out of their way to carve a new path, the prevailing industry custom binds those engaged in the business, and industry practice becomes a part of the contract. *Id.* (citation omitted).

Custom and practice points in only one direction: Plaintiffs' Routines are considered an intrinsic part of their recordings and are not licensed or paid for separately from the recording. ¶¶ 355-380, 423-451; Ex. 33 (Del Bene Report, § II). If the record label or distributor intended to depart from this longstanding practice— one that applies to broadcasters, comedy clubs and other venues, and streaming services—they would have said as much during negotiations, and the contracts ███████ ████████████████████████████████████████████████████████████ ████████.[7]

## IV.    PLAINTIFFS HAVE ENGAGED IN COPYRIGHT MISUSE AND HAVE UNCLEAN HANDS

Plaintiffs' infringement claims also fail because Plaintiffs have engaged in two forms of copyright misuse, "a judicially crafted affirmative defense to copyright infringement[.]" *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1157 (9th Cir. 2011).

---

[7] This longstanding practice, including as it relates to Pandora, has been confirmed in writing by comedians, record labels, and distributors alike. ¶¶ 988-991, 1100-1102, 1167-1178.

The misuse defense prevents "holders of copyrights 'from leveraging their limited monopoly to allow them control of areas outside the monopoly[,]'" *id.*, or otherwise violate the public policies underlying the Copyright Act. *Prac. Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 520-21 (9th Cir. 1997), *amended*, 133 F.3d 1140 (9th Cir. 1998). "When copyright misuse applies, we do not allow enforcement of the copyright for the period of misuse." *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1090 (9th Cir. 2005). In the Ninth Circuit, misuse is also an "unclean hands defense." *Id.*

### A.    Misuse Through Collective Licensing

Spurred on by the Collectives, Plaintiffs sought to license their Routines to Pandora collectively with those of many other comedians. They did so to give themselves, as Word Collections put it, a "collective weight and 'stick' [that] is much larger" than that of any individual comedian. ¶ 1220; Ex. 34 (Jaffe Report, § VIII). In other words, by collectively licensing, Plaintiffs secured for themselves "an economic advantage and economic control beyond that granted to each of them by the copyright laws." *M. Witmark & Sons v. Jensen*, 80 F. Supp. 843, 846 (D. Minn. 1948).

*M. Witmark* is on all-fours: there, plaintiff composers brought infringement claims against certain movie theaters alleging that those theaters failed to obtain the public performance licenses necessary to exhibit motion pictures containing their copyrighted music. *Id.* at 844. Each composer was a member of ASCAP—a collective licensing entity for musical works that the Collectives here seek to replicate for comedy. ¶¶ 1179, 1188-1189, 1235, 1240. In response, defendants raised the same copyright misuse defense that Pandora raises here—that, "[b]y placing the control of performance rights for motion pictures in a [collective] maintained by them, [plaintiffs] have obtained a potential economic advantage which far exceeds that enjoyed by one copyright owner." *Id.* at 847. That expansion of economic power, the court concluded at the merits stage, amounts to copyright misuse. *Id.* at 850;

*Wixen Music Publ'g, Inc. v. Triller, Inc.*, 2022 WL 3636000, at **1-2 (C.D. Cal. Aug. 1, 2022) (allegations of aggregation and blanket licensing of copyrights held by individual authors is conduct inconsistent with Copyright Act sufficient to support a misuse defense).

To prevail on its misuse defense, Pandora "need not prove an antitrust violation[.]" *Prac. Mgmt. Info. Corp.*, 121 F.3d at 521; *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 978 (4th Cir. 1990). A copyright is a limited monopoly that bestows no rights beyond the given work. *Id.* at 976. The "test" is "not whether the use is anti-competitive," but rather, whether it "violates the public policy embodied in the grant of a copyright[.]" *In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 2d 1087, 1103 (N.D. Cal. 2002).

Eight of the nine Plaintiffs have done just that. As Pandora's economic expert explained, by collectively licensing through Word Collections (seven Plaintiffs) and Spoken Giants (Plaintiff Black, for much of the relevant time period), Plaintiffs have secured for themselves bargaining power far beyond what the Copyright Act confers on any one of them alone. *See* Factual Background § III.F. That *collective* assertion of rights is deeply harmful economically and has no valid economic justification. Ex. 34 (Jaffe Report, § VIII). As even Plaintiffs' damages expert acknowledges, ███ ████████████████████████████████████████████████ ████████████ ¶¶ 1286-1287.

This is hardly "███████████," as Plaintiffs' expert blithely puts it (*see id.*), but rather, it amounts to the elimination of competition necessary for a market to function properly, creating excessive and unearned market power. Ex. 34 (Jaffe Report, § VIII). If one Plaintiff demanded an excessive royalty in a competitive market, Pandora could simply look elsewhere for comedy content. Not so, however, when, as here, the Plaintiffs only license through the Collectives, which each control combined sets of rights that represent a large enough share of all comedy streamed on Pandora—collectively accounting for 49% of total comedy streams prior to the

20

takedowns—to exercise pricing power not possessed by any individual Plaintiff. *See* ¶¶ 1180-1186, 1218-1220, 1232-1249; Ex. 34 (Jaffe Report, § VIII). In short, through collective licensing, Plaintiffs have secured "an economic advantage and economic control beyond that granted to each of them by the copyright laws." Under *M. Witmark* and *Wixen*, that is quintessential copyright misuse.

## B.    Misuse Through Fraudulent Registrations

The misuse defense also forecloses the infringement claims of Plaintiffs Carlin, Williams, Clay, Engvall (Yellow Rose), and White, because these Plaintiffs fraudulently registered certain of their Routines as musical works with PROs and/or the Mechanical Licensing Collective ("MLC"), which license music and not spoken-word comedy, all in an effort to secure royalties to which they are not entitled. *See* ¶¶ 1288-1341. The misuse defense forbids copyright holders from leveraging their copyrights to secure royalties to which they are not entitled. *Prac. Mgmt. Info. Corp.*, 121 F.3d at 520-21.

In addition to violating these licensing entities' rules and membership agreements, these Plaintiffs were steering royalties that had been earmarked for songwriters and music publishers to themselves. ¶¶ 1288-1341. And, when Pandora pays money into the royalty pools that are administered by these entities, it does so understanding that its royalties will flow exclusively to songwriters and music publishers. ¶ 1300.

The evidence adduced during discovery conclusively shows that,



. ¶¶ 1301-1313.

*Id.*



. *Id.*

. *Id.*

Plaintiff White

. ¶¶ 1317-1322.

. *Id.*

Plaintiffs Engvall and Clay each engaged in similar duplicitous schemes

. ¶¶ 1323-1330. Moreover, in his interrogatory responses, Mr. Engvall stated that "none of the [Routines] are musical works and Plaintiff does not believe that it ever authorized the [Routines] to be registered with the music society PRO." Discovery has now proven that sworn statement to be false. *Id.* As for Clay,

. ¶¶ 1331-1341.

By fraudulently extending their limited monopoly and obtaining royalty payments to which they were not entitled—including monies paid by Pandora—these Plaintiffs engaged in misuse. For the same reasons, they also have unclean hands. *Altera*, 424 F.3d at 1090.

## V.    PLAINTIFFS' COPYRIGHT CLAIMS SUFFER FROM OTHER FATAL DEFICIENCIES

### A.    Certain Plaintiffs Have Failed To Prove Copyright Ownership

A copyright infringement plaintiff bears the burden of proving copyright ownership, and only the "legal or beneficial owner of an exclusive right under a

22

copyright" has standing to bring suit for infringement of that right. 17 U.S.C. §501(b); *Fleisher Studios, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958, 962 (9th Cir. 2011) ("To prove copyright infringement, the plaintiff must show … ownership of the copyright." (citation omitted)). To satisfy its burden, a copyright plaintiff must, among other things, "establish[] a chain of title if the author identified on the copyright registration is not the entity exploiting the rights." *Zahedi v. Miramax, LLC*, 2022 WL 4596551, at *5 (C.D. Cal. Aug. 19, 2022) (Scarsi, J.); *see also Fleischer Studios*, 654 F.3d at 963. "[E]stablishing a qualifying ownership interest" is both a "substantive element of the infringement claim" and "a necessary predicate for standing to bring the claim[.]" *DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC*, 870 F.3d 978, 986 (9th Cir. 2017).

Copyright ownership can be transferred through "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright[.]" 17 U.S.C. § 101. But that kind of transfer, other than by operation of law, must be made in writing and "signed by the owner of the rights conveyed" or an authorized agent; otherwise it is "not valid." 17 U.S.C. § 204(a). And an assignee of a registered copyright "bears the burden of proving its chain of title because nothing in the registration certificate itself establishes its right to claim through the original copyright claimant." *Lumiere (Rts.) Ltd. v. Baker & Taylor, Inc.*, 1997 WL 303244, *2 (9th Cir. 1997).

Here, six Plaintiffs have failed to meet their burden of proving copyright ownership for 238 of their Routines, because they have not provided a chain-of-title connecting them to the owner listed on the certificate of registration (or even the printout from the copyright office website). Specifically, the following Plaintiffs have failed to produce documentation showing a transfer of ownership to themselves from the registered copyright owner for Routines in the following albums:

- **Black:** *The White Album* was registered by -ismist Recordings—*not* Plaintiff Black or Stark Raving Black Productions, Inc. ¶¶ 1345-1347.

23

- **Engvall:** *Now That's Awesome* and *Dorkfish* were registered to Bill Engvall dba Twin Spurs Publishing. ¶¶ 1351-1352. *Cheap Drunk: An Autobiography* was registered to Bill Engvall. ¶ 1353. And *Here's Your Sign* was registered to Twin Spurs Publishing. ¶ 1354. None of these albums were registered to Plaintiff Yellow Rose Productions, and no chain-of-title has been shown connecting the copyright owner to the Plaintiff. ¶¶ 1355-1357. *See Kevin Chelko Photography, Inc. v. JF Rests., LLC*, 2017 WL 240087, **1-3 (W.D.N.C. Jan. 19, 2017) (granting summary judgment to defendant because a corporate entity owned by an individual lacked standing to sue where the individual owned the copyrights); *Wallert v. Atlan*, 141 F. Supp. 3d 258, 266-67 (S.D.N.Y. 2015) (sole individual company owner lacked standing to sue over copyrights owned by company).

- **Carlin:** The Routines on the albums *Class Clown*, *Classic Gold*, *The George Carlin Collection*, *George Carlin on Comedy*, *An Evening with Wally Londo*, *Toledo Window Box*, *You Are All Diseased*, and *On the Road* were all registered to Dead Sea Music, Inc., *not* Plaintiff Main Sequence, Ltd. Nor has chain-of-title been shown beyond the vague testimony that a witness believed that Dead Sea Music was "folded into" Main Sequence, without any supporting documentation. *See* ¶¶ 1359-1364. But "belief alone does not establish" a transfer. *Studio S Imps., LLC v. Deutsch Imps., LLC*, 2021 WL 3598571, *3 (C.D. Cal. June 21, 2021); *Marya v. Warner/Chappell Music, Inc.*, 131 F. Supp. 3d 975, 1001 (C.D. Cal. 2015). Nor is there any evidence that Main Sequence owns *The News*, the sole Routine from the album *Sofa-Comedy Clips*; Carlin performed that Routine on *The Ed Sullivan Show*, and thus Main Sequence "had no ownership in it." *See* ¶¶ 1365-1369.

- **White:** *Drunk in Public* was transferred from Ron White to Plastered Publishing, LLC but *not* to Plaintiff Ron White, Inc. ¶¶ 1373-1374. *The Blue Collar Comedy Tour Live* was registered to Ron White dba Tater Salad

24

Productions—and *not* to Ron White, Inc. ¶¶ 1378-1379. Similarly, the album *A Little Unprofessional* was registered to Plastered Publishing, LLC and *not* to Ron White, Inc. ¶¶ 1375-1377.

- **Clay:** All albums were registered to Fleebin Dabble Publishing—and *not* to Plaintiff Brave Lion, Inc. ¶¶1383-1388.[8]

- **Williams:** The album *Reality...What a Concept* is registered to Little Andrew Publications, Inc.—*not* to Plaintiff Robin Williams Trust. ¶ 1393. The album *An Evening at the Met* was registered to Mr. Happy Productions, Inc. and later transferred to Blue Wolf Productions but *not* to Robin Williams Trust. ¶¶ 1392, 1395.[9]

Pandora is accordingly entitled to summary judgment under 17 U.S.C. §501(b) for these Routines. *See Studio S Imports,* 2021 WL 3598571 at *3 (granting summary judgment to defendant where plaintiff "presented no evidence that it acquired an exclusive ownership right in the Copyrights" through a written transfer or assignment).

### B.    Plaintiffs Have Failed To Demonstrate They Have Valid Registrations For The Routines

For 362 Routines, Plaintiffs do not have admissible evidence demonstrating valid copyright registrations. In many cases, Plaintiffs have only produced printouts of searches of the Copyright Office's online records, which are insufficient. ¶¶ 1399-1424. *Compass Homes, Inc. v. Heritage Custom Homes, LLC*, 2015 WL 4639654, **2-3 (S.D. Ohio Aug. 3, 2015). Although courts may rely on such printouts at the

---

[8] Although Fleebin Dabble Productions, Inc. was amended to Plaintiff Brave Lion, Inc., Plaintiffs have not shown that Fleebin Dabble *Publishing* and Fleebin Dabble *Productions* are the same entity. ¶¶ 1383-1388.

[9] Plaintiffs cannot create a material fact in dispute by pointing to an "Assignment of Property" from Williams to Plaintiff Robin Williams Trust, because they have not shown a chain-of-title from either Little Andrew or Blue Wolf to Williams. ¶¶ 1389-1398. Williams thus could not "assign" this material to Robin Williams Trust.

pleading stage, not so at summary judgment, as they are inadmissible, unauthenticated, fail to satisfy the "best evidence" rule, and are hearsay. FRCP 56(e); FRE 803(6), 901, 1002; *Latin Am. Music Co. v. Media Power Grp.*, 2010 WL 6420575, \*6, 9 (D.P.R. Sep. 10, 2010), *aff'd*, 705 F.3d 34, 44 (1st Cir. 2013) (dismissing copyright infringement claim and rejecting evidentiary submission of unauthenticated printouts); *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550-51 (9th Cir. 1989) ("unauthenticated documents cannot be considered on a motion for summary judgment"). One of the Copyright Office search portals Plaintiffs used to generate their printouts—the Virtual Card Catalog—warns users that any "results should not be relied on for legal matters."[10] This disclaimer makes sense, as printouts from online search portals can be demonstrably inaccurate. For example, whereas the printout produced by Plaintiffs lists Plaintiff Black as the "Copyright Claimant" for *The White Album*, the official certified registration for *The White Album* (produced by Pandora, *not* Plaintiffs) lists non-Plaintiff "ismist Recordings" as the "Copyright Claimant." ¶¶ 1413-1415.[11] Without admissible evidence of ownership, Plaintiffs' infringement claims fail.

### C. Two Plaintiffs Do Not Have Registered Copyrights Covering Certain Routines

Plaintiffs Black and Di Paolo did not register copyrights in 182 Routines across nine albums. For five albums, they have a copyright in the sound recording only. That is fatal, as "[t]he copyright in a sound recording covers the recording itself. It does not cover the music, lyrics, ***words***, or other underlying content embodied in that recording." U.S. Copyright Office, *Circular 56 Copyright Registration for Sound*

---

[10] *See* https://www.copyright.gov/vcc/.

[11] Pandora—and not Plaintiffs—produced an actual copyright registration for *The White Album* to show that (i) Plaintiffs' printout is demonstrably incorrect and (ii) Black has not shown a chain-of-title from the owner listed on the valid certificate. Plaintiffs' sole evidence, though, is still the printout, which is insufficient.

*Recordings*, https://www.copyright.gov/circs/circ56.pdf (emphasis added); *Richardson v. Kharbouch*, 2024 WL 50374, at *8 (N.D. Ill. Jan. 4, 2024) (same).

Plaintiff Black has Sound Recording ("SR") registrations for *The White Album* and *This Should Have Been a Special* that expressly register only the "sound recording." ¶¶ 1429-1430. And Plaintiff Di Paolo has SR registrations for *Born This Way*, *Road Rage*, and *Funny How?* that likewise do not include the underlying Routines.[12] ¶¶ 1425-1427. While one SR application may be used where the same claimant owns the copyright in both a sound recording and the underlying recorded material, an express claim to the underlying material must be separately included. *See* 6 Lindey on Entertainment, Publ. & the Arts §21:20 (3d ed.); U.S. Copyright Office, *Compendium: Chapter 803.8(B)*, *Joint Authorship*, https://www.copyright.gov/comp3/chap800/ch800-performing-arts.pdf.

Plaintiff Black also has Performing Arts ("PA") registrations for three albums—*Old Yeller - Live at the Borgata*, *Black to the Future*, and *Thanks for Risking Your Life*—that expressly exclude the underlying written material (*i.e.*, the "script/screenplay"). ¶¶ 1431-1443. As does Plaintiff Di Paolo for *Raw Nerve.* ¶ 1428. These PA registrations accordingly do not cover the Routines at issue, as Plaintiff Black's corporate representative acknowledged during his deposition. ¶¶ 1431-1443.

## VI. PLAINTIFFS' REQUESTED STATUTORY DAMAGES ARE EITHER UNAVAILABLE OR DRAMATICALLY OVERSTATED

Plaintiffs' request for the maximum willful statutory damages fails for two overarching reasons. *First*, many of the albums are ineligible for statutory damages because Plaintiffs failed to timely register their copyrights. *Second*, any purported infringement was not willful and was at most innocent.

---

[12] Pandora is also entitled to summary judgment on three other Di Paolo Routines (*Old People, Doggy Hotel*, and *Hair in Food*) because they were not streamed on Pandora during the relevant period. Singletary Decl. ¶ 36.

## A.    Many Albums Are Ineligible For Statutory Damages

Prompt registration is a prerequisite to statutory damages and attorneys' fees. Section 412 mandates that "no award of statutory damages or of attorney's fees … shall be made" for "any infringement of copyright in an unpublished work commenced before the effective date of its registration" (17 U.S.C. § 412(1)) or, for published works, "any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work." (17 U.S.C. § 412(2)). Section 412 "leaves no room for discretion[.]" *Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 699 (9th Cir. 2008). In the Ninth Circuit, "*the first act of infringement* in a series of ongoing infringements of the same kind marks the commencement of one continuing infringement under § 412" and therefore precludes an award of statutory damages for both pre-registration *and post-registration* uses. *Id.* at 701.

Here, 19 of the 52 albums at issue (covering 412 out of 854 Routines) were not registered before Pandora ingested them into its service—*i.e.*, the first act of purported infringement—or, for published works, within three months after they were first published. ¶¶ 1444-1538. Black's album *Thanks for Risking Your Life*, for example, was registered as an unpublished work on August 26, 2020 but was first ingested by Pandora three days prior, on August 23, 2020. ¶¶ 1529-1531.

Statutory damages are also unavailable for 14 of Hicks' 16 claimed albums, which were all registered *after* they were ingested by Pandora. ¶¶ 1459-1528. So too for: (i) Di Paolo's albums *Raw Nerve* (¶¶ 1449-1453) and *A Breath of Fresh Air* (¶¶ 1454-1458); (ii) White's album *A Little Unprofessional* (¶¶ 1444-1448); and (iii) Lopez's album *Right Now Right Now* (¶¶ 1534-1538).

**B.** **Any Purported Infringement Was Not Willful And Was At Most Innocent**

Plaintiffs have the burden of proving willfulness. *See Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1186 (9th Cir. 2016). They must show: "(1) that [Pandora] was actually aware of the infringing activity, or (2) that [Pandora's] actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights." *Wash. Shoe Co. v. A—Z Sporting Goods Inc.*, 704 F.3d 668, 674 (9th Cir. 2012) (citation omitted). Plaintiffs cannot meet that burden, as no reasonable fact-finder could determine that Pandora had such awareness or acted recklessly. *See Taylor Holland LLC v. MVMT Watches, Inc.*, 2016 WL 6892097, at *14 (C.D. Cal. Aug. 11, 2016); *Hargis v. Pacifica Senior Living Mgmt. LLC*, 2023 WL 6373869, at **3-6 (C.D. Cal. Aug. 2, 2023) (Scarsi, J.) (granting summary judgment to defendant on lack of willfulness for use of certain allegedly infringing photographs).

A reasonable belief that the user possesses a license precludes willfulness. *Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221, 1228 (9th Cir. 2012). Indeed, "[c]ontinued use of a work even after one has been notified of his or her alleged infringement does not constitute willfulness so long as one believes reasonably, and in good faith, that he or she is not infringing." *Id.*

As shown above, Pandora reasonably believed that it had a license to use the Routines. Among other things:

- For years, Plaintiffs were aware that Pandora was streaming their Routines and accepted royalties from Pandora without objection. ¶¶ 1542-1547.

- Like every other streaming service, Pandora made the recordings available under the reasonable belief that it had licensed the Routines at the source, the same model that applies to all other copyright-intensive industries besides the music industry. ¶¶ 1548-1551.

- Pandora has express policies against infringing activity that encourage rightsholders to notify Pandora if they believe their "work has been reproduced

29

on [Pandora] in a way that constitutes copyright infringement." ¶¶ 1596-1599. No Plaintiff did so, and several encouraged Pandora to use their material more. ¶¶ 23-41, 355-380, 391-398, 1546.

- When confronted with these infringement claims, Pandora promptly investigated and attempted to take down the material of the Collectives' affiliates—only for both Collectives to encourage Pandora to **leave the material up**. ¶¶ 1552-1595.

- Pandora's licensing practices are consistent with those of **every other** audio and audiovisual streaming service, television and radio station, and comedy club and other venue. ¶¶ 423-451, 1548.

Plaintiffs cannot dispute any of the above. What they instead argue is that Pandora's SEC filings establish willfulness. Plaintiffs have it backwards. As Plaintiffs' own damages witness agreed, Pandora's 10-Ks *accurately* observed that "underlying literary works are not currently entitled to eligibility for licensing by any performing rights organization in the United States." ¶ 1541. Further, Pandora went on to transparently explain in its disclosures that, "pursuant to industrywide custom and practice," Pandora makes comedy available "absent a specific license from any such performing rights organization or individual rights owners" and instead relies on its payments for the applicable sound recording licenses to cover the rights to the underlying material. ¶¶ 341-354, 1540. That disclosure is perfectly in line with industry custom and practice as, prior to the rise of the Collectives, no performing rights organizations for literary works existed and no comedian had ever licensed separately or collected a separate royalty from any streaming service or broadcaster for the underlying jokes embodied in comedy recordings. ¶¶ 423-451, 1548-1549.

Far from showing willfulness, Pandora's filings responsibly disclosed the risk that someone might later come along and try to change or otherwise challenge these practices. That is precisely what SEC risk factors are for—to alert investors to

potential risks that might be faced by the company in the future. Identifying such risks is not a concession they have any merit; far from an admission, companies routinely disclose pending and potential future litigation that they ultimately successfully defend against. *See Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir, 2015) ("Risk disclosures … are inherently *prospective* in nature"); *In re Foundry Networks, Inc.*, 2002 WL 32354617, at *7 (N.D. Cal. 2002) ("Plaintiffs … cannot state a claim based on the disclosure of risk factors," as they are speculative and uncertain); Ex. 36 (Kothari Report, §§ V-VI).[13]

Nor are Pandora's pre-litigation efforts to evaluate and respond to Word Collections' threats admissions that those threats have merit. Companies consider reasonable options for avoiding litigation all the time. *Cf. Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585 n.18 (1994) (recognizing that an offer to obtain a license "may simply have been made in a good-faith effort to avoid this litigation").

If anything, Pandora's investigation and subsequent take-down of the disputed Routines further point *against* willfulness. As this Court has explained, "a defendant in a copyright action is entitled to a reasonable period of time to investigate the legitimacy of infringement claims before an inference of willfulness arises," and "a good faith effort to resolve the issue in a reasonable time" can be "probative of a defendant's lack of willful infringement[.]" *Hargis*, 2023 WL 6373869, at *6.

The undisputed evidence demonstrates that any purported infringement was, at most, innocent. "In contrast" to willfulness, "innocent infringement occurs where the infringer was 'not aware and had no reason to believe that his or her acts constituted an infringement of copyright.'" *United Fabrics Int'l, Inc. v. G-III Apparel Grp., Ltd.*, 2013 WL 7853485, at *5 (C.D. Cal. Dec. 27, 2013) (citation omitted); *Adams v. Agrusa*, 2016 WL 7665410, at *2 (C.D. Cal. July 19, 2016) (granting

---

[13] For example, Pandora also disclosed in its SEC filings the possibility that copyright owners could allege that Pandora's use of pre-1972 sound recordings violated state laws. That case did materialize, and Pandora prevailed on summary judgment.

31

1    summary judgment to Defendant on the issue of innocent infringement), *aff'd*, 693

2    F. App'x 563 (9th Cir. 2017). Here, Pandora justifiably relied on Plaintiffs' years of

3    knowledge and encouragement of Pandora's use of the Routines without objection

4    and the longstanding and unchallenged practice of licensing spoken-word comedy at

5    the source. Accordingly, if any infringement were found despite all of the above,

6    Pandora is entitled to a ruling at summary judgment that any infringement was not

7    willful and was, in fact, innocent.

8                                 ## CONCLUSION

9         For the reasons set forth above, Pandora respectfully requests that the Court

10    grant summary judgment to Pandora on Plaintiffs' infringement claims.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2  Dated: August 21, 2024

3

4

MAYER BROWN LLP
PAUL M. FAKLER (*pro hac vice*)
JACOB B. EBIN (*pro hac vice*)
ALLISON AVIKI (*pro hac vice*)
DAVID YOLKUT (*pro hac vice*)
pfakler@mayerbrown.com
jebin@mayerbrown.com
aaviki@mayerbrown.com
dyolkut@mayerbrown.com
1221 Avenue of the Americas
New York, NY 10020-1001
Telephone: (212) 506-2500
Facsimile: (212) 262-1910

By: */s/ Paul M. Fakler*
_____
      Paul M. Fakler

MAYER BROWN LLP
JOHN NADOLENCO (SBN 181128)
DOUGLAS A. SMITH (SBN 290598)
MAX W. HIRSCH (SBN 301872)
MICHAEL A. CALVANICO (SBN 344792)
jnadolenco@mayerbrown.com
dougsmith@mayerbrown.com
mhirsch@mayerbrown.com
mcalvanico@mayerbrown.com
333 S. Grand Avenue, 47th Floor
Los Angeles, California 90071-1503
Telephone: (213) 229-9500
Facsimile: (213) 625-0248

Attorneys for Defendant
PANDORA MEDIA, LLC

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **FILER'S ATTESTATION**

The undersigned, counsel of record for Defendant Pandora Media, LLC, certifies that this brief contains 9,996 words, which complies with the word limit set forth in the Court's Order Granting In Part Joint Stipulation Regarding Summary Judgment Briefing And Case Schedule (ECF No. 328).

Dated: August 21, 2024                By: */s/ Paul M. Fakler*
                                              Paul M. Fakler