1  KING & BALLOW
2  Richard S. Busch (SBN 319881)
   *rbusch@kingballow.com*
3  2121 Avenue of the Stars, Suite 800
   Los Angeles, CA 90067
4  Telephone: (424) 253-1255
5  Facsimile: (888) 688-0482
6  *Attorney for Plaintiffs*

7

8              **UNITED STATES DISTRICT COURT**

9     **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

10

11

12  In re PANDORA MEDIA, LLC          Master File No. 2:22-cv-00809-MCS-MAR
    COPYRIGHT LITIGATION
13
                                     CONSOLIDATED ACTION
14  ─────────────────────────
    This Document Relates To:        **REDACTED MEMORANDUM OF**
15                                   **POINTS AND AUTHORITIES IN**
16  ALL ACTIONS                      **SUPPORT OF PLAINTIFFS' MOTION**
                                     **FOR PARTIAL SUMMARY JUDGMENT**
17
18                                   *Filed Concurrently with Plaintiffs' Motion for*
                                     *Partial Summary Judgment*
19
20                                   Hon. Mark C. Scarsi
21
22                                   Date:          October 28, 2024
                                     Time:            9:00 a.m.
23                                   Courtroom:   7C
                                     Pretrial Conference: January 27, 2025
24                                   Trial Date:     February 11, 2025
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

Table of Authorities .......................................................................................... iii

I.  Introduction .................................................................................................1

II. Summary of Uncontroverted Material Facts ...............................................1

III. Legal Standard ............................................................................................6

IV. Argument .....................................................................................................7

   A.  Pandora Infringed on Plaintiffs' Works by Streaming Them Without a License. ................................................................................................7

      **1.**  Comedy Routines are Copyrightable Literary Works ...................7

      **2.**  Plaintiffs Own Valid Copyrights For The Works...........................8

      **3.**  Licenses Needed to Stream Literary Works Embodied in Sound Recordings on Non-Interactive & Interactive Services. ...............10

      **4.**  Pandora Publicly Performed and Reproduced the Works Without the Requisite License During the Three Years Before the Filing of This Action. ...................................................................................11

      **5.**  Each Unauthorized Stream Is a Separate Act of Infringement.....11

   B.  Pandora Willfully Infringed the Copyrights in Plaintiffs' Literary Works...12

      **1.**  Pandora Knew it was Publicly Performing Plaintiffs' Works Without a License When it Began Streaming...............................13

      **2.**  Pandora's Agreements for the Sound Recordings Require Pandora itself to Acquire Third-Party Rights...........................................13

   C.  Plaintiffs' Claim for Statutory Damages Must Be Determined on a *Track-by-Track* Basis ...............................................................................................19

   D.  None of Pandora's Affirmative Defenses Obviate its Liability for its Infringing Uses of the Works .......................................................................21

i

1     **1.**    There is no implied license for Pandora to exploit the Works......21

2     **2.**    Plaintiffs Neither Misused Their Copyrights Nor Engaged In

3            Unclean Hands ................................................................................24

4          a.  Copyright Misuse, Generally .....................................................25

5

6          b.  Plaintiffs Did not Misuse Their Copyrights ...............................25

7              i.   No Coercive or Restrictive Licensing – Pandora Refused to

8                 License .................................................................................25

9              ii.  "Registering" with the MLC is not Misuse .........................26

10          c.  Unclean Hands ............................................................................27

11    **3.**    Plaintiffs Did Not Waive or Abandon Their Copyrights ..............28

12    **4.**    Pandora's "Defense" of Laches Is Not Applicable to Plaintiffs'

13            Claims of Copyright Infringement................................................29

14    **5.**    Plaintiffs are Not Estopped from Asserting Their Copyright

15            Infringement Claims Against Pandora...........................................29

16    **6.**    Pandora's For-Profit Exploitation of the Works is Not Fair Use..30

17

18    **7.**    Pandora's Streaming of the Entirety of Each Asserted Work does

19            not Constitute De Minimis Copying..............................................31

20  V.     Conclusion.................................................................................................31

21

22

23

24

25

26

27

28

REDACTED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Case No. 2:22-cv-00809-MCS-MAR

## TABLE OF AUTHORITIES

**Supreme Court of the United States**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...............................................6

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991)................................7

*Petrella v. MGM*, 572 U.S. 663 (2014) ...............................................................11, 29

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 595 U.S. 178 (2022)..................10

**Cases**

*A&M Records v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) ............. 25, 29, 30, 31

*Abkco Music, Inc. v. Sagan*, 50 F.4th 309 (2d Cir. 2022) .........................................30

*Apple Inc. v. Psystar Corp.*, 658 F.3d 1150 (9th Cir. 2011)....................................25

*Asset Mktg. Sys. v. Gagnon*, 542 F.3d 748 (9th Cir. 2008) .....................................23

*Atl. Recording Corp. v. Chan*, 94 F. App'x 531 (9th Cir. 2004)..............................12

*Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065 (9th Cir. 2021) ................... 7, 31

*Columbia Pictures Indus. v. Galindo*, No. 2:20-cv-03129-SVW-GJS,
    2020 U.S. Dist. LEXIS 105556, at *5 (C.D. Cal. May 11, 2020) ......................11

*Disalle v. LeNsi*, No. 2:22-cv-02152-SSS-PVCx,
    2024 U.S. Dist. LEXIS 117161 (C.D. Cal. May 7, 2024) ..................................30

*Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983 (9th Cir. 2009)................28

*Dun & Bradstreet Software Servs. v. Grace Consulting, Inc.*,
    307 F.3d 197 (3d Cir. 2002) ...............................................................................7

*Effects Assocs. v. Cohen*, 908 F.2d 555 (9th Cir. 1990) ..........................................23

*Elohim EPF USA, Inc. v. Total Music Connection, Inc.*, No. CV 14-02496-BRO (Ex),
    2015 U.S. Dist. LEXIS 194281 (C.D. Cal. Oct. 1, 2015)....................................9

*F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958 (9th Cir. 2010) ........... 7, 17

*Greenwich Film Prods., S.A. v. DRG Records, Inc.*,
    833 F. Supp. 248 (S.D.N.Y. 1993) .......................................................................9

*Greg Young Publ'g, Inc. v. Zazzle, Inc.*, No. 2:16-CV-04587-SVW-KS, 2017 U.S.
    Dist. LEXIS 100268 (C.D. Cal. May 1, 2017) ...................................................10

iii

*Howard v. Pearl,* 859 F. App'x 756 (9th Cir. 2021) ...................................................11

*ITOFCA, Inc. v. MegaTrans Logistics, Inc.,*

    322 F.3d 928 (7th Cir. 2003) (Ripple, J., concurring)...........................................24

*Japan Telecom, Inc. v. Japan Telecom Am. Inc.,* 287 F.3d 866 (9th Cir. 2002).......28

*Kaseberg v. Conaco, LLC,* 260 F. Supp. 3d 1229 (S.D. Cal. 2017)..........................8

*L.A. News Serv. v. Tullo,* 973 F.2d 791 (9th Cir. 1992)............................................28

*Malibu Media, LLC v. Tsanko,*

    2013 U.S. Dist. LEXIS 169186 (D.N.J. Nov. 30, 2013)......................................10

*McGucken v. Pub. Ocean Ltd.,* 42 F.4th 1149 (9th Cir. 2022)..................................30

*Media Rights Techs., Inc. v. Microsoft Corp.,* 922 F.3d 1014 (9th Cir. 2019).........11

*Peer Int'l Corp. v. Pausa Records, Inc.,* 909 F.2d 1332 (9th Cir. 1990),

    *cert. denied,* 498 U.S. 1109 (1991) ....................................................................12

*Practice Mgmt. Info. Corp. v. AMA,* 121 F.3d 516 (9th Cir. 1997),

    *amended by* 133F.3d 1140 (9th Cir. 1998)..........................................................25

*Russell v. Walmart Inc.,* No. CV- 19-05495-MWF (JCx),

    2023 U.S. Dist. LEXIS 6974 (C.D. Cal. Jan. 12, 2023) .....................................19

*S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081 (9th Cir. 1989) .....................................9

*Softketeers, Inc. v. Regal W. Corp.,* No. 8:19-CV-00519-JWH (JDEx),

    2022 U.S. Dist. LEXIS 232122 (C.D. Cal. Dec. 22, 2022)..................................25

*Survivor Prods. LLC v. Fox Broad. Co.,* No. CV 01-3234 LGB (SHx),

    2001 U.S. Dist. LEXIS 25511 (C.D. Cal. June 11, 2001) ...................................28

*Thomas v. Gusto Records, Inc.,* 939 F.2d 395 (6th Cir. 1991) ..................................7

*VHT, Inc. v. Zillow Grp., Inc.,* 69 F.4th 983 (9th Cir. 2023) ...................... 19, 20, 21

*VHT, Inc. v. Zillow Grp., Inc.,* 918 F.3d 723 (9th Cir.),

    *cert denied* 140 S.Ct. 122 (2019) ................................................................. 19, 21

*Wash. Shoe Co. v. A-Z Sporting Goods Inc.,* 704 F.3d 668 (9th Cir. 2012).............12

*WB Music Corp. v. Stolz,* 814 Fed. Appx. 286 (9th Cir. 2020)................................11

REDACTED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

*Westhoff Vertriebsges MBH v. Berg*, No. 22-cv-0938-BAS-SBC,

 2023 U.S. Dist. LEXIS 157988 (S.D. Cal. Sep. 6, 2023) .................................. 24

**Statutes**

17 U.S.C. §101 .................................................................................................... 7

17 U.S.C. §102(a)(1) .......................................................................................... 7

17 U.S.C. §106(1) ......................................................................................... 10, 11

17 U.S.C. §106(4) .............................................................................................. 10

17 U.S.C. §107 .................................................................................................. 30

17 U.S.C. §114(j)(7) .......................................................................................... 10

17 U.S.C. §115(d)(3)(E) .................................................................................... 27

17 U.S.C. §115(e)(10) ........................................................................................ 11

17 U.S.C. §115(e)(13) ........................................................................................ 11

17 U.S.C. §410(c) ................................................................................................ 9

17 U.S.C. §411(b)(1) .......................................................................................... 10

**Regulations**

37 C.F.R. §202.3(b)(1)(iv) ................................................................................... 9

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................ 6

**Treatises Other Authorities**

1 NIMMER ON COPYRIGHT §2.13 .......................................................................... 8

2 NIMMER ON COPYRIGHT §13.03[A][1] ............................................................ 31

3 NIMMER ON COPYRIGHT §10.02[B][4] ............................................................ 24

3 NIMMER ON COPYRIGHT §13.09[B] .................................................................. 28

4 NIMMER ON COPYRIGHT §13.06 ...................................................................... 29

4 NIMMER ON COPYRIGHT §13.08[B][1] .............................................................. 7

U.S. COPYRIGHT OFFICE, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES

 (3d Ed. January, 2021) ................................................................................ 8, 9

## I.    Introduction

There are two elements to a claim of copyright infringement: (1) ownership of a valid copyright; and (2) violation of one of the exclusive rights of the copyright owner under §106 of the United States Copyright Act. Here, as discussed below, and set forth in Plaintiffs' Statement of Uncontroverted Material Facts ("SUMF"), Plaintiffs have established both. Plaintiffs have valid copyrights for each of their Literary Works (the "Works") (SUMF¶¶3-208;319-541;655-1099;1283-1419;1481-1713;1832-2531;2810-4423;5075-5409;5565-5753) and it is undisputed that, with only nine exceptions (SUMF¶¶6112), Pandora Media, LLC ("Pandora") publicly performed and distributed the Works on its non-interactive digital radio service (since 2011) and publicly performed, reproduced and distributed the Works on its interactive streaming service (established in March 2017) in the three years preceding the filing of this action. SUMF¶¶217-318;546-654;1110-1282;1428-1480;1717-1831;2541-2809;4427-5074;5428-5564;5759-5832. Yet, Pandora neither has a public performance license required for its digital radio and interactive service, nor the additional reproduction license required for its interactive service. Plaintiffs have thus set forth a prima facie case of copyright infringement. So, where does that leave Pandora? It leaves Pandora scrambling to create litigation-inspired defenses which it knew or should have known were meritless when filed in the hope that it could bury Plaintiffs in exorbitant litigation costs so that Plaintiffs would simply give up. It has not worked, and Plaintiffs are now entitled to summary judgment on liability, and willfulness, among other items discussed below.

## II.    Summary of Uncontroverted Material Facts

Plaintiffs' SUMF contains the uncontroverted material facts relevant to this motion and tracks the summary of those facts discussed below.

Word Collections ("WC") was formed in 2020 by Jeff Price. Among other activities, WC administers Works for comedians. SUMF¶5927. In July 2020, Mr. Price approached Pandora to request proof of license for the Works and to advise that, without

a license, Pandora was committing copyright infringement. SUMF¶¶5928,5930. Bob
Kohn, CEO of Laugh.com, Inc., which controls digital distribution rights in sound
recordings of George Carlin performances, subsequently did likewise. SUMF¶¶5938;
Kohn Decl. ¶12. Pandora's senior executives responded to Mr. Price by requesting a
proposed license, SUMF¶¶5939-5949, as well as the legal basis for the claims (which
was provided) (*id*.) and then engaging in eighteen months of communications with WC
in which Pandora stated, among other things, that the matter had moved from "legal to
licensing," and it was working on "commercial terms" for a license, but never once
stated that it had some sort of license, express or implied, or did not need one. *Id*;
SUMF¶5974; *see generally* Price Decl. This was all admitted by Pandora in its
depositions in this case. SUMF¶¶5925-5973. Yet, Pandora never provided the promised
license. So, after leading WC along for eighteen months, and with no end in sight,
Plaintiffs filed suit.[1]

Pandora then went scorched earth. Pandora first filed antitrust claims against
Plaintiffs, WC, and another entity, Spoken Giants ("SG"), which this Court dismissed,
twice. ECF 83, 164.

Furthermore, in its Answer to the Second Amended Consolidated Complaint,
Pandora asserted that the literary work license was supposedly newly created by
Plaintiffs, and that ***no comedian*** has ever licensed or been paid a royalty for their Works,
and so, under custom and practice, Pandora was neither required to, nor did it, obtain
such licenses to stream the Works. ECF71 (Answer) 1:12-13;2:11-13;13-3:6;5:12-
19;46:14-19 (Sixth Affirmative Defense). Pandora said the same thing at the first
hearing in this case. Ex.417, August 29, 2022, Hrng. Tr., 12:21-25;15:2-6. This is the
backbone of Pandora's implied license defense.

---

[1] WC put other streaming services on notice of infringement as well. Unlike Pandora,
many, including ███████ entered into agreements licensing and paying the required
royalties for streaming. ████████████████████████████████████████ SUMF¶¶6047-48.

Pandora admitted in discovery, however, that it **did not** conduct **any** investigation to determine whether this statement was true. SUMF¶¶5840-5849.[2] It also admittedly never claimed this in its eighteen months of pre-litigation communications. SUMF¶¶5922-5970; Price Decl. In fact, it is blatantly false. While alleged custom and practice cannot override the law, comedians have nonetheless historically licensed and been paid royalties for their Works dating back to the beginning of 20th century comedy. SUMF¶¶5970-6019; Leib Report 3-17; Libera Report B.1-7. Discovery has shown that virtually all of the Plaintiffs, and other legendary comedians such as Lenny Bruce, Rodney Dangerfield, Woody Allen, Richard Pryor, Adam Sandler, Bob Newhart, Gilda Radner, Sam Kinnison, Steven Wright, and many more[3] have contracts providing for the licensing and royalty payment for their Works separate and apart from sound recording royalties (*id.*, Kohn Decl. ¶¶16-18; Leib Report 5-8) while some comedians have literary work royalties built into a net receipts type contract where they receive a percentage of everything collected *see, e.g.* SUMF¶6047; Leib Rebuttal ¶239. Royalty statements showing the payments of mechanical royalties for Works have also been produced by Plaintiffs and third parties. SUMF¶¶6034-6040. Sandy Fox, a transactional attorney for Plaintiffs Ron White and Bill Engvall, as well as legendary comedian Jeff Foxworthy and others, explained that he regularly negotiates these provisions into

---

[2] Adam Parness was Head of Publisher Licensing and Relations at Pandora from 2016 to 2017, when Pandora began interactive streaming, and testified in this case via declaration that: "throughout my career I have been generally aware of Literary Work Rights, including those contained in sound recordings underlying comedy material, and the right of the author/owner of those literary works to license those rights and be paid royalties for their exploitation separate and apart from sound recording royalties[,]" but apparently nobody at Pandora cared to ask him. SUMF¶5861.

[3] These are just examples. In order to resolve objections to Plaintiffs' third-party subpoenas, Plaintiffs agreed that Warner and Sony need only produce comedian agreements where the comedian had received mechanical royalties for the preceding three and a half years, so the number of comedians with mechanical licensing and royalty provisions is much greater than those produced and in this record. Universal likewise only produced royalty statements for the preceding 3 years. Busch Decl. ¶¶2-5.

comedians' agreements. SUMF¶6034. Currently, companies such as Sunflower Entertainment, LLC (on behalf of comedy record label Comedy Dynamics, LLC), which has net receipts contracts (SUMF¶¶6035-6037), and Muserk on behalf of SG,[4] collect spoken word royalties for the owners of those Works. SUMF¶¶6038-6040.

Pandora alternatively contends it received an explicit "pass-through" license for the Works in the agreements it entered into with distributors and record labels for the sound recordings Pandora interactively streamed. *See*, *e.g.*, Answer at 6, 46. Pandora knows this defense is likewise untrue. The plain language of their agreements with Sony Music Entertainment ("Sony"), Universal Music Group ("Universal"), Warner Music Group ("Warner") and The Orchard[5] (the entities from which Pandora acquired rights to the sound recordings embodying the Works) make it clear not only that no underlying third-party copyrights or other rights are passed through, but also that Pandora must obtain those rights; and two of those contracts (███████████████), specifically identify "Literary Work" rights as third party rights that Pandora is obligated to obtain separately. SUMF¶¶5854-5926.[6] These agreements also provide that ***Pandora*** is responsible for paying all royalties to the owners of any and all third-party rights. *Id*.

---

[4] Jim King is the CEO of Spoken Giants, which is a sister-company to 800 Pound Gorilla. SUMF¶6041. Spoken Giants exploits Literary Works and pays a royalty to comedians for money collected for the exploitation of literary works. SUMF¶6042.

[5] Pandora admitted that it has distribution agreements only with those companies, plus TuneCore and DistroKid. SUMF¶¶5854.

[6] It has long been the case that record labels and distributors do not pass through any underlying compositional rights to streaming services, whether it be musical composition or otherwise, so Pandora must get those licenses separately. Rosenblatt Report ¶¶21-46. Pandora recognized this in a December 2015 email to music publishers after it acquired assets from Rdio, which enabled Pandora to ultimately launch its interactive service in 2017, wherein it stated that it would not exploit those musical compositions without appropriate licenses from them. SUMF¶¶5832. Pandora admits that it never claimed an implied license to interactively stream musical compositions because it had a sound recording license. SUMF¶5857. These same agreements licensed both musical sound recordings and spoken word sound recordings without any distinction between the two. SUMF¶¶5854-5926; Rosenblatt Report at ¶52.

1  There is no way Pandora could have believed it had a pass-through license for the
2  Works. *Id.*; Nimmer Report ¶¶40-55.

3       The SUMF sets forth in detail the chain of distribution of each of the Plaintiffs'
4  recordings separately that lead to Pandora. SUMF¶¶209-216;542-545;1100-1109;1420-
5  1427;1714-1716;2532-2540;4424-4426;5414-5427;5754-5758. As shown therein, the
6  Plaintiffs' recordings that embody the Works are distributed to Pandora either under
7  Pandora's contracts with the identified entity or under no agreement at all. *Id.*;
8  SUMF¶¶5854-5926. There is no agreement in the record that provides a pass-through
9  license to Pandora. Nimmer Report at ¶¶40-46.

10      Indeed, Pandora acknowledges that when there is a "pass through" of mechanical
11  rights *via* record label to digital providers, the licensor record label is responsible for
12  paying mechanical royalties—for example, for each permanent download.
13  SUMF¶¶5856; Rosenblatt Report ¶¶29-30. That many of the Plaintiffs have agreements
14  that provide for the payment of mechanical royalties, SUMF¶¶5991-6049, but did not
15  receive any mechanical royalties from their record labels for streams on Pandora, proves
16  that no mechanical rights to the Works were passed on to Pandora. Price Decl. ¶¶1-4
17  Also, none of the digital providers like ███████, claimed they had a pass-through
18  when entering into their licensing agreement with WC. Price Decl. ¶¶17.

19      Pandora's admissions in its annual 10-K filings for 2016 and 2017, after it entered
20  into these agreements, are fatal to Pandora: "***We are not able to obtain licenses for the***
21  ***underlying literary works for the sound recordings of spoken-word comedy content***
22  ***that we stream. Third parties could assert copyright claims against us as a result***."
23  SUMF¶5838. (emphasis in original).[7] Pandora previously claimed in 10-K filings from

24  _____

25  [7] Also, in 2022, after Plaintiffs filed suit, Pandora's parent company, SiriusXM, advised
26  independent distributors and comedians that their comedy recordings would remain up
   on Pandora or Sirius XM only if they agreed to accept zero royalties and confirmed
27  their supposed "prior agreement" that SiriusXM/Pandora had the right to stream literary
   works. SUMF¶¶5976-5990. Pandora acknowledges these comedians were upset about
28  losing sound recording royalties at this time. Jaffe Report at ¶21; SUMF¶¶5976-5990.

REDACTED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No. 2:22-cv-00809-MCS-MAR

2011-2015, before interactively streaming, and when it only thus needed a public performance license, that:

> pursuant to industry-wide custom and practice, [literary work] content is performed absent a specific license from any such performing rights organization **or individual rights owners**…There can be no assurance that…we will not…be subject to claims of copyright infringement.

(SUMF¶5840) (emphasis added).

It is also untrue that comedians have never been paid for the public performance of their Works before, or that there was a custom and practice of not doing so. Libera and Leib Reports at SUMF¶¶6050-6060.

Lastly, each individual Work is entitled to its own statutory damage award under the plain statutory language, and the test this Court and the Ninth Circuit have adopted. *Hargis v. Pacifica Senior Living Mgmt. Ltd. Liab. Co.*, 2023 U.S. Dist. LEXIS 181408, at *24 (C.D. Cal. Aug. 2, 2023) (Scarsi, J.). Several of the Plaintiffs testified how each Work is created separately, and none depend on any others. SUMF¶¶6088-6109. Plaintiffs' experts also discussed this in detail in their reports and testimony. *Id*. Finally, among other things, each track, which contains each Work, has its own unique Track_ID, is streamed or downloaded individually, and royalty payments are based on the number of streams of each individual track. *Id*. Each copyrighted Work is thus no different than each copyrighted song on a musical album.

## III.   Legal Standard

FRCP 56(a) provides: "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." If the moving party satisfies her burden, the non-

---

When certain parties questioned the letter's claim that there was a prior agreement, Pandora responded by ***admitting that there was in fact no prior agreement, but that Pandora was relying on its supposed longstanding custom and practice***. SUMF¶¶5976-5990. Pandora's legal department crafted this language. SUMF¶5990.

moving party must point to specific facts demonstrating a genuine issue of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## IV.   Argument

### A. Pandora Infringed on Plaintiffs' Works by Streaming Them Without a License.

Copyright infringement has two elements: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Copyright infringement is a strict liability tort. *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1081 (9th Cir. 2021) (citing 4 NIMMER ON COPYRIGHT §13.08[B][1]).

While Pandora asserts "custom and practice" as a primary defense in this case, thus obligating Plaintiffs to debunk that defense as meritless and inapplicable, (*see, discussion infra,* and Nimmer Report ¶56-65, Libera Report ¶II.A.1-D.6, Rosenblatt Report ¶¶21-46, and Leib Report 3-15) it is ultimately irrelevant because courts universally hold that custom and practice cannot override the law. *Dun & Bradstreet Software Servs. v. Grace Consulting, Inc.*, 307 F.3d 197, 211-12 (3d Cir. 2002) ("A defense of industry custom and practice in the face of the protective provisions of the Copyright Act could undermine the purposes and objectives of the statute and reduce it to rubble"). Custom and practice also cannot alter clear, unambiguous contract terms. *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 963 (9th Cir. 2010); *Thomas v. Gusto Records, Inc*., 939 F.2d 395, 398 (6th Cir. 1991).

#### *1.   Comedy Routines are Copyrightable Literary Works*

Among the several categories of works of authorship in which copyright protection subsist are *literary works*. 17 U.S.C. §102(a)(1).[8] Literary works may be *nondramatic* or *dramatic*. "Generally, nondramatic literary works are intended to be

---

[8] "Literary works are works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects, such as books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards, in which they are embodied." 17 U.S.C. §101.

1  read; they are not intended to be performed before an audience." U.S. COPYRIGHT
2  OFFICE, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES §703 (3d ed. January
3  2021) ("COMPENDIUM (THIRD)"). Because comedy routines—especially those which
4  underlie the performances of standup comedians—are intended to be performed before
5  an audience, and are not intended to be read, they are considered *dramatic* literary
6  works. *Id.*

7      It is undisputed that all the Works in this case were fixed in some form of *tangible*
8  *mediums of expression* (*e.g.*, recorded on paper, recording tape, etc.).

9      Even short jokes may be afforded copyright protection. 1 NIMMER ON COPYRIGHT
10  §2.13 ("[I]t would seem that jokes, 'gags,' and other forms of 'stage business' may
11  claim copyright protection."); *Kaseberg v. Conaco, LLC*, 260 F. Supp. 3d 1229 (S.D.
12  Cal. 2017) (finding a two-line joke protectable).

13      The Copyright Office recognizes—and accepts for purposes of copyright
14  registration—comedy routines as literary works. COMPENDIUM (THIRD) §619.13(D).

15      Indeed, this Court has already recognized that "[s]imilar to recorded music, a
16  performance of a comedic routine and the underlying routine itself are two distinct
17  works under the Copyright Act." ECF 83,n.1.

18              **2.  *Plaintiffs Own Valid Copyrights For The Works***

19      Plaintiffs own the copyrights for the Works, and all of them are duly registered
20  with the U.S. Copyright Office.[9] SUMF¶¶3-208;319-541;655-1099;1283-1419;1481-
21

22  [9] Plaintiffs expect Pandora to challenge the Black Works on the albums *Old Yeller, Black
23  to the Future, and Thanks for Risking Your Life*. *Old Yeller* is subject to a pre-registration
24  (PRE000006583) dated August 12, 2013, covering "Lewis Black in a live performance"
     without distinguishing between the production of the motion picture, and the embodied
25  text and a separate registration for the literary works dated March 8, 2023
     (Pau004172825). SUMF¶5134. *Black to the Future* has a registration for the production
26  of the audiovisual work (PA0002026657) dated October 17, 2016, and a separate
     registration for the literary works (Pau004172518) dated March 22, 2023.
27  SUMF¶5233;5243. *Thanks for Risking Your Life* likewise has a separate registration
28  issued on March 7, 2023, for the literary works embodied in the motion picture

1713;1832-2531;2810-4423;5075-5409;5565-5753.[10] The Copyright Act provides that "[i]n any judicial proceedings the certificate of registration…shall constitute *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate," including ownership of the copyright and originality. 17 U.S.C. §410(c); *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 (9th Cir. 1989).

A copyright owner may "register a sound recording together with a…literary work if the recording and the…words…are embodied in the same phonorecord and if the claimant owns the copyright in both works." COMPENDIUM (THIRD) §803.8(A) (citing 37 C.F.R. §202.3(b)(1)(iv)). In the case of motion pictures, "[i]f the copyright owner of the motion picture owns the rights in the underlying work, and if the entire motion picture is being registered for the first time[,]" the copyright owner may register the motion picture together with the underlying works under the same application. COMPENDIUM (THIRD) §808.2(C). Moreover, in *Greenwich Film Prods., S.A. v. DRG Records, Inc.*, 833 F. Supp. 248 (S.D.N.Y. 1993), the court noted that "sound recordings can cover underlying musical compositions where the same copyright claimant is seeking to register not only the sound recording but also the musical, dramatic, or literary work embodied in the sound records, thus inviting the analogy to registration of these same underlying works by registering a motion picture which contains them in its audio portion." *Id.* at 251 (holding because plaintiff owned copyrights in the musical compositions contained on the motion picture soundtrack, the registration covered the compositions).

Furthermore, any inaccurate information in a certificate of registration—whether it be a mistake of law or fact—will not render the certificate invalid unless (1) the

---

(PAu004172517). However, the registration that issued on August 26, 2020 (Pau004039158) indicates that it covered the "entire motion picture." SUMF¶¶5363;5368.

[10] Copyright registrations copied from the U.S. Copyright Office's website are admissible, and the Court may take judicial notice of them. *Elohim EPF USA, Inc. v. Total Music Connection, Inc.*, No. CV 14-02496-BRO (Ex), 2015 U.S. Dist. LEXIS 194281, at *26-28 (C.D. Cal. Oct. 1, 2015); *see generally*, Goldberg Decl.

inaccurate information was included on the application for copyright registration with ***actual*** knowledge that it was inaccurate and (2) the Register of Copyrights would have refused registration but for the inaccurate information. 17 U.S.C. §411(b)(1); *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 595 U.S. 178, 181, 185 (2022).

Finally, third-party infringers lack standing to challenge a transfer of copyright ownership when there is no dispute between owner and transferee. *Greg Young Publ'g, Inc. v. Zazzle, Inc.*, No. 2:16-CV-04587-SVW-KS, 2017 U.S. Dist. LEXIS 100268, at *10 (C.D. Cal. May 1, 2017); *Malibu Media, LLC v. Tsanko*, 2013 U.S. Dist. LEXIS 169186 at *6 (D.N.J. Nov. 30, 2013).

Plaintiffs have valid copyrights in each of the Works. SUMF¶¶3-208;319-541;655-1099;1283-1419;1481-1713;1832-2531;2810-4423;5075-5409;5565-5753.

### 3. Licenses Needed to Stream Literary Works Embodied in Sound Recordings on Non-Interactive & Interactive Services.

The types of licenses needed to stream musical works and literary works embodied in sound recordings depend on whether the streaming occurs on a *non-interactive* or *interactive* service.[11] Pandora offers both *non-interactive* and *interactive* streaming services.

A qualified ***non-interactive*** streaming service requires a *public performance license* (under the authority of copyright owner's exclusive right of public performance under 17 U.S.C. §106(4)) to stream musical and literary works. *Paramount Pictures Corp. v. Does 1-10*, No. 2:21-cv-09317-MCS-SK, 2022 U.S. Dist. LEXIS 26167, at *5 (C.D. Cal. Jan. 7, 2022) ("Unauthorized internet streaming violates the right of public performance, and unauthorized digital reproduction violates the right of reproduction" of the underlying works).

An ***interactive*** streaming service requires *both* (a) a *public performance* license and (b) a *reproduction* license (under the authority of copyright owner's exclusive right of reproduction under 17 U.S.C. §106(1)) to stream musical and literary works.

---

[11] 17 U.S.C. §114(j)(7).

*Paramount Pictures Corp*, 2022 U.S. Dist. LEXIS 26167, at *5; *Columbia Pictures Indus. v. Galindo*, No. 2:20-cv-03129-SVW-GJS, 2020 U.S. Dist. LEXIS 105556, at *5 (C.D. Cal. May 11, 2020) (digitally reproducing copyrighted works via streaming without a license violated the reproduction right in 17 U.S.C. §106(1)). Pandora first began interactive streaming the Works in March 2017. SUMF¶5837.

### 4. *Pandora Publicly Performed and Reproduced the Works Without the Requisite License During the Three Years Before the Filing of This Action.*

Indisputably, Pandora streamed sound recordings embodying *all* but nine of the Works within the last three years on both its interactive and non-interactive service. SUMF¶¶217-318;546-654;1110-1282;1428-1480;1717-1831;2541-2809;4427-5074;5428-5564;5759-5832;6116. There is nothing in the record which grants Pandora a license to publicly perform or reproduce the Works. Plaintiffs have thus established a *prima facie* case for copyright infringement.

### 5. *Each Unauthorized Stream Is a Separate Act of Infringement*

Each unlicensed stream of a Work by Pandora during the three years preceding the filing of this action constituted a separate act of copyright infringement. *Petrella v. MGM*, 572 U.S. 663, 671-72 (2014) (under the separate accrual rule "[e]ach time an infringing work is reproduced or distributed, the infringer commits a new wrong.").

As each stream constitutes a separate royalty-bearing event, it creates a separate identifiable harm carrying its own separate accrual. *Id.*; *WB Music Corp. v. Stolz*, 814 Fed. Appx. 286, 287 (9th Cir. 2020) (each successive radio broadcast within limitations period was timely for purposes of statute of limitations analysis); *Media Rights Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1024 (9th Cir. 2019); *Howard v. Pearl,* 859 F. App'x 756, 757 (9th Cir. 2021); *cf.* 17 U.S.C. §115(e)(13) ("Interactive Stream" means "a digital transmission of a sound recording… in the form of a stream…An interactive stream is a digital phonorecord delivery."); §115(e)(10) ("[D]igital phonorecord delivery" means "**each** individual delivery of a phonorecord by digital transmission of a sound recording that results in a specifically identifiable **reproduction** . . . **and**

1    includes a permanent download, a limited download, or an interactive stream.")

2    (emphasis added).

3    **B. Pandora Willfully Infringed the Copyrights in Plaintiffs' Literary**

4    **Works.**

5    "Willful" for purposes of copyright infringement means that the infringer acted

6    with either intentional or reckless behavior. *Wash. Shoe Co. v. A-Z Sporting Goods Inc*.,

7    704 F.3d 668, 675 (9th Cir. 2012). Plaintiffs "must show (1) the defendant was actually

8    aware of the infringing activity, or (2) the defendant's actions were the result of 'reckless

9    disregard' for, or 'willful blindness' to, the copyright holder's rights." *Id*. "[E]vidence

10   that notice had been accorded to the alleged infringer … is perhaps the most persuasive

11   evidence of willfulness." *Id.*

12   Courts may find willfulness at summary judgment where the infringement

13   continues despite notice. *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336

14   (9th Cir. 1990), *cert. denied*, 498 U.S. 1109 (1991) (affirming summary judgement

15   award of maximum statutory damages for willfulness); *Atl. Recording Corp. v. Chan*,

16   94 F. App'x 531, 533 (9th Cir. 2004).

17   The undisputed facts for willfulness are overwhelming. As a threshold matter, the

18   predominant focus of Pandora's business is the exploitation of musical recordings (Jaffe

19   Report ¶15), where Pandora must obtain licenses for both the sound recordings and the

20   underlying musical compositions.[12] However, for comedy recordings, Pandora blithely

21   ignores these requirements for the underlying material. To wit: (1) Pandora knowingly

22   publicly performed the Works on its streaming broadcast service since 2011 without a

23   public performance license (SUMF¶5838); (2) Pandora admitted in its SEC filings,

24   from 2011-2017, that it performed the Works without "a specific license" from

25   copyright owners (SUMF¶5838;5840); (3) Pandora entered into sound recording

26

27   [12] Patrick Donnelly, Pandora's General Counsel and 30(b)(6) witness, admitted that
     Pandora knew the law requires a public performance license to stream underlying
28   works, and an additional mechanical reproduction license to interactively stream
     underlying works. SUMF¶6042.

REDACTED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

Case No. 2:22-cv-00809-MCS-MAR

agreements with various record labels and distributors in the Fall of 2016 before launching its interactive streaming service, in which the clear language provides that Pandora must obtain directly from third parties all rights in underlying copyrighted works, including literary works, embedded in the sound recordings and pay all royalties owed (SUMF¶¶5854-5926); (4) Pandora's SEC filings for year end 2016 and 2017 added language that Pandora is "unable to obtain licenses" for literary works streaming on its platform and may be sued for copyright infringement as a result (SUMF¶5838); (5) Pandora admittedly did no investigation to determine whether any comedians had been paid mechanical royalties for literary works (SUMF¶¶5844) even though Adam Parness, then Head of Licensing at Pandora, knew comedians had the right to license their literary works and be paid royalties (SUMF¶5861);[13] (6) after being put on notice of infringement, and during the ensuing eighteen months of communications, (SUMF¶¶5974) Pandora never claimed to have a license (express, implied, or pass-through) (*id.*), or claimed not to need a license (*id.*), but continued to infringe by streaming the Works (SUMF¶¶217-318;546-654;1110-1282;1428-1480;1717-1831;2541-2809;4427-5074;5428-5564;5759-5832); (7) Pandora requested a proposed license from WC and advised it was working on commercial terms for a license, all the while continuing its copyright infringement, and never intending to enter into a license (SUMF¶¶5927-5974); and (8) after Plaintiffs filed these lawsuits, Pandora admitted in communications with third parties that it did not have a license to stream literary works as discussed in footnote 7, *supra* (SUMF¶¶5976-5990).

### 1. Pandora Knew it was Publicly Performing Plaintiffs' Works Without a License When it Began Streaming

In 2011, Pandora launched a platform dedicated to comedy on its broadcast streaming platform. SUMF¶¶5833. This was the first time that comedy, to any significant degree, streamed on a streaming service like Pandora. Leib Report pp.21-23. While it is true there was no Performing Rights Organization ("PRO") for comedy at

---

[13] *See* n.2, *supra*

the time, as existed for music, it is absolutely untrue that comedians had not heretofore been paid for the public performance of their Works. SUMF¶¶6050-6060. Indeed, that is precisely what a comedian is paid for when performing at venues, comedy clubs, radio programs, and on television. *Id*. Pandora excused its failure to obtain necessary public performance licenses for the Works on its fabricated notion that it is "custom and practice" not to license and pay for the public performance of Works, while the truth is that Pandora simply found it too difficult to properly license the Works due to the lack of a PRO. Rosenblatt Report ¶67. That it was more difficult to work out individual deals with comedians to stream their Works does not excuse or justify Pandora's willful copyright infringement.[14]

### 2.  Pandora's Agreements for the Sound Recordings Require Pandora itself to Acquire Third-Party Rights

Pandora has sound recording license agreements for its interactive service with Warner, Universal, Sony, The Orchard, DistroKid and TuneCore.[15] SUMF¶¶5854. Pandora also receives sound recordings from two other distributors: Alternative Distribution Alliance ("ADA"), whose distributed sound recordings are governed by the Warner agreement, SUMF¶5902, and Ingrooves, whose distributed sound recordings are governed by the Universal agreement. SUMF¶¶5754-5758. In order for

---

[14] Mr. Donnelly admitted that Pandora could find no evidence of Pandora reaching out to comedians either directly or as a group to acquire licenses for the underlying literary works, and he admitted that there was nothing preventing Pandora from doing so. SUMF¶¶5850;5847. Yet, Pandora had no difficulty doing so however after these lawsuits were filed. SUMF¶¶5976-5990; N. 7 *supra*.

[15] Until June 2021, the Recordings on Mr. Lopez's albums (*Right Now Right Now* and *Team Leader*) were distributed by Ingrooves, which is governed by the terms of Pandora's Agreement with Universal. SUMF¶¶5754-5758, so those terms control the rights Pandora received through that date. They are now distributed by DistroKid. SUMF¶¶5758. Two albums have been distributed by TuneCore within the three years prior to this lawsuit: Di Paolo's *Another Senseless Killing* and Black's *Thanks for Risking Your Life*. SUMF¶¶2534-2540. *Another Senseless Killing* was also distributed during this period by the Orchard. *Id*. Black's underlying agreement with TLB Records did not convey rights to the Works. SUMF¶¶5425-5426.

14

there to be a pass-through license of underlying works, the agreements must so provide, and would likewise place the onus of paying mechanical royalties on the licensor record label. Rosenblatt Report at ¶30. These agreements not only fail to do so, but are clear that no license to the Works, or any underlying rights of any nature or kind, express or implied, was passed through (i.e., sublicensed) to Pandora.

For example, Paragraph 2(g) of Additional Provisions in the Warner agreement, titled " ███████████ ," provides in pertinent part:



SUMF¶¶5872. Paragraph 5(b), titled " ███████████████ ," provides:



SUMF¶¶5873. Tracie Parry of Warner, and Marylynne Drexler of ADA, testified via Declaration that neither Warner nor ADA pass through any rights to any Works to Pandora. SUMF¶¶5900-5904.

Pandora's agreement with Universal provides in Section 10.2, entitled " ████ ████████

1 ████████████████████████████████████████

2 ████████████████████████████████████████

3 ████████████████████████████████████████

4 ████████████████████████████████████████

5 ████████████████████████████████████████

6 ████████████████████████████████████████

7 ██████████████████

8 SUMF¶¶5882. It provides in 11.3, "████████████," that Pandora warrants:

9 ████████████████████████████████████████

10 ████████████████████████████████████████

11 ████████████████████████████████████████

12 ████████████████████████████████████████

13 ██████

14 SUMF¶¶5912. And in 12.1, "███████████

15 ████████████████████████████████████████

16 ██████████████████

17 SUMF¶¶5910. And in 19.5, "██████████

18 ████████████████████████████████████████

19 ████████████████████████████████████████

20 SUMF¶¶5911

21 The Sony and Orchard Agreements are identical and provide specifically in

22 Paragraph 28:

23 ████████████████████████████████████████

24 ████████████████████████████████████████

25 ████████████████████

26 SUMF¶¶5914-5918. Paragraph 29, "████████ provides that ████████

27 ████████████████████████████████████████

28 ████████████████████████████████████." And

1 "███████████████" are defined as "████████████████████

2 ████████████████████████████████████████████████████." While

3 "██████████ is defined to include: "████████████████████████

4 ████████████."[16] *Id.* (emphasis added).

5      Finally, Pandora's November 1, 2016 Agreement with TuneCore and April 4,

6 2016 Agreement with DistroKid are nearly identical (Pandora drafted both agreements

7 (SUMF¶5917)) and are both expressly limited to sound recordings. SUMF¶5915-5922.

8 Pursuant to Paragraph 2 of said agreements, TuneCore and DistroKid granted rights

9 only to the "████████ and "███████████████." SUMF¶5922-5926. Both defined terms

10 are expressly limited to sound recordings, "██████████" (██████████████████

11 ██████████), and "███████████████" ("███████████████████████

12 ████████") *Id.* Further, the agreement expressly tasks Pandora to ████████████████

13 ██████████████████████████████. SUMF¶5917. ████████████████

14 ████████████████████████████████████████. Pandora's

15 30(b)(6) witness George White could not point to any specific reference explicitly

16 granting rights to underlying literary works in the TuneCore and DistroKid agreements,

17 referring, instead to ████████████████████████████████████████████

18 ████████████████████████████████████████████████████████

19 ██████████████ SUMF¶¶5887

20      Removing any doubt, Pandora has admitted, affirmatively and/or tacitly, on no

21 less than three occasions that none of these Agreements pass through any rights to

22 underlying Works: (1) in Pandora's 2016 and 2017 10-K filings after these agreements

23 were entered into, in which Pandora stated that it was "not able" to obtain licenses for

24 literary works, SUMF¶5838; (2) by requesting a draft license from WC, failing to state

---

[16] The Orchard's General Counsel, Tucker McCrady, testified via Declaration that the Orchard Agreement with Pandora speaks for itself, and there is no unspoken custom and practice embedded in the agreement. SUMF¶5879. Further, purported industry custom and practice cannot be used to modify or even interpret unambiguous terms of an agreement. *F.B.T. Prods.*, *supra*.

in eighteen months of pre-litigation communications that these agreements granted a license, and instead advising WC it was working on commercial terms for a license,[17] (SUMF¶¶5927-5940-5974; *see generally*, Price Decl.) and (3) by admitting, after this litigation began, in connection with Sirius XM/Pandora's proposed letter discussed in note 7, *supra*, that it does not have any prior agreements to stream the Works, but is instead relying on its alleged "longstanding custom and practice."[18] SUMF¶¶5979-5990. Pandora's legal department crafted that admission. SUMF¶5990. These letters further show that Pandora had no problem entering into individual agreements despite its claims to the contrary.

Custom and practice not only cannot override these explicit terms, but there can be no alleged or relevant custom and practice under these circumstances. Nimmer Report at 33; Nimmer Rebuttal ¶¶14-31; Rosenblatt Report ¶54n.56; Rosenblatt Rebuttal ¶¶510;15-22.

When asked why Pandora took comedic recordings down after Plaintiffs filed suit if it had licenses to interactively stream, Pandora's General Counsel made the following damning admission: "in the event it was determined that we were wrong." SUMF¶5975.

---

[17] Mr. Donnelly tried to [falsely] claim that Pandora was not working on a proposed license, but instead was supposedly offering "more airplay." SUMF¶5972. But Iain Morris (also a 30(b)(6) witness), who communicated with Mr. Price directly, with Mr. Donnelly's knowledge, admitted that Pandora was "engaging with Jeff [Price of WC] on potential licensing terms, potential deal structures." SUMF¶5973.

[18] Tellingly, these letters did not apparently go to the labels, thus bypassing the companies that actually had direct agreements with Pandora. This alone is a tacit admission Pandora knew those entities would not "memorialize" a "prior agreement" they knew was contrary to their agreements.

### C. Plaintiffs' Claim for Statutory Damages Must Be Determined on a *Track-by-Track* Basis

"What constitutes a 'work' is a question of law when 'there are no underlying factual disputes for the jury to resolve.'" *Hargis*, 2023 U.S. Dist. LEXIS 181408, at *24 (quoting *Columbia Pictures Indus.,* 259 F.3d at 1193).

"Ultimately, what counts" in resolving this question "is the statutory definition." *VHT, Inc. v. Zillow Grp., Inc.*, 69 F.4th 983, 988 (9th Cir. 2023) ("*Zillow II*") (quoting *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 748 (9th Cir.) ("*Zillow I*") *cert. denied* 140 S. Ct. 122 (2019)). Because the Act does not define 'works' for purposes of statutory damages, "the Ninth Circuit has 'adopted the independent economic value test to determine what constitutes a separate work….'" *Russell v. Walmart Inc.*, No. CV- 19-05495-MWF (JCx), 2023 U.S. Dist. LEXIS 6974, at *43 (C.D. Cal. Jan. 12, 2023) (citations omitted); *Columbia Pictures*, 259 F.3d at 1193 ("We adopted this test for what constitutes a 'work'…."). The test is not *per se* determinative, but heavily informs the Court's analysis. *Zillow II*, 69 F.4th at 988.

To illustrate the independent economic value test, the Ninth Circuit has adopted the following analogy from the Seventh Circuit, which also relies upon the test:

> Think in the first instance of the multiple protected works as a quilt and then ask whether any one individual patch has discernable, independent economic value—whether once separated from the quilt a particular patch lives its own copyright life (as "one work")—or instead whether the value lies in the patches' combined assembly into the quilt as a whole (as a "compilation").

*Id*. at 990; *Hargis*, 2023 U.S. Dist. LEXIS 181408, at *24 (same).

Here, each of Plaintiffs' 843 individual Works are viable on their own: they have independent economic value and live their own copyright lives 'once separated from the quilt,' *i.e.* from the albums. Their "value c[o]me[s] from each [Work]'s individual

content rather than their assembly within the [album]." *Zillow II*, 69 F.4th at 990. This fact finds ample undisputed record support.

First, it is the general custom and practice in stand-up comedy to create 4-5 minute 'bits' or 'routines' as separate stand-alone material, and to then test and workshop these individually in front of audiences, and not to create individual, self-contained, full album length acts or 'specials' from scratch. SUMF¶¶6088-6109. The routines within the Works in this case were created individually and independently of each other by the Plaintiff Comedians, and only later bundled together into albums, without any organization or arrangement to create new works of authorship. *Id*. The tracks also do not "concern a 'single subject'. The disputed [tracks] depict *multiple* subjects…. [Therefore,] the creative considerations involved in each individual [track]…would necessarily have been different…" *Hargis*, 2023 U.S. Dist. LEXIS 181408, at *26 (emphasis kept).

Next, and most critically, Pandora's infringements of the literary Works at issue are only on an individual Work basis: Pandora streams comedy on a track-by-track (*i.e.*, Work-by-Work) level, not an album level. SUMF¶6103; Ex.184, Del Bene Dep. 322:5-12 ("I don't know that I can recall a specific example of hearing an entire album spun back-to-back in that webcasting service."). Pandora's Senior Manager of Comedy Programming, Drew Miller, explained he created and curated stations and playlists for listeners on Pandora featuring individual tracks he selected based on personal preference and what would fit on specific stations. SUMF¶6104. The individual tracks on Pandora are also broken down by their own unique ISRC and Track_ID numbers. SUMF¶¶6100-6109. Pandora AMP, a portal and set of tools for creators on Pandora, explains in its Frequently Asked Questions: "What are Curated Stations? … Curated Stations are sets of music or comedy tracks that function similarly to Pandora Radio stations. *Id*. All listeners can directly access Curated Stations, which will always play in shuffle mode without a visible tracklist."[19] Furthermore, Pandora's 'Comedy

---

[19] https://www.ampplaybook.com/pandora-stories-creator-faq.

REDACTED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No. 2:22-cv-00809-MCS-MAR

Genome Project' categorizes and refers users to comedy tracks to listen to and include in their own playlists by track, not album, based on comedian, subject matter, and other parameters. SUMF¶6109. Even further than Your Honors' similar finding in *Hargis*, this conclusively demonstrates "Plaintiff[s'] contention that the [tracks] [were] exploited on a piecemeal and individual basis…." 2023 U.S. Dist. LEXIS 181408, at *28 (internal quotation omitted). Pandora has demonstrated the independent economic value of the individual tracks itself, and that its use of the individual tracks were not based on any purported arrangement of the tracks within an album.

Finally, this Court has noted that "[t]hough the registration label is not controlling, it may be considered by the court when assessing whether a work is a compilation." *Id*. at *25 (quoting *Zillow I*, 918 F.3d at 748). This Circuit and other courts following the independent economic value test have, however, largely rejected the registrations' importance. *Zillow II*, 69 F.4th at 989 ("The number of copyright registrations is not the unit of reference for determining the number of awards of statutory damages."); *id*. ("The inquiry and fact finding demanded by §504(c)(1) is more functional than formal, taking account of the economic value, if any, of a protected work more than the fact that the protection came about by an artist registering multiple works in a single application."). While many of the Works are registered together, Pandora exploited them based on their individual value, not any arrangement in an album or as a part of a larger new work of authorship, rendering their registration inconsequential to the analysis. Plaintiffs are therefore entitled to separate statutory damages on all 843 Works because each track can stand alone on its own economic value, even once separated from the "quilt" of the album.

### D. None of Pandora's Affirmative Defenses Obviate its Liability for its Infringing Uses of the Works

#### 1. There is no implied license for Pandora to exploit the Works

Pandora's "implied license" defense is devoid of factual or legal support. Had Pandora genuinely believed it *may* have had an implied license to exploit the Works

before Plaintiffs filed suit, it would not have unequivocally certified in its SEC 10-K filings that it was "unable to obtain licenses for the underlying literary works for the sound recordings of spoken-word comedy content" and could "be sued for copyright infringement as a result."[20] SUMF¶5840. This statement, first appearing in Pandora's December 31, 2016, 10-K, shows that Pandora, after entering into distribution agreements, did not itself believe its own litigation inspired defenses SUMF¶¶5838-5841.

The plain language of the distribution agreements Pandora entered into with record labels and distributors, quoted verbatim above, dispels any notion that Pandora could have conceivably believed it had an implied license to stream any works underlying the licensed sound recordings. Those agreements make clear that no underlying rights were being conveyed, explicitly or implicitly, and that it was Pandora's obligation to obtain licenses and pay royalties for the Works. Again, Pandora knew that to be the case since it never claimed to have an implied license to interactively stream the Works in eighteen months of pre-litigation communications. SUMF¶¶5928-5974.[21]

Moreover, the entire foundation of Pandora's implied license defense is that "**_no comedian_** has ever licensed separately or collected a separate and additional royalty for the public performance, reproduction, or distribution of the underlying jokes embodied

---

[20] When asked why Pandora would make and certify such statements if it believed it may have had an implied license to the literary works, Pandora's own expert Dr. Kothari testified that he doesn't "know why they would say that." Ex.113, Kothari Dep. at 122:10-20.

[21] Pandora admitted that it has never claimed an implied license to stream musical compositions, even though it obtains the rights to musical and comedic sound recordings via the same agreements through which it claims to have obtained an implied license to comedic literary works. Ex.115, *Pandora Media, LLC's Responses and Objections to Plaintiff Comedians' Revised Requests for Admission, Set Two*, April 17, 2023, at RFA8. Pandora also does "not distinguish between musical and literary works in the catalogs of major labels with which Pandora has direct license agreements." Rosenblatt Report ¶52.

in any of these comedy recordings." Answer, 2:13-16 (emphasis added). This is not only absolutely untrue, as discussed above, in SUMF¶¶5986-6060,[22] and in the Libera and Leib expert reports, but Pandora admits it did no investigation to determine whether it was true or not. SUMF¶¶5844. It obviously cannot be custom and practice to not license literary works or pay comedians mechanical royalties when many of the comedians who Pandora calls "Must Have[s]," (ECF93, 45-46) have contracts that provide for both. Nimmer Report at 33-40.[23]

When analyzing whether an implied license exists, courts in the Ninth Circuit overwhelmingly utilize the test first articulated in *Effects Assocs. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990). Under this test, "an implied license is granted when (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *Asset Mktg. Sys. v. Gagnon*, 542 F.3d 748, 754 (9th Cir. 2008) (cleaned up). This Court has recently utilized the *Effects* test. *Hargis*, 2023 U.S. Dist. LEXIS 181408, at *30.

Here, Pandora did not request the Plaintiffs to create any of the Works, none of the Plaintiffs created the Works at Pandora's request and delivered them to Pandora, and none of the Plaintiffs intended for Pandora to reproduce and distribute the Works without a license and royalty payments. Each of the Distribution agreements discussed above specifically required Pandora to obtain the reproduction rights from the third-parties (Plaintiffs) who owned them.

---

[22] *Id.* Plaintiffs obtained royalty statements showing actual payments of mechanical royalties for numerous comedians. SUMF¶5992-3;6033-6039.

[23] Even Pandora's expert, Mr. Del Bene, admits that more than 20 comedians whose agreements are in this record have contracts that provide for the licensing of Works and payment of mechanical royalties. SUMF¶¶5995-6032. But even that figure is an undercount, as Mr. Leib disagrees with his analysis, (*see* Leib rebuttal report ¶¶76-81), and Mr. Del Bene failed to count many more agreements that provide for the payment of all royalties received on a net receipt basis. Leib Rebuttal ¶¶239-242;307-329.

To the extent the Court looks beyond the *Effects* test, there are no facts to support Pandora's implied license defense. First, those courts that do not follow *Effects* ubiquitously hold that intent is the *sine qua non* of a finding of an implied license. *Westhoff Vertriebsges MBH v. Berg*, No. 22-cv-0938-BAS-SBC, 2023 U.S. Dist. LEXIS 157988, at *25 (S.D. Cal. Sep. 6, 2023). Here, no such intent existed. As explained above, Pandora did not claim an implied license in its SEC filings, and the labels and distributors made clear they were not providing any license (other than for the sound recordings) to Pandora implied or express, and it was Pandora's obligation to get licenses and pay royalties. If Pandora believed it had an implied license, or one was intended, it could have (would have) simply said so at least once during the eighteen months in which it corresponded with WC prior to this litigation.[24]

### 2. Plaintiffs Neither Misused Their Copyrights Nor Engaged In Unclean Hands

Despite the Court twice dismissing Pandora's baseless antitrust claims (now, with prejudice), Pandora nonetheless contends without a scintilla of evidentiary support that Plaintiffs misused their copyrights through anti-competitive behavior. Alternatively, Pandora contends that each of Plaintiffs somehow misused their copyrights indirectly through independent conduct WC undertook to investigate the usage of a limited subset of works WC administers that was available for claiming by The Mechanical License Collective ("MLC"). Both theories are meritless.

---

[24] Nonexclusive licenses are not transferable. "[I]t has been held by several courts and noted by commentators that a nonexclusive license cannot be transferred without permission of the copyright owner." *ITOFCA, Inc. v. MegaTrans Logistics, Inc.*, 322 F.3d 928, 941 (7th Cir. 2003) (Ripple, J., concurring) (citing 3 NIMMER ON COPYRIGHT §10.02[B][4]). Accordingly, Pandora's claim to have received an implied license requires a focus on grants made to Pandora directly from the applicable rights owners. But no such inquiry is possible because no direct grant exists between Pandora and the Plaintiffs. Ex.115, RFA14. In all instances, Pandora received licenses only to the sound recordings in which the Works are embodied and only from labels and distributors, not the Plaintiffs. SUMF¶¶5854-5926; Nimmer report ¶¶40-46.

REDACTED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No. 2:22-cv-00809-MCS-MAR

### a. _Copyright Misuse, Generally_

Copyright misuse, derived from patent law, was first adopted in this Circuit as an affirmative defense to copyright infringement in _Practice Mgmt. Info. Corp. v. AMA_, 121 F.3d 516, 520 (9th Cir. 1997), _amended by_ 133 F.3d 1140 (9th Cir. 1998). Generally, it "forbids the use of the copyright to secure an exclusive right or limited monopoly not granted by the Copyright Office". _Id._ The Ninth Circuit has since advised that this defense should be "applied…sparingly" only where the copyright plaintiff tried to artificially expand the scope of its §106 rights. _Apple Inc. v. Psystar Corp.,_ 658 F.3d 1150, 1157 (9th Cir. 2011). Most cases that recognize it involve unduly restrictive licensing schemes. _A&M Records v. Napster, Inc._, 239 F.3d 1004, 1027 n.8 (9th Cir. 2001). Cases that apply the doctrine properly are those in which the plaintiff tried to create an ersatz §106 right or otherwise extend its copyright monopoly through restrictive licensing practices. _Id._ at 1026. The necessary corollary is that where (as here) a plaintiff is merely seeking to control reproduction and distribution of the copyrighted works that he owns, the doctrine is inapplicable. _Napster_, 239 F.3d 1026-27. Since _Practice Mgmt._, district courts have held that a lack of coercion is "fatal" to a defense of copyright misuse. _See, e.g._, _Softketeers, Inc. v. Regal W. Corp._, No. 8:19-CV-00519-JWH (JDEx), 2022 U.S. Dist. LEXIS 232122, at *49, 52 (C.D. Cal. Dec. 22, 2022). No such coercion being present here, the defense fails.

### b. _Plaintiffs Did not Misuse Their Copyrights_

#### i. _No Coercive or Restrictive Licensing – Pandora Refused to License_

Pandora did not license the Works (or the sound recordings embodying them) directly from the Plaintiffs and refused to engage in substantive licensing discussions with WC or SG. Absent from the record (and fatal to Pandora) is any request from Pandora to license the Works individually from the Plaintiffs _regardless_ of the affiliation with SG or WC. Hence, there is no evidence of unduly restrictive licensing regimes or coercion. Pandora's defense thus fails.

### ii.    "Registering" with the MLC is not Misuse

Pandora originally claimed this defense was based on some conspiracy among the Plaintiffs. Discovery debunking that theory, Pandora pivoted to baselessly contending that Plaintiffs "fraudulently" or improperly "registered" with the MLC. Rosenblatt Rebuttal ¶¶37-39. As a preliminary matter, there is no evidence that Plaintiffs themselves interacted with the MLC. Instead, Pandora relies on WC and Bluewater Music Services Corp. ("Bluewater") purportedly "registering"[25] some of the Works (of only three Plaintiffs) with the MLC. This cannot constitute copyright misuse.

The entire matter about which Pandora complains stems from its own conduct. Pursuant to the Music Modernization Act, in February 2021, Pandora and other Digital Service Providers ("DSP") remitted to the MLC usage data for historically unmatched sound recordings and the corresponding accrued, but unpaid mechanical royalties that they had calculated *including* for literary works. SUMF¶6070. The MLC populated a claiming tool with data from DSPs that listed these recordings by ISRC, title, and artist, and included dollar signs ($) indicating the approximate amount of mechanical royalties accrued so that the owner of the underlying material could make claims to potentially receive these royalties. SUMF¶6070.

WC, by happenstance, discovered that an entity identified in the MLC public database as "Asia Boo Boo" had fraudulently claimed rights to literary works of Richard Pryor that WC exclusively administered. SUMF¶¶6075-6083. WC's effort to investigate the extent of unauthorized claims to its clients' literary works and the role The MLC played in collecting and/or distributing royalties generated from the use of literary works embodied in sound recordings, cannot constitute copyright misuse *by any of the Plaintiffs*, but is simply required diligence by a licensing administrator. Rosenblatt Rebuttal ¶¶30-36.

---

[25]    Pandora misleadingly assigns an inappropriately narrow meaning to "register/registration" in the context of the MLC that is not supported by the record. Rosenblatt Rebuttal ¶39.

Through this investigation, WC discovered that the MLC's claiming tool included recordings embodying works by certain of its clients, including a subset of the Works by three of the Plaintiffs: Robin Williams, George Carlin, and Andrew Dice Clay. SUMF¶¶6075-6083. WC, through Bluewater, made claims for these Works, instructed Bluewater to leave any royalties from The MLC associated with literary works in escrow, and did not distribute them to its clients. *Id*. WC notified The MLC of what it found, asking it to take corrective action. *Id*.[26]

WC merely truthfully claimed its interest in rights to works without any representation as to them being musical works.[27] *Pandora's* expert, Mr. Del Bene, admits there is nothing improper or "fraudulent" in truthfully identifying oneself as the owner/administrator of literary work rights – even if the receiving party receiving does not (or statutorily cannot) issue royalties for them. SUMF¶¶6079-6082.

Further, Pandora cannot show it suffered *any* harm by way of WC's conduct. This too is fatal to its misuse defense.

### c. *Unclean Hands*

Similarly, there are no facts to support Pandora's seventeenth affirmative defense for unclean hands. Typically, a defendant may prevail on this affirmative defense by demonstrating: "(1) the plaintiff's conduct is inequitable, and (2) the conduct relates to the subject matter of the plaintiff's claims." *Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 870 (9th Cir. 2002). The Ninth Circuit clarified that unclean hands

---

[26] The MLC did not respond to WC, and instead responded directly to Bluewater, clawing back royalties associated with literary works. SUMF¶¶6075-6083.

[27] Pandora will try to confuse the Court by saying that the inclusion of "IPI" numbers in this data gave a false impression that works were musical compositions. However, IPI is merely an acronym for Interested Party Information, and IPIs are used worldwide to identify publishers and owners of creative works without limitation to musical works. Rosenblatt Decl. ¶¶7-10. Thus, their inclusion in these claims cannot be misleading. *Id.* The MLC must determine whether claims should be ingested into their databases and whether to remit royalties based on these claims. 17 U.S.C. §115(d)(3)(E); Rosenblatt Rebuttal ¶¶27-28. That the MLC was potentially remiss in its duties is not evidence that any of the relevant entities misled it.

exists when a plaintiff "in some measure affect[s] the equitable relations between the parties in respect of something brought before the court for adjudication." *Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 990 (9th Cir. 2009); *Survivor Prods. LLC v. Fox Broad. Co.*, No. CV 01-3234 LGB (SHx), 2001 U.S. Dist. LEXIS 25511, at *15 (C.D. Cal. June 11, 2001) (rejecting an unclean hands defense, holding the plaintiff was "not alleged to have used their copyright…to control material in which they hold no copyright"). The Ninth Circuit has gone so far as to note that "this defense is rarely effective" in copyright infringement cases. *L.A. News Serv. v. Tullo*, 973 F.2d 791, 799 (9th Cir. 1992) (citing 3 NIMMER ON COPYRIGHT §13.09[B])

Here, none of the conduct asserted above relates to the subject matter of Plaintiffs' claims. To wit, none of the conduct has anything to do with Pandora. Pandora's entire defense is based on either: (1) Plaintiffs' affiliation with WC or SG; or (2) "registering" with the MLC.

For the first, there is simply nothing inequitable about what the Court has already determined to be permissive parallel conduct that was merely similar reactions to the emergence of WC and SG. ECF164,p.13.

For the second, WC truthfully identifying administration rights over works to third parties cannot plausibly be inequitable to Pandora, much less relate to the subject of Plaintiffs' claims against it.

Pandora simply cannot point to *anything* in the record supporting the baseless assertion that Plaintiffs inequitably endeavored to expand the scope of their copyrights or have unclean hands. Thus, these two affirmative defenses fail.

### 3. Plaintiffs Did Not Waive or Abandon Their Copyrights

Pandora's Third and Fourth affirmative defenses are not borne out by the record. "In copyright, waiver or abandonment of copyright 'occurs only if there is an intent by the copyright proprietor to surrender rights in his work.'" *Napster*, 239 F.3d at 1026. (quoting 4 NIMMER ON COPYRIGHT §13.06); Nimmer Report ¶¶83-91.

Pandora's simply cannot point to **_any_** affirmative act done by **_any_** of the Plaintiffs which manifestly demonstrates intent by the copyright owners to surrender or abandon their rights to the Works.

### 4. Pandora's "Defense" of Laches Is Not Applicable to Plaintiffs' Claims of Copyright Infringement.

Pandora's fifteenth affirmative defense of laches fails. The Supreme Court's mandate in *Petrella* makes clear that laches is simply inapplicable to copyright infringement claims. This should be axiomatic on the tenth anniversary of *Petrella*, but a brief refresher of the facts is telling – there, it was undisputed that Petrella first notified MGM of her infringement claims, then waited over *ten years* to file suit for those infringing acts within the three years preceding the suit. 572 U.S. at 674. Yet, the Supreme Court applied the separate accrual rule, holding infringing acts within the three-year limitations period were timely. *Id.* at 672, 677. The Court denied MGM's laches defense holding: "It is hardly incumbent on copyright owners, however, to challenge each and every actionable infringement," and rejected MGM's "sue soon, or forever hold your peace" argument. *Id.* at 682.

### 5. Plaintiffs are Not Estopped from Asserting Their Copyright Infringement Claims Against Pandora

Pandora's sixteenth affirmative defense likewise fails. In a copyright infringement action, four elements are necessary to establish estoppel: (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury. *Disalle v. LeNsi*, No. 2:22-cv-02152-SSS-PVCx, 2024 U.S. Dist. LEXIS 117161, at *16 (C.D. Cal. May 7, 2024).

Here, Pandora fails on all four. First, there is no evidence that any of the Plaintiffs were aware of their rights, and prior to the filing of this litigation, Pandora certainly never advised them or reached out for a license. Second, Plaintiffs did nothing other

29

than passively receive SoundExchange royalties for sound recordings, allegedly without complaint. This cannot constitute grounds for estoppel. *Abkco Music, Inc. v. Sagan*, 50 F.4th 309, 321 (2d Cir. 2022) (holding that passive receipt of statutory royalties did not establish a defense by equitable estoppel, applying a Second Circuit standard near-identical to the Ninth Circuit test).

Third, Pandora *clearly* was not ignorant of the true facts – it publicly admitted that it was streaming sound recordings "absent a specific license" from the literary work rights holders. Exs.105,108-112. Finally, there is no evidence in the record that Pandora relied on any of Plaintiffs' conduct.

### 6. Pandora's For-Profit Exploitation of the Works is Not Fair Use.

While the Copyright Act provides that "fair use of a copyrighted work … is not an infringement" (17 U.S.C. §107), Pandora's for-profit, wholesale use of the Works cannot constitute "fair use." Four factors are used to weigh fair use: (1) the purpose and character of the use; (2) the nature of the work; (3) the "amount and substantiality of the portion used" in relation to the whole work; and (4) the effect of the use upon the potential market for the work or the value of the work. *Napster*, 239 F.3d at 1004.

Here, the use is commercial in nature. This must weigh against a finding of fair use. *Id.* It is undisputable that Pandora's use was commercial in nature given that Pandora's sole business is the streaming of sound recordings for securing subscriptions and ad revenue. Jaffe Report at ¶15.

Here, the nature of the work consists of artistic decisions, weighing against fair use. *McGucken v. Pub. Ocean Ltd.*, 42 F.4th 1149, 1152 (9th Cir. 2022).

"Wholesale copying…militates against a finding of fair use." *Napster*, 239 F.3d at 1004. Here, the ***entirety*** of the Works were available for streaming. SUMF¶6113.

Pandora's actions denied Plaintiffs their fundamental right to exclude use of the works and precluded them from entering into exclusive licenses with other streamers. SUMF¶6110.

***7. Pandora's Streaming of the Entirety of Each Asserted Work does not Constitute De Minimis Copying.***

Pandora's eighteenth affirmative defense is frivolous. Pandora copied the *entirety* of the Works and made them available for streaming. Where the copying is total or verbatim, there is no need for inquiry into whether the copying was *de minimis*. *Bell*, 12 F.4th at 1074 (citing 2 NIMMER ON COPYRIGHT §13.03[A][1]).

## V. Conclusion

Accordingly, the Plaintiffs respectfully request the Court grant summary judgment in their favor.

DATED: August 21, 2024                    KING & BALLOW

                                          By: /s/ *Richard S. Busch*
                                              Richard S. Busch

                                          Attorney for Plaintiffs *Yellow Rose Productions, Inc.; Main Sequence Ltd.; Ron White, Inc.; Robin Williams Trust; Brave Lion, Inc.; Nick Di Paolo; Mary Reese Hicks; Lewis Black; and George Lopez*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 9,921 words, which complies with the word limit set by the Court's order dated May 29, 2024 (ECF 328).


Dated: August 21, 2024                     **KING & BALLOW**


                                    By: /s/ *Richard S. Busch*

                                         Richard S. Busch

                                         KING & BALLOW

                                         *Attorney for Plaintiffs*

REDACTED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Case No. 2:22-cv-00809-MCS-MAR