KING & BALLOW
Richard S. Busch (SBN 319881)
*rbusch@kingballow.com*
2121 Avenue of the Stars, Suite 800
Los Angeles, CA 90067
Telephone: (424) 253-1255
Facsimile: (615) 266-4640

ARNOLD & PORTER KAYE SCHOLER LLP
Daniel B. Asimow (SBN 165661)
*daniel.asimow@arnoldporter.com*
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3100
Facsimile: (415) 471-3400
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| In re PANDORA MEDIA, LLC COPYRIGHT LITIGATION | Master File No. 2:22-cv-00809-MCS-MAR <u>CONSOLIDATED ACTION</u> Honorable Mark C. Scarsi |
| This Document Relates To: ALL ACTIONS | **REDACTED PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR REVIEW OF SPECIAL MASTER'S REPORT AND RECOMMENDATION RE PARTIES' MOTIONS FOR SUMMARY JUDGMENT** *Filed Concurrently with Plaintiffs' Notice of Motion and Motion for Review; Declaration of Richard S. Busch; and [Proposed] Order* Date:      August 25, 2025 Time:      9:00 a.m. Courtroom:  7C Pretrial Conference & Trial Date Not Set |

1

## TABLE OF CONTENTS

2  Table of Authorities ................................................................................. iii

3  Standard Of Review .................................................................................. 1

4  I.    The Report Erroneously Concluded that Plaintiffs Granted an Implied
5        License. ............................................................................................ 1

6        1.    The Special Master Applied the Wrong Legal Test. ................... 2

7        2.    The Special Master's Conclusion Is Wrong Even Under the Incomplete
8              Test Adopted. ................................................................... 6

9
10             a. Plaintiffs' Grant of Rights to Their Record Labels Is Not Relevant to
11                Intent. ...................................................................... 6

12             b. Plaintiffs' Purported Failure to Object .................................... 7

13             c. Plaintiffs' Purported "Encouragement". ................................ 9

14
15             d. Plaintiffs' Purported Acceptance of Compulsory Statutory Royalties for
                  Sound Recordings Is Irrelevant. ......................................... 10
16
17             e. Pandora's SEC Disclosures. .............................................. 12

18             f. An Implied License Is Inconsistent With the Language of Pandora's
19                Agreements with Record Labels. ......................................... 13

20             g. Pandora's Pre-Litigation Communications with Word Collections. .... 13

21             h. The Scope of Any Purported Implied License Is Limited to Non-
22                Interactive Streaming. ..................................................... 14
23
24        3.    The Special Master Failed to Address Revocation of the Purported
                Implied License. ............................................................. 14
25
26  II.   The Report Erroneously Concluded That Pandora Received An Express
27        License. ......................................................................................... 15

28

1.  The Special Master Erred in her Reliance on Marvez. .......................15

2.  The Plain Language in Pandora's Agreements with Labels Does Not Grant Any Rights to Underlying Works (Music or Literary). ..............16

3.  The Report Ignored Record Label Declarations and the Testimony of Pandora's Own Witnesses. ........................................................19

4.  Pandora's Post-Litigation Letters. ......................................................20

5.  Pandora's SEC Admissions. ...............................................................21

6.  The Special Master Declined to Consider Custom and Practice. .........21

7.  The Special Master Failed to Consider Any of Pandora's Other Admissions. ........................................................................................21

III.  The Special Master Erroneously Concluded That Equitable Estoppel Barred This Action. ..................................................................................................22

1.  The Report Uses The Wrong Test for Equitable Estoppel. .................22

2.  The Special Master's Conclusion is Wrong Even Under The Standard Cited By Pandora. ...............................................................................22

    a. Plaintiffs did not have Knowledge of Pandora's Infringing Conduct. .22

    b. Plaintiffs did not intend their conduct would be relied on by Pandora. .........................................................................................23

    c. Pandora was not "Ignorant of the True Facts". ...............................23

    d. Pandora Did Not Detrimentally Rely on Plaintiffs' Conduct or Silence. ...........................................................................................23

IV.  Conclusion. ...................................................................................................23

[REDACTED] MEMORANDUM OF POINTS AND AUTHORITIES ISO PLAINTIFF COMEDIANS' OBJECTIONS TO AND MOTION FOR REVIEW OF SPECIAL MASTER'S REPORT AND RECOMMENDATION IN RE PARTIES' MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:22-cv-00809-MCS-MAR

# TABLE OF AUTHORITIES

**The Supreme Court of the United States**

*Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908) ....................................................4

*Petrella v. MGM, Inc.*, 572 U.S. 663 (2014).........................................................8, 22

**Cases**

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001)........................2

*ABKCO Music, Inc. v. Sagan*, 50 F.4th 309 (2d Cir. 2022) ...............................4, 12

*Asset Mktg. Sys. v. Gagnon*, 542 F.3d 748 (9th Cir. 2008) ............................ 2, 6, 7

*Corbello v. DeVito*, 777 F.3d 1058 (9th Cir. 2015) ...................................................2

*CraftShack, Inc. v. Critical Tel. Applications, Inc.*,

 2025 WL 1255396 (C.D. Cal. Mar. 14, 2025) ....................................................5

*Crispin v. Christian Audigier, Inc.*,

 839 F. Supp. 2d 1086, 1090 (C.D. Cal. 2011)....................................................14

*Dawson v. Marshall*, 561 F.3d 930 (9th Cir. 2009)...................................................1

*Effects Associates v. Cohen*, 908 F.2d 555 (9th Cir. 1990) .......................................2

*Eight Mile Style, LLC v. Spotify USA Inc.*,

 745 F. Supp. 3d 632 (M.D. Tenn. 2024) ......................................................11, 12

*Evox Prods., LLC v. Chrome Data Sols, LP.*,

 2023 WL 1879479 (9th Cir. Feb. 10, 2023)........................................................3

*ExperExchange, Inc. v. Doculex, Inc.*,

 2009 WL 3837275 (N.D. Cal. Nov. 16, 2009)....................................................5

*Feller v. Transamerica Life Ins. Co.*,

 2017 WL 6496803 (C.D. Cal. Dec. 11, 2017) ..................................................19

*Fid. Brokerage Servs. LLC v. Pac. W. Bank*,

 749 F. Supp. 3d 1058 (C.D. Cal. 2024)..............................................................14

*Field v. Google, Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006)....................................4

iii

[REDACTED] MEMORANDUM OF POINTS AND AUTHORITIES ISO PLAINTIFF COMEDIANS' OBJECTIONS TO AND MOTION FOR
REVIEW OF SPECIAL MASTER'S REPORT AND RECOMMENDATION IN RE PARTIES' MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:22-cv-00809-MCS-MAR

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,

   2015 WL 4776932 (C.D. Cal. May 27, 2015) ............................................... passim

*Foad Consulting Grp., Inc. v. Azzalino*, 270 F.3d 821 (9th Cir. 2001) .................3, 4

*Fontana v. Harra*, 2013 WL 990014 (C.D. Cal. Mar. 12, 2013) .............................5

*Griego v. Jackson*, 2025 WL 297150 (C.D. Cal. Jan. 24, 2025) .............................5

*Hadady Corp. v. Dean Witter Reynolds, Inc.*,

   739 F. Supp. 1392 (C.D. Cal. 1990)......................................................22

*Hargis v. Pacifica Senior Living Mgmt. LLC*,

   2023 WL 6373869 (C.D. Cal. Aug. 2, 2023) (Scarsi, J.)......................................5

*Hunter v. Montgomery*, 2023 WL 4110542 (C.D. Cal. Mar. 8, 2023)....................13

*Interscope Records v. Time Warner, Inc.*,

   2010 WL 11505708 (C.D. Cal. June 28, 2010) ................................................3, 14

*Int'l Bhd. of Teamsters, Local 396 v. NASA Servs.*,

   957 F.3d 1038 (9th Cir. 2020)......................................................19

*Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944 (S.D.N.Y. 1997) .................15

*Khachatryan v. 1 Hotel W. Hollywood L.L.C.*,

   2024 WL 3015504 (C.D. Cal. June 14, 2024) ......................................................9

*Marvez v. Uproar Entertainment*,

   2022 WL 18284896 (C.D. Cal. Dec. 12, 2022) ........................................... 15, 16

*MGM Studios, Inc. v. Grokster, Ltd.*,

   518 F. Supp. 2d 1197 (C.D. Cal. 2007).............................................................4, 5

*Oddo v. Ries*, 743 F.2d 630 (9th Cir. 1984)............................................................14

*Offley v. Activision, Inc.*, 273 F. App'x 610, (9th Cir. 2008) ....................................2

*Pacific Motor Trucking Co. v. Automotive Machinists Union*,

   702 F.2d 176 (9th Cir. 1983) .............................................................................19

*PG&E v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33 (1968)..................21

*Providence Publ'ns, LLC v. NBC Universal Media, LLC*, 2025 WL 1206875 (C.D. Cal. Mar. 25, 2025) ...........................................................................5

*Softketeers, Inc. v. Regal W. Corp.*, No. 8:19-cv-00519-JWH (JDEx), 2023 WL 9227097 (C.D. Cal. Dec. 26, 2023), *aff'd* 2025 WL 636708 (9th Cir. Feb. 27, 2025)..................................................5

*Stevens v. CoreLogic, Inc.*, 194 F. Supp. 3d 1046 (S.D. Cal. 2016) ........................9

*Sukumar v. Direct Focus, Inc.*, 349 F. App'x 163 (9th Cir. 2009) ............................1

*Taylor Holland LLC v. MVMT Watches, Inc.*, 2016 WL 6892097 (C.D. Cal. Aug. 11, 2016) .......................................................3

*UMG Recordings, Inc. v. Disco Azteca Distribs., Inc.*, 446 F. Supp. 2d 1164 (E.D. Cal. 2006)................................................................12

*United States v. Westreich*, 2024 WL 2000088 (C.D. Cal. Mar. 14, 2024)..............14

**Statutes**

17 U.S.C. § 114 ...........................................................................................9, 10

17 U.S.C. §112 ......................................................................................................9

**Rules**

FED. R. CIV. P. 53 ..................................................................................................1

**Treatises and Other Authorities**

3 *Nimmer on Copyright* §10.02[A][5] (2025) ........................................................15

3 *Nimmer on Copyright* §10.15[B][3] (2025).........................................................15

Donald S. Passman, *All You Need to Know About the Music Business* 264-65 (10th ed. 2019) .............................................................................................7

Serona Elton, *Mechanical Licensing Before and After the Music Modernization Act*, 19 J. of Music & Ent. Indus. Educators Ass'n 18, 22 (2019)........................6

Plaintiff Comedians ("Plaintiffs") respectfully submit this Memorandum of Points and Authorities in support of their motion for review of Special Master Segal's July 2, 2025 Report and Recommendation (the "Report"). The Court should reject the Report, deny Pandora's motion for summary judgment, and enter partial summary judgment for Plaintiffs.

### STANDARD OF REVIEW

Under FRCP 53(f)(3) & (4), the Court decides *de novo* all objections to the master's findings of fact and conclusions of law, without deference. *Dawson v. Marshall*, 561 F.3d 930, 933 (9th Cir. 2009) (review "as if no decision had been rendered below"); *Sukumar v. Direct Focus, Inc.*, 349 F. App'x 163, 165 (9th Cir. 2009) (district court independently reviews evidence and exhibits).

## I. THE REPORT ERRONEOUSLY CONCLUDED THAT PLAINTIFFS GRANTED AN IMPLIED LICENSE.

The Report finds as a matter of law that the nine Plaintiffs granted an implied license to Pandora for their Literary Works (the "Works")[1] for both *non-interactive* streaming (requiring public performance licenses) and *interactive* streaming (requiring both mechanical reproduction and public performance licenses).[2] The Report applies the wrong test; under the correct test there is no implied license. Even under the Report's incorrect test, there is no implied license, or at minimum triable issues. Further, the Report does not properly separately analyze interactive streaming, which only began in 2017. Finally, the Report failed even to consider

---

[1] As the Court has noted, streaming a comedy track requires licenses under two separate copyrights: one for the sound recording and one for the underlying literary work. Order Re: Motion to Dismiss, Dkt.83, n.1

[2] Non-interactive streaming is like AM/FM radio, where the user may select a station. Interactive streaming, in contrast, allows a user to select any track and is a replacement for albums, CDs, and other forms of purchasing music or comedy. *See* Pl.Opening.Br. (Dkt.356-1) at 10-11; Pl.Opp. (Dkt.391-1) at 25-27; Oral Argument (5/15/25) Slide 18; Hearing Tr. 258:2-20; 268:7-10.

Plaintiffs' argument that any implied license was revoked while Pandora's infringement continued.

### 1. *__The Special Master Applied the Wrong Legal Test.__*

The Ninth Circuit requires the presence of three elements for an implied license: "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *Asset Mktg. Sys. v. Gagnon*, 542 F.3d 748, 754-55 (9th Cir. 2008) ("*Gagnon*"). Pandora does not contend it can satisfy the first two. The Works were not created at the *request* of Pandora; they were created in virtually all instances before Pandora even existed. Nor were the Works *delivered* by Plaintiffs to Pandora; instead, Pandora purchased sound recordings or obtained them from record labels. *See* Dkt.339-6 at ¶5. Because intent to permit copying is determined "at the time of the creation and delivery," 542 F.3d at 756, Pandora cannot show that element either.

This test originated in *Effects Associates v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990). The Ninth Circuit has reaffirmed it many times. *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001); *Corbello v. DeVito*, 777 F.3d 1058, 1067 (9th Cir. 2015) ("*DeVito*"). *Napster* explained: "Courts have found implied licenses **only in narrow circumstances where one party created a work at the other's request and handed it over, intending that the other copy and distribute it.**" 239 F.3d at 1026 (cleaned up; emphasis added).

Likewise, in *DeVito,* the Ninth Circuit reversed a finding of an implied license because the first two elements were not met: putative licensee "did not ask DeVito to create the [biography]" and its creation "long predated any specific effort … to parlay [DeVito's] life into a Broadway musical." 777 F.3d at 1067-68; *see Offley v. Activision, Inc.,* 273 F. App'x 610, 611-12 (9th Cir. 2008) ("The existence of a nonexclusive license may be implied from the manner in which the parties conducted their relationship **if a licensee created a work at the licensor's request and handed**

**it over,** intending that the licensor copy and distribute it.") (emphasis added) (court's emphasis omitted).

The Report applied a different test: "Grant of an implied license turns on intent, which is analyzed by considering the totality of the parties' course of conduct." Report at 33. This is essentially a restatement of the third element of *Effects* but disregards the first two limiting elements. The Report purported to find support for this abbreviated test in two Ninth Circuit decisions. Report at 34 (citing *Foad Consulting Grp., Inc. v. Azzalino*, 270 F.3d 821, 824 (9th Cir. 2001) and the unpublished *Evox Prods., LLC v. Chrome Data Sols, LP.*, 2023 WL 1879479, at *3 (9th Cir. Feb. 10, 2023)). Respectfully, this reflects a misreading of these cases. In *Foad*, the first two elements were undisputed. The works in question (architectural plans) were created at the *request* of and *delivered* to the putative licensor. 270 F.3d at 824. In *Evox*, there was an *express* agreement between the parties; the Court simply construed the express license to implicitly include a right of the licensee-requestor to sub-license the works. 2023 WL 1879479, at *3.

The Report also relied on two aberrant district court cases, primarily *Interscope Records v. Time Warner, Inc.*, 2010 WL 11505708, at *3-4 (C.D. Cal. June 28, 2010) (Wilson, J.). *See* Report at 35, 40-41. Judge Wilson denied a motion to strike an implied license defense even though creation of the work *upon request* was not alleged. Notably, *Interscope* was a decision on the pleadings, and Judge Wilson observed that ultimately "a blanket implied license would be extraordinarily difficult to prove." 2010 WL 11505708, at *9.

Significantly, a few years later (not long after *DeVito*), Judge Wilson applied all three elements of *Effects/Gagnon* in rejecting an implied license on a summary judgment motion. *Taylor Holland LLC v. MVMT Watches, Inc.*, 2016 WL 6892097, at *4 (C.D. Cal. Aug. 11, 2016). He treated the "totality of the parties' conduct" as part of the "third *Gagnon* element," not as supplanting the entire test. *Id*. at *4-5 & n.12.

The other outlier case relied on by the Report is *Field v. Google, Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006). *Field* found an implied license despite the absence of any prior relationship between copyright holder and putative licensee. The case involves unusual facts where a copyright holder tried to trick Google into copyright infringement. Rather than applying the *Effects* test, as it was bound to do, the court culled its own test from two out-of-circuit cases and a century-old Supreme Court decision setting forth requirements for an implied license defense to a charge of *patent infringement*. *Id.* at 1116; *contra Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 345-46 (1908) ("wide differences" between copyright and patent statutes precluded the Court from analogizing patent cases in a copyright case).

*Field* has been criticized by many courts, including by then Chief Judge of this Court. *See, e.g.*, *MGM Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1225-26 (C.D. Cal. 2007) ("[T]hough not seemingly acknowledged by the district court in *Field*, the Ninth Circuit has explained the implied license doctrine in copyright cases is to be very narrowly construed."). The Second Circuit characterized *Field* as applying a "permissive test" in contrast to the Ninth Circuit's "narrow test." *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 320 (2d Cir. 2022). *Field* was also decided *before DeVito*, which reversed a decision of the same Nevada district judge for improperly applying *Effects*.

Perhaps most pointedly, *Field* was characterized as "both nonbinding and distinguishable" in a 2015 decision finding musicians had not impliedly licensed their pre-1972 works to satellite radio company Sirius XM (now the parent of Pandora). *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 2015 WL 4776932, at *13 (C.D. Cal. May 27, 2015) (Gutierrez, J.).[3] Former Chief Judge Gutierrez found neither of the first two elements met, rejecting as irrelevant Sirius's nearly identical arguments to those here. *Id.* at *13. "Most importantly, binding Ninth Circuit

---

[3] *Flo & Eddie* was not previously cited by either party.

precedent supplies the standard here, and as class members own recordings created over four decades ago, they did not create those recordings at Sirius XM's direction; therefore, Sirius XM will not have credible implied license arguments as to any class members." *Id*.

Finally, the Report cited three additional district court cases (*see* Report at 33-34), but close reading of these cases shows, like Judge Wilson in *Taylor Holland*, these courts were evaluating the third element of *Effects*/*Gagnon* in situations (unlike the present) where the first two elements were satisfied. *See Griego v. Jackson*, 2025 WL 297150, at *3 (C.D. Cal. Jan. 24, 2025) (commission and delivery present); *Fontana v. Harra*, 2013 WL 990014, at *8-9 (C.D. Cal. Mar. 12, 2013) (same); *ExperExchange, Inc. v. Doculex, Inc.*, 2009 WL 3837275, at *9, *23-24 (N.D. Cal. Nov. 16, 2009) (same). In quoting *Fontana*, the Report omits a key clause, shown here in bold: "**[w]hen considering the third element of the Ninth Circuit test, the licensor's intent . . . "**

Conversely, virtually all courts in this District properly follow Ninth Circuit precedent. In *CraftShack, Inc. v. Critical Tel. Applications, Inc.*, 2025 WL 1255396, at *9 (C.D. Cal. Mar. 14, 2025), Chief Judge Gee rejected an implied license for failing to meet the first two elements without even addressing the third. In *Hargis v. Pacifica Senior Living Mgmt. LLC*, 2023 WL 6373869 (C.D. Cal. Aug. 2, 2023) (Scarsi, J.), this Court applied all three elements of *Effects* and found none of them satisfied. *Id.* at *9-11, 13; *see Softketeers, Inc. v. Regal W. Corp.*, No. 8:19-cv-00519-JWH (JDEx), 2023 WL 9227097, at *9-10 (C.D. Cal. Dec. 26, 2023) (requested and delivered), *aff'd* 2025 WL 636708, at *2 (9th Cir. Feb. 27, 2025); *see also Providence Publ'ns, LLC v. NBC Universal Media, LLC*, 2025 WL 1206875, at *4 (C.D. Cal. Mar. 25, 2025) ("totality of the parties' conduct" is considered when analyzing "the third element"). These cases and others, though cited to the Special Master, were not addressed in the Report. *See* Oral Argument (5/15/25) Slides 5-7, 15; *see also Grokster*, 518 F. Supp. 2d at 1225-26 ("Obviously, Plaintiffs did not

create their copyrighted works at StreamCast's request or for StreamCast's benefit.").

### 2. *The Special Master's Conclusion Is Wrong Even Under the Incomplete Test Adopted.*

Even if the test for an implied license is reduced to a single element, summary judgment against the Plaintiffs would be inappropriate. The Report ignored several categories of evidence raised and failed to consider important "intent" factors identified in *Gagnon*: the duration of the parties' relationship (short or non-existent, with respect to any direct relationship) and the existence of a written contract between them (there is none). *See Gagnon*, 542 F.3d at 754-57; Report at 43 ("Pandora had no direct contractual relationship with Plaintiffs"). Both factors weigh in Plaintiffs' favor. There are multiple distinct Plaintiffs here; the intent of one cannot be imputed to the others.

#### a. *Plaintiffs' Grant of Rights to Their Record Labels Is Not Relevant to Intent.*

At page 37, the Report notes that Plaintiffs granted their **record labels** (not Pandora) rights to their Works. This is irrelevant. Plaintiffs, like musical artists, routinely grant licenses to their record labels in their recording agreements under "controlled composition" clauses allowing the label to "mechanically" *reproduce* copies (or phonorecords) of any compositions (musical or comedy) the artist owns or controls in the sound recordings. Rosenblatt Rep. (Dkt.358-24) ¶28; Pl.Opening.Br. at 4; Pl.Opp. at 28; Pl.Reply (Dkt.440) at 4-7 (citing, *inter alia*, Serona Elton, *Mechanical Licensing Before and After the Music Modernization Act*, 19 J. of Music & Ent. Indus. Educators Ass'n 18, 22 (2019); Donald S. Passman, *All You Need to Know About the Music Business* 264-65 (10th ed. 2019); Pl.Ex.509 (treatise containing form record agreements)); Oral Argument (3/25/25) Slides 8-12. This allows the record company to sell physical records embodying the artist's musical or literary compositions. It also allows, **but does not require**, the record

label to "pass-through" (*i.e.*, sublicense) this right to third parties. *Id.* Labels passed through these mechanical license rights to third parties for digital downloads but did **not** do so for interactive streaming. Rosenblatt Rep. ¶¶21-46; Pl.Opp. at 3 (citing Pl.Ex.504, G.White Depo. at 280:12-281:3).

In no recording agreement does a recording artist grant the record company a license or the right to sublicense the *public performance* of the artist's underlying composition (music or comedy), which is a right the artist (singer/songwriter, comedian) reserves for the purpose of engaging a public performance society to license and collect performance royalties on their behalf (*e.g.*, ASCAP, BMI, Word Collections, Spoken Giants). Rosenblatt Rebuttal (Dkt.358-25) ¶8.

Controlled composition clauses in agreements with record labels are irrelevant. What is relevant is whether labels or distributors passed through the underlying rights in their agreements with Pandora. As discussed *infra,* the express language of those agreements, and other evidence, show they did not.

### b. *Plaintiffs' Purported Failure to Object.*

At pages 37-38, the Report cites examples of deposition testimony from five plaintiffs regarding purported failure to object, stating "[t]he result… is an implied license." This is legally and factually incorrect. Even cases analyzing only the third element of *Effects* do not collapse the inquiry to merely if the copyright holder objected. Indeed, *Gagnon* does not even mention failure to object as something to consider under the third element, and *Flo & Eddie*, 2015 WL 4776932, at *12-13, said it was not relevant when the first elements prongs are not present.[4]

Further, failure to object presupposes knowledge of (a) the use, (b) licensing requirements, and (c) lack of pass through. The record shows only knowledge of Pandora's uses for non-interactive streaming, and is silent on the last two points.

The distinction between Pandora's *non-interactive* service (launched in 2011)

---

[4] Indeed, Judge Gutierrez declined to find an implied license on almost identical facts as Pandora has proffered here. *See id.*

and its *interactive* service (launched in 2017) is important. Plaintiffs differentiated between the two in their Complaints, in opening briefing (SAC (Dkt.70) ¶¶ 24, 25, 39, 54, 67, 82, 96, 114, 132, 149; Pl.Opp. at 10-11), in their expert reports (*see generally* Rosenblatt Rep. (Dkt.358-24)), and at the two oral arguments (Oral Argument (3/25/25) Slides 14-20; Oral Argument (5/15/25) Slide 18-21). Pandora only began interactive streaming in 2017, and Word Collections wrote to it in 2020 requesting proof of licensing. SUMF¶5928; Pl.Ex.126, Price (8/4/2020) Email; Pl.Ex.422, Price Decl.

Interactive streaming is a potentially greater threat to Plaintiffs' livelihoods because it represents a full replacement for traditional forms of distribution: LPs, CDs, and permanent digital downloads (like iTunes). Rosenblatt Rep. at ¶16-46. Interactive streaming began to dominate industry revenue in the late 2010s. Rosenblatt Rep. at ¶42,n.46; Busch Letter to J. Segal May 7, 2025 (attached hereto). The Supreme Court has made clear the Copyright Act's rolling statute of limitations means a plaintiff does not lose rights (in the context of equitable estoppel/laches) by not objecting or suing until determining whether a claim is worth the cost. *Petrella v. MGM, Inc.*, 572 U.S. 663, 683 (2014).

At oral argument, the Special Master insisted the comedians knew how Pandora was performing their Works. Hearing Tr. 33:25-34:24. But Pandora failed to cite evidence Plaintiffs knew of the *interactive* service. Rather, Pandora cited royalty statements from SoundExchange. Oral Argument (5/15/25) Slide 20. SoundExchange pays performers (who may or may not be composers/authors) solely in connection with *non-interactive* streaming, pursuant to a statutory license. 17 U.S.C. §§112, 114. This might support an inference Plaintiffs knew or should have known of *non-interactive* streaming, but not of *interactive* streaming.

Even if Plaintiffs were aware of Pandora's interactive streaming, there is no evidence any Plaintiff understood it required the additional reproduction license discussed herein and throughout Plaintiffs' briefing, and which Pandora admits is

1  required at least for underlying musical compositions. *See* Pl.Opening.Br. at 22

2  (citing Pl.Ex.115, Pandora's Sworn RFA Responses).

3       Finally, even if some Plaintiffs knew of Pandora's interactive service, or the

4  reproduction license needed, it was reasonable for Plaintiffs to believe they were

5  passed through: (1) comedians granted to their labels the right to sublicense

6  mechanical reproduction rights, and (2) for many years, at least as early as the launch

7  of Apple's iTunes in January 2001, the comedian's record labels sublicensed these

8  rights for *permanent download* such as iTunes and Amazon MP3. *See* Rosenblatt

9  Rep. ¶¶29-30; Pl.SUMF (Dkt.356-2) ¶¶5992-3,6033-40; Oral Argument (5/15/25)

10 Slide 21. What the Plaintiffs did not know (and there is nothing in the record to

11 suggest they did) was their record labels **made a conscious decision not to pass**

12 **through reproduction rights for *interactive* streaming** because they did not want

13 to take on the burden and additional complexity of collecting and accounting for

14 these royalties. Rosenblatt Rep. ¶28; *see* Oral Argument (5/15/25) Slide 24.[5]

15         **c.  _Plaintiffs' Purported "Encouragement"._**

16      At pages 38-39, the Report considered evidence of purported

17 "encouragement."[6] But this is irrelevant for the same reasons Sirius's virtually

18 identical examples were irrelevant in *Flo & Eddie.*

19      Nonetheless, the Report cites a declaration from a Sirius XM representative

20

21 [5]  Pandora's 30(b)(6) witness George White admitted mechanical royalties are

22 payable by record labels when underlying licenses are passed through, *e.g.*, for

23 permanent downloads, and by interactive streaming companies when they are not.

24 Dkt.356-16 280:20-281:6. No Comedian received mechanical royalties for

    Pandora's interactive streaming from any label, which they would have if licenses

25 for their Works were passed through. Pl.Opening.Br. at 5; Rosenblatt ¶¶29-30, 53.

26 [6] Citing *Stevens v. CoreLogic, Inc.*, 194 F. Supp. 3d 1046, 1053-54 (S.D. Cal. 2016);

27 *Khachatryan v. 1 Hotel W. Hollywood L.L.C.*, 2024 WL 3015504, at *4 (C.D. Cal.

    June 14, 2024). In *Stevens* all three elements of the *Effects* test were met.

28 194 F. Supp. 3d at 1053-54. In *Khachatryan*, the court *denied* a motion to dismiss

    because the use exceeded the scope of the express license. 2024 WL 3015504, at *4.

that all Plaintiffs signed up for a Pandora marketing tool called "AMP." But virtually all Plaintiffs, when asked, disputed this. Pl.SGD to Pandora's AUMF (Dkt.439-2) at ¶¶1785-86. Plaintiffs Clay, Black, Engvall (*via* manager, JP Williams), and Lopez all stated they had not heard of nor used AMP. *Id.* Only DiPaolo's corporate representative testified to having an AMP account. *Id.* And Pandora did not provide any supporting documents in discovery. *Id.*; Pl.SGD to Pandora's SUMF (Dkt.391-2) at ¶389.

The Report also noted three of nine Plaintiffs, on one occasion each, supposedly encouraged Pandora's streaming, but one was simply an Instagram post in February 2022 thanking his fans (*after* Pandora requested a draft license from Word Collections), while another was not even from a Plaintiff but a record label relating to sound recordings (not bearing subject Works) being available on Pandora.

### d. **_Plaintiffs' Purported Acceptance of Compulsory Statutory Royalties for Sound Recordings Is Irrelevant._**

At pages 39-40, the Report references statutory SoundExchange royalties under 17 U.S.C. § 114 for Pandora's non-interactive streaming of *sound recordings* (compulsorily licensed to Pandora by record companies, not by the comedians). They are nothing else. Again, this Court has already recognized, "[s]imilar to recorded music, a performance of a comedic routine and the underlying routine itself are two distinct Works under the Copyright Act." Dkt.83, n.1. The payments relate only to non-interactive streaming, in effect covering only one of four licenses needed by Pandora:

| ROYALTIES PAID | Non-Interactive Streaming | Interactive Streaming |
|---|---|---|
| Sound Recording Rights | Statutory Royalty | Zero |
| Literary Work Rights | Zero | Zero |

As the Report acknowledges, Plaintiffs' counsel stressed "the royalties…the plaintiffs received were all for non-interactive streaming, not for interactive

streaming." Report at 47, n.8. The Report purports to dispute this, citing a single Exhibit. That exhibit, however, is a royalty statement from Warner Brothers to George Carlin's company for the fourth quarter of 2022, concerning royalties not from Pandora, but **YouTube,** which has a license to stream Carlin's literary works through Word Collections, and for which Mr. Carlin received 5 cents for "Streams-Subscription" and 9 cents for "Streams-Ad Supported." Nowhere does this statement mention Pandora, much less relate to any other Plaintiff.

Furthermore, receipt of royalties for one type of use under one copyright (for sound recordings) says nothing about whether an artist licenses a different type of use requiring different rights under a different copyright (for a literary work). The Special Master dismissed this point because she characterized Plaintiffs' position as seeking additional royalties for the "same thing," Hearing Tr. 60:1-62:23, even though Plaintiffs' counsel emphasized at the hearing that sound recordings and literary works are two different and separately subsisting subjects of copyright. *See, e.g.*, Hearing Tr. 59:21-62-2; 74:19-75:2; 112:14-113:10; Oral Argument (5/15/25) Slide 3 #8, 40-41; Dkt.83, n.1; Busch Email to J. Segal, March 31, 2025 (attached hereto).

The Special Master may also have been misled by her decision not to "rely upon any custom and practice evidence." Report 33. As one Court recognized, transactions in the recording industry occur against its unique backdrop, "with its preexisting norms, customs, and terminology," which can be opaque to outsiders unversed in industry practice. *Eight Mile Style, LLC v. Spotify USA Inc.*, 745 F. Supp. 3d 632, 669 (M.D. Tenn. 2024). Indeed, taken to its logical conclusion, the position adopted in the Report would mean a statutory payment for one copyright from any source could create an implied license on a completely different and separate

unlicensed copyright.[7]

### e. *Pandora's SEC Disclosures.*

At page 42, the Report rejected Plaintiffs' argument that Pandora's concession in SEC filings that it lacked a "specific license" to the literary works weighed against the finding of an implied license, but did not consider Pandora's other SEC disclosures in 2016 and 2017 that it had been unable "to obtain licenses for the underlying literary works for the sound recordings of spoken-word comedy content" and could "be sued for copyright infringement as a result." SUMF¶¶5838-41. Nowhere in these disclosures did Pandora state it had received or operated pursuant to an express or implied license.

Here too, the *Flo & Eddie* case is instructive in finding almost identical statements inconsistent with the existence of an implied license:

> Prior to this litigation, Sirius XM performed pre-1972 recordings without obtaining licenses or paying royalties. Sirius XM explained that its decision to perform pre-1972 recordings without first seeking licenses or paying royalties **was based on its interpretation of the applicable law.** Now, Sirius XM asserts that its "no-licenses" admission only referred to written licenses and that, "[i]n many cases," it has implied licenses with pre-1972 recording owners. However, **it is clear from Sirius XM's testimony that these alleged licenses were never sought out or relied upon by Sirius XM in its practice of**

---

[7] The Report's citation of *UMG Recordings, Inc. v. Disco Azteca Distribs., Inc.*, 446 F. Supp. 2d 1164, 1177-78 (E.D. Cal. 2006) does not support this startling proposition. There, the payments were not compulsory statutory royalties but were for the specific use of the works in question, there being no separate valid copyrights infringed by the use. And, indeed, other courts have recognized payment for a license to one copyright does not imply a license to other copyrights, even if the copyrights relate to the same work. *ABKCO*, 50 F.4th at 320-21; *Eight Mile*, 745 F. Supp. 3d at 658-59.

**performing pre-1972 recordings without formal licensing because Sirius XM decided not to formally license these recordings for performance based on its interpretation of the law, not an understanding that owners had already impliedly authorized performance.**

2015 WL 4776932, at \*12 (emphasis added and omitted; citations omitted).

### f. *An Implied License Is Inconsistent With the Language of Pandora's Agreements with Record Labels.*

At page 42-44, the Report considers whether an implied license is inconsistent with express agreements. As discussed further below, virtually all of the record label/distributor agreements in the same paragraph require Pandora to separately license musical compositions and literary work rights from the songwriters and authors. In the case of music, it is undisputed Pandora did just that: negotiate additional express agreements for the requisite rights. Pl.Ex.504, G.White Depo. Tr. 120:13-127:17; Pl.SUMF¶¶5832,5857. Thus, the Special Master ignored that, on the one hand, the same label agreements under the same provisions require Pandora to procure the requisite rights for musical works from third-party music publishers and songwriters, while finding they do not require the same for literary works, without any analysis of the provisions' language.

### g. *Pandora's Pre-Litigation Communications with Word Collections.*

The Special Master gave no weight to the 18 months of communications between Word Collections and Pandora after Word Collections first contacted Pandora requesting proof of license. Pandora not only requested a proposed license, and advised it was working on commercial terms, but never once said it believed it had an express or implied license. SUMF¶¶5925-74. The failure to do so represents a tacit admission that no license existed. *Hunter v. Montgomery*, 2023 WL 4110542, at \*13 (C.D. Cal. Mar. 8, 2023) ("[W]hen a person reacts with silence to a statement that would normally call for a response if untrue, such silence [may] be considered

1    a tacit admission.").

2    ### h. **The Scope of Any Purported Implied License Is Limited to Non-**

3    **Interactive Streaming.**

4    As Judge Wilson noted in *Interscope*, an implied license to some of Plaintiffs'

5    works "cannot, as a matter of law, give rise to a blanket license to use *all* of

6    Plaintiffs'" works. *Interscope*, 2010 WL 11505708, at *9. The same is true of type

7    of use. Questions of scope are generally for the jury. *See, e.g.*, *Oddo v. Ries*, 743 F.2d

8    630, 634 (9th Cir. 1984); *Crispin v. Christian Audigier, Inc.*, 839 F. Supp. 2d 1086,

9    1090, 1093-94 (C.D. Cal. 2011). Here, almost all the evidence relied upon by the

10    Report to find an implied license concerned only Pandora's *non-interactive*

11    streaming (launched in 2011 for comedy). Yet, the Report found the implied license

12    covered interactive streaming (2017) as well. Report at 46-51.

13    The Report faults Plaintiffs for not focusing more on the scope of the

14    purported implied license at an earlier stage. However, as the Report acknowledged,

15    the distinction between non-interactive and interactive streaming *was* raised in

16    Plaintiffs' Complaints, and in Plaintiffs' summary judgment briefings. Report at

17    46:10-15.

18    The Special Master is thus placing fault on the wrong party: "A plaintiff

19    seeking summary judgment on its claim is not obligated to affirmatively disprove a

20    defendant's affirmative defense in its opening brief.'" *Fid. Brokerage Servs. LLC v.*

21    *Pac. W. Bank*, 749 F. Supp. 3d 1058, 1065 n.2 (C.D. Cal. 2024) (quoting *United*

22    *States v. Westreich*, 2024 WL 2000088, at *3 (C.D. Cal. Mar. 14, 2024) (collecting

23    cases)). By contrast, Pandora, as the party asserting the affirmative defense, has the

24    burden to establish the scope of its purported implied license as a complete bar to

25    Plaintiffs' claims.

26    ### 3. **The Special Master Failed to Address Revocation of the Purported Implied**

27    **License.**

28    The Special Master acknowledged Plaintiffs' argument "that any implied

14

license would have been revoked on August 6, 2020 when Word Collections contacted Pandora to put it on notice of infringement and ask for proof of licensing." Report at 28:27-28; SUMF¶¶5928,5930. Yet, the Report fails to address this contention. Actions inconsistent with the implied license, such as demanding an express license or filing suit, work a revocation. *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997); 3 *Nimmer on Copyright* §§10.02[A][5], 10.15[B][3] (2025) ("It remains true that nonexclusive licenses are revocable absent consideration").[8]

Word Collections' action in 18 months of pre-litigation communications is inconsistent with an implied license and constitutes a revocation. Pandora's pre-litigation offer to remove the Works does not avoid the revocation. Since Pandora requested a proposed license and advised numerous times it was working on it, including "commercial terms" (for past and future exploitation), Word Collections understood there would be compensation for the unauthorized use of the Works. SUMF¶¶5927-5950.

## II. THE REPORT ERRONEOUSLY CONCLUDED THAT PANDORA RECEIVED AN EXPRESS LICENSE.

Despite stating she would not reach issues beyond implied license and equitable estoppel (Report at 32 n.5), the Special Master concluded in a one-half-page discussion that Pandora had express licenses to each of the Works at issue, not from Plaintiffs but from record labels. Report at 53. This was error. The Special Master relied on an inapplicable case, ignored evidence, and misread the agreements.

### 1. *The Special Master Erred in her Reliance on* **Marvez***.*

In finding an express license, the Report relies on a single case, *Marvez v. Uproar Entertainment*, 2022 WL 18284896, at *2 (C.D. Cal. Dec. 12, 2022). But

---

[8] Here, of course, there is no consideration: Pandora's entire defense rests on not having to pay Plaintiffs anything for their literary works.

*Marvez* concerns whether a record label owed mechanical royalties to the plaintiff when the plaintiff expressly waived any right to mechanical royalties (for the reproduction of her underlying routines). *Id*. at *2. The Court recognized, in the absence of such a waiver, "the underlying routines would be subject to the condition that a mechanical royalty be paid." *Id*. By virtue of this express waiver the Court held the label had the right to mechanically reproduce the underlying comedy material (though without obligation to pay mechanical royalties). *Id.* This case, addressing an artist's agreement with a record label, is irrelevant to analysis of the agreements between Pandora and record labels.

Indeed, here, most Plaintiffs expressly provided their labels with mechanical licenses—under controlled-composition clauses or similar provisions (Rosenblatt Rep. ¶28). None waived their right to mechanical royalties. *Marvez* thus supports their right and objective intent to receive such royalties—not to give them away for free, as the Report effectively concludes.

**2.   _The Plain Language in Pandora's Agreements with Labels Does Not Grant Any Rights to Underlying Works (Music or Literary)._**

The Report states: **"Plaintiffs point to no admissible countervailing evidence disputing Pandora's showing that none of Pandora's agreements with the major label and distributors expressly exclude or carve out any rights to the routines."** Not only is this wrong, but the Special Master's initial Tentative stated the same thing, and Plaintiffs pointed to abundant evidence in the record. Hearing Tr. 106:25-145:19; Oral Argument (3/25/25) Slide 30. This evidence includes the express unambiguous language of the Agreements, numerous admissions by Pandora in testimony and otherwise, and Declarations from label/distributor executives.

First, the grant language is all specific to sound recordings or masters, and does not include underlying music or literary compositions:

- Warner and ADA:[9] ███████████████████████████

  ██████████ Pl.Ex.120.

- Universal and Ingrooves:[10] ████████████████████████

  ███████████████ Pl.Ex.48.

- Sony and The Orchard:[11] ████████████████████████

  ████████████████████████████ Pl.Exs.8,119.

- TuneCore, DistroKid, and Merlin:[12] █████████████

  ████████████████████████████████████████████████

  Pl.Exs.121,122; Pan.Ex.381. ███████████████████████

  ██████████████████████████████████████████████████

  Further, ████████████████████████████████████████

  ██████████████████████████████████████████████████

  ██████████████████████████████████████████████████

  ██████████████████████████████████████████████████

  ██████████████████████████████████████████████ *Id.*

Specifically:

- <u>Warner and ADA:</u> ███████████████████████████

  ██████████████████████████████████████████████████

  ██████████████████████████████████████████████████

---

[9] ADA is Warner's wholly-owned record distributor. Tracks distributed by ADA are governed by the Warner Agreement. SUMF¶5902.

[10] Tracks distributed by Ingrooves are covered by the UMG Agreements. SUMF¶¶5754-58.

[11] These Agreements are virtually identical in all relevant aspects, SUMF¶¶5914-18, because Sony acquired The Orchard in 2015 so the Orchard agreement is consistent with and subject to the terms of the Sony/Pandora agreement. McCrady Decl. ¶4.

[12] These Agreements are virtually identical in relevant aspects and were drafted by Pandora. SUMF¶5917.

1

2

3

4

5

6

7

8  • <u>Universal  and  Ingrooves:</u>

9

10

11

12  (emphasis  added).  Pl.Ex.48;[13]  *see  also*,

13

14

15  • <u>Sony  and  The  Orchard:</u>

16

17

18

19

20  SUMF¶¶5914-5918; Pl.Exs.8,119.

21  • <u>TuneCore,  DistroKid,  and  Merlin:</u>

22

23

24

25

26

27  [13] Pandora produced two copies of their label agreements with different degrees of

28  redaction. *Compare* Pandora Ex.384 *with* Pl.Ex.48. Plaintiffs' Exhibits contain less redaction, and should be the documents reviewed: Exs.8,48, 119-122.

Plaintiffs thus absolutely pointed out "carveouts," and the Report's conclusion that these provisions are "incompatible," and defeat the agreements' purpose, is legal error. *Pacific Motor Trucking Co. v. Automotive Machinists Union*, 702 F.2d 176, 177 (9th Cir. 1983) (*per curiam*) (reversible error to "disregard[] a specific contract provision"); *Int'l Bhd. of Teamsters, Local 396 v. NASA Servs.*, 957 F.3d 1038, 1042 (9th Cir. 2020) ("The whole of a contract is to be taken together, so as to give effect to every part,… each clause helping to interpret the other.")

### 3. <u>*The Report Ignored Record Label Declarations and the Testimony of Pandora's Own Witnesses.*</u>

The Report makes no reference to the Declarations of Tracie Parry of Warner, and MaryLynne Drexler of ADA, despite Plaintiffs bringing them to her attention. They confirmed they only granted Pandora licenses to *sound recordings* and did not pass through **any rights in "copyrighted material embodied in the sound recordings, such as musical compositions or spoken word**." Pl.Exs.124,125; Oral Argument (3/24/25) Slide 36).

Yet, the Report cites a self-serving declaration from Pandora executive George White replete with inadmissible subjective intent (Report at 44:20; *but see Feller v. Transamerica Life Ins. Co.*, 2017 WL 6496803, at *12 (C.D. Cal. Dec. 11, 2017) ("Statements about unexpressed subjective intent… are inadmissible in every jurisdiction."*)*, while ignoring Mr. White's conflicting admission at his deposition the Sony agreement (which is identical to The Orchard Agreement) required Pandora to obtain literary work licenses. Oral Argument (3/25/25) Slide 41; Pl.Opp. at p.15 n.2. A break in the deposition was then taken. Mr. White met with counsel. He then changed his testimony. *Id.* (citing Pl.Ex.450, 38:6-42:18;152:6-198:23).

Finally, as discussed below, the Report also ignored the sworn Declaration submitted by the General Counsel of the Orchard stating: the Orchard distributes "recordings," the express language of its Agreement with Pandora control what rights were granted and are subject to and consistent with the Pandora/Sony

19

1  Agreement, the terms "speak for themselves," and do not "import custom and

2  practice not expressed in the agreement." *Id*. Pl.Ex.73.

3  ### 4.   ***Pandora's Post-Litigation Letters.***

4       The Report references so-called "re-platforming" letters Pandora sent third

5  parties, after this litigation was filed, on a take it or leave it basis, in which Pandora

6  refused to reinstate comedy albums unless the comedians agreed to a zero royalty

7  for literary works, and acknowledge Pandora had a pre-existing agreement to stream

8  works. SUMF¶¶5976-5990. Those who signed Sirius/Pandora's letter did so after

9  Pandora unilaterally removed all recordings of Word Collections' and Spoken

10 Giants' clients from its platform. *Id*.

11      Strikingly, the Report ignored that, in response to a third party asking what

12 prior agreement Pandora was referring to, Pandora admitted (in an email drafted by

13 in-house legal counsel), there actually were no prior agreements, but Pandora was

14 instead relying on its alleged long-standing practice. *Id*.; Oral Argument (3/25/25)

15 Slide 44.[14]

16      Similarly, the Report at page 44 cites an email from Orchard that supposedly

17 confirmed it "always" passed through necessary rights to comedy routines "to

18 Pandora and others." Pandora's AUMF¶¶ 2364-2367. Not correct. *First*, the email

19 concerned only Spotify, not Pandora, and said nothing about other services. *Second*,

20 the email was specifically in response to *Spotify's* post-litigation de-platforming of

21 all Orchard-distributed comedy albums. *Finally*, Spotify offered to "pay an

22 additional flat amount [of an approximated 1% of revenues] going forward"—an

23 amount Orchard characterized in the email as "small" (compared to the approximate

24 20% Spotify pays for streaming musical works), but something Pandora has not even

25 offered to do. Pan.Ex.579.

26

27 [14] The Special Master referenced The Orchard signing Sirius/Pandora's post-
28 litigation letter but again disregarded the aforementioned Declaration of the General
   Counsel of The Orchard.

**5.** *Pandora's SEC Admissions.*

As discussed, Pandora stated in its SEC disclosures for the years 2011-2015 it streamed comedy "**absent a specific license** from … **individual rights owners**…." SUMF¶5840, and, in year end 2016 and 2017, after interactive streaming agreements, it has been unable to secure licenses. SUMF¶5838-41.

**6.** ***The Special Master Declined to Consider Custom and Practice.***

The Special Master found there was a triable issue regarding the Parties' competing industry custom and practice evidence on whether or not rights granted by comedians to their labels and distributors were "passed through" to digital services. Report at 33 n.6, 45. While Plaintiffs' assert the Pandora label agreements unambiguously require Pandora to obtain all required reproduction licenses, under California law, a court must provisionally receive extrinsic evidence to determine if an agreement is reasonably susceptible to the interpretation advanced by the proponent of the evidence. *PG&E v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 39-40 (1968). Refusal to consider Plaintiffs' evidence of custom and practice was error.[15]

**7.** ***The Special Master Failed to Consider Any of Pandora's Other Admissions.***

After Word Collections first reached out requesting proof of license, putting Pandora on notice of infringement, Pandora never provided any proof of license, nor claimed to have a pass-through or even an implied license. SUMF¶¶5925-74; Dkt.390-43, Price Decl. at ¶¶3-12. Rather, it asked Jeff Price to propose a license, and represented it was working on "commercial terms." *Id*. These are tacit admissions. *Hunter*, 2023 WL 4110542, at *13.

---

[15] Pandora originally contended as its primary implied license/custom and practice defense, that "no comedian" has ever received licensed literary works or been paid mechanical royalties. Dkt.71; Pl.Ex.417. Discovery has shown this to be absolutely false (SUMF¶¶5994-6040; Rosenblatt Rep. at n.55), and a Pandora Senior Executive in charge of licensing during the relevant time knew it. Pl.Ex.118 (Parness Decl.) ¶¶7-9.

21

**III.    THE SPECIAL MASTER ERRONEOUSLY CONCLUDED THAT EQUITABLE ESTOPPEL BARRED THIS ACTION.**

*1.    <u>The Report Uses The Wrong Test for Equitable Estoppel.</u>*

In finding estoppel (Report at 51-53), the Special Master cited older decisions and dismissed the Supreme Court's 2014 *Petrella* decision as "primarily" about laches. But the Supreme Court, in distinguishing laches and equitable estoppel stated the latter applies only when a copyright owner engages in **"intentionally misleading misrepresentations concerning [Plaintiffs'] abstention from [bringing] suit."** 572 U.S. at 684 (emphasis added). This was not casual advice, but "**[t]he** test." *Id.* (emphasis added); *id.* at 684-85 (**"The test for estoppel is more exacting than the test for laches . . . . Delay may be involved, but is not an element of the defense."**) (emphasis added). This is vital to the Supreme Court's holding. Otherwise, the elimination of the laches defense in copyright actions would be meaningless: a defendant could simply repackage the same facts about delay and call it estoppel. Here, the record is devoid of any intentionally misleading representations from Plaintiffs regarding abstention from suit (or anything else).

*2.    <u>The Special Master's Conclusion is Wrong Even Under The Standard Cited By Pandora.</u>*

Pandora cited a four-factor test under *Hadady Corp. v. Dean Witter Reynolds, Inc.*, 739 F. Supp. 1392, 1399 (C.D. Cal. 1990), which predates *Petrella* by almost 25 years. Pandora cannot satisfy this looser standard either.

*a.    <u>Plaintiffs did not have Knowledge of Pandora's Infringing Conduct.</u>*

The Special Master erred by conflating knowledge the Works were streaming with knowledge the acts constituted "infringing conduct." As noted, nothing in the record evidences any Plaintiff was even aware of Pandora's "on demand" streaming of their works. Likewise, the Comedians were not privy to the agreements between their labels and Pandora. Pl.Opp. at 22-23. Until Word Collections first reached out to Pandora asking for proof of license for the literary works, Plaintiffs did not know

1  (and could not reasonably be expected to know) if Pandora's streaming of the sound
2  recordings embodying the literary works was infringing conduct.

3      **b.  _Plaintiffs did not intend their conduct would be relied on by Pandora._**

4      The record contains no evidence to support that Plaintiffs intended to deceive
5  Pandora into thinking it had a license.

6      **c.  _Pandora was not "Ignorant of the True Facts"._**

7      Pandora was not ignorant of the true facts—it publicly admitted it was
8  streaming sound recordings "absent a specific license" from the literary work rights
9  holders. Pl.Exs.105,108-112.

10     **d.  _Pandora Did Not Detrimentally Rely on Plaintiffs' Conduct or_**
11         **_Silence._**

12     There is simply nothing in the record to support that Pandora altered its
13 conduct at all because of Plaintiff's conduct. Pandora streamed the Works without
14 reaching out first to the comedians and continued this practice for years—there was
15 no inducement from the Plaintiffs _causing_ Pandora to start streaming the recordings.
16 Pandora did not alter its conduct when placed on notice by Word Collections.
17 SUMF¶¶5850;5847; _Flo & Eddie_, 2015 WL 4776932, at *13-14 (rejecting estoppel
18 on similar facts).

19 **IV.  CONCLUSION.**

20     As such, the Court should reject the Special Master's Report and enter partial
21 summary judgment for Plaintiffs.

22

23

24

25

26

27

28

1    DATED: July 16, 2025                    KING & BALLOW

2                                            By: /s/ *Richard S. Busch*

3                                                 Richard S. Busch

4                                            Attorneys for Plaintiffs *Yellow Rose*

5                                            *Productions, Inc.; Main Sequence Ltd.;*
                                             *Ron White, Inc.; Robin Williams Trust;*
6                                            *Brave Lion, Inc.; Nick Di Paolo;*

7                                            *Mary Reese Hicks; Lewis Black; and*
                                             *George Lopez*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs, certifies this brief contains 6988 words, which complies with the word limit set by the Court's Local Rule 11-6.1.


Dated: July 16, 2025                                    **KING & BALLOW**


                                    By: */s/ Richard S. Busch*
                                    Richard S. Busch
                                    KING & BALLOW
                                    Daniel B. Asimow
                                    ARNOLD & PORTER KAYE SCHOLER LLP
                                    *Attorneys for Plaintiffs*