1   Hon. Suzanne Segal (Ret.)
    SIGNATURE RESOLUTION, LLC
2   633 West 5th Street, Suite 1000
    Los Angeles, California 90071
3   judgesegal@signatureresolution.com

4

**FILED**
CLERK, U.S. DISTRICT COURT

7/22/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DEPUTY

5                   **UNITED STATES DISTRICT COURT**

6                   **CENTRAL DISTRICT OF CALIFORNIA**

7                          **WESTERN DIVISION**

8

9   **In re PANDORA MEDIA, LLC**              Case No.: 2:22-cv-00809-MCS-MAR

10  **COPYRIGHT LITIGATION**                  CONSOLIDATED ACTION

11                                            **SPECIAL MASTER'S REPORT &**
                                              **RECOMMENDATION RE: MOTIONS**
12  **This Document Relates To:**             **FOR SUMMARY JUDGMENT**

13  **ALL ACTIONS**                           ~~CONDITIONALLY FILED UNDER SEAL~~

14                                            **REDACTED VERSION**

15        This Report and Recommendation is submitted to the Honorable Mark C. Scarsi, United

16  States District Judge, pursuant to Federal Rule of Civil Procedure 53.   Pursuant to the Court's Order

17  appointing the Special Master, a motion for review or objections to the Report and Recommendation

18  are due no later than 14 days from the date of the Report.  Oct. 29, 2024 Order at 12.

19        This case concerns copyright litigation brought by a group of comedians[1] against Defendant

20  Pandora Media, LLC ("Pandora").   Plaintiffs allege that Pandora infringed their copyrights by

21  streaming their stand-up comedy routines without obtaining the proper licenses for the underlying

22  literary works, i.e. the jokes themselves (referred to herein as "the Routines" or the "Works").   While

23  Pandora paid royalties for the recorded performances (i.e. the sound recordings), it failed to pay

24  additional royalties for the Routines separate from those recorded performances.

25  _____

26  [1] Plaintiffs are Yellow Rose Productions, Inc., on behalf of Bill Engvall; Main Sequence, Ltd.; Ron
    White, Inc., on behalf of Ron White; Robin Williams Trust; Brave Lion, Inc., on behalf of Andrew
27  Clay Silverstein a/k/a Andrew Dice Clay; Nick Di Paolo, individually and on behalf of Acid Tongue,
    Inc.; Mary Reese Hicks, individually and on behalf of Arizona Bay Production Co., Inc.; Lewis Black,
28  individually and on behalf of Stark Raving Black Productions, Inc.; and George Lopez (collectively,
    "Plaintiffs").

On August 21, 2024, Pandora filed a Motion for Summary Judgment on multiple grounds. Pandora argued that it had an implied license and an express license to use the copyrighted comedy routine works (the "Routines" or "Works"), Plaintiffs' claims were barred by equitable estoppel, Plaintiffs' claims for infringement of the Works were barred because Plaintiffs had engaged in copyright misuse, Plaintiffs had not established registration or ownership of many of the Works, that many albums were untimely registered, and that any infringement was innocent.  *See* Dkt. 339.

That same day, Plaintiffs filed a Motion for Partial Summary Judgment as to liability for infringement, willfulness, Plaintiffs' entitlement to have their claim for statutory damages determined on a track-by-track basis, and seeking summary adjudication of Pandora's affirmative defenses in favor of Plaintiffs.  *See* Dkt. 347.

The Special Master has considered the briefs and exhibits submitted as well as the Court's order regarding the Daubert motions.  The parties presented oral argument to the Special Master in lengthy hearings held on March 25, 2025 and May 15, 2025. *See* § I.E, *infra*.

The Special Master concludes that Pandora had an implied license as well as an express license to publicly perform and distribute the Works on Pandora's non-interactive digital radio service and to publicly perform, reproduce and distribute the Works on Pandora's interactive streaming service in the three years preceding the filing of this action.  Furthermore, Pandora has established that Plaintiffs' claims are subject to equitable estoppel.  These conclusions are dispositive of Plaintiffs' claims and make consideration of the remaining arguments unnecessary.  Accordingly, it is recommended that Pandora's Motion for Summary Judgment be GRANTED and Plaintiffs' Motion for Partial Summary Judgment be DENIED.

# I.  BACKGROUND SUMMARY

## A.  Plaintiffs' Arguments in Support of its Motion for Partial Summary Judgment And in Opposition to Pandora's Motion for Summary Judgment

### 1.  Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment

In their Memorandum of Law in Support of Motion for Partial Summary Judgment (Dkt. 347), Plaintiffs argue that the comedy routines are distinct copyrights, separate from the sound recordings embodying the Routines and require specific mechanical licenses for streaming. Plaintiffs assert that they possess valid copyrights for these Routines and contend that that Pandora infringed these copyrights by publicly performing and distributing the Routines on their streaming platforms without an implied or express license, thus violating Plaintiffs' exclusive rights under copyright law.

Plaintiffs argue that the evidence produced in discovery proves that Pandora has infringed Plaintiffs' valid copyrights by streaming their comedy routines without obtaining the necessary licenses.  Specifically, Plaintiffs highlight the following evidence: (i) Pandora streamed all but nine of Plaintiffs' works in the three years preceding the filing of this lawsuit; (ii) Pandora streamed these works on both its interactive and non-interactive platforms; (iii) Pandora did not obtain the necessary licenses to do so; (iv) Pandora knew it was publicly performing Plaintiffs' works without a license when it began streaming them; and (v) Pandora's agreements with Sony Music Entertainment, Universal Music Group, Warner Music Group, and The Orchard (the entities from which Pandora acquired rights to the sound recordings embodying Plaintiffs' Routines) for the sound recordings make clear that Pandora is obligated to obtain third-party rights to the Routines.

Plaintiffs argue that Pandora's purported belief that it had an implied license was based on the false premise that it is a recognized "custom and practice" not to license literary works or pay comedians mechanical royalties. Plaintiffs point out that many comedians have contracts that provide for both. In any event, they argue, "custom and practice" cannot override the statutory law and does not provide a legal defense for Pandora.

With respect to any express license, Plaintiffs argue that the evidence will show that Pandora knew it was required to obtain licenses for the works it streamed. They argue that Pandora's executives requested a proposed license from Plaintiffs (although it appears this occurred after Plaintiffs threatened Pandora with litigation), as well as the legal basis for the claims against it (which Plaintiffs provided). According to Plaintiffs, Pandora then engaged in eighteen months of negotiations with Plaintiffs, stating that the matter had moved from "legal to licensing," and that it was working on "commercial terms" for a license, but never once stated that it had a license. Further, Plaintiffs argue, Pandora admitted in depositions that it never obtained a license for Plaintiffs' Routines.

Plaintiffs also argue that their claim for statutory damages must be determined on a track-by-track basis. Plaintiffs contend that none of Pandora's affirmative defenses protect Pandora against liability for its infringing use of the Routines.

In sum, Plaintiffs argue that they have valid copyrights for each of their Routines and that Pandora publicly performed and distributed the Routines on its non-interactive digital radio service and its interactive streaming service in the three years preceding the filing of this action. Yet, Pandora has neither a public performance license required for its digital radio and interactive service, nor the additional reproduction license required for its interactive service. Plaintiffs' MSJ at 1, ll. 14-16. Therefore, Plaintiffs argue, they have set forth a prima facie case of copyright infringement. Furthermore, Plaintiffs argue that because Pandora knew it was infringing Plaintiffs' copyrights in the Routines, Pandora's conduct was willful. *Id.*

2. **Plaintiffs' Memorandum of Law in Opposition to Pandora's Motion for Summary Judgment**

In their Memorandum in Opposition to Pandora's Motion for Summary Judgment (Dkt. 396), Plaintiffs contend that the copyright registrations for the Routines are valid. They have provided documentation and evidence to support the ownership and control of these copyrights. They also argue that any errors in the registrations are minor and do not invalidate their copyright claims.

Plaintiffs contend that Pandora does not have an implied license to use the copyrighted works. They argue that the circumstances do not meet the criteria for establishing an implied license under

*Effects Associates, Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990). According to Plaintiffs, *Effects* provides a narrow test for determining whether an implied license exists for the use of copyrighted material, and specifically asks whether the user of the material requested the creation of the work, whether the creator of the work delivered it to the user who made the request, and whether the creator intended for the user to copy and distribute the work. Absent these circumstances, Plaintiffs maintain, the creator of the copyrighted material cannot be deemed to have implicitly granted permission to the user for its use.

Given the *Effects* standard, Plaintiffs assert that Pandora's claim that it has an implied license to use the Routines is not persuasive for several reasons: (i) there was no mutual intent or meeting of the minds for an implied license; (ii) Pandora's belief that it had an implied license is based on its unilateral actions and interpretations, which do not reflect the actual intentions of the copyright owners; (iii) implying a license in this situation would be contrary to industry standards and the established practices of copyright owners and music users, inasmuch as copyright owners typically license their works through PROs or directly with users, and implying a license would undermine this system; and (iv) there is no evidence of conduct or communication from the copyright owners that would indicate an intent to grant Pandora a license, and mere silence or failure to object does not constitute implied consent.

Furthermore, Plaintiffs assert that Pandora's claim that it has an implied license to stream the works is contradicted by the undisputed facts that: (i) Pandora admitted in SEC filings that it was "unable to obtain licenses for the underlying literary works for the sound recordings of spoken-word comedy content"; (ii) the distribution agreements Pandora entered into with record labels and distributors state that no underlying rights were conveyed and that it was Pandora's obligation to obtain licenses and pay royalties for the works; and (iii) Pandora did not claim to have an implied license in eighteen months of pre-litigation communications with Plaintiffs. Plaintiffs argue that Pandora's purported belief that it had an implied license was based on the false premise that it is "custom and practice" not to license literary works or pay comedians mechanical royalties. Plaintiffs point out that many comedians have contracts that provide for both. In any event, they argue, "custom and practice" cannot override the statutory law and does not provide a legal defense for Pandora.

Plaintiffs emphasize that they have not granted any explicit permission for Pandora to use their Routines. Plaintiffs argue that Pandora's claim of having such an express license to use the copyrighted works is invalid because: (i) the agreements through which Pandora obtained the rights to sound recordings explicitly state that Pandora is required to secure the rights to any third-party content, which includes the copyrighted literary works at issue; (ii) both Warner and ADA have provided sworn statements confirming that they do not grant Pandora the right to use literary works; the Orchard has stated that their agreement with Pandora speaks for itself and does not include any implied or customary practices that would grant Pandora the right to use the copyrighted works; (iii) in filings with the Securities and Exchange Commission ("SEC"), Pandora has (according to Plaintiffs) publicly "acknowledged" that it does not have the necessary licenses to stream literary works and faces the risk of copyright infringement lawsuits; (iv) during the 18 months of discussions leading up to the litigation, Pandora never asserted that it had an express license to use the works in question; and (v) since the start of the lawsuit, Pandora has admitted that it does not possess an express license to stream the literary works. Based on this evidence, Plaintiffs argue that Pandora was well aware it was operating without the necessary legal permission.

In addition, Plaintiffs assert that the principle of equitable estoppel does not apply in this case, inasmuch as they have not made any intentional misrepresentations or engaged in misconduct that would prevent them from enforcing their copyrights, and Pandora has not relied on any actions by Plaintiffs to its detriment.

### 3. Reply in Support of Motion for Partial Summary Judgment

In their Reply Memorandum in support of their Motion for Partial Summary Judgment (Dkt. 440), Plaintiffs argue that Pandora has resorted to misdirection and false accusations against Word Collections, the administrator supporting the comedians in this litigation. Plaintiffs emphasize the importance of protecting comedians' royalties and intellectual property rights, drawing a parallel to the formation of ASCAP to protect songwriters' rights. Plaintiffs contend that Pandora's accusations of misconduct and fraud against Word Collections are a misrepresentation of Word Collections' efforts to safeguard comedians' royalties.

1    Plaintiffs disagree with Pandora's contention of an implied license, asserting that Pandora

2    failed to provide evidence of a mutual intent for implied licensing. They dismiss Pandora's reliance

3    upon express agreements between labels and Pandora as irrelevant, stating that these agreements do

4    not grant Pandora the right to stream copyrighted material or absolve Pandora of its infringement.

5    Plaintiffs emphasize the necessity of obtaining a license for the underlying literary work (i.e. the

6    Routines), irrespective of any copyright for the sound recording.

7    Plaintiffs argue that Pandora does not have an express license to use the copyrighted works.

8    They also contend that the concept of "merger" does not apply in this case, as the copyrighted works

9    are distinct from the sound recordings in which they are embodied.

10

11    **B. Pandora's Arguments in Support of Its Motion for Summary Judgment**

12    **1. Memorandum of Law in Support of Pandora's Motion for Summary Judgment**

13    In its Memorandum in Support of its Motion for Summary Judgment (Dkt. 339), Pandora

14    argues that it had an implied license to stream the works and that an implied license can be

15    established through the parties' conduct, including their actions, knowledge, and intentions.  Pandora

16    contends that its position is supported by evidence that from the first date that Pandora licensed

17    Plaintiffs' works, Plaintiffs intended to convey all necessary rights to their record companies, knew

18    their Routines were being streamed on Pandora, never objected, and accepted royalties without any

19    objections.  In addition, Pandora asserts that the parties' conduct should be viewed in the context of

20    industry practices, because comedy routines have always been licensed "at the source," whereby the

21    record label that creates the recording secures from the comedian, and passes along to downstream

22    users, *all rights* needed to use the derivative work.  Pandora rejects Plaintiffs' emphasis on the "work-

23    for-hire" aspect of the "*Effects* test" for an implied license, asserting that *Effects* does not prevent a

24    court from finding an implied license for pre-existing works.  Pandora asserts that courts have

25    generally relied on the "totality of the circumstances" and overall conduct of the parties to establish

26    implied licenses, citing cases where implied licenses were found based on facts similar to the present

27    case.

28

Alternatively, Pandora argues that it had an express license to stream the Routines by virtue of its agreements with the Collective Management Organizations ("CMOs"), which collect and distribute royalties to copyright owners. Pandora argues that its agreements with the CMOs gave it the right to stream the Routines in question.

Pandora also argues that the claims against it should be dismissed based on the doctrine of equitable estoppel. In order to establish equitable estoppel, Pandora must show that the Plaintiffs knew about Pandora's use of the works, that Plaintiffs encouraged or supported Pandora's use of the works, that Pandora was ignorant of the true facts, and that Pandora detrimentally relied on Plaintiffs' conduct. Pandora contends that Plaintiffs knew about Pandora's use of the works, as evidenced by the fact that the works were registered with the CMOs. Pandora also argues that Plaintiffs encouraged or supported Pandora's use of the works by entering into agreements with the CMOs. Pandora asserts that it was unaware that Plaintiffs' performances were not included in the CMOs' repertories. In addition, Pandora argues that it detrimentally relied on Plaintiffs' conduct by investing in its business model and infrastructure in reliance on the availability of the works in the CMOs' repertories. Accordingly, Pandora maintains that Plaintiffs are equitably estopped from pursuing their claims due to their knowledge and acceptance of Pandora's use of their routines for many years without objection.

## 2.  Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment

In Pandora's Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Dkt. 393), Pandora asserts multiple arguments. Pandora contends that it has an implied license to stream the Routines because Plaintiffs knew about and allowed Pandora's use of their comedy routines over the course of several years without making any objections, Plaintiffs accepted royalties from Pandora for this use without requesting anything further for the use and streaming of those routines, and a number of Plaintiffs testified that they intended to provide the record labels and distributors with all rights (including spoken word or literary work rights) and that they even encouraged that use because it helped promote their works. While some of the Plaintiffs asserted

1    that they never intended to permit Pandora to stream their comedy routines, those Plaintiffs never

2    manifested that intent and failed to take any steps to raise a claim of infringement.

3        Pandora contends that it had an express license to use the works, granted to Pandora by the

4    record labels that distributed the recordings.  Pandora argues that Plaintiffs are equitably estopped

5    from suing for infringement because Plaintiffs knew about Pandora's use of their works and

6    encouraged it, and Pandora relied on this encouragement to its detriment.

7

8                    **3.  Reply in Further Support of Pandora's Motion for Summary Judgment**

9        In Pandora's Reply Memorandum in further support of its Motion for Summary Judgment

10   (Dkt. 442), Pandora asserts that the undisputed evidence shows that Pandora is entitled to stream the

11   Routines.  Pandora reiterates that it is entitled to stream the Routines because it has a license, either

12   implied or express, to do so.

13       An implied license can arise from the conduct of the parties manifesting an objective intent

14   on the part of the copyright holder to grant such a license.  Such a license exists here, Pandora argues,

15   because the record companies and distributors were given the right to license the Routines to

16   streaming services like Pandora, Plaintiffs knew their recordings were streaming on Pandora but

17   never objected, actively encouraged Pandora to stream the Routines, and accepted royalties from

18   Pandora without claiming that more was owed.  Pandora distinguishes the cases cited by Plaintiffs

19   by arguing that those cases contain limiting language that does not apply to the present case.  Pandora

20   also states that its SEC filings are consistent with an implied license defense.

21       Pandora also had an express license to stream the Routines because Plaintiffs' agreements

22   with the record labels granted those companies the right to exploit the recordings, including the

23   Routines, to downstream users like Pandora.  Pandora states that its own agreements with the record

24   labels and distributors do not require Pandora to secure rights to the underlying Routines.  Finally,

25   Pandora argues that its position is also supported by the longstanding industry practice of licensing

26   comedy routines "at the source" whereby the record label that creates the recording secures from the

27   comedian, and passes along to downstream users, all rights needed to use the derivative work.

28

Pandora argues that Plaintiffs' claims should be barred due to equitable estoppel. Pandora argues that the comedians knew about Pandora's use of the routines, encouraged it, and that Pandora detrimentally relied on the knowledge that the comedians had about Pandora's use of the routines. Pandora distinguishes *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014), which Plaintiffs cite, on the ground that that case concerned laches, which is a different claim than equitable estoppel. Further, Pandora argues, contrary to what Plaintiffs assert, the Supreme Court in *Petrella* did not limit equitable estoppel to only cases involving "intentionally misleading misrepresentations." But even if that were the case, Pandora argues, Plaintiffs' conduct meets that threshold.

Pandora argues that it has an express license to use the recordings. Plaintiffs' agreements with their record labels granted the labels all rights necessary to exploit the recordings, including the routines, to downstream users like Pandora. Those broad rights were passed along to Pandora through Pandora's agreements with the record labels or distributors.

### C. The Parties' Exhibits

For purposes of this Report and Recommendation, key exhibits included: (i) the record labels' distribution agreements with Plaintiffs; (ii) Pandora's licensing agreements with record labels and distributors; (iii) transcripts from depositions of Plaintiffs and corporate representatives of their record label companies regarding their understanding and intent as to whether Plaintiffs were including spoken word rights; and (iv) admissible proffered expert testimony regarding industry comedy licensing practices. Some of the relevant evidence is excerpted below.

#### 1. Excerpts from Pandora's License Agreements[2]

It is undisputed that Pandora obtained licenses from various record companies to stream the recordings at issue. The relevant portions of these agreements are summarized below.

---

[2] Most of these license agreements were submitted under seal: many sections were redacted to preserve trade secrets. Only unredacted sections of these licenses are excerpted here.

*Pandora's Agreement with Sony Music Entertainment*

On September 12, 2016, Pandora and Sony Music Entertainment ("Sony") entered into an agreement to ████████████████████████████████████████████████████████

████████████ Pandora's Reply ISO SUMF, ¶ 915; Pandora's Ex. 371, PAN_0083310 at *310. Pandora received rights under this agreement, including:

████████████████████████████████████████████████████████

Pandora's Ex. 371, PAN_0083310 at *312. This agreement also provides that:

████████████████████████████████████████████████████████

Pandora's Ex. 371, PAN_0083310 at *328.

*Pandora's Agreement with the Orchard*

On September 12, 2016, Pandora and Orchard Enterprises NY, Inc. (a subsidiary of Sony) entered into an agreement to ████████████████████████████████████

████████████████████ Pandora's Reply ISO SUMF, ¶¶ 955 – 56; Pandora's Ex. 372, *PAN_0083371 at *371. Pandora received rights under this agreement, including:

████████████████████████████████████████████████████████

1

2

3    Pandora's Ex. 372 at *374. The agreement also provides:

4

5

6

7    Pandora's Ex. 372 at *390.

8    *Agreements between Pandora and Universal Music Group*

9         On September 14, 2016, Pandora and related entities, on one hand, and UMG Recordings

10   Services, Inc., and Universal Music Canada (collectively, "Universal Music Group"), on the other,

11   entered into a digital product agreement granting ███████████████████████████

12   ██████████████████████████████████████████████████    Pandora's

13   Reply ISO SUMF, ¶ 993, Pandora's Ex. Ex. 384, PAN_0083462 at *462. This agreement provided:

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pandora's Ex. 384, at *PAN_0083470-71. The agreement also provided that:



Pandora's Ex. 384, PAN_0083462 at *478.

On November 8, 2018, Pandora and Universal Music Group amended the September 14, 2016 agreement, including ▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Pandora's Reply ISO SUMF, ¶¶ 1005 – 06; Pandora's Ex. 565, PAN_0083275 at *275, 277.

On May 1, 2021, Pandora and Universal Music Group entered into a digital product agreement granting Pandora the rights to stream Universal Music Group sound recordings. Pandora's Reply ISO SUMF, ¶ 1007; Pandora's Ex. 386, PAN_0083070 at *0Pandora's rights under this agreement included:

1

2

3

4

5

6    Pandora's Ex. 386 at *PAN_0083082-83.

7

8    *Pandora's Agreement with Warner Music*

9        On September 15, 2016, Pandora and Warner Music Inc. entered into a Binding Term Sheet

10   authorizing Pandora to stream Warner Music Inc. recordings. Pandora's Reply ISO SUMF, ¶ 1026;

11   Pandora's Ex. 385, PAN_0083194 at *194. Pandora's rights under this Binding Term Sheet

12   included:

13

14

15

16

17

18

19   Pandora's Ex. 385 at *PAN_0083194-95.

20       As to third party rights, this agreement provided:

21

22

23

24

25

26   Pandora's Ex. 385 at *224. The agreement also provides:

27

28

1   Pandora's Ex. 385 at *227.

2

3   *Pandora's Agreements with TuneCore and its Successor-in-Interest, Believe International*

4   On October 7, 2016, Pandora Media Inc. and several other related entities entered into a

5   sound recording license with TuneCore, Inc to make certain sound recordings, including recordings

6   at issue in this litigation, available on Pandora. Pandora's Reply ISO SUMF, ¶ 1059; Pandora's Ex.

7   376, PAN0050961 at *961. This license gave Pandora the rights to play the tracks on its streaming

8   services.



17   Pandora's Ex. 376, PAN_0050961 at *964.   This license also states that

18

19

20

21   Pandora's Ex. 376 at *PAN_0050965.

22   On November 1, 2016, Pandora and TuneCore entered into another sound recording license

23   agreement to make certain sound recordings available on Pandora. Pandora's Reply ISO SUMF,

24   ¶ 1071; Pandora's Ex. 377 at *PAN_0050987. It is undisputed that this agreement is "materially the

25   same" as the October 7, 2016 Pandora-TuneCore Agreement. Pandora's Reply ISO SUMF, ¶ 1072;

26   see also ¶¶ 1073-78. It gave Pandora the following grant of rights:

27

28



Pandora's Ex. 377 at *PAN_0050987.

Like the previous Pandora-TuneCore license, this one stated that states that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮:



Pandora's Ex. 377 at *PAN_0050991.

On September 1, 2018, Pandora and TuneCore amended the November 1, 2016 sound recording license agreement. Pandora's Reply ISO SUMF, ¶ 1082; Pandora's Ex. 378, PAN0051011 at *011. This amendment replaced Section 2(g) with the following:

Pandora's Reply ISO SUMF, ¶ 1083; Pandora's Ex. 378, at *PAN0051012.

On January 1, 2019, Pandora and TuneCore again amended the November 1, 2016 sound recording license agreement, making various changes to the parties' representations and duties. Pandora's Reply ISO SUMF, ¶¶ 1085-87; Pandora's Ex. 379 at *PAN_0051050.

On April 1, 2023, Pandora and Believe International, as successor-in-interest to TuneCore, Inc., entered into a sound recording license agreement to make certain sounds recordings available on Pandora. Pandora's Reply ISO SUMF, ¶ 1088; Pandora's Ex. 380 at *PAN_0051019. This agreement provides that it supersedes all previous agreements with respect to this subject matter. Pandora's Reply ISO SUMF, ¶ 1089; Pandora's Ex. 380 at *PAN_0051019. Pandora received the following rights under this agreement:



Pandora's Ex. 380 at *PAN_0051024 – 25. This agreement also provides, in relevant part, that:



Pandora's Ex. 380 at *PAN_0051026.

*Pandora's Agreements with Merlin*

Around June 2014, Pandora and Music and Entertainment Rights Licensing Independent NetworkB.V. ("Merlin") entered into an agreement to make certain sound recordings available on Pandora. Pandora's Reply ISO SUMF, ¶ 1104; Pandora's Ex. 381, PAN_0080510 at *PAN_0080517. Under this license, Pandora received rights, including:

1

2  

3

4

5  Pandora's Ex. 381 at *PAN_0080517.

6      It is undisputed that this agreement does not expressly provide for

7

8

9      Pandora's Reply ISO SUMF, ¶¶ 1111, 1112.

10      On September 12, 2016, Pandora and Merlin entered into another sound recording license

11  agreement to make certain sound recordings available on Pandora. Pandora's Reply ISO SUMF,

12  ¶ 1113, Pandora's Ex. 382, PAN_0011965. Under this license, Pandora received rights, including:

13

14

15

16

17

18

19

20

21

22

23  Pandora's Ex. 382, PAN_0011965 at *970 – 71.

24      On March 1, 2021, Pandora and Merlin entered into another sound recording license

25  agreement to make certain sound recordings available on Pandora. Pandora's Reply ISO SUMF,

26  ¶ 1123; Pandora's Ex. 383, PAN_0011923 at *923. It is undisputed that this agreement is "materially

27  the same" as the September 12, 2016 Pandora-Merlin Agreement. Pandora's Reply ISO SUMF,

28  ¶ 1124.

*Pandora's Agreements with Distrokid*

On April 4, 2016, Pandora and PK Interactive LLC a/k/a Distrokid ("Distrokid") entered into a sound recording license. Pandora's Ex. 373, PAN_0082913 at *913. Under this license, Pandora received rights, including:



Pandora's Ex. 373, PAN_0082913 at *913 – 14. This agreement was terminated on January 1, 2019. Pandora's Reply ISO SUMF, ¶ 1138.

On January 1, 2019, Pandora and Distrokid entered into another sound recording license agreement to make certain sound recordings available on Pandora. Pandora's Reply ISO SUMF, ¶ 1146; Pandora's Ex. 374, PAN_0011607 at *607.



1   Pandora's Ex. 374, PAN_0011607 at *611 – 12.

2

3

4

5

6

7

8   Pandora's Ex. 374, PAN_0011607 at *614.

9       On April 1, 2022, Pandora and Distrokid entered into another sound recording license

10  agreement to make certain sound recordings available on Pandora. Pandora's Reply ISO SUMF, ¶

11  1154; Pandora's Ex. 375, PAN_0011579 at *579. This April 1, 2022 Pandora-Distrokid agreement

12  is materially the same as the January 1, 2019 Pandora-Distrokid agreement and supersedes all

13  previous licenses between these entities. Pandora's Reply ISO SUMF, ¶¶ 1155, 1156. It provides

14  Pandora with the following rights:



15

16

17

18

19

20

21

22  Pandora's Ex. 375, PAN_0011579 at *583 – 84.



23

24

25

26

27

28  Pandora's Ex. 375, PAN_0011579 at *585.

### 2. Testimony from Plaintiffs' Regarding Pandora's Use of Their Recordings

It is undisputed that each of the nine Plaintiffs had knowledge of their routines streaming on Pandora for many years before initiating this lawsuit.

- Plaintiff Mary Reese Hicks was aware that Pandora was streaming Bill Hicks' spoken word comedy performance as early as Quarter 1, 2012. Plaintiffs' Statement of Genuine Disputes to Pandora's Material Facts ("Plaintiffs' SGD"), ¶ 14.

- Plaintiff Yellow Rose Productions was aware that Pandora was streaming spoken word comedy performances by Bill Engvall as early as Quarter 1, 2012. Plaintiffs' SGD, ¶ 15.

- Plaintiff Brave Lion was aware that Pandora was streaming spoken word comedy performances by Andrew Clay Silverstein as early as Quarter 1, 2012. Plaintiffs' SGD, ¶ 16.

- Plaintiff George Lopez was aware that his albums had been streaming on Pandora since at least 2013. Plaintiffs' SGD, ¶ 379.

- Plaintiff Ron White, Inc. was aware that Pandora was streaming spoken word comedy performances by Ron White as early as Quarter 1, 2012. Plaintiffs' SGD, ¶ 18.

- Plaintiff Lewis Black was aware that Pandora was streaming spoken word comedy performances by Lewis Black as early as Quarter 1, 2012. Plaintiffs' SGD, ¶ 19.

- Plaintiff Main Sequence, LTD was aware that Pandora was streaming spoken word comedy performances by George Carlin as early as Quarter 1, 2012. Plaintiffs' SGD, ¶ 20.

- Plaintiff Nick di Paolo was aware that Pandora was streaming his spoken word comedy performances as early as Quarter 1, 2012. Plaintiffs' SGD, ¶ 21.

- Plaintiff Robin Williams Trust was aware that Pandora was streaming spoken word comedy performances by Robin Williams as early as May 2011. Plaintiffs' SGD, ¶ 22.

It is undisputed that none of the Plaintiffs claimed they were underpaid by Pandora until Word Collection's first contact with Pandora in 2020. Plaintiffs' SDG, ¶¶ 32 – 40.

It is also undisputed that before this litigation, none of the Plaintiffs had objected to their works streaming on Pandora. Plaintiffs' SGD, ¶¶ 23 – 31; Plaintiffs' SGD to Pandora's Statement of Add'l Uncontroverted Material Facts ("SAUMF"), ¶ 2659. Additionally, many of the Plaintiffs never even considered doing so, and they all accepted royalty payments without protest.

- Plaintiff Arizona Bay's representative was unaware of anyone questioning whether streaming services were properly licensed to stream Hicks' routines. Plaintiffs' SGD, ¶ 372.

- Plaintiff White never thought to tell a streaming service that it lacked the rights to stream his recordings. Plaintiffs' SGD, ¶ 438.

- The corporate representative for Stark Raving Black (Plaintiff Lewis Black), Benjamin Brewer, stated that he was unaware of anyone associated with Mr. Black informing streaming services that Mr. Black was not being compensated appropriately or lacked the rights to stream Mr. Black's material. Plaintiffs' SGD, ¶¶ 375 – 76, 442.

- From March 2015 through Word Collections' contact with Pandora in 2020, no one associated with Plaintiff Nick Di Paolo claimed that his album was not properly licensed for streaming on Pandora. Plaintiffs' SGD, ¶ 369; Riggs Dep. Tr., 190:5-11, 20 – 191:5.

- From 2013 until this litigation, Plaintiff George Lopez did not think that Pandora was doing anything wrong when it came to him and his comedy albums. Plaintiffs' SGD, ¶ 379.

- On behalf of Plaintiff Brave Lion, Andrew Clay testified that he had never notified anyone that they were not appropriately licensing his spoken-word comedy content. Plaintiffs' SGD, ¶ 29; Plaintiffs' Ex. 12 (Clay Dep. Tr.) 258:20-259:11.

- Plaintiff Robin Williams Trust's representative testified that the Trust never conveyed to anyone that it wanted "Reality … What A Concept" or "An Evening At The Met" taken down from the streaming services. Plaintiffs' SGD, ¶ 28; Plaintiffs' Ex. 11 (Kassoy Dep. Tr.) 273:14-18.

1    Additionally, it was undisputed that several of the Plaintiffs encouraged Pandora to stream

2    their routines and that all of them benefited from having their work streaming on Pandora.

3    • On November 18, 2020, Bill Engvall (Plaintiff Yellow Rose) shared a post from

4        Pandora congratulating him on six hundred million Pandora streams to thank his fans

5        for the support. Plaintiffs' SGM, ¶ 377. He testified that he was "thrilled" when he

6        found out he had hit this streaming milestone. ECF 335-9, Pandora Ex. 3 (Engvall Dep.

7        Tr.) 240:7-24. He also testified that Pandora was good for him "as far as keeping my

8        name out there." Plaintiffs' SGM, ¶ 392.

9    • It is undisputed that Plaintiff Black's production company encouraged streaming

10       services like Pandora to play Black's recordings. Plaintiffs' SGM, ¶ 398. Plaintiff Black

11       publicly acknowledged the many monetary and promotional benefits that streaming

12       services like Pandora offer to comedians. Plaintiffs' SGM, ¶ 399. On September 22,

13       2020, Plaintiff Black's official Facebook page promoted his album, "Thanks for

14       Risking Your Life," stating it was "streaming exclusively on Pandora right now!"

15       Plaintiffs' SGM, ¶ 377; ECF 335-33, Pandora Opening Ex. 33 (Del Bene Opening

16       Report), Figure 2. Plaintiff Black's representative, Benjamin Brewer, testified that he

17       had, over the years, encouraged streaming services to play Mr. Black's recordings more

18       frequently. Plaintiffs SGM, ¶ 398; ECF 335-33, Pandora Opening Ex. 2 (Brewer Dep.

19       Tr.) 178:10-13.

20   • Plaintiff Ron White, Inc.'s corporate representative stated that any exposure of an artist

21       is beneficial, when asked if there was a benefit to White's comedy being on Pandora.

22       Plaintiffs' SGM, ¶ 401.

23   • Plaintiff Arizona Bay's former representative stated that Arizona Bay wanted "whatever

24       exposure we could get" of Bill Hicks' materials on streaming sites. Plaintiffs' SGM,

25       ¶ 391.

26   • Plaintiff George Lopez testified that he and his team provided material and permissions

27       to Pandora to promote his album The Wall, including allowing for a period during

28       which Pandora would exclusively stream that album. Plaintiffs' SGM, ¶ 395; see also

1       ¶ 396 (stating he would approve clips for SiriusXM to post so that he could boost

2       attendance at shows).

3       The evidence also shows that when Word Collections first confronted Pandora about the

4 allegedly infringing conduct, Pandora's Associate General Counsel, Jaesan Subramaniam, became

5 Word Collections' point of contact for the matter. Pandora's MSJ, J. Subramaniam Decl., ¶ 8. On

6 December 14, 2020, Mr. Subramaniam asked Word Collections' General Counsel, Jeff Levy, "if

7 Word Collections wanted Pandora to take down the recordings associated with Word Collections'

8 affiliated comedians." Pandora's MSJ, J. Subramaniam Decl., ¶ 10. Mr. Subramaniam states that Mr.

9 Levy told him "that Word Collections wanted Pandora to keep the recordings up." *Ibid.*; Pandora's

10 Ex. 24, J. Subramaniam Dep. Tr., 48:18-22. In a March 15, 2021 email, Mr. Subramaniam asked

11 Word Collections' Jeff Price if he could "advise if you wish for us to remove content which Word

12 represents […]," referring to his earlier conversation with Jeff Levy—"Jeff L. advised that we

13 weren't being asked to remove content during our last call (i.e., not at that time, but reserving all

14 rights of course), but please advise if that has now changed." Pandora's Ex. 451,

15 WORDCOLLECTIONS00002439 at *440. Mr. Price's email response of April 6, 2021 did not

16 request that Plaintiffs' performances be removed from Pandora's platform. *Id.* at *339; Pandora's

17 Reply ISO SUMF, ¶ 1261.[3]

18    **D.  The District Court's Daubert Order**

19       Pandora filed seven motions to exclude expert reports, testimony, and opinions proffered by

20 the comedians' experts.  Plaintiffs filed one motion to exclude Pandora's expert.  The court

21

22

---

23 [3] Plaintiffs disputed Pandora's SUMF ¶¶ 1260 and 1261, arguing that they merely left the decision

24 to Pandora of whether to take down the disputed works. *See* Pandora's Reply ISO SUMF, ¶¶ 1260,
1261. Mr. Price provided a declaration stating that he "specifically informed Jeff Levy not to inform

25 Pandora that Word Collections would like Pandora's infringing comedy to remain available on its
service, or to tell Pandora to take down its infringing comedy." Plaintiffs' Opp., Ex. 485, J. Price

26 Decl., ¶ 5. However, Mr. Price was not on the call, as he tacitly admits in his declaration when he
states that "I understand that in a conversation with Mr. Subramaniam, Jeff Levy may have

27 informed Pandora that Word Collections was not *affirmatively requesting* that Pandora remove the

28 infringing content." *Id.* at ¶ 8. Here, Mr. Price's declaration cannot create a disputed fact issue as to
whether this conversation occurred as Mr. Subramaniam says it did when Mr. Price was not a party
to the conversation.

considered all of these motions, ultimately granting in part and denying in part the motions.  See Dkt. 486.

Specifically, the court denied Pandora's motion to exclude the testimony of Anne Libera, a comedy industry expert, as the court found her experience sufficient to serve as an expert on the comedy industry.  The court also concluded that Ms. Libera had a sufficient basis for her opinions and that Pandora was not prejudiced by Ms. Libera's testimony.  However, the court found that she did not have sufficient basis to opine on the Second City Contract, as she had not reviewed the complete record.

The court also considered Pandora's motion to exclude the testimony of Sidney Blum, Plaintiffs' damages expert.  The court found that several of Mr. Blum's analyses were reliable, but that his "capital appreciation" analysis was not based on sufficient facts or data and was too speculative to be admitted into evidence.  The court also found that Mr. Blum was not qualified to offer an economic opinion rebuttal.

With respect to Pandora's motion to exclude the testimony of Drew Jessel, a streaming data analyst expert, the Court allowed Mr. Jessel to testify on his opening report, but not on his rebuttal report or certain portions of his declaration because his rebuttal report did not contradict or rebut evidence on the same subject matter as Pandora's expert's report. The court also excluded certain portions of Mr. Jessel's declaration that the court found to be untimely.

Turning to Pandora's motion to exclude the testimony of William Rosenblatt, who was proffered as an expert on the customs and practices of the licensing and streaming industries, the court allowed Mr. Rosenblatt to testify on the customs and practices of the licensing and streaming industries, but not on Pandora's state of mind or certain portions of his rebuttal report, inasmuch as his opinions on Pandora's state of mind constituted speculation.  The court also excluded certain portions of his Mr. Rosenblatt's rebuttal report that were found to be improper legal opinions.

With respect to Pandora's motion to exclude the testimony of Howard Leib, who was proffered as an expert on spoken-word comedy industry customs and practices, the court granted the motion after finding that Mr. Leib did not have the requisite experience or knowledge to offer specific opinion testimony on the comedy industry's customs and practices relating to licensing.

The court next considered Pandora's motion to exclude the testimony of David Drews, proffered as an intellectual property valuation expert. The court allowed Mr. Drews to testify on statutory damages, but not provide legal opinions or certain portions of his rebuttal report because these constituted legal conclusions. The court also excluded certain portions of his rebuttal report that were found to be improper.

The court also granted Pandora's motion to exclude the testimony of David Nimmer, who was proffered as a copyright expert. The court found that that Mr. Nimmer's report offered improper legal conclusions and that his opinions constituted legal advice.

Finally, the court denied Plaintiffs' motion to exclude the testimony of Dominic Del Bene, who was proffered as an expert on comedy industry customs and practices, holding that Mr. Del Bene could testify on comedy industry customs and practices, but not on legal matters because they constituted legal conclusions. The court also addressed the parties' applications to seal their motions and supporting exhibits, deferring a decision until it received the Special Master's Report and Recommendation. Based upon the submissions with the applications to seal the motions and supporting exhibits, the Special Master recommends that the District Judge GRANT the applications to seal in their entirety.

**E.  Summary Judgment Hearings Before the Special Master**

The Special Master held two hearings on the parties' dueling Motions for Summary Judgment. Before the first hearing, the Special Master issued a tentative Report and Recommendation re: Motions for Summary Judgment (the "Report"). The first hearing was on March 25, 2015. At this hearing, Plaintiffs presented oral argument in support of their Motion for Summary Judgement. Because of the need to give both sides equal amounts of time to both present their own arguments and rebut the opposing argument, the Special Master and the parties agreed to return for a second day of oral argument. The second hearing was on May 15, 2025. At this hearing, Pandora presented its oral argument and each side also had the opportunity to rebut the other's arguments.

### 1. Plaintiffs' Oral Argument

At oral argument, Plaintiffs argued that Pandora does not have an implied license to use the copyrighted comedy routine works. Plaintiffs argued that implied licenses are only found in narrow circumstances—specifically, situations in which one party created a work at the other's request and handed it over for the other party to distribute. *A&M Records v. Napster, Inc.* 239 F.3d 1004, 1026 (9th Cir. 2001), citing *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990). Plaintiffs also contended that the Ninth Circuit model jury instruction, 17 through 25, tracks the *Effects* test. Plaintiffs also cited to *Abkco Music, Inc. v. Sagan*, a Second Circuit case, arguing that whether one applied the *Effects* test or a more permissive test, both require a meeting of the minds between the parties, which had not occurred in this case. (*Abkco Music, Inc. v. Sagan*, 50 F.4th 309, 320 (2d Cir. 2022).

Plaintiffs also addressed the four categories of evidence in the Special Master's Report, arguing that there are conflicts of evidence in each category that preclude summary judgment. Plaintiffs contended that there is no testimony regarding the grant of rights to Pandora—the testimony cited in the Tentative Report concerns the grant of rights from the comedians to the record labels. Plaintiffs also contended that artists' license underlying works in both comedy and musical recording agreements—like musical artists, comedians also include "controlled composition clauses" that allow record labels to pass through literary work rights to a digital service provider. Plaintiffs contend that in this case, the record labels did not pass through such rights for interactive streaming.

Plaintiffs also argued that they did not fail to object to Pandora's use of their recordings, as interactive streaming only began in 2017, which Plaintiffs now contend is when the mechanical reproduction right was first implicated. Plaintiffs contended that before this, from 2011 until 2017, "Pandora only operated a noninteractive streaming service where there was no need to get a mechanical reproduction license." (Rough Tr. (Mar. 25, 2025) at 32:21-24.) Pandora began interactive streaming in spring 2017, the first accountings were provided to Plaintiffs until the end of 2017 or the beginning of 2018, and Word Collections contacted Pandora on behalf of Plaintiffs in 2020. Plaintiffs contend that the comedians were unaware of the specifics of the licensing agreements

1    between the record companies and Pandora because those contracts are marked Attorneys' Eyes

2    Only ("AEO"). Plaintiffs argued that they could locate no case where a two-year delay in bringing

3    an infringement to the attention of the infringing party created an implied license. Plaintiffs also

4    argued that the law does not require the copyright holder to sue every infringer immediately.  Citing

5    *Petrella v. Metro-Goldwyn-Mayer, Inc.*, Plaintiffs argued that the copyright owner is permitted to

6    "defer suit until she can estimate whether litigation is worth the candle." *Petrella v. Metro-Goldwyn-*

7    *Mayer, Inc.* 572 U.S. 663, 683 (2014). Plaintiffs contended that the "candle" was "lit" in 2019 when

8    Pandora began interactive streaming, and that Plaintiffs timely reached out to Pandora in 2020 and

9    filed suit 18 months later.

10        Plaintiffs also argued that they did not encourage Pandora to use their recordings. Plaintiffs

11   argued that the evidence in support of such purported encouragement was limited to only three of

12   the nine Plaintiffs and that such evidence actually does not hold up to close scrutiny. Plaintiffs also

13   argued that the Tentative Report's "encouragement" cases are factually distinguishable.  Plaintiffs

14   further contended that there is no evidence that Plaintiffs were aware of the terms of Pandora's

15   agreements with labels and distributors, and they testified that they were actually unaware of their

16   rights before Word Collections advised them.

17        Regarding Plaintiffs' acceptance of royalties, Plaintiffs argued that Pandora paid, and

18   Plaintiffs accepted, royalties only for sound recordings. Plaintiffs argued that they never accepted

19   any royalties for the underlying literary works because Pandora never paid any. Plaintiffs argue that

20   Pandora's cited cases involve acceptance of royalties for the copyright allegedly infringed, and are

21   not applicable to a situation where there was a second copyright for which no royalties were paid.

22   Relying in *Abkco Music, Inc. v. Sagan*, *supra*, Plaintiffs contend that acceptance of royalties for

23   exploitation of one copyright cannot lead to an implied license to exploit a different copyright. *Abkco*

24   *Music*, *supra*, 50 F.4th at p. 320 (2nd Cir. 2022). Plaintiffs also introduced another case, *Eight Mile*

25   *v. Spotify*, in which the district court found that the available evidence did not provide a basis for

26   finding an implied license. *Eight Mile v. Spotify*, 745 F. Supp. 3d 632, 659 (M.D. Tenn. 2024).

27   Additionally, Plaintiffs contended that any implied license would have been revoked on August 6,

28   2020 when Word Collections contacted Pandora to put it on notice and ask for proof of licensing.

1    Plaintiffs also argued that they are not equitably estopped.  Plaintiffs emphasize that under

2    *Petrella*, *supra*, Plaintiffs were not required to sue on the mechanical licenses once interactive

3    streaming began because they were entitled time to first determine whether the cost would be worth

4    it. Plaintiffs contended that Pandora meets none of the elements of equitable estoppel in this case,

5    because Plaintiffs did not make any misleading representations to Pandora and there was no

6    detrimental reliance by Pandora.

7

8                          **2.   Pandora's Oral Argument**

9    Pandora presented its arguments at the May 15, 2025 hearing. It argued that the Special

10   Master's Tentative Report correctly found that Pandora had an implied license to Plaintiffs' works.

11   Pandora argued that an implied license means "consent," and that the question is whether there is

12   conduct that indicated consent to the use. Pandora argued that the inquiry is into the evidence of

13   objective intent, and that the undisputed, overwhelming evidence in this case shows that Plaintiffs

14   consented to Pandora's use of their recordings. Pandora contended that it is undisputed that all

15   Plaintiffs were aware that Pandora was streaming their comedy routines since 2011 through 2013,

16   all knew they had no written direct license agreements with Pandora and that none received separate

17   payments for the underlying jokes, none objected to Pandora's use of their comedy routines until the

18   involvement of Word Collections (and then told Pandora to continue streaming their performances),

19   and that all accepted royalties for Pandora's use of their comedy recordings. Pandora also argued

20   that there is ample evidence that all Plaintiffs had registered a Pandora AMP account (a suite of

21   services allowing recording artists to amplify the promotional impact of streaming their recordings

22   on Pandora), and that Plaintiffs encouraged their fans to access their recordings on Pandora.

23   Pandora also contended that the Tentative Report correctly found that equitable estoppel

24   applies to Plaintiffs' conduct. Pandora argued that the undisputed evidence demonstrated Plaintiffs'

25   "knowing silence" regarding Pandora's use: that Plaintiffs expected, wanted, and encouraged

26   Pandora to continue streaming their recordings. Pandora also argued that Pandora detrimentally

27   relied on this conduct, as evidenced by this litigation that could have been avoided if Pandora had

28   known that Plaintiffs wanted Pandora to take the recordings down. Pandora argues that it is

1    undisputed that when Word Collections first reached out to Pandora, Pandora's general counsel

2    asked Word Collections if Plaintiffs wanted the recordings taken down while the licensing question

3    was resolved, and Word Collections told Pandora to keep the recordings up.

4         Pandora also contended that Plaintiffs' presentation misstated the holdings of certain cases.

5    Pandora argued that Plaintiffs' counsel incorrectly stated that "No Ninth Circuit case extends implied

6    license beyond work for hire context," but two Ninth Circuit cases and multiple district court cases

7    in the Ninth Circuit have held that implied licenses are not limited to instances of works-made-for-

8    hire and/or found an implied license outside the work for hire context. Pandora also argued that the

9    Ninth Circuit jury instructions actually state that implied licenses can arise in a wide variety of

10   circumstances. Pandora also argued that the *Petrella* case's holding was about laches, not estoppel

11   or implied license.

12        Pandora further argued that Pandora mischaracterized the record regarding the distinction

13   between comedy licensing and music licensing. Pandora's position is that industry custom and

14   practice are not relevant to the implied license or estoppel defenses, but further clarified that comedy

15   industry licensing practices and music industry practices have not historically been the same.

16   Pandora argues that when streaming music, streaming services have always separately licensed

17   sound recordings and musical works, Pandora has licensed comedy the same way that every other

18   streaming service has licensed comedy during the relevant time period, *i.e,* with no separate license

19   or payment for the underlying comedy routines. Pandora argued that the evidence shows that the vast

20   majority of agreements between comedians and record labels lack "controlled composition" clauses

21   and do not call for the payment of mechanical royalties at all. Pandora argued that the evidence

22   shows that comedians typically pass along to their record labels all rights to their routines, not just

23   those relating to physical distribution. Pandora argued that the evidence shows Plaintiffs actually

24   never licensed their comedy like music.

25        Pandora also argued that Plaintiffs incorrectly claimed that the "candle was lit," or the

26   relevant timeline began, in 2017. Pandora argued that Pandora has been streaming comedy routines

27   since 2011. Plaintiffs' complaint alleges that Pandora's public performance of comedy routines has

28   infringed their rights, and that public performance started in 2011. Pandora states that in 2017 it

began offering interactive streaming, i.e., the consumer could now choose specific songs or recordings, but that from a copyright perspective, noninteractive and interactive streaming are the same thing. Pandora argues that if there is a violation of a public performance right as alleged in the complaint, that violation had to have begun in 2011. It also contends that according to Plaintiffs' expert, the public performance right for non-interactive royalties is far more valuable than any "mechanical" right, approximately $123,000.00 versus $5,000.00. Moreover, Pandora points out that when Word Collections reached out to it on behalf of Plaintiffs, its proposed license only addressed non-interactive services: it covered public performance rights and expressly excluded mechanical licenses. Thus, Pandora contends that it is illogical for Plaintiffs to argue that they were waiting until interactive streaming began, when the money was really in the non-interactive streaming. Pandora contends that Plaintiffs are not "off the hook" for all their years of knowledge just because one of the features of the service changed that led to additional potential, though smaller, royalties.

Pandora's presentation also included a detailed look at each Plaintiffs' undisputed lack of objection to Pandora' use of their recorded materials. Pandora presented in detail evidence showing Plaintiffs' intent to convey their rights to the record companies, using excerpts from deposition transcripts and distribution agreements.

Plaintiff also argued that the implied license was not revoked when Word Collections approached Pandora because it told Pandora to keep streaming recordings, and that Pandora did not tacitly admit that it lacked an implied license. Pandora further contended that its SEC disclosures are consistent with an implied license. Citing to the risk factor language in its SEC disclosures, Pandora argued that its disclosure merely acknowledges that it follows industry custom and practice regarding comedy licensing, but that the situation could change in the future.

Finally, Pandora argued that the agreements between Pandora and the label companies are only relevant if the written terms were expressly inconsistent with the grant of an implied license. Plaintiffs were unable to point to any language in those agreements that prohibit an implied license. Pandora also argues that Plaintiffs are successful, well-represented individuals and businesses who cannot reasonably claim that they were unsophisticated, and that the Plaintiffs' sophistication or lack thereof is not actually a factor in the analysis.

1       Pandora argued that Plaintiffs' claims are equitably estopped. Discussing the elements of

2  equitable estoppel, Pandora stated that Plaintiffs indisputably knew that Pandora was streaming their

3  comedy routines for nearly a decade and never objected, that they encouraged such use through their

4  conduct and that Pandora relied to its detriment on Plaintiffs' conduct and silence. It argued that the

5  *ABKCO Music*, *supra*, case on which Plaintiffs rely is inapposite for several reasons, including that

6  the *ABKCO* plaintiffs were unaware of the infringing conduct, where the Plaintiffs in this case were

7  aware of of Pandora's use of the recordings for almost a decade and said nothing, and also because

8  it is nonbinding Second Circuit authority.[4]

9

10

11 **II.    PANDORA IS ENTITLED TO AN IMPLIED LICENSE[5]**

12     **A. PANDORA'S CONTENTIONS REGARDING AN IMPLIED LICENSE**

13      Pandora maintains that the parties' conduct established an implied license to the comedy

14 routines (i.e. the Works).  See Pandora Br. 11-14, ECF 339.  Pandora contends that Plaintiffs concede

15 the critical facts supporting this defense:

16 - Several Plaintiffs admitted that they intended to convey all rights necessary for their record

17    companies and distributors to license streaming services like Pandora (Plaintiffs' Statement

18    of Genuine Disputes ("SGD") ¶¶ 371, 374, 447 – 448), ECF 396-1;

19 - Plaintiffs knew for years that their Routines were streaming on Pandora, yet never objected

20    (Plaintiffs' SGD ¶¶ 14-40, 355-356, 359-361, 363-379, 382);

21 - Several Plaintiffs encouraged Pandora to stream their Routines (Plaintiffs' SGD ¶¶ 377, 391-

22    393, 395-399, 401); and

23 - Plaintiffs accepted royalties for years without ever claiming to be owed anything more (*Id.*

24    ¶¶ 22-41, 355-356, 359-361, 363-368, 370-379, 382).

25

26

27 [4] The parties' rebuttal arguments are available in the hearing transcripts.

28 [5] Because the Special Master concludes that Pandora is entitled to summary judgment on the basis of its implied license and equitable estoppel defenses to Plaintiffs' copyright infringement claims, it is unnecessary to reach the other grounds raised by Pandora in its Motion for Summary Judgment.

In addition, Pandora contends that Plaintiffs' knowledge of Pandora's use of the Routines and failure to object should be viewed in the context of the common industry practice, which has been to license comedy routines "at the source," whereby the record label that creates and distributes the comedy recording secures from the comedian, and passes along to all downstream users, all rights needed to use the derivative work, with the comedians being compensated for those uses via their recording agreement royalties. Pandora's Statement of Undisputed Material Facts ("SUMF") ¶¶ 405-406, 423-451; Ex. 33 (Del Bene Report, § II).

**B. PANDORA IS ENTITLED TO AN IMPLIED LICENSE BECAUSE THE UNDISPUTED FACTS SHOW THAT PANDORA FALLS WITHIN THE REQUIREMENTS OF NINTH CIRCUIT LAW ON THIS DEFENSE[6]**

"[G]rants of nonexclusive copyright licenses need not be in writing," but can instead be implied "through conduct." *Foad Consulting Grp., Inc. v. Azzalino*, 270 F.3d 821, 825 (9th Cir. 2001); *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 559 (9th Cir. 1990); *Field v. Google, Inc*., 412 F. Supp. 2d 1106, 1115 (D. Nev. 2006). The inquiry turns on whether the owner has engaged in conduct "from which [the] other [party] may properly infer that the owner consents to [the] use." *Field*, 412 F. Supp. 2d at 1116 (citation omitted). In addition, "[b]ecause the implied license is derived from the relationship of the parties … it is entirely appropriate to look at any words or conduct that bear on whether a copyright license should be implied." *Foad Consulting Grp*., 270 F.3d at 834 (Kozinski, J., concurring).

Grant of an implied license turns on intent, which is analyzed by considering the totality of the parties' course of conduct. "No factor is dispositive, but the touchstone of an implied license is

---

[6] As reflected in the district court's Daubert order (Dkt. 486), Plaintiffs have proffered admissible expert testimony disagreeing with Pandora's own experts' opinions as to whether the custom within the comedy industry was for comedians to transfer all rights (including rights in literary works, i.e. the comedy routines themselves) to the record label and distribution companies and then have those rights "pass through" to third parties like Pandora who stream the sound recordings containing those works. Because this issue is in dispute, the Special Master does *not* rely upon any industry custom and practice evidence to support the finding of an implied license.

1   the licensor's objectively manifested intent at the time of delivery." *Griego v. Jackson*, 2025 WL

2   297150, at *3 (C.D. Cal. Jan. 24, 2025) (citations omitted).  Thus, in evaluating an implied license,

3   "courts consider whether the totality of the parties' conduct indicates that the licensor intended to

4   grant the licensee permission to use the work." *Fontana v. Harra*, 2013 WL 990014, at *4 (C.D.

5   Cal. Mar. 12, 2013) (citation omitted) (J. Snyder).  The Ninth Circuit may find an implied license

6   when "(1) a person (the licensee) requests the creation of a work ["work-for-hire"], (2) the creator

7   (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the

8   licensor intends that the licensee-requestor copy and distribute his work." *Asset Mktg. Sys., Inc. v.*

9   *Gagnon*, 542 F.3d 748, 754–55 (9th Cir. 2008) (citation omitted).

10          An implied license can be found on the basis of other conduct outside of a work-for-hire

11   context, including in situations where the copyright holder knew of the defendant's use of

12   copyrighted work and failed to object, regardless of what the copyright holder subsequently claims

13   regarding its actual intent of beliefs.  *See ExperExchange, Inc. v. Doculex, Inc*., 2009 WL 3837275,

14   at *23–24 (N.D. Cal. Nov. 16, 2009) (finding implied license extended to defendants' actual uses

15   where the plaintiff knew that defendant was using copyrighted work beyond the implied limitation

16   for eight years and did not object); *see also Foad Consulting Group,* 270 F.3d at 824 (implied license

17   found where no work for hire involved).  The Ninth Circuit has not strictly required the "work-for-

18   hire" element noted in *Effects*.  The *Asset Marketing* case followed the *Effects* analysis: the *Effects*

19   case involved a movie producer who hired a firm to create certain special effects for a movie, and

20   *Asset Marketing* similarly involved a marketing organization who hired a contractor to develop

21   custom software for it. Neither case expressly limits the requirements for an implied license to these

22   factors.

23          Moreover, other cases in the Ninth Circuit made clear that implied licenses are not limited to

24   the three elements articulated in *Asset Marketing*, i.e., cases *outside* the work for hire context. In a

25   published case issued eleven years after *Effects*, the Ninth Circuit found an implied license where

26   the creator/plaintiff had prepared a plot plan for the defendant developer's predecessor in interest.

27   *Foad Consulting Group, Inc.*, 270 F.3d at 824. Judge Kozinski, the author of the *Effects* opinion,

28   wrote the concurrence in *Foad* that focused specifically on implied contracts that are derived from

1    the relationship between the parties—"implied from conduct"—and noting that the results in *Effects*

2    and ensuing similar cases "each turned on its facts." *Foad Consulting Group, Inc.*, 270 F.3d at 835

3    (Kozinski, A., concurring), citing *Effects*, 908 F.2d at 558.  In 2023, the Ninth Circuit found an

4    implied license for a creator of car images in a case <u>outside</u> the work-for hire context. *Evox Prods.,*

5    *LLC v. Chrome Data Sols., LP*, 2023 WL 1879479, at *3 (9th Cir. Feb. 10, 2023). The *Evox* creator's

6    business was creating and licensing images of cars. *Id.* at *1. The Ninth Circuit found an implied

7    license based on the plaintiffs' conduct. *Id.* at *3.

8         The district courts regularly find an implied license outside the work for hire context. For

9    example, in *Field v. Google*, the court analyzed an implied license claim, stating that "[a]n implied

10   license can be found where the copyright holder engages in conduct from which [the] other [party]

11   may properly infer that the owner consents to his use." *Field*, 412 F. Supp. 2d at 1116 (citation

12   omitted). The *Field* plaintiff had written public web pages, knowing that he could use a "no-archive"

13   meta-tag to prevent Google from automatically indexing his webpage. Nevertheless, the *Field*

14   plaintiff purposely chose not to and made a conscious decision to permit Google access to the pages

15   via "Cached" links. *Id.* The court found that the plaintiff's conduct—which had nothing to do with

16   any request from the defendant—was "reasonably interpreted as the grant of a license to Google for

17   that use." *Id.*

18        Similarly, in *Interscope Records*, the court rejected the position that the *Effects* elements are

19   necessary requirements for an implied license, such that "[t]he fact that Plaintiffs in the present case

20   did not create the sound recordings at Defendant's request or for Defendant's benefit does not defeat

21   the implied license defense as a matter of law." *Interscope Recs. v. Time Warner, Inc.*, No.

22   CV101662SVWPJWX, 2010 WL 11505708, at *8 (C.D. Cal. June 28, 2010). The *Interscope*

23   *Records* court found that the defendants had stated a plausible defense for an implied license based

24   on the plaintiffs' conduct, which included encouraging the use and failing to object for years. *Id.* at

25   *9 (citing cases); *see also UMG Recordings, Inc. v. Disco Azteca Distributors, Inc.*, 446 F. Supp. 2d

26   1164, 1177 (E.D. Cal. 2006) (granting summary judgment in favor of defense on infringement claim

27   because the claimant conceded that it received and accepted royalty payments for the uses of its

28   copyrighted songs, which gave "rise to an implied license as a matter of law"); *Morrill v. Smashing*

*Pumpkins*, 157 F. Supp. 2d 1120, 1126 (C.D. Cal. 2001) (holding that copyright co-owner had impliedly granted non-exclusive license to his record company when he had conveyed to the record company a video he had co-created with another band); *Experexchange, Inc. v. Doculex, Inc.*, No. C-08-03875 JCS, 2009 WL 3837275, at *23 (N.D. Cal. Nov. 16, 2009) (finding implied license when plaintiff encouraged defendants to incorporate its software into its own products, accepted royalties, and never objected that use exceeded scope of license agreement until just prior to litigation).

In particular, district courts have granted summary judgment to copyright defendants based on an implied license where the owner knew of the allegedly infringing use but did not object to it. *See, e.g.*, *Evox Prods., LLC*, 2023 WL 1879479, at *3 (affirming summary judgment where the copyright owner did not object to reports of use); *Field*, 412 F. Supp. 2d at 1116 (granting summary judgment based on an implied license defense where the copyright holder's "silence" in the face of the defendant's copyright use was a "conscious decision to permit it"). Other courts are in accord that "consent given in the form of mere permission or lack of objection is also equivalent to a nonexclusive license[.]" *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997) (quoting *I.A.E., Inc. v. Shaver,* 74 F.3d 768, 775 (7th Cir. 1996)). Where a copyright holder not only failed to object to a defendant's use despite being aware of it but actively "encourage[d]" such use, there is an "especially" good basis for finding an implied license. *Stevens v. Corelogic, Inc.*, 194 F. Supp. 3d 1046, 1053-54 (S.D. Cal. 2016) (citations omitted); *Field,* 412 F. Supp. 2d at 1115 (same).

In addition, at least one court has held that "acceptance of [royalty] payments [from the defendant using the copyright holder's work] gives rise to an implied license as a matter of law." *UMG Recordings, Inc. v. Disco Azteca Distribs., Inc*., 446 F. Supp. 2d 1164, at 1177-78 (E.D. Cal. 2006) (granting summary judgment on implied license grounds); *ExperExchange, Inc.*, 2009 WL 3837275, at *23-24 (granting summary judgment to defendant based on implied license because the plaintiff "continued to accept . . . royalty payments for [the allegedly infringing] products" for years before bringing suit). In *Evox Productions*, for example, the Ninth Circuit affirmed the district court's grant of summary judgment on an implied license defense. The Ninth Circuit agreed that the plaintiff granted "an implied license by not objecting to [defendant's] reports of its active

1  sublicensees and accepting royalty payments for those sublicenses." *Evox Productions*, 2023 WL

2  1879479, at *3 (citation omitted).

3

4      **1.  Plaintiffs Testified That They Intended To Convey All Rights Necessary For Their**

5          **Record Companies And Distributors To License Streaming Services Like Pandora**

6      Several Plaintiffs testified that they intended to convey all rights necessary for their record

7  companies and distributors to license streaming services like Pandora. *See* § I.C.2, *supra*.  For

8  instance:

9      • White and his representatives agreed that Ron White, Inc. was providing ███████████

10        ██████████" for the record labels to exploit the Routines "as they wish."  Pandora AUMF

11        ¶ 1758.

12     • Arizona Bay's corporate representative acknowledged that its agreement with Comedy

13        Dynamics "████████████████████████████████████████████████████████

14        ██████████████████████████████████████."  Pandora AUMF ¶ 1767.

15     • Acid Tongue's corporate representative admitted that "████████████████████████

16        ██████████████████████████████" to distribute the Routines to services like

17        Pandora, and not "███████████████████████████████████████" to do so,

18        "specifically including comedy works rights."  Pandora AUMF ¶ 1842.

19     • Black admitted that his recording agreements covered "███████████████████████████

20        ████████████████████████████" and did so for a "██████████████."  Pandora AUMF

21        ¶ 1770.

22

23     **2.  Plaintiffs Never Objected To Pandora's Use Of Their Routines**

24     While some Plaintiffs testified that they did not intend to convey rights allowing streaming

25  services to use Plaintiffs' Routines, all Plaintiffs undisputedly knew for years that their Routines

26  were streaming on Pandora.  Nevertheless, for nearly a decade—from the launch of Pandora's

27  comedy offering until the Collectives emerged—they never objected.  Pandora AUMF ¶¶ 1602-

28  1621, 1751-1778. The following are examples of Plaintiffs' admissions on this point:

- Engvall: "Q. Did you ever ask Pandora to take down your content? A. … No." (Pandora AUMF ¶ 1603);

- White: "Q. Has anyone working on your behalf ever asked a streaming service to stop playing your comedy? A. … I don't know why they would, but no, I don't think so." (Pandora AUMF ¶ 1604);

- Black: "Q. Have you ever asked any entity that uses your comedy, other than Spotify, that we've already talked about, to take down your recordings? A. No, because that was -- no." (Pandora AUMF ¶ 1605);

- Main Sequence (Hamza): "Q. Did you, personally, ever ask Pandora to take down George [Carlin's] content? A. No. Q. Did anyone on your behalf ever … ask Pandora to take down [George Carlin's] content? A. Not that I know of, no." (Pandora AUMF ¶ 1606);

- Robin Williams Trust (Kassoy): "Q. In words or substance, did the Robin Williams Trust ever convey to anyone that it wanted 'Reality . . . What A Concept' taken down off of any streaming service? A. No." "Q. And to your knowledge, at any point in time did the trust convey in words or substance that it wanted 'An Evening At The Met' taken down from the streaming services? A. No." (Pandora AUMF ¶ 1608).

The result, under Ninth Circuit precedent, is an implied license. *E.g., Evox Prods., LLC,*, 2023 WL 1879479, at *3 (affirming summary judgment where the copyright owner did not object to reports of use); *Field,* 412 F. Supp. 2d at 1116 (granting summary judgment based on an implied license defense where the copyright holder's "silence" in the face of the defendant's use was a "conscious decision to permit it").

Consequently, regardless of Plaintiffs' subjective intent, the intent manifested by their conduct was entirely consistent with an intent to convey the right to use the comedy routines embedded in the sound recordings.

### 3.  Plaintiffs Encouraged Pandora's Use Of Their Routines

Plaintiffs did not just sit idly by for years while Pandora used their Routines—several actively encouraged it, knowing they stood to reap substantial monetary and promotional benefits.  Plaintiffs'

SGD to Pandora's AUMF, ¶¶ 1773, 1785-1798. Black's social media page told fans that Thanks for Risking Your Life "is streaming exclusively on Pandora right now!" *Id.* ¶ 1773. Arizona Bay's representative testified that "we wanted whatever exposure we could get," including on Pandora. *Id.* ¶ 1787. Engvall acknowledged that Pandora's "been good for me as far as keeping my name out there," and that he was "forever grateful" and "thrilled" to have reached 600,000,000 streams on Pandora. *Id.* ¶¶ 1788-1789. Lopez provided Pandora with additional "promotional materials … to help drive awareness of [his] new album" The Wall, which was released exclusively on Pandora. *Id.* ¶¶ 1600, 1791. Plaintiff Nick di Paolo testified to having an AMP account, which enabled him to use Pandora for marketing. Sirius XM's "Senior Comedy Strategy and Development Advisor," Jack Vaughn, stated that all Plaintiffs' used Pandora's AMP tool. *Id.* ¶¶ 1785-1786. Even after Word Collections claimed that Pandora needed to take an additional license for the literary works, Word Collections told Pandora to continue streaming its comedians' Routines. *Id.* ¶¶ 2614-2634.

Such express encouragement is likewise part of the "totality of the circumstances" inquiry. *See e.g. Stevens v. Corelogic, Inc.*, 194 F. Supp. 3d 1046, 1053-54 (S.D. Cal. 2016), *aff'd*, 899 F.3d 666 (9th Cir. 2018); *see also Khachatryan v. 1 Hotel West Hollywood L.L.C.*, 2024 WL 3015504, at *4 (C.D. Cal. June 14, 2024) (plaintiffs' "express assent" to defendants' use of their photograph through positive social media messages "created an implied license") (J. Wright).

### 4. The Royalties Paid To And Accepted By Plaintiffs For Years Without Any Notice Or Objection That Plaintiffs Needed To Obtain A Separate License To Stream The Comedy Routines Themselves

Plaintiffs do not deny having received royalties from Pandora via SoundExchange for several years "without complaint." Plaintiffs' Br. 29-30. As previously noted, the "acceptance of [royalty] payments gives rise to an implied license as a matter of law," at least where, as here, the copyright holders do not object that they are entitled to additional payments for the use of their material. *UMG Recordings, Inc.*, 446 F. Supp. 2d at 1177-78; *ExperExchange*, 2009 WL 3837275, at *23-24.

Plaintiffs' only response is that they were not "aware of their rights" until now and therefore did not realize that the royalty payments they received over the past several years covered only sound

1   recording royalties and that they were allegedly entitled as of 2017 to also receive separate

2   "mechanical" royalties for the Routines (the spoken literary works) themselves. Plaintiffs' Reply

3   Br. 6. Yet, as Pandora correctly points out, Plaintiffs are all counseled, experienced and well-known

4   comedians. Pandora AUMF ¶¶ 2556-2568. Furthermore, according to Plaintiffs, a number of their

5   contracts with the record labels specifically referred to "mechanical" license fees payable by the

6   labels themselves (though not by downstream streaming services like Pandora who entered into

7   agreements with the labels), and the industry custom was to require users of comedy routines to pay

8   for the routines separately from the sound recordings on which those routines were performed.

9   Plaintiffs simply cannot have it both ways. Accordingly, even if Plaintiffs now claim to have been

10  subjectively unaware of their entitlement to receive separate mechanical license fees for their

11  Routines from Pandora since 2017, this does not excuse them from their decision to allow Pandora

12  to stream the Routines without objecting or demanding additional royalties.

13

14      **5.  Plaintiffs' Remaining Arguments Fail To Rebut The Evidence That Pandora Has**

15          **An Implied License To Stream The Comedy Routines**

16      Plaintiffs initially assert that the legal test for an implied license must be "narrow[ed]" to the

17  specific facts found in *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990).

18  Plaintiffs argue that there is an "Effects test" that requires that the plaintiff created the allegedly

19  infringed work at the defendant's request. Plaintiffs' Opp. Br. 11-12, 19. However, as discussed

20  above, many courts have applied *Effects* to find an implied license even outside of the work-for-hire

21  context.

22      In cases unlike *Effects*, where the copyright holder did not create the work at the request of

23  or in partnership with the defendant but instead there is a pre-existing commercially available work

24  not made for a specific end-user, the Ninth Circuit has recognized that it is appropriate to consider

25  the parties' entire course of conduct to decide whether an implied-in-fact license exists. *Effects*

26  "contains no limiting language to that effect, and the holding in *Effects* is driven by the facts of that

27  particular case." *Interscope Records v. Time Warner, Inc.*, 2010 WL 11505708, at *3-4 (C.D. Cal.

28

June 28, 2010) (J. Wilson) (collecting cases finding implied licenses "in other circumstances," which "depends upon the objective manifestation under the totality of the circumstances").

As in *Interscope Records*, Plaintiffs here are "misreading" *Effects* and offering an "overly restrictive view of the law of implied license." *Interscope Records,* 2010 WL 11505708, at *3. As Plaintiffs concede, Ninth Circuit courts do not reflexively apply the "*Effects* test" . . . they instead often look to the parties' "intent," as expressed through their conduct. Plaintiffs' Br. 24 (citing *Westhoff Vertriebsges mbH v. Berg*, 2023 WL 5811843, at *9 (S.D. Cal. Sep. 6, 2023), which found an implied license after recognizing that "[c]ourts typically apply the *Effects* test flexibly, allowing the parties' objective intent to lead the way"). As *Effects* recognized, "[a] nonexclusive license may be . . . implied from conduct." 908 F.2d at 558. The Ninth Circuit reaffirmed that principle in *Foad Consulting Grp., Inc. v. Azzalino*, 270 F.3d 821, 825 (9th Cir. 2001); *see also id*. at 834 (Kozinski, J., concurring) ("It is entirely appropriate to look at any words or conduct that bear on whether a copyright license should be implied."). The proper inquiry turns on whether the copyright holder has engaged in "conduct . . . exhibited to another, from which that other may properly infer that the owner consents to his use." *Interscope Records,* 2010 WL 11505708, at *3 (quoting *De Forest Radio Telephone & Tele-Graph Co.,* 273 U.S. 236, 241 (1927)).

Plaintiffs also make various points relating to Pandora's: (i) SEC disclosures; (ii) express licenses; (iii) assertion that no comedian has been paid mechanical royalties; and (iv) pre-litigation communications with Word Collections. Plaintiffs' Opp. Br. 20. At the hearings, Plaintiffs also argued that (v) even if they were deemed to have provided an implied license for Pandora's public performance of their literary works on its non-interactive service, Pandora's reproduction of the comedy content on its *interactive* service required a mechanical license and therefore exceeded the scope of the implied public performance license. However, these arguments fail to refute the undisputed evidence in support of an implied license.

i.     *Pandora's SEC Disclosures Do Not Impact the Finding of An Implied License*

Plaintiffs contend that Pandora's SEC filings acknowledged that Pandora lacked any license to stream the Routines and could be subject to liability for infringement.  *See* Plaintiffs' Br. 12-13.  However, Pandora's SEC filings are not on their face inconsistent with a finding of an implied license defense inasmuch as those filings only disclosed that Pandora was acting "pursuant to industry-wide custom and practice" in making comedy available "absent a specific license from any such performing rights organization or individual rights owners."  Pandora's Br. 30-31.  In particular, the filings merely noted that there was no performing rights organization for comedy routines, explained that Pandora, pursuant to industry practice, was paying "content acquisition costs . . . for the public performance of the sound recordings in which such literary works are embodied," and disclosed the risk of potential future litigation challenging that long-standing industry practice (regardless of the merits of such cases).  *See id*.  Accordingly, Pandora's SEC statements are not in conflict with an implied license.

ii.     *An Implied License Is Not Incompatible With the Language of the Existing Agreements*

In addition, Plaintiffs assert that Pandora's implied license defense based on the parties' conduct is incompatible with the language of the express agreements between Plaintiffs and the record label companies as well as the express agreements between the recording labels and Pandora.  However, the interpretation of these agreements appears to turn in large part on an understanding of the industry customs, as to which there is a dispute between the parties.  Consequently, the language of these express agreements would be at best neutral as to the existence of an implied license, but the agreements are not dispositive of the issue.  The "industry customs" dispute, therefore, is not material to the question of an implied license.

It is true that "an implied license cannot be formed in the face of a signed agreement to the contrary," *Taylor Holland LLC v. MVMT Watches, Inc*., 2016 WL 6892097, at *5 (C.D. Cal. Aug. 11, 2015)) (J. Wilson), and that consequently an "implied license defense fails as a matter of law" where the "implied terms are . . . inconsistent with some express term of the contract." *Evox Productions LLC v. Kayak Software Corp*., 2017 WL 5634858, at *8 (C.D. Cal. Apr. 4, 2017)(J.

1    Gutierrez)).  *See also, e.g., Swanson v. Levy*, 509 F.2d 859, 861 (9th Cir. 1975) ("There cannot be a

2    valid express contract and an implied contract each embracing the same subject, but requiring

3    different results.").  However, such an inconsistency has not been conclusively demonstrated by the

4    evidence because the agreements do not on their face preclude the existence of an implied license

5    defense.  Pandora had no direct contractual relationship with Plaintiffs and Pandora's distribution

6    and streaming rights were derived from whatever licenses Plaintiffs provided to the record labels, as

7    well as contracts between the labels and Pandora.

8        In the absence of any language unambiguously informing Pandora that Plaintiffs did not

9    intend to permit Pandora to stream the Routines without paying additional royalties separate from

10   those paid for the use of sound recordings, these agreements fail to negate the inferences to be fairly

11   drawn from Plaintiffs' conduct over a period of many years.  Instead, the Court must evaluate

12   Plaintiffs' objective intent as manifested by their conduct.

13       Furthermore, far from contradicting Pandora's possession of an implied-in-fact license to use

14   the Routines, a number of Plaintiffs' agreements with the record companies did seem to expressly

15   convey any "spoken word" compositions contained in the sound recordings. For instance, █████

16   ████████████████████████████████████████████████████████████████████

17   █████████████████████████████████████████████████  ██████████████████

18   ████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████████

20   ██████████████████████████████.  Plaintiffs' SGD to Pandora's AUMF, ¶¶ 1870-1873

21   (emphasis added).  Comedy Dynamics executed an agreement acknowledging that it always passed

22   through rights to the Routines to Pandora.  *Id.* ¶¶ 2543-2548.  The same goes for Carlin's Routines.

23   ████████████████████████████████████████████  ████████████████████████

24   ████████████████████████████████████████████████████████████████████

25   ███████.  *Id.* ¶¶ 1888-1891 (████████████████████████████████████████████

26   ██████████████████████████████████████████████) (emphasis added).

27       In addition, Plaintiffs have a number of other agreements with record labels in which they

28   seemingly agreed to either (i) deliver any rights necessary to commercialize/distribute the albums or

1  (ii) broadly convey all rights to the recordings without any carveouts (in contrast to carveouts for

2  musical compositions).  *See id*. ¶¶ 1846-1876 (Hicks); 1877-1899 (Carlin); 1900-1978 (DiPaolo);

3  1979-2039 (Black); 2040-2053 (Lopez); 2054-2146 (White); 2147-2192 (Williams); 2193-2250.2

4  (Engvall); 2251-2290 (Clay).

5         Moreover, ███████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████.  *See* Plaintiffs' SGD to

7  Pandora's AUMF, ¶¶ 1846-1876 (Hicks); *id.* ¶¶ 1877-1899 (Carlin); *id.* ¶¶ 1900-1978 (Di Paolo);

8  *id.* ¶¶ 1979-2039 (Black); *id.* ¶¶ 2040-2053 (Lopez); *id.* ¶¶ 2054-2146 (White); *id.* ¶¶ 2147-2192

9  (Williams); *id.* ¶¶ 2193-2250.2 (Engvall); *id.* ¶¶ 2251-2290 (Clay).  Furthermore, with respect to any

10  agreements between Plaintiffs and the record companies that contemplate separate "mechanical"

11  license fees on their face appear to only extend that contractual payment obligation to the record

12  company, not downstream licensees like streaming services.  *See* Pandora Ex. 33 (Del Bene Opening

13  Rep. ¶¶ 76, 81, 95).  At any rate, such fees would not in themselves indicate anything about the scope

14  of the rights transferred from Plaintiffs to the record companies or of the rights that those companies

15  could transfer to streaming services like Pandora.  *See id.* ¶ 81.  The obvious purpose of these

16  agreements was for Pandora to distribute Plaintiffs' performances.  Plaintiffs' interpretations of the

17  agreements would obviously be in conflict with that purpose.

18         Plaintiffs point to no admissible countervailing evidence disputing Pandora's showing that

19  none of Pandora's agreements with the major label and distributors expressly exclude or carveout

20  any rights to the Routines.  *See* ECF 339-3 (White Decl. ¶¶ 10-54); Plaintiff's SGD to Pandora's

21  AUMF ¶¶ 2291-2330; (Sony); *id.* ¶¶ 2331-2368 (The Orchard); *id.* ¶¶ 2369-2401 (Universal); *id.* ¶¶

22  2402-2434 (Warner); *id.* ¶¶ 2435-2479 (TuneCore); *id.* ¶¶ 2480-2512 (Merlin); *id.* ¶¶ 2514-2542

23  (Distrokid). One such distributor—the Orchard, which has an agreement identical to Sony's—

24  confirmed in writing that it always obtained the necessary rights to comedy routines and passed them

25  through to Pandora and others.  Pandora AUMF ¶¶ 2364-2367.

26         Plaintiffs also emphasize provisions in these agreements addressing "Third Party Rights" and

27  holding Pandora responsible for obtaining any "third-party licenses" applicable to the distribution of

28  content and for indemnifying the record companies against liability arising from infringement of

1    such licenses.  *See* Plaintiffs' Br. 15-16 (citing Plaintiffs' SUMF ¶¶ 5872, 5873, 5882, 5900 – 04,

2    5910 – 12, 5914 – 5918).  Pandora responds that because the record labels acquired the rights to the

3    Routines from Plaintiffs, any "Third Party Rights" provisions are inapplicable under the

4    circumstances.  *See* Pandora Opp. Br. 18, n.12.  Under the circumstances, the mere reference to third-

5    party licenses would not in itself be incompatible with Pandora having an implied license.

6

7        iii.        *Resolution of the Dispute Over Whether Any Comedian Has Ever Been Paid Mechanical*

8                    *Royalties is not Necessary to Reach a Finding on Implied License*

9            Plaintiffs and Pandora dispute whether any comedians, including Plaintiffs, have ever

10   "separately licensed or been paid royalties for the reproduction of their literary works" and have been

11   paid mechanical royalties accordingly. *See* Plaintiffs' Opp., pp. 11-12, citing Plaintiffs' Reply ISO

12   SUMF, ¶¶ 6034-6040. The Special Master understands that this dispute is a meaningful one in the

13   current industry context, but finds that resolution of this dispute is not necessary to resolve the

14   implied license issue. This issue goes to the question of industry custom and practice, and as already

15   stated, because of the extensive factual disputes on that matter, the Special Master does not rely upon

16   any industry custom and practice evidence to support the finding of an implied license. *See* fn. 6,

17   *supra*.

18

19       iv.        *Pandora's Pre-Litigation Communications with Word Collections do not Create a*

20                   *Genuine Dispute as to a Material Fact*

21           Plaintiffs also argue that Pandora never claimed any kind of implied license in eighteen

22   months of pre-litigation communications after Pandora received notice of infringement based on its

23   streaming the comedy routines.  However, as Pandora notes, it was not required to disclose to Word

24   Collections its licensing arrangements with Plaintiffs, and given Word Collections' position and

25   threats of litigation unless Pandora obtained mechanical licenses to stream the comedy routines, it

26   would have been futile for Pandora to refer to an implied license.  Consequently, Pandora's

27   statements and conduct during this period are not in conflict with its current defense that it had an

28   implied license to stream the Routines embodied in the sound recordings.

     *v.*     *Plaintiffs' Argument About the Scope of the Implied License is Unavailing*

At both hearings, Plaintiffs emphasized that the mechanical license only became necessary when Pandora started interactive streaming. Rough Tr., March 25, 2025 32:16-20 (Mr. Busch: "Pandora's interactive streaming service only began in the spring of 2017. That was the time, the only time, when this mechanical reproduction right was implicated. The need to get a mechanical license it is undisputed only applies to interactive streaming. Prior to that, from 2011 until 2017, Pandora only operated a noninteractive streaming service where there was no need to get a mechanical reproduction license."); Rough Tr., May 15, 2025, 258:2 – 259:17 (Mr. Busch: "For non-interactive streaming, you only need a public performance license… for … interactive, you also need … what is called a 'mechanical reproduction license.'") In other words, Plaintiffs further developed a point briefly raised in their moving papers, i.e. that the court must find a distinction between "interactive" and "non-interactive" use, in that the streaming use of the comedy content only infringed Plaintiffs' mechanical rights when Pandora published the comedy routines in an "interactive" setting. (Plaintiffs' Mtn. for Partial Summary Jmnt., 10:18-11:4; *see also* Plaintiffs' Opp. to Pandora's MSJ, 11:27-12:7.)[7]

Plaintiffs delved further into this argument at the hearings, arguing for the first time at the second hearing that even if Plaintiffs granted an implied license for Pandora's public performance of their literary works on its non-interactive service, Pandora's 2017 reproduction of the comedy content on its *interactive* service required a mechanical license and therefore exceeded the scope of

---

[7] Plaintiffs' Second Amended Complaint ("SAC") fails to clearly make the same distinction between "interactive" and "non-interactive" streaming.  The SAC alleges that Pandora "did not possess a valid license to publicly perform" Plaintiffs' works, meaning the underlying comedy routine/jokes. SAC, ¶¶ 24, 25, 39, 54, 67, 82, 96, 114, 132, 149. The SAC also alleges that "digital service providers, like Pandora, must also get a mechanical digital reproduction license from the owner of the underlying composition in order to make the underlying composition … available for reproduction and distribution through interactive streaming" and that Pandora made Plaintiffs' works available via its interactive streaming service while knowing it did not possess <u>either</u> of the licenses necessary to do so. SAC, ¶¶ 25, 40, 55, 68, 83, 97, 115, 133, 150. The SAC also alleges that Pandora failed to pay royalty payments on either the allegedly required licenses for the written comedy routines. SAC, ¶¶ 25, 40, 55, 68, 83, 97, 115, 133, 150.

the implied public performance license.[8] While Plaintiffs have consistently argued that they were entitled to royalties for both types of licenses for their literary works, this is the first time they have argued that the claim could be split in this way. Typically, arguments raised for the first time in the reply brief—or later—should be disregarded. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."). Even if the court were to consider this new argument, i.e., that just the interactive streaming infringement claims should or could be preserved, it is not persuasive.

Assuming, *arguendo*, that Plaintiffs are entitled to public performance and mechanical licenses for the streaming of their literary works (an issue not decided here), the Special Master briefly addresses this new argument.  Regarding the public performance license for the literary works, for all of the reasons already stated, the totality of Plaintiffs' conduct supports finding an implied public performance license for the interactive and non-interactive streaming of Plaintiffs' works. The next question is whether the same can be said for the mechanical license, assuming such a right exists. A close look at the totality of Plaintiffs' conduct would also support a finding of an implied mechanical license for the interactive streaming of Plaintiffs' underlying works: Plaintiffs knew about the use without objecting for at least two years, encouraged the use, and accepted royalty payments for the use.

The evidence shows that Plaintiffs were aware that Pandora was interactively streaming their works. Plaintiffs' counsel admitted as much when he stated that Plaintiffs would have started receiving royalty statements reflecting the new on-demand streams in 2018 for the on-demand

---

[8] At the May 2025 hearing, Plaintiffs seemed to argue for the first time that there is no evidence that they accepted any royalties, at all, for interactive streaming. Rough Tr., May 15, 2025, 256:12 – 260:5; 308:1-16 (Mr. Asimow: I wanted to make sure that the record was clear that the royalties of that the plaintiffs received were all for non-interactive streaming, not for interactive streaming."). However, the evidence shows that they did receive royalties for streaming the recordings on both Pandora's interactive and non-interactive services. *See, e.g.,* Plaintiffs' Opp., 12:2-4 ("received statutorily required public performance compulsory royalties for the streaming of ***sound recordings*** […]."). At that hearing, Pandora protested that this was a new argument.  Nevertheless, Pandora was able to point to evidence showing that Plaintiff did receive interactive royalties for the streaming of sound recordings. Ex. 305 (Royalty Statement to George Carlin for Period 10/1/22 – 12/31/22.) The Special Master declines to recognize this argument, raised for the first time at the second hearing without any evidentiary support, and contradicted by Plaintiffs' briefs and arguments.

streams starting in 2017. *See* Rough Tr., 37:1-19, 97:5-12; *see also* Plaintiffs' Ex. 197.1, Blum Expert Report, pp. 49-53 [Plaintiffs' damages expert tabulating the several million interactive streams across the nine Plaintiffs' Works since 2019].) Additionally, until the second hearing, Plaintiffs had never complained that Pandora had failed to pay any of the royalties it owed for the sound recordings (whether non-interactive or interactive). *See* Pandora's Reply ISO SUMF, ¶ 1543; *supra* fn. 8.

Furthermore, as discussed earlier, Plaintiffs did not object to the streaming of any of their works until Word Collections first contacted Pandora in 2020. And, as discussed above, Pandora offered to take down the Works but was not asked to do so.

In addition, Plaintiffs accepted royalty payments for the interactive streams—as discussed in detail above, § I.C.2, they accepted royalty payments for all of Pandora's streams of their works without objecting until 2020 when Word Collections first contacted Pandora.

Moreover, several of the Plaintiffs encouraged Pandora's use of their Works during this time frame:

- On November 18, 2020, Bill Engvall (Plaintiff Yellow Rose) shared a post from Pandora congratulating him on six hundred million Pandora streams to thank his fans for the support. Plaintiffs' SGM, ¶ 357.

- On September 22, 2020, Plaintiff Black's official Facebook page promoted his album, "Thanks for Risking Your Life," stating it was "streaming exclusively on Pandora right now!" Plaintiffs' SGM, ¶ 377 (Pandora Opening Ex. 33 (Del Bene Opening Report), Figure 2 (ECF 335-33).

- Plaintiff George Lopez testified that he and his team provided material and permissions to Pandora to promote his album The Wall, including allowing for a period during which Pandora would exclusively stream that album. Plaintiffs' SGM, ¶ 395; see also ¶ 396 (stating he would approve clips for SiriusXM to post so that he could boost attendance at shows).

As to the post-2017 interactive streaming of Plaintiffs' Works, the evidence points in only one direction, i.e., that Plaintiffs knew that Pandora was interactively streaming their Works, did not object to—and in some cases encouraged—the use, and accepted royalties for the same.

1    Further, as discussed above, according to Plaintiffs, ███████████████

2    ████████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████

4    ██████████████████. Again, Plaintiffs cannot credibly argue that they were unaware of their

5    rights and also argue that the industry custom was that they would be paid for those rights. Thus, for

6    the reasons already stated, even if Plaintiffs now claim to have been subjectively unaware of their

7    entitlement to receive separate mechanical license fees for their Works from Pandora since 2017,

8    they must still be accountable for their choice to allow Pandora to stream the Routines without

9    objecting or demanding additional royalties.

10    Finally, Plaintiffs identified several cases in their oral argument that were not in their briefs.

11    All but one were published before the openings briefs were filed in this case and could be excluded

12    on that basis alone. For example, Plaintiffs discussed *Eight Mile v. Spotify*, a decision published on

13    August 15, 2024, a week before Plaintiffs submitted their Motion for Summary Judgment on August

14    21, 2024. *Eight Mile v. Spotify*, 745 F.Supp.3d 632, 658-60 (M.D. Tenn. 2024). This case was not

15    newly published or discovered (Plaintiffs' counsel also represented the plaintiffs in that action), and

16    the implied license issue in that matter was resolved under the Sixth Circuit's standard for implied

17    license, which unlike the Ninth Circuit's, focuses on the creator's subjective intent. Plaintiffs'

18    rebuttal presentation also identified five other cases "regarding uses exceeding the scope of an

19    implied license" which were not mentioned in any of the summary judgment briefings, and four of

20    which were published well before this motion was filed. Even if these five cases were to be

21    considered, they would not change the outcome:

22    • *Oddo v. Ries*, 743 F.2d 630, 634 (9th Cir. 1984)—in this matter, an implied license by

23    plaintiff partner to use his articles in a manuscript did not give defendant partner the right

24    to use the articles in any other work. This is materially different than the situation here,

25    in which Plaintiffs knew that Pandora was streaming their works on its digital platform

26    but were ostensibly unaware that Pandora was only paying royalties for the recordings

27    and not for the underlying written compositions.

28

- *Crispin v. Christian Audigier, Inc.*, 839 F. Supp. 2d 1086, 1090 (C.D. Cal. 2011)—in this case, the court found that it could not grant summary judgment that an implied license existed because the evidence differed on whether the plaintiff, who had licensed artwork to defendant to use on apparel, had agreed that the defendant could place the artwork on sex products. Again, this is materially different from the use here, which is Pandora's streaming of the product on its digital platform and whether or not Plaintiffs had impliedly granted license(s) for the underlying written compositions.

- *Reinicke v. Creative Empire LLC*, 38 F. Supp. 3d 1192, 1205 (S.D. Cal. 2014), aff'd, 669 F. App'x 470 (9th Cir. 2016)—in this matter, the court concluded that the plaintiff had granted the defendant an implied right to sublicense plaintiff's copyrighted work (10 chapters of a defendant's German language course) to distributors because distributing the language course effectuated the purpose of the license, i.e. selling the course. This case has little to do with the matter at hand, which has nothing to do with sublicensing. Rather, here, the scope question seems to be whether an implied license to stream the underlying writings on Pandora's non-interactive service would also include the right to stream it on Pandora's interactive service.

- *Khachatryan v. 1 Hotel W. Hollywood L.L.C.*, No. 2:23-CV-10829-ODW (EX), 2024 WL 3015504 (C.D. Cal. June 14, 2024)—in this matter, the court held that the plaintiffs, who assented to defendant's use of plaintiffs' photograph on their social media channels, did not give an implied license to defendant to use the photograph to sell bathrobes on its website. These facts are not analogous to the ones at bar.

- *Griego v. Jackson*, No. 2:24-CV-03260-ODW (PVCX), 2025 WL 297150, at *3 (C.D. Cal. Jan. 24, 2025)—this is the only case issued after Plaintiffs submitted their briefs. In this case, the court found that the plaintiff, who created a character for the music artist defendant's 1999 album cover, had granted an implied license for defendant to adopt and develop that character as his graphic alter ego when plaintiff knew of defendant's use of the character and did not object for nearly 25 years. While Plaintiffs' lack of objection

over several years is also a factor at issue here, this case is not otherwise factually analogous.

In sum, none of the newly submitted authorities alters the conclusion that Plaintiffs' copyright claims are barred by their grant of an implied license to Pandora.

## III.    EQUITABLE ESTOPPEL APPLIES

Pandora also argues that the doctrine of equitable estoppel bars Plaintiffs' claims. Plaintiffs dispute that equitable estoppel applies here. Defendants incorporate the facts of their implied license defense to support their assertion of equitable estoppel.

Equitable estoppel applies where the party with the alleged copyright "has aided the defendant in infringing or otherwise induced it to infringe or has committee covert acts such as holding out. . . by silence or inaction." *Field v. Google, Inc*., 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006) (internal quotations and citations omitted). Estoppel requires a showing that 1) Plaintiffs knew of Pandora's allegedly infringing conduct; (2) that Plaintiffs intended that their conduct would be relied upon in such a way that Pandora had a right to believe it was intended; (3) that Pandora was ignorant of the true facts (i.e., that the use of the Routines was not permitted); and (4) that Pandora relied to their detriment on Plaintiffs' conduct or silence. *See Field* at 1116; *Hampton v. Paramount Pictures Corp*., 279 F.2d 100, 104 (9th Cir. 1960).

Silence alone does not generally create estoppel. Instead, the party asserting an estoppel defense must show silence combined with other facts led to that party's detrimental reliance on the opposing party's silence. *See e.g., Gossen Corp. v. Marly Mouldings, Inc.,* 977 F. Supp. 1346, 1354 (E.D. Wis. 19970; *Cal. Inst. Of Technology v. Hughes*, 2015 WL 11089495 at *6 (C.D. Cal. May 5, 2015). Where silence or "inaction" becomes "misleading inaction," equitable estoppel may arise. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co*., 960 F.3d 1020, 1042-43 (Fed. Cir. 1992). If silence or inaction is prolonged (as in the present case), it is another factor in favor of an equitable estoppel defense. *See e.g. Interscope Records*, 2010 WL 11505708 at * 12 ("A copyright holders' silence or inaction in the fact of an infringement can give rise to an estoppel defense, particularly where such

1  inaction is prolonged"); *see also Carson v. Dynegy, Inc.*, 344 F.3d 446, 453 (5th Cir. 2003) ("It is

2  accepted that estoppel may be accomplished by a plaintiff's silence and inaction.").

3    As noted in Pandora's MSJ, "Plaintiffs knew, or were on notice from royalty statements, that

4  Pandora was streaming their Routines years before filing suit.  Plaintiffs admit that Pandora has been

5  advertising its comedy offerings to the public since 2011 and aver that Pandora has provided

6  streaming access to their Routines for years."  Pandora's MSJ at 12 (citing SACC ¶¶ 160, 165)

7  (internal quotations omitted).   The parties do not dispute that Plaintiffs never objected to Pandora's

8  use of the Routines at any time between 2011 and 2020, just prior to this litigation.  In addition,

9  during all of these years, Plaintiffs never asked Pandora to take a second license or pay a separate

10  royalty for the Routines.  Plaintiffs' prolonged silence was therefore misleading to Defendants, if

11  indeed Plaintiffs believed that an additional license was required.

12    Plaintiffs argue that *Petrella v. MGM*, 134 S. Ct. 1962 (2014), requires "intentionally

13  misleading misrepresentations concerning their abstention from bringing suit" for an estoppel

14  defense.  (Plaintiffs' Opposition to MSJ at 14).  *Petrella* was a decision primarily discussing the

15  application of laches, a different defense than estoppel.  While *Petrella* contains the quoted language,

16  *Petrella* included this language in its general comparison between the doctrines of estoppel and

17  laches.  *Petrella* did not address specifically the type of misrepresentations that are necessary for

18  estoppel nor did *Petrella* address (as many other cases have) when silence or inaction becomes

19  misleading to the alleged infringer.  *See Petrella* at 1977.

20    Plaintiffs also argue that Plaintiffs' promotion of Pandora's "use of sound recordings" and

21  Plaintiffs acceptance of benefits from Pandora are irrelevant to equitable estoppel, citing *ABKCO*

22  *Music v. Sagan*, 50 F.4th 309, 311 (2nd Cir. 2022).  (Plaintiffs' Opposition to MSJ at 14).  *ABKCO*

23  is distinguishable on several grounds, including the fact that the *ABKCO* plaintiffs were unaware of

24  the defendants' infringing conduct.  Here, Plaintiffs were not only aware of Pandora's allegedly

25  infringing conduct, but encouraged it.  *ABKCO* is also distinguishable because it dealt with musical

26  works, not works by comedians, and its holdings were impacted by the specific facts of that case.

27    It is undisputed that Plaintiffs did more than remain silent for years, but instead expressly

28  encouraged Pandora to stream their Routines. *See* Factual Background § II.  Plaintiffs also accepted

royalties during these years without notifying Defendants that they believed they were entitled to additional royalties for their Routines. *Id.* Finally, Pandora detrimentally relied on Plaintiffs' prolonged silence, believing that Plaintiffs agreed to streaming the Routines, only to face this litigation long after the streaming began. Accordingly, the undisputed evidence shows that this case involves silence by Plaintiffs that constituted "misleading inaction." Equitable estoppel applies and bars Plaintiffs' claims.

## IV.    THE EXPRESS AGREEMENTS BETWEEN THE RECORD LABELS AND PANDORA PERMITTED PANDORA TO USE THE UNDERLYING COMEDY ROUTINES

Pandora's express contractual rights to use the Routines defeats any claim of infringement. The court in *Marvez v. Uproar Entertainment* addressed the same dispute between a comedian and a company that distributed the comedian's sound recordings. The parties disputed whether the entertainment company had a valid copyright in the routines underlying the master sound recordings identified in the contract. The *Marvez* court found that the express contract between the parties defeated any claim of infringement. Specifically, the court found that the agreement's "plain language" necessarily included the rights to the routines or jokes because without such rights, the purpose of the agreement (i.e., to distribute the comedian's performance) would have been impossible. *See Marvez v. Uproar Entertainment*, 2022 WL 18284896, at * 2 (C.D. Cal. Dec. 12, 2022) (J. Wilson).

The *Marvez* reasoning applies here. The express agreements ████████████████ ████████████████. If such rights were withheld, the entire purpose of the agreements would have been frustrated. Neither at the time of entering into the express contracts with the record labels nor at any time until many years later, just before this action was filed, did the comedians even suggest an additional license was necessary. Accordingly, the express agreements defeat any infringement claim.

V.    **RECOMMENDATION**

Based on the foregoing, it is respectfully recommended that Pandora's pending Motion for Summary Judgment be GRANTED on the grounds that Pandora has an implied license to the disputed works and also that equitable estoppel bars Plaintiffs' claims. These findings are dispositive of the motions for summary judgment. It is therefore recommended that the Court decline to reach either parties' remaining arguments as unnecessary to resolve. It is recommended that Plaintiffs' Motion for Partial Summary Judgment be DENIED.

The Special Master further recommends that the pending Motions to Seal be GRANTED. Because the Special Master is unaware of which aspects of this Report may raise confidentiality concerns for the parties, the Special Master places the entire Report under a sealing order. The Special Master requests that the parties direct her to any portions of the Report that need to be sealed and further requests that the parties state the basis of the sealing request. If the Special Master agrees with the request, a public version of the Report will be filed with the sealed information redacted from the Report.

Pursuant to the District Judge's Order Appointing Special Master and Federal Rule of Civil Procedure 53, the parties may file a motion for review of this Report and Recommendation within 14 days of the date of this Report.

IT IS SO RECOMMENDED.

Dated: July 1, 2025

Hon. Suzanne Segal (Ret.)
2B739185DE71459...

Hon. Suzanne H. Segal (Ret.)
Special Master