1  MAYER BROWN LLP
   PAUL M. FAKLER (*pro hac vice*)
2  *pfakler@mayerbrown.com*
   JACOB B. EBIN (*pro hac vice*)
3  *jebin@mayerbrown.com*
   ALLISON AVIKI (*pro hac vice*)
4  *aaviki@mayerbrown.com*
   DAVID YOLKUT (*pro hac vice*)
5  *dyolkut@mayerbrown.com*
   1221 Avenue of the Americas
6  New York, New York  10020-1001
   Telephone:  (212) 506-2500
7  Facsimile:  (212) 262-1910

8  JOHN NADOLENCO (SBN 181128)
   *jnadolenco@mayerbrown.com*
9  MAX W. HIRSCH (SBN 301872)
   *mhirsch@mayerbrown.com*
10 MICHAEL A. CALVANICO (SBN 344792)
   *mcalvanico@mayerbrown.com*
11 333 S. Grand Avenue, 47th Floor
   Los Angeles, California  90071-1503
12 Telephone:  (213) 229-9500
   Facsimile:  (213) 625-0248

13
   *Attorneys for Defendant*
14 *Pandora Media, LLC*

15            **UNITED STATES DISTRICT COURT**

16        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

17 | In re PANDORA MEDIA, LLC | Master File No. 2:22-cv-00809-MCS-MAR |
18 | COPYRIGHT LITIGATION | |
   | | <u>CONSOLIDATED ACTION</u> |
19 | | |
   | This Document Relates To: | **DEFENDANT PANDORA MEDIA,** |
20 | | **LLC'S OPPOSITION TO PLAINTIFFS'** |
   | ALL ACTIONS | **MOTION FOR REVIEW OF SPECIAL** |
21 | | **MASTER'S REPORT &** |
   | | **RECOMMENDATION RE: MOTIONS** |
22 | | **FOR SUMMARY JUDGMENT** |
   | | |
23 | | *Filed concurrently with the Declaration of* |
   | | *Paul M. Fakler* |
24 | | |
   | | Hon. Mark C. Scarsi |
25 | | |
   | | Date:        August 25, 2025 |
26 | | Time:        9:00 AM |
27 | | Courtroom:   7C |
   | | **REDACTED VERSION OF UNDER** |
28 | | **SEAL DOCUMENT** |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................... 1

PROCEDURAL HISTORY ............................................................................... 2

LEGAL STANDARD ........................................................................................ 3

ARGUMENT ..................................................................................................... 4

I.     THE SPECIAL MASTER CORRECTLY FOUND THAT PANDORA
      HAS AN IMPLIED LICENSE TO THE ROUTINES .................................. 4

     A.    The Special Master Applied the Right Test .......................................... 4

     B.    The Undisputed Evidence Overwhelmingly Supports The
          Special Master's Finding of an Implied License ................................. 7

II.    THE SPECIAL MASTER CORRECTLY FOUND THAT
      EQUITABLE ESTOPPEL APPLIES ....................................................... 15

III.   THE SPECIAL MASTER CORRECTLY FOUND THAT PANDORA
      HAS EXPRESS LICENSES TO USE THE ROUTINES ........................... 17

CONCLUSION ................................................................................................ 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Asset Marketing Systems v. Gagnon*,
   542 F.3d 748 (9th Cir. 2008) ........................................................................... 4, 7

*Briggs v. Koenig*,
   2023 WL 4203389 (C.D. Cal. June 26, 2023) ..................................................... 3

*Cal. Inst. Of Tech. v. Hughes Commc'ns, Inc.*,
   2015 WL 11089495 (C.D. Cal. May 5, 2015) .................................................... 16

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................................ 3

*CraftShack, Inc. v. Critical Telephone Applications, Inc.*,
   2025 WL 1255396 (C.D. Cal. Mar. 14, 2025) .................................................... 7

*Disalle v. Lensi*,
   2024 WL 3221732 (C.D. Cal. May 7, 2024) ..................................................... 15

*Effects Associates, Inc. v. Cohen*,
   908 F.2d 555 (9th Cir. 1990) ....................................................................... 4, 5, 6

*Evox Prods., LLC v. Chrome Data Sols., LP*,
   2023 WL 1879479 (9th Cir. Feb. 10, 2023) ................................................ 4, 5, 6

*ExperExchange, Inc. v. Doculex, Inc.*,
   2009 WL 3837275 (N.D. Cal., Nov. 16, 2009) ................................................. 12

*Field v. Google, Inc.*,
   412 F. Supp. 2d 1106 (D. Nev. 2006) ............................................................ 4, 6

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,
   2015 WL 4776932 (C.D. Cal. May 27, 2015) ........................................ 6, 11, 14

*Foad Consulting Grp., Inc. v. Azzalino*,
   270 F.3d 821 (9th Cir. 2001) ....................................................................... 4, 5, 6

*Fontana v. Harra*,
   2013 WL 990014 (C.D. Cal. Mar. 12, 2013) ..................................................... 4

*Griego v. Jackson*,
    2025 WL 297150 (C.D. Cal. Jan. 24, 2025)........................................................4

*Hadady Corp. v. Dean Witter Reynolds, Inc.*,
    739 F. Supp. 1392 (C.D. Cal. 1990).................................................................17

*Hampton v. Paramount Pictures Corp.*,
    279 F.2d 100 (9th Cir. 1960).................................................................15, 16

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376, 387 (9th Cir. 2010)......................................................................3

*Interscope Recs. v. Time Warner, Inc.*,
    2010 WL 11505708 (C.D. Cal. June 28, 2010)...........................................4, 6, 16

*Johnson v. Gruma Corp.*,
    614 F.3d 1062 (9th Cir. 2010)...........................................................................9

*Khachatryan v. 1 Hotel West Hollywood L.L.C.*,
    2024 WL 3015504 (C.D. Cal. June 14, 2024).................................................11

*Kramer v. From The Heart Prods., Inc.*,
    300 F. App'x 555 (9th Cir. 2008).................................................................16, 17

*Marvez v. Uproar Ent.*,
    2022 WL 18284896 (C.D. Cal. Dec. 12, 2022) ...................................13, 18, 20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ...........................................................................................3

*Petrella v. Metro-Goldwin Mayer, Inc.*,
    572 U.S. 663 (2014) ...................................................................................15, 16

*Providence Publications, LLC v. NBC Universal Media, LLC*,
    2025 WL 1206875 (C.D. Cal. Mar. 25, 2025) .................................................6, 7

*Smith v. Bellco Credit Union*,
    2020 WL 8611063 (C.D. Cal. Dec. 14, 2020) .....................................................9

*Softketeers, Inc. v. Regal West Corp.*,
    2025 WL 636708 (9th Cir. Feb. 27, 2025)...........................................................7

*UMG Recordings, Inc. v. Disco Azteca Distributors, Inc.*,
    446 F. Supp. 2d 1164 (E.D. Cal. 2006)...........................................................12

iii

*United States ex rel. Kelly v. Serco, Inc.*,
    846 F.3d 325 (9th Cir. 2017) ................................................................................. 3

**Statutes**

17 U.S.C. § 115 .............................................................................................................. 10

**Other Authorities**

FRCP 53(f)(3)-(4) ........................................................................................................... 3

FRCP 56(a) ...................................................................................................................... 3

FRCP 72 ........................................................................................................................... 3

DEFENDANT PANDORA MEDIA, LLC'S OPPOSITION TO MOTION FOR REVIEW;
CASE NO. 2:22-cv-00809-MCS-MAR

# INTRODUCTION

According to Plaintiffs, the Special Master—a former chief magistrate judge of the Central District of California with decades of judicial and copyright law experience—got *everything* wrong. Plaintiffs claim Judge Segal misread nearly every case she relied on and made countless mistakes evaluating the facts. In reality, Judge Segal appropriately analyzed Ninth Circuit law addressing implied license, equitable estoppel, and express license and meticulously applied that law to a voluminous factual record that she reviewed over seven months and after hearing over seven hours of oral argument. Plaintiffs may not like Judge Segal's conclusions, but that does not mean Plaintiffs' arguments were ignored. Judge Segal expressly considered, and rightly rejected, each of Plaintiffs' arguments that they re-hash in their Objections, including those raised for the first time at oral argument and those that contradict Plaintiffs' prior positions.

As Judge Segal correctly determined, the totality of Plaintiffs' longstanding conduct—silence in the face of Pandora's use of their routines, coupled with multiple plus factors—resulted in an implied license. Plaintiffs knew for years that Pandora was streaming their routines, yet never objected or asked that Pandora take an additional license or pay an additional royalty. On the contrary, Plaintiffs encouraged Pandora's use and for good reason: Plaintiffs accepted millions in royalties and further benefited from the exposure Pandora provides. And Plaintiffs admittedly intended to, and did, provide their labels with the rights to their routines so that the labels could provide Pandora with everything needed to use their recordings and share the proceeds with Plaintiffs.

Based largely on these same undisputed facts, the Special Master correctly determined that equitable estoppel bars Plaintiffs' claims. And, following a careful analysis of the agreements between Plaintiffs and their labels and those between Pandora and the labels/distributors, the Special Master reached the only rational

conclusion: just as Plaintiffs intended, the rights to the routines were passed from the Plaintiffs to their labels and then on to Pandora. Any other result would frustrate those agreements' purpose.

Judge Segal got it exactly right—Pandora is entitled to summary judgment on multiple grounds.

## PROCEDURAL HISTORY

Following extensive fact and expert discovery, the parties cross-moved for summary judgment. Special Master's Report & Recommendation Re: Motions For Summary Judgment (ECF 489) ("R&R") 2. The filings were "voluminous"— exceeding 25,000 pages of declarations and exhibits. ECF 400 at 2. Because these materials "far exceed[ed] the length that this Court typically sees," this Court, after allowing for objection, referred the motions to Judge Segal as a Special Master. ECF 477 at 10-11 (explaining that Judge Segal's "experience with this District and copyright law would be valuable assets.").[1]

The Special Master dug into the vast record of 160 pages of briefing, 8,874 SUMFs, 1,654 exhibits, extensive evidentiary objections, and dozens of declarations. Following that exhaustive review, the Special Master issued a Tentative Ruling in Pandora's favor and held two hearings (spanning more than seven hours) during which she accepted 234 slides as demonstrative exhibits. R&R 27-32; *see also* ECF 491-2 and ECF 491-4.[2]

Judge Segal's comprehensive, 54-page R&R correctly concluded that "Pandora had an implied license as well as an express license" to use Plaintiffs' routines and that "Plaintiffs' claims are subject to equitable estoppel." R&R 2, 33-51, 51-53. Finding these conclusions "dispositive," the Special Master did not reach

---

[1] The Court appointed Judge Segal over Plaintiffs' objection, which focused on cost. ECF 477 at 7.

[2] The Special Master originally contemplated one hearing, but to accommodate Plaintiffs' request for more time, she gave them the entire first day. She added a second day for Pandora's presentation and for rebuttals. ECF 491-2 at 79-85.

Pandora's other arguments, including (i) Plaintiffs' copyright misuse; (ii) Plaintiffs' failures to establish registration or ownership; (iii) Plaintiffs' failures to establish chain-of-title; (iv) Plaintiffs' ineligibility for statutory damages for many routines; and (v) that any infringement was innocent. ECF 339 at §§ IV-VI.[3]

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "To survive summary judgment, the [plaintiff] must establish *evidence* on which a reasonable jury could find for the plaintiff." *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 330 (9th Cir. 2017). "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). No genuine issue for trial exists where the record taken as a whole could not lead a rational factfinder to rule for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Subject to certain exceptions not relevant here, this Court reviews *de novo* objections to the R&R. *See* FRCP 53(f)(3)-(4); ECF 477 at 12. But a motion for review is not an opportunity for a "do-over." Objections that fail to specifically identify an error, raise new arguments, merely repeat arguments already addressed, or assert blanket criticisms are improper. *Briggs v. Koenig*, 2023 WL 4203389, at *1 (C.D. Cal. June 26, 2023) (rejecting, in analogous *de novo* review of a magistrate judge's R&R under FRCP 72, "objections that simply repeat arguments fully addressed but rejected in the R&R").

---

[3] These fully-briefed arguments provide independent bases for granting Pandora summary judgment. If the Court declines to adopt the R&R, Pandora would be entitled to the Special Master's ruling on those arguments.

## ARGUMENT

**I.    THE SPECIAL MASTER CORRECTLY FOUND THAT PANDORA HAS AN IMPLIED LICENSE TO THE ROUTINES**

### A.    The Special Master Applied the Right Test

In the Ninth Circuit, "grants of nonexclusive copyright licenses need not be in writing," but can instead be implied through "conduct." *Foad Consulting Grp., Inc. v. Azzalino*, 270 F.3d 821, 825 (9th Cir. 2001); *Evox Prods., LLC v. Chrome Data Sols., LP*, 2023 WL 1879479, at *3 (9th Cir. Feb. 10, 2023). The inquiry turns on whether the copyright owner engaged in conduct "from which [the] other [party] may properly infer that the owner consents to [the] use." *Field v. Google, Inc.*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006)). The "touchstone of an implied license" is the licensor's "objectively manifested intent" to allow the use—no single "factor is dispositive." *Griego v. Jackson*, 2025 WL 297150, at *3 (C.D. Cal. Jan. 24, 2025) (cited in R&R 33-34). Instead, "[c]ourts consider whether the ***totality of the parties' conduct*** indicates that the licensor intended to grant the licensee permission to use the work." *Fontana v. Harra*, 2013 WL 990014, at *4 (C.D. Cal. Mar. 12, 2013) (emphasis added).

Plaintiffs nonetheless insist that the Special Master "applied the wrong legal test." Plaintiffs' Motion for Review (ECF 492) ("Motion" or "Mot.") 1-2. To Plaintiffs, a defendant in this Circuit can only prove an implied license if it commissioned the creation of the plaintiff's work, as was the case in *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990) and *Asset Marketing Systems v. Gagnon*, 542 F.3d 748, 754-55 (9th Cir. 2008).

That is wrong, as neither case "expressly limits the requirements for an implied license" to the three factors applied in *Effects*. R&R 34; *Interscope Recs. v. Time Warner, Inc.*, 2010 WL 11505708, at *3-4 (C.D. Cal. June 28, 2010) (noting that *Effects* "contains no limiting language to that effect, and the holding in *Effects* is

driven by the facts of that particular case"). While the "*Effects* test" is one way to prove an implied license, the Ninth Circuit has "made clear that implied licenses are not limited to the three elements articulated" in that test "***outside*** the work for hire context." R&R 34. Indeed, courts have routinely found implied licenses "outside of a work-for-hire context" based on the "totality of the parties' conduct." *Id.* (collecting cases).

As *Effects* recognized, "[a] nonexclusive license may be … implied from conduct." 908 F.2d at 558. The Ninth Circuit reaffirmed that principle eleven years later in *Foad*, 270 F.3d at 825. Contrary to Plaintiffs' representation, Mot. 3, the defendant in *Foad* **did not** commission the work at issue from the plaintiff; it had been commissioned by another company, which was not a defendant in the case. *Id.* at 824. Judge Kozinski, who authored *Effects*, specifically noted in his concurrence in *Foad* that "[b]ecause the implied license is derived from the relationship of the parties … it is entirely appropriate to look at any words or conduct that bear on whether a copyright license should be implied." *Id.* at 834.

More recently, the Ninth Circuit in *Evox* affirmed summary judgment to the defendant, finding an implied license because of plaintiffs' conduct in "not objecting to [defendant's] reports of its active sublicenses and accepting royalty payments for those sublicenses." 2023 WL 1879479, at *3. In *Evox*, the works comprised plaintiffs' library of automotive images available for license to its entire customer-base. No works were commissioned by anyone, refuting Plaintiffs' insistence that the only way to an implied license is through the *Effects* test.[4]

Rather than acknowledge that district courts, too, "regularly find an implied license outside the work for hire context", *see* R&R 35, Plaintiffs simply label all

---

[4] At oral argument, Plaintiffs claimed that the Ninth Circuit Model Jury Instruction 17-25 "tracks the *Effects* test." ECF 491-2 at 21. The model instruction says the opposite: that "a license may be implied by the parties' conduct," that the *Effects* test is just one way for an implied license to arise, and that the model instruction based on the *Effects* formulation may need to be changed to reflect that "implied licenses arise in a wide variety of circumstances." Fakler Decl. Ex. 1 at 13.

such cases "aberrant." Mot. 3. Nonsense. Plaintiffs cannot wish-away Judge Wilson's comprehensive dismantling of their position in *Interscope Records*, 2010 WL 11505708, at *3-4 (cited in R&R 34-35). Collecting multiple cases finding an implied license "even where the three-factor test proposed by Plaintiff is not met," Judge Wilson correctly rejected Plaintiffs' "overly restrictive view of the law of implied license" and their "misreading of *Effects*." *Id.*

Similarly unconvincing is Plaintiffs' portrayal of *Field* as some "outlier." Mot. 4. In support, Plaintiffs point to a 2015 decision that they admittedly failed to cite either in summary judgment briefing or to the Special Master. *See* Mot. 4 and n.3 (citing *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 2015 WL 4776932, at *13 (C.D. Cal. May 27, 2015) and conceding that "*Flo & Eddie* was not previously cited"). Beyond the threshold problem that Plaintiffs are purporting to object to the R&R based on an argument never made before Judge Segal, in violation of the Court's Order Appointing the Special Master (ECF 477 at 12), *Flo & Eddie* is inapposite. That decision was about class certification. When it does briefly discuss implied license and the need for a commissioned work, it is dictum: the defense was waived because "Sirius XM had failed to present the arguments at summary judgment." *Flo & Eddie*, 2015 WL 4776932, at *12. And, that dictum conflicts with *Evox*—binding Ninth Circuit precedent decided years after *Flo & Eddie*. 2023 WL 1879479, at *3. Moreover, Plaintiffs also cite *Providence Publications, LLC v. NBC Universal Media, LLC*, 2025 WL 1206875, at *4-6 (C.D. Cal. Mar. 25, 2025), which ***expressly relied on Field in granting summary judgment*** to defendant NBC on implied license grounds—where NBC had ***not*** commissioned the work at issue—because the plaintiff's "years-long" conduct, including knowledge and failure to object, "all strongly support a finding of an implied license."

As if *Foad, Evox, Interscope Records, Providence,* and *Field* were not enough authority to rely on, the R&R cites ***several*** additional cases—all directly contrary to

Plaintiffs' position—finding implied licenses through conduct where the plaintiff's work was not commissioned by the defendant. R&R 35-36 (collecting cases).[5]

## B.    The Undisputed Evidence Overwhelmingly Supports The Special Master's Finding of an Implied License

Plaintiffs' objections to Judge Segal's comprehensive assessment of the undisputed facts fare no better. Plaintiffs are wrong that the Special Master "ignored several categories of evidence." Mot. 6. She expressly considered Plaintiffs' purported evidence and simply found it could not reasonably support their claims. *See* R&R 37-40.

### (1)    Multiple Categories of Undisputed Evidence Support an Implied License

The Special Master found substantial undisputed evidence, across several categories of conduct, that combined to establish "critical facts supporting" an implied license. *Id*. 32. The evidence underlying each category of conduct is methodically detailed in the R&R including:

- Every Plaintiff knew that Pandora was streaming their Routines "for many years before initiating this lawsuit." (*id.* 21);

- No Plaintiff ever "objected to having their works streaming on Pandora" (*id.* 22);

- Plaintiffs actively "encouraged Pandora to stream their Routines" (*id.* 23-24, 38-39);

---

[5] Rather than engage with these cases, Plaintiffs pivot to three cases not cited in the summary judgment briefs. Mot. 5-6. As noted, *Providence* **supports Pandora**; it found an implied license based on the plaintiff's longstanding conduct and emphasized that "the *Gagnon* factors should not be applied rigidly" where they "do not adequately explain" the licensor's "objective intent as manifested by … its conduct." 2025 WL 1206875, at *5. Plaintiffs' other two cases are inapposite. *Softketeers, Inc. v. Regal West Corp.*, 2025 WL 636708, at *1 (9th Cir. Feb. 27, 2025), concerned a *commissioned* work. And in *CraftShack, Inc. v. Critical Telephone Applications, Inc.*, 2025 WL 1255396, at *9 (C.D. Cal. Mar. 14, 2025), the parties had no course of conduct for the court to examine.

- Every Plaintiff "accepted royalty payments without protest" for years (*id.* 22, 39);

- Every Plaintiff "benefited from having their work[s] streaming on Pandora" (*id.* 23);

- No Plaintiff ever claimed to have been underpaid between 2011 and 2020, when Word Collections emerged. (*id.* 21); and

- Plaintiffs intended to—and did—convey all needed rights to their labels to pass those rights on to Pandora (*id.* 32, 37).

***Knowing and Prolonged Silence:*** The Special Master correctly found that every Plaintiff "undisputedly knew for years" that Pandora was streaming their routines. *See* R&R 21, 37-38 (citing Pandora's AUMF ¶¶ 1602-1621, 1751-1778); *see also* SUMF ¶¶ 14-22, 355-382, 389-401. While Plaintiffs note that the R&R cites additional, corroborative deposition testimony from five Plaintiffs, *see* Mot. 7, Plaintiffs' ***own admissions*** show knowledge on ***every*** Plaintiff's part. *Compare id. with* Plaintiffs' SGD at ¶¶ 14-22 and 379. The "result, under Ninth Circuit precedent, is an implied license." R&R 38.

In response, Plaintiffs attempt to distinguish between knowledge of non-interactive streaming of their routines on Pandora, which began in 2011, and the interactive streaming of those routines, which was added in 2017.[6] Mot. 7-8. While Plaintiffs admit that they "knew or should have known" about the former, they claim there is no evidence they knew of the latter. *Id.* Working from this premise, Plaintiffs claim that the scope of any implied license must be limited to just non-interactive streaming. *Id.* at 14. This objection is waived, and fails in any event.

---

[6] Plaintiffs wrongly assert that interactive streaming is more financially significant than non-interactive streaming, relying entirely on information about the ***music*** industry. Mot. 8. As Plaintiffs' expert acknowledged, Plaintiffs' alleged royalties due from Pandora's non-interactive streaming far exceeded those from interactive streaming. Fakler Decl. Ex. 1 at 44; R&R 31.

*First*, this is a brand-new argument that Plaintiffs never briefed.[7] R&R 46. And because they first raised this during their ***rebuttal*** argument on the ***second day*** of the hearing, Judge Segal correctly found it waived. *See* R&R 47; *Johnson v. Gruma Corp.*, 614 F.3d 1062, 1069 (9th Cir. 2010) (deeming waived contentions raised for the first time at oral argument); *Smith v. Bellco Credit Union*, 2020 WL 8611063 (C.D. Cal. Dec. 14, 2020) (Scarsi, J.) (same).

*Second*, Plaintiffs' newly-minted claim that they lacked knowledge of interactive streaming is flatly inconsistent with their prior admissions. On day one of the hearing, Plaintiffs repeatedly admitted that they *were* aware that Pandora was interactively streaming their routines. Plaintiffs' counsel acknowledged, for example, that "***in the spring of 2017, yes, these recordings are interactively streamed. They know of the use of the recordings***." ECF 491-2 at 35; *id*. at 33-34 (discussing interactive streaming and explaining that ***"[w]hat they know is that their recordings are being streamed"***); *id.* at 70-72 (discussing interactive streaming and admitting that "***[t]he plaintiffs were aware that the sound recordings were streaming***"). Plaintiffs never explain this reversal. Plaintiffs also admitted that Spotify—which licensed comedy in the same manner as Pandora and every other streaming service, broadcaster, and venue (ECF 391-1 at ¶¶ 426, 1548)—began interactively streaming routines in 2011. ECF 491-4 at 263, 269. Yet Plaintiffs undisputedly never objected to Spotify's long-running use either, until Word Collections emerged. Fakler Decl. Ex. 1 at 26-38, 64-72. Clearly, Plaintiffs were perfectly happy for their routines to be streamed for years, irrespective of functionality.[8]

---

[7] Nor did Plaintiffs' raise this argument in the meet-and-confer on the summary judgment motions. Fakler Decl. ¶17.

[8] This argument also make no sense from a copyright law perspective. The only exclusive rights at issue here are the performance right (when a user hears the recording) and the reproduction right (for the server copies used to render the performances). Whether a stream is interactive or non-interactive, the same server copies are used to render the same streaming performances. The only difference is the degree of the user's control over what they hear. Moreover, the "mechanical" license that Plaintiffs harp on is a creature of the music industry, and, for interactive

*Third*, to prop up this newly-concocted argument, Plaintiffs resorted to misleading the Special Master at the eleventh-hour with a stunning—***and completely made-up***—claim during their rebuttal oral argument: that they were supposedly not aware that Pandora ***even offered*** interactive streaming. *See* ECF 491-4 at 260-62. Plaintiffs' counsel even went so far as to claim that Pandora never paid, and Plaintiffs never received, ***any*** royalties for interactive streaming. *Id.* at 308-09; R&R 47 n.8. But there is ample evidence—including deposition testimony and Plaintiffs' own documents—that demonstrates, from at least as early as January 2018, they knew about, and were paid royalties for, interactive streaming on Pandora. Fakler Decl. Exs. 2-13.[9] The frivolousness of this argument is further demonstrated by Plaintiffs' own recording agreements and Pandora's agreements with labels/distributors, which clearly require Pandora to pay Plaintiffs' record companies (instead of SoundExchange) for interactive streaming—***which Pandora undisputedly did*** (ECF 390-3 at ¶ 4)—and require those record companies to pass along a share of those royalties to Plaintiffs. *Id.* at ¶¶ 452-1165.

In any event, as the Special Master rightly concluded, in addition to being waived, this new argument about scope is "not persuasive." R&R 47. Just like with non-interactive streaming, "the evidence points in only one direction, i.e., that Plaintiffs knew that Pandora was interactively streaming their Works, did not object to—and in some cases encouraged—the use, and accepted royalties for same." *Id.* 48.

---

streaming, only applies to musical compositions. 17 U.S.C. § 115; *see also* ECF 491-4 at 331-333.

[9] Although the specific exhibit cited by Pandora on-the-fly during the rebuttal phase of the hearing responding to this "new argument" related to interactive streaming on YouTube, *see* R&R 47 n.8 and Mot. 11, this additional evidence, while not part of the summary judgment record because the argument was never previously raised, demonstrates that Plaintiffs knew that their routines were interactively streaming on Pandora, and that counsel knew, or should have known, that these representations were false. Indeed, only after Pandora told Plaintiffs that it intended to file these confidential exhibits with the Court did they file a letter, which the Court struck, mischaracterizing the false statements made to the Special Master. ECF 504, 506.

This silence—when coupled with any one of the below-discussed "plus" factors—is sufficient to establish an implied license. That there is undisputed evidence of ***each*** plus factor for ***each*** Plaintiff confirms beyond doubt that Pandora has an implied license.

***Encouragement:*** The Special Master correctly found that Plaintiffs went beyond silent acquiescence and "actively encouraged" Pandora's use of their routines, "knowing they stood to reap substantial monetary and promotional benefits." R&R 38-39; *see also* Fakler Decl. Ex. 1 at 82-96 (cataloging Plaintiffs' encouragement, including all taking advantage of Pandora's AMP program). Such "encouragement," the Special Master found, is "part of the 'totality of the circumstances' inquiry." R&R 39 (citing *Stevens v. CoreLogic, Inc.*, 194 F. Supp. 3d 1046, 1053-1054 (C.D. Cal. 2016), and *Khachatryan v. 1 Hotel West Hollywood L.L.C.*, 2024 WL 3015504, at \*4 (C.D. Cal. June 14, 2024).

In response, Plaintiffs first contend that their encouragement is "irrelevant," pointing again to *Flo & Eddie*. Mot. 9. As noted (*supra* 6), that ***class-certification*** decision is inapposite—its implied license discussion is dictum, because the defense was waived. *Flo & Eddie*, 2015 WL 4776932, at \*12. Moreover, the court concluded that Sirius XM could not maintain an implied license defense because it "decided not to formally license these recordings for performance based on its interpretation of the law" as Sirius XM (rightly, as it turned out) understood that there was no public performance right at all for the pre-1972 recordings at issue. *Id*. The situation here is unlike *Flo & Eddie*: Pandora has never stated that it need not license comedy routines as a matter of law, but rather that it secured all necessary rights—expressly from labels and impliedly from Plaintiffs.

Plaintiffs next question the Special Master's conclusion that each Plaintiff signed up for Pandora's AMP program, claiming that three Plaintiffs and one representative had not personally heard about AMP. Mot. 9-10. Plaintiffs are

individuals and corporations surrounded by many advisors, any of whom could have signed them up for AMP. Fakler Decl. Ex. 1 at 129-132. For example, while Plaintiff Clay may not know or remember what AMP is, his girlfriend did, and she engaged with Pandora to get him (and many others) an AMP account. ECF 365-150 (Pan. Ex. 550). Plaintiffs fail to undermine the Special Master's finding, based on Pandora's unrefuted internal records, that each Plaintiff encouraged Pandora's use of their routines.[10]

***Accepting Royalties Without Objection:*** "Plaintiffs do not deny having received royalties" for nearly a decade without ever claiming to have been owed more. R&R 39-40. And under *UMG Recordings, Inc. v. Disco Azteca Distributors, Inc.*, 446 F. Supp. 2d 1164 (E.D. Cal. 2006) and *ExperExchange, Inc. v. Doculex, Inc.*, 2009 WL 3837275 (N.D. Cal., Nov. 16, 2009), accepting royalties without objection "gives rise to an implied license as a matter of law." R&R 39 (citations omitted).

Plaintiffs complain that these were "sound recording" royalties and not royalties for the routines themselves. Mot. 10-11. But Plaintiffs were "all counseled, experienced and well known comedians" who could have demanded an additional royalty had they wanted. R&R 40. The only plausible inference is that Plaintiffs were satisfied with this lucrative arrangement until Word Collections and Spoken Giants convinced them otherwise. Moreover, the distinction is irrelevant to Plaintiffs' objective intent. Plaintiffs' claims are based solely upon Pandora's streaming of their recordings. Plaintiffs do not allege that Pandora made any use of their routines other than as embodied in those recordings.

Plaintiffs also argue that the Special Master may have been "misled" by her decision not to rely on "industry custom and practice evidence." Mot. 11. But as Judge Segal noted, "Plaintiffs simply cannot have it both ways" by pointing to

---

[10] Plaintiffs misrepresent or ignore the additional encouragement evidence cited by the Special Master. R&R 38-39; Fakler Decl. Ex 1 at 83-96.

Plaintiffs' purported ignorance of their rights on the one hand, while suggesting there was a supposedly well-known "industry custom" to "require users of comedy routines to pay for the routines separately" on the other. R&R 40.

***Intent to Convey All Necessary Rights:*** The Special Master also correctly found support from Plaintiffs' admitted intent to "convey all rights necessary" and for their labels to pass those rights on to Pandora. *See* R&R 37; Fakler Decl. Ex. 1 at 98-113 (cataloging undisputed evidence of Plaintiffs' intent and conduct in this regard).

In response, Plaintiffs mischaracterize their own conduct as "irrelevant," claiming that what matters is whether the labels passed along the rights to Pandora. Mot. 7. But that relates only to express license.[11]

### (2)    The Special Master Correctly Rejected Each of Plaintiffs' Additional Arguments

The R&R carefully considered each of Plaintiffs' additional arguments and rightly concluded that none of them negated Pandora's entitlement to an implied license. R&R 42-51. These include:

***SEC Disclosures*:** "Pandora's SEC statements are not in conflict with an implied license." R&R 42. Those filings disclosed that Pandora was paying "content acquisition costs" (royalty payments) pursuant to "industry custom and practice" to the owners of the "sound recordings in which such literary works are embodied." *Id*.[12] That Pandora was paying, and comedians were accepting without objection,

---

[11] Plaintiffs continue to insist there is no difference between comedy and music licensing and now, for the first time, even assert that no agreements between comedians and labels give the label the ability to pass on public performance rights to comedy routines. Mot. 7. That is exactly what Plaintiffs' agreements with their labels do. R&R 43-44; Fakler Decl. Ex. 1 at 28-38, 98-113; *Marvez v. Uproar Ent.*, 2022 WL 18284896, at *2 (C.D. Cal. Dec. 12, 2022). Plaintiffs' only supporting citation is to paragraph 8 of the Rosenblatt Rebuttal, but Mr. Rosenblatt admitted at deposition that this paragraph relates only to music and not comedy. Fakler Decl. Ex. 14 (Rosenblatt Dep. Tr. 282-290).

[12] Plaintiffs' insinuation that these risk factors are admissions that Pandora lacked implied or express licenses is wrong. The unrebutted testimony of Professor Kothari

royalties for sound recording licenses is entirely consistent with an implied license, and Plaintiffs' belated reliance on *Flo & Eddie*, *see* Mot. 12, is unavailing: unlike here, Sirius XM's decision to forego specific licenses for pre-1972 recordings was based on its understanding of the law.[13]

**Pandora's Express Agreements:** Plaintiffs assert that an implied license is inconsistent with Pandora's agreements with labels/distributors. Mot. 13. But Plaintiffs have already admitted that these agreements ***do not*** foreclose an implied license. ECF 491-2 at 131 ("So to your question, does [the language in the Pandora agreements with labels and distributors] preclude the possibility of an implied license? I don't think it does…"). In any event, to be relevant to Pandora's implied license defense, Pandora's express agreements would have to clearly preclude any implied licenses from Plaintiffs. They do not: Pandora's implied license defense does not depend on any express agreements, but arises from "Plaintiffs' conduct over a period of many years." R&R 43.

**Pre-Litigation Communications:** The Special Master correctly found nothing in Pandora's pre-suit communications with Word Collections that was inconsistent with an implied license. R&R 45-46. No part of the implied license test required Pandora to disclose to Word Collections its licensing arrangements, and given Word Collections' threats, the effort would have been futile anyway.[14] *Id.*

**Purported "Revocation":** Plaintiffs admit that the Special Master acknowledged their argument about a purported "revocation" of the implied license when Word Collections threatened Pandora with infringement litigation in 2020. Mot. 14-15. Plaintiffs are wrong, though, that the Special Master "fails to address

---

makes clear that "in no sense are [SEC risk factors] admissions of wrongdoing or statements by the company that it will face any sort of liability." ECF 340-36 at ¶ 6; *id.* ¶¶ 8, 32.

[13] Plaintiffs' related arguments made in connection with estoppel and express license (Mot. 21, 23) fail for the same reasons.

[14] Plaintiffs' related argument made in connection with express license (Mot. 21) fails for the same reasons.

this contention." *Id.* 15. The R&R credited the undisputed evidence that "the implied license was not revoked when Word Collections approached Pandora because it told Pandora to keep streaming [the] recordings, and that Pandora did not tacitly admit that it lacked an implied license." R&R 31; ECF 439-2 (Plaintiffs' SGD to Pandora's AUMF) at ¶¶ 2634, 2659.

## II.  THE SPECIAL MASTER CORRECTLY FOUND THAT EQUITABLE ESTOPPEL APPLIES

Equitable estoppel bars Plaintiffs' claims. R&R 51-53. "Four elements must be present to establish the defense of estoppel: (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury." *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir. 1960) (cited in R&R 51). Plaintiffs' objections to the Special Master's finding that each element is present are meritless.

*First*, Plaintiffs argue "the Report uses the wrong test for equitable estoppel." Mot. 22. But Plaintiffs endorsed that *same test* in moving for summary judgment. Dkt. 347-2 at 29 (citing *Disalle v. Lensi*, 2024 WL 3221732, at *7 (C.D. Cal. May 7, 2024)). Plaintiffs nonetheless argue that *Petrella v. Metro-Goldwin Mayer, Inc.*, 572 U.S. 663 (2014), created a new standard for equitable estoppel.[15] Mot. 22. Mischaracterizing *Petrella*, Plaintiffs argue that equitable estoppel applies "***only*** when a copyright owner engages in 'intentionally misleading misrepresentations concerning [Plaintiffs'] abstention from [bringing] suit,'" and suggest that a plaintiff's "delay" is insufficient. *Id*. (emphasis added).

*Petrella* said nothing of the sort; only laches, a different defense, was on appeal in *Petrella*. 572 U.S. at 667. The Court, having noted that the "courts below did not

---

[15] *Disalle* post-dates *Petrella*, and applied the same four-element test the Special Master endorsed.

address the estoppel plea," *id*. at 684 n.21, could not have narrowed the estoppel test. In the *dicta* Plaintiffs cite, the Court simply observed that estoppel, in contrast to laches, remains a viable defense in copyright actions, including where plaintiff's "[d]elay may be involved." *Id*. at 684-85.

In any event, Plaintiffs' actions were misleading. Courts have long held that equitable estoppel may arise when silence or "inaction" becomes "misleading inaction." R&R 51 (collecting cases). That occurs when, as here, silence combined with other factors leads to a party's detrimental reliance. *E.g.*, *Cal. Inst. Of Tech. v. Hughes Commc'ns, Inc.*, 2015 WL 11089495, *6 (C.D. Cal. May 5, 2015). Among the more salient factors is "prolonged" inaction, which undisputedly occurred here. *Interscope Recs.*, 2010 WL 11505708, at *12.

*Second*, Plaintiffs argue the Special Master erred in concluding there is no genuine dispute that all four estoppel elements are present. They are wrong.

**Knowledge**: Plaintiffs undisputedly knew for years that Pandora was streaming their routines. *See supra* 8-11. Plaintiffs argue such knowledge is irrelevant because they were unaware the streaming was "infringing." Mot. 22-23. But it is knowledge of the "facts"—not of the law—that matters.[16] *See Hampton*, 279 F.2d at 104; *Kramer v. From The Heart Prods., Inc.*, 300 F. App'x 555, 556 (9th Cir. 2008) (plaintiffs "knew" defendants "were going to do the acts [plaintiffs] later claimed were infringing").

**Plaintiffs' intent**: Plaintiffs argue there is "no evidence" that they "intended to deceive Pandora into thinking it had a license." Mot. 23. But again, the undisputed evidence shows Plaintiffs knew for years that Pandora was streaming their routines, encouraged the use, and never objected to it or asked for an additional license or royalty. *See supra* 8-13. Even after Word Collections threatened Pandora with

---

[16] This claim is also at odds with Plaintiffs' claim that they never gave their labels public performance rights to the routines. Mot. 7. If true, Plaintiffs must have known of the alleged "infringing conduct." Plaintiffs cannot have it both ways.

litigation, it asked Pandora to continue streaming the routines Plaintiffs now sue on. ECF 439-2 (Plaintiffs' SGD to Pandora's AUMF) at ¶¶ 2634, 2659. Those undisputed facts constitute misleading inaction. *See Kramer*, 300 F. App'x at 557.

*Ignorance*: The Special Master rightly concluded based on Plaintiffs' years of misleading inaction that Pandora "believ[ed] that Plaintiffs agreed to streaming the Routines" and had no reason to know Plaintiffs "believed they were entitled to additional royalties." R&R 53.

*Detrimental Reliance*: Pandora detrimentally relied on Plaintiffs' misleading inaction by continuing to stream Plaintiffs' routines (unwittingly increasing its exposure), "only to face this litigation long after the streaming began." *Id*. Had Pandora known Plaintiffs would lie in wait, it could have stopped streaming Plaintiffs' routines years earlier. Indeed, when Word Collections first approached Pandora with the novel claim that Pandora needed to take an additional license, Pandora promptly offered to take the recordings down. Word Collections requested that Pandora continue streaming the recordings. ECF 439-2 (Plaintiffs' SGD to Pandora's AUMF) at ¶¶ 2634, 2659. That Pandora *continued* streaming the routines, creating increased litigation exposure, shows detrimental reliance. *See Hadady Corp. v. Dean Witter Reynolds, Inc.*, 739 F. Supp. 1392, 1399-1400 (C.D. Cal. 1990) (finding defendant's "detrimental reliance" was "evidenced by the present copyright infringement claim").

## III. THE SPECIAL MASTER CORRECTLY FOUND THAT PANDORA HAS EXPRESS LICENSES TO USE THE ROUTINES

Plaintiffs' infringement claims are also defeated by Pandora's express contractual rights.

Plaintiffs conveyed to their record labels all necessary rights to the routines—not just "mechanical" rights, as Plaintiffs now claim. *Compare* Mot. 6-7 *with* ECF 491-2 at 45 ("I will say it again, the sound recordings were streaming. The labels

1  could have passed through the rights.") and 65 ("the record labels could have passed

2  through their rights"); *see also* Fakler Decl. Ex. 1 at 25-38, 98-113.

3      Some of Plaintiffs' agreements "expressly convey any 'spoken word'

4  compositions contained in the sound recordings." R&R 43. Others "either (i) deliver

5  any rights necessary to commercialize/distribute the albums or (ii) broadly convey

6  all rights to the recordings without any carveouts (in contrast to carveouts for musical

7  compositions)." *Id*. 43-44 (citing undisputed facts across all agreements). In turn, the

8  record labels and their distributors passed along all needed rights to Pandora. R&R

9  37; Fakler Decl. Ex. 1 at 28-38, 98-113 (collecting undisputed evidence of Plaintiffs'

10  understanding and intent).

11      The Special Master appropriately considered *Marvez*, 2022 WL 18284896—

12  the ***only*** other case that evaluates the purported infringement of comedy routines

13  when the recordings embodying those routines were streamed—concluding that the

14  "*Marvez* reasoning applies here." R&R 53. In *Marvez*, as here, the "agreement's

15  'plain language' necessarily included the rights to the routines or jokes because

16  without such rights, the purpose of the agreement (*i.e.*, to distribute the comedian's

17  performances) would have been impossible." *Id*. Plaintiffs discuss only part of

18  *Marvez's* rationale—the disclaimer of mechanical royalties—while ignoring its

19  primary holding: that "the plain language of the recording agreement states that

20  Uproar shall have the 'exclusive rights to reproduce, distribute the Master Sound

21  Recordings throughout the world'" and that "[i]t would be impossible" to do so if

22  Uproar "did not also have permission to use the underlying comedy routines fixed in

23  the sound recordings." *Marvez*, 2022 WL 18284896, at *2. So too here.

24      Plaintiffs next claim that Pandora's agreements with labels/distributors carve

25  out rights to the routines. Mot. 16. Not so. These agreements provide Pandora with

26  all rights needed to stream recordings with the exception of ***musical*** works rights—

27

28

rights that are typically owned and controlled by third-party music publishers. ECF 335-4 at ¶¶ 12, 15-54; Pandora AUMF, ¶¶ 2291-2542.

Plaintiffs first assert that the agreements' use of defined terms such as ███████ ████████████████████████████████████████████ Mot. 16-17. But that logic is akin to claiming that buying a loaf of bread amounts to stealing the flour in the bread—the routines are inseparably embodied in the licensed recordings. Indeed, Plaintiffs' terse discussion of these defined terms glosses over critical language; for example, while Plaintiffs claim that the terms ███████████████ ████████████████████████████████████████████████████ ███████████████████, Mot. 16-17, ██████████████████████ ████████████████████████████████████████████ ECF 358-6 at 2.a. ██████████████████████████████ *Id.* at 2.g. The subsequent agreement between Pandora and Distrokid further clarified this by defining ███████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ECF 336-16 (emphasis added). Indeed, each agreement that Plaintiffs reference explicitly excludes rights in musical compositions. If the grant of rights was truly limited to recordings—and not underlying material—these exclusions would be unnecessary.

The only other provisions that Plaintiffs address concern Pandora's need to secure certain necessary third-party rights. But those provisions are inapplicable here because the labels ***already secured*** all necessary rights to the routines. R&R 45. That these provisions have no bearing on the routines was made clear in ordinary course business communications from the Orchard, which has an agreement identical to Sony's, where it confirmed that the Orchard always obtained the necessary rights to

comedy routines and passed them through to streaming services.[17] *Id.* 44; Pandora AUMF ¶¶ 2364-2367.

Plaintiffs next turn to extrinsic evidence that purports to show that the labels withheld rights to the routines. Yet Plaintiffs never explain ***why*** the labels would secure rights to the routines only to withhold them. That gains them nothing and only risks defeating the agreements' purpose of getting the recordings streamed so that royalties can be earned. *Marvez*, 2022 WL 18284896, at *2. Plaintiffs' extrinsic evidence fails:

***Label Declarations***: Plaintiffs claim that the R&R "makes no reference" to the Parry and Drexler Declarations claiming that Warner and ADA did not pass through rights in routines. Mot. 19. Incorrect. Judge Segal referenced these declarations, R&R 6, but rightly gave them no weight as they are inadmissible and irrelevant to proving the objective meaning of the agreements.[18] The newfound views alleged in these declarations were never expressed to Pandora before this litigation and, as Plaintiffs recognize, "[s]tatements about unexpressed subjective intent … are inadmissible[.]" Mot. 19 (citation omitted). Moreover, Word Collections previously agreed that ███████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ECF 338-35; ECF 394-31 at 254-255. As Plaintiffs' own expert recognized, ████████████████████ ███████████████████████████████████████████████████. ECF 394-32 at 214-217.[19]

---

[17] Plaintiffs wrongly claim that this communication is limited to Spotify and imply that the rights to comedy routines were granted in exchange for additional compensation. Mot. 20. The email in fact states that the ████████████████ ███████████████████████████████████████████████████████████████ █████████████████████████████████████████. Pandora AUMF ¶¶ 2364-2367.

[18] These declarations should also be excluded because neither declarant was disclosed in Plaintiffs' Amended Initial Disclosures. ECF 440-3 at 9-10, 72-73; ECF 259-11.

[19] The declaration from the Orchard's General Counsel says nothing about what rights were provided. As noted, that same General Counsel made clear in ordinary course communications that the Orchard always secured and passed along rights in routines. Pandora AUMF ¶¶ 2364-2367.

20

*George White Testimony*: Plaintiffs wrongly claim that George White's Declaration conflicts with his deposition testimony. Mr. White was initially asked about isolated portions of the Sony Agreement. ECF 391-3 at 155-163. Once given the opportunity to review the full agreement, he clarified that under the agreement as a whole, the only "third-party" rights Pandora needs to secure are musical works rights (his prior answers were limited to the specific portions he was asked about). ECF 431-6 at 167-170, 183-186, 197; ECF 335-4 at ¶¶ 15-25.

*Pandora's Reinstatement Agreements*: Plaintiffs protest that the Special Master did not make more of the reinstatement agreements between record labels and Sirius XM/Pandora.[20] Mot. 20. These agreements only reinforce an express license: they confirm that labels always secured and provided Pandora with the rights needed to comedy routines. *E.g.*, ECF 342-36; ECF 341-109. Plaintiffs mischaracterize the one third-party communication they raise: Pandora never "admitted" to Surfdog that there were no "prior agreements." *Compare* Mot. 20 *with* ECF 351-43. Pandora merely clarified that the longstanding agreement between Pandora and independent record labels was based on conduct and was being memorialized in a new written agreement. That clarification was only needed because Surfdog was new to comedy; it had previously only released music albums. ECF 394-35 at 71-72; ECF 394-7 at ¶8.

*Custom and Practice*: Plaintiffs' complaint that Judge Segal declined to consider industry "custom and practice" rings hollow; they consistently argued that custom and practice is irrelevant. *E.g.*, ECF 356-1 at 7. In any event, comedy industry custom and practice only reinforces the Special Master's finding. The only witnesses with actual experience in comedy licensing and in both comedy and music

---

[20] Plaintiffs, without seeking leave, filed a revised brief days after their deadline, materially changing a footnote. ECF 498. There, Plaintiffs insinuate, without evidentiary support, that the Orchard was asked to sign a reinstatement agreement but did not. Not so. Pandora only sent reinstatement agreements to comedians and independent record labels (not their distributors), and only when asked for one. ECF 495-5 at ¶¶ 4-10. The revised brief should be rejected as untimely.

21

licensing—Messrs. Del Bene and Vaughn—both made clear that licensing practices in the music and comedy industries differ and that comedy routines, unlike musical works, have always been licensed to streaming services together with the recordings through a single agreement with record labels. ECF 335-33; ECF 335-3.[21]

Far from creating genuine disputed issues of material fact, Plaintiffs' extrinsic evidence reinforces that Pandora has an express license.

## CONCLUSION

The Court should overrule Plaintiffs' Objections, adopt the R&R, grant summary judgment for Pandora, and deny summary judgment to Plaintiffs.

---

[21] Plaintiffs' comedy licensing "expert" was excluded due to his lack of relevant experience; Plaintiffs' expert Ms. Libera offered no opinions about comedy recording licensing; and Plaintiffs' expert Mr. Rosenblatt acknowledged that his only experience with licensing relates to music. ECF 486 at 21-22; Plaintiff Ex. 117.1; ECF 415-8 at 54-55.

DEFENDANT PANDORA MEDIA, LLC'S OPPOSITION TO MOTION FOR REVIEW;
CASE NO. 2:22-cv-00809-MCS-MAR

Dated:  July 30, 2025

MAYER BROWN LLP
PAUL M. FAKLER *(pro hac vice)*
JACOB B. EBIN *(pro hac vice)*
ALLISON AVIKI *(pro hac vice)*
DAVID YOLKUT *(pro hac vice)*
pfakler@mayerbrown.com
jebin@mayerbrown.com
aaviki@mayerbrown.com
dyolkut@mayerbrown.com
1221 Avenue of the Americas
New York, NY 10020-1001
Telephone: (212) 506-2500
Facsimile:  (212) 262-1910

By: */s/ Paul M. Fakler*
_____
Paul M. Fakler

MAYER BROWN LLP
JOHN NADOLENCO (SBN 181128)
MAX W. HIRSCH (SBN 301872)
MICHAEL A. CALVANICO (SBN 344792)
jnadolenco@mayerbrown.com
mhirsch@mayerbrown.com
mcalvanico@mayerbrown.com
333 S. Grand Avenue, 47th Floor
Los Angeles, California  90071-1503
Telephone:  (213) 229-9500
Facsimile:  (213) 625-0248

Attorneys for Defendant
PANDORA MEDIA, LLC

DEFENDANT PANDORA MEDIA, LLC'S OPPOSITION TO MOTION FOR REVIEW;
CASE NO. 2:22-cv-00809-MCS-MAR

## **FILER'S ATTESTATION**

The undersigned, counsel of record for Defendant Pandora Media, LLC, certifies that this brief contains 6,999 words, which complies with the word limit set forth in Local Rule 11-6.

Dated: July 30, 2025                    By: */s/ Paul M. Fakler*
                                              Paul M. Fakler